| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )  Cr. No. 01-10384-MLW |
| | ) |
| GARY LEE SAMPSON | ) |

ORDER

WOLF, D.J.                                                    October 20, 2011

The attached version of the October 20, 2011 Memorandum and
Order on Jury Claim is being filed for the public record. In order
to strike the appropriate balance between personal privacy
interests, see In re Globe Newspaper Company, 920 F.2d 88, 95 (1st
Cir. 1990), and transparency concerning the reasons for judicial
decisions, it replaces the names of jurors and third-parties with
initials, and includes minor redactions concerning particularly
sensitive information regarding third-parties. An unredacted form
of the Memorandum and Order on Jury Claim that includes the names
of the jurors and third-parties is being filed under seal and
provided to the parties.

                                    UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA, )
                          )
            v.            )    Cr. No. 01-10384-MLW
                          )
GARY LEE SAMPSON          )

## MEMORANDUM AND ORDER ON JURY CLAIM

WOLF, D.J.                                           October 20, 2011

I.    SUMMARY

On July 24, 2001, Gary Lee Sampson murdered Philip McCloskey and attempted to steal his car. On July 27, 2001, Sampson murdered Jonathan Rizzo and stole his car. Then, on July 30, 2001, in New Hampshire, Sampson murdered Robert Whitney and later took his car as well. On July 31, 2001, William Gregory picked up Sampson who was hitchhiking in Vermont. Gregory escaped Sampson's attack on him. Soon after, Sampson called 911 and surrendered to the Vermont State Police. Sampson quickly confessed to the murders of McCloskey, Rizzo, and Whitney.

In October, 2001, Sampson was charged in this federal court with two counts of carjacking resulting in the deaths of McCloskey and Rizzo, respectively. As permitted but not required by the Federal Death Penalty Act of 1994, 18 U.S.C. §3591 et seq., the government decided to seek the death penalty.

Sampson pled guilty to the charges against him. Pursuant to the legal requirements established by the Supreme Court and codified in the Federal Death Penalty Act, a trial was nevertheless

required to permit a jury to determine whether Sampson should be executed.

Under the Sixth Amendment, every defendant in a criminal case has a constitutional right to be tried by an impartial jury. U.S. Const. Amend. VI. An impartial jury is a "touchstone of a fair trial" and has been defined as a "jury capable and willing to decide the case solely on the evidence before it." McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 554 (1984)(internal quotation omitted). Therefore, to qualify as an impartial juror an individual must not have views or personal experiences that will prevent or substantially impair his or her ability to decide a matter based solely on the evidence.

In the conventional criminal case in which the jury is asked to decide unanimously only whether guilt has been proven beyond a reasonable doubt, the existence of even a single partial person on the jury requires a new trial. In a Federal Death Penalty Act case it is particularly important that each and every juror be able to decide the case based solely on the evidence and, therefore, be impartial. The Supreme Court has held that: "the penalty of death is qualitatively different from a sentence of imprisonment, however long . . . . Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305

2

(1976)(plurality opinion). To implement this principle, the Federal Death Penalty Act provides that if even one juror does not find the death penalty to be justified the defendant may not be executed. See 18 U.S.C. §§3593, 3594; Jones v. United States, 527 U.S. 373, 380-81 (1999). Therefore, each juror has the power to decide that a defendant will live rather than die. Each juror must be able to make that decision based solely on the evidence, uninfluenced by personal experiences that he or she may have had. The Supreme Court has held that if even one member of a jury that has sentenced a defendant to death was not impartial, that sentence must be vacated. See Morgan v. Illinois, 504 U.S. 719, 729 (1992).

At trial, the court and the parties made an extensive effort to assure that each and every juror in this case would be able to decide whether Sampson should be sentenced to death based solely on the evidence. Hundreds of potential jurors were required to answer in writing, under oath, seventy-seven questions designed to elicit information concerning any possible bias or prejudice that the potential juror recognized and was willing to reveal, and also to elicit information concerning life experiences that might subconsciously injure an individual's ability to decide Sampson's case based solely on the evidence. Many potential jurors were excused based on their written responses alone. Many other jurors were questioned individually, again under oath, to determine whether they could decide whether Sampson should live or die based

3

solely on the evidence and were, therefore, eligible to serve as jurors in his case. The jury selection process lasted seventeen days.

The court recognized that the written and oral questioning would involve matters a potential juror might regard as private and sensitive. Therefore, the potential jurors were told that, upon request, the questioning and their responses on such sensitive subjects would not be made part of the public record. They were also repeatedly told, however, that it was essential that they answer every question honestly and accurately.

During weeks of individual questioning, potential jurors were excused for cause for a range of conventional reasons. Some were excused because of pretrial exposure to information about the case or because of the existence of attitudes they acknowledged that raised serious questions about their ability to be impartial. Other potential jurors were excused for cause because they had emotional life experiences that were comparable to matters that would be presented in Sampson's case and created a serious risk that they would not be able to decide whether the death penalty should be imposed based solely on the evidence. In addition, potential jurors were excused when it was discovered that they had responded to written or oral questions dishonestly.

Eventually, twelve deliberating jurors, including C, and six alternates were empaneled. During the trial, two jurors were

excused when it was discovered they had answered voir dire questions dishonestly.

At trial, the jurors heard evidence of, among other things: the manner in which Sampson murdered McCloskey, Rizzo, and Whitney, and the fear his victims undoubtedly experienced; Sampson's threats to shoot female bank tellers in the course of robberies; Sampson's substance abuse and the fact that one of his marriages ended because of it; Sampson's experiences in prison; and Sampson's parents' refusal to speak to his attorneys. Ultimately, the jury unanimously decided that Sampson should be executed for the murders of McCloskey and Rizzo.

The court subsequently denied motions to question jurors about their verdict and for a new trial. In January, 2004, it sentenced Sampson to be executed. The Court of Appeals for the First Circuit affirmed the death sentence. The Supreme Court declined to review the case.

As required by the Federal Death Penalty Act, this court then appointed new counsel for post-conviction proceedings. In May, 2009, Sampson filed a motion for a new trial pursuant to 28 U.S.C. §2255 ("the §2255 Motion"), alleging that his constitutional rights had been violated. Among other things, Sampson alleged that he had been deprived of his right to have his sentence decided by an impartial jury. This contention was based on evidence developed by Sampson's new counsel that three jurors, including C, had answered

5

voir dire questions inaccurately. Sampson also argued that their inaccurate answers deprived him of his right to exercise his peremptory challenges on a properly informed basis.

Because material facts were in dispute, in November, 2010, the court conducted a hearing in which the three jurors were required to testify concerning their inaccurate responses to voir dire questions. The court finds that two of these jurors made unintentional errors in responding to voir dire questions and that Sampson is not entitled to a new trial because of those errors.

However, as explained in detail in this Memorandum, the court also finds that C intentionally and repeatedly answered a series of questions dishonestly in an effort to avoid disclosing or discussing painful experiences she had endured concerning her daughter J and her former husband P. Her dishonesty began when she filled out her questionnaire in September, 2003, continued when she returned for individual voir dire in October, 2003, and was repeated when she was required to testify in these §2255 proceedings.

More specifically, C intentionally lied during the jury selection process in response to questions that should have elicited the facts that: in 2000 her husband P had a rifle or shotgun and threatened to shoot her; C had feared that P would kill her; as a result, C obtained an Abuse Prevention Order against P; P was later arrested in her presence and prosecuted for violating

6

that Order; C's marriage to P ended because of his substance abuse; J also had a drug problem; and J's drug abuse resulted in her serving time in prison, where C visited her. As information concerning these experiences involving J and P emerged slowly in the course of three hearings in these §2255 proceedings, C repeatedly characterized each of those experiences as "horrible" and a "nightmare." She often cried when required to think about these matters. She was frequently unable to discuss them candidly or coherently.

In McDonough, the Supreme Court described the circumstances in which inaccurate responses to voir dire questions would deny a party his right to an impartial jury and, therefore, require a new trial. See 464 U.S. at 556. It stated:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial.

Id.

Accordingly, for the reasons explained in detail in §III of this Memorandum, to obtain relief under McDonough, Sampson was required to prove by a preponderance of the evidence that: (1) C was asked a question during voir dire that should have elicited particular information; (2) the question was material; (3) C's response was dishonest, meaning deliberately false, rather than the

7

result of a good faith misunderstanding or mistake; (4) her motive for answering dishonestly relates to her ability to decide the case solely on the evidence and, therefore, calls her impartiality into question; and (5) the concealed information, when considered along with the motive for concealment, the manner of its discovery, and C's demeanor when required to discuss J and P, would have required or resulted in her excusal for cause for either actual bias, implied bias, or what the Second Circuit characterizes as "inferable bias."

The court finds that Sampson has satisfied his burden of proving every element of the McDonough test. C did not falsely answer any question as part of a conscious effort to become a juror and punish Sampson for the abuse inflicted on her by P. However, it has been proven that during the jury selection process C dishonestly answered all material questions that should have revealed important events concerning J and P because C was deeply ashamed, and became distraught when required to think about them. She repeatedly lied because the events concerning J and P were too painful for her to disclose or discuss. C's decision to lie rather than reveal these events demonstrates the tremendous emotional impact that they had on C at the time of the voir dire and calls her impartiality into question.

The matters about which C repeatedly lied under oath were comparable to matters presented by the evidence in Sampson's case.

8

C dishonestly did not disclose prior to the empanelment that, among other things, she had been threatened with being shot and killed, had ended a marriage due to her husband's substance abuse, and felt deeply ashamed of her daughter's criminal activity, drug abuse, and incarceration. If these matters had been revealed, the court would have found that there was a high risk that after being exposed to the evidence at trial C's decision on whether Sampson should be executed would be influenced by her own life experiences and, therefore, a high risk that she would be substantially impaired in her ability to decide whether Sampson should be executed based solely on the evidence. Like other potential jurors, C would have been excused for cause solely for that reason. The decision to excuse her for cause would have been reinforced by her demonstrated dishonesty, which was alone a reason that other potential jurors were excused for cause.

As the requirements of McDonough have been satisfied, the court is compelled to vacate Sampson's death sentence and grant him a new trial to determine his sentence. In essence, despite dedicated efforts by the parties and the court to assure that the trial would be fair and the verdict final, it has now been proven that perjury by a juror resulted in a violation of Sampson's constitutional right to have the issue of whether he should live or die decided by twelve women and men who were each capable of deciding that most consequential question impartially.

As the court said in sentencing Sampson in 2004, his crimes were "despicable." United States v. Sampson, 300 F. Supp. 2d 275, 276 (D. Mass. 2004). Sampson "destroyed the lives of Philip McCloskey, Jonathan Rizzo, and Robert Whitney. [He] deeply and irreparably damaged each of their families. If anyone deserves the death penalty, [Sampson] do[es]." Id. at 278.

However, in sentencing Sampson to die, the court also reasoned that "there is a difference between a murder and an execution. That difference is the fair process by which a jury of citizens from this community [] decided that [Sampson's] death is justified." Id. at 277. It has now been proven that Sampson did not receive the fair process that the Constitution guarantees every man no matter how despicable his conduct. Therefore, Sampson must be given a new trial to determine his sentence.[1]

II. PROCEDURAL HISTORY

On October 24, 2001, a federal grand jury charged Sampson with two counts of carjacking resulting in death in violation of 18 U.S.C. §2119(3). The charges arose out of the killings of McCloskey and Rizzo by Sampson in Massachusetts in July, 2001. See United States v. Sampson, 335 F. Supp. 2d 166, 174-75 (D. Mass. 2004). Sampson also killed Whitney in New Hampshire and carjacked

---

[1]Sampson is not entitled to a new trial because C's dishonesty at voir dire deprived him of information necessary to exercise his peremptory challenges on a properly informed basis. Such a claim was rejected by the Supreme Court in McDonough, 464 U.S. at 556.

Gregory in Vermont in July, 2001. While not charged in this case, those crimes were considered nonstatutory aggravating factors for sentencing purposes. Although Sampson subsequently pled guilty to both counts, his sentence was determined in a jury trial conducted pursuant to 18 U.S.C. §3593.

To select a jury, the court first required prospective jurors to respond to a written questionnaire. The prospective jurors not immediately excused for cause based on their responses to the questionnaire were subject to individual voir dire by the court and the parties. After additional prospective jurors were excused for cause as a result of individual voir dire, the parties exercised peremptory challenges with respect to the remainder. The court empaneled a jury of twelve deliberating jurors and six alternates. Among the twelve deliberating jurors were C,[2] D,[3] and G.

Following trial, the jury decided that the death penalty should be imposed for each of Sampson's offenses. The court sentenced Sampson to death on both counts on January 29, 2004. See Sampson, 300 F. Supp. 2d at 276. The First Circuit affirmed the death sentences in May, 2007. See United States v. Sampson, 486



F.3d 13, 52 (1st Cir.), reh'g and reh'g en banc denied, 497 F.3d 55 (1st Cir. 2007). Sampson unsuccessfully sought review by the United States Supreme Court, which denied his petition for a writ of certiorari on May 12, 2008. See Sampson v. United States, 553 U.S. 1035 (2008).

On June 25, 2008, the court appointed new counsel for post-conviction proceedings as required by 18 U.S.C. §3599. See June 25, 2008 Order at 8. The court subsequently denied without prejudice Sampson's request for discovery prior to the filing of the instant §2255 Motion. See May 6, 2009 Order at 2. On May 11, 2009, Sampson filed his §2255 Motion. The government filed a Request for Summary Dismissal of the entire §2255 Motion and requested discovery, which the court denied without prejudice pending the outcome of the Request for Summary Dismissal. See March 1, 2010 Order at 4-5. On March 29, 2010, Sampson filed an Amended §2255 Motion. The government did not object and again requested summary dismissal. See Gov't's Response to Pet'r's Mem. of Law Regarding Fed. R. Civ. P. 15 (Docket No. 1044).

Claim IV of the Amended §2255 Motion alleges that C, D, and G provided inaccurate answers to voir dire questions, beginning with inaccurate answers to questions on their respective questionnaires. Sampson claims that he is entitled to relief: (1) under McDonough, supra; (2) because these three jurors were actually or impliedly biased; and (3) because Sampson was prevented from intelligently

12

exercising his peremptory challenges.

For the reasons stated in a session closed to the public on August 31, 2010, the court denied summary dismissal of this claim and held three closed evidentiary hearings.[4] At the first evidentiary hearing, held on November 18, 2010, all three of the implicated jurors testified. At the second evidentiary hearing, held on March 18, 2011, C was recalled to clarify her previous testimony and to testify on certain additional matters. Following the second evidentiary hearing, the court closed the evidentiary record for this claim and ordered the parties to submit proposed findings of fact and conclusions of law. See March 19, 2011 Order. However, after Sampson identified in his proposed findings of fact certain potentially material inconsistencies between C's testimony and her statements to the media, the court recalled C to testify further on August 8, 2011, regarding those inconsistencies. Following this third evidentiary hearing, neither Sampson nor the government requested that the court receive additional evidence, and the parties agreed that further briefing was unnecessary.

III. THE APPLICABLE STANDARDS

A. Right to an Impartial Jury

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a . . . trial,

_____

[4]Much of the record regarding this claim has now been made part of the public record in redacted form. See April 15, 2011 Order at 5-8.

13

by an impartial jury . . . ." U.S. Const. Amend. VI. "One touchstone of a fair trial is an impartial trier of fact – 'a jury capable and willing to decide the case solely on the evidence before it.'" McDonough, 464 U.S. at 554 (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). In the conventional criminal case in which the jury is asked only whether guilt has been proven beyond a reasonable doubt, "[t]he bias or prejudice of even a single juror would violate [a defendant's] right to a fair trial." Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998)(en banc); see also United States v. Gonzalez, 214 F.3d 1109, 1114 (9th Cir. 2000).

Consistent with these generally applicable principles, it has long been "well settled that the Sixth . . . Amendment[] guarantee[s] a defendant on trial for his life the right to an impartial jury." Ross v. Oklahoma, 487 U.S. 81, 85 (1988). In a Federal Death Penalty Act case it is particularly important that each and every juror be impartial. As indicated earlier, the Supreme Court has held that:

> [T]he penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

Woodson, 428 U.S. at 305. To implement this principle, the Federal Death Penalty Act provides that if even one juror does not find the

14

death penalty to be justified the defendant may not be executed, and the court must impose a lesser sentence. See 18 U.S.C. §§3593, 3594; Jones, 527 U.S. at 380-81; see also Sampson, 335 F. Supp. 2d at 240-41 & n.43. In essence, a single juror has the power to decide whether the defendant will live rather than die.

It is essential that every juror be willing and able to make that decision based solely on the evidence. "If even one juror [who is not impartial] is empaneled" and the death sentence is imposed, "the [government] is disentitled to execute the sentence." Morgan, 504 U.S. at 729; see also United States v. Martinez-Salazar, 528 U.S. 304, 316-17 (2000). Therefore, a defendant is deprived of the right to an impartial jury and entitled to a new trial when a juror who is not impartial participates in deciding a case, regardless of whether or not the verdict would have been different. See Dyer, 151 F.3d at 973 n.2 ("The presence of a biased juror cannot be harmless; the error requires a new trial without a showing of actual prejudice."); United States v. Carpa, 271 F.3d 962, 967 (11th Cir. 2001)("If a court determines there was actual bias, the juror's inclusion in the petit jury is never harmless error.").

