UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
UNITED STATES OF AMERICA,      )
                              )
         Plaintiff,            )
                              )   Criminal Action
v.                            )   No. 01-10384-MLW
                              )
GARY LEE SAMPSON,             )
                              )
         Defendant.           )
                              )
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT COURT JUDGE


HEARING


Wednesday, February 18, 2015
10:04 a.m.


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On Behalf of the Government:
      UNITED STATES ATTORNEY'S OFFICE
 3         By:  AUSA Zachary R. Hafer
                AUSA Mark T. Quinlivan
 4              AUSA Dustin Chao
           One Courthouse Way, Suite 9200
 5         Boston, Massachusetts 02210
           (617) 748-3106
 6         zachary.hafer@usdoj.gov

 7    UNITED STATES DEPARTMENT OF JUSTICE
           By:  Michael S. Warbel, Esq.
 8         950 Constitution Avenue NW
           Washington, D.C. 20530
 9         202.514.5605
           michael.warbel@usdoj.gov

10

11    On Behalf of the Defendant:
      LAW OFFICE OF DANALYNN RECER
12         By:  Danalynn Recer, Esq.
           2307 Union Street
13         Houston, Texas 77007
           (713) 869-4722
14         dlrecer@aol.com

15    LAW OFFICE OF MICHAEL N. BURT
           By:  Michael N. Burt, Esq.
16         1000 Brannan Street, Suite 400
           San Francisco, CA 94103
17         415.522.1508
           mb@michaelburtlaw.com

18

      WILLIAMS & CONNOLLY, LLP
19         By:  William E. McDaniels, Esq.
                Jennifer G. Wicht, Esq.
20         725 Twelfth Street, NW
           Washington, D.C.  20005
21         (202) 434-5000
           wmcdaniels@wc.com

22

23

24

25
```

```
 1              P R O C E E D I N G S

 2          (Deputy Clerk Hohler called case to order.)

 3          THE COURT:  Good morning.  Would counsel please

 4   identify themselves for the Court and for the record.

 5          MR. HAFER:  Yes, Your Honor.  For the United States,

 6   Assistant U.S. Attorney Zach Hafer, Dustin Chao, Mark

 7   Quinlivan, and DOJ trial attorney, Michael Warbel.

 8          MS. RECER:  Good morning, Your Honor.  For Gary

 9   Sampson, Danalynn Recer, Michael Burt, William McDaniels and

10   Jennifer Wicht.

11          THE COURT:  For the reasons explained in my February 5

12   memorandum and order concerning appointment of additional

13   learned counsel, Mr. Burt has been appointed as an additional

14   lawyer for Mr. Sampson.  In essence, concerns I at least had

15   about Ms. Recer's health, and other things, caused me to be

16   persuaded that adding Mr. Burt to the defense team would best

17   assure our ability to go to trial in September as scheduled and

18   have that proceeding be both fair and final.

19          So Mr. Burt, I allowed your motion to appear pro hac

20   vice.  As I'll have occasion to describe eventually, one of the

21   things that all the lawyers who aren't members of the bar of

22   this court have certified in being admitted is that they are

23   familiar with the local rules of the court.  That includes

24   local Rule 7.1 with regard to the prerequisites for filing

25   motions, although the government has overlooked one of them,
```

1   too, but we'll get to it.

2          With regard to the agenda, I have the following

3   matters.  I want to start by addressing the disputes concerning

4   the schedule leading up to the trial.  It's my understanding

5   that the Bureau of Prisons discovery and so-called botched

6   execution discovery issues have been resolved by the parties,

7   at least for now.

8          I do want to hear argument on the motion to dismiss

9   for failure to inform the grand jury of the consequences of

10:06 10   special findings and other alleged errors.  There are three

11   other motions, and I know Mr. Warbel has been anxious to argue.

12   But I don't think, if argument is needed, it's going to be

13   today, but I believe those are failure to include the

14   non-statutory aggravating factors in the indictment, number

15   1450; the contention that the statute is unconstitutional

16   because it doesn't require proof beyond a reasonable doubt that

17   the death penalty is the most appropriate punishment, and it is

18   unconstitutional not to exempt the defendants with severe

19   mental disorders at the time of offense from eligibility for

10:07 20   the death sentence.

21          Then there's the government's motion to present victim

22   impact evidence from the Whitney family.  The defendant,

23   Mr. Sampson, responded to that yesterday.  The government's

24   reply is due on February 25.

25          The defendant also filed yesterday a motion for leave

1    to file a substantive motion asking the Court to correct

2    Mr. Sampson's sentencing, exercise its equitable power under

3    Section 2255 to sentence Mr. Sampson to something less than

4    death.  As I said, that was filed yesterday.  It's also

5    discussed substantially in the response to the victim impact

6    motion.

7           There are issues or matters relating to the firewalled

8    Assistant United States Attorneys and the Rule 12.2 notice that

9    I'll have to discuss with defense counsel and the firewalled

10:09 10   AUSAs, and there's some budget and voucher questions.

11          Is there anything else that ought to be on the agenda?

12          MR. HAFER:  Not from us, Your Honor.

13          MS. RECER:  Not from the defense, Your Honor.

14          THE COURT:  All right.  Then let's move to the issues

15   concerning the schedule.  The parties responded to the schedule

16   that I tentatively proposed in the February 6, 2015 order.

17   While I think I understand them, I'd like to hear the parties

18   explain their areas of agreement and disagreement.  And then

19   once those areas are identified, I'll hear the defendant's

10:10 20   argument that the Court lacks the authority to order the

21   disclosure pretrial of witnesses and mitigating factors and

22   whatever else the contention is.

23          In general, I don't, at the moment, find it

24   persuasive, but I want to make sure I understand what's at

25   stake and what the argument is.  So would somebody like to try

1    to explain what the parties have agreed on and what's in

2    dispute?

3            MR. HAFER:  I don't think I'm the person to do that,

4    Judge.  I'm having a hard time figuring it out.

5            THE COURT:  I agree.  Reading the papers, it seemed to

6    me the following -- then I would like to hear from the

7    defendant or from Mr. Sampson.  It seems to me that the parties

8    are in agreement that by April 24, the government -- I should

9    issue an order that requires the government to file its trial

10:11 10   brief and provide the defendant an opportunity to do that, to

11   require the parties file their proposed jury instructions,

12   require the defendant file his Rule 16(b)1.1(C) non-rule 12.2

13   expert disclosures on the assumption that the government has

14   already disclosed its experts.

15           It appears to me from the submissions that there's

16   disagreement as to whether I can or should order the defendant

17   to disclose the evidence he proposes to introduce in his

18   case-in-chief, to which the government may object.  Sampson

19   also contends the Court lacks the authority to require

10:12 20   disclosure of mitigating factors.  He objects to all non-expert

21   disclosures required by Rule 16, I think, particularly having

22   to disclose the documents he intends to use in his

23   case-in-chief.

24           He seems to be contending that he's also not required

25   to provide reports of examinations and tests by non-Rule 12.2

1  witnesses, that he's not obliged to disclose a witness list.

2  So basically, I'm interested in hearing, one, whether I've

3  identified or discerned the defendant's position correctly;

4  two, hear some argument on it; and three, if, as is my

5  tentative view that I have the authority to order disclosure of

6  a witness list, mitigating factors, certain other things, when

7  that should be, if not on the schedule that I tentatively have

8  proposed.

9         So who would like to speak to this for Mr. Sampson?

10:14 10        MS. RECER:  I think that both Mr. Burt and I will each

11  address a point.  For me, Your Honor, just very briefly, I

12  think that the outline of the agreement is ripe.  I would point

13  out that the agreement as to the motions in limine and jury

14  instructions is what was then known to the parties, and we

15  talked about proposing that there would be some language that

16  there was a good effort to raise what was known to the parties

17  at the time but that there be some language that can be

18  supplemented later, or something to that effect.

19        THE COURT:  Just take a step back.  And Mr. Burt

10:15 20  wasn't here.  We discussed this at the last hearing, and there

21  was a tension in Mr. Sampson's position at that time.  On one

22  hand you were arguing that all motions in limine should be

23  decided before jury selection, and I actually agree, continue

24  to agree that that's desirable.  Among other things, it's going

25  to shape the questions on the jury questionnaire or influence

1    them.  So that was one principle.

2         On the other hand, you know, I recognize preparing for

3    trial is an evolutionary process and it may be that certain

4    things are not known in April that are known in August.  So I'd

5    have to look at my order.  You pointed out there was some lack

6    of symmetry in some of the language, but the principle is the

7    same, as I said last time.  If as many potentially disputed

8    issues are identified, say, in late April, and there are

9    motions in limine, brief, going into by early June, we can

10:16  10   start on them then.  I can put my law clerks to work on them

11   when I'm away in July.  They can be decided in August, any that

12   are open.  And, you know, then we would move to jury selection.

13        And in fact, it's my present sense that I would order,

14   if there's a dispute, that the mitigating factors and the

15   witnesses who have to be on the jury questionnaire -- you can't

16   have a juror who is related to one of the witnesses -- you

17   know, be disclosed by the defendant in early August when we get

18   to work, I expect, on the jury questionnaire but not later than

19   that.

10:17  20        Anyway, that's some of my tentative thinking.  I don't

21   how that --

22        MS. RECER:  I think that's consistent with the point

23   that we discussed, so I don't think we have an objection to

24   that.

25        THE COURT:  So you don't have -- what my order -- if I

1    issue an order consistent with my February 6 order, I would be

2    directing Mr. Sampson to disclose the evidence by April 24,

3    disclose the evidence he proposes to introduce in his

4    case-in-chief to which the government may object so that any

5    objections may be addressed in motions in limine prior to jury

6    selection.

7          And I would clarify that, you know, if information is

8    developed after that date or recognized to be important after

9    that date, you know, the defendant could give later notice, and

10:18 10    it may be a proper basis for later motions in limine.

11          MS. RECER:  Yes.  And I didn't mean to address the

12    second issue as to the disclosure of the evidence.  I was just

13    speaking about the motions.  Yes, Your Honor.

14          THE COURT:  You were just talking about what?

15          MS. RECER:  Just the motions in limine deadline, not

16    the evidence deadline.

17          THE COURT:  Well, the disclosure of evidence is -- of

18    some evidence at least, is a predicate for the motions in

19    limine, in my view.  And I've now studied this in a way that I

10:19 20    hadn't two weeks ago and in fact hadn't in 30 years.  I'm

21    satisfied that the defendant doesn't have a Fifth Amendment

22    right, that's *Williams*, not to disclose -- not to be ordered to

23    disclose certain things before trial.

24          I don't at the moment find that there's any federal

25    statute, federal rule or local rule that prohibits, for

1    example, disclosure of mitigating factors.  I am a little --

2    there may be certain areas of evidence that I should order if

3    the government -- I'll need the government to confirm or

4    clarify whether it thinks it can use certain disclosures in its

5    case-in-chief.  I guess I'm not -- if I do have the authority,

6    which I believe I do, to issue, to require, for example,

7    disclosure of mitigating factors, then there's a question of

8    when.

9         But did you say Mr. Burt wanted to address some of

10:20 10   this?

11         MS. RECER:  As to the content, yes, Your Honor.

12         THE COURT:  The first thing I need to do is understand

13   Mr. Sampson's position on these particular points and then the

14   reasons for them.

15         MR. BURT:  Good morning, Your Honor.  I will focus on

16   our position in regard to the case-in-chief disclosures and the

17   notice of mitigating factors.  Those are the two primary

18   disputes as far as we can see.

19         THE COURT:  Let me just take -- I'd like to have

10:21 20   clarity and hopefully agreement on as much as possible.  Is

21   Mr. Sampson going to be objecting to having to disclose, say,

22   his witnesses in August?

23         MR. BURT:  No, because we agree with the Court that

24   that information has to be in the jury questionnaire.

25         THE COURT:  Okay.  All right.  Then we can get to the

1   Court's authority, and I've studied what you submitted.  But my

2   view is, for example, mitigating factors.  Last time his mental

3   condition or drug use were issues in the case.  As I recall --

4   I'm confident correctly -- there were questions on the written

5   questionnaire about whether the potential juror had experience

6   directly or through people close to him or her with mental

7   illness or drug abuse.  And some people were disqualified from

8   serving because they had experiences that were close to,

9   foreseeably, what would be in the evidence.  And we're doing

10:22 10   this in part because a perjurious juror didn't answer some of

11   those questions correctly.

12        Anyway, that's why, in addition to thinking I have the

13   power to do it, I feel I should order the disclosure of

14   mitigating factors.  But go ahead.  I actually do want to hear

15   from you.

16        MR. BURT:  I'll start with the case-in-chief

17   disclosures.  Based on my experience, I've never seen this

18   issue come up before.  A similar issue has come up in most of

19   the federal cases involving the sufficiency of the government's

10:23 20   notice of aggravating factors.

21        And typically the defense has come in with the

22   position that the notice is insufficient, that it should be

23   more detailed in the way of an offer of proof.  The

24   government's position has always been, in response to that type

25   of litigation, that the government is never required to

1    disclose evidentiary detail.  And as far as I know, the courts

2    have uniformly held that that in fact is true.

3         So the notice of aggravating factors, that the

4    government is required under the statute to provide, has

5    typically not involved evidentiary detail.  And I have not seen

6    any Court order the defense to disclose a summary of the actual

7    evidence that's being offered in the case-in-chief.

8         THE COURT:  Well, there are a couple of things.

9    First, your colleagues are very interested in what other courts

10:24 10   have done.  But the fact that nobody else has ever done it is

11   not the end of the inquiry for me.

12        MR. BURT:  I understand.

13        THE COURT:  And I actually see the grand jury matter

14   -- well, we'll get to it.  So that's one.

15        Two, the case-in-chief, putting aside for a moment

16   whether I have the authority, the Court has the authority,

17   that's the area of the greatest concern to me.  But as I said,

18   Mr. Sampson's position up to now has been that he wants

19   essentially to have the motions in limine decided before jury

10:25 20   selection.  And this is what I try to do in every case, to the

21   maximum extent possible when there are foreseeable issues, so

22   the defense and the government can devise a strategy, have as

23   reliable a sense as possible of what evidence they'll be able

24   to get in and not come up, you know, after the openings or

25   before the jury instructions and say, Well, my whole defense

1    was depending on getting this evidence in, and now we haven't

2    gotten the evidence in.  That's not fair.  Same thing with the

3    jury instructions which frames the evidentiary rulings.

4            MR. BURT:  Yes.  And I appreciate the Court's concern.

5    And I think in the last four cases I have seen the capital case

6    unit file an omnibus motion to challenge specific categories of

7    mitigating evidence.  That type of motion has not depended upon

8    the specific mitigators being alleged, except in a very general

9    way, but it has raised for the Court's decision categories that

10:26 10   the Department of Justice feels are not proper mitigation.

11           I'll give the Court some examples.  Typically these

12   motions involve motions to exclude evidence concerning

13   lingering doubt or motions to exclude evidence concerning the

14   impact of the execution on the defendant's family.  And we

15   provided to the Court in our response a typical -- one of these

16   motions.  That type of litigation could go forward at any point

17   because it's a set piece that the Department is advancing.

18   There's certainly nothing that is dependent upon our notice of

19   mitigating factors that holds that litigation up.

10:27 20           And I also point out to the Court that the government

21   does have, from the first trial, a general sense of what the

22   mitigators are because they were provided with those mitigators

23   by Mr. Ruhnke.  So they're not completely in the dark in terms

24   of where the defense is going; and they certainly are in a

25   position, it's our view, to come forward with mitigating their

1    motion to exclude mitigating factors.

2          So in terms of the Court's concern that unless we have

3    a detailed disclosure of mitigating factors or the

4    case-in-chief for that matter, we're not going to be able to

5    litigate issues, I am not sure that that's the case.

6          THE COURT:  Well, you run into two -- there are at

7    least -- well, one, it also occurred to me that we have the

8    first trial, and while there may be additional or different

9    mitigating factors, some of them are known.  And it has come

10:28 10   into sharper focus.  This was an issue embedded in the botched

11   execution dispute that I should decide and rule upon the

12   definition of a mitigating factor, whether it's limited to

13   what's in the statute essentially and what the statute codifies

14   are constitutional requirements, which I think is, basically,

15   the history and characteristics of the defendant and certain

16   things relating to the offense but not something like the risk

17   of botched executions.  That's the government's view, I think,

18   that's not a mitigating factor.  So I think we could litigate

19   those.

10:28 20         Hold on just a second.  Why don't you keep going.

21         MR. BURT:  I think one of the Court's orders

22   references the *McCleskey* definition of mitigation, which is

23   anything the defendant offers as a basis for a sentence less

24   than death.  And that's been the tension in these cases.  The

25   government saying, No, that's not what mitigation means.  It

 1   really has to relate to the character and background of the

 2   defendant.

 3          THE COURT:  That's exactly what I was talking about.

 4   And I may have been wrong in just extracting that line from

 5   *McCleskey*, but that can be -- I agree that could be decided

 6   without disclosure of specific factors.  I continue to be

 7   concerned about fashioning an appropriate jury questionnaire,

 8   you know, without knowing exactly what mitigating factors are

 9   going to be alleged.

10:29 10          MR. BURT:  And we do think that is a legitimate

11   concern.  We have set forth an argument, and I hear the Court

12   saying you're not persuaded by that argument, that you don't

13   have the authority.

14          THE COURT:  Well, you can explain it to me.

15          MR. BURT:  Well, both in relation to the case-in-chief

16   issue and the mitigating factors, the argument is simply that

17   there's certainly nothing in the rules or in the death penalty

18   statute which authorizes that.  And in regard to the notice of

19   aggravating factors, we have a specific statute that covers

10:30 20   that topic.

21          THE COURT:  I'm sorry.  Notice of aggravating factors.

22          MR. BURT:  In other words, the 3593(a) has a provision

23   which requires the government, but not the defense, to provide

24   notice of aggravating factors.  Attempts have been made to

25   change that law, and those attempts have failed.  And it seemed

1    to us that that was a persuasive argument that the statute, as

2    it presently existed, does not grant the authority to make

3    those statements.

4         THE COURT:  At the moment it doesn't appear to me to

5    be a persuasive argument because Rule 57(b) recognizes that

6    there's certainly inherent authority in the Court, and it's the

7    inherent authority to manage proceedings in a way that's not

8    inconsistent with any federal statute, federal rule of criminal

9    procedure or local rule.

10:31 10         So the fact that the statutes and the rules are silent

11    on an issue, it seems to me, to leave the inherent authority in

12    place; and then the question is, you know, what's the

13    appropriate -- is it appropriate to exercise it.  Indeed, more

14    specifically -- and I can go through this, because I don't know

15    how much time or opportunity the government has had to do

16    this -- Rule 16 says that defendant has to produce certain

17    reciprocal discovery, but the application note to the rule from

18    1974 says that's intended to establish a minimum and not to

19    reduce the Court's inherent authority, in effect.

10:32 20         So to me, the authority exists, and the most

21    problematic area would be with regard to the case-in-chief.

22    And part of the reason -- I didn't write my proposed order

23    directing the defendant to file a trial brief; but saying if

24    you foresee there's going to be litigation over something you

25    want to get into evidence, disclose it so it can be litigated,

 1    because that will serve the purpose of getting you guidance

 2    before trial.

 3            We haven't mentioned witness lists yet, or you

 4    haven't, mitigating factors, witness lists.  At some point I

 5    would order an exhibit list for your case-in-chief associated

 6    with the witnesses.

 7            What do you see as the -- without conceding, but

 8    assuming I have the authority to order all of what I addressed

 9    in my proposed order, tentative order, what's the problem with

10:34 10   requiring Sampson to disclose essentially what he intends to

11    present in his case-in-chief?

12            MR. BURT:  I think the biggest Fifth Amendment problem

13    relates to the fact that the government is going to be

14    producing evidence of unadjudicated criminal activity during

15    the sentencing phase that they have the burden of proving

16    beyond a reasonable doubt.

17            So if you think about some of the mitigators that come

18    up in relation to that prior unadjudicated criminal activity --

19    just as an example, a mitigating factor might be the defendant

10:34 20   acted under duress.  He committed the prior offense, but he

21    acted under duress.  So implicit in that mitigating factor is

22    an admission by him that he committed that conduct.  So you are

23    lightening the government's burden by coming forth before

24    they've had to put on their case-in-chief as to the

25    unadjudicated criminal activity.

1          THE COURT:  And what is -- because this is exactly

2     what I was beginning to hone in on.  What is the prejudice?  Is

3     the prejudice a concern that the government would seek to admit

4     in its case-in-chief the statement that the defendant said this

5     was a mitigating factor, or is it that the government would

6     have pretrial notice that the defendant might argue duress and

7     that it would have an opportunity to prepare for that?

8          MR. BURT:  I think it's both.  I think it lightens

9     their burden and can cause them to shift their emphasis in a

10:36 10    way that gives them an advantage they would not otherwise have

11    had the defendant not been required to produce that kind of

12    disclosure.

13         THE COURT:  But -- I'm sorry.  Go ahead.

14         MR. BURT:  I was going to say that I think it's

15    because of those very problems that most of the cases, at least

16    on the mitigating factor disclosures, have ordered that

17    disclosure right on the eve of the trial.  Because by that

18    time, the defendant certainly knows what he's going forward

19    with.

10:36 20         THE COURT:  But this case -- one of the -- Mr. Brook,

21    colleague, all these things, testified against the enactment of

22    the statute, and he talked about the Fifth Amendment right or

23    interest that exists before somebody's been found guilty.  In

24    this case, Mr. Sampson's pled guilty.  We haven't gone back

25    before that.  And we are in the penalty phase or the selection

1   phase.

2        So the concerns that might ordinarily operate don't

3   operate -- that concern about use in a guilty phase.  But I

4   mean, if the government agreed that it's not going to seek to

5   tell the jury that Mr. Sampson has told us before that he acted

6   under duress, or if I exclude that, what's the unfair

7   prejudice?

8        MR. BURT:  There might not be any, depending upon how

9   that remedy is structured.  In other words, the Court may have

10:37 10   some means to alleviate any problems that might arise.

11        THE COURT:  Because most of those cases that -- you

12   know, with regard to the government having a chance to

13   investigate, most of the cases you cited found that under the

14   statute, the government does have a right to rebuttal and for

15   that to be meaningful.  And for the case not to be interrupted

16   by many and long continuances, it was appropriate to order the

17   disclosure of mitigating factors some reasonable time before

18   the penalty phase.

19        Mr. Hafer, do you want to be heard -- is there more

10:38 20   you'd like to say on this, Mr. Burt?

21        MR. BURT:  No, Your Honor.  Thank you.

22        MR. HAFER:  Briefly, we agree.  It's right.  It's also

23   right because it facilitates the efficient progress of the

24   litigation.  I mean, we don't do boilerplate.  We're not going

25   to start filing boilerplate motions to exclude things that may

