**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 01-10384 MLW |
| | ) | |
| GARY LEE SAMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OF LAW IN SUPPORT OF
### MOTION FOR RECUSAL UNDER 28 U.S.C. §455(a)

The government respectfully submits this memorandum in support of its motion for this Court's recusal under 28 U.S.C. §455(a). A disinterested member of the public, fully informed of the facts, would have a reasonable question as to the Court's impartiality in this matter. The government makes this motion after consultation with the Department of Justice, and having obtained authorization from the Assistant Attorney General for the Criminal Division in accordance with 28 CFR 50.19(a) and U.S. Attorney's Manual 1-5.000.

The government seeks the Court's recusal reluctantly, with full appreciation that recusal may cause a delay in the proceedings. The government wants this case to be resolved expeditiously and does not wish to have the penalty-phase trial postponed. Moreover, the government has nothing to gain by this motion, other than protecting the record in this important capital case, in which heightened reliability is demanded.

Nonetheless, the Court's actions in arranging a promotional screening of the documentary film *The Life and Mind of Mark DeFriest*; the Court's subsequent organization and participation in a panel discussion following that promotional screening which addressed issues relevant to this case in a manner that was not designed to be balanced; the Court's hosting of a proposed defense expert, Dr. James F. Gilligan, at a small dinner gathering at the Court's summer home

prior to the event; and the Court's public identification of Dr. Gilligan, following his comments during the panel discussion, as one of the world's two leading experts on issues related to his proposed testimony, might cause a reasonable person to question the Court's impartiality.

In particular, the documentary *The Life and Mind of Mark DeFriest* dramatizes many issues that are material to claims that the defendant, Gary Lee Sampson, has raised in this case. The film depicts the significant prison trauma and abuse that Mr. DeFriest suffered while incarcerated; in this case, Sampson has claimed that similar prison trauma and abuse he suffered while incarcerated are mitigating factors on his behalf. The film also explores at length whether Mr. DeFriest was mentally incompetent to be sentenced when first sent to prison, including whether he suffered a brain injury causing untreated mental health issues; in this case, Sampson has claimed that the brain damage he suffered, and resulting untreated mental health issues, are mitigating factors. In addition, the issue of competency, portrayed in detail in the film and central to Mr. DeFriest's quest for parole, has been intensively litigated in this case with regard to Sampson, and the Court ordered a competency examination despite Sampson's opposition.

The Court was aware of the similarity between the subject of the documentary and Sampson, as it told at least two individuals involved in the event, including the filmmaker, that the Court had to be cautious in what it said during the panel discussion because it was handling a case involving similar issues. This concern was well-founded, as a reasonable person might question whether the Court's actions in helping arrange the promotional screening of the film, recruiting a well-known defense counsel, Professor Alan Dershowitz, to appear on a post-screening panel, moderating the panel discussion in which the panelists praised the film as accurately portraying the broken prison system in the United States, lauding Dr. Gilligan and Professor Dershowitz as the world's two leading experts on the issues raised in the film, and the

2

use of the Court's name and image in the promotion of the event and the film, call into question the Court's impartiality.

The government accepts that the Court engaged in these efforts to assist the filmmaker, Mr. London, a longtime family friend, and also made some efforts to avoid the appearance of impropriety. Nonetheless, a reasonable person, fully informed of the facts, might question the Court's impartiality because the Court did not simply moderate a panel discussion of a topic of current interest, but rather a panel discussion that addressed issues that are central to Sampson's defense in this case. Moreover, the Court's involvement was central to the screening of the film and panel discussion that took place. The Court has recently said that had it known that Sampson would call Dr. Gilligan as a witness, it would not have participated in the event. Now that the Court knows that Sampson intends to call Dr. Gilligan as a witness – and given that this is a capital case requiring particular care – the Court should now "take the steps necessary to maintain public confidence in the impartiality of the judiciary." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 861 (1988). The Court should recuse itself from further involvement in this case.

## STATEMENT OF FACTS

### A.     The §2255 Proceedings

On May 11, 2009, Sampson filed a motion under 28 U.S.C. §2255 seeking to vacate, set aside, or correct his conviction and death sentence. D.E.967. In his §2255 motion, Sampson alleged that his trial counsel provided ineffective assistance of counsel at the sentencing phase, *inter alia*, by: (1) failing to investigate and present evidence of trauma and neglect in childhood and adolescence, including specifically that Sampson had suffered significant brain damage from an early age; and (2) failing to investigate and present evidence of Sampson's abuse in prison,

which, he asserted, had adversely affected his mental health and psychological well-being. D.E.967, at 59-75. Thus, for example, with respect to the claim that defense counsel had failed to investigate and present evidence of Sampson's abuse in prison, Sampson alleged:

> Mr. Sampson spent over sixteen years of his adult life in and out of jails and prisons. This period included critical developmental years of his late adolescence and early adulthood. The brutality and deprivation that Mr. Sampson both witnessed and endured while in prison affected Mr. Sampson's mental health and psychological well-being. Yet, trial counsel failed to investigate critical aspects of his experience while in correctional facilities. * * * Trial counsel did not * * * focus on the most salient aspect of Mr. Sampson's extensive incarceration: the dangerous conditions of his confinement, and the affect [sic] of those conditions on Mr. Sampson's mental health.

D.E.967, at 59-60. Sampson also alleged that his trial counsel provided ineffective assistance of counsel by allowing him to proceed to trial while incompetent, and that the Court erred by failing *sua sponte* to order a competency examination. D.E.967, at 84-89.

On April 6, 2010, Sampson filed an amended §2255 motion, in which he provided additional information regarding several of the claims pled in the initial §2255 motion, including the claims that his trial counsel provided ineffective assistance of counsel by failing to discover: (1) evidence of Sampson's significant brain damage (Claim III(C)), and (2) significant mitigating evidence of abuse that Sampson suffered while in prison (Claim III(E)). D.E.1040, at 62-137. With respect to the former claim, Sampson alleged that his counsel had "missed a key set of medical records" produced by the government that, among other things, "documented a severe blow to the rear of Mr. Sampson's head caused by a 10-foot fall when he was four years old," which resulted in a trip to the emergency room. D.E.1040, at 62. Sampson alleged that his brain injury condemned him "as a misfit, a provocateur in his home and social environment, whether in the free world or in prison," that this resulted in "years of abuse, physical and verbal," and that

he "responded with self-destructive aberrant behavior, addiction and lawlessness."  D.E.1040, at 86.

