# IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **VS.** | ) | **CRIMINAL 1:01-cr-10384** |
| | ) | |
| **GARY LEE SAMPSON** | ) | |

### DEFENSE RESPONSE TO GOVERNMENT' S MOTION FOR RECUSAL
### UNDER 28 U.S.C. § 455(a)

The government's motion to recuse this Court makes much ado about very little, claiming

that the Court's interactions with a potential defense expert witness over a totality of three hours,

including moderating a panel discussion related to this case only on the highest level of

generality, have generated an appearance of the Court's bias outweighing the Court's fourteen

year-experience with and conduct of this case.  *See generally* Motion for Recusal Under 28

U.S.C. § 455(a) and Memorandum in Support, D.E. 2025 (07/16/2015) (hereinafter "Motion").

The Motion relies almost exclusively on *In re School Asbestos Litigation,* 977 F.2d 764 (3d Cir.

1992), a case that bears scant resemblance to the facts presented here, and has subsequently been

frequently distinguished on the basis of its unique set of facts.  The Motion also paradoxically

seeks to transform any efforts the Court may have taken to minimize any potential for an

imputation of bias in any case, into further evidence of it; and to transform the very fact that the

government has now decided to litigate this issue into an assertion that, because "the course of

this litigation" has now been "influenc[ed]" by the Court's assistance to a family friend a year

ago, the government must prevail on that issue.  Mot. at 27.  The facts disclosed by this Court,

and confirmed and expanded upon through the government's extensive investigation, would not

cause a fully informed objective and knowledgeable person to have a reasonable basis to question this Court's impartiality in this case.  What an informed knowledgeable observer would see is that, in an effort to help a young family friend in his career, the Court suggested and then participated as a moderator in a film screening and panel discussion on an issue important to the criminal justice system.  Judicial engagement of this sort is not merely acceptable, but actually encouraged by the judicial canons and does not require the Court's recusal from this case.

The defense respectfully submits that the Motion should be denied.

## I.     BACKGROUND

The Motion chronicles many of the relevant facts and background surrounding this recusal issue, and the defense will not repeat all of them here.  However, the further relevant facts and procedural history are as follows.

### A.     Prior Procedural History

#### 1.     2255 Motion and Dr. Gilligan's Declaration

On April 6, 2010, the defense filed an amended motion to vacate Mr. Sampson's sentence of death under 28 U.S.C. § 2255.  D.E. 1040.  One of the many grounds asserted in the motion was that trial counsel provided ineffective assistance by failing to adequately investigate and present evidence of Mr. Sampson's past abuse in prison (Claim III(E)).  *Id*. at 103-136.  The 2255 motion was supported in this regard by, among other things, a declaration by Dr. James Gilligan.  Ex. A[1] to D.E. 1040 at 28-29 ("Gilligan Declaration").  The Court denied the

---

[1] At the hearing on June 26, 2015, the government referenced the fact that Dr. Gilligan's declaration was "Exhibit A" to the 2255 motion, Tr. (06/26/2015) at 19, perhaps to suggest either that the Court should have recalled Dr. Gilligan's involvement in the case or to emphasize Dr. Gilligan's supposed central role in the prior litigation.  What the government did not recite at the hearing is the fact that the 2255 motion had 193 numbered exhibits, contained in Volumes I through IV, followed by the lettered exhibits in Volume V.  Accordingly, to the extent the placement of Dr. Gilligan's declaration in the overall exhibits to the 2255 motion has any

government's motion to summarily dismiss claim III(E), *see United States v. Sampson*, 820 F.

Supp. 2d 202, 213, 242-45 (D. Mass. 2011), but never took any testimony on the issue once in

mid-2010 the Court focused solely on the juror misconduct issue that ultimately necessitated

these resentencing proceedings, *see United States v. Sampson*, 820 F. Supp. 2d 151, 161 (D.

Mass. 2011).

### 2.      The Government's Previous Attempts to Draw the Court's Recusal

This is not the first time that the government has raised the specter of this Court's recusal.

It did so as soon as the resentencing phase began in November 2013, based on the Court's

association with Assistant United States Attorney Zachary Hafer and his wife.  In 2010 this

association had been previously raised by the Court and discussed; all parties had then agreed

that there was no actual bias under § 455(b), no risk of the appearance of partiality under

§ 455(a), and waived any such appearance under § 455(e).  In 2013, however, the government

nonetheless argued that the recusal issue needed to be revisited based on (1) Mr. Hafer's

elevation to lead prosecutor in the case, and (2) the alleged change in legal standard on recusal in

the First Circuit based on *In re Bulger*, 710 F.3d 42 (1st Cir. 2013).  *See United States v.*

*Sampson*, 12 F. Supp. 3d 203, 204-05 (D. Mass. 2014) ("*Sampson*").  Though the government

did not move for recusal outright, it continually expressed its view that the Court should "revisit"

and "re-analyze" its prior recusal decision.  *See id*. at 205; Memo of U.S. in Resp. to Court's

Nov. 29, 2013 & Dec. 5, 2013 Orders, D.E. 1263 at 5–7 (12/20/2013); Govt's Resp. to Court's

Order re Recusal, D.E. 1288 (01/30/2014).

The Court entertained the request and "seriously considered whether [it] should not

recuse [itself] *sua sponte*," before ultimately rejecting the government's argument of changed

---

significance—which the defense rather doubts—Dr. Gilligan's declaration was actually the
194th exhibit, not the first exhibit its "Exhibit A" label might suggest.

circumstances or any change in the law and concluding that its recusal was neither required nor appropriate. *Sampson*, 12 F. Supp. 3d at 204-05, 212. The Court chronicled its involvement and rulings in the history of this case since its inception in 2001, which then included "at least 230 orders" and "hundreds, if not more, oral rulings." *Id*. at 208-11. The defense incorporates by reference that history, as it is also relevant to the recusal question here. The Court concluded:

> It appears to me at this point that my recusal would be an abdication of my responsibility and an imposition on my colleagues. It would also delay the progress of this case and, rightly or wrongly, encourage the injurious perception that the government can, by its selection of a prosecutor, "manipulat[e] the system for strategic reasons, perhaps to obtain a judge more to their liking." *In re Allied–Signal,* 891 F.2d at 970.

*Id*. at 212. Now, once again, the government raises the recusal issue, this time actually moving for recusal based on the Court's involvement in the screening of, and a panel discussion regarding, a film named *The Life and Mind of Mark DeFriest*.

