# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Crim. No. 01-10384 MLW |
| | ) | |
| GARY LEE SAMPSON, | ) | |
| | ) | |
| Defendant. | ) | |

## REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR RECUSAL UNDER 28 U.S.C. §455(a)

Gary Lee Sampson's response to the government's motion for this Court's recusal under 28 U.S.C. §455(a), does nothing to undermine the basis for the government's request. As shown below, Sampson misapplies the standards governing recusal under §455(a) by arguing that the issues raised in the government's motion must be balanced against this Court's 14-year history of presiding over this case. In *In re Bulger*, 710 F.3d 42 (1st Cir. 2013), however, the First Circuit made clear that a reasonable person may doubt a court's impartiality under §455(a) without the presence of any evidence that a judge is subjectively biased, even where that judge has presided over a case for more than a decade. The First Circuit also has held doubts ordinarily should be resolved in favor of recusal, a presumption that would be turned on its head if a court were permitted to weigh its history and record of presiding over a case in the §455(a) calculus, or the burden that recusal might place on a judicial colleague.

Sampson also errs by presenting the facts throughout his response in the light most favorable to the Court, when, instead, they must be judged from the perspective of the average person on the street, someone who is not a judicial insider and thus would be less inclined to presume the Court's impartiality than would persons who work in the judicial system.

Judged under the correct standards, the average person on the street might reasonably question the Court's impartiality.  This Court's recusal therefore is required under §455(a).

## ARGUMENT

### A.    Sampson Misapplies the Standards Under §455(a).

Sampson misapplies the standards governing recusal under §455(a), and those legal errors pervade the arguments he makes in contending that this Court's recusal is not required.

**1.**  Sampson first errs in arguing that the facts giving rise to the government's motion for recusal must be weighed against the Court's 14-year history with that case.  Def. Resp. at 1.  This is a central theme of his response:

> The Court has presided over this case for some fourteen years, spending countless hours devoted to it and authoring hundreds of pages or orders and memorandum opinions.  It sentenced Gary Sampson to death once, and has issued various rulings with which both sides have at times vigorously but respectfully disagreed.  A reasonable observer, fully informed of all the circumstances in this case, would not find that record outweighed by a casual lobster roll dinner and the moderating of a panel discussion about a film concerning the experience of a different inmate, convicted of a different crime, in a different prison system.

*Id.* at 27-28.

That argument is meritless, as it collapses the question whether a judge has exhibited *subjective* bias warranting disqualification under §455(b) into the altogether different question whether an *objective* question exists about a court's impartiality under §455(a).  Those inquiries are distinct, as the First Circuit made clear in *Bulger* in holding that "a reasonable person may question impartiality without the presence of any evidence that a judge is subjectively biased." 710 F.3d at 46; *see also In re Martinez-Catala*, 129 F.3d 213, 220 (1st Cir. 1997) ("Where the appearance of partiality exists, recusal is required regardless of the judge's own inner conviction that he or she can decide the case fairly despite the circumstances.").

2

In *Bulger*, the First Circuit held that Judge Stearns's recusal was required even though he had presided over the case for almost 14 years by the time a recusal motion was filed, including presiding over the prosecutions of Kevin Weeks, Kevin P. O'Neil, Stephen J. Flemmi, and Michael S. Flemmi, all of whom were charged in the same case. *See generally United States v. Kevin Weeks*, No. 99-CR-10371-RGS.  There was no evidence that Judge Stearns had handled the case with anything but the utmost rectitude and distinction; indeed, the First Circuit took pains to emphasize that Bulger "has made no claim that Judge Stearns has in fact demonstrated any bias in his handling of the case." *Bulger*, 710 F.3d at 46.  Notwithstanding Judge Stearns's record of impartial decision-making in that case, the First Circuit found that recusal was warranted based on how a reasonable person would view the judge's ability to impartially consider an immunity claim raised by the defendant, James J. Bulger, in light of the supervisory positions that Judge Stearns had previously held in the U.S. Attorney's Office. *Id.* at 46-49.  In doing so, the First Circuit emphasized the distinction between the inquiries under §455(a) and §455(b):

> [O]ur analysis of the defens[e] claim and relevant facts does not question either Judge Stearns's ability to remain actually impartial or his sincerity in concluding that he is not biased against the defendant, nor do we draw any conclusion that he is biased.  The point under §455(a) is not his actual state of mind at a particular time, but the existence of facts that would prompt a reasonable question in the mind of a well-informed person about the judge's capacity for impartiality in the course of the trial and its preliminaries.

