UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                            )
            v.              )       Cr. No. 01-10384-MLW
                            )
GARY LEE SAMPSON            )

MEMORANDUM AND ORDER REGARDING RECUSAL

WOLF, D.J.                                      September 8, 2015

TABLE OF CONTENTS

I.    SUMMARY ................................................... 2

II.   THE APPLICABLE STANDARDS ................................ 17

III.  THE FACTS .............................................. 25

  A. The Pretrial Proceedings, Trial, and Sentencing ......... 25

  B. The §2255 Proceedings ................................... 28

  C. The  Proceedings  to  Prepare  for  a  Second  Sentencing
  Hearing ................................................... 33

  D. The July 27, 2014 Program ............................... 41

  E. The Matters Following the July 27, 2014 Panel ........... 54

IV.   ANALYSIS ............................................... 63

  A. My Recusal is Not Required .............................. 64

    1. My Role Concerning the DeFriest Panel Could Not Cause a
    Reasonable Person to Question My Impartiality ............. 64

    2. The Added Fact that Dr. Gilligan Had Submitted an
    Affidavit in 2010 Could Not Cause a Reasonable Person to
    Question My Impartiality ................................. 79

    3. The Added Fact that Dr. Gilligan is a Prospective Witness
    at the Retrial Could Not Cause a Reasonable Person to
    Question My Impartiality ................................. 84

  B. Comparison with Other Cases ............................. 90

  C. The Interest of Heightened Reliability in a Capital Case Does
  Not Make Recusal Necessary or Appropriate ................. 101

  D. Recusal Could Encourage the Reasonable Public Perception that
  the System Can Be Manipulated to Obtain a Preferable Judge . 104

V.    CONCLUSION ............................................ 113

VI.   ORDER ................................................. 114

I.  SUMMARY

The government has moved for my recusal because, on July 27, 2014, I moderated a panel that included Dr. James Gilligan.  In June 2015, I learned that defendant Gary Sampson had recently decided to retain Dr. Gilligan as a potential expert witness at the retrial to determine Sampson's sentence in this capital case. I immediately began discussing with the parties whether there is a proper basis for my recusal under 28 U.S.C. §455. The government acknowledges that despite my association with Dr. Gilligan, I remain impartial and that my recusal is not required by §455(b)(1). The government argues, however, that a reasonable person could question my impartiality and, therefore, my recusal is necessary under §455(a).  It does not wish to waive that alleged ground for recusal as permitted by 28 U.S.C. §455(e).  Sampson opposes the government's motion for my disqualification.

For the reasons summarized below, and discussed in detail in this Memorandum, I find that a reasonable person aware of all the relevant facts could not question my impartiality.  Therefore, the government's motion is being denied.

As discussed more fully in §II, infra, 28 U.S.C. §455(a) requires that a judge "disqualify himself in any case in which his impartiality might reasonably be questioned."  Because the issue is only one of an appearance of partiality, a party may waive a

2

ground for recusal under §455(a). See 28 U.S.C. §455(e). In contrast, a party may not waive a ground for recusal under §455(b), which requires disqualification in all cases in which the judge is actually biased or prejudiced. See 28 U.S.C. §455(e).

Section 455(a) issues must be analyzed from the perspective of an objective, knowledgeable member of the public, rather than from the perspective of a person involved in or directly affected by the case. The test asks whether a reasonable person, fully informed of all of the facts, would doubt the judge's impartiality. Under §455(a), recusal is required even when the judge lacks actual knowledge of facts that would cause a reasonable person to question his impartiality if that reasonable person, knowing all of the circumstances, would expect the judge knew those facts.

With regard to §455(a), the presumption is that a judge will impartially apply the law, as required by his or her oath. Therefore, the First Circuit has explained:

§455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. . . . [A] high threshold is required to satisfy this standard. Thus, under §455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

3

In re United States, 158 F.3d 26, 34 (emphasis added) (quoting Liteky v. United States, 510 U.S. 540, 557-58 (1994) (Kennedy, J., concurring)).

The "high threshold" for disqualification under §455(a), id., is necessary because the disqualification decision must reflect both the need to promote public confidence in judicial proceedings and also the need to prevent even the appearance that parties can too easily obtain the disqualification of an impartial judge to get a preferable judge. See In re Bulger, 710 F.3d 42, 47 (1st Cir. 2013). This standard also seeks to assure that judges will not misuse §455(a) to avoid presiding in difficult or controversial cases, or to avoid possible appellate review.

In this case, a fully informed, reasonable person would know the following. In 2004, I sentenced Sampson to death pursuant to a jury verdict. In affirming that sentence, the First Circuit wrote that I had "handled the case patiently and sensitively." United States v. Sampson, 486 F.3d 13, 51 (1st Cir. 2007). It concluded that I had conducted the sentencing proceedings "fairly and with scrupulous attention to the process required by law." Id. at 52.

In 2011, I vacated Sampson's sentence because of juror misconduct. In 2013, the First Circuit affirmed that decision. This case was returned to me for a new proceeding to determine Sampson's sentence.

4

In July 2014, while on vacation, I helped organize and moderated a program on a film concerning a prisoner in Florida, The Life and Mind of Mark DeFriest, which had been produced by a young friend, Gabriel London. As discussed in §IV.A.1, infra, my role in the DeFriest program was not a manifestation of a special interest in issues relating to prisons and prisoners. Rather, it was an example of the wide range of programs I have organized or participated in, often with young people.

I arranged for Professor Alan Dershowitz, with whom I had taught at Harvard Law School, to be a panelist. I also agreed to Mr. London's request to include Dr. Gilligan on the panel. I did not then realize that Dr. Gilligan had, in 2010, filed an expert affidavit as part of a voluminous Amended Petition for a new sentencing trial for Sampson.[1] However, for the purpose of the motion for my recusal, I assume that a knowledgeable reasonable person could believe I knew that he had done that. However, such a person would also know that, as of July 2014, Dr. Gilligan had not been retained by Sampson to testify as an expert at the retrial.

---

[1] The Amended Petition, in which Dr. Gilligan was referenced, was 252 pages. It was supported by more than 1100 pages of exhibits. Dr. Gilligan's affidavit was, in effect, the 194th exhibit. I did not reference or rely upon Dr. Gilligan's affidavit in deciding to grant a new trial on the issue of juror misconduct to which Dr. Gilligan's affidavit did not relate.

The DeFriest film is about the experience of a particular prisoner. The film essentially seeks to make a case for DeFriest's parole. It depicts him as allegedly having a mental illness, possibly caused by brain damage, exacerbated by prolonged solitary confinement and violence in prison, including by prison guards. The film does not mention Sampson or this case. However, Sampson proposes to introduce at retrial evidence from several experts that he is mentally ill, has brain damage, and has been subject to violence in prison.

I invited Mr. London and Dr. Gilligan to have supper with my wife and me at our rental home before the film and program on July 27, 2014. In the approximately one hour that Dr. Gilligan, Mr. London, and I were together, the talk was almost exclusively social. I did, however, tell Mr. London and Dr. Gilligan about the organization of the panel, and asked Dr. Gilligan how he would like to be introduced. There was no discussion of Sampson, this case, or the death penalty.

On July 27, 2014, not realizing that Dr. Gilligan had filed an affidavit in 2010, I nevertheless wanted to ensure that my role in moderating the panel would not be misunderstood. Therefore, after the film was shown, I began the program by explaining that I was a federal judge and my participation should not be construed as an endorsement of the case for DeFriest's parole, as an expression of my views on any of the issues raised by the film, or

6

as a comment by me on any other case or issue, including the death penalty, as to which DeFriest makes a brief, pejorative reference in the film.

Dr. Gilligan spoke about how the United States prison and mental health systems are "broken."  He expressed the view that violence in prisons, including violence by guards, is out of control and makes inmates more prone to violence.  Dr. Gilligan also said that treatment in the right environment can end the pattern of violence by even prisoners with a long history of violence.  He also criticized politicians for lacking the will to deal with these issues.  Professor Dershowitz joined in that criticism.  Neither Dr. Gilligan nor anyone else made any reference to Sampson or this case.

Before taking questions from the audience, I noted that the panelists had expressed "strong views."  I added that I did not "mean to sound timid, but it was not my role as moderator to express my own."  I stated that I did not necessarily agree with everything that Professor Dershowitz or Dr. Gilligan had said, but it was valuable for citizens in our democracy to hear about the issues being discussed.

I concluded the program by asking the audience to applaud Mr. London for making the film; the panelists, "Alan" and "Jim," who were "literally like the two world's leading experts on this

7

issue"; and the other members of the audience for spending part of their vacation watching a film about a prisoner.

In October 2014, I discovered that Dr. Gilligan had filed an affidavit in 2010.  In reviewing Sampson's budget submissions, I learned that Sampson did not plan to have Dr. Gilligan testify at the retrial.  After consulting another judge, I decided that a reasonable person could not possibly question my impartiality because of my limited association with Dr. Gilligan in 2014. Therefore, I did not discuss the DeFriest program with the parties. Instead, after Sampson's counsel confirmed that they did not intend to call Dr. Gilligan as a witness, I continued to focus on hearing Sampson's motions to dismiss and addressing the innumerable other matters to be resolved before the retrial, which was then scheduled for February 2015.

I subsequently granted Sampson's motion for a continuance and rescheduled the retrial for September 16, 2015.  On June 19, 2015, I learned that Sampson was seeking funding to have Dr. Gilligan testify as an expert in place of another witness who had become unavailable.  I immediately disclosed and began discussing the implications of the DeFriest program with the parties.   The following week, I obtained and provided to the parties the DeFriest film and a video of the panel that did not include all of my opening remarks, and conducted two hearings. The government agreed that I was not biased or prejudiced and, therefore, that my recusal

was not required under §455(b).  It requested and received several weeks to investigate whether my recusal was required by §455(a). The government asserted that it would never waive any such ground for recusal under §455(e).

The government's investigation--by the First Assistant United States Attorney, the Federal Bureau of Investigation ("FBI"), the Internal Revenue Service, and the Massachusetts State Police-- confirmed the facts that I had disclosed concerning the DeFriest program.  On July 16, 2015, the government reiterated that it does not allege that I am actually biased or prejudiced.  However, it moved for my recusal under §455(a), arguing that a reasonable person could question my impartiality.  Sampson has opposed that motion.

After careful consideration, I find that a reasonable person fully informed of the relevant facts could not question my impartiality in this case based on my participation in the DeFriest program.  Judges are encouraged to engage in activities to educate the public on issues relating to the administration of justice as long as those endeavors do not interfere with their duty to be, and reasonably appear to be, impartial.  See Code of Conduct for United States Judges, Canon 4 & cmt. (U.S. Courts Mar. 2014) ("Code of Conduct").  The issues concerning prisons that are raised by the DeFriest film in the context of a particular prisoner are of public concern.

9

As discussed in §IV.A.1, a reasonable, fully informed person could not question my impartiality based on my role in the program concerning the DeFriest film.  The film makes no reference to Sampson.  The issues discussed in the film and by the panel are related to Sampson's case only at a high level of generality.  I acted only as a moderator of the panel.  I repeatedly stated that I was not expressing my own opinions on DeFriest, or any case or subject, and that I did not agree with everything the panelists said.  In light of these facts, a reasonable person could not question my impartiality because I organized, promoted, and moderated the panel.

The additional fact that Dr. Gilligan had been previously involved in this case does not alter this conclusion, as explained in §IV.A.2.  At the time of the program, I did not realize that Dr. Gilligan had filed an affidavit in connection with Sampson's Amended Petition for a new trial.  However, assuming for present purposes that I was fully informed and knew that Dr. Gilligan had been involved in this case previously, based on the record in July 2014 I also would have known that he had not been retained to testify at the retrial.  During the DeFriest program, Dr. Gilligan made general statements about prison violence that are similar to statements contained in his 2010 affidavit.  However, he did not mention Sampson, either at my house or during the panel. Furthermore, I expressly stated during the program that my role

10

was to moderate the discussion, and that my participation should not be construed as an expression of my views on any of the issues raised by the film, or as a comment on any other case or issue. In July 2014, a knowledgeable, reasonable person could not have questioned my impartiality because I moderated the DeFriest panel, which included a person who had, four years earlier, filed an affidavit and would have no further involvement in this case.

As explained in §IV.A.3, the fact that Dr. Gilligan has recently become a potential witness also does not alter this conclusion.[2] I am now acquainted with Dr. Gilligan, have participated in the DeFriest program with him, and have characterized him as one of the "two world's leading experts." While Dr. Gilligan and I are merely acquainted and are not friends, ordinarily even a judge's friendship with a prospective witness does not require a judge's recusal under §455(a). See United States v. Salemme, 164 F. Supp. 2d 86, 92-93 (D. Mass. 1998) ("Salemme II"); United States v. O'Brien, 18 F. Supp. 3d 25, 34-35 (D. Mass. 2014). Dr. Gilligan discussed some issues that may be of general relevance to mitigating factors on which Sampson

---

[2] I am, for present purposes, assuming that Dr. Gilligan will be a witness at retrial. However, as discussed in §III, infra, in response to a June 27, 2015 Order, Sampson's counsel did not "categorically commit[]" to calling him to testify. D.N. 2011 at 1. Rather, they have stated that "at this time Dr. Gilligan continues to be a witness Mr. Sampson may seek to present at the trial of this matter." Id.

intends to present evidence, but neither he nor anyone else discussed Sampson. Therefore, I did not receive a preview of what would have to be the heart of any admissible testimony that Dr. Gilligan may have--evidence about Sampson himself. Furthermore, during the program I stated that I did not necessarily agree with everything that Dr. Gilligan had said. A fully informed, reasonable person who is aware of these facts could not believe that, as a result of the DeFriest program, I "harbor[] an aversion, hostility, or disposition of a kind that a fair-minded person could not set aside" in any decision I must make concerning Dr. Gilligan's proposed testimony or any other matter. See United States v. Snyder, 235 F.3d 42, 48 (1st Cir. 2000) (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring)). Rather, such a reasonable person would believe that I will continue to obey my oath to apply the law impartially in deciding matters in this case. Therefore, the "high threshold" for recusal under §455(a) has not been met. See In re United States, 158 F.3d at 34 (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring)).

This conclusion is not altered by the need for heightened reliability in capital cases. As discussed in §IV.C, infra, the First Circuit, among others, has noted that vacating an unbiased judge's decisions is not likely to be appropriate even if it is later determined that there was a reasonable appearance that he was not impartial. See In re Bulger, 710 F.3d at 49 n.3; In re

12

Allied-Signal Inc., 891 F.2d 967, 972-73; In re Sch. Asbestos
Litigation, 977 F.2d 764, 786-87 (3d Cir. 1992).  Accordingly, I
conclude that my recusal is not required.

Recusal in these circumstances, where the government has not
shown that a reasonable person could question my impartiality,
could encourage the reasonable, and harmful, appearance that a
party can successfully convert §455(a) into a vehicle for judge
shopping.  As then-Judge Stephen Breyer explained:

> [In judging a motion for recusal under §455(a),] the district
> court is not to use the standard of "Caesar's wife," the
> standard of mere suspicion.  In re United States, 666 F.2d
> [690,] 695 n.*[ (1st Cir. 1981)].  That is because the
> disqualification decision must reflect not only the need to
> secure public confidence through proceedings that appear
> impartial, but also the need to prevent parties from too
> easily obtaining the disqualification of a judge, thereby
> potentially manipulating the system for strategic reasons,
> perhaps to obtain a judge more to their liking.

In re Allied-Signal, 891 F.2d at 970; see also In re Bulger, 710
F.3d at 47 ("The recusal standard must be more demanding" to
prevent parties from judge shopping.).

Several aspects of the history of this case implicate this
interest of not encouraging a reasonable public perception that
parties will benefit by too easily obtaining the disqualification
under §455(a) of an admittedly impartial judge.

The government's inconsistent position regarding recusal
issues in this case could suggest strategic motivations.  A
reasonable, fully informed person would know that my association

13

with the lead prosecutor in this case, Zachary Hafer, is greater than my association with Dr. Gilligan.  I attended Mr. Hafer's wedding, hosted him and his wife in my home, successfully recommended both of them for jobs (including Mr. Hafer's present position as a federal prosecutor), and publicly praised Mr. Hafer as having experience and qualities comparable to some of the finest prosecutors with whom I had worked.  In 2010, when Mr. Hafer first appeared in this case, the government represented that my recusal was not required under §455(a) because no reasonable person could question my impartiality and, in any event, waived any ground for my recusal under §455(e).

It was not until I vacated Sampson's death sentence and the First Circuit affirmed that the government suggested I should recuse myself because of my association with Mr. Hafer.  See Sampson 12 F. Supp. 3d 203, 212 (D. Mass. 2014).  I declined to disqualify myself in part because recusal could encourage the reasonable perception that §455(a) can be abused to have an impartial judge replaced for strategic reasons.  Id.[3]

---

[3] In addition, as described in §IV.A.1, infra, in 2010, I participated in a program at the Boston Police Academy with John Wortmann, Jr., who was then the lead prosecutor in this case.  In addition, in 2010, Mr. Wortmann served on a committee I chaired to plan a program on gang violence in Boston.  Neither I, Mr. Wortmann and his colleagues, nor anyone else raised a question of whether these activities required my recusal under §455(a) in this case or any other.

14

The government's present motion also implicates the interest of not encouraging a reasonable public perception that parties can succeed in using §455(a) to engage in strategic judge-shopping. As described earlier, in finding that the 2003 trial to determine Sampson's sentence was fair, the First Circuit wrote that I "handled the case patiently and sensitively." Sampson, 486 F.3d at 51. It concluded that "the sentencing proceedings in this case were conducted fairly and with scrupulous attention to the process required by law." Id. at 52. As I said when I sentenced Sampson to death in 2003, providing that fair trial "required making decisions that I understand were painful to the victims' families, but which were legally necessary and appropriate." Sampson, 300 F. Supp. 2d at 277.