B. Meaning of Impartiality

An impartial jury, to which every defendant is entitled, is one in which every juror is "'capable and willing to decide the case solely on the evidence before [him].'" McDonough, 464 U.S. at

554 (quoting Smith, 455 U.S. at 217); see also United States v. Villar, 586 F.3d 76, 84 (1st Cir. 2009). Jurors are regularly instructed that one of their duties is to decide the case based solely on the evidence. See United States v. Thomas, 116 F.3d 606, 616-17 n.10 (2d Cir. 1997). However, a juror is not impartial if his experiences, opinions, predispositions, biases, prejudices, interests, or relationships "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" See Wainwright v. Witt, 469 U.S. 412, 424 (1985)(quoting Adams v. Texas, 448 U.S. 38, 45 (1980); see also Cravens v. Smith, 610 F.3d 1019, 1031 (8th Cir. 2010)(juror properly excused for cause after expressing "gut feeling" that he would disfavor insurance company); United States v. Torres, 128 F.3d 38, 47-48 (2d Cir. 1997)(juror properly excused for cause who had structured financial transactions, in case involving evidence of structuring of cash deposits); Hunley v. Godinez, 975 F.2d 316, 319 (7th Cir. 1992)(per curiam)(jurors in case charging burglary and murder should have been excused after they became victims of burglary during trial).

When a judge makes decisions about whether to dismiss a juror for cause during voir dire, or when a litigant argues after trial that he was denied his right to an impartial jury because of a juror's bias, several types of bias are recognized and relevant: actual bias, implied bias, and inferable bias.

16

## 1. Actual Bias

"Actual bias is 'bias in fact.'" Torres, 128 F.3d at 43 (quoting United States v. Wood, 299 U.S. 123, 133 (1936)); see also United States v. Greer, 285 F.3d 158, 171 (2d Cir. 2002). To establish actual bias after a trial, a party must prove that a juror was not "capable and willing to decide the case solely on the evidence before [him]." McDonough, 464 U.S. at 554; see also Rogers v. McMullen, 673 F.2d 1185, 1190 (11th Cir. 1982).

With regard to actual bias, "[a] juror is found by the judge to be partial either because the juror admits partiality . . . or the judge finds actual partiality based upon the juror's voir dire answers." Torres, 128 F.3d at 43; see also Hughes v. United States, 258 F.3d 453, 456 (6th Cir. 2001). Whether a juror is actually biased is a question of fact determined by the trial judge. See Dyer, 151 F.3d at 973 (citing Patton v. Yount, 467 U.S. 1025, 1038 (1984)); Torres, 128 F.3d at 43 (citing Wood, 299 U.S. at 133); Dall v. Coffin, 970 F.2d 964, 970-71 (1st Cir. 1992)(Wolf, D.J., sitting by designation); Amirault v. Fair, 968 F.2d 1404, 1405-06 (1st Cir. 1992).

A juror who is found to be actually biased must be excused for cause. See United States v. Rhodes, 177 F.3d 963, 965 (11th Cir. 1999); Morgan, 504 U.S. at 729. Therefore, a moving party is entitled to a new trial if a judge failed to excuse an actually biased juror based on information available at the time of trial or

if it is later discovered that a juror who was actually biased participated in rendering a verdict. See Dyer, 151 F.3d at 972 n.2; see also McDonough, 464 U.S. at 556 (Blackmun, J., concurring)(recognizing actual bias as a basis for relief). However, absent an admission by the juror, actual bias is difficult to prove, in part because the juror may have an interest in concealing it and in part because the juror may not even be consciously aware of it. See Smith, 455 U.S. at 221-22 (O'Connor, J., concurring). This difficulty is magnified when the issue is addressed many years after trial. See Dyer, 151 F.3d at 981.

## 2. Implied Bias

The difficulty of determining actual bias has led courts to imply bias when "certain circumstances create too great a risk of affecting a juror's decisionmaking process, even if the juror is not, consciously, fully aware of the impact." Fields v. Brown, 503 F.3d 755, 806 (9th Cir. 2007)(Berzon, J., dissenting). As explained by the Supreme Court:

> Bias or prejudice is such an elusive condition of the mind that it is most difficult, if not impossible, to always recognize its existence, and it might exist in the mind of one (on account of his relations with one of the parties) who was quite positive that he had no bias, and said that he was perfectly able to decide the question wholly uninfluenced by anything but the evidence. The law therefore most wisely says that, with regard to some of the relations which may exist between the juror and one of the parties, bias is implied, and evidence of its actual existence need not be given.

Crawford v. United States, 212 U.S. 183, 196 (1909); see McDonough,

464 U.S. at 556 (Blackmun, J., concurring)(recognizing implied bias as a basis for relief); Smith, 455 U.S. at 221-22 (O'Connor, J., concurring)(same); Amirault, 968 F.2d at 1406 (same); see also Conaway v. Polk, 453 F.3d 567, 587 n.22 (4th Cir. 2006)(collecting cases demonstrating continuing viability of the principle).

Implied bias, which is sometimes called "presumed bias," is determined as a matter of law and "attributed to a prospective juror regardless of actual partiality." Torres, 128 F.3d at 45 (citing Wood, 299 U.S. at 133); see United States v. Tucker, 243 F.3d 499, 509 (8th Cir. 2001)(implied bias determined "without regard to [the juror's] subjective state of mind"). Where a juror is impliedly biased, disqualification of the juror is mandatory. See Rhodes, 177 F.3d at 965. Therefore, after trial, a conclusion that a juror who participated in rendering a verdict was impliedly biased entitles the moving party to a new trial. See, e.g., Hunley, 975 F.2d at 319-20.

Bias is implied in "'extreme situations where the relationship between a prospective juror and some aspect of the litigation is such that it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances.'" Sanders v. Norris, 529 F.3d 787, 792 (8th Cir. 2008)(quoting Person v. Miller, 854 F.2d 656, 664 (4th Cir. 1988)); see also Fields, 503 F.3d at 770. "Some examples might include a revelation that the juror is an actual employee of the prosecuting agency, that the

juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." Smith, 455 U.S. at 222 (O'Connor, J., concurring); see also United States v. Brazelton, 557 F.3d 750, 753-54 (7th Cir. 2009)(stating that courts must imply bias if the juror is related to one of the principals in the case, regardless of whether the juror is objective in fact); cf. Treesh v. Bagley, 612 F.3d 424, 437-38 (6th Cir. 2010)(holding that bias should not be implied where a juror had taken a course taught by the prosecutor).

In some circumstances, bias is also implied "when there are similarities between the personal experiences of the juror and the issues being litigated." Skaggs v. Otis Elevator Co., 164 F.3d 511, 517 (10th Cir. 1998). In criminal trials, for example, bias has been implied when the juror was himself, at the time of trial, involved in events that shared significant similarities with the alleged criminal conduct at issue in the case. See Hunley, 975 F.2d at 319-20 (holding, in a case charging murder in the course of a burglary, that bias should be implied where two jurors were the victims of similar burglaries during deliberations); Burton v. Johnson, 948 F.2d 1150, 1159 (10th Cir. 1991)(holding, in murder case in which the defendant presented a defense based on having suffered domestic violence at the hands of the victim, that a juror living in similarly abusive circumstances at the time of trial, and

20

who gave dishonest answers regarding that subject at voir dire, was impliedly biased); United States v. Eubanks, 591 F.2d 513, 517 (9th Cir. 1979)(per curiam)(implying bias where, in a trial for participation in a heroin distribution conspiracy, a juror failed to disclose at voir dire that he had two sons who were serving long prison sentences for heroin-related crimes); cf. Fields, 503 F.3d at 774-75 (holding, in a case involving allegations of robbery, rape and murder, in which the juror answered questions honestly at voir dire, that bias should not be implied where a juror's wife had been beaten, raped and robbed two years prior to voir dire); United States v. Powell, 226 F.3d 1181, 1186, 1189 (10th Cir. 2000)(holding, in case involving charge of kidnaping for sexual gratification, that bias should not be implied where a juror honestly disclosed at voir dire that she had a daughter who had been raped ten years earlier); Torres, 128 F.3d at 46 (holding, in case involving structuring of financial transactions, that bias should not be implied where juror honestly disclosed in response to voir dire question that the juror herself structured transactions "some years before");[5] Amirault, 968 F.2d at 1406 (holding, in a case charging rape of a child, that bias should not be implied where the juror had repressed a memory of being raped as a child forty years earlier and had, therefore, answered voir dire

---

[5]As discussed below, however, in Torres it was held that the juror was properly excused for what the Second Circuit refers to as "inferable" or "inferred" bias. See 128 F.3d at 47.

21

questions honestly).

In addition, bias may be implied "where repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury." Fields, 503 F.3d at 770 (citing Dyer, 151 F.3d at 982); see also Green v. White, 232 F.3d 671, 677-78 (9th Cir. 2000)(holding that a juror was impliedly biased where he "lied twice to get a seat on the jury," provided misleading, contradictory, and false responses when questioned about those lies, and engaged in behavior that brought his impartiality into question). As the Ninth Circuit explained in Dyer, where implied bias was found because a juror repeatedly lied to get on the jury, "[a] juror . . . who lies materially and repeatedly in response to legitimate inquiries about her background introduces destructive uncertainties into the process." Dyer, 151 F.3d at 983; see also Green, 232 F.3d at 676 (holding that a juror's "pattern of lies, inappropriate behavior, and attempts to cover up his behavior introduced 'destructive uncertainties' into the fact-finding process, and, under Dyer, we must presume bias under these circumstances").

Even when prospective jurors are dishonest for reasons other than a desire to secure a seat on the jury, dishonest answers to voir dire questions indicate that a juror is unwilling or unable "to apply the law as instructed by the court to the evidence presented by the parties" and, therefore, are indicative of a lack

of impartiality because a fundamental instruction in every federal case is that a juror must render a verdict "solely on the evidence presented at trial." Thomas, 116 F.3d at 617 & n.10 (citing the Federal Judicial Center's Benchbook for U.S. District Court Judges). Therefore, dishonest answers are a factor that can contribute to a finding of implied bias. See Skaggs, 164 F.3d at 517.

### 3. Inferable Bias

In Torres, the defendants argued that a judge had improperly dismissed a juror who was not shown to have an actual or implied bias, and that the judge's improper dismissal caused the government to gain an additional peremptory challenge. See Torres, 128 F.3d at 42. The defendants were charged with conspiring to violate federal money laundering laws and, at voir dire, the trial judge excused for cause a potential juror who recognized that she herself had at one point engaged in structuring cash transactions. Id. at 41-42. Writing for the Second Circuit, Judge Guido Calabresi rejected the defendants' claim, finding that "there exist a few circumstances that involve no showing of actual bias, and that fall outside of the implied bias category, where a court may, nevertheless, properly decide to excuse a juror. We call this third category 'inferable bias.'" Id. at 46-47.

"Inferable" or "inferred" bias exists "'when a juror discloses a fact that bespeaks a risk of partiality sufficiently significant

23

to warrant granting the trial judge discretion to excuse the juror

for cause, but not so great as to make mandatory a presumption of

bias.'" Greer, 285 F.3d at 171 (quoting Torres, 128 F.3d at 47).

As the Second Circuit wrote with regard to excusing a juror for

inferred bias:

> There is no _actual_ bias because there is no finding
> of partiality based upon either the juror's own admission
> or the judge's evaluation of the juror's demeanor and
> credibility following voir dire questioning as to bias.
> And there is no _implied_ bias because the disclosed fact
> does not establish the kind of relationship between the
> juror and the parties or issues in the case that mandates
> the juror's excusal for cause.
>
> Nonetheless, inferable bias is closely linked to
> both of these traditional categories. Just as the trial
> court's finding of actual bias must derive from voir dire
> questioning, so the court is allowed to dismiss a juror
> on the ground of inferable bias only after having
> received responses from the juror that permit an
> inference that the juror in question would not be able to
> decide the matter objectively. In other words, the
> judge's determination must be grounded in facts developed
> at voir dire. And this is so even though the juror need
> not be asked the specific question of whether he or she
> could decide the case impartially. Moreover, once facts
> are elicited that permit a finding of inferable bias,
> then, just as in the situation of implied bias, the
> juror's statements as to his or her ability to be
> impartial become irrelevant.[6]

---

[6]In Torres, the Second Circuit further explained in a
footnote:

> Nonetheless, a judge may - particularly when
> considering whether some marginal types of disclosed
> facts are enough to show inferable bias - ask about a
> juror's impartiality and might be persuaded by the
> force of the juror's assurance (even though another
> judge would have discretion to take the disclosed fact
> and make a finding of inferred bias without further
> inquiry).

<u>Torres</u>, 128 F.3d at 47; <u>see also</u> <u>Greer</u>, 285 F.3d at 171; <u>United</u> <u>States v. Quinones</u>, 511 F.3d 289, 301 (2d Cir. 2007).

Although declining to define the "precise scope of a trial judge's discretion to infer bias," Judge Calabresi further explained:

> <u>It is enough for the present to note that cases in which</u> <u>a juror has engaged in activities that closely</u> <u>approximate those of the defendant on trial are</u> <u>particularly apt. The exercise of the trial judge's</u> <u>discretion to grant challenges for cause on the basis of</u> <u>inferred bias is especially appropriate in such</u> <u>situations.</u> "Because [in such cases] the bias of a juror will rarely be admitted by the juror himself, 'partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it,' [partiality] necessarily must be inferred from surrounding facts and circumstances." <u>McDonough Power</u> <u>Equip.</u>, 464 U.S. at 558, 104 S.Ct. at 851 (Brennan, J., concurring) (citation omitted).

<u>Torres</u>, 128 F.3d at 47 (emphasis added). Therefore, the category of inferable bias, one courts have long "implicitly assumed to exist," <u>id.</u> at 43, permits a court in its discretion to dismiss a juror because of an inference that the juror will not be able to decide the case solely on the evidence, even though the juror has not been found to be actually biased and does not satisfy the requirements of implied bias.

Such discretion on the part of trial judges deciding matters of juror bias both during trial and after it has also been recognized by the First Circuit. <u>See</u> <u>United States v. Rowe</u>, 144

---

128 F.3d at 47 n.12.

F.3d 15, 20 (1st Cir. 1998)("[W]e will not intervene unless the trial court's denial of a cause-based challenge to a juror constitutes a 'clear abuse.'" (quoting United States v. McNeill, 728 F.2d 5, 10 (1st Cir. 1984))); see also United States v. Rodriguez-Ortiz, 455 F.3d 18, 23 (1st Cir. 2006); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 393-94 (1st Cir. 2002); United States v. Lowe, 145 F.3d 45, 49 (1st Cir. 1998); United States v. Gonzalez-Soberal, 109 F.3d 64, 69-70 (1st Cir. 1997). Although the First Circuit has not expressly recognized inferable bias, its deferential review of trial courts' decisions about juror bias is consistent with the Second Circuit's conclusion that a category of bias must exist for which removal of a juror for cause is permissible, but not mandatory. See Torres, 128 F.3d at 46-47.

C. The Role of Voir Dire

Voir dire examination is intended to assure that every juror is both willing and able to be impartial. See McDonough, 464 U.S. at 554. Voir dire protects the right to an impartial jury "by exposing possible biases, both known and unknown, on the part of potential jurors." Id.; see also Wainwright, 469 U.S. at 423 ("the quest is for jurors who will conscientiously apply the law and find the facts"); Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981)("Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the

26

evidence cannot be fulfilled.").

It can be challenging, however, to determine whether a juror is capable of being impartial in a particular case. See Smith, 455 U.S. at 221-22 (O'Connor, J., concurring); Crawford, 212 U.S. at 196; Fields, 503 F.3d at 806 (Berzon, J., dissenting). As explained earlier, similarities between the pre-trial experiences of the juror and matters being litigated raise concerns about whether the juror can decide the case solely on the evidence, uninfluenced by his extrajudicial experiences. See Skaggs, 164 F.3d at 517; Lowe, 145 F.3d at 48-49; Gonzales v. Thomas, 99 F.3d 978, 987 (10th Cir. 1996). These concerns arise because some cases involving circumstances similar to a juror's own experiences create "the 'potential for substantial emotional involvement'" adversely affecting impartiality. Eubanks, 591 F.2d at 517 (quoting United States v. Allsup, 566 F.2d 68, 71-72 (9th Cir. 1977)).

"There is no precise formula to guide judges in juror-qualification matters." Sampson, 486 F.3d at 41. Rather, a trial judge must exercise judgment and discretion in deciding whether a juror should be excused for cause. See Lowe, 145 F.3d at 49; Gonzalez-Soberal, 109 F.3d at 69-70. A court's assessment of a juror's demeanor in discussing those areas of potential bias plays "an important part" in a judge's determination of whether a juror is impartial or should be excused for cause. See Ristaino v. Ross, 424 U.S. 589, 594-95 (1976). For example, in a case involving

27

alleged interstate transportation for illegal sexual activity, the
First Circuit held that the trial judge properly excused for cause
several jurors who had experience with sexual abuse, even though
they asserted that they could be impartial, because "the judge did
not believe [them] after assessing their demeanor." Lowe, 145 F.3d
at 49. The court also found, however, that the trial judge
properly declined to excuse for cause two other jurors who had
experience with sexual abuse, relying on their demeanor and noting
with regard to one of them, "'[u]nlike the . . . two other women
who were just in front of me who appeared so visibly upset, she
didn't. She seemed to be able to put it aside, she said she'd be
fair and impartial.'" Id. (quoting trial court); see also United
States v. Ploof, 464 F.2d 116, 118 (2d Cir. 1972)("[T]he judge was
in the best position to evaluate the juror's demeanor and to
determine, by the juror's answers to the judge's questions, whether
he could fairly and impartially hear the case and return a verdict
based solely on the evidence presented in court.").