```
 1    or may not be identified as mitigators.  That's backwards.  We
 2    should know what they intend the mitigators to be.  I have two
 3    responses to the claim that we already know.  We certainly know
 4    what they were in 2003.  But ad nauseam, we've been told that
 5    the prior defense counsel did a horrific job.  We don't agree.
 6    That's what they say.
 7         So how helpful are the horrible mitigators that the
 8    prior counsel put on?  We don't know because they've been
 9    telling us since the 2255 that they did a terrible job.
10         The second thing I would say --
11         THE COURT:  Let me just pin down some of the
12    implications of that.  With regard to the framework that was
13    established tentatively by me after hearing from all of you for
14    the motions in limine, they'd have to identify the mitigators,
15    say, April 24, not August 8, and they haven't argued yet that
16    they're not far enough along to know what any or all of their
17    mitigators are going to be.
18         But go ahead.  So you're arguing for sort of
19    disclosure April 24, not August 8, hypothetically?
20         MR. HAFER:  Yes, absolutely, Your Honor, especially
21    because, you know, we've looked at the last couple of cases Mr.
22    Burt has done.  He's tried to put 150 mitigators in front of
23    the jury, literally.  We think that's wildly inappropriate.
24    There were about 17 or 18 that went before this jury the last
25    time.
```

 1          But if they're even going to attempt that game again,

 2   then we need lots of time to streamline this and knock these

 3   out because there should not be anywhere near that number of

 4   mitigators.

 5          THE COURT:  In fact, about a year ago I ordered

 6   disclosure of the mitigators, and you got a cut-and-paste

 7   version of more than 100.

 8          MR. HAFER:  I think it was in that area code, yes,

 9   Your Honor.  It was about 90.

10:41 10          And the point is that -- and something Ms. Recer said,

11   and Your Honor discussed this tension earlier -- is they need

12   to be ordered, in our view, to do this by April 24.  If there's

13   good cause to add a mitigator or two post-April 24, then of

14   course, then there's good cause and it can be added.  But

15   there's this hyphenated word going in the pleadings:  "Then-

16   identified," "then-known," "then-aware of."  And it's been used

17   to essentially -- so it can't be that you order these

18   mitigators disclosed by April 24, and on April 24 they disclose

19   two or some very generic disclosure and say, "That's what we

10:41 20   know today, April 24," and over the next three or four months,

21   we get inundated with tens and tens and tens of additional

22   mitigators.

23          They have an idea of what their case is.  And as you

24   said, 57(b) provides you with authority that is not taken away

25   anywhere in 3593, and it facilitates the efficient presentation

1    of this case.  And, and, I might add, it's not like we're

2    playing hide the ball here on our case.

3              First off, as I've said numerous times, they have a

4    roadmap to our case, more than a roadmap.  You've also ordered

5    us to file our trial briefs.

6              THE COURT:  Okay.  Let's spell this out because Mr.

7    Burt is here, and I think I understand you, but let me see if I

8    do.

9              First of all, you filed a detailed -- the government

10:42 10    filed a detailed trial brief, as I recall, in 2003, correct?

11              MR. HAFER:  Yes, Your Honor.

12              THE COURT:  And I believe you said at the last hearing

13    or in December you said, when you had a deadline for a trial

14    brief, you were going to file essentially the same trial brief.

15              MR. HAFER:  Expanding on -- noting a couple of areas

16    of difference, dead witness who would be replaced with,

17    providing in detail the Terre Haute case, for example, but yes.

18              THE COURT:  So basically the new part would be what's

19    happened in the last ten years?

10:43 20              MR. HAFER:  Yes, Your Honor.

21              THE COURT:  So you have a trial brief, and then you

22    have the trial.

23              MR. HAFER:  Right.

24              THE COURT:  And you've said that it's your present

25    intention to put on, say, the same experts and essentially the

1    same case, plus evidence of dangerousness in Terre Haute?

2         MR. HAFER:  Correct, Your Honor.  And there was one

3    where there's a substantive difference in the expert under Rule

4    16.  We did a detailed disclosure on that as per your order

5    last October.  We provided an updated notice.  One of the

6    medical examiners is deceased, and yet, we're happy to file a

7    trial brief on April 24 where we will explain, you know, for

8    example, there's a handful of witnesses who are no longer

9    available either due to death or incapacity of some other type

10:44 10   and explain that.

11        THE COURT:  And then you would say you propose to use

12   their testimony from the first trial, and if they wanted to

13   challenge whether that's hearsay or admissible under the

14   unavailable witness exception, they could do that.

15        MR. HAFER:  Correct.  There are some witnesses,

16   exactly, Your Honor, that we might say, Here we're not looking

17   necessarily for a substitute witness.  We're looking to do a

18   read-in.  It's prior sworn testimony tested by

19   cross-examination.  Therefore, it's admissible for the truth,

10:44 20   even though the rules of evidence don't apply.  There will be

21   other cases where we might say, This witness is deceased.  We

22   intend to call this witness in lieu of that witness.  This

23   witness has dementia, so we intend to call this witness instead

24   of that witness.  Or, we say, We propose doing a read-in of the

25   prior testimony.  All that stuff, we intend to describe in

 1    detail in the April 24 filing.

 2          THE COURT:  So to the extent that Mr. Burt's recent

 3    experience in other cases in other jurisdictions has been that

 4    the government won't give any detail about the aggravators, you

 5    intend to include a reasonable level of detail in the trial

 6    brief, and there's the record of the 2003 trial.

 7          MR. HAFER:  That's exactly right, Your Honor.

 8          THE COURT:  So to the extent I have some inherent

 9    power and I'm looking for the equitable way to exercise it, I

10:45 10    think you're arguing the fact that the government is making

11    full disclosure, substantial disclosure, should influence me to

12    order the government -- Sampson to make more disclosure than

13    might be appropriate in a different case?

14          MR. HAFER:  That's right, Your Honor.  It's, A, that

15    you have the authority to do this; B, this will facilitate the

16    progress of this litigation in a way that doesn't prejudice

17    anyone; and C, certainly it's been the approach that the

18    government has taken on its own and that you've ordered us to

19    undertake by filing a trial brief.  We didn't stand -- if you

10:46 20    read the '03 trial brief, and it will be the same here, we're

21    putting it out there.  There's not going to be any surprises

22    from our end.  Despite the fact that we have been told ad

23    nauseam that there shouldn't be any surprises from either end,

24    we continue to get resistance to any type of substantive

25    disclosures.

1        But we -- it is not going to impact how we proceed.

2   There will be no surprises.  We've produced all the *Jencks* in

3   our possession.  We've produced the trial transcripts.  We will

4   continue to put our case out in the open.

5        THE COURT:  We're not there yet.  I've put aside the

6   *Jencks* issue, 26.2 issues, but we'll get to them shortly.

7        Well, Mr. Burt, is there the prospect that there will

8   be 75 or 100 mitigators proposed in this case?

9        MR. BURT:  I don't think I'm deep enough into it to be

10:47 10  able to answer that question, but I can state to the Court

11  that, generally, the trend in more recent cases, not just mine

12  but others as well, has been to break down the number of

13  mitigators and offer as many as possible.  The reason for that

14  is to avoid the kind of 2255 attacks that occur down the line

15  if counsel doesn't offer every piece of mitigating evidence

16  that is available.

17        So we're not trying to burden the jury or the Court.

18  We're trying to do our job here.  And so yes, there will be a

19  number of mitigators, and the fact that the government has

10:47 20  looked at these other cases indicates to me they know generally

21  the kinds of things that will be offered in mitigation.  And

22  from the experience of other cases, they have used that

23  knowledge to their advantage to file these in limine motions,

24  however you designate them, boilerplate or not, raising the

25  issues about the proper scope of mitigation.