Sampson's amended §2255 motion also expanded on the claim that his trial counsel provided ineffective assistance of counsel by failing to investigate and present evidence of prison abuse, detailing the years spent in different jails and prisons in Massachusetts, New Hampshire, Connecticut, and Maine, and alleging that the years he spent in prison "were marked by violent, abusive, and abysmal living conditions, which left him terrified, traumatized, and with limited successful coping strategies to manage a world that was already confusing to him by virtue of his brain impairments."  D.E.1040, at 103.  This claim was supported by a 29-page report from Dr. Gilligan, a Clinical Professor of Psychiatry in the School of Medicine, an Adjunct Professor in the School of Law, and a Collegiate Professor in the School of Arts and Sciences at New York University, a former member of the faculty in the Department of Psychiatry at Harvard Medical School, and the former medical director at Bridgewater State Hospital in Massachusetts.  D.E.1041-194 (Report of James F. Gilligan, M.D., Exhibit A to amended §2255 motion).  Sampson relied principally on Dr. Gilligan's report in arguing that his trial counsel provided ineffective assistance by failing to investigate and present evidence of prison abuse, citing it repeatedly in his §2255 motion.  D.E.1040, at 105-106, 113, 115, 116-117 n.27, 117, 119, 119 n.28, 120, 121, 122, 125, 128, 129, 130, 131.

The government moved for summary dismissal of Sampson's amended §2255 motion, and, as relevant here, explained why Dr. Gilligan's report did not undermine the conclusion that summary dismissal of that claim was warranted.  D.E.1057, at 90 n.44, 116-117.  Sampson opposed the government's motion and, as relevant here, emphasized that Dr. Gilligan was a prominent physician, author, faculty member, and expert on prison conditions.  D.E.1060, at 2.

The Court heard argument on the government's motion for summary dismissal on August 30, August 31, and September 1, 2010, during which the substance of Sampson's claims regarding brain injury and prison trauma abuse were discussed, although Dr. Gilligan's name was not mentioned.  On October 20, 2011, the Court granted in part and denied in part the government's motion for summary dismissal in a published memorandum and order and, as relevant here, denied the government's motion as to Sampson's ineffective assistance claims based on the failure to investigate and present evidence regarding brain damage (Claim III(C)) and prison abuse (Claim III(E))).  *See United States v. Sampson*, 820 F. Supp. 2d 202, 213, 242-45 (D. Mass. 2011).  The Court also denied the government's motion for summary dismissal regarding Sampson's ineffective assistance claim based on the failure to raise a competency claim.  *Id.* at 245-47.  On the same date, the Court held that Sampson was entitled to a new penalty-phase hearing because of a juror's misconduct, and the Court subsequently vacated Sampson's death sentence.  *See United States v. Sampson*, 820 F. Supp. 2d 151, 159-97 (D. Mass. 2011); *United States v. Sampson*, No. 01-10384, 2012 WL 1633296 (D. Mass. May 10, 2012), *petition for mandamus dismissed*, 724 F.3d 150 (1st Cir. 2013).[1]

B.     **Proceedings on Remand Prior to July 27, 2014**

Following the First's Circuit's issuance of the mandate, on January 15, 2014, Sampson submitted a proposed budget in which he stated, *inter alia*, that Dr. Gilligan would serve as a fact witness because he had been the medical director of Bridgewater State Hospital when Sampson was there, and also sought approval to retain Dr. Gilligan for five hours at $300 an hour so that

---

[1] The Court's order vacating Sampson's death sentence and ordering a new penalty-phase hearing rendered moot the remaining claims of ineffective assistance of counsel motion regarding the first penalty-phase proceeding, including the claims related to brain damage, prison abuse, and competency.  *See United States v. Sampson*, 2013 WL 6224287, at *1 & n.1 (D. Mass. Nov. 29, 2013).

counsel could transition from Dr. Gilligan to another expert witness regarding prison abuse. D.E.1271, at 44, 45 (Jan. 15, 2014 budget under seal).   Sampson's April 11, 2014 budget proposal likewise referenced the need for another proposed expert witness to consult with Dr. Gilligan.  D.E.1331, at 50 (Apr. 11, 2014 budget under seal).

Sampson thereafter moved to disqualify government counsel because, in his view, they had been improperly exposed to privileged or protected materials in the §2255 proceeding, and he identified Dr. Gilligan's report as one of those privileged or protected materials.  D.E.1357, at 4; D.E.1357-1, at p.7.   In addition, on June 6, 2014, in an order memorializing the Court's decision to order a competency examination under 18 U.S.C. §4241, the Court referred to the report Dr. Gilligan had submitted in the §2255 litigation, ordering the government to provide to the Bureau of Prisons for use by the competency examiner, *inter alia*,   "Relevant evidence submitted in connection with the §2255 Motion, including but not necessarily limited to: * * * the Report of Dr. James F. Gilligan (§2255 Motion Ex. A) * * *.  D.E.1365, at 3.

### C.   The Promotional Screening and Panel Discussion of the Film *The Life and Times of Mark DeFriest* on Martha's Vineyard on July 27, 2014.

Sometime in 2014, Mr. London's parents, who were longtime family friends of the Court's, sent out an e-mail announcement that Mr. London's film, *The Life and Mind of Mark DeFriest*, was having its premier at the Los Angeles Film Festival in early June 2014.  Transcript of Interview of Gabriel London (hereafter "London Tr.") at 2, 8 (attached as Exhibit B to Declaration of Alexander R. Zwillinger (hereafter "Zwillinger Decl.").[2]  That film chronicles the life of Mark DeFriest, who has been incarcerated in various Florida prisons for his entire adult life, and dramatizes many issues related to DeFriest's incarceration and early life experiences,

---

[2] The film subsequently was renamed *The Mind of Mark DeFriest* when it debuted on Showtime.  London Tr. at 2.

including, *inter alia*, the fact that five out of six doctors declared that DeFriest was mentally incompetent to be sentenced when he was first sent to prison in 1981; the many years of abuse he has suffered at the hands of guards and other inmates while incarcerated; and whether Mr. DeFriest suffered an undiagnosed childhood brain injury.[3]  As this Court noted, the film "depicts brutality in prison and misconduct by guards," and Mr. DeFriest "apparently has a mental illness, according to the movie."  Transcript of Lobby Conference, June 19, 2015 (hereafter "6/19/15 Tr.") at 7.  The Court had earlier contributed $50 to a Kick-Starter campaign for the film; the campaign netted approximately $20,000 for the film.  Transcript of June 23, 2015 Hearing (hereafter "6/23/15 Hearing") at 26; London Tr. at 23.  The Court had also discussed criminal justice issues on many occasions with Mr. London.  London Tr. at 11.