### B.       *The Life and Mind of Mark DeFriest*

Around 2007, filmmaker Gabriel London began filming *The Life and Mind of Mark DeFriest*, a film that told the story of a man who was incarcerated at age 19 for a nonviolent property crime, but because of additional punishment for escapes, has spent his entire adult life to date behind bars. Interview of Gabriel London (07/08/2015), D.E. 2026-1, at 17 ("London Tr."); Motion Ex. F, D.E. 2026-5. According to Mr. London,

> this film has always been about the life of a single prisoner. So, I've always maintained that it is not a purely human rights film. . . . We've been excluded from many grants because it was about an individual and not a topic. . . . [A] lot of what my work has been tied up in is in the storytelling of an individual. But knowing full well that individual was in this dark prison world. . . . [S]omebody in one of the Boston articles wrote that the film is about guard abuse and it is just so not about guard abuse . . . . Just like it is not about prisoner rape. It is not about solitary confinement. It is not about mental illness behind bars. It is about all those things in a way, because, it's his life, but, that's it.

London Tr. at 39-40.

As it happens, Mr. London is family friends with Dr. Gilligan through his aunt.  Also as it happens, Mr. London is an old family friend of the Court's.  Hr'g Tr. at 11 (06/19/2015).  In June 2014, the Court traveled to Los Angeles upon the birth of a grandson.  Hr'g Tr. at 9 (06/23/2015).  Mr. London also happened to be there for a premiere of *The Life and Mind of Mark DeFriest*.  Hr'g Tr. at 11 (06/19/2015).  The Court did not attend the premiere (nor had it previously seen the movie), but did, along with the Court's wife, meet Mr. London for brunch there on or about June 14, 2014.  Hr'g Tr. at 11 (06/19/2015); London Tr. at 28-29.  It was there, wanting to help out a young man, that the Court suggested that the film could be screened on Martha's Vineyard that July, and that the Court could recruit a friend, Alan Dershowitz, to be a part of a discussion of it.  *Id*. at 29-31; Hr'g Tr. at 11 (06/19/2015).

Sometime after that, Mr. London is not exactly certain when, but he believes his aunt told him once she learned that a screening might happen on Martha's Vineyard, that the Gilligans also had a place on Martha's Vineyard.  *Id*. at 17.  Thus, Mr. London asked Dr. Gilligan if he would be willing to participate in the panel too, and he agreed.  *Id*.  At that time, the Court explained, "Dr. Gilligan's name meant nothing to me, and Mr. London really wanted him, so I said okay."  Hr'g Tr. at 12 (06/19/2015); *id*. at 5, 9, 18; Hr'g Tr. at 4 (06/23/2015).

Richard Paradise, the founder and director of the Martha's Vineyard Film Society, recollects that originally Mr. London reached out to him by email to see if he would screen the film on Martha's Vineyard.  Interview of Richard Paradise (07/14/2015), D.E. 2026-3, at 22-23 ("Paradise Tr.").  That email mentioned the Court's and Mr. Dershowitz's names.  Mr. Paradise did not respond to that email.  *Id*.  At that time, Mr. Paradise explained that he was not inclined to screen the film because the Film Center was already into its summer programming and had largely filled its calendar.  *Id*. at 23-24.  Mr. London then sent a follow-up email mentioning the

name of his "good friend Eleanor Dunn." *Id*. Mr. Paradise explained that Mrs. Dunn's husband, Sam Dunn, is a friend of his who owns the building that houses the Film Society, and without whom it would probably not exist. *Id*. at 25-27. It was after he received the email mentioning Mrs. Dunn that Mr. Paradise began to "warm up to the idea, and [] responded to" Mr. London's email. *Id*. at 27.

For his part, Mr. Paradise stated that he does not know the Court socially, aside from the fact that the Court comes to the Film Center and may be a member. *Id*. at 27. He stated that he is "80 to 90 percent certain," but not completely sure, that he spoke to the Court regarding the film. *Id*. at 31, 33. He does not have a recollection of any email communications with the Court, other than surmising he must have had contact with the Court or its assistant in order to receive his biographical information. *Id*. at 17-18, 30-31. Therefore, Mr. Paradise's own testimony makes clear that it was the connection to Mrs. Dunn that was critical to securing the screening of the film, and the Court played a minor role, if any.

Mr. London's testimony also explains that Mrs. Dunn's contact was critical to securing the film. He explained that "the Dunns got involved," and stated that Eleanor Dunn emailed Mr. Paradise, believing she "was the first person to email Richard [Paradise]." London Tr. at 31-33. As the government notes, in Mr. London's view, the "full court press" to convince Mr. Paradise to screen the film included both the Court and Mrs. Dunn. *Id*. at 33. Whatever Mr. London's beliefs about what influenced Mr. Paradise, the latter's own testimony makes clear that it was primarily Mrs. Dunn's endorsement that motivated his decision.

### C.    Video Screening on Martha's Vineyard

On Martha's Vineyard that July, the Court did not directly communicate with Dr. Gilligan to invite him to his home for dinner prior to the film screening. Rather, the Court provided the information of the time and place of the gathering to Mr. London, who provided it

6

by email to Dr. Gilligan.  *See* D.E. 2026-4 (redacted email of July 27, 2014).  The dinner at the

Court's home on July 27 was a brief and social gathering; there was no discussion of either the

substance of the film or the Sampson case.  *See* 6/23/15 Tr. at 4-5; London Tr. at 60-61;

Interview of Dr. James Gilligan (07/13/2015), D.E. 2026-2 at 18-28, 52-53 ("Gilligan Tr.").

Indeed, there was no discussion of the Sampson case by the Court or anybody at any point

surrounding the film.  Dr. Gilligan traveled alone in his own car to the dinner, and from the

dinner to the film screening.  Gilligan Tr. at 16, 29.

In the panel discussion following the screening of the video, the Court served only as

moderator of the discussion, while Mr. London, Mr. Dershowitz, and Dr. Gilligan served as

panelists.  The Court stated on at least three occasions that it was not commenting on or

endorsing the video or any of the views expressed by the panelists.  Early in the recorded tape,

the Court stated, "as I said, without taking a position with regard to Mark DeFriest or any

particular point raised by the movie, it's really commendable that Gabriel has done this movie."

Memorandum and Order, D.E. 1983 (06/24/2015) at n.1 (quoting Panel Rec. I at 0:49).  The

Court has explained that that statement referred back to a previous statement not on the recorded

tape, which it has now paraphrased.  Hr'g Tr. at 3-4 (06/26/2015) ("the video does not include

any of my opening remarks in which I stated in effect that my participation in the program

should not be construed as an expression of my views on particular points made in the movie or

anything the panelists might say").  Third and lastly, the Court stated at the panel discussion,

> You're hearing the expression of strong views.  I don't mean to sound timid on
> this.  It's not my role really to express my own, except to say that I think all of
> this is extremely valuable to expose judges, who are encouraged to do things that
> will enhance the understanding of the administration of justice.
>
> I do not necessarily agree with every single thing Alan [Dershowitz] said or every
> single thing that Jim [Gilligan] said.  I will say that these are issues that emerge in

7

our cases, and how they're dealt with is substantially determined by the democratic process . . . .