*Id.* at 46.

Just so here.  The question whether this Court's recusal under §455(a) must be based solely on the facts and circumstances that have given rise to this motion, and may not be weighed or balanced against this Court's history and record of presiding over this case.

This principle is consistent with First Circuit authority holding that "the duty to recuse and the duty to sit do not exert equal pull; in close cases, 'doubts ordinarily ought to be resolved in favor of recusal.'" *United States v. Snyder*, 235 F.3d 42, 46 (1st Cir. 2000) (quoting *In re United States*, 158 F.3d 26, 30 (1st Cir. 1998)). That presumption would be turned on its head if courts were able to weigh their overall record of handling a case in the §455(a) calculus.[1]

Sampson's related claim that this Court should weigh the burden that recusal would place on a colleague also fails. That is not an appropriate consideration under §455(a) where, as here, a substantial appearance question has been raised, *see In re School Asbestos Litigation*, 977 F.2d 764, 784-85 (3d Cir. 1992), as it would lead to the counterintuitive result that the more significant or complicated a case might be, the more disinclined a court should be from recusing itself. That, too, would fly in the face of the First Circuit's admonition that where a court's impartiality has been called into question under §455(a), doubts must be resolved in favor of recusal. *See Snyder*, 235 F.3d at 46; *In re United States*, 158 F.3d at 30.

Nor is *In re Allied-Signal, Inc.*, 891 F.2d 967, 972 (1st Cir. 1989), to the contrary, as the First Circuit there noted that "other things being equal, the greater the extent to which the potentially disqualifying circumstance facilitates the just and efficient resolution of a case, the less likely a knowledgeable observer will consider it a sign of judicial partiality." In that case,

---

[1] For similar reasons, there is no merit to Sampson's argument that in considering whether recusal is required, the Court should take into consideration the fact that the government had previously asked the Court to revisit a separate recusal inquiry based on the Court's association with Assistant U.S. Attorney Zachary R. Hafer and his wife, *see* Def. Resp. at 3-4, or to his claim that this Court should deny the government's motion for recusal because the families of the victims have voiced criticisms of the Court, *see* Def. Resp. at 26-28. The question whether this Court's recusal is required must be based exclusively on the facts and circumstances giving rise to the government's motion. *See Home Placement Service, Inc. v. Providence Journal Co*., 739 F.2d 671, 675(1st Cir. 1984) (although judge's association with U.S. Senator did not provide ground for recusal under §455(a), holding that alternative ground did warrant recusal and that "its impact must be assessed *separately* from the Judge's relationship with Senator Chafee, although both are lumped together in the recusal motion ") (emphasis added).

the potentially disqualifying circumstance was the fact that two of the judge's career law clerks had brothers who represented the plaintiffs, and the First Circuit noted that "[t]he record suggests that their experience and participation were highly useful in bringing Phase One to trial, smoothly, and with unusual speed.  In other words, the court's need for the clerks was somewhat special and likely to have been seen as such."  *Id.*

Here, by contrast, the disqualifying circumstances involve the Court itself, and cannot be said to have helped facilitate the just and efficient resolution of this case.  To the contrary, as the Court has recognized, the disqualifying circumstances have had nothing but deleterious effects on the litigation in this case.

**2.**   Sampson also errs by presenting selected facts in his response in the light most favorable to the Court, rather than how they would be perceived by the average person on the street.  Thus, for example, Sampson asserts that "[w]hat an informed knowledgeable observer would see is that, in an effort to help a young family friend in his career, the Court suggested and then participated as a moderator in a film screening and panel discussion on an issue important to the criminal justice system."  Def. Resp. at 2.  He similarly asserts that "[i]t is undisputed that the Court's participation in the panel was entirely occasioned by his desire to assist a longtime family friend, [Gabriel] London, in the screening of the film – a man who, by pure happenstance, was also a family friend of Dr. Gilligan, who also happened to also have a house at Martha's Vineyard."  *Id.* at 19.