Nevertheless, at Sampson's sentencing in 2003, the father of one of Sampson's victims expressed "outrage" at my conduct of the trial. See Jan. 29, 2004 Tr. at 7 (D.N. 775). This outrage was reported to have been expressed again when I vacated Sampson's sentence because misconduct by a juror had violated Sampson's constitutional right to a fair trial. See O'Ryan Johnson and John Zaremba, Judge blasted for killer flip, Boston Herald, Oct. 21, 2011 (D.N. 2046-3 at 18-19). In 2014, after I discussed the possibility of ordering that Sampson's competency to stand trial be evaluated, the media reported that the same individual called my "actions 'infuriating' and said he was trying to take steps to

15

have the judge removed from the Sampson case." See Chris Burrell, Families of murderer Gary Sampson's victims distressed by latest ruling from judge, The Milford Daily News, Mar. 19, 2014 (D.N. 2046-6 at 1-2). This desire for my disqualification has recently been reiterated. See Milton Valencia, Recusal call clouds Gary Sampson case, Boston Globe, August 31, 2015, at A1.[4]

For the reasons described in detail in this Memorandum, after careful consideration I have concluded that no reasonable person could believe that as a result of my participation in the DeFriest panel I now have a "disposition of a kind that a fair-minded person could not put aside when judging" in this case. Snyder, 235 F.3d at 48 (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring)). Recusal in the current circumstances would be incompatible with my duty to be sensitive to the "need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." In re Allied-

---

[4] Relatives of Sampson's victims may understandably be frustrated by the complicated process that the law requires in every capital case and by the ponderous progress of this one. I recognize and respect the right of Sampson's victims to have and express their views, including to the media. Ordinarily, there would be no reason for me to reference criticism of my judicial conduct and I would not do so. However, such criticism is relevant to whether my recusal could encourage the reasonable perception that §455(a) can be abused to replace an impartial judge with another that a party may prefer.

16

Signal, 891 F.2d at 970.  It would also be inconsistent with my duty not to misuse §455(a) to avoid presiding in a difficult and controversial case.

The parties and I have devoted much of the past two years to preparing for what Sampson represents would have been the fastest retrial of a federal capital case in history.  I had established an intensive schedule for submissions, hearings, and decisions in August and September 2015 to prepare for a September 16, 2015 retrial.  More than two months have now been devoted to the government's investigation, the parties' briefing, and my deciding the government's motion for my recusal, rather than to resolving the many other pretrial issues that were on the agenda.  Therefore, it will not be possible to begin the retrial as scheduled before a judge the parties each acknowledge is actually impartial.

While I have been obligated to decide the government's motion, I may not be the ultimate arbiter of its merit.  I am providing the government until October 13, 2015, to state whether it intends to seek review of my decision by the First Circuit.  It will not be possible to establish a new schedule for the retrial until the motion for my recusal is finally resolved.

II.  THE APPLICABLE STANDARDS

As explained earlier, the government has repeatedly stated that it does not assert that I am actually biased or prejudiced as a result of my role in the program concerning The Life and Mind of

Mark DeFriest.  See, e.g., D.N. 2025 at 28 ("The government wishes
to emphasize once again that it is not suggesting that the Court
actually harbors any bias or prejudice based on the events of July
2014.").   The government also does not contend that I have any
personal knowledge of disputed evidentiary facts relating to
Sampson as a result of my role in that program.  Therefore, it has
not moved for my disqualification under 28 U.S.C. §455(b)(1), which
prohibits a judge from presiding in a case if "he has a personal
bias or prejudice concerning a party, or personal knowledge of
disputed evidentiary facts concerning the proceeding."

Rather, the sole basis for the government's motion is 28
U.S.C. §455(a), which states that a judge "shall disqualify himself
in any proceeding in which his impartiality might reasonably be
questioned."  Section 455(a) is based on the premise that in some
circumstances "a reasonable person may question impartiality
without the presence of any evidence that a judge is subjectively
biased."  In re Bulger, 710 F.3d at 46.

It is the duty of the presiding judge, rather than another
judge, to decide whether his disqualification is required by
§455(a).  See In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir.
1997).  As the First Circuit has explained:

> It might seem odd that recusal issues should be decided
> by the very judge whose recusal is in question.  But
> there are other considerations at work, including a
> desire for expedition and a concern to discourage judge
> shopping.

Id.; see also Salemme II, 164 F. Supp. 2d at 92-93.

In 1989, then-Judge Stephen Breyer wrote with regard to a motion to disqualify under §455(a) that:

> We draw our legal standards for review of a district judge's decision not to disqualify himself from []In re United States, 666 F.2d [690]. We there held (1) that "a charge of partiality must be supported by a factual basis," (2) that "disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality," and (3) that this court of appeals will allow the district judge "a range of discretion" in making these determinations. Id. at 695 (emphasis in original). Only if the district court's decision to sit "cannot be defended as a rational conclusion supported by reasonable reading of the record" will we insist upon disqualification. Id. (emphasis added).

In re Allied-Signal, 891 F.2d 967, 970 (1st Cir. 1989).

The standard for determining a motion for disqualification under §455(a) is "[w]hether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily in the mind of the litigant filing the motion under 28 U.S.C. §455, but rather in the mind of the reasonable man." United States v. Voccola, 99 F.3d 37, 42 (1st Cir. 1996) (quoting United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976)). Therefore, the disqualification issues must be analyzed from the perspective of "an objective, knowledgeable member of the public," rather than from the perspective of a person involved in,

or directly affected by, the case. El Fenix de Puerto Rico v. M/V JOHANNY, 36 F.3d 137, 141 (1st Cir. 1994) (quoting In re United States, 666 F.2d at 695).

This test asks "whether a reasonable person, fully informed of all the facts, would doubt [the judge's] impartiality." In re United States, 158 F.3d at 31 (emphasis added); see also United States v. Vazquez-Botet, 532 F.3d 37, 48 (1st Cir. 2008); El Fenix de Puerto Rico, 36 F.3d at 141; Home Placement Service, Inc. v. Providence Journal Co., 739 F.2d 671, 676 (1st Cir. 1984). The proper perspective has been described as that of "the reasonable man on the street . . . who knows the full facts even if those facts are not known on the street." Ricci v. Key Bancshares of Maine, Inc., 111 F.R.D. 369, 374 (D. Me. 1986) (Aldrich, J., sitting by designation).

In deciding a §455(a) motion, a judge's actual lack of knowledge of potentially disqualifying facts is not the end of the inquiry. Rather, "[u]nder section 455(a) [], recusal is required even when a judge lacks actual knowledge of the facts indicating his . . . bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge." Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860-61 (1988) (quoting Health Services Acquisition Corp. v. Liljeberg, 796 F.2d 796, 802 (5th Cir. 1986)).

The conduct that has prompted the motion for recusal is not to be considered in isolation. Rather, the record as a whole must be considered. See In re Cargill, Inc., 66 F.3d 1256, 1260 (1st Cir. 1995) (reviewing recusal in light of "careful perscrutation of the record"); In re Allied-Signal, 891 F.2d at 972 (noting role of clerks whose brothers were plaintiffs' counsel "in bringing Phase One to trial"); cf. United States v. Ayala-Vazquez, 751 F.3d 1, 23 (1st Cir. 2014) ("[W]hen a defendant claims he has been prejudiced through a trial judge's interventions at trial, '[c]harges of partiality should be judged not on an isolated comment or two, but on the record as a whole[.]'" (quoting United States v. Polito, 856 F.3d 414 418 (1st Cir. 1998))).

In addition, when, as here, the issue involves the judge's participation in an educational program, "matters that provide important context for the challenged aspects of the Judge's remarks" must also be considered. United States v. Pitera, 5 F.3d 624, 626-27 (2d Cir. 1993); cf. In re Charges of Judicial Misconduct, 404 F.3d 688, 694 (2d Cir. 2005) (discussing allegations of judicial misconduct against Circuit Judge). That context includes everything the judge said during the program. See Pitera, 5 F.3d at 626-27. The judge's role in other programs with other perspectives is also among the facts that should be considered in determining whether a reasonable person would question his impartiality. Id.; cf. In re Charges of Judicial

21

Misconduct, 404 F.3d at 694; Judicial Conference of the United States, Committee on Codes of Conduct, Adv. Op. No. 105: Participation in Private Law-Related Training Programs (September 2010) ("When speaking to an audience that predominantly includes attorneys or clients on one side of litigation, a judge . . . must be equally available to address the other litigation constituency.").

In deciding a motion to recuse under §455(a), "the district court is not to use the standard of 'Caesar's wife,' the standard of mere suspicion." In re Allied-Signal, 891 F.2d at 970; see also In re Bulger, 710 F.3d at 47 (same); Cigna Fire Underwriters Co. v. MacDonald & Johnson, Inc., 86 F.3d 1260, 1271 (1st Cir. 1996) (same). Rather, as Justice Anthony Kennedy has written, and the First Circuit has reiterated:

> [Section] 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under §455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring in the judgment); see also Snyder, 235 F.3d at 48 (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring in the judgment)); In re United States, 158 F.3d at 34 (same). In essence, "the presumption

22

is that a judge will put personal beliefs aside and rule according to the laws as enacted, as required by his or her oath." In re Aguinda, 241 F.3d 194, 204 (2d Cir. 2001).[5] However, the First Circuit has explained that "doubts ordinarily should be resolved in favor of recusal." In re United States, 158 F.3d at 30.

The "high threshold" required for recusal under §455(a) recognizes certain realities. Id. at 34 (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring)). As the First Circuit has stated, "[i]n the real world, recusal motions are sometimes driven more by litigation strategies than by ethical concerns. . . . [C]ourts cannot afford to spawn a public perception that lawyers and litigants will benefit by undertaking such machinations." In re Cargill, 66 F.3d at 1262-63. Therefore, as then-Judge Breyer wrote:

> [W]hen considering disqualification, the district court is not to use the standard of Caesar's wife, the standard of mere suspicion. This is because "the disqualification decision must reflect not only the need to secure public confidence through proceedings that appear to be impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.

In re Allied-Signal, 891 F.2d at 967; see also In re Bulger, 710 F.3d at 47 (quoting In re Allied-Signal, 891 F.2d at 970)); In re

---

[5] See also First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler, 210 F.3d 983, 988 (9th Cir. 2000) ("[J]udges . . . are presumed to be impartial and to discharge their ethical duties faithfully so as to avoid the appearance of impropriety.").

United States, 441 F.3d 44, 67 (1st Cir. 2006) (same); Cigna Fire Underwriters Co., 86 F.3d at 1270 (same).

In addition, because "litigants have an incentive to judge-shop, [] a judge should not grant a recusal motion simply because a claim of partiality has been given wide-spread publicity." In re Aguinda, 241 F.3d at 206; see also In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1309 (2d Cir. 1988).  Because it is important not to allow, or appear to allow:

> litigants or third parties [the power] to exercise a
> negative veto over the assignment of judges . . . [the]
> inquiry cannot stop with the questions: have a number of
> people thought or said that a judge should not preside
> over a given case? has the judge's failure to recuse
> himself been a subject of unfavorable comment in the
> media? or, would the judge have avoided controversy and
> the need for appellate review if he had stepped aside?

In re United States, 666 F.2d at 694-95.

Moreover, §455(a) "should not be used by judges to avoid sitting on difficult or controversial cases." Snyder, 235 F.3d at 45 (quoting H.R. Rep. No. 1453, 93d Cong., 2d Sess., 1974 U.S. Code Cong. & Admin. News 6351, 6355); see also Salemme II, 164 F. Supp. 2d at 94.

Where, as here, the only basis for a motion for disqualification is §455(a), the parties agree that the judge is actually impartial and the only issue is one of perception. Therefore, after full disclosure of the facts by the judge, on the record, the parties are permitted to waive a §455(a) ground for

recusal under 28 U.S.C. §455(e), but not a ground under §455(b),
which addresses actual impediments to the judge's ability to
preside impartially.[6]  See, e.g., In re Cargill, 66 F.3d at 1261
("The relevant statute, 28 U.S.C. §455(e), plainly contemplates
that a party may waive an appearance-of-impropriety ground for
disqualification."); Salemme II, 164 F. Supp. 2d at 93-94. Such
waivers permit a case to proceed without interruption or delay.

III.  THE FACTS

The facts and other relevant matters that a fully informed,
reasonable person would know include, but are not limited to, the
following.[7]

A.    The Pretrial Proceedings, Trial, and Sentencing

An indictment charging Sampson with two counts of carjacking
resulting in the murders of Phillip McCloskey and Jonathan Rizzo,
in violation of 18 U.S.C. §2119, was returned on October 24, 2001.
After he murdered Mr. McCloskey and Mr. Rizzo, Sampson also
murdered Robert Whitney in New Hampshire.  The case was randomly
assigned to me.  The Attorney General subsequently authorized the

---

[6] 28 U.S.C. §455(e) states: "No justice, judge, or magistrate judge
shall accept from the parties to the proceeding a waiver of any
ground for disqualification enumerated in subsection (b).  Where
the ground for disqualification arises only under subsection (a),
waiver may be accepted provided it is preceded by a full disclosure
on the record of the basis for disqualification."

[7] Additional relevant facts that such a person would know are
included in the discussion of certain issues, infra.

United States Attorney, Michael Sullivan, to seek the death penalty for each alleged offense.

Prior to trial, I denied Sampson's challenges to the constitutionality of the Federal Death Penalty Act, 18 U.S.C. §3591 et seq. See United States v. Sampson, 245 F. Supp. 2d 327 (D. Mass. 2003); United States v. Sampson, 275 F. Supp. 2d 49 (D. Mass. 2003).

Sampson pled guilty on September 9, 2003. Jury selection as to sentencing began September 18, 2003, with potential jurors answering 77 questions in writing under oath. Individual questioning of jurors not excused based on their written responses was conducted over 16 days.

The trial to determine Sampson's sentence began on November 5, 2003. The government was represented by Assistant United States Attorneys Frank Gaziano, George Vien, and John Wortmann, Jr. The trial took six weeks. I made numerous rulings on issues not addressed by First Circuit precedent or, in some instances, by any other jurisprudence. See United States v. Sampson, 335 F. Supp. 2d 166 (D. Mass. 2004).

After deliberating for three days, the jury returned special findings and jury verdicts on December 23, 2003. As required under 18 U.S.C. §3593(e) for a death sentence to be imposed, it unanimously found that Sampson should be executed.

I subsequently denied Sampson's motions for a new trial, among other things. See United States v. Sampson, 332 F. Supp. 2d 325 (D. Mass. 2004). The law concerning the motion for a new trial required me to consider the credibility of the witnesses and to express my evaluation of their testimony on certain matters. See, e.g., United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001). Based in part on a juror's post-verdict statement to the media, Sampson had argued that the jury evidently misunderstood my instructions in unanimously finding that Sampson did not have a mental illness when he murdered Mr. McCloskey and Mr. Rizzo. See Sampson, 332 F. Supp. 2d at 330-31.[8] With regard to that claim, I wrote:

> Where, as here, the court is deciding a Rule 33 motion for a new trial, it may, and indeed must, consider its own evaluation of the credibility of the evidence and it may, in certain limited circumstances, grant a new trial if it disagrees with the jury's judgment. In this case, if the decision were to be made by the court rather than the jury, the court would have found that Sampson at least had a mental illness, bipolar disorder.

Id. (citations omitted). Nevertheless, concluding that reasonable people could differ on this issue, I denied the motion for a new trial. Id. at 330-32.

---

[8] Mental illness was one of 17 alleged mitigating factors that the jury was required to consider.

On January 29, 2004, I sentenced Sampson to be executed.
Before imposing sentence, I said, among other things, to Sampson
that:

> I have made my best effort to give you a fair trial.
> That required making decisions that were painful to the
> victims' families, but which were legally necessary and
> appropriate.

Id. at 277.

Sampson appealed his sentence.  On May 7, 2007, the First
Circuit affirmed the decision that he be executed.  See Sampson,
486 F.3d at 52.  Among other things, the First Circuit stated that,
"[a]lthough this was an emotion-laden trial, the district court
appears to have gone the extra mile to ensure the jury remained
focused on the evidence and free from extraneous influences."  Id.
at 47.  It also wrote that "[t]he district court handled the case
patiently and sensitively."  Id. at 51.  The First Circuit
concluded that: "We are persuaded that the sentencing proceedings
in this case were conducted fairly and with scrupulous attention
to the process required by law."  Id. at 52.

B.    The §2255 Proceedings

On June 25, 2008, as required by 28 U.S.C. §2255 and 18 U.S.C.
§3599, I appointed new counsel to represent Sampson in the post-
conviction proceedings.  Sampson filed a lengthy petition for a

28

new trial under §2255 on May 11, 2009.[9]  That petition was amended
on March 29, 2010 (the "Amended Petition").

The Amended Petition was 252 pages.  It was supported by about
200 exhibits, totaling more than 1100 pages.  The exhibits included
at least 43 affidavits from fact witnesses and seven affidavits
from six expert witnesses.  An affidavit of Dr. Gilligan was, in
effect, the 194th exhibit, preceded by 863 pages of other
exhibits.[10]  See D.N. 1035-200 (Dr. Gilligan's affidavit) (Under
Seal); D.N. 1035-201 (appendices to the affidavit) (Under Seal).

The Amended Petition asserted approximately 21 grounds for a
new trial.  Dr. Gilligan's affidavit was filed in support of Claim
III(E), which alleged that Sampson's original counsel were
ineffective by failing to adequately investigate and present
evidence that Sampson had been abused while in prison before

---

[9] Dr. Gilligan was mentioned on one page in the original petition.
See D.N. 969 at 61 (Under Seal).  He was not mentioned in any
exhibits.  He was mentioned once in the government's motion to
dismiss the original petition.  See D.N. 1007-2 at 80 n.39.  He
was not mentioned in Sampson's opposition or the government's
reply.  See D.N. 1034 (Under Seal), 1050 (Under Seal).

   Dr. Gilligan was mentioned on only one page of Sampson's
budget requests during the several years of the §2255 proceedings.
Specifically, he was listed as a mental health professional who
might be consulted.  See D.N. 925 at 4 (Ex Parte and Under Seal).
No Criminal Justice Act request for compensation was submitted by
Dr. Gilligan or approved by me.

[10] The Amended Petition included 193 numbered exhibits in Volumes
I through IV, followed by lettered exhibits in Volume V.  Dr.
Gilligan's affidavit was identified as Exhibit A, making it, in
effect, the 194th exhibit.

committing the crimes at issue in this case.  See D.N. 1040 at
103-36.  Dr. Gilligan was mentioned or cited on some 15 of the 250
pages of the Amended Petition.  See D.N. 1040 at 105, 106, 113,
115-117 & n.27, 119-22 & n.28, 125, 128-31.  He was mentioned and
cited in the affidavits of two other experts as well.  See D.N.
1035-206 at 3 (Lebowitz Decl. part I) (Under Seal); D.N. 1035-207
at 32, 33, 45 (Lebowitz Decl. part II) (Under Seal); D.N. 1035-
208 at 7, 15, 16, 18, 23 (Woods Decl.) (Under Seal); D.N. 1035-
209, app. B at 1 (records reviewed by Dr. Woods) (Under Seal).

The government filed a 273-page motion for summary dismissal
of the Amended Petition.  See D.N. 1055 (Under Seal).  Dr.
Gilligan's name was included on 8 pages of that submission.  See
id. at 90-91 n. 44, 106, 114, 116-19 & n.54, 56, 121.  The
government stated that "[t]here is no indication that Dr. Gilligan
ever treated Sampson, had any professional dealings with him
whatsoever (the government is aware of no records mentioning
Gilligan), or even knew who he was before Sampson was arrested for
his 2001 killing spree."  Id. at 90-91 n.44.