Deciding whether to excuse a juror for cause necessarily
requires a prediction, in part because even a well-intentioned
juror at voir dire does not then know much in advance about the
nature of the evidence at trial. A judge must decide whether a
juror who claims to be impartial at voir dire, and who the judge
may not find to be actually or impliedly biased at that time, will
in fact become impaired during the course of the trial because

28

exposure to the evidence will dredge up in the juror's mind memories of disturbing events and associated emotional responses. See Lowe, 145 F.3d at 49. The need to make such a prediction is one of the reasons that "'[t]here are few aspects of a jury trial where [the First Circuit] would be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on challenges for cause.'" Id. (quoting Gonzalez-Soberal, 109 F.3d at 69-70).

At the same time, with regard to decisions being made during the jury selection process, "an impartial jury is so fundamental to the Sixth Amendment right to a fair trial, [that] '[d]oubts regarding bias must be resolved against the juror.'" United States v. Mitchell, 568 F.3d 1147, 1154 (9th Cir. 2009)(Thomas, J., dissenting)(quoting Gonzalez, 214 F.3d at 1114). Therefore, "in spite of [the] deferential standard of review" applied to trial judges' rulings on challenges for cause, Judge Calabresi again writing for the Second Circuit found that a district court had abused its discretion and committed reversible error in denying a challenge for cause of a juror whose answers to voir dire questions revealed actual bias. See United States v. Nelson, 277 F.3d 164, 202 (2d Cir. 2002). At voir dire, the juror in that case repeatedly expressed doubt about his ability to remain impartial, and expressed personal interest in events affecting the Jewish community and in the specific crime at issue in the case. See id.

at 201-02; see also United States v. Nell, 526 F.2d 1223, 1230 (5th Cir. 1976)(reversal warranted where trial judge failed to explore potential bias of juror who belonged to rival union and knew defendant in case charging embezzlement of union funds).

D. Post-Trial Relief Based Upon Evidence of Partiality

Where a judge's questions on voir dire do not elicit relevant information about a juror's bias, a juror may be empaneled whose ability to decide a question solely on the evidence is later placed into question. There are generally two reasons why voir dire might not have revealed relevant information. First, in what are sometimes referred to as "non-disclosure cases," jurors are not asked any questions during voir dire that should have elicited the information. See, e.g., Crowley, 303 F.3d at 407 (describing "non-disclosure" standard); Dall, 970 F.2d at 969-70 (referencing a non-disclosure standard and stating that "jurors cannot be faulted for failing to disclose information for which they were never asked"); United States v. Aponte-Suarez, 905 F.2d 483, 492 (1st Cir. 1990)("Jurors cannot be faulted for failing to disclose . . . since they were never asked during the course of voir dire to make such a disclosure."). Second, in what are sometimes referred to as "inaccurate answer cases," jurors do not provide relevant information because they give inaccurate or incomplete answers to the questions that should have elicited it. See, e.g., McDonough, 464 U.S. at 555 (characterizing the case as one involving "a

30

juror's mistaken, though honest response to a question"); Crowley, 303 F.3d at 407 (describing "inaccurate answer[]" standard); Amirault, 968 F.2d at 1405 (analyzing claim of juror bias based on juror's failure to mention she had brought rape charges forty years prior when asked during voir dire about previous involvement in criminal or civil cases).[7]

## 1. Non-Disclosure Cases

In non-disclosure cases, a party claiming his right to an impartial jury has been violated can obtain a new trial only by proving actual or implied bias. See Crowley, 303 F.3d at 407-08; Dall, 970 F.2d at 969-70; Aponte-Suarez, 905 F.2d at 492. Because non-disclosure cases do not involve juror dishonesty or fault on the part of the juror, see id., they do not raise the substantial concerns that exist in cases where jurors are deliberately dishonest on voir dire. See Dyer, 1515 F.3d at 982-83 (juror's repeated lies during voir dire cast doubt on process and supported finding of implied bias requiring new trial). Therefore, a litigant claiming the denial of the right to an impartial jury in a non-disclosure case must prove that a juror was actually biased or that the facts are such that bias is to be implied. See Aponte-Suarez, 905 F.2d at 492. Such a litigant cannot prevail under the additional test provided by McDonough, which grants relief in cases

[7]Some First Circuit cases conflate the standards for non-disclosure and inaccurate answer cases. See, e.g., DeBurgo v. St. Amand, 587 F.3d 61, 71-72 (1st Cir. 2009).

involving dishonest answers provided by jurors who would have been dismissed for cause if relevant information had been received in response to questions asked during voir dire.

## 2. Inaccurate Answer Cases

Where a juror has provided an incorrect answer to a question that should have revealed information relevant to a determination of juror bias, a party claiming he was denied an impartial jury may obtain relief by showing actual bias or implied bias, or by satisfying the test articulated in McDonough. As explained below, the McDonough test provides a separate means of relief, and does not require a showing of actual or implied bias. See 464 U.S. at 556 (Blackmun, J., concurring); Amirault, 968 F.2d at 1405-06 & n.2; Dall, 970 F.2d at 970.

### a. Traditional Means of Obtaining Post-Trial Relief

Prior to McDonough, the traditional means of obtaining post-trial relief based on a juror's inaccurate answers during voir dire were the same as those for obtaining such relief as a result of a juror's non-disclosure of information about which the juror was not asked during voir dire. See Skaggs, 164 F.3d at 516 ("Before the McDonough test was adopted by the Supreme Court, litigants alleging juror [partiality] had the opportunity to prove actual or implied bias on the part of a juror after a verdict was entered."). The "normal avenue of relief available to a party . . . asserting that he did not have the benefit of an impartial jury" was the

demonstration that a juror was actually biased, or, that circumstances were such that bias had to be implied. See McDonough, 464 U.S. at 556-57 (Blackmun, J., concurring); see also Smith, 455 U.S. at 215 (remedy for allegations of juror partiality is opportunity to prove actual bias); id. at 221-22 (O'Connor, J., concurring)(asserting that implied bias remained viable form of relief in juror bias claims); United States v. Fulks, 454 F.3d 410, 432 (4th Cir. 2006); Fields, 503 F.3d at 768 & n.6. These two forms of relief correspond with the "traditional[]" means of challenging a juror for cause, based on actual or implied bias. See Torres 128 F.3d at 43; Wood, 299 U.S. at 133.

### b. Relief Pursuant to McDonough

McDonough was a product liability case involving a child who was injured in a lawnmower accident. See 464 U.S. at 549. The court of appeals ordered a new trial because one juror who had a son who had been hurt by the explosion of a truck tire did not respond to a voir dire question asking whether any prospective jurors or their immediate family members had ever sustained severe injury in an accident. Id. at 549-50. The juror's failure to respond affirmatively was assumed to have been the result of an honest interpretation of the question by the juror. Id. at 555.

The Supreme Court rejected the view that a mistaken, but honest response to a voir dire question was by itself grounds for a new trial. Id. Instead the Court defined the key inquiry as

33

whether "the juror's failure to disclose denied respondents their right to an impartial jury." Id. at 549; see also id. at 556 (Blackmun, J., concurring)("I agree with the Court that the proper inquiry in this case is whether the defendant had the benefit of an impartial trier of fact.").

This framing of the relevant question was based on harmless error principles, which require a court to exercise judgment instead of ordering "automatic reversal for 'error,'" and to "ignore errors that do not affect the essential fairness of the trial." Id. at 553 (citing Kotteakos v. United States, 328 U.S. 750, 759-60 (1946)). The Supreme Court reasoned that "'[a litigant] is entitled to a fair trial but not a perfect one,'" and that "the important end of finality" would be ill served if the court were to "invalidate the result of a three week trial" in order to recreate the voir dire process because of a mistaken, but honest response to a question. Id. at 553, 555 (quoting Brown v. United States, 411 U.S. 223, 231-32 (1973)).

Applying these principles, the Court in McDonough then described circumstances in which inaccurate responses to voir dire questions would deny a party his right to an impartial jury and, therefore, affect the essential fairness of the trial, stating:

> We hold that to obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause. The motive for concealing information may vary, but only

those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial.

Id. at 556.

As explained below, this test requires a party seeking relief under McDonough to prove by a preponderance of evidence admissible under the Federal Rules of Evidence[8] that: (1) A juror gave an inaccurate answer to a question that was asked on voir dire; (2) the question was material; (3) the inaccurate response was dishonest, meaning knowingly and intentionally false, rather than the result of a good faith misunderstanding or mistake; (4) the reasons for the knowingly and intentionally false response relate to the juror's ability to decide the particular case based solely on the evidence and, therefore, call into question the juror's ability to be impartial; and (5) a correct response would have provided a valid basis for a challenge for cause and would have required or resulted in the excusal of the juror for cause based on actual bias, implied bias, or inferable bias. See id.; Dall, 970 F.2d at 970. A defendant who proves these five elements has demonstrated a deprivation of the right to an impartial jury – meaning a jury composed only of individuals willing and able to decide the case solely on the evidence - even absent proof of actual or implied bias. See McDonough, 464 U.S. at 556. If the juror would have been excused for cause and the other elements of

---

[8]See DeBurgo, 587 F.3d at 71; Crowley, 303 F.3d at 408; Fed. R. Evid. 1101(b).

the McDonough test are met, the defendant is entitled to a new trial without regard to whether the participation of the juror affected the outcome of the case. See Jackson v. Alabama State Tenure Comm'n, 405 F.3d 1276, 1288-89 (11th Cir. 2005)(affirming district court's ruling that defendant was entitled to relief under McDonough because a juror dishonestly failed to disclose convictions making her statutorily ineligible to serve, where district court "did not consider the effect that said juror might have had on the outcome of the jury's deliberations or any possible bias she might have had"); see also McDonough, 464 U.S. at 556; Dyer, 151 F.3d at 973 n.2.

As explained below, the McDonough test provides an additional means for a defendant to demonstrate that he was denied a right to an impartial jury, distinct from the "normal avenue of relief" available through a claim of actual or implied bias. See Fitzgerald v. Greene, 150 F.3d 357, 363 (4th Cir. 1998)(quoting McDonough, 464 U.S. at 556 (Blackmun, J., concurring)); Amirault, 968 F.2d at 1405-06 & n.2. In providing this additional form of relief, the McDonough test recognizes that inaccurate answers cast doubt on the efficacy of the voir dire process and the integrity of the trial in a way in which simple non-disclosure of unsolicited information does not. See 464 U.S. at 554. The test further recognizes the unique connection between willfully dishonest answers and the likely partiality of a potential juror, see id. at

36

556 (Blackmun, J., concurring), and the principle that convictions should not be overturned unless an error is one that affects the fundamental fairness of the trial by denying the defendant the right to an impartial jury, see id. at 553-54.

i. Inaccurate Answer to Question Asked at Voir Dire (Prong One)

The first prong of the McDonough test requires that a question soliciting the relevant information have been asked of the juror during voir dire, provoking an inaccurate answer. See 464 U.S. at 556. This prong recognizes that the McDonough test applies only to cases involving inaccurate answers to voir dire questions, and not to cases involving non-disclosure of unsolicited information. See Dall, 970 F.2d at 969-70. When a juror fails to answer accurately a question that is asked, doubts are raised about the juror's motives for the inaccurate answer which are not present when a juror is not asked a question that should elicit relevant information. See id. at 970; Aponte-Suarez, 905 F.2d at 492. Accordingly, the additional form of relief available in claims of jury bias through McDonough applies only where a relevant question was asked at voir dire and the juror's answer was inaccurate. See 464 U.S. at 556; Skaggs, 164 F.3d at 515; Crowley, 203 F.3d at 407-08.

ii. Material Question (Prong Two)

In addition, the juror must have provided an inaccurate answer

to a question that was material. See McDonough, 464 U.S. at 556. Generally, a matter is material if it has a natural tendency to influence, or be capable of influencing, the judge who must decide whether to excuse a juror for cause. See Neder v. United States, 527 U.S. 1, 16 (1999)(giving general definition of materiality). This requirement is connected to the other requirements of the test, including that the juror's motive for lying at voir dire relate to juror's ability to the decide the case based solely on the evidence, and that the information eventually learned by the court, if known, would have provided a valid basis to excuse the juror for cause.

### iii. Dishonest Answer (Prong Three)

The McDonough test requires a defendant to demonstrate that a juror "failed to answer honestly," that is, that his inaccurate response was dishonest rather than merely mistaken or a result of misunderstanding. See McDonough, 464 U.S. at 556; see also United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir. 1984)(court must determine whether juror "was aware of the fact that his answers were false"). The Court in McDonough characterized the issue presented as being whether "the result of a three-week trial" should be invalidated "because of a juror's mistaken, though honest response to a question." 464 U.S. at 555. The Court then stated the test to be applied when an inaccurate response is at issue and held that it is not met unless it is proven that the inaccurate

response was dishonest rather than merely mistaken. Id. at 555-56; see also DeBurgo, 587 F.3d at 71-72 (no relief under McDonough where inadequate showing of dishonesty); Crowley, 303 F.3d at 408 (same); Davila Cortes v. Ramos Barroso, 27 F.3d 554, at *2 (1st Cir. 1994)(per curiam)(unpublished table decision)(same); Dall, 970 F.2d at 970 (same); Amirault, 968 F.2d at 1405 (same).

McDonough reflects the understanding that the implications of an innocent error and a dishonest answer are different. An innocent, unintentional error does not itself raise a question of whether an individual is able to decide a case based solely on the evidence, although the information that should have been provided may do so.[9] See 464 U.S. at 555-56. Such a mistake does not suggest that the failure to disclose information that was solicited may have denied a party his right to an impartial jury. See id. at 549, 555-56. McDonough recognizes the reality that "in most cases, the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." Id. at 556 (Blackmun, J., concurring); see also United States v. Boney, 977 F.2d 624, 634 (D.C. Cir. 1992)("[L]ying or failing to disclose relevant information during voir dire itself raises substantial questions about the juror's possible bias."); Burton, 948 F.2d at

---

[9]An unintentional, erroneous response may, however, communicate something about a juror's ability to understand and follow instructions of law, and therefore may be relevant to his fitness to serve.

1159 ("This dishonesty, of itself, is evidence of bias."); United States v. Colombo, 869 F.2d 149, 152 (2d Cir. 1989)("[H]er willingness to lie about it exhibited an interest strongly suggesting partiality."); United States v. Stewart, 433 F.3d 273, 304 (2d Cir. 2006)("[C]ertain false statements that 'might be harmless in isolation' may present a 'much more sinister picture' when viewed as a whole." (quoting Green, 232 F.3d at 678 n.10)).

The requirement that a defendant show that an answer was dishonest also recognizes the way in which dishonest answers call into question the integrity of the trial. As the court observed in McDonough, "[t]he necessity of truthful answers by prospective jurors if [voir dire] is to serve its purpose is obvious." 464 U.S. at 554. "Honesty is the heart of the jury-selection process in an adversarial system; indeed, 'voir dire' means 'to speak the truth.'" Fields, 503 F.3d at 772. As explained by Justice Benjamin Cardozo in a related context:

> If the answers to the [voir dire] questions are willfully evasive or knowingly untrue, the [prospective juror], when accepted, is a juror in name only. His relation to the court and to the parties is tainted in its origin; it is a mere pretense and sham.

Clark v. United States, 289 U.S. 1, 11 (1933).

iv. Motive for Dishonest Answer (Prong Four)

Even an intentionally false response to a material question is not the end of the McDonough inquiry because "[t]he motives for concealing information may vary, but only those reasons that affect

40

a juror's impartiality can truly be said to affect the fairness of a trial." McDonough, 464 U.S. at 556. The implications of this statement were not explained by the Supreme Court in McDonough. However, as discussed below, a "reason[] that affect[s] a juror's impartiality" is not necessarily a motive that proves actual or implied bias. See id. Rather, Judge John Noonan expressed the test correctly when he wrote for the Ninth Circuit that, "[u]nder McDonough, a new trial is warranted only if the district court finds that the juror's voir dire responses were dishonest, rather than merely mistaken, and that her reasons for making the dishonest response call her impartiality into question." Pope v. Man-Data, Inc., 209 F.3d 1161, 1164 (9th Cir. 2000)(citing McDonough, 464 U.S. at 556)(emphasis added). Therefore, under McDonough, "even an intentionally dishonest answer is not fatal, so long as the falsehood does not bespeak a lack of impartiality." Dyer, 151 F.3d at 973. Similarly, in Boney, the District of Columbia Circuit wrote that, "[b]ecause the record provides no evidence that the motivation for the lie was unrelated to bias in this case," an evidentiary hearing was required. See 977 F.2d at 634; see also Tucker, 137 F.3d at 1028 ("If [the defendant] can prove that [the juror] deceived the court at voir dire, he will also have to prove that she did so because of partiality, rather than for some reason that is irrelevant to the fairness of the trial." (emphasis added)).