```
 1          THE COURT:  Let me go back to Mr. Hafer.  I meant to
 2     ask you this.  Does the government contemplate seeking to use
 3     any of these statements by Sampson's counsel in its
 4     case-in-chief?
 5          MR. HAFER:  No.
 6          THE COURT:  So would you be agreeable to an order that
 7     prohibited that, that you just use it to prepare your case to
 8     essentially rebut?
 9          MR. HAFER:  Correct, yes.  With, you know, I would --
10:48 10     yes.  The short answer is yes.  I would think we would have
11     some standard interest of justice exception if something came
12     up that was, you know, the standard letter and language in a
13     proffer agreement or something like that.  But other than that,
14     yes, we wouldn't have any interest in using it in our
15     case-in-chief.
16          And I don't know why we would start by guessing what
17     the mitigators are and filing to exclude things.  And I would
18     say the trend -- just so it's clear, Your Honor, the trend
19     among the anti-death penalty defense bar is to flood the Court
10:49 20     with mitigators.  It's not accurate to say the trend among the
21     verdict forms is to submit hundreds of mitigators to the jury.
22          Very similar litigation just occurred a year and a
23     half ago in the Eastern District of New York in the Ronell
24     Wilson sentencing retrial in Brooklyn.  That judge, Judge
25     Garaufis, excluded and consolidated huge numbers of mitigators.
```

1    So the notion that it's being done, by the way -- and I have to

2    comment on this.  The notion that it's being done to make a

3    cleaner 2255, that's not credible.  That's not why it's being

4    done.  It's being done to create confusion.

5         If you look at some of these things on some of these

6    other verdict forms, it's -- and that's something I do want to

7    respond to because it did come up in the Whitney motion, and I

8    can do it later, Judge, or I can do it now.

9         THE COURT:  We're going to do the Whitney motion

10:50 10   separately, but if it's relevant to this, you can say something

11   about it.

12        MR. HAFER:  This constant refrain about, we have to do

13   what they say or there's going to be a 2255; we have to do

14   everything they say, or there's going to be a 2255, it's

15   getting tiresome.  They stuck in the Whitney motion, which half

16   of which has nothing to do --

17        THE COURT:  We're going to get to that.

18        MR. HAFER:  Okay.  I'll wait.  The point is, by

19   requiring disclosure of the mitigators, Your Honor, you can

10:50 20   facilitate informed challenges to the mitigators prior to trial

21   which, therefore, they need to be baked into the questionnaire.

22        If they're going to be putting on, for example, that

23   he has hepatitis C or if they want to put on something that he

24   has hepatitis C as a mitigating factor and there are potential

25   jurors who lost family members to hepatitis C, well, we need to

1    know that.

2            THE COURT:  I'll explain it momentarily, but I'm going

3    to order disclosure of the mitigators.  The open issue is are

4    we talking about August or are we talking about April.

5            And my reaction to the concern about the 2255 was as

6    follows:  I think it can -- if you look -- I haven't looked at

7    it recently, but if one looks at the list of mitigators that

8    was filed a year ago, some of which, as I recall, had nothing

9    to do with Mr. Sampson or this case, but if there are,

10:52 10  hypothetically, ten mitigators that a jury could reasonably be

11   expected to find and the defendant in the capital case

12   persuaded the judge to give them 75, those ten could be lost.

13   You know, after having found the first 25 are frivolous or 50

14   of them are frivolous, they might not focus on and give

15   adequate weight to the others because they've been obscured.

16           I do constantly strive to try to assure things will be

17   fair and final, but sometimes it can be ineffective to not be

18   focused.

19           MR. BURT:  Could I add one thing, Your Honor?

10:52 20          THE COURT:  Sure.

21           MR. BURT:  I understand the Court at this point is

22   focused on when these disclosures would take place.

23           THE COURT:  Actually, putting aside evidence relating

24   to the case-in-chief, I think that presents its own issues,

25   although I do think I have the authority.  I'm talking about

1    witness lists.  I'm talking about mitigating factors.  I'll be

2    talking about exhibits at some point, former pretrial evidence

3    or disclosure of pretrial evidence, experts.  Go ahead.

4         MR. BURT:  I think the Court has the witness lists and

5    the exhibit lists closer in time, or you're contemplating

6    closer in time to trial, and that makes sense to us because

7    that has to be in the jury questionnaires.

8         The key provision for us on the mitigating factor list

9    is the language you propose in 1(c) of your order 1797,

10:54 10   "Without prejudice to his right to supplement this disclosure

11   as his preparation for trial progresses."  I think that's where

12   the dispute is down the line, if we're trying to anticipate

13   problems.  I just heard counsel sort of allude, Well, if they

14   come in with one or two other mitigators that were not in the

15   list, that's what we're trying to avoid because our

16   investigation is going to proceed beyond April, and there's no

17   doubt going to be more than one or two.  So as long as there's

18   an understanding that there is a safety valve there, then I

19   think the concern with earlier disclosure could be alleviated.

10:54 20   But if we're talking about a drop-dead list --

21        THE COURT:  Here.  You're getting on a train that's

22   down the track but I'm hoping that its direction is going to

23   change because I expect, like I think my colleagues throughout

24   the country expect, zealous advocacy from both sides in good

25   faith.  Emphasize the good faith.  You know, if a good faith

1    effort is made in April to identify what may be the mitigating

2    factors, and then the investigation, which of course will

3    continue, discloses others, I'm not going to say you can have

4    two more or you can have five more but you can't have ten more

5    to propose.

6         On the other hand -- and there's reason for me to have

7    this concern in this case.  You know, if I order April, and

8    there are two, hepatitis C and mental condition, and then in

9    August we found 90 others, you know, I have to exercise my

10:56 10   judgment, and it's going to be influenced by the

11   trustworthiness, the credibility of counsel and how hard I'm

12   going to push to have it shown to me, at least ex parte, that

13   this is new.

14        But ordinarily, I'd be able to rely on the

15   representations of counsel.  And I hope -- although I have some

16   problems with that now, manifest in some of the unprecedented

17   orders I've issued, including requiring that motions for relief

18   to file substantive motions be submitted.

19        This is a useful discussion because it is without

10:56 20   prejudice.  And I don't think -- you know, if the government

21   gets -- I mean, my inclination, having heard you and Mr. Hafer

22   and done the work I've done, it would be to say that, you know,

23   in April, the defendant should identify the mitigating factors

24   which it in good faith believes it may ask go to the jury

25   without prejudice to the right to supplement the disclosure as

1       the preparation for trial progresses.

2              And that will permit the most focused motions in

3       limine to be prepared.  And, you know, if you're acting in good

4       faith, I'll understand it.  And whatever you come up with

5       later, we'll deal with.  It will permit focused consideration

6       and informed decisions.

7              MR. BURT:  Your Honor, there's one aspect of the

8       proposal which the Court is contemplating in a simultaneous

9       filing of what the government has described as a trial brief

10:58  10  which will contain a detailed case-in-chief summary at the same

11      time we're being ordered to disclose mitigators.  And I'm

12      wondering if the Court would consider ordering the government's

13      disclosure to precede ours so that we're in a position to look

14      at that and assess it before we file the mitigators.

15             THE COURT:  I suspect Mr. Hafer won't have a problem

16      with this because he was prepared to file his trial brief last

17      month.

18             MR. HAFER:  If you want to back us up prior to April

19      24 on the trial brief to allow that --

10:58  20      THE COURT:  I'll put you about a month before.

21             MR. HAFER:  That's fine.

22             MR. BURT:  Thank you.

23             THE COURT:  All right.  Actually, let me give

24      Mr. Hafer a chance at least to speak to this, or both parties.

25      With regard -- I believe I have the authority under *Williams* --

 1      and I'm going to describe this in a minute -- to order the

 2      disclosure of evidence.  I don't at the moment feel comfortable

 3      ordering the defendant to file a detailed trial brief.  I do

 4      want to either order or invite and encourage the disclosure of

 5      evidence, as I wrote here, that foreseeably could be the

 6      subject of a motion in limine.  And since the defendant has an

 7      interest in getting guidance, I hope to get that.

 8              But do you want to be heard on that approach?

 9              MR. HAFER:  No, Your Honor.  We don't have a strong

11:00 10     opinion on the trial brief.  If you have any concerns, we don't

11      feel that it's necessary to order a trial brief.  Again, so

12      long as we get something to facilitate the motions in limine

13      practice, we don't -- we're not pushing asking for a defense

14      trial brief.

15              THE COURT:  Mr. Burt, I am inclined, as I said, to

16      either order -- that's the way the February 6 is written,

17      "shall disclose evidence you can foresee that wouldn't provoke

18      a motion in limine."  Do you want to be heard on that?

19              MR. BURT:  I just want to make sure I understand the

11:00 20     intent of that paragraph B.  Is the Court in that language,

21      when you say, "disclose the evidence he proposes to introduce

22      in the case-in-chief to which the government may object," is

23      the Court contemplating that we would look at our case-in-chief

24      and decide what are the controversial issues here and only be

25      disclosing those?

1          THE COURT:  Yes.  Is that okay?

2          MR. BURT:  Okay.  Yeah, that's fine.  I just want to

3     make sure I was reading that correctly.

4          THE COURT:  It is.  And it's only to make this motion

5     in limine process work.  I do this in every case.  I am very

6     interested in motions in limine.  I'm very interested in the

7     proposed jury instructions.  I'm very interested in identifying

8     disputes relating to the proposed jury instructions in advance

9     because they frame -- that frequently frames -- provides the

11:01 10   standards for deciding many motions in limine.  Is this

11    relevant?  Is it admissible?  And once I do that, it permits

12    counsel to develop a strategy based on evidence the jury is

13    likely to hear and not based on, you know, some misconception

14    about what I'm going to allow the jury to hear.

15         MR. BURT:  Makes sense.  I think the Court indicated

16    you didn't have a problem with that "without prejudice"

17    language being added.

18         THE COURT:  We absolutely can add the "without

19    prejudice language" because that is the intention.

11:02 20   MR. HAFER:  And the good faith language.

21         THE COURT:  All right.  Let me, since the issue is

22    raised by the submissions, and I may actually excerpt this and

23    write something about it or include it in the order, I will

24    note that Mr. Sampson has asserted with regard to the schedule,

25    in writing at least, that the Court does not have the authority

1    to order the disclosure of evidence the defendant proposes to

2    introduce in his case-in-chief, and certain other things,

3    including mitigating factors.  I find that that contention is

4    not correct.

5         More specifically, I find that the Court has the

6    authority to order the pretrial disclosure of a witness list,

7    mitigating factors, proposed exhibits and evidence that the

8    defendant proposes to use in his case-in-chief, although I'm

9    not going to exercise that authority to its full limits.

11:03 10       First, the defendant does not have a Fifth Amendment

11    right to remain silent regarding his defense before trial.  The

12    Supreme Court decided that in *Williams v. Florida*, 399 U.S. 78

13    at 85 to 86, when addressing an alibi defense.  This has also

14    been discussed in District Court in Puerto Rico in

15    *Catalan-Roman*, 376 F. Supp. 2d 108 at 117.  The fact that the

16    defendant does not have a right to remain silent regarding his

17    defense before trial is implicit in the provisions of Federal

18    Rule of Criminal Procedure 16(b)(1), which require disclosure

19    of certain evidence the defendant intends to use in his

11:04 20    case-in-chief.

21         In the 1970 -- I think I may have written the year

22    down incorrectly.  In the 1974 application note to Rule 16, or

23    Advisory Committee note to Rule 16, the Advisory Committee

24    wrote, "The rule is intended to prescribe the minimum amount of

25    discovery to which the parties are entitled.  It is not

1    intended to limit the judge's authority to order broader

2    discovery in appropriate cases," as the Court noted in

3    *Catalan-Roman* at 115.

4           Rule 57(b) of the Federal Rules of Criminal Procedure

5    also recognizes and codifies the Court's inherent authority by

6    stating that, "A judge may regulate practice in any manner

7    consistent with the federal law, these rules or the local rules

8    of the district."  I recognize and exercise such inherent

9    authority to act interstitially in applying the standards of

11:06 10   Rule 29 after the first Sampson trial.  That is discussed in

11   *Sampson,* 335 F. Supp. 2d at 200 and also in *Catalan-Roman,* 376

12   F. 2d at 115 which cites *Sampson.*

13          There is no federal statute, federal rule or local

14   rule that addresses whether or when a defendant can be required

15   to disclose witnesses, exhibits, other evidence or mitigating

16   factors:  In 2007, that Congress did not enact proposed

17   legislation that would have required disclosure of mitigating

18   factors before the guilt phase of a capital case.  However, the

19   failure to act does not limit the Court's inherent authority as

11:07 20   a statute would, particularly in this case where the defendant

21   has pled guilty and the parties are preparing for a sentencing

22   phase.

23          18 United States Code, Section 3432 requires the

24   government to provide a capital defendant notice of its

25   witnesses at least three days before trial.  This does not --

1    the language itself is "at least three days before trial."  It

2    communicates that a Court may order earlier disclosure.  It

3    just prohibits a Court from authorizing later disclosure.

4           The statute is silent with regard to disclosure of

5    witnesses by a defendant.  Ordering pretrial disclosure of

6    witnesses by a defendant would not conflict with this statute.

7    Most courts have held that judges have the authority to order

8    the disclosure of mitigating factors and witnesses before the

9    penalty phase of a trial to make the government's right to

11:08  10   rebuttal under 18 United States Code, Section 3593(c)

11   meaningful.

12          Judge O'Toole did that in *Tsarnaev*, 2014 Westlaw

13   4823882 at page 5.  He required the disclosure of mitigating

14   factors three weeks before trial, basically three weeks before

15   jury selection, and witnesses as well.

16          In *Wilson*, 493 F. Supp. 2d 464, at 465 to 66, the

17   District Court of the Eastern District of New York required

18   disclosure of mitigating factors four days after the beginning

19   of the guilt phase, and what *Sampson* characterizes as *Lujan*,

11:09  20   disclosure of mitigating factors -- well, the decision was

21   issued one week before the penalty phase began and required

22   disclosure on or before the beginning of the penalty phase.

23          *Catalan-Roman*, 376 F. Supp. 2d at 11, the Court

24   required disclosure of non-mental health mitigating evidence a

25   week after the penalty phase began.  The only contrary decision

1        cited by *Sampson* is a magistrate's decision, *Umana*.

2              So I find that I have the authority and that it's

3        appropriate to exercise it to require disclosure of mitigating

4        factors and the defendant's witnesses prior to the submission

5        of the jury questionnaire.  I'm going to require the disclosure

6        of the mitigating factors, which in good faith are known to the

7        defendant, on about April 24, without prejudice to the right to

8        supplement that as investigation evolves.

9              That's information that's necessary to select the jury

11:10 10  and to permit the motions in limine that we've discussed.  It

11        will also give the government reasonable time to prepare

12        rebuttal.  I am also, with the agreement of the defendant,

13        going to order the disclosure of evidence that he proposes to

14        introduce in his case-in-chief to which the government may

15        object so that any objection may be addressed in motions in

16        limine and decided before jury selection.  I'm going to make

17        that April 24.

18              Also, as was just agreed, as I understand it, but it

19        is without prejudice to supplementation as investigation by the

11:11 20  defendant proceeds.  I will set a date for the disclosure of

21        the witnesses, too.  It may be altered, but I'm going to place

22        that for both parties in August, mid-August.  And I will, in

23        the future, set a date for the submissions of exhibits that the

24        party proposes to use in his or its case-in-chief.

25              Basically, it's been confirmed today what Ms. Recer

1    said on February 4, 2015.  It's in the interests of the

2    defendant to have motions in limine, regarding proposed

3    mitigating factors or evidence that foreseeably the government

4    will assert is not admissible, decided before jury selection.

5    So I am going to use that April 24 date to trigger a process

6    that will get those motions fully briefed by early June.

7         There was one other issue raised by the response to

8    the proposed schedule, and I'd like to clarify the defendant's

9    position.  The defendant, Mr. Sampson, stated that he would

11:13 10  produce witness statements in the manner required by Rule 26.2.

11   26.2 basically provides for the disclosure of witness

12   statements which are defined in the same way that they're

13   defined in Section 3500 after the witness testifies.

14         It's been the practice for a long time in the District

15   of Massachusetts in almost every case, including this case, for

16   the government to expansively define witness statements to

17   include, for example, FBI reports that may not have been signed

18   or seen and adopted by the defendant and for the defense, in

19   return for getting those before the government's witness

11:14 20  testifies, to agree that it will provide any witness statements

21   which it usually defines in the way the rule defines them,

22   something signed by the witness or adopted by the witness early

23   as well.

24         So I think it should -- and the standard pretrial

25   order, I don't understand that I have the authority to order

1    the government to do what it's been doing in this case, which

2    is turn over reports that are not witness statements as defined

3    in 3500 and 26.2.  But I encourage it in part because they do

4    have an obligation to turn over any material exculpatory

5    information in a witness state, and they can do it by turning

6    over the statement, or they can do it by reliably summarizing

7    it, which is risky business.

8            But what's Mr. Sampson's position?  I want to make

9    sure the government understands it.  Because if Mr. Sampson,

11:15 10   you know, even if he gets a signed statement from a witness,

11   doesn't intend to turn it over until the witness testifies, the

12   government should know that and it can consider whether it

13   wants to continue voluntarily, which is what it's been doing so

14   far, giving the defense all the detailed information it's been

15   given.

16           MS. RECER:  I think -- the position as to witness

17   statements that were signed, that those could be disclosed

18   earlier.  The concern is the definition of the statements, and

19   we don't disagree that the -- if it's a signed written

11:16 20   statement.

21           THE COURT:  It's not just -- again, I just want to

22   make sure.  I was talking shorthand.  There are about four ways

23   under 26.2 and 3500 that a document could be a witness

24   statement.  So it's all of those.

25           MS. RECER:  By that -- yes, by the definition -- if

1    that's the definition, we don't have a problem with early

2    disclosure of that, with the caveat that there are some

3    declarations which are under the protective order, which will

4    obviously be different.  But as to any other statements that

5    fit that definition, then we agree to that.

6              THE COURT:  26.2(f) defines statement for those

7    purposes.  I believe it's verbatim, the same as the *Jencks* Act,

8    3500.  So I think there are two issues.  I mean, the government

9    has been turning over more than that.

11:17 10              MR. HAFER:  Yes.

11              THE COURT:  Which I think is in the interest of

12    justice and minimizes the risk of any *Brady* issues.  But do you

13    have any questions about this, Mr. Hafer?

14              MR. HAFER:  You know --

15              THE COURT:  Then there's going to be a question of by

16    what date.

17              MR. HAFER:  I guess that was my first question.  And

18    so long as it's clear that, you know, there's no -- and I

19    don't, you know -- whatever.  I don't like to do this, but I

11:18 20    want to make sure there's no parsing going on that we're going

21    to get statements made to defense investigators, defense

22    attorneys, the same way Mr. Chao and I go and interview a

23    witness, and he or she says something to us, we turn it over.

24              THE COURT:  Yeah.  No.  This is what I'm trying to

25    tease out.  That's not what I'm hearing.  This is a subtlety,

1    but this is what I discerned the issue was.  I haven't read

2    cases recently.

3            What you've been turning over is more than what 3500

4    and 26.2(f) define as a witness statement.  Because if you make

5    a memo of -- you know, if an FBI agent does a 302 report, so it

6    includes some of what the person said but it isn't

7    substantially verbatim and the witness, prospective witness has

8    never seen it and adopted it by signing it or saying, Yes,

9    that's accurate, it's my understanding your memos, the 302, are

11:19 10   not *Jencks* statements of the person being interviewed.  They'd

11   be a *Jencks* statement of the agent if the agent was testifying.

12           So you've been, by agreement, turning over more than

13   is required.  I don't know what you get in a drug case or

14   something, but you probably don't get much because the

15   defendants are saying, We don't have any witness statements.

16   They don't have grand jury transcripts.  They don't have

17   anything their prospective witness has signed, although they

18   probably made memos of what the witness told them.

19           MR. HAFER:  Correct.  In a drug case, that's correct.

11:20 20   But that's not what this case is.  We know that they're

21   interviewing witnesses, developing evidence.  And, you know, as

22   long as it's clear and they want to take the position in

23   court -- I just -- I wish we could just -- maybe it's a small

24   point, but it's the sanctimony that's really starting to bother

25   me.

1          THE COURT:  No --

2          MR. HAFER:  No, but Judge, it's, Oh, they told us

3     something, but if it's not written, we don't have to give it to

4     you.  I mean, come on.  What is the game here?  What is the

5     game?

6          THE COURT:  First of all, it's not a game.  Don't get

7     me going.  I have an hour-and-15-minute talk I've given to many

8     law schools.  The law is not a game, and you know that.  The

9     rules -- and this is why I'm going to it, because I don't want

11:20 10    you to feel sandbagged.

11         MR. HAFER:  Here is my concern.  I'm not trying to be

12    glib --

13         THE COURT:  You're not, no.  But this is why I'm

14    teasing this out.  I don't want you to feel sandbagged, and I

15    want to know what's agreed to.  The standard pretrial order

16    which I wrote 25 years ago for the court or something, 20 years

17    ago, it says with the agreement of the parties, you know, 3500

18    statements will be exchanged or 26.2 statements will be

19    exchanged by X date.  And it's different than the rest because

11:21 20    I think I have no authority to require something that's defined

21    as a statement in the rule and statute before the witness

22    actually testifies.

23         Now we're talking, though, about something different.

24    You've, in my understanding -- the U.S. Attorney's office

25    generally turns over more than is required if you turned over

1    just what is required by 26.2, and 3500.  You turn over more.

2    You might have to turn that over because it includes material

3    exculpatory information, and that constitutional requirement

4    trumps the statute and the rule.

5         But what I heard Ms. Recer saying is, you know, if we

6    ever ask a witness to sign a statement, we'll turn it over.

7    And she's communicating to me, although maybe not immediately

8    to you, that if their investigator talks to a witness, doesn't

9    write down a substantially verbatim account but writes down the

11:22 10   highlights and doesn't show it to the witness, she's not going

11   to give it to you.

12         MR. HAFER:  All right.  Just so it's clear, if they

13   interview a witness -- and let's say they're attempting to

14   develop this bad childhood evidence, and they interview a

15   witness who says, I never saw Gary Sampson's father lay a

16   finger on Gary Sampson, and nobody writes it down, they have no

17   obligation to turn that over to us, and they can, in fact,

18   affirmatively put on evidence to the contrary of that?

19         THE COURT:  Well, I think the answer is that the

11:23 20   obligation under *Brady* -- the short answer is that's my

21   understanding, because the government has a duty to turn over

22   material exculpatory information but the defendant doesn't have

23   a duty to turn over material inculpatory information.

24         MR. HAFER:  But it's not inculpatory if it's

25   impeachment of a witness.  If they're putting a witness on the

1   stand that they believe has knowledge of a fact that they're

2   eliciting evidence on -- I just want to be clear.  This is what