On or about June 14, 2014, the Court and his wife met Mr. London and his parents for brunch in Los Angeles.  6/19/15 Tr. at 4-5; London Tr. at 9.  During the brunch, the Court proposed the idea of having a screening of Mr. London's film at the Martha's Vineyard Film Society; as London recalls the conversation, the Court said: "[W]e can do a screening in Martha's Vineyard, I'm sure it is possible.  We just need to talk to Richard [Paradise],[4] you know.  And I bet I could get Alan Dershowitz to do it."  London Tr. at 29.  Mr. London was

---

[3]    https://www.facebook.com/defriestfilm/info?ref=page_internal.  As one reviewer noted in recounting a key event depicted in the film – a psychiatrist's conclusion that Mr. DeFriest was incompetent after re-evaluating him – "Whether it's a childhood brain injury, trauma from the vicious prison beatings at the hands of guards and other prisoners, or some other form of psychosis, in his second assessment, Dr. Berland finds DeFriest to be decidedly psychotic."   http://blogs.indiewire.com/theplaylist/laff-review-doc-the-life-and-mind-of-mark-defriest-is-a-haunting-devastating-depiction-of-prison-life-and-its-most-notorious-escape-artist-20140617.

[4] Richard Paradise is the founder and director of the Martha's Vineyard Film Society, Inc. Transcript of Interview of Richard Paradise (hereafter "Paradise Tr.") at 2 (attached as Exhibit D to Zwillinger Decl.); *see* http://mvfilmsociety.com/about-us/

thrilled by the idea – which he had not thought of before as he had never heard of the Martha's Vineyard Film Society – because, he explained, it is difficult to get people to buy tickets to a documentary film unless there is a media campaign or celebrities involved, and having Professor Dershowitz discuss the film would "immediately [be] a validator for the film at a very early stage."  London Tr. at 31.

Mr. London looked at the Film Society's website, saw an opportunity for a screening in late July 2014, and reached out to Mr. Paradise by e-mail on June 26, 2015, specifically noting in the e-mail that the Court and Professor Dershowitz might serve on a panel about the film. Paradise Tr. at 6, 22; London Tr. at 32-33.[5]  Mr. Paradise was not initially interested in the idea because the Film Society had already scheduled its summer programming.  Paradise Tr. at 23-24. There then ensued a "full court press," in Mr. London's words, to make the screening at the Film Society happen, and Mr. London recalls that the Court's communication with Mr. Paradise was critical to Mr. Paradise's decision to have the film screened at the Film Society:

> It was kind of like from that point it was kind of like a full court press like Eleanor Dunn, me, at one point Judge Wolf saying, somehow being in touch with Richard Paradise and being like, "We could do this.  I would do it."  Basically, validating it, and saying yes.  And, then, Richard Paradise being like, "Okay. I think we can do that on this date.  Okay. Yeah."

London Tr. at 32-33.  Mr. Paradise, for his part, is "probably 80, 90 percent sure" that the Court contacted him by telephone about the possible screening, and that the Court might have said, "I'm, you know, committed to being there and talking, you know, afterwards."  Paradise Tr. at

---

[5] In its motion for an extension of time to file this motion, the government noted that, during the interview, Mr. London stated that the Court made the initial contact with Mr. Paradise.  Upon review of the transcript of the interview, which the government received after the motion for extension was filed, the point Mr. London was making was, as set forth *infra*, that the Court had one of the important contacts with Mr. Paradise that led to the screening of the film at the Film Society.  London Tr. at 33.

31, 33.  The Court also reached out to Professor Dershowitz to participate in a panel discussion after the screening.  London Tr. at 31.

Mr. London arranged to have Dr. Gilligan participate in the panel discussion.  6/23/15 Tr. at 26; London Tr. at 18, 35.  Mr. London had interviewed Dr. Gilligan on the documentary sometime in 2006 or 2007, although that interview did not make the final cut.  London Tr. at 17, 19.  Dr. Gilligan spoke at a fundraiser for development of the film at the Maysles Institute sometime in 2007 or 2008, and Mr. London acknowledged Dr. Gilligan in the film's credits. London Tr. at 19-20.

The screening and panel discussion were advertised on the Martha's Vineyard Film Society webpage, which included pictures and biographies of the Court, Professor Dershowitz, and Dr. Gilligan.[6]  The screening and panel discussion also were discussed in an article in the *Vineyard Gazette* entitled "Documentary Explores Prisoner's Rights," which noted that the Court, Professor Dershowitz, and Dr. Gilligan would discuss the film after it was shown.[7]  Mr. London also touted the screening and panel discussion on the film's Facebook page.[8]  These pieces did not distinguish between the Court's role and those of Dr. Gilligan and Professor Dershowitz.  *See infra* nn.6-8.  Mr. London does not recall discussing having a balanced panel with the Court or anyone else.  London Tr. at 54-58.

The Court watched the film sometime prior to July 27, 2014, and, although the Court did not believe that an appearance problem would be created if it participated in panel discussion

---

[6]        http://mvfilmsociety.com/2014/07/the-life-and-mind-of-mark-defriest-with-panel-discuss-afterwards-featuring-alan-dershowitz-judge-mark-wolf-and-dr-james-gilligan/   (attached as Exhibit F to Zwillinger Decl.).

[7]        http://vineyardgazette.com/news/2014/07/24/documentary-explores-issues-prisoners-rights?k=vg55a3cebf22054&r=1. (attached as Exhibit G to Zwillinger Decl.).

[8]        https://www.facebook.com/events/756099541080044/.

about the film, the Court stated during a hearing on June 23, 2015, that it might have declined to participate in the event but for the promises it had made to Mr. London.  6/23/15 Tr. at 32-33.