D.E. 1983 at n.1 (quoting Panel Rec. I at 17:14-18:51).

The Court also made a substantive comment, essentially, that extrajudicial punishment by prison guards violates the Eighth Amendment, Panel Rec. II at 17:21-18:30,[2] and also described Mr. Dershowitz and Dr. Gilligan as "two of the world's leading experts" on the issue.  Panel Rec. II at 18:35-19:06.  There was no discussion of the Sampson case in any capacity at the screening.  *See generally* Panel Recs. I, II.  The death penalty was only mentioned in passing. Panel Rec. I at 9:30-11:00; Panel Rec. II at 15:21-17:21.  Neither the moderator nor the panelists were compensated for their participation.  London Tr. at 42.  The Court and Dr. Gilligan never contacted one another after that evening.  Gilligan Tr. at 35; Hr'g Tr. at 17 (06/19/2015).[3]

### D.     Recent Procedural History

The Court did not recall that Dr. Gilligan had filed a declaration in the 2255 proceeding until September 2014, some three months after the panel discussion and film screening, when he learned of it in the context of litigation over competency.  Hr'g Tr. at 5 (06/19/2015); Hr'g Tr. at 3-7 (06/23/2015).  This June, when it first became apparent that the defense was seeking funding for Dr. Gilligan as an expert witness in this new resentencing, after a previously selected alternative witness had become unavailable, the Court immediately raised the present issue with counsel.  *Id.*; Hr'g Tr. at 3-9 (06/19/2015).  The Court assured the parties that, based on the limited interaction with Dr. Gilligan, "if there's litigation about the admissibility of Dr. Gilligan's testimony, as I say, I feel comfortable and confident that I would just decide it the way

---

[2] For ease of reference, the Defense adopts the same citation for the recordings of the panel discussions as the government's Motion.  *See* Mot. at 13.

[3] Dr. Gilligan recalls briefly meeting the Court once before, decades prior.  Gilligan Tr. at 17. The Court stated it "didn't know Dr. Gilligan before" the panel discussion.  Hr'g Tr. at 17 (06/19/2015).

I would decide it if it was somebody I had never encountered." *Id*. at 18.  The government also

inquired as to the expected subject of Dr. Gilligan's testimony at the resentencing hearing.

Defense counsel responded:

> MR. BURT: *I think the [2255] declaration will give you a roadmap of what he's going to say.*  It will be updated with whatever information we have between when it was first written down, but the general contours of it are written in the declaration.
>
> MR. HAFER: Okay. That's fine.

*Id*. at 19 (emphasis added).

At the hearing, the government further stated that it wanted to view the transcript of the

hearing before deciding what further action to take.  Hr'g Tr. at 17 (06/19/2015).  On June 22,

the Court stated that it was "my present, but tentative, view that a reasonable person would not

question my impartiality and, therefore, my recusal would not be permissible or appropriate

under 28 U.S.C. §455(a)."  Order, D.E. 1978, at 1-2 (06/22/2015).  However, the Court allowed

the parties the opportunity to question the Court further concerning its association with Dr.

Gilligan or discuss further the implications of it.  *Id*. at 3.  The government accepted the

invitation, and the parties further discussed the issue on June 23.   The Court offered to attempt

to obtain for the parties *The Life and Mind of Mark DeFriest* and video of the discussion that

followed the showing of the film on July 27, 2014.  Memorandum and Order, D.E. 1983

(06/24/2015).  The next day, the Court made available to the parties a video it had received of

"most, but not all," of that panel discussion.[4]  *Id*. at 2.

The Court convened another hearing on the issue on June 26, 2015. There, the

government stated that it had seen the video made available, but wanted the opportunity to

---

[4] The government's witness interviews suggest that the video provided is the most complete version and it is likely that no video tape exists for the portion of the discussion missing from the copy supplied by the Court.

conduct a more thorough investigation over the next two weeks.  Hr'g Tr. at 5-7, 36-37

(06/26/2015).  Accordingly, the Court directed the government to file, by July 14, 2015, any

motion for the Court's recusal based on the Court's interactions with Dr. Gilligan, or a statement

that it would not file such a motion.  D.E. 1993 (06/26/2015).  On July 8, 2015, the government

interviewed Mr. London at the office of the FBI in New York City.  On July 10, 2015, the

government filed a motion to extend that deadline until July 28, 2015. D.E. 2019 (07/10/2015).

The defense opposed, and the Court denied that motion, although it allowed the government until

July 16 to file any recusal motion if certain circumstances were met.  D.E. 2023 (07/13/2015).  In

this intervening period, the government took the additional recorded interviews of Dr. Gilligan at

its offices in Boston and of Mr. Paradise at the Martha's Vineyard police station.  The

government then filed the instant Motion on July 16 seeking the Court's recusal on the basis of

its involvement of the screening of the film and panel discussion with Dr. Gilligan.

## II.    ARGUMENT

### A.    Legal Standards for Recusal

It is important to note that the government does not assert that the Court is actually

biased, but rather raises only the appearance of bias under § 455(a).  This Court is no stranger to

the legal standard regarding such a recusal claim, having written extensively on the issue in this

case already in *United States v. Sampson*, 12 F. Supp. 3d 203 (D. Mass. 2014) and at least twice

in another case, *United States v. Salemme,* 164 F. Supp. 2d 49 (D. Mass. 1998) ("*Salemme I*");

*United States v. Salemme,* 164 F. Supp. 2d 86 (D. Mass. 1998) ("*Salemme II*").   Ultimately, the

Court must recuse itself only "if a fully informed, reasonable person might question his

impartiality."  *Id.* at 213 n.7 (citing *In re Allied-Signal*, 891 F.2d at 970); *see also In re U.S.*, 158

F.3d 26, 31 (1st Cir. 1998) (asking "whether a reasonable person, *fully informed of all the*

*relevant facts,* would fairly question the trial judge's impartiality") (emphasis in original).  This is an exacting standard.

> "§ 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under § 455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute."

*In re U.S.,* 158 F.3d at 34 (quoting *Liteky v. United States,* 510 U.S. 540, 557-58 (1994) (Kennedy, J., concurring in the judgment)); *see also Salemme I*, 164 F. Supp. 2d at 51-52 (quoting *id.*); *Salemme II*, 164 F. Supp. 2d at 93 (quoting *id.*).

In *Sampson*, the Court carefully laid out the competing interests that a judge considering recusal must balance:

> In *In re Bulger,* quoting its earlier decision in *In re Allied–Signal,* the First Circuit emphasized that:
>> The disqualification decision must reflect not only the need to secure public confidence in proceedings that appear impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.
> *In re Bulger,* 710 F.3d [42, 47 (1st Cir. 2013)] (quoting *In re Allied–Signal Inc.,* 891 F.2d 967, 970 (1st Cir.1989)[1]). "Hence," the First Circuit wrote, "a district judge asked to recuse is not to use the standard of Caesar's wife, the standard of mere suspicion." *Id.* (quoting *In re Allied–Signal,* 891 F.2d at 970).