The error in this presentation is that it analyzes the appearance problem from the wrong vantage point.  When considering whether an appearance problem exists under §455(a), courts do not view the question from the perspective of the judge or a judicial insider, but rather from the perspective of the average person on the street:

> Because 28 U.S.C. §455(a) focuses on the appearance of
> impartiality, as opposed to the existence in fact of any bias or
> prejudice, a judge faced with a potential ground for disqualification
> ought to consider how his participation in a given case looks to the
> average person on the street.  Use of the word "might" in the
> statute was intended to indicate that disqualification should follow
> if the reasonable man, were he to know all the circumstances,
> would harbor doubts about the judge's impartiality.

*Home Placement Service*, 739 F.2d at 676 (quoting *Potashnick v. Port City Construction Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980)).  As this Court has observed, "[t]he question is whether a reasonable person who is objective, not a lawyer, not a litigant, not a judge, not anybody who has a personal involvement in the case, how would they view it."  Transcript of Hearing, June 26, 2015, at 29 (hereafter "6/26/15 Tr.").  This is so because "the hypothetical reasonable person under §455(a) must be someone *outside* the judicial system because judicial insiders, 'accustomed to the process of dispassionate decision making and keenly aware of their Constitutional and ethical obligations to decide matters solely on the merits, may regard asserted conflicts to be more innocuous than an outsider would.'"  *In re Kensington Intern*, 368 F.3d at 303 (emphasis added) (quoting *United States v. DeTemple*, 162 F.3d 279, 287 (4th Cir.1998)); *see also Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 133 (2d Cir. 2003) (Jacobs, J., concurring) ("The standard that properly governs the panel opinion is what a reasonable person would believe, knowing the salient circumstances – not what a reasonable person would think who had the benefit of inside knowledge about the work of courts, of particular judges, and of judges in general.").

Viewed from the vantage point of the average person on the street, that person would not necessarily know or believe that the Court's subjective intent was simply to assist a longtime family friend.  Instead, that person might reasonably suspect that the Court took the actions it did because the Court found the film enlightening and agreed with its message, as reflected by the

6

Court's praise of Mr. London, its statement that the film raises issues "that emerge in our cases," and its statement that the film depicted events inconsistent with the values and aspirations manifested in the Eighth Amendment.  Panel Rec.II at 17:14-18:30.

The average person on the street would not necessarily know or believe that, when the Court told Mr. London and Mr. Paradise that it had to be careful about what it said because the Court was then dealing with a case involving similar issues,[2] the Court was merely "tak[ing] measures to limit any potential imputation of bias, not avoid them out of fear that those very measures would paradoxically become further evidence of an imputation of bias."  Def. Resp. at 23.  Instead, that person might reasonably believe that these statements, as well as the Court's questioning of two federal judges who attended the event whether anything inappropriate had been said, reflected the Court's awareness of the appearance problems that its participation in the event might cause.[3]

---

[2] Sampson suggests that this Court may have been referring to a different case, asserting that "[t]he Court has no doubt handled countless cases in which 'prison rights' or 'prison issues' were addressed – not the least of which is another case the Court itself said it could have, but did not refer to at the panel discussion."  Def. Resp. at 22 (citing *Disability Law Ctr. v. Mass. Dep't of Correction*, 960 F. Supp. 2d 271 (D. Mass. 2012)).  But this Court has stated that this case is the most important case on its docket, *see* 6/26/15 Tr. at 46, and the parallels between the events depicted in the film and the claims raised by Sampson in this case are obvious.  Moreover, the Court allowed the motion to approve a settlement agreement in *Disability Law Ctr.* on April 12, 2012, more than two years before the film screening and panel discussion took place, and the docket sheet in that case reflects that the case also was administratively closed and terminated on April 12, 2012.  *See Disability Law Ctr. v. Mass. Dep't of Correction*, No. 07-cv-10463-MLW.  In any event, if the Court was dealing with *two* complicated cases involving claims of prison abuse and trauma when the film screening and panel discussion occurred, that would only magnify the appearance problem that has been created.