Sampson filed a 72-page opposition to the government's motion
for summary dismissal of the request for a new trial.  Dr. Gilligan
was mentioned twice.  See D.N. 1060 at 2, 44-45 n.32.  In a

footnote, Sampson stated that "Dr. Gilligan is an expert witness, not a fact witness." Id. at 44-45 n.32.[11]

The government filed a 50-page reply to Sampson's opposition. See D.N. 1066 (Under Seal). Dr. Gilligan was mentioned once. See id. at 3.

I held hearings on the motion to summarily dismiss the Amended Petition on August 30 and 31, and September 1, 2010. Dr. Gilligan was not mentioned in those hearings and, therefore, his name does not appear in the nearly 500 pages of transcripts of them.

On August 31, 2010, I denied the government's request to dismiss summarily Sampson's request for a new trial based on the alleged failure of three jurors to answer questions truthfully during the jury selection process. See United States v. Sampson, 820 F. Supp. 2d 151, 160-61 (D. Mass. 2011). The litigation then focused almost exclusively on the claim of juror misconduct, which was Claim IV of the Amended Petition. Id. I heard testimony on this claim on November 18, 2010, March 18, 2011, and August 8, 2011. Id. at 161.

---

[11] Sampson's §2255 petitions, the government's motions for summary dismissal, Sampson's oppositions, and the government's reply concerning the original §2255 petition were included in the record relating to Claim IV of Sampson's Amended Petition, which alleged that three jurors failed to answer questions truthfully during the jury selection process. See D.N. 1181. The court released the record to the public on April 15, 2011. It is nearly 3900 pages.

I subsequently found that one juror had repeatedly lied, under oath, in response to important questions concerning her ability to be impartial in this case, and would have been disqualified from serving if she had been honest or if her dishonesty had been discovered before the verdict in 2003.  See id. at 181-97. Therefore, I vacated the death sentence.  Id. at 202.  In summarizing the reasons for this decision, I wrote:

> In essence, despite dedicated efforts by the parties and the court to assure the trial would be fair and the verdict final, it has now been proven that perjury by a juror resulted in a violation of Sampson's constitutional right to have the issue of whether he should live or die decided by 12 women and men who were each capable of deciding that most consequential question impartially.
>
> * * *
>
> It has now been proven that Sampson did not receive the fair process that the Constitution guarantees every man no matter how despicable his conduct.

Id. at 159-60.

On October 20, 2011, I also issued a second lengthy decision, granting the government's motion to summarily dismiss some of Sampson's claims for a new trial and denying it with regard to others.  See United States v. Sampson, 820 F. Supp. 2d 202 (D. Mass. 2011).  Among the claims I did not dismiss were the assertions that Sampson's original counsel were ineffective because they failed to adequately investigate possible brain damage, id. at 242-45, and failed to request an evaluation of

32

whether Sampson was competent to stand trial, id. at 245-47. Dr. Gilligan was not mentioned in that decision.

On May 10, 2012, over Sampson's objection, I exercised my discretion to authorize an immediate appeal of my decision vacating Sampson's death sentence. See United States v. Sampson, 58 F. Supp. 3d 136 (D. Mass. 2012).

On July 12, 2013, the First Circuit affirmed that decision. See United States v. Sampson, 724 F.3d 150 (1st Cir. 2013). It wrote that, "[t]he district court's meticulous fact finding brought to light a litany of lies told by [the juror] during voir dire." Id. at 161. The First Circuit characterized this case as "a stark reminder of the consequences of juror dishonesty." Id. at 169. It held that "we conclude--as did the district court-- that the death sentence must be vacated and a new penalty phase hearing undertaken." Id.

## C.   The Proceedings to Prepare for a Second Sentencing Hearing

On November 15, 2013, the First Circuit returned this case to the district court. On November 29, 2013, I ordered the parties to confer and report on various issues before a scheduling conference was held. See D.N. 1255. I explained that, in view of Sampson's claim that his original counsel were ineffective because they did not move to have his competency to stand trial evaluated

33

in 2003, I intended to address whether it was appropriate to have his competency evaluated before the retrial. Id. at 3-4.

By 2013, two of the three prosecutors who had tried this case in 2003 had left the United States Attorney's office. On December 2, 2013, the government filed an assented-to motion to withdraw of the third, Mr. Wortmann, because of family health issues. See D.N. 1257. Mr. Wortmann had, in effect, been serving as lead counsel for the government in the §2255 proceedings. As more fully described in §IV.A, infra, Mr. Wortmann and I had both spoken at a December 7, 2010 training program at the Boston Police Academy. See September 8, 2015 Order Concerning Evidence Referenced in Memorandum and Order Regarding Recusal, Ex. F ("Add'l Evid. Order"). Mr. Wortmann had also served on a committee that I chaired to develop a June 15, 2010 program, which I moderated, at the courthouse on "Rwanda, Darfur, and Youth Violence in Boston." See id., Ex. E.

The motion concerning Mr. Wortmann stated that "the government [would] continue to be represented by [Assistant United States Attorneys] Zachary Hafer and other members of [the United States Attorney's Office]." See D.N. 1257 at 1.

Mr. Hafer had filed an appearance in this case in 2010. On August 23, 2010, I issued a Memorandum and Order: describing my relationship with him; expressing the tentative view that my recusal was not required by 28 U.S.C. §455(a), as interpreted in

34

In re Allied-Signal; and requesting the advice of the parties on this issue. See Sampson, 12 F. Supp. 3d 203 (D. Mass. 2014); D.N. 1070, 1075-1. As I wrote in 2010:

> Mr. Hafer is married to [NAME REDACTED]. [HIS WIFE'S]
> father, [NAME REDACTED], and I practiced law together in
> the firm of Sullivan and Worcester from 1977 to 1981.
> We have remained friends. I met Mr. Hafer in 2002, when
> I spoke at a class at the University of Virginia Law
> School in which [HIS WIFE] and he were enrolled. In about
> 2003 or 2004, at the invitation of the [WIFE'S] family,
> I attended Mr. Hafer's wedding, and my wife and I
> undoubtedly gave the couple a gift.  I have also
> occasionally given [HIS WIFE] and Mr. Hafer, among many
> others, career advice, including concerning their
> respective interests in becoming prosecutors.  In
> response to a question from the United States Attorney
> and/or one of his Assistants, I recommended Mr. Hafer's
> appointment as an Assistant United States Attorney.
> Pursuant to my usual practice as Chief Judge, I presided
> at the ceremony at which Mr. Hafer was sworn-in as an
> Assistant United States Attorney.  I may have also
> supported [HIS WIFE'S] appointment as an Assistant
> District Attorney [IN MASSACHUSETTS], following her
> service as a prosecutor in Manhattan.  In addition, in
> about June, 2010, I recommended [MR. HAFER'S WIFE] for
> a part-time teaching position at [A LOCAL LAW SCHOOL]
> and am informed that she has been given that position.

D.N. 1075-1 at 1-2 (redactions in original); Sampson, 12 F. Supp.3d at 209-10.

When I swore Mr. Hafer in as an Assistant United States Attorney, I said, in part, that he had "qualities that characterize[d] some of the fine prosecutors I worked with, like Bob Mueller, the present Director of the Federal Bureau of Investigation, Bob Cordy, now a distinguished judge of the Massachusetts Supreme Judicial Court . . . , and John Pappalardo,

35

a former acting United States Attorney . . . ."  See Add'l Evid.
Order, Ex. G at 8-9.  In January 2014, Mr. Hafer reminded me that
he and his wife had also come to my home in about 2008 to discuss
career opportunities for his wife.  See Sampson, 12 F. Supp. 3d at
210 n.4.

On August 23, 2010, the day I issued my Memorandum and Order
concerning Mr. Hafer, the government filed a written response,
stating that: it did not believe that my recusal for actual bias
or prejudice was required under 28 U.S.C. §455(b); it did not
believe that a reasonable person could question my impartiality,
and, therefore, it did not believe that recusal was justified under
§455(a); and, in any event, it waived any objection under §455(e).
See D.N. 1073.  On August 25, 2010, Sampson responded by agreeing
with the views stated by the government and also waiving any
objection to my participation under §455(e).  See D.N. 1077.

Nevertheless, on December 7, 2013, the government suggested
that I should recuse myself, in part because Mr. Hafer had become
the lead prosecutor and in part because it interpreted In re Bulger
as substantially expanding the circumstances in which recusal is
required under §455(a).  See D.N. 1263 at 7-9; see also Sampson,
12 F. Supp. 3d at 204-05.

On January 21, 2014, after discussion with counsel, I
explained my view that In re Bulger did not alter the jurisprudence
concerning §455(a), a reasonable person would not question my

36

impartiality based on my association with Mr. Hafer, and my recusal was not justified. See Sampson, 12 F. Supp. 3d at 205-13. However, because these views were developed without the benefit of briefing by the parties, I offered them an opportunity to file a motion seeking my recusal. Id. at 212-13. Neither party did so. See id. at 213 n.7.

As requested by the government, pursuant to §455(e), Sampson, through counsel and personally, waived any objection to my continued participation in this case based on my relationship with Mr. Hafer. See D.N. 1077; D.N. 1268 at 2-4; D.N. 1345-1; D.N. 1758 at 9-12.

After deciding that my recusal was not justified, and receiving an affidavit from Mr. Wortmann, I allowed him to withdraw his appearance. See D.N. 1293.[12]

On January 15, 2014, Sampson's counsel filed, ex parte and under seal, a 54-page Proposed Pretrial Litigation Budget, with more than 40 pages of exhibits. See D.N. 1271 (Under Seal). The proposed budget requested authority to pay about 12 experts, and mitigation specialists and attorneys as well. On page 46, the proposed budget requested five hours of funding for Dr. Gilligan to consult with another expert Sampson intended to use at trial

---

[12] I subsequently met with Mr. Wortmann. We did not discuss the Sampson case. However, he told me about a book his son had written and I bought a copy.

37

instead of Dr. Gilligan. See D.N. 2001-1 at 4. As explained earlier, in 2010 Sampson had stated that Dr. Gilligan was solely an expert witness and, therefore, it was necessary for the court to approve funding for his services pursuant to 18 U.S.C. §3599(f) and (g). In the January 15, 2014 submission, he was also characterized as a fact witness. Id. Dr. Gilligan was mentioned on three other pages of the proposed budget. See D.N. 1271 at 44 (stating that "Dr. Gilligan is a prison trauma expert [from] the 2255 proceeding who gave a supporting declaration"), 45 (stating that another doctor will "build upon" Dr. Gilligan's work"), 52 (including, in a chart, the number of hours requested for Dr. Gilligan, his hourly rate, and the total cost to retain him).

At a January 21, 2014 conference with Sampson's counsel, I declined to approve the proposed budget because it was too general. See D.N. 1295, at 11 (Ex Parte and Under Seal); see also D.N. 1275, ¶11. Instead, I ordered that proposed budgets be provided for the case in phases. Dr. Gilligan was not mentioned at that conference.

In early 2014, the government requested a February 17, 2015 date for the commencement of the retrial to determine Sampson's sentence. Sampson's counsel argued that it would be impossible for them to be prepared for trial by that date. They asserted that it was premature to set any trial date and requested, in any event, that the retrial not begin before the fall of 2015. On March 18, 2014, I scheduled the retrial to begin on February 17,

2015, and stated that I would extend that date if despite industrious efforts it would not be fair or feasible to begin then. See United States v. Sampson, 68 F. Supp. 3d 233, 236-37 (D. Mass. 2014); D.N. 1329 at 89.

At the March 18, 2014 hearing, I also discussed the possibility of ordering that Sampson's competency to stand trial be evaluated promptly in order to get the issue, which had been raised in the Amended Petition for a new trial, resolved far in advance of the February 2015 trial date.

In 2014, I issued many orders, received many submissions, and conducted many hearings with a view toward preparing the case for a retrial to determine Sampson's sentence as soon as reasonably possible.

Sampson made so many lengthy filings that the government in November 2014 moved to deny his counsel fees for "the unnecessary and meritless motions and pleadings they have filed since the commencement of this re-trial." See D.N. 1633 at 1. More specifically, the government wrote:

> To date, Sampson's unreasonable filings have included, but are not limited to: (i) over 25,000 pages of "constitutional" motions, memoranda, and attachments, comprising over 850 entries on the docket, in which Sampson has comprehensively briefed settled issues of law and filled the docket with irrelevant documents; (ii) over 400 pages of legal memoranda, accompanied by many hundreds more pages in attachments, in which Sampson has claimed he does not have enough time to meet court-imposed deadlines; and (iii) motions unsupported by any factual or legal basis, often characterized by

39

extensive "cutting and pasting" from prior filings, such as Sampson's motion to disqualify government team members.

Id. at 2.  On June 23, 2015, Mr. Hafer correctly characterized the record of this case as "beyond voluminous."  See D.N. 1984 at 13.

Among Sampson's lengthy submissions was an April 11, 2014 52-page proposed budget, with about 30 pages of exhibits, which, on page 50, mentioned Dr. Gilligan once.  See D.N. 2001-1 at 4.  The proposal indicated that Dr. Gilligan would not be a witness at the retrial, stating that, "Dr. [A] will require some time . . . to . . . consult with Dr. Gilligan to build upon his work . . . ."  Id.

On May 28, 2014, Sampson filed a motion to disqualify the government trial team, arguing, in part, that the prosecutors were impermissibly aware of information presented in the Amended Petition for a new trial, which, as explained earlier, was 250 pages and supported by more than 1100 pages of exhibits.  Many investigators and experts were referenced in Sampson's 19-page memorandum, which was supported by approximately 14 pages of exhibits.  See D.N. 1357 and 1357-1.  Dr. Gilligan was mentioned once in the Memorandum, see D.N. 1357 at 4, and once in the exhibits attached to it, see D.N. 1357-1 at 7.

On June 6, 2014, I issued four orders memorializing decisions I made orally at a June 4, 2014 hearing.  See D.N. 1362, 1363, 1364, 1365.  Three of them related to my decision to direct the

40

Bureau of Prisons to evaluate Sampson's competency to stand trial.
See D.N. 1362, 1364, 1365.  In one Order I directed that testimony,
reports, and/or affidavits of eight experts in the 2003 trial and
§2255 proceedings, and other information, be provided to the Bureau
of Prisons Examiner.  See D.N. 1365.  Dr. Gilligan's affidavit was
among those referenced.  Id. at 3.

A review of all of the criminal and civil cases assigned to
me indicates that from May 1 to June 30, 2014, I issued about 304
orders.  Fifteen of them were orders in this case.

D.    The July 27, 2014 Program

On June 12, 2014, I went to Los Angeles, California for the
birth of my grandson.  While there, my wife and I met with good
friends from Washington, D.C., who we rarely saw, Paul London and
Paula Stern.  They were with their son Gabriel London and his
family.  Mr. London's mother had by email invited us, among many
others, to the Los Angeles premiere of Mr. London's film about a
state prisoner in Florida, The Life and Mind of Mark DeFriest.  In
response to a mass e-mail sent by Mr. London's parents, on December
26, 2011, I had contributed $50 to a "Kickstarter" campaign for
the film.[13]  I did not, however, attend the premier.

---

[13] I have also contributed to Kickstarter campaigns for films by
or about other young friends.  For example, I contributed $50 to
Rebecca Parrish's Radical Grace.  I also contributed $100 to Lost
Child: Sayon's Journey, which is a film about Sayon Soeun, a former
child soldier in Cambodia whose wedding I performed.

Mr. London was excited about the premier and told me that he was trying to find additional venues to show his film. I said that if he could arrange a showing at the non-profit Martha's Vineyard Film Society in July, while I would be there on vacation, I would ask my fiends Harvard Law School Professors Alan Dershowitz and Charles Ogletree to participate in a discussion I would moderate after the film.

Mr. London wrote to the head of the Film Society, Richard Paradise. I successfully encouraged him to show the film on July 27, 2014. I also arranged for Professor Dershowitz to participate on the panel following it. In addition, I contacted the local newspaper, The Vineyard Gazette, which interviewed Mr. London and published an article describing the panel that would follow the film, including a reference to me as Judge Mark Wolf. See D.N. 2026-6. I also permitted the Film Society to use my picture and biography to publicize the July 27, 2014 event. See D.N. 2026-5.

When Professor Ogletree proved to be unavailable, Mr. London asked me if he could invite another family friend, Dr. Gilligan, to participate in the program following the film. I did not realize that Dr. Gilligan had filed an affidavit in this case. After consulting Professor Dershowitz, I agreed to Mr. London's request.

I invited Mr. London and Dr. Gilligan to join my wife and me for a light supper at our rental house before the July 27, 2014

program.    We  were  together  there  for  about  an  hour.    The
conversation was primarily social.  We also briefly discussed the
organization of the panel and I asked Dr. Gilligan how he would
like to be introduced.

Dr. Gilligan was interviewed by the government on July 13,
2015.  He reported the following, among other things.  On July 27,
2014, he recalled he had filed an affidavit on behalf of Sampson
in about 2010, and knew that I was then the presiding judge.  D.N.
2026-2 at 26-28.  He had not been retained to do any further work
in this case and did not know he would become involved in it again.
Id. at 26, 34.  Dr. Gilligan did not tell Mr. London or me of his
prior involvement.  Id. at 28; D.N. 2026-1 at 65-66.  He did not
know if I was still involved in this case.  D.N. 2026-2 at 28.

Dr. Gilligan stated this case was not discussed by us at
supper or at any other time.  Id. at 28, 52-53.  Mr. London
confirmed this in his interview with the government on July 8,
2015.  See D.N. 2026-1 at 69, 86, 99-100.  It is correct that I
did not discuss this case with Dr. Gilligan at supper or at any
other time.  Nor did we discuss the death penalty, which is not
the subject of Mr. London's film.[14]

---

[14] In their interviews with the government, Dr. Gilligan, Mr.
London, and Mr. Paradise each made some statements which were, in
some  respects,  inaccurate.     However,  their  descriptions  of
relevant matters are consistent with the facts I disclosed in June
2015, as amplified in this Memorandum.   I have not attempted to
correct every inaccuracy in their statements.  I am citing accurate

The Life and Mind of Mark DeFriest is about an inmate in the

Florida State prison system.  It was described on the Film Society

website, in pertinent part, as follow:

> The Life and Mind of Mark DeFriest is a hybrid of
> documentary film and animation. The film[] chronicle[s]
> Mark's life--from his childhood through a modern day
> parole story--while the animation reveal[s] the
> hyperactive world of his mind--from planning ingenious
> escapes to the sci-fi prison universe he inhabits.
>
> Mark DeFriest's life is living history.  At age 19, his
> original sentence was for a nonviolent property crime,
> but because of additional punishment for escapes, he has
> spent his entire adult life behind bars. DeFriest has
> survived 31 years in prison, most of it in longterm
> solitary confinement in a custom cell above the electric
> chair at Florida State Prison. He has been raped, beaten,
> shot and basically left for dead, but he has somehow
> lived to tell the tale. When he was sent to prison in
> 1981, five out of six doctors declared that he was
> mentally incompetent to be sentenced. They warned the
> judges that Mark couldn't learn better behavior and
> needed treatment. Instead, he was allowed to plead
> guilty, even at one point to a Life Sentence.  The
> documentary brings this story to life. . . .