41

In other words, the McDonough test is not met when the motive for dishonesty is irrelevant to a juror's ability to decide the case impartially. See United States v. Langford, 990 F.2d 65, 69-70 (2d Cir. 1993)(motion for new trial properly denied where juror in controlled substances case did not reveal, due to embarrassment, that she had been convicted of prostitution fifteen years earlier). Rather, as articulated by McDonough, the party seeking relief must show a motive that calls the juror's impartiality into question. 464 U.S. at 556.

> v. Correct Answer Would Have Provided Valid
> Basis for Challenge For Cause (Prong Five)

Finally, in order to justify a new trial under McDonough, a party must prove that an accurate answer would have provided a valid basis for a challenge for cause. See 464 U.S. at 556. The First Circuit has stated that for the purpose of McDonough analysis, a party seeking a new trial must prove that "'correct' responses to the voir dire questions would have required or resulted in the disqualification of [the juror] for cause." Dall, 970 F.2d at 970 (emphasis added); see also Greer, 285 F.3d at 171. As described further below, this court understands McDonough and Dall to refer both to cases in which the court would have been required to excuse a juror because of actual or implied bias, and to cases where the court would have had discretion, and would have exercised that discretion, to excuse a juror because of inferable

bias. See Rhodes, 177 F.3d at 965 (mandatory excusal for cause in cases of actual and implied bias); Torres, 128 F.3d at 47 (describing discretion to excuse juror on basis of inferable bias). The court must "'determine if it would have granted the hypothetical challenge'" to the juror for cause. Stewart, 433 F.3d at 304 (quoting Greer, 285 F.3d at 171). The focus is on what the court would have done if it had, prior to empanelment of the juror, all of the information obtained after trial.[10]  See Stewart, 433 F.3d at 304. As recognized by the parties,[11] a court may consider not only what it would have done in light of a juror's "correct response" to the questions asked at voir dire, see McDonough, 464 U.S. at 556, but also how it would have been affected by knowledge of any deliberate action that the juror took to conceal information sought to be elicited in the jury selection process and the circumstances under which the information was eventually disclosed, as a juror's dishonesty itself raises questions about partiality and about the juror's willingness to follow instructions.  See Boney 977 F.2d at 634; Burton, 948 F.2d at 1159.

[10]Events potentially affecting a juror's impartiality occurring after jury empanelment is complete are not relevant for McDonough purposes because a juror could not have dishonestly failed to provide such information during voir dire.  For example, if the only basis of the claim is the fact that a juror was subjected to extrajudicial influences during the course of the trial, a party may attain relief by proving actual or implied bias, but is not eligible for relief under McDonough.

[11]See Gov't's Resp. to Order of Nov. 19, 2010 at 28; Sampson's Resp. to Sealed Order of Nov. 19, 2010 at 18.

43

vi. <u>McDonough</u> Does Not Require Proof of Actual

or Implied Bias

The last two prongs of the <u>McDonough</u> test require a party seeking a new trial to show that a juror's "motives for concealing information" were those that "affect a juror's impartiality," and that the concealed information, when considered along with the motive for concealment and the circumstances of eventual disclosure, "would have provided a valid basis for a challenge for cause." 464 U.S. at 556. As explained earlier, this inquiry requires the court to determine, among other things, whether the information obtained after trial "would have required or resulted in the disqualification of [the juror] for cause." <u>Dall</u>, 970 F.2d at 970.

The government asserts that <u>McDonough</u>, and other cases, should be interpreted to require a showing of actual or implied bias to establish the necessary "valid basis for a challenge for cause." See <u>McDonough</u>, 464 U.S. at 556. This contention is not correct. Under the <u>McDonough</u> test, a party can prove that he was deprived of his right to an impartial jury without proving that a juror was actually or impliedly biased. <u>See id.</u>; <u>Dall</u>, 970 F.2d at 970; <u>Amirault</u>, 968 F.2d at 1405-06 & n.2. In other words, the Court in <u>McDonough</u> identified certain factors which, if proven, are sufficiently indicative of a juror's inability to decide a case based solely on the evidence to demonstrate that a party was

44

deprived of his right to an impartial jury, whether or not that juror can be shown to have been actually or impliedly biased. <u>See</u> 464 U.S. at 556.

This construction of <u>McDonough</u> is consistent with the Supreme Court's own statements in that case. After rejecting the proposition that a mistaken, but honest response to a voir dire question would alone be sufficient to require a new trial, the Court stated a test that allowed a litigant to prove a deprivation of his right to a fair trial in cases where a juror provided dishonest answers at voir dire and "a correct response would have provided a valid basis for a challenge for cause." <u>McDonough</u>, 464 U.S. at 556. By its own terms, the <u>McDonough</u> test does not require proof of actual or implied bias. <u>Id.</u> As explained earlier, a valid basis to excuse a juror for cause includes not only actual or implied bias, but also inferable bias. <u>See</u> <u>Greer</u>, 285 F.3d at 171-72; <u>Torres</u>, 128 F.3d at 43; <u>see also</u> <u>Wainwright</u>, 469 U.S. at 424 (juror excusable for cause if his views or experiences would prevent or substantially impair the performance of his duties as a juror in accordance with his oath); <u>Jones v. Cooper</u>, 311 F.3d 306, 312 (4th Cir. 2002)(noting, in analyzing a <u>McDonough</u> claim, that inferred bias might justify a challenge for cause). A valid basis to excuse a juror for cause has been recognized to encompass the highly discretionary determination of a trial court that a juror should be excused for cause because there is reason to doubt that

he will be able to decide the case solely on the evidence. <u>See</u>
<u>Rowe</u>, 144 F.3d at 20; <u>Rodriguez-Ortiz</u>, 455 F.3d at 23; <u>see also</u>
<u>Wainwright</u>, 469 U.S. at 425-26 (recognizing answers to voir dire
questions frequently do not lead to definite conclusions about
juror bias, and determinations by trial judge must be given
deference); <u>Frazier v. United States</u>, 335 U.S. 497, 511 (1948)("in
each case a broad discretion and duty reside in the court to see
that the jury as finally selected is subject to no solid basis of
objection on the score of impartiality"). The plain language of
<u>McDonough</u> does not require actual or implied bias. Rather, it is
broad enough to include that range of cases in which a judge would
have had discretion to excuse a juror for cause and, as stated in
<u>Dall</u>, would have exercised his discretion to do so. <u>See</u> <u>Dall</u>, 970
F.2d at 970.

This interpretation of <u>McDonough</u> is consistent with the
manifest understanding of the majority of the Justices in that
case. The seven-member majority in <u>McDonough</u> did not expressly
state whether its new test was intended to replace actual and
implied bias as bases for relief or provide an additional means of
proving a claim of juror bias. However, Justices Blackmun, Stevens
and O'Connor joined the majority opinion and also concurred
separately to clarify that juror partiality could still be proven
by showing actual or implied bias, stating that:

> [We] understand the Court's holding not to foreclose the
> normal avenue for relief available to a party who is

46

asserting that he did not have the benefit of an impartial jury. Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.

McDonough, 464 U.S. at 556 (Blackmun, J., concurring).

In addition, Justice Brennan, who concurred only in the judgment, wrote for himself and Justice Marshall that:

In my view, the proper focus when ruling on a motion for new trial in this situation should be on the bias of the juror and resulting prejudice to the litigant . . . . "[T]he bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law."

Id. at 557-58 (Brennan, J., concurring in the judgment)(quoting Wood, 299 U.S. at 133).

These concurrences indicate that the ability to obtain relief based on actual or implied bias survives McDonough. See Amirault, 968 F.3d at 1405-06 & n.2. If the McDonough test replaced the actual or implied biased inquiries, a litigant who could not satisfy the other elements of McDonough would be deprived of the ability to obtain a new trial even in the face of clear evidence of actual bias, a result that has been rejected by the First Circuit, and would leave no remedy to litigants who could show that they were deprived of their constitutional right to an impartial jury. See 464 U.S. at 556 (Blackmun, J., concurring); Amirault, 968 F.3d at 1405-06 & n.2.

47

If the McDonough test required a showing of actual or implied bias in addition to a showing of dishonesty, the test Justice Rehnquist stated for the majority would be superfluous. Any party who proved the bias prong of the McDonough test would necessarily be entitled to relief under the actual or implied bias tests, without regard to whether the party succeeded in proving dishonesty. The only way to interpret the Opinion of the Court in McDonough to have any meaning, therefore, is to recognize three distinct but overlapping tests and permit relief under McDonough without requiring a showing of actual or implied bias.

The First Circuit recognized these three tests in Amirault. See 968 F.3d at 1405-06 & n.2. In Amirault, the First Circuit cited both concurrences for the proposition that McDonough's "majority vote . . . require[s] a further determination on the question of juror bias even where a juror is found to have been honest," and noted that relief could still be obtained by proving actual or implied bias. Id. Thus, the First Circuit held that where relief under McDonough is unavailable, a court must still consider whether a juror has been shown to have been actually or impliedly biased. Id. Applying these principles, the court in Amirault sustained the state trial court's finding that the juror in question was not actually biased, found the petitioner to be ineligible for relief under McDonough because the juror was not shown to have been dishonest, and, in addition, found that "bias

48

should not be implied" because there was not a sufficient connection between the unrecalled rape of the juror forty years before and the facts of the case. Id. at 1405-06.

The corollary to the court's conclusion in Amirault that implied and actual bias are separate tests from the McDonough test is that actual and implied bias are not requirements for relief pursuant to McDonough. If the McDonough test required actual or implied bias, the application of the McDonough test in Amirault would have been superfluous in light of the First Circuit's conclusion that neither actual nor implied bias were shown. See id. at 1405-06.

The First Circuit made this point somewhat more explicitly in Dall, where it found that the McDonough test was not satisfied because it had not been shown that "correct responses to the voir dire questions would have required or resulted in the disqualification of [the juror] for cause." 970 F.2d at 970. As discussed earlier, disqualification of a juror for cause is required in cases of actual or implied bias. See Rhodes, 177 F.3d at 165. A juror may also be excused for cause as a result of an exercise of the trial judge's discretion in cases involving inferable bias. See Torres, 128 F.3d at 47. Thus, the First Circuit's decisions in Dall and Amirault indicate that proof of actual or implied bias is not a requirement of the McDonough test.

Nevertheless, this court's statement of the McDonough test has

49

been developed without the benefit of extensive discussion by the
First Circuit. The lack of extensive discussion is, in part, the
result of the fact that the First Circuit has never decided a case
in which the party seeking a new trial proved that a juror had been
dishonest at voir dire and it has not, therefore, been required to
analyze the remaining prongs of the McDonough test.  For example,
in Amirault, relief under McDonough was denied because the juror
was not dishonest, and there was no occasion to discuss whether a
further showing of actual bias or implied bias was necessary to
satisfy the McDonough test.  See 968 F.2d at 1405-06; see also
DeBurgo, 587 F.3d at 72 (inadequate showing of dishonesty);
Crowley, 303 F.3d at 408 (same); Davila Cortes, 27 F.3d at *2
(same); Dall, 970 F.2d at 970 (same).  However, the First Circuit
has never held that the McDonough test requires a showing of actual
or implied bias.[12]  Instead, in Amirault, the case whose analysis

---

[12]The government cites DeBurgo and Dall for the proposition
that the First Circuit requires actual bias in order to obtain
relief under McDonough.  See Gov't's Reply to Pet'r's Proposed
Findings of Fact and Rulings of Law on Juror Misconduct Claims at
3, 8.  However, those decisions do not support that contention.

DeBurgo articulates the McDonough test and then states that
"the defendant has 'the burden of showing that the juror was not
impartial and must do so by a preponderance of the evidence.'"
587 F.3d at 71 (quoting Commonwealth v. Amirault, 399 Mass. 617,
626 (1987)).  Although the government does not make this
argument, the court notes that the Supreme Judicial Court's
decision in Amirault, which was cited in DeBurgo, suggests relief
is only available when the moving party proves actual bias.  See
399 Mass. at 625.  However, DeBurgo did not cite the Supreme
Judicial Court decision for this proposition.  See 587 F.3d at
71.  DeBurgo cited the state court's decision in Amirault only

50

is most explicit and most faithful to <u>McDonough</u> itself, the First
Circuit stated that actual or implied bias provide a separate means
of relief from that provided under the <u>McDonough</u> test. <u>See</u> 968
F.2d at 1405-06 & n.2.

As the Sixth Circuit has noted, the case law reflects some
confusion concerning the meaning of <u>McDonough</u>. <u>See Zerka v. Green</u>,
49 F.3d 1181, 1185 (6th Cir. 1995). However, the decisions of
several circuits support the conclusion that <u>McDonough</u> establishes
the existence of three distinct tests: the <u>McDonough</u> test announced
in the Opinion of the Court, and the actual and implied bias tests,
which remain as alternate bases of relief. In <u>Skaggs</u>, the Tenth
Circuit upheld the district court's conclusion that a plaintiff in
a product liability case was not entitled to a new trial under
<u>McDonough</u> on the basis of a juror's intentionally dishonest failure
to respond affirmatively to a question inquiring whether any juror
had been involved in a lawsuit. <u>See</u> 164 F.3d at 515-16. Although
it was later revealed that the juror had been involved in at least
nine lawsuits, the district court found that the juror would not

for the proposition that a defendant must prove a juror was not
impartial. <u>See id.</u> As explained in this Memorandum, satisfying
the <u>McDonough</u> test is one way in which a party may prove a juror
was not impartial.

  In <u>Dall</u>, the First Circuit stated that "a party seeking a
new trial <u>based on nondisclosure</u> by a juror must 'demonstrate
actual prejudice or bias.'" 970 F.3d at 969 (quoting <u>Aponte-
Suarez</u>, 905 F.2d at 492)(emphasis added). This statement,
however, does not refer to cases where jurors provide inaccurate
answers, to which <u>McDonough</u> applies.

51

have been excused for cause on this basis. Id. Still, the court found it necessary to consider whether the plaintiff was entitled to relief on the basis of actual or implied bias. Id. at 516. The court explained that "McDonough merely provides a party who alleges juror dishonesty during voir dire with an additional vehicle to obtain a new trial by demonstrating juror bias. The advent of the test did not eliminate a litigant's broader historic right to prove actual or implied juror bias." Id. at 516. Similarly, in Gonzales, the Tenth Circuit wrote:

Cases such as this one-based on allegations of dishonest voir dire answers-fall within a larger category that comprises all cases of alleged juror partiality, whatever the source of partiality. Though a petitioner in the position of Mr. Gonzales has available the McDonough analysis, he is not "foreclose[d] [from] the normal avenue of relief available to a party who is asserting that he did not have the benefit of an impartial jury."

99 F.3d at 985 (quoting McDonough, 464 U.S. at 556 (Blackmun, J., concurring)); see also Burton, 948 F.2d at 1159 (juror impliedly biased, and, additionally, relief was appropriate under McDonough because juror was dishonest and correct answer to voir dire questions would have resulted in juror's dismissal for cause).

The Fourth Circuit has also indicated that actual or implied bias are not necessarily requirements of relief under McDonough and that "[t]he McDonough test is not the exclusive test for determining whether a new trial is warranted: a showing that a juror was actually biased, regardless of whether the juror was truthful or deceitful, can also entitle a defendant to a new

52

trial." Jones, 311 F.3d at 311-13 (inquiring, for purposes of

relief under McDonough, whether a juror would have been excused on

the basis of actual, implied or inferable bias, and separately

inquiring whether relief was warranted on the basis of actual or

implied bias); see also Fulks, 454 F.3d at 432 (holding that, where

McDonough was not satisfied because the district court found that

it would not have exercised its discretion to excuse the juror for

cause, a party seeking a new trial must show actual or implied

bias); Fitzgerald, 150 F.3d at 362-63 ("[f]ailure to satisfy the

requirements of McDonough does not end the court's inquiry" (citing

McDonough, 464 U.S. at 556 (Blackmun, J., concurring)).[13]

In Greer, the Second Circuit explained that, in deciding a

claim under McDonough, a court must determine whether a correct

answer at voir dire would have provided a valid basis for a

_____

[13]As the government notes, a subsequent, unpublished case of
the Fourth Circuit holds (citing Fulks) that, even where the
district court would actually have excused a juror for cause "in
an abundance of caution," a McDonough claim necessarily fails
without a showing that the district court would have abused its
discretion in denying a challenge for cause because the juror was
actually or impliedly biased. See United States v. Blackwell,
Nos. 09-4193, 09-4202, 2011 WL 2558845, at *3 (4th Cir. Jun. 29,
2011)(per curiam). The court finds Blackwell to be inconsistent
with Fulks, and, in any event, unpersuasive. Moreover, Blackwell
is an unpublished decision that is not binding precedent even in
the Fourth Circuit.

The Fourth Circuit's analysis of the motive prong in Conaway
arguably requires a motive for dishonesty that proves actual bias
or implied bias, although the Fourth Circuit did not articulate
the concept in precisely those terms. See 453 F.3d at 585 &
n.20, 588-89. If this is an accurate reading of Conaway, this
court respectfully disagrees with its reasoning.