3   I'm fleshing out because then it's going to affect how we

4   prepare our cross-examinations -- and if the ultimate ruling

5   here is that we get a lot of rope to cross these people on,

6   When did you meet with them, What did they tell you, Did you

7   see what they wrote down, I mean --

8           THE COURT:  Well, you do have that.  If there's no

9   privilege, you do.  But maybe I ought to hear from the

11:24 10   defendants.

11          MR. HAFER:  I understand very much what you're saying

12   about 26.2.  I understand what you're saying about 3500.  We

13   do, as an office, take the position that the Court does not

14   have the authority; but in most cases well in advance of trial,

15   21 days, what is typically referred to, sometimes in a case

16   like this, it's years in advance of a trial, we turn it over.

17          But I just want to make sure that we all, Mr. Chao and

18   I especially, understand the ground rules for when they

19   interview people so that we can make discovery requests and

11:24 20   that sort of thing, if necessary.  If we feel that there might

21   be someone who said something that didn't make it in the

22   declaration, we think that that goes to credibility, bias, any

23   sorts of other things like that, and we want to have the

24   ability to probe on that.

25          THE COURT:  Well, that's -- trying to get this

1   clarified for you.

2   MS. RECER:  I believe the Court correctly understood

3   our position, I mean, that we do not have a *Brady* obligation,

4   the government has the burden, and that we would turn over

5   statements that fit the definition.

6   THE COURT:  But in those circumstances -- I'll write

7   an order that says, "By agreement the parties will turn over,"

8   early -- and I'll set a date, probably like in August, we can

9   talk about the date, you know -- "statements as defined in Rule

11:25 10   26.2(f)."

11   Now, the government is, under that order, permitted, I

12   would say encouraged to continue to do what it's been doing,

13   giving you more than documents that fit the definition of

14   26.2(f), but it's not ordered to.  And if they decide they

15   don't want to do it anymore, my present sense is, absent a

16   reciprocal agreement with you, I don't have the authority to

17   order them to keep giving you as much as you've been getting.

18   So I think that's where it is.

19   What's an appropriate date for the defendant to

11:26 20   disclose his witness statement?  I have in mind now, as I say,

21   July or something, early August.

22   MS. RECER:  Your Honor, is it going to be a staggered

23   disclosure where the government would have one day and we would

24   have a subsequent day?

25   THE COURT:  The government is doing it.

1          MS. RECER:  Okay.  You just proposed July.  I don't

2     think that we have an objection to that.

3          MR. HAFER:  That's fine, Your Honor.  And I guess one

4     other clarification that occurs to me is, obviously notes, a

5     mitigation specialist, for example, they intend to put on

6     interviews of a number of people, his or her notes seem to me

7     to fit right squarely --

8          THE COURT:  This is a valuable discussion.  But as far

9     as I know, there's nothing unique to a capital case about this.

11:27 10    So Mr. McDaniels, Mr. Burt, Ms. Wicht, yes, if a mitigation

11    specialist as a witness took the notes, the notes are 26.2(f)

12    statement of that witness, the mitigation specialist.  If the

13    notes are of an interview with a third party and the third

14    party testifies, those notes are not a statement of the third

15    party unless the third party adopted them in some way by

16    signing or reading and saying, "Yes, that's what I told you."

17    Okay?

18          MS. RECER:  That's precisely my understanding, yes.

19          THE COURT:  I guess I would say the government so far

11:28 20    has been turning over more than I'll be ordering.  If you

21    change that generally or for specific witnesses, I think it

22    would be appropriate for me to order you to let Sampson and me

23    know.

24          MR. HAFER:  I'll let you know now.  We're not going to

25    change it, Your Honor.  We're going to keep doing what we've

1    been doing voluntarily.

2            THE COURT:  All right.  But I may just put that in

3    there.

4            MR. HAFER:  That's fine.

5            THE COURT:  It's 11:30.  We're going to take a short

6    break, in part for the stenographer, and resume with the motion

7    to dismiss for the failure to inform the grand jury of the

8    consequences of the special findings and other alleged

9    misconduct before the grand jury.  I expect that I'm going to

11:29 10   decide that matter orally today.

11           And then we're going to go to some discussion of the

12   Whitney motion, which is not fully briefed, if the government

13   wants a reply, and the related motion.  And that will be it

14   before lunch.  It may be it with the government today because

15   when we get through that, I've got the firewalled assistants

16   coming at 1:00, I think, and I thought I would work with them

17   this afternoon and the defense lawyers on the budget issues.

18           Okay.  So here.  We'll take a ten-minute break to

19   11:40.  Court is in recess.

11:42 20           (Recess taken 11:30 a.m. to 11:42 a.m.)

21           THE COURT:  All right.  As I said, I'd like to hear

22   your argument on the motion to dismiss for failure to inform

23   the grand jury finding probable cause with certain factors

24   would make Mr. Sampson eligible for the death penalty.  That

25   original argument has been supplemented with some case-specific

1    contentions based on the transcripts.  I'd like to bifurcate

2    the argument.  So we'll give you a chance to address the,

3    essentially, constitutional issue first.

4         Yesterday, I issued an order directing you to be

5    prepared to discuss the implications of *Sparf v. United States*

6    for this argument because it's my present view that if the

7    Supreme Court had to discuss this issue in more than dicta, it

8    would find for a grand jury, as it found for the jury in *Sparf*,

9    essentially, that while the grand jury has the power to

11:44 10   disregard the evidence and refuse to bring a capital charge,

11   even if probable cause for each of the necessary requirements

12   exists, the grand jury does not have the right to bring a

13   capital charge when the government decides to seek the death

14   penalty and probable cause exists for each factor that makes

15   the defendant eligible for the death penalty.

16        But that's my present view.  I am interested in

17   hearing from you.  Who would like to speak to this for

18   Mr. Sampson?

19        MR. MCDANIELS:  I have that, Your Honor.

11:44 20        THE COURT:  Thank you.

21        MR. MCDANIELS:  In advance of the argument, I agree

22   with dividing it into two parts.  When I get to the second

23   part, can I assume that the seal has been removed?

24        THE COURT:  Yes.  I'm sorry.  I meant to address that.

25   There's a motion to unseal, which also occurred to me, there's

1    not an opposition to it.

2              MR. HAFER:  I think it's even assented to, I believe.

3              THE COURT:  The motion to unseal is allowed.  I'm

4    sorry I didn't mention that.  Okay.  Mr. McDaniels.

5              MR. MCDANIELS:  I do wish that the *Sparf* case had been

6    a little shorter in terms of --

7              THE COURT:  Actually, I should have put the jump cite

8    for you.

9              MR. MCDANIELS:  Actually, it would help me.  When I

11:45 10  think of the *Sparf* case, I actually thought of it in a

11    different context.  It's cited in the *Gaudine* case of the

12    Supreme Court, which is the case about materiality and mixed

13    question of fact and law.  And I've always understood the *Sparf*

14    case to be related to what the petit jury can do and that the

15    petit jury is required to follow the Court's instructions on

16    the law.

17             THE COURT:  Here.  I'll tell you what I think the

18    implications of this case are.  And I know it because I've

19    taught it.  But if I wasn't working on so many things, I would

11:46 20  have given you a jump cite.

21             If you go to page 293, basically *Sparf* resolved a

22    raging dispute, I think going back to the founding, as to

23    whether lawyers ought to be allowed to argue for jury

24    nullification, in effect tell the jury you don't have to follow

25    the law as the judge described it.  You can decide what the law

1    is.  And even if you don't like the fugitive slave law, for

2    example, you may find -- if you don't like the fugitive slave

3    law, you can find my client not guilty notwithstanding what the

4    judge tells you.

5         So that was all about juries.  So I'm thinking of this

6    analogously.  My present thinking is that I should deny your

7    motion because the jury doesn't have the right not to indict if

8    the evidence is sufficient to establish probable cause of each

9    of the elements, and the factors that make somebody eligible

11:47 10   for the death penalty procedurally are like elements; and

11    therefore, since they don't have the right not to indict, the

12    government has no obligation to tell them the effect of the

13    findings they're being asked to make; and therefore, it wasn't

14    an error not to do that in this case, and that the grand jury

15    would -- you know, this is different than the dicta in *Vasquez*

16    and *Campbell* but consistent with the dicta in *Branzburg* about

17    the role of the grand jury to find probable cause, that it does

18    provide protection.  It's protection against unfounded

19    prosecutions that could be politically motivated or --

11:48 20   prosecution when there's no probable cause to believe the

21    essential facts, but that the role of the grand jury, now at

22    least -- and it might have been different in England or before

23    the American Revolution -- is not to second-guess the

24    executive's decision to devote its resources to prosecuting a

25    case.  That's my present view.

1          MR. MCDANIELS:  Well, it won't surprise you that we

2    respectfully disagree on that.  If I could, as I understood the

3    role of the jury, petit jury for a moment, obviously the law is

4    now you can't argue that the jury can nullify.  It has to

5    follow the law and the instructions given by the Court.  It can

6    in fact nullify if it wants to.  It could return a general

7    verdict of not guilty in *Sparf*, if it wanted to.

8          THE COURT:  Yes.  And that's why I think there's a

9    difference between a power and a right.  To have the power --

11:49 10  and the grand jury has the power not to indict even if the

11   evidence is sufficient and it would be secret and unreviewable.

12   But I don't think the Supreme Court would find it that they

13   have the right to do that.

14          In fact, actually, there's one other thing I intended

15   to give you.  We don't have the transcript of the impanelment

16   of this grand jury as far as I know, correct?  I haven't seen

17   it.

18          MR. MCDANIELS:  I haven't seen that, Your Honor.

19          THE COURT:  But I can show you what the Benchbook for

11:50 20  federal judges had as the standard for language that should be

21   used in impaneling a grand jury.  This is probably what the

22   grand jury was told when it was selected.  So we'll give you

23   that, too.  We'll make it Exhibit 1.  Then I'm going to listen

24   to you.

25          MR. MCDANIELS:  I think the distinction is that the

1    grand jury does, in fact, have rights that the petit jury would

2    not have in the sense that -- I'm not going to go through all

3    the history, but we've shown the history from the precolonial

4    days from the English precedence where jurors knew that it was

5    capital or were informed that it was capital.  And same thing

6    with the juries during the period after the adoption of the

7    amendment, the Fifth Amendment, guaranteeing the grand jury

8    here.  And you know, I don't think that, while it's dicta in

9    each of these cases, it's not like the Supreme Court has only

11:51 10   said it once, and it's not like it's making a light statement

11   when it quotes in both *Campbell* and *Hillery*, the statement is

12   very clear that the grand jury has this power.

13        THE COURT:  But here is part of what reminded me of

14   *Sparf*.  *Campbell* at 1423 --

15        MR. MCDANIELS:  Right.

16        THE COURT:  -- it says, "The grand jury, like the

17   petit jury, acts as a vital check against the wrongful exercise

18   of power by the state and its prosecutors," and it's

19   analogizing the grand jury or petit jury, trial jury.  And I

11:52 20   thought in *Sparf* when the Supreme Court focused on it, they

21   said, you know, that they didn't have the power to nullify, and

22   that what's being argued to me now is comparable to that.

23        MR. MCDANIELS:  To go on to say, as Your Honor notes

24   there, that not only, it says it controls not only the grand

25   jury, the initial decision to indict but also decisions about

1       what to charge, how many counts to charge, including the

2       important decision to charge a capital case and cites with

3       approval the language from *Vasquez v.* Hillery, which is very

4       specific to the powers of the grand jury.

5               And I quote from there on page 263 of *Vasquez v.*

6       Hillery.  "The grand jury does not determine only that probable

7       cause exists to believe the defendant committed a crime or that

8       it does not.  In the hands of the grand jury lies the power to

9       charge a greater offense or a lesser offense, numerous counts

11:53 10    or a single count, and perhaps most significant of all, a

11      capital offense or a non-capital offense all on the basis of

12      the same facts.  Moreover, the grand jury is not bound to

13      indict in every case where a conviction can be obtained."

14              THE COURT:  And I think that's really -- I think there

15      the Supreme Court's citing Judge Friendly's dissent.

16              MR. MCDANIELS:  Correct.

17              THE COURT:  I guess -- yes.  My present view is that

18      if the Supreme Court had to focus on that, it wouldn't hold

19      that.  And so because -- this is dicta, so I'm not required to

11:54 20    follow that.  I think everybody agrees on that, right?

21              MR. MCDANIELS:  Correct.

22              THE COURT:  As usual, I'm trying to be as transparent

23      as possible.

24              MR. MCDANIELS:  They said it twice.  It's not like

25      they just said it once in passing.  It was reconfirmed and it's

1    recent.  It's well long after *Sparf* that they're saying this.

2         THE COURT:  Right.  And maybe you and I are the only

3    two people that remember *Sparf.*  Even though we're not old

4    enough to remember it, we know about it.  But you have

5    *Branzburg.*  I mean, I perceive a tension between *Campbell*,

6    *Vasquez* on one hand and *Branzburg,* also dicta.  The Supreme

7    Court writes, "The grand jury has the dual function of

8    determining if probable cause exists and in protecting citizens

9    against unfounded criminal prosecutions.  Its task is to

11:55 10   inquire into the existence of possible criminal prosecutions

11   and to return only well-founded verdicts."  *Branzburg*, 1972, I

12   guess earlier than the two cases on which you're relying.

13        MR. MCDANIELS:  I think, again, even now, the practice

14   in the Federal Court is not consistent.  I mean, we have

15   examples of the grand jury being informed that the consequences

16   of what they're about to do are serious.  It's a capital

17   offense.

18        THE COURT:  That happened in *Gooch*.

19        MR. MCDANIELS:  It happened in *Gooch,* and I think we

11:56 20   have a couple more.  It happened in the *Williams* case and also

21   in *Diaz.*  We have two other cites, Your Honor, where the grand

22   jury was informed of the special consequences, particularly

23   that their findings would make this case a capital case.  And

24   in this situation here in Massachusetts as well, I mean, it's

25   not intuitive by any means to an average citizen in

1    Massachusetts that carjacking would be a capital offense.

2         And that's something that -- and we'll come to it when

3    we talk about what was actually said there, but there was

4    certainly no bringing home to the jurors the significance of

5    the decision that they were making as they reviewed these

6    special factors, what would be the consequence.

7         THE COURT:  I agree with that.  Here.  Let me -- if

8    you want to keep going, you can keep going, but I'll tell you

9    one more thing that influences my tentative thinking.  It's

11:57 10   very important, and this relates to some of Mr. Sampson's other

11   motions.  In 1972, the death penalty was found to be

12   unconstitutional because juries were acting with unguided

13   discretion, the results were found to be arbitrary and

14   capricious and, therefore, in violation of the prohibition of

15   cruel and unusual punishment.

16        In 1976, in *Gregg*, the Supreme Court found that that

17   Georgia statute provided guided discretion, and, therefore, it

18   wasn't unconstitutional.  It didn't violate the Eighth

19   Amendment.  The Federal Death Penalty Act establishes elaborate

11:58 20   procedure to guide the discretion of juries, and that's

21   intended to guard against, minimize, if not eliminate,

22   arbitrary results and results based on impermissible factors

23   such as race.

24        If the grand jury is permitted to do whatever it wants

25   and to say in effect, you know, Congress and the president said

1   the death penalty is appropriate for some car-jackers who

2   murder, but we disagree, it seems to me to inject an

3   unreviewable form of potential inequality.  I mean, each grand

4   jury would decide for itself, and it could be in the south or

5   throughout the country, they look as though, This is a white

6   person.  You know, we don't think he should be subject to the

7   death penalty.  He only killed a black person.  But if it was a

8   black person who killed a white person, the grand jury might

9   reason differently.

11:59 10       So it would leave in the system, that's been so

11   elaborately ponderously perhaps crafted by the Supreme Court,

12   Congress and the president, a big opportunity for

13   arbitrariness, maybe even bias.

14       MR. MCDANIELS:  It seems to me that to inform the jury

15   what it is about would be consistent with having a meaningful

16   decision made by the jury, and a uniform practice would seem to

17   be appropriate, too, since obviously some grand juries are

18   being told it and some grand juries aren't.

19       THE COURT:  What would be the purpose of telling them,

12:00 20   other than to invite them not to indict even if the evidence

21   was sufficient if they didn't like the death penalty or they

22   did like the defendant?

23       MR. MCDANIELS:  One of the purposes would be to make

24   sure that they would pay attention to the decision they're

25   about to make.  In this instance, I mean, less than ten minutes

1   was spent on a multitude of factors.  So understanding the

2   gravity of what is the consequence of the decision you're about

3   to make.  And also, there's always a place in the death penalty

4   and in the federal death penalty, too, for decisions to find --

5   not justify, to find for reasons, mercy or otherwise, that the

6   death penalty is not justified.

7           THE COURT:  That exists for the trial jury.  I mean,

8   that's the ultimate question:  Is it justified, after they've

9   made certain factual findings.  Why is that a role for the

12:01 10   grand jury rather than just finding probable cause that alleged

11   facts exist?

12           MR. MCDANIELS:  Well, again, what it's finding are the

13   steppingstones.  That's another motion that we have, Your

14   Honor, that that should be part of the grand jury's decision.

15   That's one of the motions we have here, which would be the

16   consequence of finding that the justification decision had to

17   be made beyond a reasonable doubt, would also be that that had

18   to be presented to a grand jury as well.

19           I know that's another motion.  But there is no reason

12:01 20   why, since it's a steppingstone and a requirement, actually, of

21   the statute before the death penalty can be imposed, that the

22   grand jury actually -- rather, the petit jury actually engage

23   in that determination, then it's an element of the offense, we

24   argue.

25           THE COURT:  But a grand jury proceeding is just the

1   government.  It doesn't provide the putative defendant a chance

2   to offer evidence.  The government's not required to offer

3   exculpatory evidence, I think.

4           MR. MCDANIELS:  That's correct.

5           THE COURT:  The grand jury's not well-suited to do

6   that weighing; and there's no statute, like the Federal Death

7   Penalty Act, that gives the grand jury the responsibility or,

8   the government will argue, the authority to do that.

9           MR. MCDANIELS:  It's true that the role of the grand

12:02 10   jury is not mentioned in the statute, and that's what *Ring*

11   ended up creating as a rule of criminal procedure, essentially

12   that certain procedures had to be followed before the grand

13   jury to satisfy the Constitution.

14           So our position is that, consistently through history,

15   the grand jury has performed a role that went beyond simply

16   finding probable cause that included deciding whether in its

17   decisionmaking power it thinks these charges should be brought.

18           I don't think there's any more I can say on that

19   point, unless Your Honor has a question.

12:03 20           THE COURT:  I'll just give you a chance to address

21   this.  I mean, I think this is an issue of historic importance,

22   just the way the issue decided in *Sparf* decided an open issue

23   that had been hotly debated.

24           The idea that the grand jury could refuse to indict in

25   colonial times at the moment makes sense to me because we had

          1    taxation without representation.  The American Colonists were

          2    not represented in making the laws.  They didn't have influence

          3    over who were the prosecutors.  And, you know, historically in

          4    that period, it seems to me, it was a sort of principle

          5    justification for applauding the exercise of this power and

          6    maybe even calling it a right.

          7          Now our laws are democratically made, and prosecutors

          8    represent the president who is accountable to the people.  So

          9    it seems to me there's less justification for applauding the

12:04    10    power and a lot of risk.  I mean, implicit in your argument is

         11    that, you know, the grand jury would have treated Mr. Sampson

         12    in a way that you regard as more humane, and if it had known

         13    the seriousness of what it was being asked, even if there was

         14    probable cause, they might have said, you know, I don't believe

         15    -- enough of them might have said, We just don't believe in the

         16    death penalty.  Nobody should be put to death.

         17          One, that would be disagreeing with the law that was

         18    made in Washington for the whole country; and two, you know,

         19    they might say in Boston or in Memphis, you know, The defendant

12:05    20    is white.  He killed a black person.  We don't think he should

         21    be executed, or say, He's black and he killed a white person.

         22    We do think he should be executed.  And you would never know

         23    that that was their reasoning, because it's secret.

         24          And it seems to me at the moment that undermining the

         25    laws that have been democratically made and creating this

1    opportunity for arbitrary or discriminatory action is not

2    something the Courts, in the context of capital punishment,

3    should find the grand jury has the right to do.

4           MR. MCDANIELS:  Your Honor, I can't agree that there's

5    no remaining need for the grand jury in the current American

6    system of criminal justice to exercise its traditional powers.

7    And we're talking hypothetically here now about the powers of

8    the grand jury and not specifically about Mr. Sampson or his

9    case.  But we gave you examples in the pleadings, I mean, where

12:06 10    clearly, there are prosecutors and there have been prosecutions

11    that have been vindictive prosecutions that shouldn't have been

12    brought, and the grand jury as it stands in bulwark of freedom

13    is what -- and I don't think that's changed just because we're

14    here in 2015.

15           THE COURT:  No.  I think that the grand jury's role

16    would be, today, to keep factually unfounded charges from being

17    brought.  So down in Arkansas, you know, there was the claim

18    that Governor Seligman was being prosecuted for partisan

19    purposes.  I think he appointed some campaign contributor or

12:07 20    something.  And, you know, if there wasn't a factual basis of,

21    Here's the statute if the jury was properly instructed -- and

22    this jury wasn't, grand jury wasn't in one respect -- but if

23    they find that, you know, there's not probable cause to believe

24    A, B or C which are elements of the offense, then they wouldn't

25    bring the charge.  But they wouldn't be second-guessing the

1    wisdom of a factually-founded charge.

2        MR. MCDANIELS:  I think we covered this in the brief

3    as well, but there are reasons now today to question because

4    there are so many laws that are so complex that if you want to

5    go after somebody, you can find a way to go after somebody, and

6    it would be, quote, "probable cause," but that doesn't mean it

7    was right.

8        In that role of the conscience of the community, that

9    role of judging is the grand jury's purpose in standing between

12:08 10   the state and the citizen.  That is the purpose of its being,

11   and I don't think that has changed because of where we are now.

12   I mean, there are different problems than the colonial days,

13   but there's still problems in the initiations of prosecutions.

14       THE COURT:  In my current conception, if somebody is

15   being prosecuted federally, you know, for possession of

16   marijuana, which is a federal offense but not something that is

17   commonly, if ever anymore, prosecuted in Federal Court, there

18   should be a political check on that.  You know, if they're

19   being prosecuted because of who they are, what political party

12:09 20   they're in, there should be a democratic political check on

21   that.

22       And as a practical matter, the grand jury would have

23   the power not to do it, but I don't know that it has the right

24   not to do it.

25       MR. MCDANIELS:  Again, in this instance, unlike the

1   jury situation, petit jury, where you're saying you can't tell

2   the grand jury what its power is -- no one is telling this

3   grand jury that it has the power, but it knows that it,

4   nonetheless, has the power to do it.  So it's not an

5   invitation, but when the right case comes up, it should be

6   free, despite the existence of probable cause, to exercise its