The Court and Mr. London had some discussion about the panel discussion in the week prior to the event, and, on July 21, 2014, Mr. London sent an e-mail to the Court and other panel members that attached a link to the film, and in which Mr. London stated that he agreed with the Court that it would be a good idea to discuss the upcoming panel discussion prior to the event:

> Hello all -
>
> Just to confirm, I'm sending a link to view the film before the Martha's Vineyard Film Society panel on Sunday.  If possible, I agreed with Mark [Wolf] that it would be a good idea for us all to connect via email or a brief call towards the end of the week to go over the approach to our conversation post-screening.  The film raises myriad issues about the prison system, so if we can discover common focal points, I think that would be ideal.
>
> Best,
> Gabriel

Exhibit E to Zwillinger Decl, at 2.  As Mr. London later explained, this e-mail led to the dinner at the Court's summer home on the evening of the screening and panel discussion.  Exhibit E to Zwillinger Decl, at 1.

That dinner gathering took place prior to the film's screening at the Court's summer home on July 27, 2014, and was attended by the Court, Dr. Gilligan, and Mr. London; Professor Dershowitz was invited but was unable to attend.   6/23/15 Tr. at 4-5; D.E.1993 (Order of June 26, 2015) at 1 n.1; London Tr. at 59-60.  The Court served lobster rolls, but does not recall anything substantive that was discussed.  6/23/15 Tr. at 4-5; D.E.1993 at 1 n.1.  Mr. London recalls that after briefly engaging in story trading and family connections, the Court outlined the parameters of its involvement and described how the panel discussion would work.  6/23/15 Tr. at 25; London Tr. at 60-61.  Dr. Gilligan recalls having a lobster roll, but not much else.

Transcript of Interview of Dr. James F. Gilligan (hereafter "Gilligan Tr.") at 18-25, 52 (attached as Exhibit C to Zwillinger Decl.).  Dr. Gilligan said, however, that he did not mention that he had previously filed a report in this case because he did not know whether the Court was still presiding over the case and, in any event, he "took it for granted" that it would be inappropriate to speak with the Court about the case.  Gilligan Tr. at 27-28; London Tr. at 61, 66, 68-69.  Dr. Gilligan recalls that he had met the Court only once before, approximately 30 years earlier at an event in Boston.  Gilligan Tr. at 17.

After the dinner, the Court drove to the event with Mr. London, during which the Court said that it was important that it would only be moderating rather than participating in the panel discussion, and also emphasized that that the Court had to be cautious about what it said because it was then working on a complicated case involving issues of abuse and possibly head injuries:

> Okay.  So, I do remember, yeah, I do remember a conversation, probably on the drive over, where he was kind of saying as a little bit of background, "And the reason I have to be cautious here is because there is a case that I'm dealing with where there's issues of abuse, and maybe head injuries," maybe something like that. But I remember him – but, again, I remember it was in the context of not like, "I'm so glad that you've made a film that brings this to light."  I remember this much more in, "I have to be cautious here, because I have to make distinctions between Mark's case, and this other thing that I'm working on."
>
> *   *   *
>
> Yeah, but I do remember at some point having been in his car, I think on the way to the screening, and just hearing that, yeah, there is this layer of complication here, this thing that is going on.

London Tr. at 51-52, 91-92, 95.

The promotion of the screening and panel discussion apparently was successful, as the film was shown to a near full-house.  Paradise Tr. at 53.  After the screening, the Court began the panel discussion by complimenting Mr. London and the amount of time that he had worked on

the film, although the Court noted that it was not endorsing the film or any particular point raised

in it, and also introduced Professor Dershowitz and Dr. Gilligan:

> Gabriel first discussed this film with me 13 years ago when he was
> embarking on it.  He's dedicated 13 years of his still young life to
> this story, and the story could not have been told as powerfully if it
> hadn't been told over a long period of time.  So I think, as I said,
> without taking a position with regard to Mark DeFriest or any
> particular point raised in the movie, it's really commendable that
> Gabriel has done this movie.  It's really commendable that all of
> you here on Martha's Vineyard who come out and seeing
> something that is illuminating because I will say that I don't think
> there's anything in the movie that I haven't experienced and
> evidenced in cases over the last 29 years.  But to come out to see a
> movie that's illuminating and also entertaining.
>
> We have, as Richard said, quite an exceptional panel, starting with
> my friend for decades, colleague at times teaching, Alan
> Dershowitz, literally the man who needs no introduction.  But
> there are two things that are relevant particularly about Alan I
> would say now are, is as a young man, when he was a law clerk he
> was a law clerk to one of the most distinguished court of appeals
> judges in the United States, David Bazelon, who was a pioneer
> with regard to his concern for the mentally ill in prison and then at
> the age of 25, 50 years ago, Alan was hired to teach the first course
> on Law and Psychiatry at the Harvard Law School, with a
> psychiatrist.
>
> So I think – maybe I'll just mention now because this will be a
> little more fluid, and as you heard we have Dr. James Gilligan,
> who for 30 years was on the faculty of the Harvard Medical School
> and in that capacity ran the mental health program of
> Massachusetts state prisons, which when he started were very
> terrible; while he was there, improved substantially, and now are
> back in the newspapers, within the last week, for events that were
> regarded as scandalous and led to the resignation – forced
> resignation of the commissioner of corrections.

Recording of Panel Discussion I (hereafter "Panel Rec.I") at 0:30-3:08 (attached as Exhibit A to

Zwillinger Decl).

The Court then invited Professor Dershowitz and Dr. Gilligan – whom the Court

addressed as "Alan" and "Jim" – to comment on whether this was a significant film.  Panel Rec.I

at 3:08-3:24.    Professor Dershowitz spoke first and extolled the virtues of the film, saying,
among other things, that it was a "transformative" film that should be seen by every judge,
prosecutor, and defense counsel in the United States.    Panel Rec.I at 3:08-8:15.    Dr. Gilligan
similarly said that, "I think that this is an extremely important film that illustrates, to me, two
points:    one, is that our mental health system is broken, and the other is that our prison system is
broken.    And both of them need fundamental repairs."    Panel Rec.I at 8:38-8:57.    Dr. Gilligan
also stressed that "one of the most important facts that this film illustrates is the degree of out-of-
control violence in the prisons, not just by other inmates, not even primarily by other inmates,
but by correction officers themselves."    Panel Rec.I at 9:06-9:30.    Dr. Gilligan said that he
received calls "every week from all over the country regarding atrocities committed in our
prisons," and also said that "the American prison system is by far the most punitive in the
developed world, we have the highest imprisonment rate in the entire world, more than even the
so-called police states, we're the only Western democracy that still has the death penalty, thus
we have both legal and illegal violence in our prison system."    Panel Rec.I at 9:30-11:00.