*Id*. at 205-06; *see also id*. at 206-207.  Similarly, the Court emphasized that "the Court of Appeals for the First Circuit allows the district judge 'a range of discretion' in deciding whether a reasonable, objective person would question his impartiality and reviews that decision only for abuse of discretion."  *Id*. at 206 (quoting *Salemme I*, 164 F. Supp. 2d at 51-52) (quoting *In re Allied–Signal,* 891 F.2d at 970)).  Finally, "[t]he trial judge has a duty *not* to recuse himself or herself if there is no objective basis for recusal."  *In re U.S.*, 441 F.3d 44, 67 (1st Cir. 2006)

(emphasis added); *see also In Re Allied-Signal*, 821 F.2d at 970 ("A judge is as much obliged not to recuse himself when it is not called for as he is obliged when it is.") (internal quotation omitted).[5]  As the court stated in *In re Allied-Signal*, 891 F.2d at 970, "[o]nly if the district court's decision to sit '*cannot be defended as a rational conclusion supported by reasonable reading of the record*' will we insist upon disqualification." (emphasis in original ) (internal quotation omitted).

Canon 4(A)(1) of the Code of Conduct for United States Judges is pertinent to the recusal analysis.  It provides: "A judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice."  The commentary to that rule advises:

> Complete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the society in which the judge lives. *As a judicial officer and a person specially learned in the law, a judge is in a unique position to contribute to the law, the legal system, and the administration of justice, including revising substantive and procedural law and improving criminal and juvenile justice*. To the extent that the judge's time permits and impartiality is not compromised, the judge is *encouraged* to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the law.

*Id*. cmt., Canon 4 (emphasis added).

Against that backdrop, judges routinely decline to recuse themselves for participation in discussions, panels, and other public conversations that are alleged to have some connection to the cases before them.  *See Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137, 143-44

---

[5] *See also id*. at 970 ("Even though § 455 was intended to do away with the formal 'duty to sit' doctrine, the judge must still tread cautiously, recognizing, on the one hand, the great importance to the judicial institution of avoiding any appearance of partiality, while simultaneously remaining aware of the potential injustices that may arise out of unwarranted disqualification.") (internal citation omitted).

(S.D.N.Y. 2012); *id.* at 160-61 (collecting cases);[6] *United States v. Bonds*, 18 F.3d 1327, 1331

(6th Cir. 1994); *In re Aguinda*, 241 F.3d 194 (2d Cir. 2001).

Nor is extra-judicial involvement with an issue related to a case before the judge grounds

for recusal. *See, e.g., In re Sherwin–Williams Co.,* 607 F.3d 474, 478–79 (7th Cir.2010) (judge

---

[6] *Da Silva*, 868 F. Supp. 2d at 160-61 ("The cases make clear that participation on an educational panel with counsel is not a basis for recusal, for sound policy reasons. *See, e.g., Leja v. Schmidt Mfg., Inc.,* No. Civ. 01–5042, 2010 WL 2571850 at *2 (D.N.J. June 22, 2010) ("In my own case, during the course of 31 years on the bench, I have developed numerous personal friendships with members of the Bar and have participated in many charitable, legal and public service organizations in which lawyers, law firms and other judges have participated. This is probably the experience of most judges. To permit such associations to become grounds for recusal would either push judges towards a hermit like existence or open the floodgates to recusal motions."); *In re Wolverine Proctor & Schwartz, LLC,* 397 B.R. 179, 183 (Bankr. D. Mass. 2008) ("[T]he Court rejects [creditor's] assumption that [the judge's] service on the Financial Literacy Committee with [counsel], and numerous other volunteer lawyers and fellow judges, gives rise to a disqualifying connection and establishes reasonable grounds for doubting this Court's impartiality."); *In re Healy,* No. 04–28375–D–13L, 2006 WL 3751617 at *4 (Bankr. E. D. Cal. Dec. 18, 2006) ("It is common knowledge, of course, that judges regularly appear on panels and at presentations for members of the bar, and that such events are regularly advertised in various publications that might be viewed by both the public and the bar. But it is not reasonable to conclude that the participation of a judge with members of the bar who appear before the judge's court would create a predisposition, or an appearance of a predisposition, to favor the members of the bar who participate over those who do not. The Debtor's assertion of an appearance of impropriety is undermined by Canon 4 of the Code of Conduct, which not only permits judges to participate in such activities, but encourages judges to do so."); *Moran v. Clarke,* 213 F. Supp. 2d 1067, 1073 (E.D. Mo. 2002) ("A judge's involvement with other attorneys in bar association activities is not a basis for recusal. Indeed, the commentary to Canon 4 ... encourages judges to 'contribute to the improvement of the law, the legal system, and the administration of justice.... [T]he judge is encouraged to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the improvement of the law.' A judge should not be required to withdraw from all social relationships and live in seclusion."); *Bailey v. Broder,* 94 Civ. 2394, 1997 WL 73717 at *2 (S.D.N.Y. Feb. 20, 1997) ("If my 'relationship' with [counsel (because of bar association and court-related social activities) ] were to require recusal under the instant circumstances, I daresay recusal would be required in so many other cases because of my acquaintance with an attorney that I—and probably most other judges—would be unable to function in our jobs."); *Rosado v. Bridgeport Roman Catholic Diocesan Corp.,* 292 Conn. 1, 970 A.2d 656, 671 (Court "can conceive of no reason to depart from the rule that [a judge's] membership in a task force concerning a particular legal issue does not justify disqualification of a judge simply because the judge's service happens to be coincident with his participation in a case dealing with the same issue.")") (marks in original).

who had written a law review article on a subject at issue in the litigation not required to recuse);
*United States v. Pitera,* 5 F.3d 624, 626–27 (2d Cir.1993) (judge who had given a lecture to
government agents and prosecutors, including advice on how to increase the prospects of a
conviction in narcotics cases, not required to recuse herself from narcotics prosecution); *Buell v.
Mitchell*, 274 F.3d 337, 347 (6th Cir. 2001) (judge who previously, as a legislator, supported a
bill restoring the death penalty was not required to recuse himself from a death penalty case);
*United States v. Bauer*, 84 F.3d 1549, 1560 (9th Cir. 1996) (holding that a judge's personal
views on legal issues may not serve as a basis for a motion to disqualify that judge; judge's
previous statements regarding marijuana distribution as a serious and pervasive social problem
did not require recusal); *Laird v. Tatum*, 409 U.S. 824, 836 (1972) (Justice Rehnquist denying a
motion that he disqualify himself due to previous testimony before Congressional
Subcommittee); *United States v. Payne*, 944 F.2d 1458, 1476 (9th Cir. 1991) ("expertise on and
exposure to a subject, such as Payne alleges the judge had by virtue of his service on the
Commission, does not necessitate recusal"); *S. Pac. Commc'ns Co. v. Am. Tel. & Tel. Co.,* 740
F.2d 980, 993 (D.C. Cir. 1984) ("It is well established, however, that a judge is not disqualified
merely because he personally disagrees with the policy underlying a law that he is bound to
apply in a case."); *United States v. Corbin*, 827 F. Supp. 2d 26 (D. Me. 2011) (judge who had
made a strong statement about the dangers of methamphetamine tracking did not recuse in a
criminal case against a defendant charged with possession with intent to distribute
methamphetamine).