[3] Sampson's reliance on the fact that the two fellow judges viewed the program and found that it did not pose problems for the Court is misplaced.  There is no evidence that the judges knew that the Court had suggested and helped organize the event, recruited the marquee speaker, hosted Dr. Gilligan at its vacation home, or knew anything about this case and Dr. Gilligan's role in it.

The average person on the street would not necessarily know or believe that Dr. Gilligan's participation in the panel discussion was a matter of "pure happenstance." Def. Resp. at 19. Instead, that person might reasonably believe that it was no mere coincidence that Dr. Gilligan was participating in the panel discussion after having submitted a report on Sampson's behalf about prison abuse and trauma, inasmuch as the events depicted in the film paralleled the claims of prison trauma and abuse that Sampson had raised.

The average person on the street would not necessarily know or believe, as the Court has stated, that it simply forgot that Dr. Gilligan had submitted a report in the §2255 proceedings when the film screening and panel discussion occurred. Instead, that person might reasonably believe that the Court was aware of that fact at the time – the relevant inquiry under *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 859-60 (1998)[4] – based on the prominence that that report played in Sampson's amended §2255 motion and the pleadings related to the

---

[4] Sampson faults the government for arguing that a reasonable person could conclude that the Court in fact was aware that Dr. Gilligan had submitted a report in the §2255 proceedings when the film screening and panel discussion took place "despite the fact that the Court has repeatedly and unequivocally denied such awareness." Def. Resp. at 23-24. But *Liljeberg* – dispositive, on-point authority that Sampson does not cite – makes clear that a court's forgetfulness is not "the sort of objectively ascertainable fact that can avoid the appearance of partiality," and that the test under §455(a) thus "does not depend upon whether or not the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." 486 U.S. at 859-60 (internal citation omitted); *see also Chase Manhattan Bank*, 343 F.3d at 130 ("In *Liljeberg*, the Supreme Court held that a judge's 'forgetfulness' was not deemed 'the sort of objectively ascertainable fact that can avoid the appearance of partiality.' We hold that under the present facts the district judge's stated ignorance of the merger cannot overcome the objective appearance of a conflict of interest requiring disqualification under Section 455(a).") (quoting *Liljeberg*, 486 U.S. at 860); *In re School Asbestos Litigation*, 977 F.2d at 784 ("The Supreme Court has squarely held that a judge need not have had actual knowledge of facts creating an appearance of partiality to violate subsection 455(a). * * * Thus, we cannot assume that a reasonable person would believe that Judge Kelly simply forgot the connection between Selikoff, the conference, and the source of funding for the conference.") (citing *Liljeberg*, 486 U.S. at 859-61).

government's motion for summary dismissal,[5] and the fact that the Court itself referred to Dr.

Gilligan's report as being amongst the "relevant evidence submitted in connection with the 2255

Motion" in its order of June 6, 2014.  D.E.1365.  In light of the fact that that order would have

presumably required the Court to review Dr. Gilligan's report to determine that it was amongst

the relevant evidence that needed to be turned over to the competency examiner,[6] a reasonable

person might find it hard to believe that the Court had forgotten about that report when it hosted

Dr. Gilligan at its vacation home and participated on the panel discussion with him little more

than one month later.  *See Liljeberg*, 486 U.S. at 865 ("First, it is remarkable that the judge, who

had regularly attended the meetings of the Board of Trustees since 1977, completely forgot about

the University's interest in having a hospital constructed on its property in Kenner.").