See D.N. 2026-5.

In his interview with the government, Mr. London explained

that:

> [T]his film has always been about the life of a single
> prisoner. So, I've always maintained that it is not
> purely a human rights film. . . . We've been excluded
> from many grants because it was about an individual and
> not about a topic. . . . [A] lot of what my work has
> been tied up in is in the storytelling of an individual.
> But knowing full well that individual was in this dark
> prison world.

---

information they provided, and correcting some inaccuracies, such
as the statements by Mr. London and Mr. Paradise that I did not
communicate with The Vineyard Gazette about the film.

* * *

> [S]omebody in one of the Boston articles wrote that the
> film was about guard abuse and it is just so not about
> guard abuse . . . . Just like it is not about prisoner
> rape.   It is not about solitary confinement. It is not
> about mental illness behind bars. It is about all those
> things in a way, because, it is his life, but, that's
> it.

See D.N. 2026-1 at 39-40.

I watched the film for the first time shortly before July 27,
2014.   I recognized that the film sought to make the case for
DeFriest's parole and I did not want my involvement in the panel
to appear to be an endorsement of that effort.   Therefore, as I
was driving Mr. London from my home, I told him that in moderating
the panel I would explain that my participation should not be
construed as an endorsement of his advocacy for DeFriest.

I also recognized that the film dealt with issues that emerge
in my cases, including this one.   For example, I mediated and, in
2012, approved a settlement in a case concerning the effects of
prolonged solitary confinement on the mentally ill.   See Disability
Law Center v. Mass. Dep't of Corrections, 960 F. Supp. 2d 271 (D.
Mass. 2012).   Similarly, in 1995 and 1996, I tried a case in which
the jury found that officers of the New Bedford, Massachusetts
Police Department had beaten a prisoner to death and then tried to
cover up their culpability.   See Gonsalves v. City of New Bedford,

939 F. Supp. 921 (D. Mass. 1996); Gonsalves v. City of New Bedford,
939 F. Supp. 915 (D. Mass. 1996).

In addition, I recognized that issues of competence and mental
illness have been raised in this case.  Therefore, I told Mr.
London that I would also make clear that my participation in the
program should not be interpreted as a comment by me on any other
case or as an expression of my views on any of the issues raised
in DeFriest's case.

As Mr. London said when interviewed by the government, I did
not discuss with him Gary Sampson, this case, the question of
competency to stand trial, or the death penalty.  See D.N. 2026-1
at 69, 85-88, 99-100.  After being provided information by the
First Assistant United States Attorney concerning the Sampson
case, Mr. London said that I told him I wanted to be cautious
because "there is a case that I'm dealing with where there's issues
of abuse, and maybe head injuries, maybe something like that."
Id. at 91-92 (internal quotation marks omitted).  I question
whether this is correct.  I believe that I told Mr. London that I
was presiding in a capital case, but that I did not mention issues
of abuse or head injuries.  I know that I did not discuss Sampson
or this case with Mr. London.  However, any differences in our
recollections are not material.  I did, as Mr. London told the
government, communicate to him that I wanted to assure that it did
not appear that my participation on the panel concerning his film

46

was a comment on a case in which I was presiding, meaning this
case, without referencing it by name.

Similarly, as Mr. Paradise, the Director of the Film Society,
told the government, I did not mention or discuss Sampson or this
case with him.  See D.N. 2026-3 at 68.  I did, however, inform Mr.
Paradise that I would tell the audience that by moderating the
panel I was not endorsing the case for DeFriest's parole or
commenting on any other case.  Id. at 35-36.  I believe Mr. Paradise
was correct when he told the government that I let him know that
I did not want my participation to involve, or appear to involve,
a comment by me on any of my cases.  Id. at 36.  In doing so, I
had in mind this case, as well as others.

Mr. London and Mr. Paradise each expressed interest in having
the panel videotaped.  I had proposed doing a panel to help Mr.
London present his film to a limited audience.  I had not
anticipated being involved in anything else.  Therefore, I told
Mr. London and Mr. Paradise that the panel could be filmed, but
the video could not be used for any purpose without my permission.
They agreed to that condition.

As I recall, about 100 to 175 people saw the film.  Some, but
not all, of the people who watched the film stayed for the panel.
Some members of the audience were friends invited by my wife and
me.  I know that Professor Dershowitz and his wife also invited
some of their friends, who attended.

Mr. Paradise regarded the well-known Professor Dershowitz as the "marquee" attraction--the "bigger name."  See D.N. 2026-3 at 47-48.  In his view, neither Dr. Gilligan nor I carried much "marketability."  Id. at 52.  In any event, the proceeds of the sale of tickets at $9 and $12 each went to the non-profit Film Society.  My wife and I paid for her ticket.  Although I was not required to buy a ticket, my wife and I joined the Film Society for the first time, so my participation in the event cost us about $112.

On July 27, 2015, I drove Mr. London to the Film Society.  I saw some of my friends, including a Senior United States District Judge who is not from Massachusetts.  She was accompanied by a United States District Judge I had not met before.

I sat with my wife to watch the film.  Dr. Gilligan did not sit with us.

As described earlier, Mr. London's movie is about a man who was sentenced to serve four years in Florida for a non-violent property crime, but because of multiple escapes has been in prison for decades.  Unless paroled, he will be incarcerated for the rest of his life.  The film is not about Sampson, the evidence concerning him in this case, or the death penalty.  However, DeFriest does speak briefly about prisoners on death row, and characterizes executed individuals as being "barbecued."  See Add'l Evid. Order, Ex. D, at about 1 hr., 24 min.

48

The film includes discussion of whether DeFriest was competent to be sentenced. It also explores whether he is mentally ill, and how prolonged solitary confinement and violence in prison, including by prison guards, might have affected any mental illness he may have. It also includes some discussion of whether Mr. DeFriest had a childhood brain injury.

Mr. Paradise made some remarks before the film was shown. He may also have spoken briefly after the film. As moderator, I opened the discussion.

The interns operating the camera did not film the beginning of my remarks. In the unrecorded portion, I stated that I was a federal judge and my participation should not be construed as an endorsement of the case for DeFriest's parole, or an expression of my views on any of the issues raised in the film, or as a comment on any other case or issue, including the death penalty.[15] Although the film is not about Sampson or the death penalty, I wanted to assure that nobody construed my participation in the panel as an endorsement of DeFriest's brief, pejorative reference to the death penalty.[16] Mr. London confirmed that I made such a disclaimer.

---

[15] While I was on vacation in July 2015, my staff found the 2 pages of notes I made as talking points for the film. See Add'l Evid. Order Ex. C. Point 1 states "Disclaimer--MLW ≠ [meaning "not"] endorsing commenting or [expressing] view (i.e., on DP)." "DP" is an abbreviation for the death penalty.

[16] In its submission, the government does not argue that my participation in the program would be regarded reasonably, or even

See D.N. 2026-1 at 51 (Mr. London stating that Judge Wolf started the panel discussion and "mentioned that he was appearing, but not endorsing the material in the film"); see also D.N. 2026-3 at 35-36 (Mr. Paradise stating Judge Wolf said "'I'm not endorsing any particular viewpoint'"); D.N. 2026-2 at 22 (Dr. Gilligan stating that Judge Wolf "said it to the audience that he was the moderator, he was not presenting his own opinions about the film").

At the beginning of the remaining approximately 50 minutes of the panel that was filmed, I stated that, "as I said, without taking a position with regard to Mark DeFriest or any particular point raised in the movie, it's really commendable that Gabriel has done this movie." See Add'l Evid. Order, Ex. B.

After introducing Professor Dershowitz and Dr. Gilligan, I asked them what, if anything, was significant about the film. Professor Dershowitz responded that it was important because it demonstrated that many sentences are too long, and that prison sentences often result in inmates being raped and beaten. See Add'l Evid. Order, Ex. A.

Dr. Gilligan stated that the film was "extremely important" because it illustrates that our nation's mental health system is broken, our prison system is broken, and both need fundamental repairs. Id. at 6. Among other things, Dr. Gilligan asserted

---

unreasonably, as an expression of a personal view on capital punishment.

that violence in prison is "out of control" and "correction
officers are committing murders of inmates for which they are very
seldom prosecuted or convicted, often because of the wall of
silence." Id. at 6-7. He added that:

> I've worked with the most violent people our society
> produces and found that these men who have been
> repeatedly violent, and I mean homicidally violent, if
> they're put in the right kind of environment and offered
> treatment, education and are not subjected to violence
> themselves, completely stop their pattern of violence,
> despite a lifetime of it." Id. at 7-8. Dr. Gilligan
> then stated that "we have lacked . . . the political
> will to make the fundamental changes in our prison system
> and our mental health system . . . .

Id. at 8.

> Before soliciting questions from the audience, I said:

> You're hearing [] the expression of strong views. I
> don't mean to sound timid on this. It's not my role to
> really express my own, except to say that I think all of
> this is extremely valuable to expose judges, who are
> encouraged to do things that will enhance the
> understanding of the administration of justice.

> I do not necessarily agree with every single thing that
> Alan said or every single thing that Jim said. I will
> say that these are issues that emerge in our cases, and
> how they're dealt with is substantially determined by
> the democratic process . . . .

Id. at 11.

In the question and answer period, both Professor Dershowitz
and Dr. Gilligan discussed the effect of politics on policies
concerning the administration of justice, particularly the fear of
elected officials of being labelled "soft on crime." Professor
Dershowitz said, in part:

51

> [T]he fault is with liberal Democrats.  Let there be no
> mistake about that. We know where the conservatives are
> going to vote.  The fault is with liberal Democrats.
> Liberal Democrats don't have the guts to stand up to the
> law-and-order people.  They are the worst.

Id., Ex. B at 2-3.

> In response to another question, Dr. Gilligan said:

> I spoke earlier about how much of the violence in prisons
> is committed by correction officers or prison guards, but
> I didn't mean by that to damn them all.  Some of the most
> dedicated and humane people I've found have also been
> prison guards, so there's a range among them.

> The problem I think in our prisons in general is that
> there is kind of a subculture of violence that prison
> officers  are  subjected  to,  whether  or  not  they
> personally, you know, on their own, would commit serious
> violence.  We've done a lot of research on this, and we
> find that prison officers themselves, if you talk to them
> individually, usually have much more humane attitudes
> than they think their fellow officers do.

Id. at 8.

At the end of the program, I encouraged the audience to
applaud: Mr. London for making the film; the panelists, "Alan and
Jim," who were "literally, like the two world's leading experts on
this issue"; and the other members of the audience for spending
part of their vacation watching a film about a prisoner, because
"if people are ignorant of the issues raised in this film, there's

Dr. Gilligan also noted that the United States is "the only
Western democracy that still has the death penalty.  That's where
we have both legal and illegal violence in our prison system."
See Add'l Evid. Order, Ex. A at 7.

52

no way that our democracy on this issue or these range of issues
can properly function." Id. at 14.

After the program, I spoke briefly with the two federal judges
who had come to the event.  Understanding that judges are not
permitted to participate in partisan political activity, and
having Professor Dershowitz's criticism of liberal Democrats
primarily in mind, I said to them, rhetorically rather than because
of any serious concern, that I hoped that my participation in the
program would not be regarded as improper.  They each confirmed
that it would not.[17]

On July 16, 2015, in response to a question from the
government, Mr. Paradise said that he did not find it "strange" to
have a federal judge on a panel concerning the DeFriest film.  See
D.N. 2026-3 at 70.  He added that he "did not feel like [Judge
Wolf] had a preconceived notion of what . . . the film was about,
or that he was either pro or anti what was in the film." See id.
Mr. Paradise also said that he thought "the Judge . . . was more

---

[17] On June 19, 2015, immediately after I learned that Sampson had
recently decided he wanted to retain Dr. Gilligan as an expert
witness, I told the parties that I said to the other two judges,
"I hope . . . certainly nothing I said or did could be regarded as
calling my impartiality into question, and they said, Oh, no,
everything was fine." See D.N. 1978 at 14.  On reflection, I now
believe that the statement of my question in the text above is
more accurate.  However, there is not, in my view, a material
difference between them.

neutral and more balanced" than the panelists, particularly Professor Dershowitz.  Id. at 70-71.

    E.    The Matters Following the July 27, 2014 Panel

In mid-August 2014, Mr. London emailed me that he had made a five-minute excerpt of the panel.  The excerpt began with my asking Professor Dershowitz if the film was "significant."  The remainder was Professor Dershowitz's praise of the film, including his statement that every judge, prosecutor, and defense lawyer should watch it.  Mr. London told me that he had forgotten to ask my permission to use the clip, which was posted on an "unlisted" "Vimeo" page.[18]

I was disappointed that Mr. London had not asked my permission before doing anything with the video of the panel.  I told him that I did not believe that the clip, or whole panel discussion, would raise any reasonable question about the propriety of my participation in the program.  I said, however, that I was very busy and could not devote any more time to questions concerning the film.  Therefore, I was not authorizing the Film Society, or Mr. London, to make any public use of the video of the panel.  I did, however, tell Mr. London he could put the clip of Professor Dershowitz praising his film on his website.  To my knowledge, the

---

[18] It appears that the clip has since been removed.  See https://vimeo.com/103264915.

clip was "tweeted," but not put on Mr. London's website. See
DeFriest Film (@defriestfilm), Twitter (Aug. 13, 2014, 10:29
a.m.).[19]

In September and October 2014, many issues were being
intensively litigated in this case. Among those were substantial
disputes concerning the evaluation of Sampson's current competency
to stand trial. See United States v. Sampson, 2014 WL 7717616, at
*14-17 (D. Mass. Nov. 8, 2014). I had received, ex parte, the
Bureau of Prisons Examiner's report. In reading it in early
October 2014, I saw that the Examiner had reviewed, and summarized,
Dr. Gilligan's 2010 affidavit.[20] I then realized that I had
participated in a program with someone who had been involved with
this case.

It was, at most, then uncertain whether Dr. Gilligan would
have any further involvement in this case. As explained earlier,
in 2010, Sampson's counsel had represented that Dr. Gilligan was
solely a potential expert witness and not a fact witness. See
D.N. 1060 at 44-45 n.32. Although I had approved budgets that
provided funding for many proposed expert witnesses to prepare to

---

[19] Available at https://mobile.twitter.com/defriestfilm/status/
499608799012192257?p=v.

[20] On June 23, 2014, I said that I discovered Dr. Gilligan's
involvement in this case in September 2014. See D.N. 1984 at 4-
6. I now know that I reviewed the Examiner's report and discovered
Dr. Gilligan's involvement in October 2014. This, however, is not
material to the question of recusal.

testify at the retrial, I had not been asked to approve funding for Dr. Gilligan to prepare to testify.

More specifically, the January 15, 2014 proposed budget, which I read in pertinent part in October 2014, asked only for funding for five hours of Dr. Gilligan's time to facilitate a transition to another expert to testify at the retrial. See D.N. 2001-1 at 4. Similarly, the April 11, 2014 budget did not seek funding for Dr. Gilligan, but mentioned him only because it was proposed that the other expert be funded to build upon his work. See id.

Therefore, in October 2014, I realized that I had participated on a panel with an expert whose opinions had not been relied upon, or even referenced, in any of my decisions. The recent budget submissions indicated that he was not likely to be a witness at the retrial. I consulted another judge on how I should deal with this matter. Following that discussion, I decided that a reasonable person knowing the foregoing facts could not possibly question my impartiality, that it would be appropriate to continue to focus on deciding the many matters that had to be resolved before the February 17, 2015 trial date, and to discuss Dr. Gilligan with the parties if he ever became a proposed witness.

At a November 14, 2014 conference with Sampson's counsel to discuss, ex parte, a pending budget request, I noted that no funding had been requested for Dr. Gilligan and asked if he was a

56

potential witness. Id. at 4-5. Counsel confirmed that Dr. Gilligan had not been retained and no decision had been made as to whether he would testify. Id.

I continued to give highest priority to preparing this case to begin the retrial on February 17, 2015. This involved conducting many hearings and making many decisions. Nevertheless, on December 23, 2014, I granted Sampson's motion for a continuance and set a new trial date of September 16, 2015, which was sooner than Sampson requested. In summarizing the reasons for that ruling, I wrote:

> When, on March 18, 2014, the court scheduled the retrial for February 17, 2015, it stated that it expected that the parties would work industriously to prepare properly by that date. It also stated that it would postpone the retrial if the evolution of events demonstrated that it would not be fair or feasible for it to begin on February 17, 2015.
>
> The court recognizes that a continuance will prolong the agony and uncertainty of the retrial for the families and friends who loved and lost the people Sampson murdered. Their interest is substantial and the most significant factor weighing against granting a continuance. The interests of the government, which has worked hard to make a February 17, 2015 trial date feasible, also weigh against a continuance. In addition, the court has given the highest priority to this case and organized its docket to devote up to four months to retrying it beginning in February 2015.
>
> However, unforeseen circumstances since March 18, 2014—some but not all of which were beyond Sampson's attorneys' control--have injured the ability of his attorneys to prepare for a retrial. Most significantly, contrary to the representations made to the court by the Bureau of Prisons, Sampson's attorneys, investigators, and experts had only limited access to him in the

approximately four months Sampson was in North Carolina
at FMC-Butner to have his competency to stand trial
evaluated.    In addition, the failure of Sampson's
counsel, particularly Danalynn Recer, Esq., to prioritize
and present properly to the court the most significant
issues has contributed to their plight.

The court now finds that it would not be fair or feasible
to require that Sampson's counsel begin the retrial on
February 17, 2015. Rather, a continuance for a reasonable
period of time is justified.  Therefore, the retrial is
being rescheduled to begin on September 16, 2015. . . .
[T]his will still be the fastest retrial of a federal
capital case in history.

In essence, the court concludes that despite the
significant interests of the victims' families, and the
interests of the government and the court, a reasonable
continuance until September 16, 2015 is justified to
assure that the retrial to determine whether Sampson
should be executed will be fair and, hopefully, final.

<u>United States v. Sampson</u>, 68 F. Supp. 3d at 234-35 (footnote

omitted).

        This case continued to receive my highest priority in 2015.

This included reviewing and, to the extent appropriate, approving

Sampson's request for funding for experts.