53

challenge for cause, and whether the court "would have granted" such a challenge. See 285 F.3d at 171. In finding that no grounds for a successful challenge for cause were present in that case, the court explained that "[c]hallenges for cause are generally based on actual bias, implied bias, or inferable bias." Id. (citing Torres, 128 F.3d at 43).[14]

Other cases cited by the government do not persuade the court that McDonough requires proof of actual or implied bias. In Johnson v. Luoma, the Sixth Circuit stated in applying the McDonough test that "a juror is subject to a valid challenge for cause based on actual bias and, in certain limited circumstances, implied bias." See 425 F.3d 318, 326 (6th Cir. 2005). However, the court in Johnson cited only the Second Circuit's decision in Torres for this definition of a valid basis for a challenge for cause and explicitly noted that the court in Torres also permitted a challenge for cause based on inferred bias. See 425 F.3d at 326 (citing Torres, 128 F.3d at 43, 49).[15] In other cases the Sixth

---

[14]Although questioning whether "affirmance of the District Court's findings regarding actual bias ends our inquiry, or whether a post-trial allegation of jury partiality may alternatively be proven by implied or inferred bias," the Second Circuit in Greer found none of these bases for an excusal for cause was proven. See 285 F.3d at 171-72.

[15]In addition, the statements in Johnson regarding bias are dicta, in that the court had already concluded that the petitioner was not entitled to relief because the juror at issue "honestly answered all questions posed during voir dire." See 425 F.3d at 325.

54

Circuit has recognized that "the <u>McDonough</u> test is not the exclusive test for determining whether a new trial is warranted on the basis of juror bias." <u>Dennis v. Mitchell</u>, 354 F.3d 511, 520 n.4 (6th Cir. 2003); <u>see also Zerka</u>, 49 F.3d at 1186 n.7 ("<u>McDonough</u> does not entirely foreclose a party from seeking a new trial on the basis of a prospective juror's honest, though mistaken, response." (citing, among others, <u>Amirault</u>, 968 F.2d at 1405-06; <u>McDonough</u>, 464 U.S. at 556-57 (Blackmun, J., concurring))).

The Eleventh Circuit has also stated that relief under <u>McDonough</u> "requires a showing of actual bias." <u>BankAtlantic v. Blythe Eastman Paine Webber, Inc.</u>, 955 F.2d 1467, 1473 (11th Cir. 1992)(citing <u>Perkins</u>, 748 F.2d at 1532). However, that circuit employs the term "actual bias" in a different manner than other courts.[16]  The requirements for relief under <u>McDonough</u> in the

---

[16]The Eleventh Circuit provides that "[a]ctual bias may be shown in two ways: 'by express admission or by proof of specific facts showing such a close connection to the circumstances at hand that bias must be presumed.'" <u>See Perkins</u>, 748 F.2d at 1532 (quoting <u>Nell</u>, 526 F.2d at 1229). However, in <u>Nell</u>, the court explicitly concluded that the term "presumed bias" is not the same thing as implied bias, but rather describes "situations in which the circumstances point so sharply to bias in a particular juror that even his own denials must be discounted in ruling on a challenge for cause." <u>Nell</u>, 526 F.2d at 1229 n.8. <u>Nell</u> involved a juror who knew who the defendant was, and belonged to a union that had been in a dispute with the defendant's union. <u>Id.</u> at 1228. Although the juror had not admitted bias, and insufficient information had been elicited from that juror to permit a presumption of bias, the court observed that "doubts about the existence of actual bias should be resolved against permitting the juror to serve," and concluded that the juror should have

Eleventh Circuit are, therefore, unclear.[17]  Even assuming that the

Eleventh Circuit's test requires actual or implied bias, its

analysis is inconsistent with McDonough, which requires only a

"valid basis for a challenge for cause," see 464 U.S. at 556, and

with the First Circuit.  See Dall, 970 F.2d at 970; Amirault, 968

at 1405-06 & n.2.[18]

The remaining case on which the government relies, North,

states that "a 'valid basis for a challenge for cause,' absent a

_____

been excused for cause.  Id. at 1230.  These cases suggest that
relief under McDonough could be obtained in the Eleventh Circuit
based on facts which are insufficient to prove actual bias, and
do not involve the sort of relationships associated with the
concept of implied bias, but raise enough question about a
juror's actual bias as to warrant dismissal of that juror for
cause.  See BankAtlantic, 955 F.2d at 1473; Perkins, 748 F.2d at
1532; Nell, 526 F.2d at 1229-30 & n.8.

[17]In a later case, the Eleventh Circuit found that, where a
juror had dishonestly failed to disclose a felony conviction
which would have disqualified that juror from serving on the
jury, McDonough was satisfied because "an honest answer from this
juror would have provided a basis to challenge her for cause."
Jackson, 405 F.3d at 1288.  The court in that case upheld the
district court's grant of a new trial even though the lower court
had not considered whether the juror had any bias.  Id.

[18] The government also cites Gonzalez, 214 F.3d 1109, and
United States v. Doke, 171 F.3d 240 (5th Cir. 1999), as cases
requiring actual or implied bias for a showing of a valid basis
for a challenge for cause under McDonough.  However, Gonzalez was
a direct appeal of a district court's denial of a challenge for
cause and did not address McDonough.  See 214 F.3d at 1111-12.
Doke addresses McDonough and notes that actual or implied bias
would necessitate a removal for cause, but the analysis is brief
and does not state that only actual or implied bias can justify
excusing a juror for cause.  See 171 F.3d at 246-47.  The court
does not, therefore, find these cases to be persuasive authority
for the proposition that a finding of actual or implied bias is
necessary to justify relief under McDonough.

showing of actual bias, is insufficient" to obtain relief under
McDonough. See United States v. North, 910 F.2d 843, 904 (D.C.
Cir. 1990)(quoting McDonough, 464 U.S. at 556). In so stating, the
D.C. Circuit adds a requirement to McDonough that is unsupported by
the Supreme Court's language in that case. See McDonough, 464 U.S.
at 556. The D.C. Circuit relied on the concurrences of Justices
Blackmun and Brennan for the proposition that "an aggrieved party
must show that the juror's correct response at voir dire would have
demonstrated actual bias." See North, 910 F.3d at 904. However,
this conclusion is not supported by Justice Blackmun's concurrence
and is contrary to the First Circuit's interpretation of it. See
Amirault, 968 F.2d at 1405-06 & n.2 (citing Justice Blackmun's
concurrence and stating that "a further determination on the
question of juror bias" is required after a party has failed to
satisfy the McDonough test). It is, of course, necessary that this
court follow the law as it has been described by the First Circuit.
The court can do so comfortably because the First Circuit's
recognition in Amirault that there are three tests for determining
whether a juror was impartial – actual bias, implied bias, and
McDonough – is consistent with the language and reasoning of the
Supreme Court in that case.

E. Conclusion

For the foregoing reasons, to vacate a sentence of death and
obtain a new trial on the question of punishment based on a juror's

57

inaccurate answer to a question asked on voir dire, Sampson must show actual or implied bias, or satisfy the McDonough test. Under that test, Sampson must prove by a preponderance of the evidence that: (1) the juror provided an inaccurate answer to a question asked at voir dire that should have elicited particular information; (2) the question was material; (3) the juror response was dishonest; (4) the motive for answering dishonestly relates to the juror's ability to decide the case based solely on the evidence and calls the juror's impartiality into question; and (5) the concealed information, when considered with the motive for concealment and circumstances of eventual disclosure, including the juror's demeanor in answering the question, would have required or resulted in the juror's dismissal for cause based on actual bias, implied bias, or inferable bias.

IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.  Juror C

As indicated earlier, Sampson bears the burden of proving facts justifying a new trial by a preponderance of the evidence that is admissible under the Federal Rules of Evidence. See DeBurgo, 587 F.3d at 71; Crowley, 303 F.3d at 408; Fed. R. Evid. 1101(b). Sampson asserts that he is entitled to a new trial because C's inaccurate answers at voir dire caused him to be deprived of the right to an impartial jury guaranteed by the Sixth Amendment. This contention is correct.

## 1. <u>Voir Dire and Testimony at §2255 Proceedings</u>

C testified three times in these §2255 proceedings. The opportunity to observe and evaluate her demeanor was important to the court in several ways. First, it was important in deciding her credibility. The court's perception of C's demeanor was also important in assessing whether she would have been able to decide whether Sampson should be executed based solely on the evidence or, instead, was likely to have been substantially impaired in her ability to do so by her disturbing personal experiences and enduring emotional reaction to them. As described below, the court finds that: C intentionally gave false answers to many important questions in her questionnaire, during individual voir dire, and in these §2255 proceedings; she did so in an effort to hide painful experiences which were, in some respects, comparable to matters involved in Sampson's case; if, before empanelment, the court had the information it now possesses, she would have been excused for cause because of the high risk that she would not be able to decide whether Sampson should live or die based solely on the evidence; and the decision to excuse her for cause would have been reinforced by her repeated perjury.

As explained earlier, in this case Sampson was charged with two carjackings resulting in death. Prior to trial, the parties and the court knew that the jury would be exposed to disturbing evidence of those murders and of a third murder in New Hampshire.

It was also known that the trial would include evidence that Sampson had threatened to shoot female bank tellers in North Carolina in the course of a series of robberies, and that he had made threats during a third carjacking as well. In addition, it was known to Sampson's counsel, at least, that the jury would hear evidence of Sampson's history of drug abuse and the toll it took on one of his marriages. It was also foreseen that there would be testimony about Sampson's experiences in prison. Moreover, it was expected that the jury would learn that Sampson's parents and other family members had abandoned him after he was charged with being a murderer.

Prior to trial, the court worked with counsel for the parties to develop a detailed questionnaire that was intended to elicit all of the information necessary to determine whether a juror was eligible to serve in Sampson's particular capital case. The seventy-seven questions were designed to develop information concerning any bias a juror realized that he or she had and was willing to reveal. The questions were also designed to obtain information concerning life experiences that were relevant to determining whether a juror would be able to decide the issues presented based solely on the evidence, unimpaired by the influence of anything that he or she may have experienced personally.

The jury selection process began with jurors appearing in court to complete the questionnaire. Each juror was sworn and

instructed orally by the court. The jurors were told that while there were no right or wrong answers, it was essential that each question be answered truthfully. To emphasize this, the jurors were informed that any intentionally false statement could subject them to a prosecution for perjury. The jurors were also instructed to take whatever time was necessary to answer the questions thoughtfully.

The court was aware that some of the questions on the questionnaire were designed to elicit information that jurors might regard as private and sensitive. Therefore, the jurors were told that they could request that certain of their answers be kept permanently out of the public record or, alternatively, that they could respond to a question by writing "private." The jurors were informed that if they were called back for individual voir dire, upon request sensitive or private information would be discussed in a session closed to the public.

These points were reiterated in the questionnaire itself. The introduction to the questionnaire instructed each juror that "[i]t is very important that you answer the questions as completely and accurately as you can." Ex. 64 at 1. The questionnaire also explained that "[y]ou have taken an oath promising to give truthful answers, and any intentionally false statement could subject you to prosecution for perjury." Id. The written instructions also stated that with regard to a sensitive subject a juror could either

request that her answer be kept out of the public record or, alternatively, simply write the word "private," which would result in oral questioning on that matter if the juror was recalled for individual voir dire. Id. at 1-2.

C was in a group that received the court's oral instructions and completed their questionnaires on September 18, 2003. She was then 51 years old. She had graduated from high school and had worked for many years in customer service for a telecommunications company. C understood the oral and written instructions she received, including the requirement that she provide honest, accurate, and complete answers to each question unless she marked a question "private." She took the time necessary to complete the questionnaire. She then signed it, certifying "under the pains and penalties of perjury, that the answers which I have given in this questionnaire are true and complete to the best of my knowledge and belief." Id. at 30.

As described below, this certification was known by C to be false. As C then knew, she had deliberately falsely answered a series of questions because it was too emotionally painful for her to disclose or discuss certain personal experiences that she regarded as "horrible." See Mar. 18, 2011 Tr. at 70; Nov. 18, 2010 Tr. at 66, 133, 143.

While many other jurors were excused for cause based on their written responses to the questionnaire, C was not. Rather, she and

62

some other jurors appeared for individual voir dire on October 2, 2003. She was asked to read the transcript of the court's earlier oral instructions. In addition, she was told again that, upon request, the public would be excluded from the discussion of sensitive, personal subjects. C was also reminded that she remained under oath. Prior to being questioned orally, C confirmed that she had read the transcript of the court's oral instructions and that she understood that she remained under oath.

When asked whether she wanted to correct her responses to any of the questions in the questionnaire, C asked to clarify only her response to Question 24, which addressed her ability to consider mental illness as a mitigating factor. However, in her questionnaire, C had answered "no" to, among other inquiries, questions that asked: whether she or anyone close to her had been charged with committing a crime (Question 63); whether she knew anyone who had ever been in prison (Question 64); whether she, or anyone close to her, had ever been a victim of a crime or a witness to a crime (Question 59); whether she, or anyone close to her, had ever been questioned as part of a criminal investigation (Question 61); whether she or anyone close to her had an experience with the police in which she or that other person was treated fairly (Question 65); whether she or anyone else close to her had ever been employed, in any way, in law enforcement (Question 68); and whether she or anyone close to her ever had a drug problem

(Question 32). As C knew both when she answered the questionnaire on September 18, 2003, and when she appeared for individual voir dire on October 2, 2003, her "no" response to each of those questions was false.

As of September, 2003, C had endured a difficult personal life that included events she subsequently described in these §2255 proceedings as "horrible" experiences that she "had to move on" from and "ha[d] to forget." See Mar. 18, 2011 Tr. at 40-41, 81, 86-87. These experiences mainly involved her daughter J and her second husband P. These experiences were so deeply disturbing to C that she frequently cried when testifying about them in these §2255 proceedings. Both during voir dire in 2003 and in the course of these §2255 proceedings, C deliberately and systematically gave false answers to questions intended to elicit information concerning these experiences because it was too painful for her to disclose or discuss them.

C married                in 1971, and divorced him in about 1978. C and          had two children, J and a son. J married          and moved from the small town of Merrimac, Massachusetts, where C lived, to Florida in about 1993.

In about 1995, J got a job performing administrative duties with the Sanibel, Florida Police Department, where she received promotions and commendations. C was very proud of J's success in the Police Department.

However, by September, 2003, when she appeared as a potential juror in Sampson's case, C was no longer proud of J because she knew the following. In 1997, J was arrested and charged with stealing property from the Police Department, and then arrested and charged again for stealing and using a coworker's credit card. J was placed on probation for these offenses. Then, in 1998, J was sentenced to six months in prison for violating the terms of her probation by using cocaine and absconding from supervision. C believed that J had been treated fairly by law enforcement in all of these matters. In connection with them, C learned that J was addicted to cocaine. She visited J in prison and was distraught by her daughter's appearance. In 2003, C had a relationship with J, for example, bringing J's children to see her annually.

C was deeply ashamed of J's criminal conduct. In these §2255 proceedings C tearfully characterized J's conviction and incarceration as "a nightmare" and said they had caused "a horrible, horrible time in [her] life." Mar. 18, 2011 Tr. at 40, 73. Indeed, she tried hard but unsuccessfully to forget about J's drug addiction and incarceration because thinking of them was "killing [her]." Id. at 87. In September, 2003, C remembered J's convictions and incarceration, but she "could not admit that [] would happen in [her] family." Id. at 73. These feelings were still evident in 2011.

C married her second husband, P, in 1979, and divorced him in

2002. P worked for the United States Postal Service. The couple had three sons.

During their marriage, P regularly abused alcohol and marijuana. C urged him to get treatment for his drug problem. P's substance abuse ultimately contributed greatly to C's decision to divorce him. As she testified in these §2255 proceedings: "He liked to drink. He liked his vodka. And he liked smoking his pot. And I had had it." Nov. 18, 2010 Tr. at 143-44.

In about 1985, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. When C later learned about it, she felt confused, ashamed, and embarrassed. See Mar. 18, 2011 Tr. at 66. As the crying C described it in her testimony in these §2255 proceedings, "[i]t was horrible," id., "like the end of my life," Nov. 18, 2010 Tr. at 162.

In addition, P often threatened to harm his wife by physically chasing her, punching walls, and causing C to believe he would punch her too if he could catch her. These incidents frightened C, who would frequently go to her mother's home to avoid her husband.

On May 29, 2000, P's threats to his wife escalated. After refusing C's repeated requests for a divorce, P angrily confronted her at a bar. Later that day, C found in her home a suicide note her husband had written. Soon after, P came to their house with a shotgun or rifle. He told C that "he was going to shoot [her] and then himself." Id. at 141. As C wrote in her affidavit to obtain

an Abuse Prevention Order, she was genuinely "afraid he was going to shoot [her]." Ex. 66. Two of her sons took the weapon away from P. C took it and the suicide note to the Merrimac Chief of Police, who she knew, and discussed the incident with him. As she later tearfully testified in the course of these §2255 proceedings, this incident too was "horrible" for her. Nov. 18, 2010 Tr. at 143.