7   role standing between the government and the individual and say

8   no.

9          THE COURT:  You haven't had a chance to read it yet, I

12:09 10   just got it yesterday, but that excerpt from the Benchbook

11   which was in effect in 2003 when the second superseding

12   indictment was returned here, it doesn't have any language that

13   I read that is consistent with the idea that the grand jury can

14   decline to indict even if it finds probable cause.

15          So I just thought that ought to be out there.

16   Although, as I say, we don't have a transcript of exactly what

17   they're told.  And I'll say two things that weigh in your

18   favor.  The Supreme Court favorably quoted Judge Wisdom in *Cox*,

19   recognizing, treating this as a right, and Judge Friendly, and

12:11 20   I think it's *Ciambrone*, or maybe -- in any event, you've got

21   Judge Wisdom and Judge Friendly who are in the pantheon of

22   judges on your side.

23          The Supreme Court quoted Judge Friendly, at least, and

24   actually, when I wrote my *Ring*-related decision in 2003, I

25   implicitly, or explicitly, shared your view because I wrote,

1   you know, the grand jury decides if it's permissible and

2   appropriate to bring a capital charge.

3           MR. MCDANIELS:  Yes.  Well --

4           THE COURT:  But I now think that I wasn't right.

5           MR. MCDANIELS:  -- want to put you in that pantheon.

6           THE COURT:  Anyway.  Why don't I hear from

7   Mr. Quinlivan, who has been waiting for a long time.

8           MR. QUINLIVAN:  Thank you, Your Honor.  I have several

9   responses on the merits, and at the end I do want to argue

12:12 10   about why I think this and several like claims should be

11   rejected under the law of the case doctrine.

12           THE COURT:  In fact, we can go off on that.  That's

13   another thing I may have been wrong on.  I'm not sure that the

14   law of the case doctrine applies under 2255.  We're not here on

15   a remand.  My law clerks have found this.  That's part of the

16   reason I leapfrog over it.

17           MR. QUINLIVAN:  Certainly.  I'll just briefly touch on

18   that.  I'll go directly to the merits.

19           I think Your Honor's understanding of *Sparf* is

12:12 20   entirely correct.  And indeed, I note your analogy of the

21   marijuana prosecutions.  When the Department of Justice was

22   litigating the medical marijuana cases in California, this

23   issue arose time and time again.  And what the courts have

24   uniformly held is exactly what Your Honor said, that while a

25   petit jury and a grand jury as well has the power to nullify,

 1    it does not have that right, nor should a judge do anything

 2    that would encourage the jury or a grand jury to so --

 3              THE COURT:  What cases are those?

 4              MR. QUINLIVAN:  I'm sorry?

 5              THE COURT:  Did you cite those cases in your brief?

 6              MR. QUINLIVAN:  We did cite one of them, which is

 7    *United States v. Marcucci,* which is a Ninth Circuit decision in

 8    which one of the claims was that the Benchbook guidance -- and

 9    I'm not sure if it was the Benchbook or if it was the model

12:13 10    federal charge.

11              THE COURT:  I think it was -- I read the other one,

12    the other Ninth Circuit case.  I think they have a Ninth

13    Circuit pattern charge.

14              MR. QUINLIVAN:  Yes, that's right.  There was a

15    dissent.  Judge Hawkins took the broad view that, in fact,

16    grand juries should have this right to nullify, but the Court

17    itself rejected that, and with good reason.  And I think Your

18    Honor has pointed several of those out.

19              It wouldn't, in this case, for example, be limited to

12:14 20    the death penalty because, as we pointed out in the brief,

21    there are any number of sentencing factors, like following the

22    lean, for example, any fact that would trigger a mandatory

23    minimum sentence has to be found by the grand jury or charged

24    by the grand jury and found by a jury beyond a reasonable

25    doubt.

1          THE COURT:  Did your argument -- I thought you cited

2     *Melendez*, but I may be confused, that basically no Court has

3     found that a grand jury has to be told that a factual finding

4     will create a mandatory minimum sentence or increase a

5     mandatory minimum?

6          MR. QUINLIVAN:  That's right.  In fact, to the

7     contrary, both the Benchbook and grand jury charge state is

8     that jurors are not to concern themselves with sentencing or

9     what any potential sentence would be.  And that's consistent

12:15 10    not only with *Branzburg* but, as we noted in our brief, with

11    *Hamling*, in which the Supreme Court said, "Our prior cases

12    indicate that an indictment is sufficient if it first contains

13    the elements of the offense charged and fairly informs the

14    defendant of the charge against which he must defend," and

15    second, "enables him to plead an acquittal or conviction and

16    bar prosecutions for the same offense."

17         THE COURT:  How does that relate to the role of the

18    grand jury?

19         MR. QUINLIVAN:  Well, that's what Courts that have

12:15 20    considered this specific issue have said.  In this case, which

21    isn't dicta, the Court is saying as long as the defendant is

22    apprised of the charge against which he or she must defend

23    himself against, that's sufficient to satisfy the grand jury

24    clause of the Fifth Amendment.  No mention is made that the

25    grand jury must also be informed of what any potential sentence

1    would be.

2           And I would submit that *Vasquez* and *Campbell* aren't

3    inconsistent with that because Mr. McDaniels said that what the

4    Court said in *Campbell* is that they could choose not to charge

5    a capital case.  That's not what the Court said.  *Campbell* says

6    expressly, "but also significant decisions such as how many

7    counts to charge and whether to charge a greater or lesser

8    offense, including the important decision to charge a capital

9    crime."

12:16 10          Similarly, *Vasquez* talks about, "charging a capital

11   offense or a non-capital offense."  So they're talking about

12   charging the offense, which has capital implications and is

13   consistent with the grand jury's traditional role that say in

14   any murder case, it can charge first-degree murder, which might

15   expose the defendant to a capital charge, or a lesser crime,

16   which does not expose the defendant to a capital crime.

17   Nothing is said about the decision whether or not to seek a

18   particular sentence.

19          So again, I think that, you know, this is dicta, and I

12:17 20   would submit that the Supreme Court in neither of these cases

21   was sort of resurrecting, you know, something that -- prior

22   practices from the 18th century.  And indeed I can't help but

23   note the irony that after we've been told time and time again

24   that, you know, with respect to the Eighth Amendment and the

25   due process clause, you know, the defendant argues that we have

1    evolving standards of decency, and what the Supreme Court says

2    in *McCleskey* in 1986 no longer holds sway, and now they seem to

3    be born-again originalists with respect to the grand jury

4    clause.

5            But it's all to say that *Vasquez* and *Campbell*, if you

6    actually look at what the Court says, it is dicta, and they

7    weren't saying that the grand jury has the role of deciding

8    whether to affirm the government's decision to seek a

9    particular sentence.

12:18  10       THE COURT:  Well, *Vasquez* has language that's not in

11   *Campbell*.  They quote Judge Friendly's dissent and say,

12   "Moreover the grand jury is not bound to indict in every case

13   where a conviction can be obtained."

14           MR. QUINLIVAN:  That's right.  No, and I think that --

15           THE COURT:  That's inconsistent with my present

16   conception.  My present view is if the grand jury has not just

17   the power but the right not to indict when there's probable

18   cause to believe each of the elements of the offense and the

19   Attorney General has decided he wants an indictment, then the

12:19  20  grand jury would have a right to know that.

21           It would be a prosecutor's responsibility and a

22   judge's in impaneling, saying, you know, You're going to be

23   called upon to decide whether there's probable cause.  If

24   there's not probable cause for each essential element, you

25   can't indict.  Then if there is probable cause, you decide

1    whether it's fair.  I mean, I think that's what we judges would

2    have to be telling grand juries, and I don't believe that's

3    what we do.

4         MR. QUINLIVAN:  I agree entirely.  And, respectfully,

5    I don't think even this quotation from Judge Friendly suggests

6    that outcome.  He's merely -- and I think he's just merely

7    reflecting the understanding that a grand jury has that power.

8    But, you know, what Courts have said, the First Circuit has

9    repeatedly, following *Sparf*, has said that Courts should do

12:20 10    nothing to enable a grand -- or petit jury to nullify, such as

11    giving an instruction on nullification, such as allowing an

12    argument in closing about nullification and indeed not even

13    allowing an argument about how the particular sentence -- what

14    the particular sentence might be in the hopes that the jury

15    might acquit based on that.

16         I would point Your Honor to -- Judge Friendly,

17    obviously, was from the Second Circuit.  I think the Second

18    Circuit's most powerful exegesis on this is a decision, *United*

19    *States v. Thomas*.  I don't have the pinpoint, but it's 116 Fed.

12:21 20    3d, and I'll provide the Court with the pinpoint cite.  It's a

21    decision that goes into detail about the history of

22    nullification, the decision in *Sparf,* and why in that

23    particular case in which the juror is actually asked a question

24    about whether or not they could acquit based -- I believe what

25    happened was the defense basically made a nullification

1    argument in the closing.  Nothing was said about it.  And so

2    the jurors and the judge didn't stop him from doing it and

3    didn't instruct the jury about it.  The jurors asked the judge

4    a question about whether or not that should be allowed, and the

5    judge instructed the jury, no.

6         So yes, I would say in sum and substance, this is no

7    different than the decisions that say that although you

8    recognize the power, you should do nothing to empower that --

9    it is not a right, and you should do nothing to empower a jury

12:22 10   from exercising it.

11         THE COURT:  Legitimize that power --

12         MR. QUINLIVAN:  Absolutely.

13         THE COURT:  -- and characterize it as a right.

14         MR. QUINLIVAN:  That's right.  That's right.

15         And just one final point because, again, we are

16   talking about these two decisions as being dicta, but I did

17   want to point out, and we noted it in our brief, that there is,

18   I think, a significant change in the language of what the Court

19   said.  Because in *Vasquez*, you know, the description of what

12:23 20   the power is is set off by semicolons as if they are separate

21   and distinct powers it might have.  So it's, "The decision to

22   charge a greater offense or a lesser offense; numerous counts

23   or a single count; perhaps most significant of all a capital

24   offense or non-capital offense."  Again, it's dicta.  I don't

25   think that that suggests the Court was distinguishing the two.

1          But in *Campbell*, the Court makes clear the decision to

2     charge a capital or non-capital offense is, in fact, part of

3     the decision to charge a greater or lesser offense.  It's not

4     something different.  So I submit *Campbell* and *Vasquez* are not

5     inconsistent with the uniform understanding that a jury does

6     not concern itself with the potential sentence in a case.

7          THE COURT:  Since you couldn't resist saying all of a

8     sudden they're sounding like originalists when they argue about

9     evolving standards of decency, I wrote about this in my August

12:24 10    2003 decision in this case.  I believe it was the original

11    intent of the framers of the Eighth Amendment that it would

12    change over time.  They knew that there were punishments that

13    existed 100 years, 200 years before that were regarded as

14    barbaric in 1787; and they foresaw that there might be

15    continued evolution, so they didn't prohibit all punishments

16    that were impermissible in 1787.  They used broad language,

17    like the Fourth Amendment uses, unreasonable searches and

18    seizures, capable of growing, and therefore not collapsing.

19    But anyway.

12:25 20    MR. QUINLIVAN:  No.  And that's been the understanding

21    since the -- certainly since the 1950s since, I believe it's

22    *Weems,* where the Supreme Court expressly adopted that language.

23          THE COURT:  My point is that I think there's more

24    support in the text of the Eighth Amendment for using evolving

25    standards of decency and less guidance or clarity from the

1    grand jury clause of the Constitution.  And maybe these things

2    are reconcilable.  I mean, it is true that a grand jury would

3    have charged carjacking in a form that would not be a capital

4    offense if it had made different factual findings.

5         But I didn't get the feeling that that's what the

6    Supreme Court was saying in *Hillery* and *Vasquez*.  They were

7    assuming the kind in dicta, the kind of power that Sampson

8    advocates the grand jury had here and should have been told

9    about.  And at the moment, I respectfully think that if it

12:26 10  focused on it, particularly in the context of a capital case,

11   the Supreme Court would not adopt what it said in *Campbell* and

12   *Vasquez*.

13        MR. QUINLIVAN:  And the only point I just reiterate in

14   response, Your Honor, is, again, the language the Court used

15   was about charging a capital crime or a capital offense.  And I

16   would suggest that that is consistent with the understanding

17   that, yes, the jury is making that decision here, for example,

18   whether or not the carjacking is going to be accompanied by the

19   special findings.  That's different from making the decision

12:26 20  whether it's appropriate in this case to seek a capital

21   sentence.

22        And so, you know, again, it's dicta.  I think

23   everyone's trying to read a little too much into what -- you

24   know, the Supreme Court clearly wasn't intending to issue a

25   broad pronouncement, but I would suggest that the language

1    itself, talking about charging a capital crime or offense,

2    isn't inconsistent with the current practice at all.

3            THE COURT:  Because they have to make the factual

4    finding.

5            MR. QUINLIVAN:  That's right.  That's right.  And the

6    words "sentence" -- you know, or whether it's appropriate to

7    seek a capital sentence, isn't in those decisions.

8            THE COURT:  Okay.  All right.  Thank you.

9            MR. MCDANIELS:  Just briefly, Your Honor.  One thing

12:27 10    to respond to the argument of the parsing of the language

11    making it a lesser offense.  With the indictment that was

12    presented to this grand jury, they could have decided to come

13    back with Counts One and Two and not the special factors, and

14    they would have made it a lesser offense, life imprisonment

15    only at that point.  So they would have made that decision if

16    they knew the consequences of these findings and had that as

17    part of their decisionmaking.

18            Also, I mean, we'll come to that at a later part.

19    There's no indication in this regard that they made any of

12:28 20    these determinations, absolutely none, but we'll come to that

21    in the second part.

22            The second part is, originalists maybe, but we cited

23    on pages 3 to 5 and onward in our reply to the government's

24    response to the supplemental memo a number of cases, modern

25    cases that reiterate the power of the grand jury.  And I

 1    understand we're making a distinction here between a power and

 2    a right, but I'm not sure how that distinction makes -- because

 3    for Judge Wisdom to say in 1965 that, quote, "It has the

 4    unchallengeable power to shield the guilty, should the whims of

 5    the jurors or their conscious or subconscious response to

 6    community pressures induce 12 or more jurors to give sanctuary

 7    to the guilty."  I mean, that's saying that they have the

 8    power, despite probable cause, to return a no bill.

 9         THE COURT:  And he would have been very familiar with

12:29 10    that power because it was being exercised very much by state

11    juries and probably grand juries in the segregated south, and,

12    you know, this is part of what he and his colleagues were

13    contending with.

14         And I mean, I am engaged by the idea that he thought

15    that was legitimate.  Although, I haven't studied *Cox,* but with

16    as much humility as I'm capable of, really delving into this, I

17    don't think the Supreme Court would now say what -- the most

18    obvious meaning of *Vasquez* and *Campbell.*  And maybe Judge

19    Wisdom and Judge Friendly would have a different view now, too.

12:30 20         Here.  Let me explain myself.

21         MR. MCDANIELS:  Sure.  We appreciate Your Honor's

22    time.

23         THE COURT:  It's a serious issue.  I'm denying the

24    original motion to dismiss for failure to inform the grand jury

25    that finding probable cause for certain factors would make the

1    defendant eligible for the death penalty.

2         In essence, I find that the grand jury has the power

3    to disregard the evidence and refuse to bring a capital charge

4    even if probable cause exists.  The grand jury does not,

5    however, have the right not to bring a capital charge when the

6    government seeks the death penalty and probable cause exists

7    regarding each factor or sufficient factors that make the

8    defendant eligible for the death penalty.

9         This issue exists or has been raised and taken

12:31 10   seriously in meaningful measure because of the dicta in

11   *Campbell v. Louisiana*, 532 U.S. 392 at 398, and *Vasquez v.*

12   *Hillery,* 474, U.S. 254 at 263.

13        *Campbell* involved the practice of excluding blacks in

14   selection of grand jury forepersons.  In dicta, the Supreme

15   Court wrote, "The grand jury, like the petit jury, acts as a

16   vital check against the wrongful exercise of power by the state

17   and its prosecutors.  It controls not only the initial decision

18   to indict but also significant decisions such as how many

19   counts to charge and whether to charge a greater or lesser

12:32 20   offense, including the important decision to charge a capital

21   crime."

22        In *Vasquez*, which involved the systematic exclusions

23   of blacks from the grand jury, the Supreme Court said

24   essentially the same and added that, "The grand jury is not

25   bound to indict in every case where a conviction can be

1     obtained."  That's 474 U.S. at 263.

2          The dicta in *Campbell* and *Vasquez* describes the role

3     of the grand jury differently than the dicta in *Branzburg v.*

4     *Hayes*, 408 U.S. 665 at 686 and 688, a case involving whether a

5     newsman had a privilege not to disclose a confidential source

6     to the grand jury.

7          In *Branzburg,* the Supreme Court wrote, "The grand jury

8     has the dual function of determining if probable cause exists

9     and of protecting citizens against unfounded criminal

12:33 10     prosecutions.  Its task is to inquire into the existence of

11    possible criminal prosecutions and to return only well-founded

12    indictments."

13         I have not been given the transcript of the

14    instructions given to the grand jury that returned the second

15    superseding indictment in this case in 2003, nor have I been

16    given the oath that those grand jurors took.  However, I have

17    marked as Exhibit 1 the version of the Benchbook for United

18    States District Court Judges that was in effect in 2003.  It's

19    the fourth edition with the March 2000 revisions.  That it is,

12:34 20     in my view, likely that the grand jury was instructed

21    consistent with that Benchbook.  It's the practice of many

22    judges in my experience.

23         The Benchbook charge in part states that the grand

24    jury should be told, "Your task is to determine whether the

25    government's evidence is sufficient to conclude there is

1    probable cause to believe that the accused is guilty of the

2    offense charged, that is, whether the evidence presented to you

3    is sufficiently strong to cause a reasonable person to believe

4    that the accused is probably guilty of the offense charged."

5    Then later, it says, "While you would perform a disservice if

6    you did not indict where the evidence justifies an indictment,

7    you would violate your oath if you merely rubber-stamped

8    indictments brought before you by government representatives."

9    That's on page 210, where judges were advised to inform grand

12:36 10    juries, "You would perform a disservice if you did not indict

11    where the evidence justifies an indictment."

12          This charge, which, in essence, directs a grand jury

13    to indict if the evidence creates probable cause for each

14    element of an offense, is consistent with the definition of the

15    role of the grand jury in the dicta in *Branzburg* that I quoted.

16    "It does not inform the grand jury that it has the right to

17    disagree with the executive's decision to prosecute if probable

18    cause exists.  The role of the grand jury as defined in

19    *Branzburg* protects citizens from factually unfounded charges

12:36 20    that could be motivated by bias, prejudice or partisan purpose.

21    Like a petit jury, a grand jury has the power to refuse to

22    issue an indictment even if the evidence establishes probable

23    cause for the element of it."

24          As I wrote in *Sampson*, 245 F. Supp. 2d, 327 at 333,

25    "After *Ring,* the intent and aggravating factors requirements of

1   the Federal Death Penalty Act must now be treated procedurally

2   as elements of the offense.  A grand jury could ignore the

3   evidence and refuse to find probable cause for facts that make

4   a defendant eligible for the death penalty.  In this sense, it

5   has the power to refuse to issue a well-founded indictment.

6   The petit jury has a similar power not to convict, even if the

7   evidence proves each essential element beyond a reasonable

8   doubt."

9          However in *Sparf v. United States*, 156 U.S. 51 at 102

12:37 10   to 103, in 1895 the Supreme Court found that, "While a petit

11   jury has the power to disregard a judge's statement of the law

12   and find a defendant not guilty, even if under the judge's

13   instructions he had been proven guilty beyond a reasonable

14   doubt, the jury did not have the right to do that."

15          I note that *Sparf* resolved a question that had raged

16   for a century concerning whether jury nullification was lawful.

17   For example, in a fugitive slave law case in this jurisdiction,

18   *United States v. Morris*, prosecution against a black attorney

19   for his alleged part in a rescue attempt, Richard Daner and

12:38 20   John Hale argued that the jury should be instructed that it

21   could independently decide both the law and the facts.

22          Then Judge Benjamin Curtis not only refused to give

23   any such discretion to the jury, he explicitly charged them

24   that their moral responsibility was to make every conscientious

25   effort to apply the law as charged by the judge to the facts as

1    found by themselves.  He stressed that power is not a right,

2    and the mere fact that there was no easy to way to pierce a

3    general verdict of acquittal in no sense gave the jury a right

4    to render such verdict contrary to the law charged by the

5    judge.  That's a quote from Robert Cover's Justice Accused at

6    191, quoting *United States v. Morris*, 26 FCAS 1323, 1331 to 36.

7          This is, of course, the charge the district judges

8    routinely and rightly, after *Sparf,* give to juries in every

9    case.  That is, they must follow the law as the judge describes

12:39 10   it, regardless of whether they agree with it.

11          *Sparf* was a capital case.  The Supreme Court held that

12   where the evidence proved the commission of the crime charged,

13   it was proper to instruct that the jury could not convict the

14   defendant of a lesser included offense.  That's at page 115,

15   perhaps.  The Supreme Court reasoned in *Sparf* that, "Public and

16   private safety alike would be in peril if the principle be

17   established that juries in criminal cases may of right

18   disregard the law as expounded to them by the Court and become

19   a law unto themselves."  That's page 102.

12:40 20          It noted that, "Permitting disregard for the laws

21   declared by the Court would undermine the equal protection of

22   the law and cause our government to cease to be a government of

23   laws and become a government of men."  That's page 103.

24          I now find respectfully that despite the dicta in

25   *Vasquez* and *Campbell,* the Supreme Court now would find that the

1    grand jury has the power but does not have the right not to

2    indict if the government presents a capital charge and the

3    evidence established probable cause for every essential element

4    of it.

5          As I said in sentencing Sampson to be executed in

6    2003, "The people's representatives in Washington

7    democratically decided that the death penalty is appropriate

8    for some defendants who commit the offense of carjacking

9    resulting in murder."  That's 300 F. Supp. 2d at 278.

12:41 10          "If the grand jury" -- "If there was an obligation to

11    tell the grand jury that certain factual findings would make a

12    defendant eligible for the death penalty would invite the grand

13    jury to question the wisdom of that law and nullify it if it

14    was found by a sufficient number of grand jurors to be unwise."

15          As the Ninth Circuit wrote in *Navarro-Vargas,* 408 F.

16    3d 1184 at 1203, "The prospect of a grand jury here and there

17    deciding for itself that the law lacked wisdom is an invitation

18    to lawlessness and something less than equal protection of the

19    laws."

12:42 20          I find that it would be particularly intolerable with

21    regard to capital cases, that is, finding that the grand jury

22    has this right to nullify, in effect.  In *Furman*, 408 U.S. 238

23    in 1972, the Supreme Court found that, "The unguided discretion

24    of juries resulted in the arbitrary imposition of death

25    sentences and therefore constituted cruel and unusual

1  punishment in violation of the Eighth Amendment."

2        Four years later, in *Gregg*, 428 U.S. 153, the Supreme

3  Court decided that, "A statute providing for guided discretion

4  by jurors in deciding whether to impose a death penalty was

5  constitutional.  The FDPA is such a statute creating elaborate

6  standards and procedures for petit jurors where that petit

7  juror must follow in deciding whether to impose a death