After these and other comments, the Court repeated that it was not endorsing the
viewpoints in the film or "every single thing" said by the panelists, but noted that the issues they
raised were issues that emerge in cases in federal court:

> You're hearing the expression of strong views.  I don't mean to
> sound timid on this.  It's not my role really to express my own,
> except to say that I think all of this is extremely valuable to expose
> judges, who are encouraged to do things that will enhance the
> understanding of the administration of justice.
>
> I do not necessarily agree with every single thing Alan said or
> every single thing that Jim said.  I will say that these are issues that
> emerge in our cases, and how they're dealt with in this country is
> substantially determined by the democratic process that makes the
> sentencing laws, that for a long time for us on the federal level [is]
> discretionary in issuing sentences, the amount of money that's

14

> available for mental health treatment in prison, the amount of money that's available for mental health treatment generally because, of Jim's expertness, when we went through a wave of deinstitutionalization more than a generation ago, we ended up with homeless shelters and prisons that house a substantial portion of the mentally ill.  And this is invisible to many or most judges most of the time, and it's certainly not visible to the public, but this is something for which as a polity we're responsible.

Panel Rec.I at 17:14-18:51.

Dr. Gilligan later noted that even though some of the most dedicated and humane people have been prison guards, there is a sub-culture of violence at prisons that guards are subjected to even if they would not personally engage in violence.  Panel Rec.II at 9:01-12:00.  Dr. Gilligan noted that in Italian Renaissance paintings, for example, "the devils are doing the work that prison guards do in prison, they're the one with the pitchforks whose job is to torment those who've been bad."  Panel Rec.II at 12:00-12:09.  Dr. Gilligan said that historically, this is the professional identity that prison guards have inherited whether they consciously know it or not – "they certainly have acted accordingly," Dr. Gilligan noted – and training prison guards appropriately required a fundamental restructuring of the very purpose of prisons and correctional facilities.  Panel Rec.II at 12:09-12:51.

Professor Dershowitz, in response to a question from the audience, castigated liberal Democrats who had not taken steps to reduce prison sentences, and said that it was a "crass cost-benefit analysis" and "cheap politics to just talk about law-and-order" and that politicians were unwilling to take on the issues of the death penalty and prison reform.  Panel Rec.II at 15:21-17:21.  The Court also commented, in response to the same question, that the film portrayed events that were inconsistent with the Eighth Amendment:

> I said one thing quickly in, in response to that question, we have the Eighth Amendment of the Constitution, which the founding fathers decided to make impermissible cruel and unusual punishment. Part of cruel and unusual punishment is extra-judicial punishment – punishment beyond what the judge prescribed, five years in prison, punishment from prison guards. The whole jurisprudence of the Eighth Amendment is – is this inconsistent with the norms of a civilized society? So, we from the beginning of our Nation, essentially, have had ideals and aspirations that are inconsistent with what is depicted in this film. And it's in the nature of ideals and aspirations that they won't be fully or permanently realized. But I think, A, it's good to recall them.

Panel Rec.II at 17:21-18:30.

At the conclusion of the panel discussion, after Professor Dershowitz and Dr. Gilligan had set forth their views of the film and the state of the prison and mental health system in this country generally, the Court invited the audience to applaud Mr. London, Professor Dershowitz, and Dr. Gilligan, and specifically lauded Professor Dershowitz and Dr. Gilligan as being "literally" the world's two leading experts on the issues raised in the film:

> But I think there are three reasons for your applause, again, at this point. One, of course, is for Gabriel, for the dedication, insight, and skill. One is for the, for the panel, as I think it's only on the Vineyard, you know, in, in like about a week you had, you know, really, literally, like the two world's leading experts on this issue in, in Alan and Jim.

Panel Rec.II at 18:35-19:06.

After the panel discussion ended, the Court spoke with two other federal district court judges who had attended the screening and panel discussion and said, "I hope nothing occurs – certainly nothing I said or did could be regarding as calling my impartiality into question, and they said, Oh, no; everything was fine." 6/19/15 Tr. at 8.

The Court nonetheless expressed concern when Mr. London used a short clip of Professor Dershowitz's laudatory remarks about the film from the panel discussion – in which the Court

appears sitting next to Professor Dershowitz – to the film's Twitter and Facebook pages to promote the film, and asked Mr. London to check with the Court before using any more clips for promotional purposes.  London Tr. at 47.  Mr. Paradise also recalls that the Court and other panel members wanted a say before the clip of the panel discussion was used by the Film Society, and that the Court also made some disclaimer to the effect that it did not want its participation in the panel to be connected to a case the Court was working on:

> You know, I can't say for certain what exactly he said, but I know, I'm pretty sure that there was some sort of disclaimer.  There might have been a – sort of a loose – he might have alluded to the fact that – that there was another case or that – Yeah, I can't remember exactly, John, other than the fact that I know he did say something to the effect that – that – that there was another case and that he didn't want to sort of, kind of, connect those two.  He didn't want to feel, you know, say that – that his comments would have any bearing on this other case.  It could have be[en] the murder case, it could not be, I don't know.  I mean I really don't know.

Paradise Tr. at 36, 39-40.

During an interview, Mr. London noted that although he had not acknowledged the Court in the credits of the film, which was completed long before the screening and panel discussion at the Film Society, he would credit the Court now for helping organize the screening and panel discussion: "We did the credits before – like I would acknowledge him now for what he did for helping me to host that panel on Martha's Vineyard * * *."  London Tr. at 21.  While the Court does not appear to have had any subsequent involvement with the film, Dr. Gilligan wrote an opinion piece in the *Tallahassee Democrat* entitled "Mark DeFriest film exposes broken criminal justice system" in support of the film.[9]

---

[9]   http://www.tallahassee.com/story/opinion/columnists/2014/11/16/mark-defriest-film-exposes-broken-criminal-justice-system/19126361

D.     **Relevant Events Following July 27, 2014**

Sometime in September 2014, in connection with the competency litigation, the Court was reminded that Dr. Gilligan had filed a report in the §2255 proceedings.  6/19/15 Tr. at 7; 6/23/15 Tr. at 5.  After thinking about the matter and consulting a colleague, the Court decided not to raise the matter with the parties at that time because the Court did not know whether Dr. Gilligan was going to be a witness and "the issue of my association with Dr. Gilligan would be academic if he were not going to be a witness."  6/23/15 Tr. at 6.