Moreover, "[g]enerally, familiarity—or even a judge's friendship with prospective
witnesses—does not require a judge's recusal under § 455(a)."  *Salemme II*, 164 F. Supp. 2d at
104; *id*. at 104-07 (analyzing and collecting cases); D.E. 1978 at 2-3 (quoting *id*.); *United States*

*v. O'Brien*, 18 F. Supp. 3d 25 (D. Mass. 2014) ("[t]he mere fact that a witness, especially a minor witness, might be a friend or colleague of the judge does not normally require recusal. *See, e.g., In re Beyond Innovation Technology Co., Ltd.,* 166 Fed. App'x 490, 491 (Fed. Cir. 2006) (recusal not required where expert damages witness was "a close personal friend" of the judge);" [collecting four other cases].).

### B.     Recusal Is Not Warranted Under the Facts Here

The government relies heavily on the decision in *In Re School Asbestos Litigation*, 977 F.2d 764, but that case is clearly distinguishable from the facts disclosed by this Court and the government's extensive investigation (which has corroborated the Court's own report).  The Third Circuit summarized the key facts in that case:

> To put it succinctly, [the judge] [1] attended a predominantly pro-plaintiff conference on a key merits issue; [2] the conference was indirectly sponsored by the plaintiffs, largely with funding that he himself approved; and [3] his expenses were largely defrayed by the conference sponsor with those same court-appointed funds.  Moreover, [4] he was exposed to a Hollywood-style "pre-screening" of the plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to what they expected to say at trial.  We need not decide whether any of these facts alone would have required disqualification, for, as we shall explain, we believe that together they create an appearance of partiality that mandates disqualification.

977 F.2d at 782.

It is clear that those four facts that mandated recusal in *In Re School Asbestos* are a far cry from those here, or in a variety of other cases which have distinguished it and found recusal unwarranted.   The second and third facts laid out by the Third Circuit, relating to the sponsoring and funding of the program, are entirely absent here.  It is undisputed that neither Mr. Sampson, the defense, nor this case played any role whatsoever in the sponsoring or genesis of the panel discussion of Mr. London's film on Martha's Vineyard.  Nor, of course, were there any case

funds that were in any way related to the screening of the film, or any expenses of the Court's to be reimbursed.

The fourth fact is also a far cry from the facts of this case.  Rather than *thirteen of eighteen* experts being present at the panel with the Court, just one of Defendants' multiple expected experts participated.  Nor did the substance of Dr. Gilligan's comments on the panel in any way constitute a "pre-screening" of his testimony in this case.  Indeed, here the Court and the government now have before the trial a "pre-screening" of Dr. Gilligan's testimony, in the form of his 2255 declaration itself, to which defense counsel referred them in June 2015 after this issue arose.[7]  Dr. Gilligan's general comments about the prison system from the panel discussion in no way connected to Mr. Sampson or the places in which he was incarcerated, pale in comparison as a "preview" provided by the case-specific 2255 Gilligan declaration.  Surely, receipt of a declaration from a witness as part of a 2255 petition is not grounds for a court's recusal upon resentencing.

The only fact of *In re School Asbestos* arguably even close to that here is that there was a discussion of an issue bearing a relationship to this case in not a fully "balanced" manner (fact 1 as described by the court of appeals).  In *In re School Asbestos*, plaintiffs' executive committee explicitly created the conference out of "what the committee perceived to be one-sided scientific conferences on the dangers of asbestos in place," and indeed ultimately, "[t]he views expressed were overwhelmingly consistent with the plaintiffs' position." 977 F.3d at 779-80.  Here, the defense had nothing to do with the screening or the panel discussion and the purpose of the panel was only to spark a discussion of issues presented by Mr. London's film, where one of the

---

[7] As described earlier, when this issue first arose, the defense confirmed for the government that Dr. Gilligan's 2255 declaration was a "roadmap" for what he would do in resentencing.  And the budget entries disclosed by the Court and relied upon by the government reveal that, as of the time of the movie screening, Dr. Gilligan had not yet begun work in support of resentencing.

panelists was suggested by the Court (Mr. Dershowitz) and the other was suggested by Mr. London (Dr. Gilligan). Under those circumstances, the "balance" of a panel, standing alone, carries little if any weight on the recusal issue.

The numerous other courts that have considered and distinguished the *In re School Asbestos* decision make clear that its holding rests, unsurprisingly, on the unique combination of the particular facts that were shown there, and courts must take care not to over-read the decision as a bar on all judicial participation in civic life, even where it touches on legal issues before the Court. *Da Silva Moore* is particularly instructive. There, the judge had participated in panel discussions at a conference regarding e-discovery topics that arose in the case before him; in two of those panels, he was joined by defense counsel. 868 F. Supp. 2d at 160.

Judge Peck ruled that that contact did not give rise to an appearance of bias, observing that he never had any *ex parte* communication with defense counsel regarding the lawsuit, and the panel discussion did not discuss "the details of the predictive coding protocol involved in this case or . . . what a predictive coding protocol should look like in any case." *Id*. at 160. The court distinguished *In re School Asbestos* from the case before him, noting that he was a speaker at the conferences, not an audience member; the conferences were not one-sided; he had no part in approving the funding of the conferences, nor did he receive any expense reimbursement from defendants; and he did not receive a "pre-screening" of defendants' case because "the panel discussions only covered the subject of computer-assisted review in general." *Id*. at 162.

The judge had also made references to the very case before him at those panels, *id*. at 144-45 & n.11, but rejected those statements as a basis for recusal because they "did not mention the parties or counsel involved," and mirrored statements the Court had previously made in open court, *id*. at 157. The judge also distinguished *In re Aguinda*, relied upon by the government

17

here, on the grounds that the conference did not receive "a significant portion of [its] general funding from litigants or counsel." *Id*. at 163.[8]  Finally, the judge noted that a contrary result would run counter to Canon 4(A)(1), would cause the judges who are the most informed on a topic to decline to speak on that topic, and "would discourage lawyers from participating in CLE programs with judges about ediscovery issues, for fear of subsequent motions to recuse the judge (or disqualify counsel)." *Id*.