The average person on the street would not necessarily know or believe that when the

Court hosted Dr. Gilligan and Mr. London prior to the film screening and panel discussion, it

was simply a "casual lobster roll dinner."  Def. Resp. at 28.  Instead, that person might

reasonably believe that the purpose of the dinner, as reflected in Mr. London's e-mails, was to

"to go over the approach to our conversation post-screening," Exhibit E to Declaration of

Alexander R. Zwillinger (hereafter "Zwillinger Decl.") at 2, indicating that at least some

---

[5] Sampson states that Dr. Gilligan's report, although marked as Exhibit A to his amended §2255 motion, actually was only the 194th numbered exhibit and its demarcation as Exhibit A does not itself suggest any prominence.  Def. Resp. at 2 n.1.  That argument is misleading. Sampson relied principally on Dr. Gilligan's report in his amended §2255 motion to support his claim of ineffective assistance of counsel for failure to investigate and present evidence of prison abuse and trauma, and that report was addressed at great length by both parties in their pleadings on the government's motion for summary dismissal.  D.E.1040, at 105-106, 113, 115, 116-117 n.27, 117, 119, 119 n.28, 120, 121, 122, 125, 128, 129, 130, 131; D.E.1057, at 90 n.44, 116-117; D.E.1060, at 2.

[6] The Court's statement that it relies on its law clerks to distill the pleadings in this case, *see* 6/26/15 Tr. at 29, does not in any way alter this conclusion.  How this Court manages its chambers is precisely the kind of information that would not be known to the average person on the street.  *See In re Kensington Intern*, 368 F.3d at 311; *Chase Manhattan Bank,* 343 F.3d at 133 (Jacobs, J., concurring).

discussion of the substance of what would be said during the panel discussion took place during the dinner, including possibly a discussion about the prison abuse dramatized in the film.

The average person on the street would not necessarily know or believe that, as the Court has suggested, "[i]f I had been expressing my views, I could have reported that [strides had been made in the treatment of inmates' mental health], since I mediated the settlement that was said to substantially improve the way mentally ill people are treated in the Massachusetts prisons." 6/26/15 Tr. at 6.   Instead, that person might reasonably believe that the Court believed that conditions in Massachusetts prisons were regressing rather than improving, inasmuch as the Court not only made no reference to the settlement and improved conditions, but, in introducing Dr. Gilligan, said that he had run "the mental health program of Massachusetts state prisons, which when he started were very terrible; while he was there, improved substantially, and now are back in the newspapers, within the last week, for events that were regarded as scandalous and led to the resignation – forced resignation of the commissioner of corrections."  Panel Rec.I  at 0:2:30-3:08.

Finally, the average person on the street would not necessarily know or believe, as the Court has suggested, that its praise of Dr. Gilligan and Professor Dershowitz as being "really, literally, like the two world's leading experts on the subject, in Alan and Jim," can be explained by "some degree of generosity in thanking panelists in that setting."  6/26/15 Tr. at 25.[7]  Instead, that person might reasonably believe that the Court meant what it said and that its high praise of Dr. Gilligan and its implicit agreement with some of Dr. Gilligan's harsh assessment of prison

---

[7] Sampson misquotes this Court as saying that Dr. Gilligan and Professor Dershowitz were "two of the world's leading experts" on the issue.  Def. Resp. at 8.  This Court's precise words were that Dr. Gilligan and Professor Dershowitz were "really, literally, like the two world's leading experts on this issue in, in Alan and Jim."  Panel Rec.II at 18:55-19:06.

conditions and prison guards in particular.[8]  Put differently, the average person on the street might find it hard to believe that the Court disagreed with or was skeptical of the views expressed by Dr. Gilligan about prison abuse and trauma if it believed that he was "literally" one of the "two world's leading experts" on the subject, particularly where Dr. Gilligan's views during the one-sided discussion were never challenged.

In sum, when viewed from the correct vantage point, the average person on the street might reasonably harbor doubts about the Court's impartiality.