        In an April 27, 2015 budget update concerning experts, Sampson

wrote, in part, that "the defense wants to reserve the possibility

of using Dr. James Gilligan regarding the psychological effects of

prison trauma."  <u>See</u> D.N. 2001-1 at 5.  I discussed this statement

with Sampson's counsel on May 1, 2015.  They confirmed that they

were not seeking funding to employ Dr. Gilligan and "just didn't

want to waive the possibility."  <u>See</u> <u>id.</u> at 6.

On page 19 of a May 22, 2015 budget submission, without explanation, Sampson requested funding for 15 hours for Dr. Gilligan, who was characterized in a chart as a "prison expert." I first saw this submission in the late afternoon of June 19, 2015, after several days of hearings and rulings concerning various issues in this case. In response to one of my questions, at what was initially an ex parte conference, Sampson's counsel explained that they had intended to use another expert, but he had become unavailable. Id. at 7. Therefore, they had met with Dr. Gilligan the previous week and decided to employ him. Id. In response to another of my questions, Sampson's counsel said they had told Dr. Gilligan that I was the judge and he mentioned that he had had a meal with me. See D.N. 2001-3 at 5. I said it would be necessary to include the prosecutors in a discussion about the implications of the emergence of Dr. Gilligan as a potential witness.

I then explained the circumstances of the DeFriest program to all counsel. See D.N. 2001-3 at 9-15. I told them that as Dr. Gilligan had just become a possible witness, a §455(a) analysis should be done, and the parties should consider whether they wished to waive any possible grounds for my recusal based on my participation on a panel with Dr. Gilligan. Id. at 14. I provided the government with an opportunity to question Sampson's counsel and me, and said I would have a transcript prepared promptly and

made part of the public record.  Id. at 16-21.  This was done.
See June 22, 2015 Memo. and Order (D.N. 1984).

On June 22, 2015, I offered the parties an opportunity for a
further hearing on the issue, see D.N. 1978 at 3, which the
government requested.  That hearing was held on June 23, 2015.

On June 19, 2015, among other things, I had stated that, if
I had known Dr. Gilligan had filed an affidavit in this case, I
would have told Mr. London that he could have one of us on the
panel and suggested he choose Dr. Gilligan.  See D.N. 2001-3 at
18.  As I explained on June 23, 2015:

> [W]hen I was speaking on [June 19, 2015], which was
> necessarily quickly, I wasn't saying that a reasonable
> person would question my impartiality because Dr.
> Gilligan and I have been on the same program.  I'm saying
> it was foreseeable that I would have to disclose it.
> There would have to be attention devoted to it.  It would
> be an unfortunate distraction.

See D.N. 1984 at 12.  I also said on June 23, 2015, that "I just
generally try to avoid these issues."  Id. at 32.

At the June 23, 2015 hearing, Mr. Hafer stated that the
government was not asserting that I am biased or prejudiced as a
result of my interaction with Dr. Gilligan or anything else.  Id.
at 18-19.  Rather, the question was whether a reasonable person
would question my impartiality if fully informed.  Id.

I offered to try to obtain as soon as possible the DeFriest
film and video of the panel, which the government wanted to review.
Id. at 22-23, 34.  I stated I wished to assure that a well-informed

60

decision would be made on the §455(a) issue.  Id. at 24.  I also
noted that I did not know if the retrial could begin in September
2015 if the issue of my possible recusal distracted us from the
many other matters scheduled to be addressed in hearings and
decided before then.  Id.

On June 23, 2015, I obtained from Mr. London the video that
was made of most of the panel.  I provided it to the parties the
next day.  See D.N. 1983.  On June 25, 2015, I obtained from Mr.
London the film and immediately gave it to the parties.  See D.N.
1985.[21]

Another hearing was held on June 26, 2015.  The government
requested an opportunity to investigate the program concerning Mr.
London's film.  Mr. Hafer stated that "the inquiry has to be
undertaken without any regard to the trial date."  D.N. 2002 at
10.  He also indicated that the government would never be in a
position to waive any §455(a) objection under §455(e).  Id. at 12.
I provided the government more time than it initially requested on
June 26, 2015, to conduct its investigation.  See D.N. 2023.

On June 27, 2015, I issued an Order directing Sampson to
confer with Dr. Gilligan and state whether he continued to be a

---

[21] In response to a request from Mr. London, I sent him two
newspaper articles about this matter, and the June 22, 2015 Order,
which had attached to it the transcript of the June 19, 2015
discussion of this matter.  See D.N. 1978.

61

witness Sampson would seek to present at the retrial. See D.N. 1997. In doing so, I noted that, in 2014, Judge Dennis Saylor IV had granted a motion to recuse under §455(a) based on the representation that Judge Timothy Hillman would be a witness at trial, but that Judge Hillman was never called. Id. (citing O'Brien, 18 F. Supp. 3d 25); see also §IV.D, infra. I wrote that:

> The court does not wish to interfere with Sampson's right to present witnesses of his choice who want to participate in this case. However, in view of the recent experience in O'Brien and the present posture of this case, it is now prudent and appropriate to determine whether Dr. Gilligan intends to participate in the retrial to determine Sampson's sentence.

D.N. 1997 at 1-2. Sampson's counsel reported that they had conferred with Dr. Gilligan and that "[w]hile the defense is not categorically committing that it will call Dr. Gilligan to testify, the defense confirms that at this time Dr. Gilligan continues to be a witness Mr. Sampson may seek to present at the trial of this matter." D.N. 2011 at 1.

The government--including the FBI, Internal Revenue Service, Massachusetts State Police, and First Assistant United States Attorney--investigated this matter for several weeks. After being granted a brief extension, it moved for my recusal on July 16, 2015. See D.N. 2024. Sampson filed his opposition on July 31, 2015. The government submitted a reply on August 7, 2015. Sampson filed a sur-reply on August 13, 2015. The government also filed a motion requesting that I not make any substantive rulings in

this case until the question of my recusal is resolved.  See D.N. 2037.

The motion for my disqualification caused the cancellation of the hearings scheduled to resume on August 10 and 24, 2015, as well as the granting of motions for relief from deadlines established in anticipation of jury selection commencing on September 16, 2015.  See D.N. 2049, 2051, 2057, 2063.

IV.  ANALYSIS

In moving for my recusal under §455(a), the government argues that my role in promoting and participating in the DeFriest program would require my recusal even if Dr. Gilligan were not involved in this case.  It further asserts that Dr. Gilligan's roles as an affiant in 2010, as a panelist, and now as a prospective witness reinforce that conclusion.  For the reasons explained in this Section, these contentions are not correct.

This ruling has been reached by considering the totality of all of the relevant facts of which a reasonable person would be informed.  However, it is valuable to consider whether my role in the program alone would, as the government suggests, raise a reasonable question concerning my impartiality, and then consider the implications of the additional facts that Dr. Gilligan was on the panel and Sampson has recently requested funding to retain him to testify as an expert at the retrial.

A.   My Recusal is Not Required

    1.   My Role Concerning the DeFriest Panel Could Not Cause a Reasonable Person to Question My Impartiality

I have long understood that "a judge should not participate in extrajudicial activities that . . . interfere with the performance of the judge's official duties [or] reflect adversely on the judge's impartiality." Code of Conduct, Canon 4.  However, the Code of Conduct recognizes that "[c]omplete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the society in which the judge lives." Id., Canon 4 cmt.  Therefore, judges are encouraged to contribute to the public understanding and improvement of the administration of justice, and engage in other civic, charitable, and educational endeavors, if the activity would not reflect adversely on the judge's impartiality.  Id., Canon 4 & cmt.[22]

_____

[22] Canon 4 of the Code of Conduct states, in part, that: "A judge may engage in extrajudicial activities, including law-related pursuits . . . and may speak, write, lecture, and teach on both law-related and nonlegal subjects.  However, a judge should not participate in extrajudicial activities that . . . reflect adversely on the judge's impartiality . . . ."
The commentary to that rule states:

Complete separation of a judge from extrajudicial activities is neither possible nor wise; a judge should not become isolated from the society in which the judge lives.  As a judicial officer and a person specially learned in the law, a judge is in a unique position to contribute to the law, the legal system, and the administration of justice, including revising substantive and procedural law and improving criminal

There is a proud history of judges being involved in educational endeavors. For example, then-Harvard Law School Professor Felix Frankfurter wrote in 1920 to Judge Learned Hand that Justice Louis D. Brandeis "cares about educating and in fact he cares more than anything else for the processes of education which will enable our modern democracy to understand what public matters are about and then act upon such understanding." Letter to Learned Hand from Felix Frankfurter (June 28, 1920), in Reason and Imagination: The Selected Correspondence of Learned Hand: 1897-1961, 93 (Constance Jordan ed., 2013).

A fully informed member of the public would know that I share Brandeis's view. See, e.g., Aging gracefully: Judge Wolf takes senior status, Boston Globe Oct. 19, 2012, at A16 (Judge Mark L. Wolf "used his perch as chief judge to educate students about legal issues, and advance the cause of human rights[.]"); Milton Valencia, Wolf to step down as chief U.S. judge, Boston Globe, Oct. 17, 2012, at B1 ("A longtime supporter of charitable efforts and community organizing, Wolf has prioritized the development of seminars for lawyers and programs for inner-city schools."). The

---

and juvenile justice. To the extent that the judge's time permits and impartiality is not compromised, the judge is encouraged to do so, either independently or through a bar association, judicial conference, or other organization dedicated to the law.

Id., Canon 4 cmt. (emphasis added).

DeFriest program was not a manifestation of a special interest in issues relating to prisons and prisoners, but rather an example of the wide range of programs I have organized or participated in, often with young people.

The value of promoting public understanding of the issues depicted in the DeFriest film is evidenced by President Obama's recent attention to them. For example, in a July 14, 2015 speech, President Obama--who does not share with judges a duty to appear impartial--said:

> [W]e should not tolerate conditions in prison that have no place in any civilized country. . . . We should not be tolerating gang activity in prison. We should not be tolerating rape in prison. . . . Do we really think it makes sense to lock so many people alone in tiny cells for 23 hours a day, sometimes for months or even years at a time?

See Press Release, White House Office of the Press Secretary, Remarks by the President at the NAACP Conference (July 14, 2015)[23]; see also Press Release, White House Office of the Press Secretary, Remarks by the President after Visit at El Reno Federal Correctional Institution (July 16, 2015).[24, 25]

---

[23] Available at https://www.whitehouse.gov/the-press-office/2015/ 07/14/remarks-president-naacp-conference.

[24] Available at https://www.whitehouse.gov/the-press-office/2015/ 07/16/remarks-president-after-visit-el-reno-federal-correctional -institution.

[25] I made similar comments on the DeFriest panel:

If, as I find, my conduct could not raise a reasonable question concerning my impartiality in this or any other case, the program on the DeFriest film is the type of activity in which the Code of Conduct encourages judges to engage. As the government implicitly recognizes, the fact that I watched the DeFriest film would not cause, or contribute to causing, a knowledgeable, reasonable person to question my impartiality in this case. As the Second Circuit has explained, "the acquisition of general information is vital to judges." In re Aguinda, 241 F.3d at 205. Consistent with this, it has been stated that a judge's "methods of informing himself as to a given area of the law, do not constitute grounds for recusal unless they come within some other, specific grounds for recusal." United States v. Bonds, 18 F.3d 1327, 1329 (6th Cir. 1994). Issues that generally relate to cases

---

We have the Eighth Amendment of the Constitution, which the founding fathers decided to make impermissible cruel and unusual punishment. Part of cruel and unusual punishment is extrajudicial punishment, punishment beyond what the judge prescribed, five years in prison, punishment from prison guards. The whole jurisprudence of the Eighth Amendment is [the question], "is this inconsistent with the norms of a civilized society?"

So we, from the beginning of our nation, essentially have had ideals and aspirations that are inconsistent with what is depicted in this film. And it's in the nature of ideals and aspirations that they won't be fully or permanently realized.

See Panel Tr. II at 13-14.

67

assigned to other judges and me, including this one, are often discussed in the media. See, e.g., Michael Schwirtz and Michael Winerip, After 2 Killers Fled, New York Prisoners Say, Beatings Were Next, N.Y. Times, Aug. 12, 2015, at A1. This reported claim of the beating of prisoners by guards is comparable to events depicted in the DeFriest film. Yet it could not be correctly argued that the fact that I read the article caused, or contributed to causing, a reasonable question concerning my impartiality in this case.[26]

---

[26] At the June 23, 2015 hearing, the government asserted that literary references I have made in the course of this case, "amplify[]" the reasons that an objective person would question my impartiality. D.N. 1984 at 19. It claimed that the only such references were to what it views as anti-death penalty literature— Albert Camus's Reflections on the Guillotine, Robert Burt's Death is that Man Taking Names, and the Czech dissident author Ivan Klima's Judge on Trial. Id. at 19-20. The government also suggested that such questions would be reinforced by my friendship with Mr. Klima. Id. at 20.

However, as the government itself wrote in 2010, "[t]here is nothing at all improper about citing literary works in responding to a legal claim--even in [] capital cases--and that heretofore unremarkable proposition is evidenced by the fact that numerous courts have done so, including the Supreme Court." See Gov's Reply in Support of Request for Summary Dismissal of First Amended 2255 Petition at 2-3 (D.N. 1069) (citing cases). Indeed, in rejecting mere suspicion as a proper basis for recusal under §455(a), Judge Frank Coffin wrote that, "[i]n this respect, the standard for disqualification is not quite on the same plane as the standard for judging Caesar's wife" and discussed Plutarch's The Lives of Noble Grecians and Romans. See In re United States, 666 F.2d at 695 n.*.

In any event, the government's claim that I have in the past 14 years only referenced literature adverse to its interests is incorrect. Alexander Bickel's Morality of Consent provided a framework for my remarks in sentencing Sampson to death. See Sampson, 300 F. Supp. 2d at 278 ("[I]n our nation there is another

The facts that I promoted the program concerning the DeFriest

film by recommending it to the Film Society, encouraged The

Vineyard Gazette to write about it, recruited Professor Dershowitz

_____

morality that governs judges. It is sometimes called the 'morality of consent.'  See Alexander M. Bickel, The Morality of Consent (Yale Univ. Press 1975).").  Similarly, Robert Cover's Justice Accused provided a framework for my analysis in denying Sampson's motion to dismiss because the grand jury was not informed that its findings would make this a capital case, and the book was quoted in support of that conclusion.  See D.N. 1818 at 77-78.  In addition, Camus's Reflections on the Guillotine was referenced by me to illustrate the historic nature of the issue when I decided that evidence of "botched executions" was not relevant to a mitigating factor, as properly defined, and could not be introduced in this case.  See D.N. 2014 at 56-57.

The government's comments about some of what I have read and referenced could have a chilling effect on what judges read and thus injure their ability to perform their judicial duties wisely and well.  In 1913, Justice Oliver Wendell Holmes characterized judges as "naif, simple-minded men . . . [who] need education in the obvious--to learn to transcend our own convictions . . . ."  Justice Oliver Wendell Holmes, Law and the Court: Speech at a Dinner of the Harvard Law School Association of New York, Feb. 15, 1913, in The Occasional Speeches of Oliver Wendell Holmes 168, 172 (Mark DeWolfe Howe ed., 1962).  Judges continue generally to be fortunate, successful people, chosen from the mainstream of society.  We are often called upon to exercise judgment in matters concerning unfortunate, unsuccessful people with very different backgrounds and experiences.  Books, including literature, can expand a judge's knowledge and provide an empathetic understanding of the people affected by his or her decisions.

Recognizing this, the Federal Judicial Center ("FJC"), which trains judges, offers a seminar on "Literary Perspectives on Justice and Law."  This seminar is designed to "help deepen an understanding of the greater human questions and consequences of [a judge's] work."  See Add'l Evid. Order, Ex. H.  At my request as Chief Judge, the FJC presented such a program for my colleagues and me in 2010.

for the panel, allowed my participation to be publicized,[27] and moderated the panel also could not cause, or contribute to causing, a knowledgeable, reasonable person to question my impartiality in this case. The issues in the film were related to Sampson's case at only a very high level of generality, and I repeatedly explained that that I was not endorsing the views of the film or the panelists, and was not expressing my own.

The DeFriest film discusses, in the context of a particular prisoner, some general issues on which Sampson proposes to introduce evidence in his effort to prove some of the many mitigating factors he hopes to present to the jury. More specifically, the film depicts violence in prison and its effect on a man who is allegedly mentally ill, perhaps as a result of brain damage. Some of these issues were discussed by the panelists, who stated that they perceived such problems to be

---

[27] Contrary to the government's contention, I do not believe that promoting the DeFriest film program constituted the use of the prestige of my judicial office to advance the private interests of Mr. London. See Code of Conduct, Canon 2B. Mr. London was not being paid or reimbursed for his expenses by the non-profit Film Society. I was engaging in an effort to educate the public on a matter concerning the administration of justice, as federal judges are encouraged to do by our Code of Conduct, as long as the activity would not raise a reasonable doubt about the judge's ability to decide any issue impartially. Id., Canon 4 & cmt. Similarly, in 2006, as Chief Judge, I organized and moderated a program at the courthouse in which Abby Ginzberg, the producer of the film Soul of Justice: Thelton Henderson's American Journey, participated. See Add'l Evid. Order, Ex. I. Neither I, nor, evidently, anyone else perceived that I was using the prestige of my judicial office to advance Ms. Ginzberg's private interests.

widespread.    These issues generally relate to this case, and to some others in which I have previously presided.    See, e.g., Disability Law Center, 960 F. Supp. 2d 271 (concerning the effect of  segregation  (i.e.,  solitary  confinement)  on  mentally  ill prisoners); Gonsalves, 939 F. Supp. 921 (concerning killing of detainee by police officers); Gonsalves, 939 F. Supp. 915 (same). In  addition,  the  panelists  were  critical  of  the  United  States prison system and sentencing laws.

Among the 308 mitigating factors on which Sampson now proposes to introduce evidence at retrial are the alleged facts that he suffers from a mental illness and brain damage, and that he was assaulted in prison.    However, whether DeFriest is mentally ill, has brain damage, or was abused by guards or other inmates, is not relevant to whether Sampson is mentally ill, has brain damage, or was abused by guards or other inmates.    The film and panel also did  not  include  any  discussion  of  how  mental  illness,  brain damages, or abuse in prison might operate as mitigating factors in a capital case.    Therefore, the panel discussion did not involve discussion of the particular issues to be decided by the jury at retrial.

As the DeFriest panel did not include discussion of evidence specific to Sampson or of capital sentencing, a reasonable person could not question my impartiality based on my role concerning it.

71

This conclusion is confirmed when the film, and my role in organizing and moderating the panel are, as they must be, viewed in the context of everything of which a reasonable, fully informed person would be aware.  See Pitera, 5 F.3d at 626-27.  What I said during the program is particularly important.  Id.