On May 31, 2000, C requested and received an Abuse Prevention Order that required that P stay at least fifty yards away from her. Ex. 66. At the top, the document stated that "VIOLATION OF THIS ORDER IS A CRIMINAL OFFENSE punishable by imprisonment or fine or both." Id. C read the Order. In both 2000 and in September, 2003, when she filled out her questionnaire, she knew that a violation of the Order was a criminal offense.

P violated the Order on June 20, 2000, and was arrested in C's presence for doing so. On that day, P returned to C's home, chased her into a bedroom, and would not let her leave. Once again, C was afraid he was going to hurt her. However, after one of her sons intervened, C was able to call 911. When police officers arrived, they observed that C was "visibly shaken and crying." Ex. 67. She was, however, able to report that her husband had violated the Abuse Prevention Order. A police officer questioned her at her home about the incident. As he was doing so, P returned and was arrested. C then went to the police station and gave a further

statement.

Although C unconvincingly claimed in her testimony in these §2255 proceedings not to know it, P was prosecuted for violating the Abuse Prevention Order and put on probation. When C went to court to have that Order extended, her husband became very angry and unruly, and court security officers had to remove him from the courtroom.

While the Abuse Prevention Order was in effect, P stalked C at least three times. When she complained to the police, they told her they could not do anything because her husband was remaining more than fifty yards away from her. C believed that the Merrimac police had treated her fairly, just as she believed that J had been treated fairly by authorities in Florida.

Between the time of C's divorce in 2002 and voir dire in September, 2003, she maintained regular contact with P. They talked about their children and were supportive of each other when their youngest son was hospitalized for ten days. Thus, as of September, 2003, P remained a person who was close to C.

Nevertheless, C regards the events that lead to her divorce from P as "horrible" and "a nightmare." Mar. 18, 2011 Tr. at 81; Nov. 18, 2010 Tr. at 133. Although she never forgot those events, including during the voir dire process, she found those events emotionally too difficult to disclose or discuss.

As indicated earlier, during voir dire C consistently and

intentionally answered questions falsely in order to avoid disclosing J's drug addiction, convictions, and incarceration. She also consistently gave dishonest answers to questions which should have revealed, among other things, that P had threatened to kill her about three years earlier.

For example, with regard to J, in response to Question 47 which asked for information concerning any children, C disclosed only her two sons who were then living with her in her home. In these §2255 proceedings, C testified that she thought the question only sought to identify children who were living at home,[19] noting that in response to Question 48 she disclosed that she then had a son in the Marines. This claim of confusion might have been convincing if C had not intentionally refused to mention J in her dishonest responses to many other questions. For example, C did not disclose J in response to Question 63(a), which asked "[h]ave you or anyone close to you ever been charged with committing a crime," or to Question 64, which asked "[d]o you or anyone close to you know anyone who is, or has been, in prison." Similarly, C answered "no" when asked whether anyone close to her ever had a drug problem (Question 32); whether anyone close to her ever had an experience with the police or the criminal justice system in which

---

[19]Question 47 stated: "If you have a spouse or live in companion, and/or any children or grandchildren, please provide the following information for them." The form contained columns with space under each for "Relationship," "Age," "Gender," "Education," and "Employment." Ex. 64 at 21-22.

69

the person was treated fairly (Question 65); and whether anyone close to her had worked in law enforcement in any way (Question 68). As discussed below, when C's inaccurate answers concerning J were discovered in the course of these §2255 proceedings, she gave a series of excuses for them that are not credible. As she admitted concerning her failure during voir dire to disclose that J had been in prison, C's inaccurate answers to questions that should have elicited information about J were each deliberately untrue.[20]

C also deliberately failed to provide honest answers

---

[20]With regard to Question 64, which asked whether C knew anyone who had been in prison, C had the following colloquy with the court:

THIS COURT:    What you just said is you knew – what's your explanation for why you answered that, "No," is it you forgot your daughter was in prison or you knew she was in prison but you didn't want to admit it or is it something else?

THE WITNESS:   I didn't want to admit it.

THIS COURT:    But you knew it?

THE WITNESS:   Oh, yeah.

(Pause.)

THE COURT:     So with regard to [Question 64], you gave me, and everybody else, an answer that you knew was not true, right?

THE WITNESS:   Yes.

Mar. 18, 2011 Tr. at 90 (emphasis added).

70

concerning questions that should have revealed that P had threatened to kill her, among other things that were material to whether she was capable of being an impartial juror in this case. Indeed, as with J, P is not mentioned in her responses to the questionnaire. For example, C intentionally did not disclose that: P, who was close to her, had a drug problem (Question 32); she had been a victim of a crime - an assault by P - that two of her sons had witnessed (Question 59); she had been questioned as part of the criminal investigation of the violation of the Abuse Restraining Order (Question 61); P was charged with the crime of violating that Order (Question 63); and C felt she had been dealt with fairly by the Merrimac police (Question 65). If C had disclosed that her former husband had been charged with a crime, she would have been required to provide details concerning it (Question 63(b)-(e)).[21]

---

[21] The court finds that C answered the following material questions dishonestly: Question 32 (dishonestly failed to disclose that both J and P had drug problems); Question 34 (dishonestly failed to disclose that P worked for the United States Postal Service); Question 47 (dishonestly failed to disclose the existence of three of her five children, including J); Question 54 (dishonestly failed to disclose that she was raised as and remained an Episcopalian because she did not think it was appropriate for the court to inquire about religious matters); Question 59 (dishonestly failed to disclose that she was the victim of P's repeated assaults, that two of her sons were witnesses to two of these assaults, and that,

);

Question 61 (dishonestly failed to disclose that she gave a statement to the police when she turned in the rifle or shotgun and suicide note, and that she and her sons were questioned by police with respect to P's violation of the restraining order); Question 63 (dishonestly failed to disclose that P had been

These details would have prompted questions during the individual voir dire that would have revealed that P had threatened to shoot C, and that she remained very emotional about that experience.

C's dishonest answers were not discovered before she was empaneled and became one of the deliberating jurors who unanimously decided that Sampson should be executed. However, Sampson's counsel in these §2255 proceedings discovered that in 2000 C had obtained an Abuse Prevention Order against P, and successfully argued that she should be questioned about it and related matters.

C appeared for questioning on November 18, 2010. She reviewed her answers to her questionnaire and the transcript of her individual voir dire. After again being sworn to tell the truth, and given the opportunity to correct any previous response that was

---

charged with violating the restraining order, and that J had been charged with theft, fraudulent use of a credit card, and parole violations); Question 64 (dishonestly failed to disclose that she knew J, who had been in prison); Question 65 (dishonestly failed to disclose that she believed she was treated fairly by the Merrimac police following P's assaults, and that she believed that J was treated fairly by the Sanibel police in connection with her prosecution and parole violations in Florida); Question 68 (dishonestly failed to disclose that J worked for the Sanibel Police Department).

The questions regarding religion and employment by the federal government were material. C's dishonest responses to those questions were relevant to assessing her credibility and her reasons for answering other questions inaccurately. However, the court does not consider these two dishonest responses to be important to the overall legal analysis of Sampson's claims because, in contrast to C's many other dishonest answers, the information concealed would probably not alone have produced a valid basis for a challenge for cause if discovered during voir dire. See McDonough, 464 U.S. at 556.

inaccurate or incomplete, C did not correct any of her dishonest answers concerning P or J. Instead, her dishonesty concerning P was disclosed through questioning. When asked why she had withheld information relating to P, she responded that: "When I was filling out this questionnaire, my personal life – that was my personal life. . . . I didn't think my personal life had anything to do with me being a juror." Nov. 18, 2010 Tr. at 149. At the November 18, 2010, hearing, C resisted answering questions about the details of her personal life, stating, "I don't want to go into all of these [things]." Id. at 148. C was visibly distraught while talking about matters involving P. When asked, "In September and October of 2003, when you filled out the questionnaire and then came back and had questions asked, did you know all these horrible things had happened to you?," C responded, "I did know those things happened to me . . . yes." Id. at 156. C explained that she had deliberately refused to provide information concerning P because she just did not want to talk about him. Id. at 157. It was too painful.

At the November 18, 2010, hearing the parties and the court learned for the first time that C had five children, including J. Sampson's counsel conducted additional investigation and persuaded the court to recall C in order to question her about J.

C appeared again on March 18, 2011. After again being placed under oath and asked whether there was anything in her prior

testimony that she wanted to correct, C said that she recalled after she left the courthouse on November 18, 2010 that her daughter J had been arrested "like 20 years ago." Mar. 18, 2011 Tr. at 40. She claimed that she wanted to call the court to report this, but did not have the telephone number. This contention was dishonest. The court's letter and subpoena for her November 18, 2010 appearance provided C a telephone number she could have called. In addition, a call could have been made to the court's Deputy Clerk at a number available on the District Court's website. The court finds that C mentioned J at the outset of the March 18, 2011 hearing only because she had correctly inferred that she had been recalled because J's criminal history had been discovered.

In any event, C quickly characterized her experience with J's crimes as a "humiliating" "nightmare." Id. at 40, 41. Her tears, and many inconsistent and incredible explanations[22] for her continued failure to provide accurate information demonstrated that J was, and remains for C a very painful subject. As C did candidly testify: "I am not proud of [J] . . . I just . . . can't admit it would happen in my family." Id. at 73; see also id. at 72 ("It's not something I like to admit, even on paper.").

At the March 18, 2011 hearing, C testified that she did not

---

[22]Among the untruthful explanations C gave for her failure to discuss J before March 18, 2011 were: that she filled out the questionnaire in a hurry, Mar. 18, 2011 Tr. at 74; she "block[ed] that one part of my life out," id.; and she "knew" but she "was not thinking," id. at 71-72.

speak to any of her fellow jurors after the trial was over. Id. at
70. She also stated that she had not had any contact with the
families of the victims in the case. Id. These statements too
proved to be dishonest.

After March 18, 2011, Sampson's counsel found newspaper
articles that reported that C had come to court to observe
Sampson's sentencing. See Ex. 25. One article quoted C as saying
that she had returned to the sentencing because she "needed to meet
the [victims'] families." Id. When recalled to testify again on
August 8, 2011, C admitted that she had returned for the
sentencing, spoke to another juror who had also come, and spoke to
and hugged the parents of one of Sampson's victims, Jonathan Rizzo.
C also disclosed that after the verdict was returned she had
received letters from the McCloskey and Rizzo families.[23]

---

[23]In making these findings of fact, the court is not
suggesting that it was improper for C to attend the sentencing of
Sampson or to have contact with the families of his victims after
the verdict. However, before the January, 2003 media reports
were discovered, in arguing that Sampson had not proven that C
lacked impartiality, the government wrote that:

> Nor has C's conduct since the trial cast any doubt
> about her lack of impartiality during it. Since the
> verdict was returned more than seven years ago, C has
> eschewed any involvement with this case; she has made
> no known statements to the press or sought to
> capitalize on her experience as a juror, and she
> testified that she [had] not stayed in touch with her
> fellow jurors, nor has she had any contact with
> victims' families. While these facts do not preclude a
> finding of partiality, they do provide some relevant
> backdrop against which her recent testimony can be
> assessed.

## 2. C's Inaccurate Answers Denied Sampson His Right to an
## Impartial Jury

As explained earlier, to prove that he is entitled to a new trial because he was denied his constitutional right to a jury that is "capable and willing to decide the case solely on the evidence before it," McDonough, 464 U.S. at 554, Sampson bears the burden of proving by a preponderance of the evidence facts that justify granting a new trial for actual bias, implied bias, or under McDonough. See Amirault, 968 F.3d at 1405-06 & n.2; Dall, 970 F.2d at 970. As explained below, while actual or implied bias have not been proven, Sampson has established that he is entitled to a new sentencing trial under McDonough.

### a. Actual Bias

The court finds that the foregoing facts are not sufficient to prove whether or not C was actually biased. Sampson is, therefore, not entitled to relief based on actual bias.

---

Proposed Findings of Fact and Rulings of Law of the United States (Docket No. 1184) at 53. The court's findings concerning C's conduct after the jury returned its verdict in December, 2003, are relevant to the government's argument concerning her alleged actual bias. They are also relevant generally to her credibility. However, as these events occurred after the verdict and, therefore, could not have been the subject of dishonest answers to voir dire questions, these facts have not been considered by the court as a possible basis for relief under McDonough. See McDonough, 464 U.S. at 556 (to obtain McDonough relief "a party must first demonstrate that a juror failed to answer honestly a material question on voir dire"); Stewart, 433 F.3d at 304 (in applying McDonough analysis, court must "'determine if it would have granted the hypothetical challenge'" to a juror for cause (quoting Greer, 285 F.3d at 171)).

As described earlier, actual bias is an issue of fact. See Amirault, 968 F.2d at 1405-06; Fields, 503 F.3d at 767; Dyer, 151 F.3d at 973; Torres, 128 F.3d at 43. When the issue arises during the jury empanelment process, actual bias has been defined as "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." Fields, 503 F.3d at 767 (quoting Gonzalez, 214 F.3d at 1112 and Torres, 128 F.3d at 43)(internal quotation marks omitted).

When it is alleged after trial that a juror who participated in deciding the case was actually biased, courts often focus on whether the juror proved to be willing and able to decide the case based solely on the evidence. For example, in Fields the defendant was charged with committing robbery, rape, and murder. See 503 F.3d at 761. In response to voir dire questions a juror disclosed that his wife had been assaulted and robbed two years earlier. Id. at 764. After trial, it was discovered that the juror's wife had been raped in the course of those crimes. Id. at 764-65. The trial court found that the juror "did not intend to mislead the trial court, or hide the facts of the attack on his wife, by using the word 'assault' instead of 'rape.'" Id. at 767.[24] Further, the trial court believed the juror's testimony that "he never confused

_____

[24]Because the juror was not dishonest, the defendant was not entitled to a new trial under McDonough, which as explained earlier requires a dishonest answer to a voir dire question. See Fields, 503 F.3d at 767.

77

the events that occurred to his wife with the facts presented in the Field's case, he did not urge other jurors to follow any course of action because of his wife's experience, and he was one of the jurors who initially defended Fields in deliberations." Id. at 764-65. The Ninth Circuit affirmed the trial court. It stated:

We are satisfied that there was no manifest error in the district court's finding that [the juror] was not actually biased. He put aside what happened to his wife and did not confuse those events with what he had to decide about Fields. He truthfully represented that he was impartial.

Id. at 767.

In the instant case, it is not possible for the court to determine whether or not C was willing and able to decide whether the death penalty was justified based solely on the evidence, unimpaired by her painful personal experiences. As the government argued, Federal Rule of Evidence 606(b) provides that "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions . . . or concerning the juror's mental processes." The First Circuit has recognized a limited exception to this principle where it is alleged that a juror was biased because of the defendant's race or ethnicity. See Villar, 586 F.3d at 87-88. However, this exception is not applicable in the instant case. Therefore, the court informed the parties of its tentative view that Rule 606(b) operates to exclude evidence of matters or statements occurring during the course of

jury deliberations, even if offered to show dishonesty at voir dire rather than to prove a juror's thought process in deciding whether the death penalty was justified. See Mar. 18, 2011 Tr. at 8-9; United States v. Benally, 546 F.3d 1230, 1235-36 (10th Cir. 2008)(citing Williams v. Price, 343 F.3d 223, 235 (3rd Cir. 2003)(Alito, J.)); but see Hard v. Burlington Northern Railroad, 812 F.2d 482, 485 (9th Cir. 1987)(citing Maldonado v. Missouri Pacific Railway Co., 798 F.2d 764, 770 (5th Cir. 1986)). Sampson did not generally press this issue and, following the court's comments, C was not questioned specifically about matters that occurred during jury deliberations.[25]

C did claim that her painful personal experiences did not affect her ability to be fair and impartial in deciding whether Sampson should be executed. See Nov. 18, 2010 Tr. at 136-37, 166-67. The court is not persuaded that this contention is correct. C credibly testified that she would be very disturbed if her conduct caused the jury's verdict to be vacated; as she put it, "[i]t would kill [her]." Aug. 8, 2011 Tr. at 39.[26] This concern

---

[25]This case is, therefore, distinguishable from Fields, where the court considered evidence about the juror's thought process and statements during deliberations. See Fields, 503 F.3d at 764-66.

[26]More specifically, in response to a question asking how C would feel if as a result of her performance as a juror a new trial was required, she responded:

It would kill me. It would kill me to see those families go through that again because of me. It's just

provided a motive for her to lie about whether her painful personal experiences impacted her performance as a juror. As described earlier, C began providing dishonest answers to relevant questions when she filled out her questionnaire and she continued to respond dishonestly during individual voir dire and in her testimony in these §2255 proceedings. She may well have done so with regard to whether she was able to compartmentalize her own experiences and decide the issues presented based solely on the evidence.

In any event, it is often difficult to determine many years after the fact whether a juror was actually biased. See Dyer, 151 F.3d at 981 ("Whether [the juror] was actually biased . . . is difficult to figure out eighteen years later."). It is particularly difficult to now assess C's state of mind in 2003 because she was so distraught during her testimony. C herself may not now truly know whether she performed her jury service impartially. Her repeated lack of candor and her inability to discuss certain matters unemotionally and coherently cause the court to be concerned that C was not actually able to decide the relevant issues based solely on the evidence.