8  sentence.  Among other things, it prohibits jurors from being

9  influenced by race as provided in 18 U.S.C., Section 3593 F."

12:44 10        If it were held that the grand jury had a right to

11  refuse to find facts that would make a person eligible for the

12  death penalty, despite the existence of probable cause to

13  support them, and therefore a right to be told that their

14  factual findings would determine if a putative defendant would

15  be eligible to be executed, their discretion would be unguided.

16  There would be a great risk that their decisions would be

17  influenced by impermissible consideration such as race.

18  Because deliberations of a grand jury are secret, the exercise

19  of that discretion would be unreviewable, and a system

12:44 20  carefully calibrated to eliminate arbitrary results would be

21  undermined.

22        Prior to the Constitution's adoption in 1787, in

23  England and the American Colonies, the grand jury may have been

24  regarded as having the right as well as the power to refuse to

25  return a factually well-founded indictment.  Before the

1    American Revolution, at least, colonists were not represented

2    in making the laws or in selecting those charged with enforcing

3    them.  Thus, there was therefore a rationale for such a right.

4    However, as the eminent constitutional historian Mark DeWolfe

5    Howe wrote in 1939 regarding juries, "It is arguable that such

6    a right loses its importance when a statute is the enactment of

7    a truly democratic legislature.  This is equally true of a

8    grand jury."

9         Every Federal Court that has decided the issue,

12:45 10    including two in the District of Massachusetts, has held that

11    it is not an error for the government to not tell a grand jury

12    that certain factual findings will make a defendant eligible

13    for the death penalty.  In most of those cases, the Courts

14    reason that the government is not required to tell the grand

15    jury that certain factual findings will make a defendant

16    eligible for the death penalty because the grand jury's proper

17    role was to determine if there is probable cause for those

18    proposed findings.

19         Those cases include two in this district, *United*

12:46 20    *States v. Green*, 372 F. Supp. 2d, 168 at 184, note 27, and

21    Judge O'Toole's more recent decision in *Tsarnaev*.  Other

22    districts that have decided this question and reached the same

23    conclusion, or other district courts, are those in *Sanders,*

24    *Savage*, *Williams*, *McCleskey*, *Jacques*, *Aquart, Cruz-Ramirez*,

25    *Troya*, *Williams*, *Green;* in Kentucky, *Duncan*, *O'Reilly*, *Talik,*

 1    *Lecco, Williams*.  In Hawaii, *Diaz*, *Batson, Rodriguez, Haynes*

 2    and *Matthews*.

 3            I now concur in this conclusion and note that, to my

 4    knowledge, the government is correct when it argues that no

 5    Court has held that the grand jury must be told that a factual

 6    finding will make the defendant subject to a mandatory minimum

 7    or a higher mandatory minimum.

 8            So that's my reasoning.

 9            And it's now quarter to 1:00.  I think it would be

12:48 10    useful to hear your argument now on the other grand jury

 11    related issues and then break for lunch, if we do get this

 12    concluded before 1:30, when I think the cafeteria will close.

 13    But why don't I hear your argument.

 14            MR. MCDANIELS:  Thank you, Your Honor.  The background

 15    to this argument is that in June of 2002, the Supreme Court

 16    decided *Ring,* and in light of that decision, on August 5 of

 17    2002, Mr. Sampson sought to withdraw his previously entered not

 18    guilty plea and enter a guilty plea to the indictment that at

 19    that time would not have qualified for the death penalty.

12:49 20    Three days later, the grand jury was convened.  The Court did

 21    not grant that motion then.  The grand jury --

 22            THE COURT:  Excuse me.

 23            MR. MCDANIELS:  -- convened to address the *Ring* issue.

 24            THE COURT:  Wait one second.  I want to get the grand

 25    jury transcript.  You're fired.  Sorry.  They're working very

     1    hard.  They get confused when I re-organize the files.

     2         MR. MCDANIELS:  The position we have, Your Honor, and

     3    this is based on the record of the grand jury that has now been

     4    produced, the grand jury, just as Your Honor read from the

     5    instructions, not to be a rubber stamp for the government, had

     6    no choice here but to -- and as a result was a rubber stamp for

     7    an indictment that was drawn and presented by the government.

     8         We say that because, first of all, the grand jury met

     9    on this case for under two hours to consider it.  They heard

12:51 10   the testimony from a single witness in person, who they heard

    11    excerpts of the confession by Mr. Sampson, and they were

    12    presented at the very end of that presentation at 11:48 with 14

    13    transcripts of prior grand jury testimony that prior grand

    14    juries heard and told they could read it if they wanted to but

    15    practically -- at the end of that, there was further

    16    instruction on the law by the government, and then the

    17    deliberation, which could not have occurred -- the deliberation

    18    could not have occurred any more than ten minutes.

    19         And what they had to do to follow the instructions

12:51 20   that were involved was to make findings regarding these special

    21    factors, the aggravating factors and intent factors, the

    22    statutory aggravating factors and these intent factors in the

    23    act.  And for that decision to be made as to Mr. McCloskey,

    24    there were eight separate factors that had to be found, four

    25    intent factors and four other statutory aggravating factors.

1    For Mr. Rizzo, there were another seven that had to be found,

2    four intent and three of the statutory aggravating factors.

3    That's 15 determinations.  It's just impossible that they were

4    made individually in the time allowed.

5         So given that, it's understandable where the jury

6    ended up, given the way the case was presented to them and the

7    statements that were made along the way.  I mean, we certainly

8    have set forth a law that the defendant is entitled under the

9    Fifth Amendment to an independent grand jury, one that really

12:52 10    makes the decision, not simply a rubber stamp, and that has due

11    process and Eighth Amendment implications as well in the death

12    penalty case.

13         So when you look at how the government presented this

14    to the grand jury, they minimized what the grand jury was

15    about.  It's not that they just didn't tell them that what they

16    were doing was finding factors that would make this case

17    capital, but they never ever mentioned that they were finding,

18    quote, "aggravating factors."  There was never any indication

19    that the findings that they were making was to make this a more

12:53 20    serious case, a more blameworthy case, a case that carries more

21    weight to it.

22         In fact, they indicated that the only reason that we

23    were here was that the law had been changed slightly; that it's

24    a relatively straightforward matter, and it's not really

25    complicated.  And they told the grand jury that two prior grand

1    juries had already looked at the matter.  So they never gave

2    any indication of the consequences of these findings.

3         THE COURT:  Well, two things.  One, they told them --

4    I'm looking at page 5 of the transcript.  We'll get a copy and

5    make it Exhibit 2 of this proceeding.  They said, "There was a

6    new Supreme Court case that changed the law slightly and, as a

7    result, it's the opinion of the Department of Justice and the

8    people of Washington that we have to ask you to rule on certain

9    factors at the end of the indictment."  So they were telling

12:54 10   them that those factors were the new part, drawing their

11   attention to the factors.

12         MR. MCDANIELS:  What I hear is, "Washington is making

13   us do this, but it's really not a big deal.  Two other grand

14   juries have heard this matter.  We got to be here and do this."

15   That's what I hear in this.  What the grand jury heard then

16   is --

17         THE COURT:  Hold on just a second.  Go ahead.

18         MR. MCDANIELS:  So in the grand jury -- the prior

19   grand juries that considered this obviously considered over 300

12:55 20   pages, 350 pages of transcript of testimony of eyewitnesses.

21   There's no way that this grand jury that was supposed to be

22   making an independent decision on these 15 factors considered

23   any of that testimony.  Could not have, impossible.  They got

24   it at 10 minutes of 12:00, and after that, there was

25   instructions by Mr. Vien.

          1          THE COURT:  I suppose you would understandably argue

          2     that this is no excuse, it's been a long time, more than --

          3     well, 30 years since I've been in a grand jury.  But with

          4     superseding indictments, I think it is customary to just give

          5     them everything that went before, have somebody summarize it

          6     and tell them they can delve as deeply into it or not as they

          7     want to.  So maybe that's no excuse if it's inadequate.  This

          8     is just one of the rare cases where, for appropriate reasons, I

          9     found the grand jury transcript.

12:56   10          MR. MCDANIELS:  The difference here, Your Honor, I

         11     mean, it really wasn't accurate to say the two prior grand

         12     juries had considered this because this was the only grand jury

         13     to be considering the 15 special factors, aggravating factors

         14     or intent factors.  No other grand jury had been called upon to

         15     consider those, so that was all new.

         16          And these are not simple.  Some of them, by far, took

         17     up a lot of time and the Court's time to figure out substantial

         18     planning, the cruel and heinous, and even the fact that these

         19     two crimes were part of a single criminal act, which they later

12:57   20     turned out --

         21          THE COURT:  With regard to substantial premeditation

         22     and substantial planning, based on what I ultimately

         23     instructed -- and I wrote about this in the August 2004

         24     decision -- the instruction here was incorrect.  And in fact --

         25     I've written a lot.  It's hard to remember it.  I don't know.

1           MR. MCDANIELS:  The problem --

2           THE COURT:  No.  You want to hear this.  It helps you,

3     but it's also going to focus because in my current conception,

4     they made an error.  If you look at *Sampson* 335, 166, beginning

5     at 209, I found and instructed the jury that there had to be

6     substantial planning and substantial premeditation to seriously

7     injure or kill a particular person.

8           The instruction here just told them they have to find

9     there was substantial premeditation and planning concerning the

12:58 10    carjacking, stealing each particular car.  So my present view

11    is that was erroneous.

12          Then I went on, I'm reminded, to find that the

13    evidence was insufficient to prove that factor beyond a

14    reasonable doubt with regard to Mr. McCloskey, not with regard

15    to Mr. Rizzo.  And I set aside, I believe, the jury's verdict

16    on that finding.

17          So with regard to that particular point, which you

18    seem to be going by, I believe there was an error made, it's

19    possible, in what the instruction was.  It's possible that the

12:59 20    evidence might have been insufficient to prove something beyond

21    a reasonable doubt but would have been sufficient to establish

22    probable cause.

23          In fact, that's my current tentative view.  And

24    therefore, this was a harmless error, because we haven't talked

25    about the standards yet, but I think the *Bank of Nova Scotia*

1    standard is the right one here.  The errors you're arguing at

2    the moment do not appear to me to be structural as the courts

3    have defined them, like excluding blacks from the grand jury,

4    and therefore you have to show prejudice that the decision to

5    indict was likely to have been affected by the error.  But I do

6    think that the government made an error here.

7              MR. MCDANIELS:  I didn't mean to go by it.  It was my

8    next one on my list.

9              THE COURT:  All right.

01:00  10              MR. MCDANIELS:  Because really, this was compounded in

11    several ways relating to substantial planning regarding

12    Mr. McCloskey.  When the question was asked of Trooper Cooke --

13    one of the grand jurors was confused about the rope and whether

14    the rope had been used in both the case of Mr. Rizzo and the

15    case of Mr. McCloskey, which goes to, the rope has obviously

16    been used by the government as evidence of substantial

17    planning, and we know that it was not used with respect to

18    Mr. McCloskey.  And not only --

19              THE COURT:  But I think it was used with regard to

01:00  20    Mr. Whitney, and that's why they heard some evidence of it, but

21    they hadn't been told about the Whitney murder.  It hasn't been

22    pointed out to them.

23              MR. MCDANIELS:  Correct.  And the juror wanted

24    clarification of that.  He said, "Did he use it in these two

25    murders that we're considering?"  And the trooper was not able

1   to answer the question, which Your Honor just gave the answer.

2   The trooper certainly knew as well.  But he wasn't allowed to

3   answer that.  The government instructed that the grand juror

4   should use his own memory.  And what's more, specifically said,

5   "Confine your deliberations to the carjacking presented today."

6   Told the jurors specifically to confine their deliberations to

7   the carjacking.

8          And like Your Honor said, later when they described

9   substantial planning, it was described in terms of planning the

01:01 10   carjacking.  That's what Mr. Vien told the grand jury.  "Did he

11   plan the carjacking?"  And then finally, the jury was told --

12   and they asked a question, "Is this all or nothing?"  And they

13   were told, "Yes," that this is all or nothing.

14          But it's not all or nothing.  And we just got through

15   talking about all the things the grand jury could do, including

16   finding one or more of these -- when you look at that --

17          THE COURT:  Let me stop there.  There is that "all or

18   nothing" language, but there's also a statement -- you know,

19   generally speaking with regard to trial juries, errors in a

01:02 20   particular statement are assessed in the context of everything

21   the jurors were told.  They're not looked at in isolation in

22   determining whether the error was prejudicial.  And in this

23   case, with regard to the all or nothing, which is on page 14,

24   at the outset, the Assistant U.S. Attorney told the grand jury

25   that it had to rule on certain factors at the end of the

1    indictment, that's on 5, and asked the grand jury to, "Give it
2    a fresh look and make your decision whether or not there is
3    probable cause to believe he did those things, and those
4    special factors exist at the end."

5          So my tentative thought is this was a grand jury that
6    evidently wasn't hearing its first case.  And things that I
7    read were correct, that they should take "a fresh look and make
8    your decision whether or not there is probable cause to believe
9    he did those things and those special factors exist at the
01:04 10   end."  So if the right standard is prejudice, that error at the
11   end, if it was an error, I don't know that I have great doubt
12   that it influenced the decision to bring the charge.

13         MR. MCDANIELS:  Your Honor, in the record that you
14   have here, how can one have any satisfaction that they
15   considered these special factors?  I mean, you look at what the
16   instruction was, consider the carjacking, when you look at what
17   they came back with, the question, the only question they came
18   back with, in probably ten minutes they had to decide what they
19   were going to do had to do, with the VIN number that is part of
01:05 20   the carjacking offense in Counts One and Two, not in the
21   special factors at all.

22         I mean, it's a physical impossibility for them to have
23   considered these 15 and really thought about any of them and
24   certainly the ones that have a lot of complexity to them in the
25   time they had allowed.  I mean, if I see a grand jury being

1   told, Hey, two grand juries have looked at this, not a

2   complicated matter.  It's a simple statute.  Just focus on the

3   carjacking.  These are just some factors, a slight change in

4   the law -- *Ring* was not really a slight change in the law but a

5   slight change in the law -- it was all to minimize what we were

6   doing here.

7        And the grand jury got it, and they came back in less

8   than ten minutes with an indictment.  That could not be

9   anything other than saying, Oh, yeah, okay, rubber stamp.  And

01:05 10   that's not what they were supposed to do.  They were supposed

11   to think about and talk about and deliberate on 15 factors.

12        THE COURT:  But assuming without deciding all of that

13   is right and they dealt with it quickly because of what the

14   government said, why should I doubt that if the matter had been

15   more fully explained to them and they spent hours or days

16   looking at the evidence, they wouldn't have returned this

17   indictment?

18        MR. MCDANIELS:  First of all, as Your Honor noted a

19   moment ago, our position is that the denial of an independent

01:06 20   grand jury, which this, we submit, indisputably was because the

21   grand jury didn't really act on these and could not have acted

22   on these factors, is a structural error and that we're not

23   required to demonstrate prejudice.

24        THE COURT:  But the courts have defined structural

25   errors as errors that, for example, that involve denial of

1   counsel.  Or I think in *Vasquez* and *Campbell, the* exclusion of

2   blacks would have been a structural error.  This I think

3   doesn't go to the structure of the grand jury.  It goes to the

4   way this particular grand jury performed, properly constituted,

5   following all the formalities -- not formalities --

6   requirements of Rule 6, performed under the direction of these

7   prosecutors.  It doesn't strike me as structural.

8           MR. MCDANIELS:  Well, under our position -- what I can

9   see here, it was a nullity.  That's why it's structural because

01:07 10   there can be no confidence whatsoever that they considered

11   every one of these 15 separate findings they had to make based

12   on the record of time they had and what they did with that time

13   based on the question they had and consistent with the

14   instructions they were given.

15           We obviously agree that the Supreme Court has not

16   extended at this point a structural error to the grand jury,

17   but it's not decided otherwise either, and at least Justice

18   Scalia would find a denial of an independent grand jury to be a

19   structural error.

01:08 20           THE COURT:  What does Scalia --

21           MR. MCDANIELS:  That was in his dissent.  It was

22   citing his decision in *Neder* as well.  Just a second.  I

23   thought I could find it.

24           THE COURT:  Here.  Why don't I -- is there more you'd

25   like to say?  We can get Justice Scalia's decision later.

1          MR. MCDANIELS:  *United States v. Resendiz-Ponce,* 549

2    U.S. 102 at 116-17, 2007.  So even -- you know, that's on the

3    one hand.

4          Beyond that, it seems to me that in terms of seriously

5    affecting the decision to indict, the standard, even beyond if

6    it's constitutional error, it would be the Chapman Standard,

7    beyond a reasonable doubt.  Even in the lowest of the

8    standards, I don't think there can be any question that the way

9    it was presented affected the quality of the decision because

01:10 10    they couldn't have reviewed the very things that they were

11    supposed to be determining.

12          And, you know, when you say, Your Honor -- I mean, I

13    don't know what would happen if they paid serious attention to

14    substantial planning, for example.  As Your Honor pointed out,

15    you didn't find it.  They had a question about it.  They were

16    told, essentially, look at the carjacking.

17          THE COURT:  But that wouldn't have made -- let's say

18    that was taken out.  Mr. Sampson still would have been eligible

19    for the death penalty with regard to Mr. McCloskey because of

01:10 20    the other findings.

21          MR. MCDANIELS:  If they made those findings, yes.

22          THE COURT:  You mean if they properly made them?

23          MR. MCDANIELS:  Correct.

24          THE COURT:  Okay.  Thank you.  What does the

25    government say about this?

 1          MR. QUINLIVAN:  Your Honor, to begin with, I think you

 2   are entirely correct that just as after a trial, a case of

 3   instructional error would look at the entirety of the

 4   instructions given.  I think what the defendant has done here

 5   is basically take out isolated phrases that are completely

 6   divorced from the entire context of the instructions given.

 7          And let me just begin, because with respect to the

 8   suggestion that the government underemphasized or that the

 9   grand jury wasn't put on notice that it had to make the

01:11 10   findings as to each one of those special factors, in fact, as

 11   we noted in our brief, on at least ten separate occasions

 12   during the instructions, the government -- in different

 13   phraseology but the effect was the same -- is to inform the

 14   grand jury that it had to make findings as to these claims.

 15          And I'll just point to a few that you've already

 16   highlighted.  On pages 2 to 3, the government says, "And so

 17   we're going to present evidence about, you know, about those,

 18   and then there are a number of statutory factors that we also

 19   have to ask you to rule on about how the crimes were

01:12 20   committed."

 21          A page later, the government tells the jury that he's

 22   going to "tell you what the law is," "and then, as I said, some

 23   special factors at the end that we're asking you to rule on."

 24          The next page, again, the question is asked about

 25   whether it's a superseding indictment.  He explains it's

1    actually a second superseding indictment, that because of a

2    Supreme Court decision, it's the opinion of the Department of

3    Justice and people in Washington that this has to be done,

4    quote, "that we have to ask you to rule on certain factors at

5    the end of the indictment."  "So, just give a fresh look and

6    make your decision whether or not there's probable cause to

7    believe that he did those things and these special factors

8    exist at the end."  Page 10, "And then we're asking you to make

9    some special findings as well."  And then the description is

01:13 10   made --

11           THE COURT:  Hold on a second.  Where --

12           MR. QUINLIVAN:  I'm sorry.  On Page 10, right in the

13   middle.

14           THE COURT:  Line 13.  Go ahead.

15           MR. QUINLIVAN:  Yes.  And then going on with the

16   description as to several of the special findings, again, it's

17   repeated that, you know, "Here is some of the evidence that you

18   may consider.  It's up to you to make that finding or not."  So

19   there's no possible way that the grand jury in this case didn't

01:14 20   think that it had to rule on the special findings.

21           And with respect to the all or nothing comment, I note

22   that this wasn't introduced by the government in this case.  It

23   was a question from one of the grand jurors.

24           THE COURT:  How does that help you?

25           MR. QUINLIVAN:  Just in the sense that I think it just

1    reflected -- it reflected how, as we noted in the brief, how

2    grand jury practice typically works, in the sense that the

3    government oftentimes will say, We're giving you a completed

4    indictment for you to review.  If you have any problems or

5    concerns with it, come back to us.  And that's --

6             THE COURT:  Yeah.

7             MR. QUINLIVAN:  Again, after saying, Yes, it's an all

8    or nothing indictment, you know, the government then says, But

9    if you have any questions, concerns, et cetera, I'm just

01:15 10   outside the door.

11            THE COURT:  But wouldn't it have been a more accurate

12   and clear response to say, You need to find probable cause for

13   each of the following things, and if you don't, we'll take that

14   out of the indictment, and the defendant will still be charged?

15            MR. QUINLIVAN:  Yeah.  I can't disagree with that.  I

16   mean, obviously, in retrospect, you know, that would probably

17   have been a more accurate statement.  But, you know, all or

18   nothing -- people understand what all or nothing means.  It

19   means unless you find everything, you find nothing.

01:15 20           THE COURT:  Which conveys the impression -- this is

21   the defendant's argument -- that Mr. Sampson would walk, go

22   free if they didn't find everything.

23            MR. QUINLIVAN:  I would suggest that that -- I mean, I

24   think the defendant's argument is now morphing from the

25   government engaged in instructional error to the grand jury

1    violated their oaths in this case.

2              THE COURT:  Well, does that make a difference?

3              MR. QUINLIVAN:  Yeah, I think it does because at

4    bottom, this is a claim that -- well, two points.  First off,

5    this is a claim, or at least as initially briefed, it was a

6    claim that the grand jury was improperly instructed.  Now it

7    seems to be a claim that, well, even if, even if they had been

8    told repeatedly that they had to rule on these special

9    findings, and even if the common sense understanding of all or

01:16 10   nothing is that unless you find everything, you find nothing,

11   there's the risk that the grand jury, given the horror that

12   they had heard about what the defendant has committed, that

13   they thought he would go free and, therefore, they violated

14   their oath.  That is not tied to any of the instructional

15   claims that the defendant is making, I would submit.  Because

16   again, consistent with the idea, again, that they had been told

17   repeatedly that, We're asking you to rule on these special

18   findings, I'd say anyone's understanding of the term "all or

19   nothing" is, again, unless you find everything, you find

01:17 20   nothing.

21              I want to go to a couple of points on some of the

22   other claims.

23              THE COURT:  It's now 1:15.

24              MR. QUINLIVAN:  Sure.

25              THE COURT:  I think the cafeteria closes at 1:30.

 1    We're going to stop.  Please come back at 2:30 because I have

 2    to do a little further work to prepare on some of the other

 3    issues.

 4          We'll do this.  We'll have some discussion of the CVRA

 5    issue and the latest filing by the defendant, and then I'll