The Court nonetheless questioned Sampson's counsel during *ex parte* budget conferences about whether they intended to call Dr. Gilligan as a witness at budget conferences on November 24, 2014 and April 27, 2015.  D.E.1998-1, at 2-3 (quoting Nov. 24, 2014 Budget Conference); D.E.1998-1 at 4 (quoting May 1, 2015 Budget Conference).

Sampson's May 22, 2015 budget identified Dr. Gilligan as Sampson's prison expert, and requested authorization for 15 hours from May 2, 2015 through August 5, 2015.  D.E.1998-1, at 4 (May 22, 2015 Budget).  The Court addressed the request with Sampson's counsel during June 19, 2015 budget conference:

> **THE COURT:**  I may double-check on that.  And then Dr. James Gilligan.   I don't think there's any narrative on him in here, is there?
>
> **MS. RECER:**  Let's see.  I think previously –
>
> **MR. McDANIELS:**  There were in the previous.
>
> **THE COURT:**  There has been some in the previous budgets.  I now know that he also filed an affidavit before the sentence was vacated, right?  What's his proposed role in this?
>
> **MR. BURT:**  We had some uncertainty whether he was going to be available, but we met with him last week.  He is available.  He will be testifying to –

18

> **THE COURT:**  If he wasn't available, did you have somebody else in mind?
>
> **MR. BURT:**  We did.  That was Dr. [A], but unfortunately, Dr. [A] became unavailable.  That's why we went back to Dr. Gilligan.
>
> **MS. RECER:**  Hours for Dr. [A] had been approved in the budget, too, so I think the idea was to carry them over, to transfer them over.

D.E.1998-1, at 5 (June 19, 2015 Budget Conference).  The Court then brought the government's trial team into the conference, stated that there was an issue that had become ripe for the Court to discuss after reading Sampson's budget, and disclosed to the parties the film screening and panel discussion involving Dr. Gilligan on July 27, 2014.  6/19/15 Tr. at 3-9.  The Court made additional disclosures to the parties about these events in hearings held on June 23 and 26, 2015, and in orders issued over the next several days.  6/23/15 Tr. at 8-21; D.E.1983, at 2-3; D.E.1993, at 1 n.1.

## ARGUMENT

Section 455(a) of Title 18 provides that "[a]ny justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The test under §455(a) for determining whether a judge's impartiality might reasonably be questioned is:

> Whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. §455, but rather in the mind of the reasonable man.

*United States v. Voccola*, 99 F.3d 37, 42 (1st Cir. 1996) (citations omitted).  "[S]ection 455(a) requires that we ask whether a reasonable person, fully informed of all the relevant facts, would

fairly question the trial judge's impartiality." *In re United States*, 158 F.3d 26, 31 (1st Cir. 1998)

(emphasis in original).

      The §455(a) analysis does ***not*** call into question either the Court's actual impartiality or

the Court's ability to remain impartial, as "a reasonable person may question impartiality without

the presence of any evidence that a judge is subjectively biased." *In re Bulger*, 710 F.3d 42, 46

(1st Cir. 2013).  As the Supreme Court has explained:

> The goal of section 455(a) is to avoid even the appearance of
> partiality.  If it would appear to a reasonable person that a judge
> has knowledge of facts that would give him an interest in the
> litigation then an appearance of partiality is created even though no
> actual partiality exists because the judge does not recall the facts,
> because the judge actually has no interest in the case or because the
> judge is pure in heart and incorruptible.

*Liljeberg*, 486 U.S. at 860 (quoting *Health Servs. Acquisition Corp. v. Liljeberg*, 796 F.2d 796,

802 (5th Cir. 1986)).

      Courts have emphasized that while the acquisition of general information is vital to

judges and a judge's attendance at a lecture or conference that may emphasize a particular

viewpoint or school of thought does not in itself preclude a judge from presiding over a case, the

calculus changes where a presentation concerns issues material to the disposition of litigation, or

involves parties, witnesses, or counsel in particular actions.  In *In re School Asbestos Litigation*,

977 F.2d 764 (3d Cir. 1992), for example, the Third Circuit ordered the recusal of a district judge

presiding over a nationwide products liability class action regarding asbestos because the judge

had attended a one-sided conference on the dangers of asbestos in buildings and low-level

asbestos generally that was sponsored, in part, by funding that the judge had approved, and in

which 13 of the 18 expert witnesses that the plaintiffs intended to call at trial spoke.  *Id.* at 780.

The Third Circuit granted the defendants' petition for a writ of mandamus, concluding that a reasonable person might question the judge's ability to remain impartial in these circumstances:

> To put it succinctly, he attended a predominantly pro-plaintiff conference on a key merits issue; the conference was indirectly sponsored by the plaintiffs, largely with funding that he himself had approved; and his expenses were largely defrayed by the conference sponsors with those same court-approved funds. Moreover, he was, in his own words, exposed to a Hollywood-style "pre-screening" of the plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to what they expected to say at trial. We need not decide whether any of these facts alone would have required disqualification, for, as we shall explain, we believe that together they create an appearance of partiality that mandates disqualification.

*Id.* at 781-82. Indeed, the Third Circuit explained, a reasonable person might question whether the judge's attendance at a "preview" of the plaintiffs' case might have predisposed him towards the plaintiffs' position, or, alternatively, that the judge might be upset by the appearance problem that had been created and overreact. *Id.* at 782.

In *In re Aguinda*, 241 F.3d 194 (2d Cir. 2001), the Second Circuit denied a mandamus petition seeking the recusal of a district judge who, while presiding over a suit by a group of citizens of Ecuador and Peru who claimed that Texaco, Inc. had polluted rain forests and rivers in those two countries, attended an expense-paid seminar on environmental issues that Texaco had indirectly funded. *Id.* at 198. The Second Circuit denied the requested relief, in part, because even assuming that the conference presented an "unbalanced" presentation of environmental issues, the presentations did not "relate to legal issues material to the disposition of a claim or defense in an action before a judge who attended the presentation." *Id.* at 202-04. The Second Circuit cautioned, however, that "where a presentation concerns issues material to

21

the disposition of litigation or involves parties, witnesses, or counsel in particular actions, the recusal calculus will differ, albeit again without an applicable mechanical standard." *Id.* at 206.