Similarly, in *United States v. Bonds*, 18 F.3d 1327 (6th Cir. 1994), a circuit court judge had attended a scholarly conference regarding forensic uses of DNA, including a presentation by the FBI scientist who had testified at a prior hearing *in the very case on appeal*, *regarding that testimony and the analysis he had conducted in that case*.  Judge Boggs found that his recusal was not warranted: "a judge should never be reluctant to inform himself on a general subject matter area, or participate in conferences relative to any area of the law, for fear that the sources of information might later be assailed as 'one sided.'"  *Id*. at 1330.  He wrote that the recusal motion before him:

> both proves too much and too little. To the extent that a judge remains interested at all in the events of society, a judge will inevitably be exposed to matters relating, in greater or lesser degree, to interesting areas of the law on which the judge may be called to rule. However, such general knowledge does not constitute extra-judicial knowledge of disputed evidentiary facts. To the extent that the motion attempts to insinuate a particular closeness by this judge to one participant or another in the conference, as indicated above, it is simply not accurate. Nor does past participation in conferences such as the Banbury Conference, even when that participation is recorded in print, indicate bias or extra-judicial

---

[8] This distinction also makes clear that the government's reliance on *In re Aguinda,* a case that found recusal was *not* appropriate, is misplaced.  *See* Mot. at 21-22.  The very portion of that case quoted by the government states that if presentations relate to legal issues in a case, or involves parties, witnesses, or counsel in the case, "the recusal calculus will differ" — *not* that recusal is always or even most often appropriate.  Mot. at 21-22 (quoting 241 F.3d at 206).  As *Da Silva Moore* makes clear, recusal can be inappropriate even when both those facts are present.

knowledge, any more than the fact that a judge has written previous law review articles or opinions in a certain field.

*Id*. at 1331.  Like the *Da Silva Moore* court, he too distinguished *In re School Asbestos*, observing that "the conference was sponsored by a major university, and the judge in question had no part whatsoever in the organizing or funding of the conference,"; all evidentiary matters had been fixed in the record below, there was no "pre-screening" of evidentiary matters to be presented to the court (at most, the conference amounted to an attempt to "spin" facts already in the record); and the knowledge he gained from the conference would simply be akin to that of reading a law review article or attending a civil liberties conference.  *Id*. at 1331.  Judge Boggs concluded that while "an unreasonable person could focus on one aspect or another of the things I have read or said, persons to whom I have talked, or articles to which I have been credited," "a reasonable person, looking at all of the facts, would say that I am interested in the subject matter area, and no more." *Id*.

Not only are the facts in *In re School Asbestos* clearly distinguishable, but there are other facts present here that, taken together further support why recusal is not required or appropriate. It is undisputed that the Court's participation in the panel was entirely occasioned by his desire to assist a longtime family friend, Mr. London, in the screening of his film—a man who, by pure happenstance, was also a family friend of Dr. Gilligan, who also happened to also have a house at Martha's Vineyard.  The Court did not select Dr. Gilligan for the panel, Mr. London did.  The facts show that the Court and Dr. Gilligan have had no contact whatsoever outside the approximately three hours they spent together on July 27, 2014—half of which was spent watching a movie with no discussion or interaction whatsoever.  *See* Hr'g Tr. at 17-18 (06/19/2015).  The Court did not discuss the *Sampson* case with Dr. Gilligan or anyone else in

the events surrounding and including the panel discussion, and Dr. Gilligan did not discuss it either.

At the panel discussion, the Court was careful to point out on three occasions that it was not endorsing any of the views of the panelists, and even then that it "d[id] not necessarily agree with every single thing" they said.  Panel Rec. I at 17:14-18:51.  While it was the Court's idea initially to screen the film on Martha's Vineyard, the Court played only a minor role in Mr. Paradise's ultimate decision to actually screen it; instead, the main catalyst was Eleanor Dunn.[9] And in either event, the Court was not the "sponsor" of the film screening in any financial sense.

Nor are the statements by the Court at the panel discussion offered by the government of any particular concern here.  First, the Court's recognition that Dr. Gilligan is one of the "world's leading experts" in his field is entirely uncontroversial —the government has nowhere alleged that Dr. Gilligan is *not* a leading expert in this field, or that it would or could challenge his qualifications.  Panel Rec. II at 18:35-19:06.  Nor is the Court's statement that the Eighth Amendment prohibits extrajudicial punishment material to this case—the defense has advanced no such claim.  *See* Panel Rec. II at 17:21-18:30.  As the Court stated, if it had indeed expressed its opinions freely at the panel, it would have said that the way mentally ill people are treated in Massachusetts prisons has improved.  Hr'g Tr. at 6 (06/26/2015).

The subject matter of the film itself had at most a tangential relationship to this case: as Mr. London stated, the film was "about the life of a single prisoner" and his experience in the Florida state prison system, not a human rights film in the broader sense.  London Tr. at 39-40.

---

[9] The government's brief overplays the Court's role in securing the film screening and the panel discussion.  *See* Mot. at 24; *id.* at 9-10.  The government asserts that, "according to Mr. London, that communication [between the Court and Mr. Paradise] apparently played a significant role in Mr. Paradise's decision to agree to the event."  Yet in doing so, the government overlooks Mr. Paradise's own testimony to the contrary, as explained in the Background section above.

Moreover, any similarities between issues faced by the individual in the film and those Mr.
Sampson faced are not markedly different from those faced by many inmates and by judges as
they consider sentencing, competency, mental illness, and prison conditions.  *See, e.g., Disability
Law Ctr. v. Mass. Dep't of Correction*, 960 F. Supp. 2d 171 (D. Mass. 2012) (Court approving
settlement in case alleging that Department and its officials violated federal constitutional rights
of prisoners by subjecting them to disciplinary and other forms of segregation for prolonged
periods of time).  At that level of generality—the only level at which the film could be said to
relate to Mr. Sampson—there is not a sufficient nexus between the film or discussion of it and
this case as to generate a legitimate recusal concern.  *See Da Silva Moore*, 868 F. Supp. 2d at
162; *Bonds*, 18 F.3d at 1330-31.