**B.      The Code of Conduct of U.S. Judges Offers No Refuge Here.**

In his response, Sampson points to Canon 4(a)(1) of the Code of Conduct for United States Judges (hereafter "Code of Conduct"), which provides that "[a] judge may speak, write, lecture, teach, and participate in other activities concerning the law, the legal system, and the administration of justice," and to the commentary that accompanies Canon 4, which provides, in part, that, "[a]s a judicial officer and a person specially learned in the law, a judge is in a unique position to contribute to the law, the legal system, and the administration of justice, including revising substantive and procedural law and improving criminal and juvenile justice."  Code of Conduct, Canon 4(a)(1), cmt. Canon 4.   Against this backdrop, Sampson asserts, "judges routinely decline to recuse themselves for participation in discussions, panels, and other public

---

[8] Sampson errs in asserting that "the Court's recognition that Dr. Gilligan is one of the 'world's leading experts' in his field is entirely uncontroversial – the government has nowhere alleged that Dr. Gilligan is not a leading expert in this field, or that it would or could challenge his qualifications."  Def. Resp. at 20.  The average person on the street, hearing that the Court believes that Dr. Gilligan is "literally" was one of the "two world's two leadings experts" on the issue, might harbor doubts about the Court's ability to make impartial rulings related to Dr. Gilligan's testimony.  Furthermore, if this Court did not recall that Dr. Gilligan had submitted a report in the §2255 proceedings at the time, then the Court's appraisal of Dr. Gilligan's qualifications came from extra-judicial sources.

conversations that are alleged to have some connection to the cases before them."  Def. Resp. at 12.

But Sampson's quotation from the Code of Conduct is selective, and other provisions undermine his reliance on them here.  Canon 4, in particular, begins by stating, in relevant part, that "a judge should not participate in extrajudicial activities that * * * reflect adversely on the judge's impartiality * * *."  Code of Conduct, Canon 4.  Here, as shown above and in the government's opening memorandum, because a reasonable person might question the Court's impartiality in these circumstances, its actions cannot be rationalized as being authorized by other provisions of the Code of Conduct.

Moreover, Sampson's insistence that "the Court's participation in the panel was entirely occasioned by his desire to assist a longtime family friend, Mr. London, in the screening of his film," Def. Resp. at 19, actually undercuts his position under the Code of Conduct.  Canon 2(B) provides, in relevant part, that "[a] judge should neither lend the prestige of the judicial office to advance the private interest of the judge or others * * *."  Code of Conduct, Canon 2(B).  Here, as noted in the government's opening memorandum, the Court allowed its name and the prestige of its office to be used to promote the film screening and panel discussion on the webpage of the Martha's Vineyard Film Society.[9]  If, as Sampson suggests, the Court's participation in the panel was "entirely occasioned by his desire to assist a longtime family friend," that would at least raise the question whether the use of the Court's name and office to promote a film dealing with prison abuse made by a personal friend complied with the spirit, if not the letter, of Canon 2(B).

---

[9]  *See*  http://mvfilmsociety.com/2014/07/the-life-and-mind-of-mark-defriest-with-panel-discuss-afterwards-featuring-alan-dershowitz-judge-mark-wolf-and-dr-james-gilligan/   (attached as Exhibit F to Zwillinger Decl.).

C.       **Sampson Misreads *In re School Asbestos Litigation* and Other Cases.**

Sampson attempts to distinguish *In re School Asbestos Litigation* in his response, but to no avail.  Although every case is different, the parallels between the circumstances at issue in that case and those here are salient and marked.  There, the judge attended a predominantly pro-plaintiff conference on a key merits issue.  *See* 977 F.2d at 781-82.  Here, the Court did much more.  It suggested the idea of having the film screened at the Film Society, helped arrange and promote the screening and panel discussion, and participated in a one-sided panel discussion about a film dealing with prison abuse – a key merits issue in this case.  There, the judge was exposed to a "pre-screening" of the plaintiff's case inasmuch as 13 of the 18 expert witnesses the plaintiffs intended to call at trial gave presentations very similar to what they expected to say at trial.  *See id.* at 782.  Here, the Court was not only exposed to a "pre-screening" of key expert testimony that Dr. Gilligan is expected to give at trial, but publicly stated that Dr. Gilligan and Professor Dershowitz were "really, literally, like the two world's leading experts on the subject, in Alan and Jim."  The Court made that extra-judicial assessment with no input from the government.