A reasonable, fully informed person would know that I was the moderator of the panel discussion.  As moderator, my role was to facilitate an orderly discussion of the issues raised by the film. I stated at the outset of the program that my participation should not be construed as an endorsement of the case for DeFriest's parole, as an expression of my views on the issues raised in the film, or as a comment on any other case or issue, including the death penalty.  See, e.g., Add'l Evid. Order, Ex. A at 2.  I later stated that I did not necessarily agree with everything Professor Dershowitz or Dr. Gilligan had said.  See id., Ex. A at 11.  I added that the issues depicted in the film emerge in federal cases and "how they're dealt with in this country is substantially determined by the democratic process."  Id.  I concluded the program by congratulating the audience members for attending the film and panel because if people are ignorant of the issues raised by the film, there is no way our democracy can properly function concerning them.  Id., Ex. B at 14.

I believe that a reasonable person would understand that my statements were not, as the government suggests, expressions of

72

consciousness of conduct incompatible with the requirements of §455(a).   Rather, a reasonable person would understand my statements to be the effort of a prudent judge to assure that his conduct and comments were not misconstrued as he participated in an educational program of public importance.[28]

The evidence indicates that my statements about my role had their intended effect.   Mr. Paradise, the Director of the Film Society, told the government that he did not perceive that I "was either pro or anti what was in the [DeFriest] film."   See D.N.

---

[28] The government repeatedly argues that "the average person on the street might not know and believe" certain facts as I have described and discussed them, including my statements on July 27, 2014, in my role as moderator of the DeFriest panel.   See D.N. 2060 at 6-11.   For example, the government argues that an "average person on the street would not necessarily believe that Dr. Gilligan's participation in the panel discussion was a matter of 'pure happenstance,'" as Sampson characterizes it. However, the First Circuit has emphasized that "a charge of partiality must be supported by a factual basis . . . ."   In re Allied-Signal, 891 F.2d at 970.   "Compulsory recusal must require more than subjective fears, unsupported accusations, or unfounded surmise."   In re United States, 158 F.3d at 30.   In this case, when interviewed by the government, Dr. Gilligan and Mr. London confirmed that Mr. London alone arranged for Dr. Gilligan's participation in the program.   Many of the government's other arguments about what a reasonable person might believe are similarly flawed.

As explained in § II, supra, and discussed in § IV.A.2, infra, I recognize that my actual lack of knowledge of relevant facts is not the proper focus for recusal analysis.   Rather, I must decide what a reasonable person, knowing all the circumstances, would expect I actually knew.   See Liljeberg.   486 U.S. at 860-61. Therefore, I have assumed, without finding, that a reasonable person could believe I was aware of Dr. Gilligan's involvement in this case in 2010, for example.

2026-3 at 70. Rather, I "was more neutral and more balanced" than the panelists. Id. at 70-71. Similarly, although they, like me, did not then know that Dr. Gilligan was involved in this case, the two other federal judges who saw the film and the panel did not perceive any issue concerning the propriety of my participation. See D.N. 1978 at 14.

The government argues that the "unbalanced" or "one-sided" nature of the panel would cause, or contribute to causing, a reasonable person to question my impartiality. This position conflicts with the practice of the Department of Justice in inviting federal judges to train Assistant United States Attorneys and Department of Justice lawyers at its National Advocacy Center. For example, the National Advocacy Center offers a Criminal Appellate Advocacy Seminar in which prosecutors are "required to participate in mock oral arguments before faculty and a circuit judge." See U.S. Dep't of Justice Offices of the U.S. Attorneys, Course Offerings: FY-2016 Course Descriptions (Aug. 25, 2015) (emphasis added).[29]   The National Advocacy Center also offers a seminar on Motion Practice and Brief Writing for Civil Attorneys which "culminate[s] in videotaped oral argument before federal judges." Id. (emphasis added). Evidently, and correctly, the Department of Justice does not believe that such "one-sided"

[29]   Available at http://www.justice.gov/usao/training/course-offerings/course-descriptions-2016.

programs for prosecutors only raise issues under §455(a).  Like
many federal judges, many years ago, I taught federal prosecutors
at the National Advocacy Center.

As explained in §II, supra, it is permissible for a judge to
speak to a group representing one side of litigation if he or she
is "equally available to address the other litigation
constituency."  Judicial Conference of the United States,
Committee on Codes of Conduct, Adv. Op. No. 105: Participation in
Private Law-Related Training Programs (Sept. 2010).  Therefore, it
is important to consider other events in which I have participated.
See Pitera, 5 F.3d at 626-27; see also In re Charges of Judicial
Misconduct, 404 F.3d at 694.  A knowledgeable, reasonable person
would know that I have participated in some programs solely for
prosecutors and law enforcement officers, as well as engaging in
many activities for the criminal defense bar, and in joint programs
for prosecutors and criminal defense lawyers as well.

For example, in 2010, while he was the lead prosecutor in
this case, Mr. Wortmann and Assistant United States Attorney
Theodore Heinrich served on the Planning Committee that I chaired
for a June 15, 2010 program of the District Court, at the
courthouse, on "Rwanda, Darfur, and Youth Violence in Boston."
See Add'l Evid. Order, Ex E.  The participants included a
representative of the Boston Police Department, whose officers
often testify before me.  However, neither I nor, evidently, the

75

government or anyone else perceived that my collaboration with Mr. Wortmann, or my participation in the program, raised a question concerning my possible recusal in any of the many cases in which Mr. Wortmann regularly appears before me, including this one.[30]

Similarly, on December 7, 2010, I spoke at the dedication of a courtroom, to be used for training, at the Boston Police Academy. Mr. Wortmann and First Assistant United States Attorney Jack Pirozzolo also spoke at that event. See Add'l Evid. Order, Ex. F. At the Academy, I emphasized the importance of law enforcement officers writing reports accurately and testifying truthfully. I said that I viewed the courtroom that was being dedicated as a symbol of the Boston Police Department's commitment to law enforcement that will be fair and more effective.

---

[30] Following my usual practice, I also included a young person, Taisha Sturdivant, in the program. Taisha had worked in my chambers as a Fellow in the Judge David S. Nelson program for Boston students that I chaired for the District Court for many years. Taisha's contribution to the "Rwanda, Darfur, and Youth Violence in Boston" discussion led to her being given an opportunity to write a series of guest columns for the Boston Globe from the perspective of a young black woman. See Charles B. Fancher, Jr., God Bless the Child That's Got Her Own, B.C. Law Sch. Mag., Summer 2015, at 40, 43, available at http://lawmagazine.bc.edu/2015/06/god-bless-the-child-thats-got-her-own/. Taisha wrote one of her columns on the Boston Future Stars camp, discussed in footnote 31, infra, where she was working that summer, and mentioned that speakers at the camp had included Boston Police Commissioner Edward Davis, Suffolk County District Attorney Dan Conley, and me. See Taisha Sturdivant, Boston needs more safe havens for kids, Boston Globe, Aug. 16, 2010, at A11.

In my remarks at the Academy, as in my remarks at the Film Society, I did not discuss the Sampson case.  However, my remarks at the Academy did have general relevance to it.  In 2003, Sampson alleged as a mitigating factor that he had called the FBI in an attempt to surrender on bank robbery charges before murdering Mr. McCloskey and Mr. Rizzo, but the FBI never came to arrest him. See D.N. 654 at 8; 654-2 at 8.  In the retrial, 16 of Sampson's 308 mitigating proposed mitigating factors relate to his attempt to surrender.  See D.N. 1868.  In a case assigned to me, in 2003, an FBI employee admitted to repeatedly lying in denying that he had received that telephone call from Sampson.  See United States v. Anderson, 249 F. Supp. 2d 60, 61-62 (D. Mass. 2003).  This failure of a member of law enforcement to provide accurate information almost deprived Sampson of important evidence of a mitigating factor that eight jurors found to be proven in 2003. See D.N. 654-2 at 8.

Therefore, my remarks at the Academy generally related to an issue in this case in a way that is similar to the discussion on the DeFriest panel of prisoners alleged to be mentally ill or abused by prison guards generally related to issues in this case. Nevertheless, neither Mr. Wortmann, the First Assistant United States Attorney, nor I thought that my participation with them, or my remarks, at the ceremony at the Academy raised an issue that should have been disclosed or discussed concerning whether a

reasonable person would question my impartiality in this case or any other.

Like the judge in Pitera, I have also participated in many matters involving the criminal defense bar. For example, I chaired the committee which, in 1993, reformed the District Court's Criminal Justice Act Plan, including the way in which counsel for indigent defendants are appointed. I also twice chaired the First Circuit committee to advise on the reappointment of the Federal Public Defender. In addition, I have participated in many programs exclusively for members of the Criminal Justice Act panel. I have also initiated or participated in many joint programs for prosecutors and defense lawyers. See, e.g., United States v. Jones, 620 F. Supp. 2d 163, 185 (D. Mass. 2009) (ordering joint Brady training); United States v. Jones, 686 F. Supp. 2d 147 (D. Mass. 2010) (discussing the effects of joint Brady training).[31]

---

[31] I have also been involved in other efforts to educate the public on matters relating to the administration of justice, including contributing to programs for young people at risk of becoming involved in the criminal justice system. For example, in 1998, I helped my son, who was a high school student, start the Red Auerbach Future Stars camp to keep Cambodian and Hispanic youth in Lowell, Massachusetts out of violent street gangs by introducing them to sports and other constructive activities. The Lowell Police Superintendent, Edward Davis, became a virtual partner in the camp, at which I spoke annually and met Superintendent Davis. After Mr. Davis became the Boston Police Commissioner in 2006, he prompted my son to start a second camp in Boston, at which I also spoke annually. These programs, including at times my role, were reported on in the media. See, e.g., Brian R. Ballou, Camp teaches peaceful solutions, Boston Globe, Aug. 16, 2008, at B4; Peter Gelzinis, Wolf working wonders for our kids, Boston Herald, May 2,

In view of the foregoing, I find that a reasonable person could not question my impartiality in this case based solely on my role in the DeFriest program.

> 2. The Added Fact that Dr. Gilligan Had Submitted an Affidavit in 2010 Could Not Cause a Reasonable Person to Question My Impartiality

I understand that "where a presentation concerns issues material to the disposition of litigation or involves parties, witnesses, or counsel in particular actions, the recusal calculus will differ, albeit again without an applicable mechanical standard." In re Aguinda, 241 F.3d at 206.

As explained earlier, the DeFriest film focuses on a particular prisoner, explores whether he is mentally ill, and what the effects of his experience in prison have been on him. None of these issues are material to the disposition of this case.

However, the fact that Dr. Gilligan had been involved in Sampson's case prior to participating on the panel must also be

---

2008, at 6; Matthew P. Collette, Judge's son honored for work with at-risk teens, Boston Globe, May 1, 2008, at B3; Peter Gelzinis, Learning leadership at Dorchester Camp, Boston Herald, Aug. 3, 2007, at 19; Camp Steers Kids Away from Violence: Program Gives At-Risk Kids More Choices, TheBostonChannel.com, July 30, 2007; Peter Gelzinis, Summer camp sheds light on new top cop's vision, Boston Herald, Nov. 19, 2006, at 4; Monica Rhor, Haven from life's hard lessons, Boston Globe, July 19, 2004, at A1; Christopher Cox, Weston man takes on gang violence in Lowell, Boston Herald, Aug. 6, 2001, at 6. I have nevertheless presided without any §455(a) question being raised in innumerable drug and gun cases involving youthful defendants from Boston and Lowell. Many of those cases have been prosecuted by Mr. Wortmann.

considered in evaluating whether a reasonable person could question my impartiality in this case. In July 2014, I did not realize that Dr. Gilligan was, among many other experts, mentioned in the Amended Petition and had filed one of many affidavits in support of the request for a new trial. Nevertheless, I understand that "[u]nder section 455(a), . . . recusal is required even when a judge lacks actual knowledge of the facts indicating his . . . bias in the case if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge." Liljeberg, 486 U.S. at 860-61 (internal quotation marks omitted). My reference to Dr. Gilligan's 2010 Affidavit, among other materials, in a June 6, 2014 Order concerning the Bureau of Prisons competency evaluation makes it appropriate to assume, without necessarily finding, that a reasonable person could believe I knew that he had been involved in this case. See id.

However, again, the information in the record as a whole must also be considered. See, e.g., Pitera, 5 F.3d at 626-27; In re Cargill, 66 F.3d at 1260; In re Allied-Signal, 891 F.2d at 972. In July 2014, an informed, reasonable person would have known that Dr. Gilligan had not been retained by Sampson to testify at the retrial.[32]  Therefore, in addition to the facts relating to the

---

[32] The January 2014 budget submission characterized Dr. Gilligan as a fact witness as well as an expert. See 2001-1 at 4. This

film and the panel discussed in §IV.A.1, supra, in July 2014 a reasonable person would have known that I entertained in my home a person who had filed an affidavit in this case, which I never referenced or relied upon, and that I moderated the panel on which he spoke.

On that panel, Dr. Gilligan made comments that were comparable to some of the general statements about violence in prison that are in his 2010 affidavit. See D.N. 1035-200 and -201. He did not, however, say anything about Sampson or this case. In moderating the panel, I stated that my participation should not be construed as an endorsement of the case for DeFriest's parole, or an expression of my views on any of the issues raised by the film, or as a comment on any other case or issue, including the death penalty. Once again, I believe a reasonable person would understand and accept these statements as true.

---

statement, however, was contradicted by Sampson's earlier representation that Dr. Gilligan was only an expert witness, see D.N. 1060 at 44-45 n.32. The correctness of this characterization was confirmed by Dr. Gilligan's affidavit, in which he stated that he had been retained as an expert, see D.N. 1035-200, ¶1 (Under Seal), and in which he reports no contact with Sampson except as an expert in the §2255 proceedings, see D.N. 1035-200, 1035-201; see also D.N. 2001-3 (Sampson's counsel stating that Dr. Gilligan did not have contact with Sampson decades ago while Sampson was at Bridgewater but did meet with him during the §2255 proceeding). In any event, when he was interviewed by the government, Dr. Gilligan said that in July 2014, he was not involved in this case and did not know that he would become involved later. See D.N. 2026-2 at 26, 34.

I do not believe that the added fact that I invited Dr. Gilligan to my rented home and gave him a light supper would cause, or contribute to causing, a reasonable person to question my impartiality. Dr. Gilligan and I are now acquainted, but are not friends. Even if Dr. Gilligan and I were friends, my recusal would not ordinarily be required. See O'Brien, 18 F. Supp. 3d at 34-35 (citing cases).[33] As I wrote in 1998:

> Generally, familiarity--or even a judge's friendship with prospective witnesses--does not require a judge's recusal under §455(a). See, e. g., Parrish v. Board of Comm'rs of Ala. State Bar, 524 F.2d 98, 103-04 (5th Cir.

---

[33] In O'Brien, 18 F. Supp. 3d at 34-35, Judge Saylor wrote:

The mere fact that a witness, especially a minor witness, might be a friend or colleague of the judge does not normally require recusal. See, e.g., In re Beyond Innovation Technology Co., Ltd., 166 Fed. App'x 490, 491 (Fed. Cir. 2006) (holding that recusal was not required where the expert damages witness in a patent case was "a close personal friend" of the judge); United States v. Kehlbeck, 766 F. Supp. 707, 712 (S.D. Ind. 1990) (noting that "judges may have friends without having to recuse themselves from every case in which a friend appears as counsel, party, or witness"); M.K. Metals, Inc. v. Nat'l Steel Corp., 593 F. Supp. 991, 996 (N.D. Ill. 1984) (noting that "friendship between judges and trial actors other than parties, untainted by any financial interests, should not generally justify recusal"); In re Jim Slemons Hawaii, Inc., 2013 WL 980115, at *12 (9th Cir. BAP Mar. 13, 2013) (noting that "[s]ocial acquaintances, friendships or associational relationships are rarely grounds for recusal"); United States v. Nelson, 2010 WL 2629742, at *7 (E.D.N.Y. June 28, 2010) (noting that "[m]any opinions have discussed the impact of a judge's 'friendship' with a litigant or 'interested party' on the decision to disqualify under §455(a). In few cases, however, has disqualification been deemed required.").

1975) (en banc); <u>United States v. Mavroules</u>, 798 F.Supp. 61, 63 (D. Mass. 1992); <u>Hirschkop v. Virginia State Bar Ass'n</u>, 406 F.Supp. 721, 724-25 (E.D. Va. 1975). This is the general rule because it is recognized that the public understands that judges are usually longstanding members of the community in which they serve and although they will inevitably encounter witnesses with whom they, or people close to them, have had positive or negative experiences, judges can and will ordinarily ignore those experiences and decide the matters before them impartially. <u>See</u> <u>In re United States</u>, 666 F.2d at 696-97.

<u>Salemme II</u>, 164 F. Supp. 2d at 104-05.[34]

Accordingly, I find that the additional facts that Dr. Gilligan submitted an affidavit in 2010, and was given supper by me before the <u>DeFriest</u> program, could not cause a reasonable person to question my impartiality. Therefore, my recusal under §455(a) is not justified.

This conclusion is not contradicted by my statement on June 19, 2015 that if I had known Dr. Gilligan had filed an affidavit in this case, I would have told Mr. London that he could have one of us on the panel and suggested he choose Dr. Gilligan. <u>See</u> D.N.

---

[34] <u>See also</u> <u>In re Beyond Innovation Tech.</u>, 166 Fed. App'x at 491 (finding that the trial judge did not clearly abuse his discretion in denying a motion to recuse under §455(a) where the witness at issue was the judge's "close personal friend" and "personal accountant"); <u>Hadler v. Union Bank and Trust Co. of Greensburg</u>, 765 F. Supp. 976, 978 (S.D. Ind. 1991) ("To conclude that this judge or any judge would ignore the law and his solemn oath in order to favor the testimony of a witness merely because of friendship with that witness one would have to engage in 'speculation.'").

2001-3 at 18.  As I explained on June 23, 2015, after Dr. Gilligan
became a proposed witness:

> [W]hen I was speaking on [June 19, 2015], which was
> necessarily quickly, I wasn't saying that a reasonable
> person would question my impartiality because  Dr.
> Gilligan and I have been on the same program.  I'm saying
> it was foreseeable that I would have to disclose it.
> There would have to be attention devoted to it.  It would
> be an unfortunate distraction.

See D.N. 1984 at 12.  As I also said on June 23, 2015, "I just
generally try to avoid these [§455(a)] issues."  Id. at 32.  I
believe that a reasonable person would understand that on June 23,
2015, I was seeking to explain that I was trying to be careful to
avoid activities that might possibly raise questions that might
need to be analyzed under §455(a), rather than expressing the view
that doing the DeFriest program with an affiant would require
recusal under §455(a).  In any event, I have now considered this
question more thoroughly and find that it does not.