However, there is insufficient evidence for the court to find whether or not C was actually biased. Accordingly, Sampson has not

_____

not right. It would kill me.
(Cries.)

satisfied his burden of proving that he is entitled to a new trial because of actual bias.

### b. Implied Bias

Whether Sampson is entitled to a new trial because C should be found to have been impliedly biased is a close question. As explained earlier:

Implied or presumed bias is "bias conclusively presumed as a matter of law." Wood, 299 U.S. at 133, 57 S.Ct. at 179. It is attributed to a prospective juror regardless of actual partiality. In contrast to the inquiry for actual bias, which focuses on whether the record at voir dire supports a finding that the juror was in fact partial, the issue for implied bias is whether an average person in the position of the juror in controversy would be prejudiced. See Haynes, 398 F.2d at 984. And in determining whether a prospective juror is impliedly biased, "his statements upon voir dire [about his ability to be impartial] are totally irrelevant." Id.

Torres, 128 F.3d at 45 (footnote omitted); see also Fields, 503 F.3d at 770; Sanders, 529 F.3d at 792-93.

This case does not involve "a revelation that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or the criminal transaction, or that the juror was a witness or somehow involved in the criminal transaction." Smith, 455 U.S. at 222 (O'Connor, J., concurring). Therefore, C is not impliedly biased because of any direct personal relationship to the parties or specific events in the case.

Nor is the relationship between C's personal experiences and the issues being litigated in Sampson's case as immediate as those

in some criminal cases in which implied bias has been found. For example, in <u>Hunley</u> the defendant was being tried for murder committed in the course of a burglary and two jurors were victims of similar burglaries during deliberations. <u>See</u> 975 F.2d at 320. There, implied bias was found because "[t]he burglary placed the jurors in the shoes of the victim just before she was murdered." <u>Id.</u> at 319.[27] Similarly, in <u>Eubanks</u> implied bias was found to be proven when the defendant was charged with conspiring to distribute drugs and the juror had dishonestly failed to disclose that he had two sons serving long sentences for crimes relating to their efforts to buy heroin. <u>See</u> 591 F.2d at 517.[28] In addition, in <u>Burton</u>, a juror dishonestly failed to disclose that she was afraid of being abused by her husband while she was serving in a case in which the defendant claimed that she suffered from "battered woman's syndrome" that had contributed to her belief that she had to kill her husband to protect herself. <u>See</u> 948 F.2d at 1154. In view of the juror's dishonest answers at voir dire, the Tenth Circuit found that a new trial was required both because implied bias had been proven and because the <u>McDonough</u> test was satisfied. <u>Id.</u> at 1158-59. In the instant case, the temporal relationship

---

[27] Because these events occurred after voir dire, they could not have been the subject of dishonest answers and, therefore, <u>McDonough</u> did not provide a basis for analysis or relief.

[28] <u>Eubanks</u> was decided in 1979, five years before <u>McDonough</u>. If it had been decided after 1984, the defendant would evidently also have been entitled to relief under <u>McDonough</u>.

between the relevant events in C's life, which occurred before the trial, and those testified to at trial is more remote than in the foregoing cases in which implied bias was found.

In addition, this case is not one in which implied bias may be found because "repeated lies in voir dire imply that the juror concealed material facts in order to secure a spot on the particular jury." See Fields, 503 F.3d at 770 (citing Dyer, 151 F.3d at 982)(emphasis added); see also Green, 232 F.3d at 677-78 (holding that a juror was impliedly biased where he "lied twice to get a seat on the jury," provided misleading, contradictory, and false responses when questioned about those lies, and engaged in behavior that brought his impartiality into question). C did not lie during the jury selection process because of a conscious desire to become a juror and punish Sampson for the fear and abuse she had suffered. Rather, she lied to avoid having to disclose or discuss her painful personal experiences.

However, C did repeatedly provide dishonest answers at voir dire, a factor that weighs in favor of a finding of implied bias. See Skaggs, 164 F.3d at 517. This case is, therefore, distinguishable from those in which jurors discussed their experiences honestly, and implied bias was not found. See, e.g., Fields, 503 F.3d at 774-75 (holding, in a case involving allegations of robbery, rape and murder, where the juror answered questions honestly at voir dire, that bias should not be implied

83

because juror's wife had been raped and robbed two years prior to voir dire); Powell, 226 F.3d at 1186, 1189 (holding, in a case involving a charge of kidnaping for sexual gratification, that bias should not be implied where a juror honestly disclosed in voir dire that she had a daughter who had been raped ten years earlier); Torres, 128 F.3d at 46 (holding, in a case involving structuring of financial transactions, that bias should not be implied where the juror disclosed during voir dire that she had herself structured transactions "some years before," but finding that inferable bias justified her excusal for cause); Amirault, 968 F.2d at 1406 (holding, in a case charging rape of child, that bias should not be implied where the juror had repressed a memory of being raped as a child forty years earlier and had, therefore, answered voir dire questions honestly).

Although C's repeated dishonesty at voir dire contributes to raising a close question about whether she should be found to have been impliedly biased, the court does not find that implied bias has been proven because C did not have a direct relationship to the parties or events in the case, the occurrences in her own life which may have affected her ability to decide the case based solely on the evidence occurred before rather than during the trial, and she did not lie in order to secure a seat on the jury.

c. Sampson is Entitled to Relief Under McDonough

Although the court does not find actual or implied bias

84

proven, this case is a paradigm for granting relief under McDonough. As explained earlier, McDonough is a third, alternative means of obtaining a new trial, which does not require proof of actual or implied bias. See McDonough, 464 U.S. at 556 (Blackmun, J., concurring); Amirault, 968 F.2d at 1405 n.2. Once again, McDonough is rooted in the recognition that "the honesty or dishonesty of a juror's response is the best initial indicator of whether the juror in fact was impartial." McDonough, 464 U.S. at 556 (Blackmun, J., concurring). Because dishonest answers to material questions create destructive uncertainty concerning whether a juror is willing and able to decide issues based solely on the evidence, McDonough creates a special test when dishonest answers have been given to material questions. Id. (majority opinion).

For the reasons explained previously, to achieve relief under McDonough, a party must prove by a preponderance of the evidence that: (1) a juror gave an inaccurate answer to a question that was asked on voir dire; (2) the question was material; (3) the inaccurate response was dishonest, meaning knowingly and intentionally false rather than the result of a good faith misunderstanding or mistake; (4) the reason for the knowingly and intentionally false response relates to the juror's ability to decide the particular case based solely on the evidence and, therefore, calls into question the juror's ability to be impartial;

and (5) a correct response would have provided a valid basis for a challenge for cause and would have resulted in disqualification of the juror based on actual bias, implied bias, or inferred bias. The court finds that Sampson has satisfied each of the requirements of this test.

First, C provided inaccurate answers to questions asked at voir dire. Thus, the instant case is not a "non-disclosure" case in which the information now at issue was not required to be disclosed by any question and, therefore, relief would be available only if actual or implied bias are proven. See id. (Blackmun, J., concurring); Crowley, 303 F.3d at 407-08; Dall, 970 F.2d at 969-70; Aponte-Suarez, 905 F.2d at 492. Rather, in this case the questionnaire included many questions which, if answered accurately, would have elicited most of the information concerning C's painful experiences with J and P, which would in turn have led to the discovery of any remaining, undisclosed facts.

More specifically, C answered inaccurately all of the questions that should have elicited the information that J was addicted to cocaine, convicted of related crimes, and served time in prison. She also inaccurately answered every question that should have elicited the information that P abused drugs and had threatened to shoot C about three years earlier, that C feared that P would kill her and obtained an Abuse Prevention Order against him, that P's drug abuse had contributed to their divorce, and that

86

these subjects were too painful for C to discuss. Because C provided inaccurate answers to many voir dire questions, the McDonough test applies in this case and its first prong is satisfied. See, e.g., Amirault, 968 F.2d at 1405-06 (applying McDonough where the voir dire questioning should have elicited the relevant information).

With regard to the second prong of the McDonough test, each of the questions that C answered inaccurately by withholding elicited information concerning J and P had the potential to influence the decision on whether she was willing and able to decide the case based solely on the evidence and, therefore, could and would be an impartial juror. Thus, those questions were material. See Neder, 527 U.S. at 16; United States v. Lecco, 634 F. Supp. 2d 633, 660 (S.D. W. Va. 2009)(vacating a death sentence under McDonough based in part on a finding that questions about prior investigation of juror by law enforcement were material).

In addition, each of C's inaccurate responses to questions that should have elicited relevant information about J and P was dishonest, meaning knowingly and intentionally false, rather than the result of a good faith misunderstanding or mistake. See Jackson, 405 F.3d at 1288-89 (granting a new trial under McDonough where trial judge implicitly found that juror's inaccurate answers to material questions were intentional and dishonest); Burton, 948 F.2d at 1158 (granting a new trial under McDonough after finding

87

that, contrary to the conclusion of the state court, it was "hard to believe that the juror honestly answered the [relevant] voir dire questions").

The fourth prong of the McDonough test requires this court to examine the motives for C's dishonesty, and whether these reasons call into question her ability to be impartial. See McDonough, 464 U.S. at 556; Pope, 209 F.3d at 1164; Greer, 285 F.3d at 167; Dyer, 151 F.3d at 973; Tucker, 137 F.3d at 1028; Boney, 977 F.2d at 634. As the Supreme Court noted in McDonough, "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can be said to affect the fairness of the trial." 464 U.S. at 556. Accordingly, the court must decide whether the reasons for C's dishonest answers to voir dire questions that should have elicited important information concerning J and P relate to C's willingness or ability to decide Sampson's case based solely on the evidence.

The court has found that C lied because of her shame and embarrassment about what J had done and about her experiences with P. Her shame and embarrassment were so intense that she could not discuss those matters candidly, unemotionally or, often, coherently. Moreover, thinking of J and P damaged, if not destroyed, C's general ability to think clearly and respond rationally, rather than with excessive emotion, about other matters.

88

The intensely emotional matters that caused C to lie repeatedly under oath in order to avoid disclosing and discussing them relate to matters the jury was required to consider in deciding whether to sentence Sampson to death. Like Sampson's victims, C had experienced the fear of being murdered. Like the bank tellers Sampson robbed, she had been threatened with being shot. Like Sampson's former wife, C had a marriage that was destroyed by her husband's substance abuse. And like Sampson's parents, C was deeply ashamed of her child and refused to be associated publicly with her problems. As discussed in the implied bias context, such emotional responses to facts that are similar to evidence that will be presented in a trial present a risk of an emotional involvement that will adversely affect a juror's impartiality. See Tinsley v. Borg, 895 F.2d 520, 527 (9th Cir. 1990); Burton, 948 F.2d at 1159; Eubanks, 591 F.2d at 517.

This case is, therefore, unlike Langford, discussed below, in which a juror's dishonest failure to reveal during voir dire in a drug case that she had been convicted of prostitution many years before was a result of her embarrassment about that conviction and did not suggest that she would react emotionally to the evidence in the case or would otherwise be unable or unwilling to decide the case solely on the evidence. See Langford, 990 F.2d at 67-68. Here, C's reasons for lying during voir dire reflect her deep emotional distress about events similar to those presented in the

trial and are, therefore, "reasons that affect [her] impartiality."
McDonough, 464 U.S. at 556. Prong four of McDonough is thus
satisfied.

The fifth prong of the McDonough test is also satisfied
because, if fully informed before empanelment, the court would have
had the discretion to excuse C for cause,[29] see Torres, 128 F.3d at
46-48, and would have exercised that discretion to excuse C. See
Dall, 970 F.2d at 969; Stewart, 433 F.3d at 304. More
specifically, if the court had been properly informed before
empanelment of C's painful personal experiences, it would have
excused C for cause primarily because of the substantial risk that
those experiences would significantly impair her ability to decide
whether the death penalty was justified based solely on the
evidence. See Dall, 970 F.2d at 970 (applicant for relief must
show that "'correct' responses to the voir dire questions would
have required or resulted in the disqualification of [the juror]
for cause."). This conclusion would have been based not only on
the matters revealed, but also on C's extreme emotional distress
when required to think about them. See Ristaino, 424 U.S. at 594-
95 (court's perception of juror's demeanor plays "an important
part" in determining whether a juror could and would be impartial);
Lowe, 145 F.3d at 49. This concern would have been reinforced by

_____

[29]At the August 8, 2011 hearing the government acknowledged
that the court would have had the legitimate discretion to excuse
C for cause. Aug. 8, 2011 Tr. at 69, 78.

C's repeated dishonesty. See, Boney, 977 F.2d at 634; Burton, 948 F.2d at 1159; Colombo, 869 F.2d at 152; Stewart, 433 F.3d at 304. Such dishonesty during a jury selection process in which the importance of accurate answers was emphasized would also have caused the court substantial concern that C would not follow its instructions on other issues and would, therefore, have provided another reason to have excused her for cause. See Thomas, 116 F.3d at 616-17 & n.10.

During voir dire, the court excused other jurors who had disturbing life experiences that were similar to events at issue in the case and which evoked a highly emotional response. For example, one juror stated that she could be impartial, but disclosed that her late sister had struggled with mental illness and alcoholism. See Oct. 2, 2003 Tr. at 242-43. The juror indicated that if there was testimony about Sampson suffering from mental illness, she "assume[d] [she] might be able to identify more with it because I've lived with it a little bit." Id. at 244. The court observed that the juror was "sincere" in stating that she could be impartial. Id. However, the court noted that "the juror's on the verge of weeping when she's talking about her sister" and stated that it was "concerned that if we start hearing about somebody else's family history and claims of mental illness that it's going to have an unduly emotional effect on her and that it could not only be very painful for her, but cause her to be

91

unable to go through the process that a juror has to go through."
Id. Without stating that the juror was actually biased, with the
assent of the parties, the court excused the juror based on the
prediction that she would likely encounter problems once she heard
the evidence in the case. See id. at 244-45. In excusing the
juror the court explained to her that:

All the evidence is going to be hard to hear. That's
going to touch nerves with you, as you said, have a
stronger impact on you, that will be more upsetting to
you because of your sister and her experience than it
would be for another juror, and that that could also
injure your ability to do everything a juror would need
to do.

Id. at 245.

Another juror disclosed that she had a sibling who had a
serious psychological condition and equivocated when asked if she
could be impartial if there was evidence that Sampson was
psychologically disturbed. See Sept. 30, 2003 Tr. at 131-46. The
court found that it would not necessarily excuse a person who
expressed such equivocation or who had a family member who was
mentally ill. Id. at 147. However, this particular juror
exhibited such a strong emotional response to discussion of mental
illness that the court concluded that the trial "will become an
especially difficult ordeal for her" and was "sufficiently
concerned that her experience with her brother will substantially
impair her ability to succeed in what [the court thought] would be
an effort to follow the law and that she would be in such great

92

risk of having a breakdown of some sort that it could infect the rest of the jury." Id. at 147-48. Therefore, although the court did not state that this juror was actually biased, the court concluded that "the most appropriate decision is to excuse her" over the defendant's objection. Id. at 148.

Similarly, if the court had been properly informed by honest answers in C's questionnaire and during individual voir dire, it would have exercised its discretion to excuse her for cause. While the jurors just discussed were excused because of their emotional reaction to matters relating to people close to them, C's difficulties arose largely from things that had happened directly to her, such as P's threat to kill her. As indicated earlier, at the time of voir dire, the court would have foreseen that the trial would include: testimony about violent murders; testimony from female bank tellers who Sampson had threatened to shoot; testimony that Sampson abused alcohol, cocaine, and marijuana; testimony that one of Sampson's marriages ended as a result of his drug use; and testimony that Sampson had been incarcerated. If the court had known that C was deeply distressed because: three years earlier she had herself been threatened with being shot and killed; she had ended a marriage due to her husband's substance abuse; and she felt deeply ashamed of her daughter's criminal activity, drug abuse, and incarceration, the court would have found that, after being exposed to the evidence in the case, C was likely to be influenced by her

93

own life experiences and probably be substantially impaired in her ability to decide the case based solely on the evidence. She would, therefore, have been excused for cause for this significant risk of partiality alone.

In addition, the court also excused jurors solely because it was discovered that they had provided answers that they knew were false on their questionnaire. For example, one juror had disclosed on his questionnaire that his brother had a drug addiction and been treated, but did not reveal his own addiction to oxycontin and treatment for it. See Oct. 1, 2003 Tr. at 127-29. The juror explained he had not revealed his own situation because he "just didn't really feel [he] had to . . . ." Id. at 128. With the agreement of the parties, he was excused because he had lied. Id. at 126-28. Similarly, another juror was excused because, the court explained, "I have, observing his demeanor, the definite impression that he would be unable to apply the law and, indeed, in some respects, was not candid when he filled out the questionnaire." Oct. 15, 2003 Tr. at 67. Moreover, when the court discovered during trial that two sitting jurors had answered portions of the questionnaire dishonestly, it dismissed those jurors as well. See Nov. 20, 2003 Tr. (Sealed Lobby Conference) at 3-5; Dec. 12, 2003 Tr. (Sealed Lobby Conference) at 39, 41. Therefore, had the court learned prior to empanelment that C had intentionally lied on her questionnaire and had later failed to correct her responses when

given the opportunity to do so, she would have been excused for cause for that reason as well.