 6    work with the firewalls.

 7          Okay.  Court is in recess.

 8          (Recess taken 1:17 p.m. to 2:52 p.m.)

 9          THE COURT:  I apologize for the delay in starting, but

02:52 10   I've been reading some additional cases concerning the matter

11    you were just arguing.  Mr. Quinlivan, is there more you would

12    like to say?

13          MR. QUINLIVAN:  Yeah, a couple more points on some of

14    the other issues, Your Honor.

15          Just briefly, the allegation that the government

16    barred Trooper Cooke from answering questions, all the

17    government said was that it's the juror's recollection of the

18    testimony that controls.  The jury had the CD with the

19    defendant -- with Mr. Sampson's confession that it could play.

02:52 20   That's no different from the instruction that this Court and

21    other courts give, you know, when a juror comes back with a

22    question, for example, asks for a transcript, so there's

23    nothing erroneous or improper about that.

24          And I point out that this particular -- I just want to

25    touch briefly on the law of the case because this issue arose

1    in the transcript of Trooper Cooke's testimony that the

2    defendant has had since the beginning of this case.  This isn't

3    related to the other claims where they only recently got this

4    instruction.

5         So this absolutely is the kind of issue that they

6    could have and should have raised back in 2003.  And I'm not

7    going to spend a lot of time belaboring the point, but I do

8    think that, you know, these issues are ones that should have

9    been raised back then and that this Court, I think, does need

02:53 10   to resolve the law of the case issue because I think it's an

11   important one that's going to affect not just this issue but

12   several others that we may be confronting as this case goes on.

13        THE COURT:  Well, my thinking may be evolving on the

14   proper standards, and I'll explain my evolving thinking at some

15   point, but I don't think this is the best time.

16        MR. QUINLIVAN:  Certainly.  I do want, on the

17   substantial and planning and premeditation, I do want to go to

18   that because I respectfully disagree.  The government properly

19   instructed the jury with respect to that issue, and I think --

02:54 20   and I would suggest consistent with Your Honor's decision in

21   that case.

22        So as Your Honor correctly pointed out in that

23   decision, it requires, that statutory factor requires first off

24   that you intended to cause the death of a particular person,

25   not just any person.  And secondarily, it's not the underlying

1    crime that makes it death-eligible that you look at.  It's not

2    substantial planning and premeditation to commit the carjacking

3    but rather the death of Mr. McCloskey and Mr. Rizzo.  And

4    that's exactly what the government, in fact, instructed in this

5    case.

6            And I point Your Honor to page 12 of the instructions.

7    And this is -- I think it's important to point out first, if

8    you look at the very end, page 11 of the instructions, that's

9    where the government sets out that there are a set of factors

02:55 10    enumerated regarding the McCloskey indictment.  So all of the

11    factors that he thereafter is setting out are referring

12    specifically to Mr. McCloskey.  So this isn't just the death of

13    any person, generally, but it's referring specifically to

14    Mr. McCloskey.

15           Then we go on to page 12.  "B, the defendant, Gary Lee

16    Sampson, committed the offense charged in Count One after

17    substantial planning and premeditation to cause the death of a

18    person."

19           THE COURT:  Not so fast, particularly on this part

02:56 20    because this is the part that is, in my view, wrong.

21           MR. QUINLIVAN:  Okay.  Well --

22           THE COURT:  But go ahead.  Read it.  Just read it

23    slowly, so she can write it down accurately.

24           MR. QUINLIVAN:  Certainly.  "B, the defendant, Gary

25    Lee Sampson, committed the offense charged in Count One, after

1    substantial planning and premeditation to cause the death of a

2    person.  If you find that there's evidence that he thought

3    about what he was doing, he was going to car-jack, what he was

4    doing all along, preparing himself for it."  So the second

5    sentence is simply modifying the first sentence that sets out

6    the standard.

7         He's saying the carjacking is one of the things you

8    can look to, not the only thing, one of the things you can look

9    to to determine that he engaged in substantial planning and

02:57 10   premeditation to cause the death of a person.

11        And Your Honor, that's made all the more clear when

12   you look at the similar instruction with respect to Mr. Rizzo.

13   And there we're talking about page 13 to 14.  And I'll quote,

14   "The defendant, Gary Lee Sampson, committed the offense after

15   substantial planning and premeditation to cause the death of a

16   person.  He arranged at will and planned to car-jack the

17   situation and have the bug spray.  It's up to you to find these

18   factors, but I'm just pointing to some bits of evidence that

19   you may want to consider in your deliberations on that."

02:58 20        So two points are key there.  One, the last sentence,

21   he's expressly -- the prosecutor is expressly saying these are

22   just some bits of evidence that would support the statutory

23   aggravating factor, which is planning and premeditation to

24   cause the death of a person.

25        And secondly --

1          THE COURT:   Substantial planning and substantial

2     premeditation.

3          MR. QUINLIVAN:   Substantial planning, that's right.

4          In addition, Your Honor, there the prosecutor doesn't

5     simply reference the carjacking, but he references the bug

6     spray.  And as Your Honor is well aware, because that's one of

7     the factors you found supported the factor in this case, the

8     bug spray in this case wasn't used in any sense to car-jack

9     Mr. Rizzo.  It was used to kill -- in the course of killing

02:58 10    Mr. Rizzo.

11          So again, the reference to carjacking in both of those

12     instructions is simply an example of evidence that the jury

13     could look to to find the aggravating factor, which is

14     substantial planning and premeditation to cause the death of a

15     person.  And indeed, Your Honor, I would note that the

16     defendant in his reply brief doesn't even respond to our

17     argument on this claim, which I think underscores why it lacks

18     merit.

19          And, in fact, the only way that the defendant in his

02:59 20    opening brief is able to make the claim is by admitting that

21     key first sentence in the quoted language.  The quotation goes

22     straight to the carjacking but it omits again the central

23     point, which is substantial planning and premeditation to cause

24     the death of a person.  So I would submit there is no and there

25     was no error in this particular instruction.

1          In any event, Your Honor, as yourself noted, it

2    certainly would be harmless with respect to Mr. McCloskey,

3    given Your Honor's finding.

4          THE COURT:  Well, this is down the line, but people

5    should make a mental or actual note.  The government should

6    think about this, whether this aggravating factor with regard

7    to Mr. McCloskey should be struck from the indictment.  In

8    other words, the government has said it's going to be the same

9    evidence again, and I found that the evidence was insufficient

03:00 10   last time.

11         It's not anything to be resolved now, but just

12   something to think about or maybe you'll get a motion to

13   strike.  But I think that even without that allegation -- I

14   said this earlier -- the findings are sufficient to make

15   Mr. Sampson death-eligible with regard to the carjacking

16   resulting in the murder of Mr. McCloskey, right?

17         MR. QUINLIVAN:  Right, right.

18         THE COURT:  All right.  Mr. McDaniels, is there

19   anything further you'd like to say?

03:01 20        MR. MCDANIELS:  Very briefly, Your Honor, on that

21   point.  On page 13 of our brief we quoted the first and the

22   second sentence.  I think the thrust of what the government did

23   there in focusing the jury on the carjacking, "planning of the

24   carjacking," everything was the carjacking, including telling

25   them to "confine your deliberations to the carjacking that we

1    are presenting today," and combining that with the minimization

2    of what these special factors were, the result of which is, I

3    think, even in the lowest standard, did this substantially

4    influence the decision to return the indictment, I think the

5    record is clear that what most of the grand jury did was focus

6    on the carjacking and could not have focused on the special

7    factors.  And for that reason we think that the special

8    factors, Your Honor, should be dismissed.

9         THE COURT:  Let me give you a chance to address this

03:02 10   before I decide this motion.

11        In my current conception, whether something had a

12   substantial influence on the decision -- well, whether there's

13   a substantial question as to whether the indictment would have

14   been returned to me relates to the sufficiency of the evidence.

15   In other words, let's say there's an error, and I continue to

16   think this instruction with regard to Mr. McCloskey, and

17   probably in the context of all of it, was an error, but if the

18   grand jury was properly instructed the way I instructed the

19   jury and it had taken its time, as much time as it wanted to

03:03 20   have delved into the evidence, there would have been ample

21   evidence to find probable cause.

22        So in that sense -- or if this allegation with regard

23   to Mr. McCloskey was eliminated, he still would have been

24   properly -- Mr. Sampson would have been properly subject to the

25   death penalty with regard to Mr. McCloskey.

1          So it seems to me there's no prejudice, even if

2     there's an error, because had the government not erroneously

3     stated the law, the jury would have come to the same

4     conclusion.

5          Do you want to be heard on that view of prejudice

6     being linked to the sufficiency of the evidence?

7          MR. MCDANIELS:  The prejudice I think that we have

8     asserted here is that this grand jury proceeding, to the extent

9     it was to decide the aggravating factors and the intent

03:04 10     factors, was a nullity as to Mr. Sampson.  Because the grand

11     jury did not make that decision.  They rubber-stamped what was

12     presented to the government.  At best and at most, they focused

13     on the carjacking, Counts One and Two, and not the special

14     factors shown by the question they raised.

15          Certainly, if they had done -- if they had looked at

16     the 14 volumes of the past grand jury, if they had actually

17     discussed -- I'm not saying there wasn't evidence that could

18     have supported those.  But what I think we have on this record

19     is clear evidence that they did not do that, could not have

03:05 20     done it.  It was physically impossible to do that in the less

21     than ten minutes they had to deliberate and given what they

22     came back with during those ten minutes of a question confined

23     to Counts One and Two about the VIN number and jurisdiction.

24          So our position is that that's why this is a

25     structural error, because it deprived Mr. Sampson of one step

1    in the process.  And certainly the way it was presented led to

2    the result of the grand jury doing just what they were told to

3    do, focus on the carjacking but not on the special factors.

4           THE COURT:  Do you want to be heard on that?

5           MR. QUINLIVAN:  I do, Your Honor.  A couple of points.

6    First off, I don't know where this ten minutes comes from

7    because it is a little difficult to -- you have to go back and

8    forth between the transcripts.  But this ten minutes is just

9    made -- it's clear that there was somewhere between 27 -- we

03:06  10  don't know exactly how long the grand jury deliberated.  What

11   we do know, let me point out, in the instructional -- we know

12   from the instructions that the proceedings began at 10:11 and

13   that Trooper Cooke testified after the initial instructions by

14   the government until approximately 11:15 a.m.  We know that the

15   government played the CD and that, following less than a page

16   of comments, that matter was concluded at 11:48.  So probably

17   an entire half an hour of the proceeding was the grand jury

18   listening to Mr. Sampson's confession in his own words.  So

19   that's 11:48.

03:07  20         We then have, from pages 6 to 15 of the instructional

21   transcript, the government giving instructions.  The grand jury

22   retires to deliberate.  They come back with a question.  The

23   prosecutor goes on for several more pages with the instruction

24   about the carjacking, and at 12:15 it's concluded.  So we don't

25   know what the precise time was that the grand jury deliberated.

1    It may have been 20 minutes, it might have been 15.  We don't

2    know.  What we do know is that, in addition to Trooper Cooke's

3    testimony, the grand jury listened to the defendant confess his

4    crimes for half an hour.

5         So I would suggest that when you look at that evidence

6    in addition to, as we noted, the government telling the grand

7    jury time and time again that they had to rule on the special

8    findings, I would suggest that there's no merit whatsoever to

9    the suggestion that the grand jury here simply rubber-stamped

03:08 10   the superseding indictment in this case.

11        MR. MCDANIELS:  I do have the times, Your Honor, if

12   that is important.

13        THE COURT:  Go ahead.

14        MR. MCDANIELS:  I think it's clear that, first of all,

15   the CD was 20 to -- 20 minutes, but the key point is that

16   Trooper Cooke finished his testimony at 11:48.  Then as seen

17   from Exhibit 1, there are several pages of instructions that

18   the government gave to the grand jury after that which I think

19   took about -- we know that the grand jury began at 10:11 and

03:08 20   Trooper Cooke didn't begin until 10:21, and there were fewer

21   pages there that took up ten minutes.  So it's clear that from

22   11:48 until noon, there was instructions given; and at noon

23   they went out and they came back with a question about the VIN

24   number and transportation.  So at the most it was ten minutes

25   for them to do their work.

1          THE COURT:  All right.  It's rare that defense counsel

2     and the Court get to read the transcript of the grand jury

3     proceedings, including instructions.  It was justified in this

4     case, as I've decided and explained previously.

5          The matter was presented to the grand jury in a

6     summary way, and the instructions were not careful in the

7     manner of jury instructions.  And in one respect, as I'll

8     explain, not correct, but given the applicable standard,

9     standards, I'm denying the motion to dismiss based on the

03:10 10     individual and cumulative contentions that the grand jury

11     lacked its usual -- or the required independence, and maybe the

12     jurisprudence reflects an evolution in the -- well, whatever it

13     is, the standard is that usually a Court may not dismiss an

14     indictment unless an error of prejudice to the defendant, as

15     the First Circuit says in *Lopez-Matias,* 522 F.3d 150 at 154 in

16     2008.

17          Before that, in 2006, in *Goodrich*, 448 F.3d 45 at 50,

18     the First Circuit explained, "The circumstances in which an

19     indictment will be dismissed are very rare, even when there's

03:11 20     not been a petit jury verdict of conviction."  It stated that

21     "Where a defendant seeks dismissal of an indictment before

22     there is a petit jury verdict, such relief is appropriate only

23     if it is established that the violation substantially

24     influenced the grand jury's decision to indict or if there's

25     grave doubt that the decision to indict was free from the

1    substantial influence of such violations."  That's *Bank of Nova*

2    *Scotia*.  Further, "An indictment returned by a legally

3    constituted and unbiased grand jury, if valid on its face, is

4    enough to call for trial of the charge on the merits."  That's

5    *Costello*.

6         Similarly, Rule 52(a) provides that any error that

7    does not affect substantial rights must be disregarded.

8    However, the defendant would not have to prove prejudice if a

9    structural protection of the grand jury has been so compromised

03:12 10    that the proceeding is fundamentally unfair.  The Georgetown

11    Law Journal 43rd Annual Review of Criminal Procedure 2014 on

12    page 293, discusses this principle and cites cases.  It says

13    that, "An indictment may be dismissed for presumed prejudice

14    when the structural protections of the grand jury have been so

15    compromised to render the proceedings fundamentally unfair.

16    For example, by racial discrimination, gender discrimination or

17    history of prosecutorial misconduct that is systemic and

18    pervasive," and it cites cases for that proposition.

19         *Lopez-Matias* at 154 also discussed the different

03:13 20    standard for a structural violation.  In *Davila*, 133 Supreme

21    Court 2139 at 2149, the Supreme Court indicated that "a

22    structural violation would be something like a denial of

23    counsel during a trial," focusing on juries; and I would say as

24    we were discussing earlier, the exclusion of blacks from the

25    grand jury in *Vasquez* and *Campbell* was a structural violation.

1          The errors alleged here, individually and

2    cumulatively, are not structural.  Therefore, Sampson must

3    prove prejudice to prevail.  Prejudice, as I said under the

4    *Bank of Nova Scotia* standard referenced by the First Circuit,

5    involves whether the violation causes grave doubt regarding the

6    grand jury's decision to indict.

7          In this case, I find that the Assistant United States

8    Attorney made an error in instructing on the aggravating factor

9    of substantial planning and premeditation.  Generally speaking,

03:15 10    the First Circuit has said the government is not required to

11    instruct on the law.  It could have just read the statute.

12    That's *Lopez-Lopez* 282 F.3d 1 at 9.

13          However, the prosecutor does have a duty not to

14    provide a misleading instruction regarding the law.  So, for

15    example, in *Larrazolo*, L-a-r-r-a-z-o-l-o, the Third Circuit

16    wrote, "The prosecutor has no duty to outline all of the

17    elements of conspiracy so long as the instructions given are

18    not flagrantly misleading or so long as all the elements are at

19    least implied.  "Erroneous grand jury instructions do not

03:16 20    automatically invalidate an otherwise proper grand jury

21    indictment.  "Appellants must show the conduct of the

22    prosecutor is so flagrant it deceived the grand jury in a

23    significant way, infringing on their ability to exercise

24    independent judgment."

25          Under the criteria stated in *Nova Scotia*, "The alleged

1    error in grand jury instructions is not structural nor

2    historically pervasive and thus does not rise to constitutional

3    error giving a presumption of prejudice to defendant," citing

4    *Nova Scotia*.  Therefore, under the rule in Nova Scotia, this

5    Court cannot reverse the trial court in the absence of actual

6    prejudice to the defendant."

7         In this case, as I said, the Assistant United States

8    Attorney made an error with regard to instructing on

9    substantial planning and premeditation with regard to

03:17 10   Mr. McCloskey at least.  The instruction on page 12, "The

11   defendant, Gary Lee Sampson, committed the offense charged in

12   Count One, after substantial planning and premeditation to

13   cause the death of a person.  If you find there's evidence that

14   he thought about what he was doing, he was going to car-jack,

15   what he was doing all along, preparing himself for it."  I

16   think that would reasonably be understood by a juror to mean

17   that the grand jury only had to find that there was substantial

18   planning and premeditation about the carjacking, not about the

19   murder, or about the murder of Mr. McCloskey particularly.

03:18 20       I think that the discussion of Mr. Rizzo and that

21   particular factor is not comparably infirm, although it's still

22   not clear.  The prosecutor said, "Gary Lee Sampson," in effect,

23   "must have committed the offense after substantial planning and

24   premeditation to cause the death of a person.  He arranged it

25   well and planned to car-jack the situation and have the bug

1   spray.  It's up to you to find these factors, but I'm only

2   pointing to some bits of evidence that you may want to consider

3   in your deliberations on that."  I addressed the proper

4   instruction in *Sampson* 335 F. Supp. 2d, 166 at 209 et seq. the

5   charge of substantial planning and premeditation to cause the

6   death of Mr. McCloskey and Mr. Rizzo.  I held that the

7   government had to prove substantial planning and premeditation

8   to cause the death of Mr. McCloskey particularly and Mr. Rizzo

9   particularly.  I explained that substantial premeditation to

03:20 10   car-jack would not be enough.  The jury found both proven

11   beyond a reasonable doubt.  The flawed jury found both proven

12   beyond a reasonable doubt.  I found that the evidence was

13   sufficient to prove beyond a reasonable doubt the substantial

14   planning and premeditation concerning Mr. Rizzo but not

15   Mr. McCloskey.  That's at pages 211 and following.

16         I found that the evidence was sufficient to prove

17   premeditation and planning concerning Mr. McCloskey but not

18   sufficient to prove substantial planning and substantial

19   premeditation.  In these circumstances, I held that the

03:21 20   evidence was sufficient -- well, in these circumstances, I find

21   that the evidence was sufficient to provide probable cause

22   regarding substantial planning and premeditation with regard to

23   Mr. McCloskey.

24         The instruction, as I say, was incorrect.  And my view

25   of prejudice in this circumstance essentially is that if the

1    instruction had been given correctly, the grand jury would have

2    indicted.  There was ample evidence to find probable cause,

3    although not proof beyond a reasonable doubt eventually, and

4    therefore, I don't have a grave doubt that the government's

5    error improperly impacted the decision to indict.  I'm

6    interpreting that as meaning if there's a proper instruction,

7    would the evidence have been adequate assuming -- well, would

8    the evidence have been adequate to find probable cause, or was

9    the grand jury improperly led into returning an indictment that

03:23 10   was not factually founded that should not have had to be tested

11   by a jury?

12         Another important claim that Mr. Sampson makes is that

13   on page 14 of the August 8, 2002 transcript concerning the

14   instructions, the juror asked, "Is it an all or nothing

15   indictment?"  The prosecutor answered, "Yes."

16         This may have -- well, this arguably suggested that

17   the defendant could not have been charged at all if the jury

18   didn't find probable cause for every alleged aggravating

19   factor.  That would have been an erroneous understanding.

03:24 20   However, with regard to jury instructions, and I believe also

21   grand jury instructions, they must be viewed as a whole to see

22   if they adequately informed the grand jurors of their role.

23         The grand jurors, as I understand it, in part based on

24   the Benchbook which I made Exhibit 1 earlier today, had been

25   instructed at the outset of their service, their job was to

1    find probable cause.  The concept of looking at jury

2    instructions as a whole is familiar, but it's in *Brown,* 669

3    F.3d at 29, *Troy,* 18 F.3d at 33, two First Circuit's cases.

4         As I said, the grand jury, I expect or understand, was

5    instructed, when it was impaneled, its job was to find probable

6    cause for each of the facts alleged.  In connection with this

7    transcript, in these instructions, on August 8, 2002, at the

8    outset, the prosecutor on page 3 said, in part, "There are a

9    number of statutory factors which we also have to ask you to

03:25 10   rule on about how this crime was committed."

11         On page 4, the prosecutor said, "We'll ask you to vote

12   on the proposed indictments which will be in two counts:  one

13   count relating to each carjacking, each murder is one count.

14   And then, as I said, some special factors at the end that we're

15   asking you to rule."  On page 5, he reiterated that, "We have

16   to ask you to rule on certain factors at the end of the

17   indictment."  He also on page 5 told the grand jury to, "Just

18   give it a fresh look and you make your decision whether or not

19   there's probable cause to believe that he did those things and

03:26 20   these special factors at the end."

21         There are, I think, some other examples that the

22   government cited today, but in balance, I find that an

23   experienced grand jury, instructed by a judge when impaneled

24   and being told all the things it was told by the prosecutor on

25   August 8, 2002, would not misunderstand that probable cause was

1    required for each aggravating factor to be included in the

2    indictment.  The grand jury was told on page 15 that it could

3    ask the prosecutors questions.  No questions were asked about

4    this matter.

5              I don't find that in this context, telling the jurors

6    that it was an all-or-nothing indictment was an error, and in

7    any event, the error became harmless.

8              I also find that there was no error in failing to

9    explain the importance of the special factors.  This is related

03:28 10    to my ruling earlier that the grand jury did not have the right

11    not to bring capital charges if there was probable cause to

12    support the factors that made Mr. Sampson eligible for the

13    death penalty.

14             I also find it is not in error to tell the grand jury

15    it was being asked to return a second superseding indictment.

16    There was a lot of evidence presented to prior grand juries

17    that was made available to it.  It would have been confusing

18    and perhaps misleading to not tell them that prior grand juries

19    had acted on this and there had been a change in the law that

03:29 20    brought the prosecutors back to seek a second superseding

21    indictment.

22             As I said, grand jurors were asked to take a fresh

23    look.  The grand jury may not have taken a lot -- not have

24    taken much time in reaching its decision.  And the whole

25    proceeding was relatively brief, and arguably casual, given the

1    momentous consequences, but it hasn't been proven to me that

2    the grand jury was rushed by the government.  There's no

3    evidence in the transcript of this, and I understand that it's

4    the defendant's argument that the individual deficiencies are

5    cumulative, that this is organic, and the grand jury was a