The concerns identified by these courts are present in this case, and amplified by the Court's role in helping arrange and organize the film screening and panel discussion. Mr. London's film explores issues that are central to the disposition of this case – prison trauma and abuse, the effect of a childhood brain injury, and competency – and the Court helped organize a panel discussion of the film that it moderated in which the panel members said that the film accurately portrayed prison conditions generally in the United States. Much like Sampson's claim that the prison trauma and abuse he endured in various jails and prisons has adversely affected his mental health and well-being, the film dramatizes at length how the many years of abuse that Mr. DeFriest endured at the hands of guards and other inmates while incarcerated had affected his mental health. And following the screening of the film, the panelists praised the film as accurately portraying prison conditions in the United States generally. Dr. Gilligan, in particular, said that the film was extremely important because it illustrated that both the mental health and prison systems in this country were broken, and that "one of the most important facts that this film illustrates is the degree of out-of-control violence in the prisons, not just by other inmates, not even primarily by other inmates, but by correction officers themselves." Panel Rec.I at 9:06-11:00.

In addition, much like Sampson's claim that the brain injury he suffered as a child is a mitigating factor in his favor, the film dramatizes whether Mr. DeFriest may have suffered from a childhood brain injury and suggests that that injury contributed to his psychosis. Much like the question whether Sampson is competent, which was being litigated during 2014, the film presses the point that Mr. DeFriest should have been deemed mentally incompetent when he was first

22

incarcerated in 1981.  The film also takes a viewpoint on the issue of prison trauma and abuse that is consistent with the positions and arguments that Sampson has advanced in this case, with the aid of Dr. Gilligan's report and expected testimony.

Notably, the Court appears to have been aware of the similarities between the claims raised in Sampson's case and the issues explored in the film regarding Mr. DeFriest.  The Court told Mr. London on the drive to the screening and panel discussion that it had to be cautious about what it said because the Court was then dealing with a case that involved issues of abuse and head injuries.  London Tr. at 91-92, 95.  The Court also told Mr. Paradise that it did not want its comments at the panel discussion to be connected to another case the Court was working on.  Paradise Tr. at 36.  And the Court asked Mr. London and Mr. Paradise to check with the Court before using the short clip of the panel discussion for promotional purposes (Dr. Gilligan and Professor Dershowitz made the same request to Mr. Paradise).  London Tr. at 47; Paradise Tr. at 39-40.  Although it thus recognized the similarities between the issues raised in the film and those raised in this case, the Court nonetheless participated in the panel discussion following the screening in which Professor Dershowitz and Dr. Gilligan lauded the film as accurately portraying prison conditions, and lambasted the prison system in this country as being "broken" and in need of fundamental repairs (Professor Dershowitz), and so plagued by "out-of-control violence in the prisons" that it was beyond hope of reform (Dr. Gilligan).  Panel Rec.I at 8:38-11:22.

The Court, to be sure, emphasized at various points that it was not taking a position regarding any particular point raised in the film, nor was it necessarily agreeing with all of the views expressed by Professor Dershowitz or Dr. Gilligan.  Panel Rec.I at 0:30-3:08, 17:14-18:51.  But the Court also made some substantive comments about the film as well, Panel Rec.I at 1:07-

1:19, Panel Rec.II at 18:04-18:17, and ultimately lauded Professor Dershowitz and Dr. Gilligan following their comments about the film and prison and mental health conditions in the country generally, as being, "really, literally, like the two world's leading experts on this issue in, in Alan and Jim. " Panel Rec.II at 19:00-19:06.

Moreover, the film screening and panel discussion would never have taken place but for the Court's involvement. It was the Court that initially suggested having a screening of the film and panel discussion at the Martha's Vineyard Film Society; Mr. London had never even heard of the Film Society at the time. London Tr. at 29-30. The Court also recruited as a panelist Professor Dershowitz, whom Mr. Paradise described as the marquee speaker and the biggest draw for the event. Paradise Tr. at 47-48. The Court told Mr. Paradise that it would participate in the event, and, according to Mr. London, that communication apparently played a significant role in Mr. Paradise's decision to agree to the event. London Tr. at 33.

In addition, the Court's participation in the panel discussion about the film was used to promote the event. *Compare In re School Asbestos Litigation*, 977 F.2d at 779-80 & n.16 (noting that the Chief Judge had advised the district judge that the judge's attendance would not be problematic as long as, *inter alia*, the judge's attendance was not used to promote the event, but that the conference in fact had "trumpeted" the appearance of the district judge and other judges at the conference in promotional literature and numerous press releases). A reasonable person, knowing all these facts, might question the Court's impartiality.

This conclusion is amplified by the fact that Dr. Gilligan, who had submitted a report in the §2255 litigation regarding prison trauma and abuse, and whom Sampson intends to call as an expert witness regarding that issue at retrial, also participated in the panel discussion and was invited to the Court's home prior to the event for a meal. A reasonable person might question

whether the Court essentially was given a "preview" of Sampson's case on the issue of prison trauma and abuse that would predispose him towards Sampson's position, or, alternatively, that the Court might restrict Dr. Gilligan's testimony in order to avoid any possible appearance problems. *Compare In re School Asbestos Litigation*, 977 F.2d at 782 ("In high profile cases such as this one, the outcome of which will in some way affect millions of people, such suspicions are especially likely and untoward. A reasonable person might suspect that Judge Kelly's plaintiff-subsidized attendance at the 'preview' of the plaintiffs' case would have predisposed him toward the plaintiffs' position. Alternatively, others may reasonably believe that because he now knows that the plaintiffs indirectly paid his way, he might be angry at them for compromising him and might overreact to their prejudice.").