    The government makes much of the Court's statements that it was sensitive to the issue
of recusal, and might have declined to participate on the panel with Dr. Gilligan had it known he
was an expert in the case.  The problem with that method of analysis it that it improperly
transforms the recusal inquiry into a self-fulfilling prophecy.  That is, any action that a judge
takes in an effort to avoid the mere *possibility, risk, or specter* of an appearance of bias itself
transforms into an indication of the appearance of bias.   As the Court clearly explained, what it
would have sought to avoid is not an appearance of bias itself, but the risk of litigating over
appearance of bias at a crucial juncture in the case — the very litigation embodied in this
briefing and its concomitant voluminous pages of transcripts and exhibits.  *See* Hr'g Tr. at 12
(06/23/2015) ("I wasn't saying that a reasonable person would question my impartiality . . . . I'm
saying it was foreseeable that I would have to disclose it.  There would have to be attention
devoted to it.  It would be an unfortunate distraction."); *id*. at 31-32 ("I just generally try to avoid
these issues."); Hr'g Tr. at 20 (06/26/2015) ("I would have wanted to avoid what we're doing

today.”); Hr'g Tr. at 20 (06/19/2015) (“I'm sorry that I've injected one more issue into a case that has lots of issues”).   Similarly, the Court's prophylactic inquiry of whether the other federal judges present at the film screening and discussion perceived any risk of impartiality is not an indication that a reasonable person would perceive bias, but *the opposite*: both those judges (assumedly both reasonable objective observers) replied, “Oh, no; everything was fine.”  Hr'g Tr. at 14 (06/19/2015); Hr'g Tr. at 30 (06/23/2015); *cf*. Mot. at 16.

So too with the Court's efforts to limit the use of its likeness to promote the film, or its cautionary words to Mr. London and Mr. Paradise (if it was in fact referring to the Sampson case at all).  *Cf*. Mot. at 16-17.  Everyone present agrees there was no discussion of the Sampson case in particular at any point in time.  *See* London Tr. at 11, 86; Gilligan Tr. at 28, 52-53; Paradise Tr. at 68, 73.  Mr. London and Mr. Paradise recall the Court making an oblique reference to a case the Court was handling.  Mr. London is clear, however, that he did not know at the time *and he does not know to this day* whether or not the Court was even referring to the Sampson case. London Tr. at 86, 99-100.  Mr. Paradise does not even recall whether the Court made the reference at the time of the screening or in connection with another film and later said that the comment may have simply been about “prison rights, prison issues, you know, but not any specific case.”  Paradise Tr. at 36-38.  Similarly, at the panel discussion, this Court only broadly said, “I will say that these are issues that emerge in our cases . . . .” and referred to discretion in sentencing.  Panel Rec. I at 17:14-18:51.  This Court has no doubt handled countless cases in which “prison rights” or “prison issues” were addressed—not the least of which is another case the Court itself said it could have, but did not refer to at the panel discussion.  Hr'g Tr. at 6 (06/26/2015) (referring to *Disability Law Ctr.,* 960 F. Supp. 2d 171); *see also, e.g., Kosilek v.*

*Spencer*, 889 F. Supp. 2d 190 (D. Mass. 2012), *rev'd on reh'g en banc,* 774 F.3d 63 (1st Cir.

2014), *cert. denied*, 135 S. Ct. 2059 (2015).

In sum, judges should be encouraged to take measures to limit any potential imputation

of bias, not avoid them out of fear that those very measures would paradoxically become further

evidence of an imputation of bias.

Finally, the government makes too much of the casual dinner that occurred at the Court's

summer home prior to the screening of the video.  *Cf.* Mot. at 24.  The Court, Dr. Gilligan, and

Mr. London all recall that it was only a social gathering and nothing substantive about the film or

the panel was discussed, aside from logistics of the panel (who would make introductions, who

would ask questions, etc.).   This brief social interaction between the Court and Dr. Gilligan—

again, on the only day in their lives the two have been in real contact—goes little towards

demonstrating an appearance of bias in the mind of a reasonable person, especially given the

robust case law finding recusal inappropriate even where a judge and witness are *close personal*

*friends.  See Salemme II*, 164 F. Supp. 2d at 104; cases cited *supra*.[10]

The government's various suppositions about what a "reasonable person" could conclude

from this series of events are, with all due respect, instead quite *un*reasonable.  *Cf.* Mot. at 25-27.

According to the government, a reasonable person could conclude that the Court in fact "was

---

[10] *O'Brien*, 18 F. Supp. 3d 25, is readily distinguishable.  There, a proposed central witness in the
case was another judge who was a very close friend of the trial judge—they had been two of only
three judges in the Worcester courthouse for six years, in which they "spoke with one another on
a near-daily basis."  *Id*. at 28.  Furthermore, the subject of the testifying judge's testimony, his
personal actions and mental state in making certain candidate references/sponsorships, would be
offered to demonstrate that defendants acted the same, and therefore innocently.  *See id*. at 34-
36.  Here, there is little comparison between both the extent of the social relationship (three
hours' interaction versus a deep friendship spanning several years), and the type of proffered
testimony (expert testimony on prison conditions versus a personal accounting of the witness's
own actions and mental states).

aware that Dr. Gilligan had submitted a report . . . when the film screening and panel discussion took place," despite the fact that the Court has repeatedly and unequivocally denied such awareness; and that the Court's "ruling on the definition of a mitigating factor," one of the most critical and hotly contested issues in this entire resentencing litigation, was apparently so decided in order to eliminate Dr. Gilligan's testimony so the recusal issue would not arise. *Id*. at 25-26. These totally unfounded suspicions would not be entertained by a reasonable person fully informed of the facts and circumstances given the Court's reputation in general and his conduct in this case in particular.

"The 'reasonable person is not someone who is 'hypersensitive or unduly suspicious.'" *United States v. Holland*, 519 F.3d 909, 913(9th Cir. 2008)) (internal quotation omitted).  No reasonable person fully informed would conclude that this Court is not telling the truth on the issues surrounding this recusal inquiry.  Rather, in the three instances in this case where separate recusal issues have been discussed, the Court has been fully candid and forthcoming, even raising issues on his own accord.

Equally absurd is to argue that the Court's ruling on the scope of mitigation that was in favor of the government on this crucial issue is somehow evidence of an appearance of bias for the defense.  Nor does that ruling eliminate Dr. Gilligan's testimony, even if it stands after further briefing the Court has ordered.  As Dr. Gilligan's declaration makes clear, his testimony is not about prison conditions generally but rather is tied to the impact of Gary Sampson's prison conditions on him personally.

The government's other claims suffer from a different flaw.  The government claims that the Court's decisions to delay approval of Dr. Gilligan's funding and questioning of defense counsel whether it still intended to use Dr. Gilligan as a witness, may have been "influenced by

the specter of the Court's possible recusal," which is now "influencing the course of this

litigation." *Id*. at 27.  The "course of this litigation" has already been altered largely as a result

of the government's own various efforts to bolster and keep this issue alive as long as possible.