Sampson asserts that the Court did not receive a "pre-screening" of Dr. Gilligan's testimony because Dr. Gilligan had earlier submitted a report in the §2255 proceedings, *see* Def. Resp. at 16, but that misses the point entirely.  If the Court did not recall at the time that Dr. Gilligan had submitted a report in the §2255 proceedings, Dr. Gilligan's remarks during the panel discussion – which focused on the institutional issues of prison abuse and trauma that had been raised by the film – necessarily amounted to an extra-judicial, "pre-screening" of his anticipated trial testimony.

The film screening and panel discussion, to be sure, were not funded by Sampson.  But this case involves many facts not present in *In re School Asbestos Litigation* that underscore the appearance problem.  In *In re School Asbestos Litigation*, the judge merely attended but did not organize or speak at the conference, and there were 56 presentations spread over three days, and it was not clear which presentations the judge attended.  *See id.* at 780.  Here, the Court helped organize the screening and panel discussion, and personally moderated the panel.  In *In re School Asbestos Litigation*, the judge did not converse with any of the conference speakers. *See id.* Here, the Court interacted directly with Dr. Gilligan not only during the panel discussion, but at a private dinner that the Court hosted.  In addition, the Court's videotaped endorsement of Dr. Gilligan is far more troublesome than the facts in *In re School Asbestos Litigation*.

The other cases on which Sampson places principal reliance do not help him.   In *Da Silva Moore v. Publicis Groupe*, 868 F. Supp. 2d 137 (S.D.N.Y. 2012), a magistrate judge found that its recusal was not required based on the judge's participation in e-discovery conferences, some of which included defense counsel, and, as relevant here, distinguished *In re School Asbestos Litigation* on the ground that: (1) the judge was a speaker at the educational conferences, not an audience member; (2) the conferences were not one-sided but rather concerned e-discovery issues including search methods in general; (3) the judge had no part in approving the sponsors or exhibitors and received no expense reimbursement; and (4) there was no "pre-screening" of a defendant's case because "the panel discussions only covered the subject of computer-assisted review in general."  *Id.* at 162.  Here, by contrast, the panel discussion was not a balanced educational event; it was a one-sided promotional event about a film dealing with prison abuse.  In addition, and as noted, the Court publicly endorsed Dr. Gilligan and recruited and endorsed Professor Dershowitz, the marquee speaker.

*United States v. Bonds*, 18 F.3d 1327 (6th Cir. 1994), is even more wide of the mark. There, Judge Boggs denied a motion seeking his recusal based at his attendance at a conference sponsored by a major university because (1) he "had no part whatsoever in the organizing or funding of the conference"; (2) due to the nature of an appellate case, "there was no 'pre-screening' of evidentiary matters to be presented to the court"; and (3) "all evidentiary matters by this time had been fixed in the record." *Id.* at 1331. That is a far cry from this case, in which the Court had a significant role in helping organize and promote the film screening and panel discussion, the evidentiary record is not fixed, and the Court was exposed to a "pre-screening" of Dr. Gilligan's anticipated trial testimony.

### D.      Sampson Misapprehends the Appearance Problems in this Case.

Sampson also fails in his efforts to minimize the appearance problems that have been created in this case. He criticizes the government for arguing that a reasonable person might believe that this Court's ruling narrowing the definition of a mitigating factor was related to the scope of Dr. Gilligan's testimony, arguing that "[t]hese unfounded suspicions would not be entertained by a reasonable person fully informed of the facts and circumstances given the Court's reputation in general and his conduct of this case in particular." Def. Resp. at 24. That argument suffers from the very same defect that has been addressed above – conflating the inquiry whether a reasonable person might harbor doubts about a court's impartiality under §455(a) to the altogether different question whether the court's record in presiding over a case exhibits any actual bias under §455(b).

Moreover, this Court recognized the significance of its ruling on the definition of a mitigating factor as it relates to Dr. Gilligan's testimony when it first apprised the parties of these events on June 19, 2015:

> **THE COURT:** * * *  My memory of this, refreshed by quickly looking at my notes that I made on this months ago when we were doing competency – when there were disputes concerning the competency evaluation, is that the defendant proposes that Dr. Gilligan talk generally about prison conditions.  And it hasn't come into sharp focus, but my understanding from at least one of the government's submissions is that it would object to any testimony that's about prison conditions that's not linked to Mr. Sampson.  Is that –
>
> **MR. HAFER:**  Yes, your Honor.
>
> **THE COURT:**  That's the general position?
>
> **MR. HAFER:**  Yes.