> 3.    The Added Fact that Dr. Gilligan is a Prospective
>       Witness at the Retrial Could Not Cause a Reasonable
>       Person to Question My Impartiality

On June 19, 2015, I learned that Sampson had recently decided
to retain Dr. Gilligan as an expert witness to replace an expert
who would not be available for the retrial scheduled to begin in
September 2015.  Therefore, for the first time, this case involved
my association with a potential witness, which could cause the
recusal calculus to change.  See In re Aguinda, 241 F.3d at 206.
Having carefully considered this, in addition to all of the other

relevant facts, I conclude that a reasonable person could not now question my impartiality in this case.

Sampson has indicated that he will seek to have Dr. Gilligan testify to the matters discussed in his 2010 affidavit. See D.N. 2041 at 16 & n.7, 24; D.N. 2061 at 10 (Under Seal). In that affidavit, Dr. Gilligan stated that he had "been retained as an expert on prison conditions, the psychological effect of adverse conditions of confinement on inmates (including those with pre-existing vulnerabilities), and specifically the effects of those conditions on Gary Lee Sampson." D.N. 1035-200, ¶1. As a result of my participation on the panel, I heard Dr. Gilligan discuss his opinion of the psychological effects of adverse conditions of confinement, including violence, on prisoners, including those with mental illness. During the panel, I noted that the panelists were expressing "strong views" and that I did not necessarily agree with everything Dr. Gilligan had said. I had previously stated that my participation as moderator of the panel should not be misconstrued as a comment by me on any case or issue. I did, however, end by characterizing Professor Dershowitz and Dr. Gilligan as "literally, [] the two world's leading experts" on the issues discussed.

Dr. Gilligan's remarks on the panel were more general than his 2010 affidavit, which included background information not concerning Sampson specifically. I believe a reasonable person

would understand that the relevance of any testimony concerning the general matters Dr. Gilligan discussed on the panel, and the weight to be given to any such evidence if it is credible, will depend on its linkage to Sampson specifically. As explained earlier, however, neither the DeFriest film nor the discussion that followed it referred to Sampson. Therefore, I did not, in July 27, 2015, get a "pre-screening" of what would be the essential part of any admissible testimony Dr. Gilligan may have. Accordingly, as explained in §IV.B, infra, the facts of this matter are materially different than those in In re School Asbestos, 977 F.2d at 782, on which the government heavily relies.

I recognize that an informed, reasonable person would know that I had characterized Dr. Gilligan as one of the world's leading experts on some matters that may provide background for any admissible testimony he may have concerning Sampson specifically. A reasonable person would likely recognize this praise to be the sort of generous hyperbole common to moderators on similar occasions. In any event, I do not believe that my statement, in the context of all of the other relevant facts, could cause, or contribute to causing, a reasonable person to believe that I have "an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging" the merits of any issue relating to the admissibility of Dr. Gilligan's proposed testimony. See Snyder, 235 F.3d at 48 (internal quotation marks

omitted) (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring)); In re United States, 158 F.3d at 34 (same).

The government also argues that a reasonable person would question my impartiality with respect to the corrections officers the government intends to call as witnesses at the retrial because of Dr. Gilligan's characterization of many, but not all, prison guards as violent. However, again, a reasonable person would understand that my participation on the panel was not an endorsement of Dr. Gilligan's views on prison guards generally and, in any event, that he did not say anything about the guards who may be witnesses in this case. In addition, my role at the retrial will only be to determine whether the corrections officers have admissible testimony concerning Sampson that is not outweighed by the risk of unfair prejudice. See 18 U.S.C. §3593(c). The jury will decide whether each is credible and, if so, what weight to give to his testimony.

The manner in which I have dealt with the DeFriest program is also relevant to whether a reasonable person could question my impartiality. In the two cases cited by the government in which recusal was found to be required, the judges had not disclosed the relevant facts to the parties. See Liljeberg, 486 U.S. at 866 (in finding recusal required by §455(b)(4) because of judge's service as a trustee of a university that profited by millions of dollars as a result of his decision, and by §455(a) as well, the Supreme

Court stated that it was "remarkable--and quite inexcusable" that the judge did not disqualify himself as soon as he learned of the university's interest in the case or disclose the facts to the parties); In re School Asbestos, 977 F.2d at 780 (six months of "hard-fought" litigation was required for defendants to discover details of ex parte presentations by 13 of plaintiffs' experts on key, contested issues).

I did not discuss the DeFriest program with the parties in October 2014, when I realized Dr. Gilligan had filed an affidavit in 2010, because I did not believe that any possible issue was raised by my association with an expert who had, in 2010, filed an affidavit which I neither referenced nor relied upon, and who was not expected to be a witness at the retrial. In addition, I wanted to sustain the focus on preparing for the retrial scheduled to begin in February 2015. This analysis was unchanged by Sampson's reference to Dr. Gilligan in the April 2015 budget update concerning experts, as Sampson's counsel indicated that they "just didn't want to waive the possibility" of later retaining Dr. Gilligan. See id. at 6. However, I disclosed the matter instantly and candidly when I learned that Sampson had recently decided to retain Dr. Gilligan to serve as an expert witness at the retrial. These facts would contribute to a fully informed, reasonable person having confidence in my impartiality.

I also provided the government several weeks to investigate the matter, which is not a right provided by §455.  Section 455(e) authorizes the waiver of a possible ground for disqualification under §455(a) "provided it is preceded by a full disclosure on the record of the basis for disqualification."  The statute, therefore, requires full disclosure by the judge, but does not contemplate or provide for discovery in connection with a §455(a) issue.  See, e.g., Ricci v. Key Bancshares of Maine, 111 F.R.D. 369, 373 & n.4 (D. Maine 1986) (noting that the district judge denied a request for discovery in connection with a motion to disqualify him made pursuant to §455(a)).  In this case, I provided more than an opportunity for discovery, in which Sampson's counsel would have had a right to participate.  I gave the government several weeks to have an investigation conducted unilaterally by the United States Attorney's Office and investigators from the FBI, the Internal Revenue Service, and the Massachusetts State Police.

That investigation confirmed the facts that I had disclosed. I did not discuss Sampson or this case with Dr. Gilligan or anyone else associated with the DeFriest program.  Nor was there any meaningful discussion of the film at my rental home.  There was no reference to Sampson or the case in the film or on the panel.  At the unrecorded outset of the program, I explained that my participation should not be misconstrued as an expression of a view by me on DeFriest's case, any other case, or any issue.

Although I did characterize Dr. Gilligan as one of the world's leading experts, I also stated I did not agree with everything he said.

I find that a reasonable person could not believe that, as a result of my participation on the DeFriest program with Dr. Gilligan, I would now disregard my oath to be impartial and to faithfully apply the law in this case. Therefore, I am denying the government's motion for my recusal under §455(a).

### B.   Comparison with Other Cases

This conclusion is confirmed by the following comparison of this case with other relevant cases. As the First Circuit has explained, "[t]ypically, cases implicating section 455(a) are fact-specific, and thus sui generis." In re United States, 158 F.3d at 31. The instant case validates the view that every case is unique. Nevertheless, the facts and reasoning of the cases on which the parties primarily rely are consistent with the conclusion that my recusal is not justified in this case.

The government relies most heavily on In re School Asbestos in contending that my recusal is required. In that case, the judge had been presiding in four consolidated suits for about eight years, and the cases were almost ready for trial. In re Sch. Asbestos, 977 F.2d at 771-72. In holding that the judge's recusal was required by §455(a), the Third Circuit described some of the relevant facts, by stating that the judge:

90

[A]ttended a predominantly pro-plaintiff conference on a key merits issue; the conference was indirectly sponsored by the plaintiffs, largely with funding that [the judge] himself had approved; and his expenses were largely defrayed by the conference sponsors with those same court-approved funds. Moreover, he was, in his own words, exposed to a Hollywood-style "pre-screening" of the plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to what they expected to say at trial. We need not decide whether any of these facts alone would have required disqualification, for . . . we believe that together they create an appearance of partiality that mandates disqualification.

Id. at 782. The Third Circuit also noted that the promotional literature for the conference "trumpeted the appearance of the judges" at the conference. Id. at 780.

As indicated earlier, the judge did not disclose the foregoing facts to the parties even after the plaintiffs filed a list of 18 prospective expert witnesses that included the 13 who spoke at the conference. Id. When, after six months of "hard-fought" litigation, the defendants discovered the details about the conference, the judge initially decided to exclude the 13 experts from testifying and subsequently limited their testimony solely to factual matters. Id. at 780-81. The judge himself stated that "some people could reasonably suspect a taint" and stated that "had he known of the connections between the plaintiffs and the conference, he would not have attended." Id. at 783.

There are some analogies between the instant case and In re School Asbestos. Although I did not authorize funding for the

program at issue, I did participate in organizing it, allowed the Film Society to publicize my participation, and moderated the program. The three DeFriest panelists were generally critical of the United States prison system and the program was, in this sense, "one-sided." However, I repeatedly stated that I was not endorsing their views and, as described earlier, I have participated in many other programs that might be characterized as "one-sided"--some for prosecutors and law enforcement officers, others for defense lawyers.

Like the judge in In re School Asbestos, I have stated that if I had known that Dr. Gilligan had filed an affidavit in this case I would not have participated on the program with him. However, again, that was not because I believed that doing so could have caused a reasonable person to question my impartiality, but rather because I would have wanted to avoid the risk of even an unreasonable question concerning my impartiality. See D.N. 1984 at 12.

Most importantly, the instant case is materially different from In re School Asbestos with regard to the facts emphasized by the Third Circuit. See 977 F.2d at 782. No party participated in organizing the presentation of the DeFriest film or the panel discussion of it. Sampson did not provide funds for the program, did not send Dr. Gilligan to participate, and had no knowledge of it. Therefore, in contrast to the asbestos conference, a

92

reasonable person could not perceive the DeFriest program as an effort by a party to influence my decisions in this case.

The asbestos conference involved thirteen of plaintiff's eighteen expert witnesses on a key merits issue, and it was foreseeable that there would be intense litigation concerning the proposed testimony that was previewed at the conference. See id. at 782. In contrast, the DeFriest panel involved only one of Sampson's many potential expert witnesses. While Dr. Gilligan discussed some issues that are generally relevant as background for any admissible testimony he may have concerning Sampson, he did not mention, let alone express an opinion, on Sampson. Therefore, he did not give a "pre-screening" of what would be the most important part of any admissible trial testimony—testimony concerning Sampson himself. In essence, unlike the asbestos conference, the DeFriest panel had no direct connection to Sampson or his particular mitigation case.[35]

---

[35] In In re School Asbestos, the Third Circuit may have applied a lower standard for finding recusal under §455(a) is required than the First Circuit applies. The Third Circuit reasoned, in part, that, "people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges." In re Sch. Asbestos, 977 F.2d at 782. In contrast, the First Circuit has repeatedly stated that "mere suspicion" is not sufficient to justify recusal." See, e.g., In re Bulger, 710 F.3d at 97; In re Allied-Signal, 891 F.2d at 971; Cigna Fire, 86 F.3d at 1271; In re United States, 666 F.2d at 695 n.*. In any event, as described above, this case is materially different than In re School Asbestos.

Another case discussed by the parties, In re Aguinda, 241 F.3d at 203-04, 206, addressed, among other things, the implications of a judge attending a program of "unbalanced" presentations. Aguinda was a case brought by foreign plaintiffs who claimed that Texaco polluted rainforests in their countries. The District Judge dismissed the suit. Id. at 197. After the dismissal, he attended an expense-paid seminar sponsored by a non-profit entity, FREE, that discussed issues relating to the environment and pollution. Id. at 198-99. The program, which was "unbalanced," allegedly presented a pro-development, anti-environmental point of view. Id. at 202-04. Texaco, a defendant in Aguinda, had provided some funding for the FREE program, and the former CEO of Texaco was a speaker. Id. at 199, 202. The dismissal was subsequently reversed and the case was remanded. The plaintiffs moved for the recusal of the judge, who denied the motion.

The Second Circuit affirmed, holding that recusal was not permissible under §455(a) because no reasonable person could have questioned the judge's impartiality. Id. at 206-07. The Second Circuit found that, although "unbalanced," the presentation at the FREE seminar did not relate to legal issues material to the disposition of a claim or defense in the remanded case. Id. at 202, 204. It wrote that, "[e]ven if a judge were persuaded by the FREE seminar that our environmental laws are on balance harmful in

94

many respects, the presumption is that a judge will put personal
beliefs aside and rule according to the laws as enacted, as
required by his or her oath."  Id. at 204.  It added that "the
imbalance of a seminar involves no more of an objective appearance
of partiality than does that appearance created by the fact that
every judge inevitably has opinions on the controversies of the
day."  Id.

The instant case is comparable to Aguinda to the extent that
the DeFriest panel involved discussion of issues generally
implicated in this case, as well as others.  However, it did not
include any discussion of Sampson, this case, or any legal issue
to be decided in this case.  Therefore, like Aguinda, the panel
did not include discussion of issues material to the disposition
of this case.  Thus, the Second Circuit's reasoning in Aguinda
concerning the implications of an "unbalanced" presentation is
relevant.  However, I again recognize that this case presents the
additional issues arising from Dr. Gilligan's participation
analyzed previously.

United States v. Bonds, 18 F.3d 1327, is another case cited
by the parties in which recusal under §455(a) was found to be
unjustified.  In Bonds, a Court of Appeals judge denied a motion
to disqualify him from participating in a rehearing en banc.  Id.
at 1328.  A significant issue was whether blood found at a crime
scene was the defendant's.  Id.  The judge had attended a seminar

at which the speakers included several FBI forensic analysts who had testified at an evidentiary hearing concerning the admissibility of DNA testimony in the trial of the defendant and his co-defendants. Id. at 1328-29; see also United States v. Bonds, 12 F.3d 540, 552 (6th Cir. 1993). One of them spoke substantially about his testimony at the evidentiary hearing, and discussed new data not mentioned in his testimony. Bonds, 18 F.3d at 1329. The program was one-sided. Id. Some of the panelists attacked Bonds's attorneys, who were present. Id. The judge was seen conversing with a trial witness from the FBI's forensic laboratory. Id.

Nevertheless, the judge denied the request to recuse, in part because, in contrast to the instant case, the evidence he would be considering was already "frozen into the record sometime before." Id. at 1330. The judge analogized his attendance at the conference to acquiring information from a book or article. Id. at 1330-31. He concluded that:

> [A] reasonable person would not doubt my impartiality. An unreasonable person could focus on one aspect or another of things I have read or said, persons to whom I have talked, or articles in which I have been credited. However, a reasonable person, looking at all of the facts, would say that I am interested in the subject matter area, and no more.

Id. at 1331. Similarly, the DeFriest panel would encourage a reasonable person to believe that I am interested in educating the public concerning issues regarding prisons and prisoners, but not

that I would violate my oath to be impartial in this, or any other, case.

In Da Silva Moore, a magistrate judge denied a motion to recuse under §455(a) after he participated in a conference regarding e-discovery issues that arose in a case before him. Id. 868 F. Supp. 2d at 156-57, 159-60. Defense counsel in that case spoke on two panels with him. Id. at 160. The magistrate judge mentioned the case in which they were all participating, but not by name. Id. at 157.

The magistrate judge denied the request for his disqualification for several reasons. Among other things, he did not have any ex parte communications with defense counsel about the case. Id. at 160. In contrast to In re School Asbestos, supra, he had not received a "'pre-screening'" of the defendants' case because "the panel discussions only covered the subject of computer-assisted review in general." Id. at 162. Therefore, the magistrate judge concluded that his disqualification would be inconsistent with the Code of Conduct, which, as explained earlier, encourages judges to participate in programs to educate members of the bar and the public concerning matters relating to the administration of justice if doing so would not raise a reasonable question concerning their impartiality. Id. at 163-64. The instant matter is analogous to Da Silva in these respects.

97

Pitera is also an illuminating case.  There, the judge was
presiding in a drug case in which the death penalty was sought for
murder in furtherance of a continuing criminal enterprise.  See
Pitera, 5 F.3d at 626.  Seven months before trial, the judge gave
a lecture to the local federal Organized Crime Drug Enforcement
Task Force, which "included advice to the assembled agents and
prosecutors about steps they might take to increase the prospects
for conviction in narcotics cases and urged them to take such
steps."  Id.  The judge did not, however, mention the Pitera case.
Id.  She later denied the defendant's motion to recuse under
§455(a) in what the Second Circuit called a "carefully considered
oral decision."  Id.

The Second Circuit affirmed that decision.  Id. at 626-27.
As described earlier, it explained that the judge's comments had
to be viewed in the context of "significant matters" of which "a
reasonable person, knowing all the facts," would be aware.  Id. at
626 (emphasis in original).  In Pitera, this information included
the fact that the lecture had also included criticisms of
prosecutors and that the judge "commendably lecture[d] to a variety
of trial practice seminars."  Id. at 626-27.  Therefore, the Second
Circuit was "satisfied that a reasonable person knowing all the
facts would not think that the Judge's impartiality might
reasonably be questioned."  Id. at 627.

Similarly, in the DeFriest program, the Sampson case was not mentioned. I stated, among other things, that I did not necessarily agree with everything any panelist had said. I too participate in many programs for members of the bar and the public, including some that are exclusively for prosecutors and law enforcement officers. In essence, the argument for recusal is less strong in this case than in Pitera because a reasonable person would not believe that I was expressing my own views or endorsing Dr. Gilligan's.

In summary, with regard to the cases the parties discuss, this case is different in material respects from In re School Asbestos. It is more analogous to cases like In re Aguinda and Pitera, where recusal was not required.

Although, again, each case is unique, I have dealt with comparable issues before. In Salemme, I denied the government's motion to recuse based in part on my association with witnesses. See Salemme II, 164 F. Supp. 2d at 104-07. As discussed in Salemme II, id. at 101, 105-06, in In re United States, 666 F.2d at 691-97, the First Circuit held that the district judge's recusal was not required under §455(a) in a public corruption case when two trial witnesses had testified about corruption in a Governor's administration when the judge was his Chief Counsel, and the defendant, a State Senator, had supported the Governor. With regard to the defendant, the First Circuit wrote:

[I]t is beyond contemplation that [any] gratitude would
be of the weight necessary to cause a judge to jettison
his impartiality and, in open court day after day, to
violate his deepest professional and ethical commitments
as a judge.

* * *

[Finding recusal to be required] would reflect a more
jaundiced view as to when there should be a reasonable
doubt about a judge's impartiality than accords with the
public perception.

In re United States, 666 F.2d at 696-97.