In view of the foregoing, prong five of the McDonough test, the requirement that C could and would have been excused for cause, is satisfied.

In finding prongs four and five of McDonough satisfied, the court concludes that this case is distinguishable from Langford, 990 F.2d 65, on which the government relies, and comparable to Burton, 948 F.2d 1150, in which the McDonough standard was met. Langford was a case in which a doctor was charged with dispensing controlled substances illegally. See 990 F.2d at 66. In response to a question about whether she had ever been arrested or convicted, a juror intentionally did not disclose that she had, fifteen years earlier, been convicted of prostitution. Id. at 67. She did not answer the voir dire question honestly because of "substantial embarrassment." Id. However, when her record was discovered, the juror candidly confessed and explained, evidently calmly, her motive for lying. Id. Unlike C, the events that the juror dishonestly failed to disclose in Langford were very different from the matters presented by the evidence in the case she was called upon to decide. The trial judge found no reason to be concerned that she could not decide the case based solely on the evidence and held that the juror would not have been excusable for

cause. Id. at 67-68.[30]  Therefore, the motion for a new trial was denied. Id.

In contrast, in the instant case, C's reasons for lying during voir dire cast doubt on whether she could have decided the case based solely on the evidence and she would, therefore, have been both excusable and excused for cause. Thus, this case is analogous to Burton. In Burton the defendant was charged with murdering her husband. See Burton, 948 F.2d at 1151. She claimed that she suffered from "battered woman's syndrome" and that contributed to her belief that she had to kill her husband to protect herself. Id. In response to questions intended to elicit information concerning personal experience with abuse, a juror dishonestly failed to mention her own history of being abused by her husband and her fear of him at the time of trial. Id. at 1154, 1158. The juror claimed that she did not connect her abusive experiences with the voir dire questions and that she tried not to think about her own situation. Id. at 1154. The trial judge did not find this

---

[30]The Second Circuit's decision in Langford, 990 F.2d 65, preceded its decisions in Torres, 128 F.3d at 46-47, and Greer, 285 F.3d at 171, which articulated the concept of "inferable bias." If written after them, it appears that the district judge in Langford would have recognized that the juror's dishonesty raised a possibility of bias that provided the discretion to excuse her or not to excuse her for cause. See Torres, 128 F.3d at 47. It is evident that the judge would not have exercised such discretion to excuse the juror. Because an honest answer would not have resulted in the juror being excused for cause, the McDonough standard would not have been met. See Dall, 970 F.2d at 970.

claim to be credible and, therefore, granted a new trial pursuant to McDonough. Id. at 1158.

In affirming this decision, and finding implied bias proven as well, the Tenth Circuit wrote:

Here, the record is clear that [the juror] was dishonest in her response to questions on voir dire - this is true whether or not she simply did not, or could not respond properly because of her own emotional distress. This dishonesty, of itself, is evidence of bias.

We likewise find that [the juror's] failure to respond on voir dire denied [the defendant] a fair trial under the McDonough test, for it is clear that the juror did fail to answer a material question, and that a correct response would have provided a basis for a challenge for cause. Had [the juror] responded honestly, she would have been excused for cause. That is exactly what happened to [other jurors] who revealed their exposures to family and child abuse.

Id. at 1159 (citations and footnote omitted). The Tenth Circuit's reasoning regarding McDonough is equally applicable to the instant case. Had C honestly answered the questions that should have elicited the relevant information regarding J and P, the court would have had the discretion to excuse her for cause and would have done so.

In summary, C dishonestly provided inaccurate answers to material voir dire questions which sought to elicit, among other things, information about whether she had experiences which were similar to the evidence that would be presented and whether those experiences would likely impair her ability to decide the case based solely on the evidence. Her motives for lying and her

97

emotional distress about the subjects she refused to disclose raise substantial doubt concerning whether she could and would have decided the case based solely on the evidence. If properly informed, this court would have excused her for cause. Sampson has proven each of the facts required by McDonough and, therefore, that he was denied his Sixth Amendment right to an impartial jury. Accordingly, he must be granted a new trial at which twelve truly impartial jurors will have to decide whether he should live or die. See McDonough, 464 U.S. at 554, 556; Morgan, 504 U.S. at 729.

B. Juror D

Sampson also claims that he is entitled to a new trial for sentencing because juror D gave inaccurate responses during jury selection. As discussed earlier, relief is attainable in an inaccurate response case by showing actual or implied bias, or by proving each of the elements of the McDonough test. See Dall, 970 F.2d at 969-70; Amirault, 968 F.2d at 1405-06 & n.2.

D completed her questionnaire on September 18, 2003, and appeared for individual voir dire on October 17, 2003. Investigation by Sampson's counsel in these §2255 proceedings indicated that her responses to some questions were inaccurate. Therefore, the court required her to testify on November 18, 2010. In contrast to C, D was composed, candid, and credible when she testified.

The court finds that D made a number of inaccurate statements

in answer to questions at voir dire. However, these statements were the result of a good faith misunderstanding or mistake, rather than of dishonesty.

During the voir dire process, D was living with ░░░░░░░░░░ , and several of her inaccurate answers to questions on the questionnaire relate to him. First, in response to Question 68, which asked about whether anyone close to her had ever been employed as a private security guard or in law enforcement, she did not report that ░░░░░ had worked as a police officer at Northeastern University until about 1998. The court finds that D did not withhold this information intentionally. Rather, at the time of voir dire she had forgotten that ░░░░░ had worked in this capacity.

Similarly, Questions 63 to 66 asked whether D or anyone close to her had been charged with a crime, been in prison, or had a fair or unfair experience with law enforcement. D did not report that ░░░░░ had been convicted of driving under the influence. However, she did not know in 2003 of ░░░░░ 's conviction. Therefore, her response was not dishonest.

Question 22 asked whether D or anyone else close to her was a member of any religion that had taken a position concerning the death penalty. In 2003, D was a member of the United Methodist Church, which opposed the death penalty. D, however, did not know that the Church had taken a position on the death penalty.

Therefore, her response to Question 22 was also not dishonest.

Finally, Question 48 asked whether any member of D's family had ever served in the military. In 2003, D knew that her father and uncle had served in the Army, and that her uncle had served in combat. She did not report this information because she did not remember it when she was answering the questionnaire or when she returned for individual voir dire. Therefore, D's response to Question 48 was not intentionally false.

In view of these findings, Sampson is not entitled to relief. In general, D impressed the court as an honest, thoughtful juror. She was not proven to be actually biased. Moreover, the matters that she failed to disclose were not comparable to matters at issue in Sampson's case. Because there were not similarities between D's undisclosed personal experiences and the issues involved in Sampson's case, implied bias has not been demonstrated. See Sanders, 529 F.3d at 792-93; Person, 854 F.2d at 664.

As D did give some inaccurate answers, the McDonough test applies. See McDonough, 464 U.S. at 556; DeBurgo, 587 F.3d at 72; Crowley, 303 F.3d at 408; Dall, 970 F.2d at 970; Amirault, 968 F.2d at 1405. However, because none of D's inaccurate answers were dishonest, they do not provide a basis for granting relief under McDonough. See McDonough, 464 U.S. at 556; Crowley, 303 F.3d at 408; Amirault, 968 F.2d at 1405. Moreover, the information not disclosed does not suggest any impairment of D's ability to decide

the case based solely on the evidence. Accordingly, accurate responses would not have required or resulted in her being excused for cause. See Dall, 970 F.2d at 970. Therefore, the McDonough test is not met for these reasons as well.

In essence, Sampson has failed to prove that D's inaccurate responses demonstrate actual or implied bias, or meet the requirements of McDonough. Therefore, Sampson is not entitled to a new trial based on D's service as a juror.

C. <u>Juror G</u>

Sampson also argues that he was deprived of his right to an impartial jury because juror G answered some voir dire questions inaccurately. Therefore, G too was required to testify on November 18, 2010. Although at times suffering from a lack of memory, G was a calm and credible witness in 2010.

G completed his questionnaire on September 18, 2003, and returned for individual voir dire on October 17, 2003. The court finds that on July 20, 1990, when G was 18 years old, he lost control of his car and drove it into a fence in East Bridgewater, Massachusetts. On July 22, 1990, an application for a complaint was filed in the Brockton District Court which alleged that G operated his vehicle to endanger the lives or safety of the public in violation of M.G.L. c. 90, §24. The Brockton District Court summoned G to appear on October 30, 1990, and the case was assigned the docket number ▮▮▮▮. G failed to appear and a default warrant

issued.

On January 29, 1991, G was stopped by police for a motor vehicle infraction in Brockton, Massachusetts, and was found to be driving with a suspended license in violation of M.G.L. c. 90, §23. During that stop, police arrested G based on the outstanding warrant for failing to appear. About two hours later, after paying a $25.00 fee, G was released on personal recognizance and was ordered to appear in Brockton District Court the following morning.

The next day, G appeared in Brockton District Court and was arraigned on both the driving to endanger charge, docket number ▮▮▮, and the charge of driving with a suspended license, which was assigned the separate docket number ▮▮▮. The default warrant arising out of the driving to endanger charge was removed. The court appointed counsel to represent G in both matters.

On March 26, 1991, G admitted sufficient facts to find him guilty of driving to endanger, and that case, docket number ▮▮▮, was continued without a finding until September 26, 1991. He was ordered to pay $80.00 in costs and assessments, which he paid in April, 1991.

In mid-April, 1991, a default warrant was issued in the case charging G with driving with a suspended license, docket number ▮▮▮. The warrant was removed on April 23, 1991, at which time G admitted sufficient facts to find him guilty of driving with a suspended license. That case, docket number ▮▮▮, was continued

without a finding until September 26, 1991.

On September 26, 1991, the case charging driving to endanger, docket number ▮▮▮▮, was dismissed. The case charging driving with a suspended license, docket number ▮▮▮▮, was not dismissed at that time because G had not paid related costs and fees, and a default warrant was issued in that case. There was no further activity in the case charging driving with a suspended license until 1999, when the case was dismissed by the court for administrative reasons.

On January 2, 1992, G was ticketed for speeding in Arizona, in violation of Arizona Revised Statutes 28-702-01D, a misdemeanor. Shortly thereafter, he appeared in court and paid a fine.

On March 28, 1992, G was issued a citation in Arizona for underage drinking and was ordered to appear in court at a later date. However, he returned to Massachusetts and did not appear as ordered. The Arizona court issued a warrant for G's arrest.

At some point later in 1992 or in 1993, G moved back to Arizona to attend school. In late 1992 or in 1993, G was a passenger in a car that was stopped for speeding. The police determined that there was an outstanding warrant for G and arrested him. He was transported to the police station in handcuffs, held in a cell for several hours, and then posted bond for his release. About two weeks later, he was required to appear in court in Arizona and to pay a fine equal to his bond, meaning that he did

not have to make any additional payments to the court. The court adjudicated G guilty regarding the underage drinking citation on May 18, 1993.

On April 5, 1995, G was charged in Arizona with two motor vehicle violations, entering a highway from a private road or driveway in violation of Arizona Revised Statutes 28-774 and failing to provide proof of financial responsibility in violation of Arizona Revised Statutes 28-1253D. As to both violations, he was found responsible by default on May 2, 1995 and ordered to pay fines totaling $483.00. He paid the fines on May 19, 2005.

G did not disclose any of the foregoing information in his questionnaire or during individual voir dire, despite questions which asked whether he had ever been charged with a crime (Question 68) and whether he had any experience in which the police or criminal justice system had treated him fairly (Question 65) or unfairly (Question 65). At the November 18, 2010, hearing, G was questioned on these matters.

At the time of jury selection in 2003, G remembered some, but not all, of his encounters with the police and courts described above. With respect to events in Massachusetts, he remembered that he was charged with driving to endanger, was arrested in connection with that charge, spent several hours in custody, went to court on at least one occasion, had a court-appointed attorney, and ultimately paid a fine. G believed that the driving to endanger

104

charge was a "traffic violation" and, as such, was not a criminal charge he had to disclose. G did not remember that he had been charged with driving with a suspended license.

With respect to events in Arizona, he remembered that he had been cited for underage drinking, that a warrant was issued for his arrest when he failed to appear, that he was arrested after being a passenger in a car stopped for speeding, that he was transported to the police station in handcuffs and held in a cell for several hours, that he was released on bond, and that he later appeared in court and was ordered to pay a fine. He did not recall being charged for speeding or cited for motor vehicle violations in Arizona. Once again, he did not understand the questionnaire to be asking about traffic violations. In 2003, G felt that during his encounters with police and other parts of the criminal justice system, he had been treated fairly.

The court finds that at the time of jury selection, in 2003, G did not withhold any information because of a desire to serve on the jury in Sampson's case. Cf. Green, 232 F.3d at 676-78; Dyer, 151 F.3d at 982-83; see also Clark, 289 U.S. at 11. G sincerely, but mistakenly, interpreted the questions on the questionnaire soliciting information about "crimes" to be asking about felonies rather than "traffic violations" or a citation for underage drinking. He also thought that the related questions about whether he had been treated fairly or unfairly by the police or criminal

105

justice system referred only to events arising out of more serious offenses. To the extent that he remembered the events, G did not disclose them because he did not understand the questions. Therefore, his responses were not intentionally false. See McDonough, 464 U.S. at 555-56.

G has not been proven to have been actually biased. In addition, the matters he failed to disclose were not comparable to matters involved in Sampson's case. Because there were not similarities between G's undisclosed personal experiences and the issues involved in Sampson's case, implied bias has not been established. See Sanders, 529 F.3d at 792-93; Person, 854 F.2d at 664. Because G gave inaccurate answers, the McDonough test applies. See McDonough, 464 U.S. at 556; DeBurgo, 587 F.3d at 72; Crowley, 303 F.3d at 408. However, because G was not dishonest in responding to any questions, his inaccurate answers do not provide a justification for granting a new trial. See McDonough, 464 U.S. at 556; Crowley, 303 F.3d at 408; Amirault, 968 F.2d at 1405.

As Sampson has failed to meet his burden to prove by a preponderance of the evidence that G was not an impartial juror due to actual bias, implied bias, or under the McDonough test, Sampson is not entitled to a new trial based on G's service as a juror.

V. PEREMPTORY CHALLENGES

Sampson asserts that he is entitled to a new trial because inaccurate responses by C, D, and G deprived him of his right to

exercise his peremptory challenges on a properly informed basis. However, in the context of a juror's inaccurate responses to questions on voir dire, mere injury to the ability to exercise peremptory challenges properly is not a ground on which a new trial may be granted. See McDonough, 464 U.S. at 556.

In McDonough, the court of appeals had held that a new trial was necessary to remedy the prejudice to plaintiff's right to peremptory challenges due to a juror's failure to give an accurate response during voir dire. Id. at 549. The Supreme Court explicitly rejected the contention that a court should "wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination." Id. at 555. Accordingly, the Supreme Court has ruled that injury to the ability to exercise peremptory challenges caused by inaccurate responses in voir dire does not constitute a cognizable basis for granting a new trial. See id.; Jones, 311 F.3d at 314 n.3; Zerka, 49 F.3d at 1185 ("The Supreme Court in McDonough explicitly rejected the argument that a plaintiff who is prevented from intelligently utilizing his peremptory challenges is entitled to a new trial . . . ."); see also Rivera v. Illinois, 129 S. Ct. 1446, 1455 (2009)(holding erroneous denial of a peremptory challenge by a state court did not amount to a federal constitutional violation); Martinez-Salazar, 528 U.S. at 316 (holding that a

107

conviction should not be reversed where a defendant was permitted the correct number of peremptory challenges, despite the fact that one of the jurors only remained in the venire because the trial court had erroneously denied a motion to excuse the juror for cause).

Sampson's claim concerning peremptory challenges relies on Colombo, 869 F.2d at 151. However, in that case, although the Second Circuit noted that incorrect responses in voir dire could result in prejudicial harm to the exercise of peremptory challenges, it ultimately remanded the case for a narrow factual determination relating to the issue of bias. See Colombo, 869 F.2d at 152. Sampson also relies on United States v. Barnes, 604 F.2d 121, 142 (2d Cir. 1979), a case that did recognize a right to the intelligent exercise of peremptory challenges. However, the decision in Barnes predates McDonough, which in effect overruled it. See McDonough, 464 U.S. at 555-56.

Accordingly, this court concludes that denial of the ability to exercise peremptory challenges intelligently due to a juror's erroneous responses during voir dire is not a basis for granting a new trial.

VI. CONCLUSION AND ORDER

In view of the foregoing findings of fact and conclusions of law concerning C, Sampson has proven Claim IV of his Amended §2255 Motion. He is, therefore, entitled to a new trial to determine

whether the death penalty is justified. However, because it is not clear whether it is necessary to resolve the remaining claims in Sampson's Amended §2255 Motion, or whether the court must decide whether to issue a Certificate of Appealability regarding Sampson's claims for dismissal, the court is not now entering a final order granting §2255 relief. Rather, in a separate order, the court is directing the parties to confer and inform the court of their positions concerning how this matter should proceed.

This redacted version of the October 20, 2011 Memorandum and Order on Jury Claim shall be filed for the public record.

UNITED STATES DISTRICT JUDGE