6    rubber stamp.  But the particular matters that are charged as

7    errors either are not errors or are harmless errors.  And

8    others might define prejudice or understand prejudice somewhat

9    differently, but I find if this grand jury had been properly

03:30 10   instructed and even if it knew that this was a potential

11   capital case and it looked at all the evidence, it would have

12   found probable cause for every one of the allegations in the

13   indictment, including that Mr. McCloskey died after substantial

14   planning and premeditation even if there wasn't enough evidence

15   to prove that beyond a reasonable doubt.

16          All right.  I'd like to move to some discussion,

17   although I think not complete argument, on the government's

18   motion to allow victim impact evidence from the family of

19   Robert Eli Whitney and Sampson's response to that and the

03:32 20   related motion.  So the government's motion to allow victim

21   impact evidence from Mr. Whitney's family was filed on February

22   3.  There was no affidavit in support of it as required by

23   local Rule 7.1(b)(1).  The opposition was filed yesterday on

24   February 17.  I had previously given the government an

25   opportunity until February 25 to reply.

1          Yesterday, February 17, the defendant filed a motion

2     for leave to file a motion asking the Court to correct the

3     defendant's sentence and sentence him to life in prison or

4     less.  That's October number 1805, the motion for leave to file

5     is required by my December 23, 2014 memorandum and order

6     explained at page 19, and the December 26, 2014 order regarding

7     scheduling.  In essence, given all of the poorly conceived and

8     presented motions, constitutional motions, which have caused a

9     lot of confusion and delay to this point, I took the unusual, I

03:33 10    think for me unprecedented, step of requiring Sampson's counsel

11    to ask permission to file substantive motions so there can be

12    some attention paid to whether they were appropriate.

13          The opposition to the motion relating to whether the

14    Whitneys have rights under the Crime Victim Rights Act at pages

15    28 to 42 discusses the issue of whether the Court should

16    sentence Mr. Sampson to less than death.  It is something that

17    has the effect but not the purpose of someone circumventing

18    December orders.

19          My tentative thoughts are as follows:  I would like to

03:34 20    hear argument on the CVRA motion after I receive a reply, or if

21    there's no reply, after I have a chance to study this.  The

22    response just came in yesterday.  That doesn't have to be in

23    the very far future.

24          It may be appropriate that I require compliance with

25    local Rule 7.1(b)(1) and have the government file an affidavit

1    from a representative of the Whitney family.  Section 3771(d)

2    allows an attorney for the government to assert the rights of a

3    victim as defined in Section 3771(a).  A key issue with regard

4    to this motion, although I haven't studied it, is whether the

5    Whitneys are victims as defined in the Crime Victim Rights Act.

6            The February 15, 2013 Boston Herald -- I meant to

7    bring copies, but I think I didn't -- quoted or reported

8    Mr. Whitney's son as saying he's not sure if he wants to

9    testify in this case.  And it reports the United States

03:35 10   Attorney's Office as saying the motion was filed on behalf of

11   prosecutors without a request of the family.

12           This motion raises another interesting issue, but

13   there really should be, in effect, a case of controversy

14   concerning it, is my tentative view.  So that's one matter to

15   discuss today.

16           The motion for leave to file does not contain the

17   certificate by local Rule 7.1(a)(2) that the parties have

18   conferred in an attempt in good faith to resolve the dispute.

19   This is significant.  In the usual case, the District Court

03:36 20   here is justified in rejecting a motion if it doesn't represent

21   that that conference has occurred.  This one does not represent

22   that conference has occurred.  Many other motions do.  I didn't

23   see that certificate on this one.

24           And it seems to me that considerations of comity make

25   it particularly appropriate to require a conference here.

1    Decisions to prosecute, decisions to sustain this as a capital

2    case are generally for the executive branch to make.  I do

3    recognize, I've pointed out previously that I do have certain

4    equitable authority given the particular posture of this case.

5    But decisions whether to prosecute are generally for the

6    executive branch to make.  Despite having more than a year to

7    do so and being given several deadlines, as far as I know,

8    Mr. Sampson has never gone to the Department of Justice to seek

9    de-authorization unless this has happened recently and nobody

03:38 10    told me.

11            But the motion is seeking essentially the same relief.

12    And putting aside whatever equitable authority I may have, it

13    seems to me particularly important that probably not just the

14    U.S. Attorney but the Department of Justice decide this.  If

15    Mr. Sampson really doesn't want to go to trial, which is

16    actually an open question in my mind, the argument that I

17    looked at quickly on those 14 pages of the opposition to the

18    motion relating to the Whitneys and the three pages requesting

19    leave look to me like arguments that ought to be presented to

03:39 20    the Department of Justice and, to the extent that they're ever

21    ripe to be presented to me, that Mr. Sampson should be here for

22    the argument to make sure this is what that -- that he agrees

23    with the request.

24            But basically, we've been operating for about a year

25    and a half on the understanding that this case needed to be

1    prepared for trial, and it's still my understanding.  And with

2    regard to this motion, requirement of a conference that exists

3    with regard to every motion filed in a criminal case in this

4    court is important.

5              I'm sorry.  Did the parties confer on this?

6              MS. RECER:  Yes, Your Honor, we did.

7              THE COURT:  Excuse me if I overlooked it.  Let me see

8    where that is.

9              MS. RECER:  The certificate isn't in the motion for

03:40 10    leave.  I was following the order of things that were supposed

11    to be in the motion for leave.  I thought that was sort of a

12    separate proceeding.  It's not the actual motion.  It's just

13    the motion for leave.

14              THE COURT:  It's a motion.  It's a motion.  Local Rule

15    7.1 applies to every motion.

16              MS. RECER:  We did confer and we actually --

17              THE COURT:  You conferred with the U.S. Attorney?

18              MS. RECER:  We didn't confer as to the motion for

19    leave to file it.  We asked them to join us in the motion and

03:40 20    received a response.

21              MR. HAFER:  Can I give you the history, Your Honor?

22    Would you like the history?  Here's the history.  This is

23    important.

24              THE COURT:  It's very important.

25              MR. HAFER:  First off, you're exactly correct, pages

1    28 to 43 are a de-authorization presentation camouflaged as a

2    motion for relief in the court.  No, they have not made a

3    de-authorization presentation; and no, they did not confer the

4    motion for leave to file.

5         And it's particularly disturbing because when we want

6    to file a motion, the conferrals have become incredibly arduous

7    the other way because Mrs. Recer is constantly telling us that

8    the rule requires good faith effort to narrow and resolve and

9    discuss issues.  And as you saw from the certification that we

03:41 10   put in the Whitney motion, we conferred that thing for like an

11   hour.  We missed calls and we had e-mails.  It was

12   time-consuming.

13        THE COURT:  But it's important.  This is nobody's --

14   well, it's not your first case in the District Court.  These

15   conferences, when they're conducted in good faith, frequently

16   narrow issues -- eliminate issues, narrow issues, and then

17   permit the Court to focus on things that are genuinely in

18   dispute and decide them on an informed basis.

19        MR. HAFER:  Correct.  And so what happened here is

03:42 20   they sent us a number of weeks ago a proposal, whereby we would

21   agree to make a joint motion to you to correct Sampson's

22   sentence.

23        And in this proposal, they included a lot of things,

24   frankly, Your Honor, which were deeply, deeply upsetting.  And

25   we shared these, we shared this proposal with the families.

1    They included things like, "If we agree to this proposal,

2    Mr. Sampson will retract some of the particularly inflammatory

3    things he has said in the last 12 years in connection with this

4    case."  And we were reading this thing and frankly stunned that

5    it would take -- we would have to give them something to get

6    him to do something like that.

7         They said in this proposal that if we didn't agree to

8    it, they might have to challenge the conviction now.  And in

9    fact, Your Honor, that's in pages 28 to 43 that if we don't

03:43 10   join this proposal, they still have two live 2255 issues that

11    go to the integrity of the conviction, and they're going to

12    raise those.

13         This is extortion.  This isn't an attempt to resolve

14    the case.  And to put in here -- look, Mrs. Recer, Mr. Burt,

15    they've devoted their careers to ending the death penalty.

16    That's fine.  But what's not fine is to publicly file pleadings

17    in which they proclaim that what they're doing is to help the

18    families.  They're giving the families what they really want

19    but what the families don't know that they actually want.

03:43 20        We got their proposal.  We presented it to the

21    families.  They were -- I'm not even going to use in open court

22    some of the words that were used by various members of all the

23    families in response to this proposal.  They weren't positive.

24         We responded we won't be joining you in the motion.

25    Beyond that, there was no conferral on this particular thing.

 1    We think you should deny it.  As you said, it can be denied

 2    under 7.1(a)(2), but it can be denied substantively.  Even if

 3    you have the authority -- we certainly don't think you have the

 4    authority.  Even if you have the authority, you have a case or

 5    controversy, as you've noted, concerns of comity and the

 6    executive branch's prerogative, and were pursuing a sentence

 7    here that we believe is the just sentence based on the facts of

 8    this case.  And that's what we're pursuing.

 9          And the notion that they're looking out for the

03:44 10   families, again, we don't begrudge them looking out for their

 11   client.  That's what they do.  That's what they've devoted

 12   their careers to.  That's fine.  But similar to what I said

 13   earlier, what we do begrudge is pretending that they're looking

 14   out for the families, and they're not.  They have said many

 15   times in court that they want to do what is right and they want

 16   to make it less painful.  Well, that something that they can do

 17   to make it less painful is to stop making it seem like that's

 18   their motivation.

 19         Their motivation is to get Sampson off, and their

03:45 20   motivation is guerrilla warfare against the death penalty.

 21   That's what's going on.  And that's fine.  That's fine.  But

 22   that's what it is.

 23         And so no, the motion wasn't conferred.  With respect

 24   to 7.1(b)(1), no one from The Herald called me.  No one from my

 25   office talked to me about the inquires made by The Herald.

1    What I will say in open court is that we did consult with the

2    Whitney family prior to filing that motion, and I don't think

3    that an affidavit is required.  We obviously consulted with

4    them before we filed the motion, and I represent that in open

5    court.

6            THE COURT:  There was some discussion, maybe it was

7    conferring, but the fundamental point remains.

8            Do you want to be heard on this, Ms. Recer?  Because

9    I -- well, I'm going to say a couple things.  Not to heighten

03:46 10    everybody's -- when I was compelled to vacate Vincent Ferrara's

11    sentence in his 2255 because of prosecutorial misconduct and

12    was affirmed by the Court of Appeals, or eventually was

13    affirmed by the Court of Appeals, I vacated his sentence.  The

14    government agreed that the case couldn't be tried 15 years

15    after he was sentenced.  And then the question was should he

16    get the same 22-year sentence that he agreed to as a result of

17    the prosecutorial misconduct for a lesser sentence, and I

18    decided he should get a lesser sentence.  He was released, and

19    that was affirmed on appeal.

03:46 20            So such authority may exist.  I haven't even read -- I

21    haven't even read what they wrote.  I just glanced at it, 28 to

22    42.  But, you know, I do believe that there's value to the

23    process if it's regarded as necessary, even though ultimately

24    there may be some futility to the whole thing.  That's the

25    defendant's argument, if I understand it.  They arguably

1    believe that Mr. Sampson's life expectancy is limited and the

2    duration of this case is unlimited, like every other capital

3    case.

4           And in fact, as I got into this and looked at the

5    *Roane* case, there seems to be a de facto moratorium on the

6    death penalty.  The Department of Justice keeps agreeing to a

7    stay while it works on protocol to execute people.  Maybe

8    someday there will be a different administration in the

9    Department of Justice.

03:48 10          But what would you like to say, Ms. Recer?  But, you

11   know, have you gone to the Department of Justice in Washington

12   to make this argument?  And if not, and this isn't the end of

13   the inquiry, why shouldn't I say you have to do at least that

14   before I decide whether to let you file this motion?

15          MS. RECER:  Yes, Your Honor.  Couple of points.

16          We have not gone to the DOJ, and we wrote -- and when

17   we discussed this with the government, I believe it's also in

18   the motion, we specifically said we wanted to raise this motion

19   before going to the DOJ.  And there's two reasons.

03:49 20          First of all, the presentation to the DOJ for

21   de-authorization is on the issues that the DOJ asked to hear

22   about in a particular memo.  But secondly, the whole idea of

23   this correction of sentence is the Court's authority to, in

24   these proceedings for equitable reasons and not to -- the idea

25   is that if we were to go to DOJ and persuade them, that they

1    would be giving in.  And my feeling and assessment of the

2    situation is, as the Court just pointed out, there is a de

3    facto moratorium.  In fact, Mr. Holder announced last night at

4    the National Press Club that he thinks a national moratorium

5    would be appropriate for the death penalty nationwide in all

6    jurisdictions until the Supreme Court rules.

7         The writing is on the wall in terms of changing

8    standards of decency.  There have been two more states, since

9    the last time we argued that motion, that have had moratoriums,

03:50  10  Pennsylvania, and Maryland cleaned off what was left of their

11   row.  So I believe that the situation we're in is perfect and

12   exactly what equitable authority is for.  And that is that

13   we're trapped in the situation where it is absolutely not

14   realistic to think that Mr. Sampson could ever be executed,

15   because of his health, because even if the federal death

16   penalty were to pick up right now, he would be in line behind

17   people that have been waiting for more than 20 years, and he is

18   not going to live that long, because changing standards of

19   decency means the death penalty is not going to live that long.

03:50  20       So what is happening is a proceeding that we have

21   heard and we really have heard the expression over and over

22   about how painful and difficult this is.  We're not presuming

23   that we can speak for anyone.  It's what has been said.  And we

24   believe it.  I'm sure that this is awful, to put people through

25   the hard part when they're not going to get a benefit, but who

1  can back down at this point?  Who can say we're going to stand

2  down?  The judge can do that for the parties, but the parties

3  haven't -- so the idea was to ask the Court to -- either

4  jointly to ask the Court to have a hearing to assess what the

5  equities and the proposal is that a lot of the equities, things

6  that really matter to people, are not the legal questions; and

7  the things that really matter, people aren't allowed to talk

8  about because they don't fit in the narrow parameters.

9       The reason this came up in response to the motion

03:51 10  regarding the CVRA is that our position is that we think that

11  the consequence of these legal rules, the real effect on the

12  family, we agree that they shouldn't be treated differently,

13  but that's the way the death penalty works.  And that's what's

14  so awful about it.  It's parsing murders and ranking them and

15  saying which is worse.  And we do agree that that has

16  consequences for people that it shouldn't and that it's awful

17  for them.

18       And it does logically raise the question of what are

19  we doing to have these proceedings where the defense and

03:52 20  Mr. Sampson is getting all of the care and the extraordinary

21  process and resources because he's a capital defendant, which

22  is absolutely appropriate.  And the Court has been

23  extraordinarily careful about that, and that's exactly as it

24  should be, except for the fact that it's completely unrealistic

25  to think he would ever be executed.

1          So I think that we wanted to propose to the Court, and

2     this is a very serious motion and something we have actually

3     consulted with folks who are experts on procedural issues and

4     2255 to make sure we're right about the way it would work.

5     We've done a lot of research about it, and it is a way that the

6     Court can exercise authority that is exactly for a circumstance

7     like this, where the parsing of the law and the legal remedies

8     and legal procedures are not going to help anybody, but the

9     Court could create a circumstance in which people got to have a

03:53 10     proceeding that did address the issues that really do matter to

11     them.

12          And that is the proposal.  It's not extortion.  The

13     issues that remain in Mr. Sampson's case do remain, and they

14     will be litigated.  But it is saying realistically, everything

15     that's wrong with these proceedings, everything that has been

16     cited as painful and insulting, are things that could stop and

17     we could have a different kind of proceeding.  And that's what

18     the motion is about.

19          THE COURT:  A different -- okay.  What kind of

03:53 20     proceeding?

21          MS. RECER:  A proceeding where to correct the sentence

22     is about the equities.  What are the equities?  The equities

23     about people's real interests and the issues that matter to

24     them.  So that people, the families of the victims as well as

25     surviving victims could talk without it being subjected to all

1   the rules about it being victim impact and without having to

2   worry that if they say something in court or to a newspaper

3   they might mess up the case.  And that's not fair.  For them to

4   be able to say what really matters to them and --

5           THE COURT:  And I always hesitate to ask these

6   questions because I don't think they're for me now.

7           Okay.  It's an equitable proceeding so the judge

8   decides.  Would the judge have the authority to sentence

9   Mr. Sampson to death?

03:54 10          MS. RECER:  No.

11          THE COURT:  No.

12          MS. RECER:  I mean, the only way the death sentence

13   can happen is in a proceeding where the death sentence would

14   happen.  But the point is, here we're going to go through all

15   that where everybody is muzzled, there's tight rules, and it's

16   not ever going to happen.

17          THE COURT:  I've asked you this before, although

18   perhaps not in a public session.  A, whatever argument you're

19   making now you could have made a year ago.  And we're down the

03:55 20   track toward the trial that I think everybody contemplated

21   after the remand from the First Circuit.  I believe I've asked

22   this question before.  I've certainly discerned it.

23          But B, I don't understand.  You say everybody's locked

24   in, and yet, you've never gone to the Department of Justice in

25   Washington to make any kind of presentation at all, as far as I

1    know.  Mr. Warbel has said, I believe, although it may not have

2    been in public session -- well, I think it was -- the door is

3    open, and if you come in it once and then you get something

4    else that could be material to an adverse decision of

5    Mr. Sampson, you can present that later.

6         You know, I haven't even read what you've written, and

7    we'll get to it with the firewalls, too.  Anyway.  I haven't

8    even read what you wrote on this and filed yesterday.  I don't

9    know why it had to be filed yesterday when it's obvious I'm

03:56 10   going to be absorbed in getting ready to decide some of the

11   issues I've just decided.  But why shouldn't I say that at a

12   minimum this isn't ripe, and you ought to go to the Department

13   of Justice in Washington if you're not satisfied with the

14   answer you're getting from the United States Attorney's Office?

15        MS. RECER:  And our suggestion was that the proposal

16   is to look at the equities where Mr. Sampson wouldn't have

17   gotten the government to back down, so that the government

18   never has to say, you know, this isn't a death penalty case.

19        THE COURT:  Go talk to Mr. McDaniels.  When Eric

03:57 20   Holder came in, he inherited a case that wasn't indicted on his

21   watch, the *Stevens* case.  And he went in and he asked -- and

22   Stevens had been convicted -- and there's no finding of

23   prosecutorial misconduct here.  That's not why we're doing this

24   again -- but he looked at it and he said, "This case should be

25   dismissed."

1          MS. RECER:  I have very closely looked at the

2     authorization and de-authorizations.  As I've said before, the

3     reason that we didn't just slap something together quickly is

4     because there are particular issues that need to be worked up

5     that we are investigating, and we've filed a couple of

6     different pleadings about the need for time to be able to focus

7     on the de-authorization.  And while the government has said

8     that they didn't have a deadline, in a de-authorization

9     situation, sure, if you come up with some specific new facts,

03:58 10    but they're not going to let you keep coming back.

11          I've been through the authorization process before,

12     Your Honor, and people that we've consulted with have been

13     through the de-authorization and regular authorization process,

14     and you don't just slap something together and then supplement

15     it later.  You go in when you have a case.

16          THE COURT:  I never even liked reading Camus.  But

17     last time I told you about Reflections on the Guillotine.  Now

18     let's go to The Plague.  The Plague, if I'm remembering right,

19     has a character in it who is trying to write the perfect book.

03:59 20    He's coming to the end of his life, and he hasn't got the

21     perfect first sentence done yet.  I mean, you keep -- you want

22     to perfect your de-authorization proceeding, the trial is going

23     to be over.

24          MS. RECER:  It's not --

25          THE COURT:  Just listen.  I don't think -- I haven't

1   even read this yet, but I'm disinclined to entertain this

2   motion unless and until you've gone to the Department of

3   Justice in Washington.  You have arguments, and it strikes me

4   that they ought to be directed, in the first instance at least,

5   to the Department of Justice.  But anyway, there's really

6   nothing more to say on that now.

7        But it is -- you know, I said to Mr. Hafer I was

8   concerned.  I kind of wanted to button up whether this is what

9   the Whitneys really wanted.  I wonder whether it's what

04:00 10   Mr. Sampson really wants, or whether Mr. Sampson, who was so

11   anxious to get back to Terre Haute during the competency

12   investigation that -- I want to be careful not to say anything

13   that's not in the public record -- whether Mr. Sampson just

14   wants to be sentenced to death again and go back to Terre Haute

15   indefinitely until he thinks he's going to die.

16        Anyway.  I just don't know whether there's more to say

17   on that, except if I have any more argument on this, I may want

18   Mr. Sampson here for it so he can hear it.  And there are some

19   other things he should see.

04:01 20        I'll get to -- my understanding is the government

21   opposes the motion for leave to file.

22        MR. HAFER:  Correct, Your Honor.

23        THE COURT:  At the moment, I'm not ordering you to

24   file anything else.  When I look at this, if I think there

25   should be a response, I'll give you a chance to respond to it

1    formally.

2              MR. HAFER:  Thank you.

3              THE COURT:  Everybody's got a lot to do.  It's been

4    filed, so I'm going to read it the way I always do and think

5    about it and encourage everybody who is involved and interested

6    in this to read it, too.  But we're also going to proceed on

7    the assumption, the understanding that there's a September 17

8    trial date.

9              Is there anything further before I let you all go and

04:02 10   spend some time with defense counsel and the firewalled

11   attorneys?

12             MR. HAFER:  No, Your Honor.

13             THE COURT:  All right.  It's 4:00.  We'll resume at

14   4:15.  We're going to resume in open court, but this has to be

15   a closed proceeding because what's discussed with the

16   firewalled attorneys can't go to the prosecutors and,

17   therefore, it can't be public.  We'll resume at 4:15.  Court is

18   in recess.

19             (Whereupon the proceedings adjourned at 4:00 p.m.)

20

21

22

23

24

25

 1

 2                    CERTIFICATE OF OFFICIAL REPORTER

 3

 4              I, Kelly Mortellite, Registered Merit Reporter

 5    and Certified Realtime Reporter, in and for the United States

 6    District Court for the District of Massachusetts, do hereby

 7    certify that pursuant to Section 753, Title 28, United States

 8    Code that the foregoing is a true and correct transcript of the

 9    stenographically reported proceedings held in the

10    above-entitled matter and that the transcript page format is in

11    conformance with the regulations of the Judicial Conference of

12    the United States.

13              Dated this 4th day of March, 2015.

14

15              /S/ KELLY MORTELLITE

16              _____

17              KELLY MORTELLITE, RMR, CRR

18              OFFICIAL COURT REPORTER

19

10:33 20

21

22

23

24

25