The government acknowledges in this regard that the Court has stated that it did not recall that Dr. Gilligan had submitted a report in the §2255 litigation when it appeared on the panel with him on July 27, 2014. But that is irrelevant under §455(a). As the Supreme Court made clear in *Liljeberg*, scienter is not an element of §455(a) and "advancement of the purpose of the provision – to promote public confidence in the integrity of the judicial process – does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." 486 U.S. at 859-60 (internal citation omitted). Here, the public might reasonably believe that the Court was aware that Dr. Gilligan had submitted a report in the §2255 litigation when the film screening and panel discussion took place based on the fact that Sampson principally relied on Dr. Gilligan's report in the portion of his amended §2255 motion raising the prison trauma and abuse claim, and that the report was referred to in various pleadings prior to July 2014, including the Court's order of June 6, 2014 that identified Dr. Gilligan's report as being one of the relevant

materials submitted in the §2255 litigation. *See Liljeberg*, 486 U.S. at 867-68 ("Although Judge Collins did not know of his fiduciary interest in the litigation, he certainly should have known.").

The appearance problem that has arisen in this case might manifest itself in any number of additional ways. For example, a reasonable person might question whether any decision about allowing Dr. Gilligan to testify at the retrial, or what the scope of his testimony will be, might be influenced by the Court's personal dealings with Dr. Gilligan and the Court's view that he is one of the world's two leading experts on prison abuse or trauma, or, alternatively, that any decision excluding or curtailing Dr. Gilligan's testimony, or even admitting that testimony, may be viewed as an attempt to avoid any possible appearance problem. A reasonable person might also question whether the Court's ruling on the definition of a mitigating factor –made when the Court was aware that questions about the film screening and panel discussion might arise – might have been influenced by the Court's desire that this issue not be publicly aired, inasmuch as that ruling might affect the scope of Dr. Gilligan's testimony. And these questions will not go away even if a jury concludes on retrial that Sampson should be sentenced to death, as a new round of §2255 counsel might very well argue that Sampson's current defense team provided ineffective assistance of counsel by failing to move for the Court's recusal for these very reasons.

The government also expects to call no less than 10 correctional officers at the retrial in this case. As noted, in his comments on the film on a panel with the Court, Dr. Gilligan stressed that "one of the most important facts that this film illustrates is the degree of out-of-control violence in the prisons, not just by other inmates, not even primarily by other inmates, but by correction officers themselves," and further stated that he receives calls "every week from all over the country regarding atrocities committed in our prisons," and also said that "the American prison system is by far the most punitive in the developed world, we have the highest

26

imprisonment rate in the entire world, more than even the so-called police states, we're the only Western democracy that still has the death penalty, thus we have both legal and illegal violence in our prison system." Panel Rec.I at 9:06-11:00.  Dr. Gilligan also stated that even though some of the most dedicated and humane people have been prison guards, there is a sub-culture of violence at prisons that guards are subjected to even if they would not personally engage in violence, and that that culture of violence is a professional identity that prison guards have inherited whether they consciously know it or not Panel Rec.II at 12:01-12:51.  Given Dr. Gilligan's characterizations of prison guards and the culture under which they operate, and the fact that, following those and other remarks, the Court said that Dr. Gilligan was one of the world's two leading experts on the subject, a reasonable person might question whether the Court can be impartial when issues regarding the testimony of those officers arise.  Indeed, Dr. Gilligan's statements during the panel went entirely unchallenged.

Furthermore, a reasonable person might question whether the Court's decision to delay the approval of funding for Dr. Gilligan, which Sampson has vigorously protested, is being influenced by the Court's desire to avoid having another potential ground for recusal arise. 6/26/15 Tr. at 37-41.  Similarly, a reasonable person might question whether the Court's memorandum and order of July 27, 2014, in which, based on the experience in *United States v. O'Brien*, 18 F. Supp. 2d 25 (D. Mass. 2014), the Court ordered Sampson's counsel to consult with Dr. Gilligan and state whether Dr. Gilligan continues to be a witness Sampson will seek to present at retrial, D.E.1997, at 1, was influenced by the specter of the Court's possible recusal. A reasonable person, in other words, might question whether these actions reveal that the Court's involvement in the film screening and panel discussion are influencing the course of this litigation.

The government wishes to emphasize once again that it is not suggesting that the Court actually harbors any bias or prejudice based on the events of July 2014.  But, as the Third Circuit noted in *In re School Asbestos Litigation*, "[t]he problem, however, is that regardless of actual impartiality, a reasonable person might perceive bias to exist, and this cannot be permitted."  977 F.2d at 782; *see also In re Murchison*, 349 U.S. 133, 136 (1955) ("Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties.  But to perform its high function in the best way 'justice must satisfy the appearance of justice.'") (citation omitted).

Finally, the government acknowledges that this Court has presided over this case for more than a decade, that one of the Court's colleagues will have to become familiar with the case, and that the Court's possible recusal might cause additional delay.  But those sentiments are irrelevant to the §455(a) calculus, as the Third Circuit also made clear in addressing similar concerns:

> We suspect that Judge Kelly chose not to disqualify himself because he felt duty-bound to shepherd this extraordinarily complicated and protracted litigation to its conclusion and out of concern about creating additional delay.  These are both laudable sentiments, and we must acknowledge that the newly assigned district judge will face a gargantuan task in becoming familiar with the case.  We also recognize that the delay may disadvantage the plaintiffs, although that result is, to some degree, of their own doing.  Nevertheless, a district judge has no "duty to sit," and under 28 U.S.C. §455 he or she may not sit where his or her partiality may reasonably be questioned and the parties refuse to waive that objection. Indeed we believe that this episode is precisely the kind that Congress contemplated in broadening section 455. If Judge Kelly were to continue presiding, the outcome of this massive, important, and widely followed case would be shrouded with suspicion.  Accordingly, we are compelled to order Judge Kelly to disqualify himself.

*In re School Asbestos Litigation*, 977 F.2d at 784-85.

Similarly, in this case, the appearance problem is cause for reasonable concern. That would be unacceptable in any case, but it is particularly troublesome in a capital case, in which heightened standards of reliability are demanded.

## CONCLUSION[10]

For the reasons set forth above, the United States respectfully moves for this Court's recusal under 28 U.S.C. §455(a).

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:    /s/ Mark T. Quinlivan
ZACHARY R. HAFER
DUSTIN CHAO
MARK T. QUINLIVAN
Assistant U.S. Attorneys

MICHAEL S. WARBEL
DOJ Trial Attorney

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

/s/ Mark T. Quinlivan
MARK T. QUINLIVAN
Assistant U.S. Attorney

Date:  July 16, 2015

---

[10] The government is not requesting an evidentiary hearing as it believes this motion can be decided on the existing record, and the government is unsure in any event how an evidentiary hearing would proceed given the Court's role in the events in question.