*See, e.g.,* Govt's Mot. for Extension of Time, D.E. 2019 (07/10/2015).  As the defense has

explained, litigation of this issue has caused defense counsel, among other things, to take a last-

minute trip to Boston to attend the interview of Dr. Gilligan, and to spend hours of time

investigating and briefing this issue at the same time it must prepare other important pre-trial

materials.  *See* Def. Opposition to Govt's Mot. for Extension of Time, D.E. 2020, at 3-4

(07/10/2015).  Thus, it is the government's own actions surrounding recusal that have caused the

issue to "influenc[e] the course of this litigation," nothing else.  Once more, it would turn the

§ 455(a) recusal inquiry into a strange self-fulfilling prophecy if issues necessarily attendant to

the litigation of a recusal issue became themselves further grounds for recusal; if a party could

both light the spark of a potential recusal issue, and then fan the flame.

     Again, as in *Sampson*, the enormous burden recusal would place on another member of

this Court and the administration of justice in this case should not be ignored.  *See Sampson*, 12

F. Supp. 3d at 212; *Salemme II*, 164 F. Supp. 2d at 111 ("Transferring this complex case to

another judge would undoubtedly further delay the progress of the proceedings.  The public, as

well as the parties, however, has a legitimate interest in seeing this case progress with all

deliberate speed."); *Salemme I*, 164 F. Supp. 2d at 83 ("it would, at a minimum, be challenging

and time-consuming for another judge to become familiar with the three-year history of this case

and the hundreds of decisions I have made in it") (citing *In re Allied-Signal*, 891 F.2d at 972).

     Here the history spans fourteen years including a previous sentencing and related appeals,

a § 2255 proceeding and related appeal, and a resentencing that is approaching the two year

mark.  This history raises complex issues arising out of the interrelationships between these three separate proceedings that require constant cross-referencing between them and intimate familiarity with each.  This makes it not just challenging and time-consuming for any other judge to become familiar with this history, it makes it virtually an impossibility.

Moreover, this Court has not yet ruled on a host of pending substantive motions, including perhaps most notably Defendants' multiple motions to dismiss this case on various constitutional grounds.  If this Court recuses itself, it cannot rule on these motions *sub judice,* and a new judge would have to acquaint himself or herself with those dense and complex issues. *See El Fenix de Puerto Rico v. M/Y JOHANNY*, 36 F.3d 136, 141 (1st Cir. 1994) ("a trial judge who has recused himself should take no other action in the case except the necessary ministerial acts to have the case transferred to another judge.") (internal quotation omitted).  Moreover, it would remain an open question whether this Court's previous orders entered as far back as July 2014 would need to be retroactively vacated, further complicating the proceedings.  *See Salemme I*, 164 F. Supp. 2d at 83 (discussing various possible remedies permitted under § 455(a)); *In re School Asbestos*, 977 F.2d at 786-87 (same); *Anderson v. City of Boston*, 244 F.3d 236, 238 n.1 (1st Cir. 2001) (same); *In re Allied-Signal*, 891 F.2d at 973.  The difficulty a new judge would have in getting up to speed on this unique death penalty case simply cannot be understated.

As appearances are being considered in connection with this recusal motion, one final point bears mention.  The fully informed knowledgeable person would be aware of the repeated publicly reported criticisms of the Court by the families of the victims at every stage of these proceedings—over rulings at the original sentencing and comments by the Court in imposing the

death penalty, [11] during the 2255 proceeding[12] and the Court's decision to vacate the death

penalty,[13] and since this new resentencing proceeding began in November 2013.[14]  At times this

chorus of criticism has been joined by former U.S. Attorney Michael Sullivan,[15] who was in

charge of the office at the time of the original charges and the initial sentencing proceeding.

These articles include one with the following statement with respect to a ruling by the court in

this resentencing:  "[Michael] Rizzo called Wolf's actions 'infuriating' and said he is trying to

take steps to have the judge removed from the Sampson case."[16]  Against this background,

recusal by the Court would raise the same concern that the Court expressed with respect to the

Hafer-related recusal issue that it would, "rightly or wrongly, encourage the injurious perception

that the government can . . . 'manipulat[e] the system for strategic reasons, perhaps to obtain a

judge more to their liking.'"  *Sampson*, 12 F. Supp. 3d at 212 (quoting *In re Allied-Signal*, 891

F.2d at 970).

     The Court has presided over this case for some fourteen years, spending countless hours

devoted to it and authoring hundreds of pages of orders and memorandum opinions.  It sentenced

Gary Sampson to death once, and has issued various rulings with which both sides have at times

vigorously but respectfully disagreed.   A reasonable observer, fully informed of all the

---

[11] Consistent with the treatment of press articles in connection with the venue motion, we attach under seal as Exhibit 1 to this Response examples of these public comments.

[12] Attached under seal as Exhibit 2 to this Response are examples of these public comments.

[13] Attached under seal as Exhibit 3 to this Response are examples of these public comments.

[14] Attached under seal as Exhibit 4 to this Response are examples of these public comments.

[15] Attached under seal as Exhibit 5 to this Response is an example of these public comments. Additionally, the defense will provide the Court and government Exhibit 6, a video example of these public comments, on a CD by Federal Express.

[16] Attached under seal as Exhibit 7 to this Response are examples of these public comments.

circumstances in this case, would not find that record outweighed by a casual lobster roll dinner and the moderating of a panel discussion about a film concerning the experience of a different inmate, convicted of a different crime, in a different state prison system.  The reasonable observer would conclude that the Court, seeking to help a personal friend, facilitated and moderated a discussion that "contribute[d] to the law, the legal system, and the administration of justice," and nothing more.  C.C.U.S.J. cmt., Canon 4; *id*. Canon 4(A)(1); *see Bonds*, 18 F.3d at 1331.

## III.    CONCLUSION

Based on the foregoing reasons, the defense requests that this Court deny the government's Motion for recusal.

*     *     *

In compliance with the Court's Order, by the signatures below, Ms. Recer, Mr. Burt, Mr. McDaniels and Ms. Wicht certify that they have read this submission.  *See* Amended Order Regarding Scheduling, D.E. 1756 (12/26/2014).

Respectfully Submitted,

*/s/Danalynn Recer*
Danalynn Recer
Gulf Region Advocacy Center
2307 Union Street
Houston, TX 77007
(713) 869-4722

*/s/Michael Burt*
Michael Burt
Law Office of Michael Burt
1000 Brannan Street
Suite 400
San Francisco, CA 94103
(415) 522-1508

*/s/William E. McDaniels, Esq.*
William E. McDaniels, Esq.
Jennifer G. Wicht, Esq.
Williams & Connolly LLP
725 Twelfth Street, NW
Washington, D.C. 20005
(202) 434-5055

Date: July 31, 2015

## CERTIFICATE OF SERVICE

I, Jennifer G. Wicht, hereby certify that a true copy of the above document was filed electronically through the ECF system on July 31, 2015, which will cause the government to be served electronically with a copy of the document.

/s/ Jennifer G. Wicht

Jennifer G. Wicht, Esq.