Transcript of June 19, 2015 Lobby Conference at 3-4.  This Court itself thus recognized that its ruling on the definition of a mitigating factor, which was occasioned by the government's motion that the Court was referencing, had the potential to narrow the scope of Dr. Gilligan's testimony, if not eliminate it altogether.  The average person on the street, knowing that the Court had been aware of a potential appearance problem regarding Dr. Gilligan since September 2014, might reasonably question whether that ruling was linked to the desire to avoid having this question publicly aired.

The government wishes to emphasize that it is not suggesting that this Court's ruling was based on any such consideration, as the government strongly believes that the Court's ruling was correct.  But a reasonable person might harbor that suspicion, and that is the relevant inquiry under §455(a).  Moreover, the appearance problem that has been created cannot be avoided; as the government noted in its opening memorandum, if Sampson is sentenced to death following the retrial, successor counsel will assuredly argue that his present counsel provided ineffective assistance by not raising this claim, inasmuch as the Court's ruling on the definition of a mitigating factor affects the entirety of Sampson's case.

Moreover, the appearance problem that has been created impacts central claims that will be raised in both the government's and Sampson's cases-in-chief.  As noted, Dr. Gilligan will be testifying as an expert witness regarding Sampson's claim in mitigation that the prison abuse and trauma he allegedly suffered impacted his mental health, and a reasonable person might suspect that the Court might be predisposed toward Sampson's position after having heard a preview of Dr. Gilligan's testimony at the panel discussion, and given the Court's appraisal that he was one of the world's two leading experts on the subject.  *Compare In re School Asbestos Litigation*, 977 F.2d at 782 ("A reasonable person might suspect that Judge Kelly's plaintiff-subsidized attendance at the 'preview' of the plaintiffs' case would have predisposed him toward the plaintiffs' position.").

The government, for its part, will be basing its claim in aggravation of future dangerousness on the testimony of no less than 10 correctional officers and prison guards, and a reasonable person might suspect that the Court would be dubious of their testimony given the film and Dr. Gilligan's critical assessment of the character of prison guards.  Nor does the fact that this case will be tried to a jury alter this conclusion, as "section 455 properly makes no distinction between jury and nonjury trials" and this Court "will doubtlessly be called upon to make numerous rulings on the qualification of witnesses and on evidentiary matters, not to mention post-trial motions."  *Id.*  Indeed, this Court has indicated that it might conduct a *voir dire* of the government's witnesses regarding the claim of future dangerousness before allowing them to testify.  D.E.1991.  That puts into sharp focus the appearance problem that has been created in this case.  Among other things, Dr. Gilligan described the "out-of-control violence" committed by prison guards, said that he receives calls "every week from all over the country regarding atrocities committed in our prisons," and said that "the fact is, throughout this country,

17

correctional officers are committing murders of inmates, for which they are very seldom prosecuted or convicted, often because of the blue wall of silence" and because "relevant evidence disappears at the time of trial." Panel Rec.I at 9:30-10:30. The average person on the street might reasonably question whether the Court's assessment of the credibility of correctional officers and prison guards, its decision whether to allow those witnesses to testify, and its decision as to the scope of any such testimony would be impacted by the film or Dr. Gilligan's remarks at the panel discussion.

## CONCLUSION

For these reasons and those set forth in the government's opening memorandum, this Court should recuse itself from this case under §455(a) because the average person on the street, fully informed of the facts, might reasonably question the Court's impartiality.

<div style="margin-left:40%">

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:   /s/ *Mark T. Quinlivan*
ZACHARY R. HAFER
DUSTIN CHAO
MARK T. QUINLIVAN
Assistant U.S. Attorneys

MICHAEL S. WARBEL
DOJ Trial Attorney

</div>

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

/s/ *Mark T. Quinlivan*
MARK T. QUINLIVAN
Assistant U.S. Attorney

Date:  August 8, 2015