Similarly, the questions the government asserts a reasonable

person would have about my impartiality concerning Dr. Gilligan

and issues discussed on the DeFriest panel are rooted in too

"jaundiced" a view of reasonable people. A reasonable person would

know that in affirming the death sentence I imposed in 2008, the

First Circuit wrote that "the sentencing proceedings in this case

were conducted fairly and with scrupulous attention to the process

required by law." Sampson, 486 F.3d at 52. Nevertheless, the

government asserts, in effect, that as a result of my role in the

DeFriest program, a reasonable person would believe that I now

have a "'disposition of a kind that a fair-minded person could not

set aside when judging [this] dispute.'" See Snyder, 235 F.3d at

48 (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring));

In re United States, 158 F.3d at 34 (same). In essence, it claims

that a reasonable person could believe I would now, because of the

DeFriest program, begin to violate my oath, be biased, and not

100

faithfully apply the law in any decisions I must make concerning Dr. Gilligan's proposed testimony and the testimony of correction officers the government intends to present concerning Sampson's dangerousness while on death row. See D.N. 2060 at 15-18. I find that a reasonable person could not have such doubts.

## C. The Interest of Heightened Reliability in a Capital Case Does Not Make Recusal Necessary or Appropriate

The conclusion that my recusal under §455(a) is not necessary or appropriate is not affected by the fact that heightened reliability is required in determining whether a death sentence is justified in a capital case. See Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality op.). As explained previously, the government agrees that I am actually impartial and has moved for my recusal only under §455(a), claiming that a reasonable person would question my impartiality. Because it is undisputed that I am actually impartial, there should be no question about the integrity, and therefore reliability and finality, of the decisions I have made, and may make, in this case.

In ordering Judge Richard Stearns's recusal under §455(a) in Bulger, the First Circuit noted the distinction between cases involving actual bias or prejudice that require disqualification under §455(b) and those in which recusal is required based only on an appearance of partiality under §455(a). It wrote:

Nor does our own ruling require that Judge Stearns's March 4 order [on the issue of immunity] (or any other,

> save the one under review) be vacated. The defendant is
> free to respond to that order as he sees fit, but nothing
> we decide here necessarily requires reploughing the
> ground, given the absence of any allegation that Judge
> Stearns is actually biased.

In re Bulger, 710 F.3d at 49 n.3 (emphasis added). Similarly, in
In re Allied-Signal, 891 F.2d at 972-73, the First Circuit
explained in extensive dictum that a violation of §455(a) would
not have required a retrial of a long and complicated case.

Relying in part on In re Allied-Signal, 891 F.2d at 972-73,
after ordering recusal under §455(a) in In re School Asbestos, 977
F.2d at 786-87, the Third Circuit wrote that, "we do not believe
that leaving [the district judge's] orders in place will cause any
serious injustice to the parties in this case." In Pitera, which
as explained earlier was a capital case, the Second Circuit did
not refer to the need for heightened reliability when the death
penalty is sought and applied the customary §455(a) standard to
find that the trial judge's recusal was not required as a result
of her lecture to prosecutors and law enforcement officers on
issues related to that case. See Pitera, 5 F.3d at 626-27.[36]

---

[36] In Liljeberg, the Supreme Court found that the judge learned he
had a fiduciary interest in the case and, therefore, that his
disqualification was required under §455(b)(4), as well as
§455(a). See Liljeberg, 486 U.S. at 866-67. The violation of
§455(b)(4) contributed to the Court's holding that vacatur of the
judge's decision benefiting the University on whose board he served
"was an appropriate remedy." Id. at 867. Liljeberg is the only
case cited by the parties that ordered vacatur of prior decisions
as well as recusal.

Moreover, Sampson, advised by experienced counsel, including counsel experienced in capital cases, has ardently argued that my recusal is not required under §455(a). It is likely that, if asked, he would, under §455(e), waive any objection relating to the DeFriest program, as he has repeatedly waived any §455(a) ground for my recusal based on my association with Mr. Hafer. It is, as the government argues, conceivable that if Sampson is again sentenced to death, successor counsel may assert that his current counsel are performing ineffectively with regard to the issue of recusal. It is, however, not conceivable that they could satisfy the "'highly demanding'" and "'heavy burden'" to justify relief based on ineffective assistance of counsel. See Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006) (quoting Williams v. Taylor, 529 U.S. 362, 394 (2000)); see also Strickland v. Washington, 466 U.S. 668 (1984).

To find recusal to be justified in this capital case, when it would not be in a non-capital case, would be inconsistent with the principle that a motion for recusal should not be granted simply because claims of partiality have been highly publicized. See, e.g., In re Aguinda, 241 F.3d at 201-02, 206; In re Drexel Burnham, 861 F.2d at 1309; see also In re United States, 666 F.2d at 694-95. It would also be incompatible with the requirement that in deciding whether to recuse under §455(a), "the district court is not to use the standard of 'Caesar's wife,' the standard of mere

suspicion." In re Allied-Signal, 891 F.2d at 970; see also In re Bulger, 710 F.3d at 47 (same); Cigna Fire, 86 F.3d at 1271 (same). Moreover, recusing in a capital case when disqualification would not be justified in a conventional case would contravene the direction that §455(a) "should not be used by judges to avoid sitting on difficult or controversial cases." Snyder, 235 F.3d at 45 (internal quotation marks omitted).

D.   Recusal Could Encourage the Reasonable Public Perception that the System Can Be Manipulated to Obtain a Preferable Judge

In view of the foregoing, I find that §455(a) does not require my recusal. This conclusion also serves the interest of assuring that §455(a) is not abused, and does not reasonably appear to have been abused, by a party to manipulate the system to replace an impartial judge with one it prefers. See In re Bulger, 710 F.3d at 47. Events in other cases in this District make it particularly important that any such perception not be encouraged now.

Litigants are entitled to a judge who is, and to a reasonable person appears to be, impartial. However, they are not entitled to a judge of their own choosing. See In re Drexel Burnham Lambert, Inc., 861 F.2d at 1312. In enacting §455(a):

Congress expressed concern over abusive invocation of the statute by parties as a means of judge shopping, stating:

Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a

> question against him into a "reasonable fear"
> that the judge will not be impartial.
> Litigants ought not have to face a judge where
> there is a reasonable question of
> impartiality, but they are not entitled to
> judges of their own choice.

United States v. Cooley, 1 F.3d 985, 993 (10th Cir. 1993) (quoting

H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974)).

The First Circuit has written that "[i]n the real world,

recusal motions are sometimes driven more by litigation strategies

than by ethical concerns" and "courts cannot afford to spawn a

public perception that lawyers and litigants will benefit by

undertaking such machinations." In re Cargill, 66 F.3d at 1262-

63.

Therefore, again, with regard to motions for recusal under

§455(a), the First Circuit has repeatedly and recently reminded

that:

> the disqualification decision must reflect not only the
> need to secure public confidence through proceedings
> that appear impartial, but also the need to prevent
> parties from too easily obtaining the disqualification
> of a judge, thereby potentially manipulating the system
> for strategic reasons, perhaps to obtain a judge more to
> their liking.

In re Bulger, 710 F.3d at 47 (internal quotation marks omitted)

(quoting In re Allied-Signal, 891 F.2d at 970)).[37]

---

[37] In neither its memorandum in support of its motion for recusal,
see D.N. 2025, nor its reply brief, see D.N. 2060, does the
government discuss the First Circuit's repeated statements that
the disqualification decision must reflect both the need for
proceedings that appear to be impartial and also the need to

The judges of this District Court have long been concerned about the damaging effect that the reasonable perception that the assignment of cases can be manipulated has on the public confidence in the administration of justice. Concern about this issue has increased as a result of certain recent events.

For example, in 2001, Rule 40.1(E) of the Local Rules of the United States District Court for the District of Massachusetts was amended to provide that, "[c]riminal cases shall be assigned to that division in which the most significant criminal conduct related to the alleged violation occurred within the District of Massachusetts." Nevertheless, in 2012, the government indicted in Worcester a RICO case against the Commissioner of the Massachusetts Probation Office, who was based in Boston, and two of his deputies. See O'Brien, 18 F. Supp. 3d at 27-28. "Essentially, the government contend[ed] that defendants engaged in a scheme to defraud involving the process of hiring probation officers, in which individuals who were 'sponsored' by state legislators would be hired in return for favorable appropriations and other legislation." Id. at 28. The Legislature, like the Commissioner of Probation, is based in Boston, which is in the Eastern Division of the District of Massachusetts. The fact that the indictment

---

prevent the appearance that a party can manipulate the system to obtain a judge it prefers.

was obtained in Worcester could have reasonably encouraged the perception that the government was seeking to evade the random assignment of cases that occurs in the Eastern Division, which in 2012 had about eleven judges, and select the one judge then based in Worcester, Judge Saylor.

The defendants subsequently moved for Judge Saylor's recusal, primarily relying on the claim that they intended to present as a witness at trial Judge Timothy S. Hillman, who as the Magistrate Judge sitting in Worcester had worked closely with his friend Judge Saylor, including on the O'Brien case. Id. at 28-30. Judge Saylor granted that motion. Id. at 37-38. However, Judge Hillman was never called to testify.

The two cases against James "Whitey" Bulger raised comparable concerns. Bulger had been a fugitive from charges in a case assigned to me in 1995. He was subsequently charged in a second case before Judge Stearns.[38] In the 1980s, Judge Stearns held several managerial positions in the Criminal Division of the United States Attorney's Office in the District of Massachusetts. Bulger moved for Judge Stearns's recusal under §455(a). See In re

---

[38] I denied Bulger's motion to consolidate the case before Judge Stearns with my case pursuant to Federal Rule of Criminal Procedure 8 and Local Rule 40.1(J). See United States v. Bulger, No. 94-cr-10287, 2011 WL 2600996 (D. Mass. June 30, 2011). As explained at a June 30, 2011 hearing, I denied Bulger's request in meaningful measure because my taking the case from Judge Stearns would have encouraged the perception that Bulger had successfully manipulated the system to select a judge he preferred.

Bulger, 710 F.3d at 44-45. He argued that a reasonable, fully informed person would question Judge Stearns's impartiality because of his responsibilities in the Criminal Division, his continuing friendship with the former Chief of the Criminal Division and then-Director of the FBI, Robert S. Mueller, III, and the fact that Mr. Mueller and Judge Stearns would be called as material witnesses concerning Bulger's immunity defense. Id. The First Circuit found that Judge Stearns's recusal was required by §455(a). Id. at 48-49. However, after the case was reassigned, Bulger did not call Mr. Mueller or Judge Stearns to testify to the judge on the immunity issue or to the jury on any other issue.[39]

Bulger and O'Brien reasonably suggest that §455(a) can be misused to have an impartial judge replaced with another judge a party might prefer. As indicated earlier, several aspects of the history of this case implicate the interest of not encouraging a

---

[39] I have, for present purposes, assumed that Dr. Gilligan will be a witness at retrial. However, as explained earlier, Sampson's counsel have not "categorically committ[ed]" to calling Dr. Gilligan to testify. D.N. 2011 at 1. Rather, they have stated that "at this time Dr. Gilligan continues to be a witness Mr. Sampson may seek to present at the trial of this matter." Id. Dr. Gilligan was selected by Sampson to replace an expert witness who was unavailable to testify at a retrial beginning on September 16, 2015. The retrial is being postponed. It is possible that the expert that Sampson preferred will be available for the retrial or that Dr. Gilligan will not be called by Sampson to testify for some other reason. Although the risk that Dr. Gilligan will not be called to testify has not affected my analysis of the §455(a) issue, it should be recognized that it exists.

reasonable public perception that parties will benefit by too easily obtaining the disqualification under §455(a) of an admittedly impartial judge.

The government's inconsistent position regarding recusal issues in this case could suggest strategic motivations. As described earlier, a reasonable, fully informed person would know that my association with the lead prosecutor in this case, Mr. Hafer, is greater than my association with Dr. Gilligan. I attended Mr. Hafer's wedding, hosted him and his wife in my home, successfully recommended both of them for jobs (including Mr. Hafer's present position as a federal prosecutor), and publicly praised Mr. Hafer as having experience and qualities comparable to some of the finest prosecutors with whom I had worked. In 2010, when Mr. Hafer first appeared in this case, the government represented that my recusal was not required under §455(a) because no reasonable person could question my impartiality and, in any event, waived any ground for my recusal under §455(e).[40]

It was not until I vacated Sampson's death sentence and the First Circuit affirmed that the government suggested I should recuse myself because of my association with Mr. Hafer. See

---

[40] Similarly, as discussed earlier, the government did not suggest that my recusal was required under §455(a) because of the two programs in which Mr. Wortmann, who was the lead prosecutor in the case, and I collaborated in 2010.

Sampson 12 F. Supp. 3d 203, 212 (D. Mass. 2014).   I declined to disqualify myself in part because recusal would encourage the reasonable perception that §455(a) can be abused to have an impartial judge replaced for strategic reasons.   Id.[41]

---

[41] As I explained in 2014, my concern about the injurious public perception that a party can without justification influence the judge who will preside in its case is long-standing.   See Sampson, 12 F. Supp. 3d at 212.

> In 1994, the United States Attorney's Office took the position in United States v. Sawyer, Cr. No. 94-10168-MLW, that my disqualification under 28 U.S.C. §455(a) was neither necessary nor appropriate, where the prosecutor had been my part-time personal assistant in the United States Attorney's Office, I later successfully recommended him for employment in that office, and I had recently officiated his wedding.   In Sawyer, the government offered to replace the lead prosecutor, if necessary, to keep me as the judge in the case.

> In a September 2, 1994 Memorandum and Order, I ruled that, under In re Allied-Signal, it would be permissible for me to preside in the Sawyer case. However, in view of the confluence of several unique factors, I recused myself. Among those factors was my desire not to encourage the public perception that the United States Attorney could influence which judge would preside in a criminal case by its selection of a particular person to prosecute it.   See United States v. Sawyer, Cr. No. 94-10168-MLW, slip op. at 12 (D. Mass. Sept. 2, 1994).   In Sawyer, the prosecutor had a long history with the case and I had none.   In Sampson, the situation [with regard to Mr. Hafer] is essentially the reverse.   Id.

Id.
    Similarly, in the original case against Bulger and others in 1998, I denied the government's motion for my recusal under §455 based in part on matters it had previously stated would not cause a reasonable person to question my impartiality, including my friendship with former colleagues in the United States Attorney's office, and, in any event, had twice waived as grounds for my

The interest of not encouraging a reasonable public perception that parties will benefit by too easily obtaining the disqualification under §455(a) of an admittedly impartial judge is also implicated by the government's present motion. As described earlier, in finding that the 2003 trial to determine Sampson's sentence was fair, the First Circuit wrote that I "handled the case patiently and sensitively." Sampson, 486 F.3d at 51. It concluded that "the sentencing proceedings in this case were conducted fairly and with scrupulous attention to the process required by law." Id. at 52. As I said when I sentenced Sampson to death in 2003, providing that fair trial "required making decisions that I understand were painful to the victims' families, but which were legally necessary and appropriate." Sampson, 300 F. Supp. 2d at 277.

Nevertheless, at Sampson's sentencing in 2003, the father of one of Sampson's victims expressed "outrage" at my conduct of the trial. See Jan. 29, 2004 Tr. at 7 (D.N. 775). This outrage was reported to have been expressed again when I vacated Sampson's sentence because misconduct by a juror had violated Sampson's constitutional right to a fair trial. See O'Ryan Johnson and John

---

disqualification. See United States v. Salemme, 164 F. Supp. 2d 49, 84-85 (D. Mass. 1998) ("Salemme I"); Salemme II, 164 F. Supp. 2d at 94-96. I denied the government's request to withdraw its waivers and rejected the government's request for my recusal in part because of concerns about the perception of judge shopping. See Salemme II, 164 F. Supp. 2d at 94-96.

Zaremba, Judge blasted for killer flip, Boston Herald, Oct. 21, 2011 (D.N. 2046-3 at 18-19). In 2014, after I discussed the possibility of ordering that Sampson's competency to stand trial be evaluated, the media reported that the same individual called my "actions 'infuriating' and said he was trying to take steps to have the judge removed from the Sampson case." See Chris Burrell, Families of murderer Gary Sampson's victims distressed by latest ruling from judge, The Milford Daily News, Mar. 19, 2014 (D.N. 2046-6 at 1-2). This desire for my disqualification has recently been reiterated. See Milton Valencia, Recusal call clouds Gary Sampson case, Boston Globe, August 31, 2015, at A1.

For the reasons described in detail in this Memorandum, after careful consideration I have concluded that no reasonable person could believe that, as a result of my participation in the DeFriest panel, I now have a "disposition of a kind that a fair-minded person could not put aside when judging" matters in this case. Snyder, 235 F.3d at 48 (quoting Liteky, 510 U.S. at 557-58 (Kennedy, J., concurring)). Recusal in the current circumstances would be incompatible with my duty to be sensitive to the "need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." In re Allied-Signal, 891 F.2d at 970. As indicated earlier, it would also be inconsistent with my duty not to misuse §455(a) by recusing

112

myself to avoid presiding in a difficult and controversial case. See Snyder, 235 F.3d at 45.

V.  CONCLUSION

For the forgoing reasons, the government's motion for my recusal under §455(a) is being denied.

The parties and I have devoted much of the past two years to preparing for what Sampson represents would have been the fastest retrial of a federal capital case in history. I had established an intensive schedule for submissions, hearings, and decisions in August and September 2015 to prepare for a September 16, 2015 retrial. More than two months have now been devoted to the government's investigation, the parties' briefing, and my deciding the government's motion for recusal, rather than to resolving the many other pretrial issues that were on the agenda. Therefore, it will not be possible to begin the retrial as scheduled before a judge the parties each acknowledge is actually impartial.

Nor can a new schedule be established until the motion for my recusal is finally resolved. The government may wish to petition the First Circuit for a writ of mandamus reversing the denial of its motion for my disqualification. Such a writ is sought under the All Writs Act, 28 U.S.C. § 1651, which provides no time limit for seeking review. See Cheney v. U.S. Dist. Ct. for Dist. Of Columbia, 542 U.S. 367, 378 (2004). Pursuant to Federal Rule of Appellate Procedure 4(b)(1)(B), the government usually has 30 days

to file a notice of appeal in a criminal case. I am providing the government until October 13, 2015, to state whether it will seek a writ of mandamus.

VI.  ORDER

In view of the foregoing, it is hereby ORDERED that:

1.  The government's Motion for Recusal (D.N. 2025) is DENIED.

2.  The government shall report, by October 13, 2015, whether it intends to seek a writ of mandamus from the First Circuit regarding the Motion for Recusal.

3.  Sampson's Motion to Seal Exhibits to Recusal Response (D.N. 2046) is DENIED and the exhibits (D.N. 2046-1 to -7) are UNSEALED.

4.  An ex parte order authorizing Sampson to retain Dr. James Gilligan as an expert witness shall be issued.

_____
UNITED STATES DISTRICT JUDGE