UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA          )
                                  )
        v.                        )        Cr. No. 01-10384-MLW
                                  )
GARY LEE SAMPSON                  )

MEMORANDUM AND ORDER REGARDING GRAND JURY

WOLF, D.J.                                      September 11, 2015

This memorandum is based on the transcript of the decision
rendered orally on February 18, 2015, denying defendant Gary
Sampson's Motion to Strike the Death Notice for Failure to
Inform the Grand Jury of the Consequences of its Special
Findings (Docket No. 1436) (the "Motion").  See Feb. 18, 2015
Tr. (Docket No. 1818).[1]  This memorandum adds background
information and citations, clarifies some language, and refines
some discussion.

* * *

I.  INTRODUCTION

In this case, Sampson is charged with two counts of
carjacking resulting in the deaths of Phillip McCloskey and
Jonathan Rizzo, in violation of 18 U.S.C. §2119(3).  As
permitted, but not required, by the Federal Death Penalty Act of

---

[1] Sampson has raised several issues related to the grand jury
proceedings.  This memorandum addresses his arguments related to
the grand jury not having been informed that its factual
findings could make this a capital case.  The defendant's other
grand-jury related arguments are addressed in the February 18,
2015 transcript.

1994 (the "FDPA"), 18 U.S.C. §3591 et seq., the government decided to seek the death penalty.  It did not, however, inform the grand jury presented with the proposed indictment that the requested special findings would make this a capital case.  In the Motion, Sampson argues that the grand jury was, therefore, unable to perform its constitutional function and the capital charges should be dismissed.  As explained in this Memorandum, this argument is unmeritorious.  Therefore, the Motion is being denied.

II.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

On July 24, 2001, Mr. McCloskey picked up Sampson, who was hitchhiking.  Sampson murdered Mr. McCloskey and attempted to steal his automobile.  On July 27, 2001, Sampson was again hitchhiking.  He was picked up by Mr. Rizzo.  Sampson murdered Mr. Rizzo.  Sampson then stole Mr. Rizzo's automobile.  On July 30, 2001, Sampson, while in New Hampshire, encountered Robert "Eli" Whitney.  He murdered Mr. Whitney.  He then stole Mr. Whitney's automobile.  The next day, after a failed attempt at another carjacking, Sampson surrendered to the police and confessed to these murders.

In October 2001, a federal Indictment was returned against Sampson in the District of Massachusetts, alleging two counts of carjacking resulting in the deaths of Mr. McCloskey and Mr. Rizzo.  A superseding indictment was returned on June 5, 2002.

On June 24, 2002, the United States Supreme Court decided Ring v. Arizona, 536 U.S. 584 (2002), which requires that an indictment allege the statutory aggravating factors the government will seek to prove in support of a death sentence. See United States v. Sampson, 245 F. Supp. 2d 327, 331-32 (D. Mass. 2003). Therefore, on August 8, 2002, a third grand jury returned a second superseding indictment against Sampson (the "Indictment").

Sampson pled guilty to the charges in the Indictment.  A jury trial was conducted, pursuant to the FDPA, to determine whether a death sentence was justified.  The jury decided that Sampson should be executed.

This court, therefore, sentenced Sampson to death.  This court later vacated the jury's verdict following the discovery that a juror had persistently lied during the jury selection process.  See United States v. Sampson, 820 F. Supp. 2d 151 (D. Mass. 2011), aff'd, 724 F.3d 150, 170 (1st Cir. 2013).  Sampson now faces another jury trial to determine his sentence.

On August 1, 2014, Sampson filed the Motion.  The Motion argues, in essence, that in order to fulfill its constitutional role as a bulwark between the government and the accused, the grand jury has the right to charge a non-capital offense, even if the evidence supports the findings necessary to charge a capital offense.  Sampson, therefore, contends that the

3

government must inform the grand jury that the proposed findings constitute a capital offense.

Sampson alleged that the grand jury which returned the Indictment was not informed that it was being asked to charge a crime for which the death penalty could be imposed.  On August 14, 2014, the court ordered the government to disclose, pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E), the transcripts of the government's instructions to the grand jury. See Aug. 19, 2014 Order Memorializing Decisions at the Aug. 12 and 14, 2014 Hr'gs, ¶4(b).  The government filed a motion to reconsider this Order on August 27, 2014.  The court denied this motion on November 12, 2014.  See Nov. 14, 2014 Order Concerning Grand Jury Discovery, ¶¶1-2.

Following the disclosure of the grand jury transcripts, Sampson filed a supplemental memorandum alleging that the government committed other errors during the grand jury proceedings.  Therefore, Sampson argues, the grand jury did not function as an independent body as required by the Constitution.

III. ANALYSIS

Sampson's contention that a grand jury must be informed that the findings it is being asked to make will make the alleged crime a capital offense is incorrect.  In essence, the grand jury has the power to disregard the evidence and refuse to bring a capital charge even if probable cause exists.  The grand

4

jury does not, however, have the right not to bring a capital charge when the government seeks the death penalty and probable cause exists regarding each factor that makes the defendant eligible for the death penalty.

This issue is raised by the dicta in Campbell v. Louisiana, 523 U.S. 392, 399 (1998), and Vasquez v. Hillery, 474 U.S. 254, 263 (1986). Campbell involved the practice of excluding blacks in the selection of grand jury forepersons. In dicta, the Supreme Court wrote:

> The grand jury, like the petit jury, "acts as a vital check against the wrongful exercise of power by the State and its prosecutors." It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, including the important decision to charge a capital crime.

Campbell, 523 U.S. at 399 (citation and internal quotation marks omitted) (quoting Powers v. Ohio, 499 U.S. 400, 411 (1991)).

In Vasquez, which involved the systematic exclusion of blacks from the grand jury, the Supreme Court wrote essentially the same and added that "[t]he grand jury is not bound to indict in every case where a conviction can be obtained." Vasquez, 474 U.S. at 263 (internal quotation marks omitted) (quoting United

States v. Ciambrone, 601 F.2d 616, 629 (2d Cir. 1979) (Friendly,
J., dissenting)).[2]

These statements describe the role of the grand jury
differently than the dicta in Branzburg v. Hayes, 408 U.S. 665
(1972), a case involving whether a newsman had a privilege not
to disclose a confidential source to the grand jury. There, the
Supreme Court wrote, "the grand jury [] has the dual function of
determining if there is probable cause to believe that a crime
has been committed and of protecting citizens against unfounded
criminal prosecutions."  Id. at 686-87.  "[I]ts task is to
inquire into the [e]xistence of possible criminal conduct and to
return only well-founded indictments."  Id. at 688.

The court has not received the transcript of the
preliminary instructions given to the grand jury that returned
the Indictment in this case in 2003, or the oath that those

_____

[2] These statements have been echoed by judges outside the First
Circuit writing in concurrence and dissent to assert that the
grand jury has the right to serve as a check on prosecutors even
where probable cause is shown.  "By refusing to indict, the
grand jury has the unchallengeable power . . . to shield the
guilty, should the whims of the jurors or their conscious or
subconscious response to community pressures induce twelve or
more jurors to give sanctuary to the guilty."  Ciambrone, 601
F.2d at 629 (quoting United States v. Cox, 342 F.2d 167, 189-90
(5th Cir. 1965) (Wisdom, J., concurring)).  Moreover, this court
has, in another context, stated that under the FDPA "a grand
jury must agree with the Department of Justice that it is
permissible and appropriate that a defendant be exposed to the
death penalty and give him notice in the indictment of the
alleged grounds for imposing it."  United States v. Sampson, 245
F. Supp. 2d 327, 333 (D. Mass. 2003).

6

grand jurors took.  However, the court has reviewed the Fourth Edition of the Benchbook for U.S. District Court Judges (the "Benchbook"), which contains the March 2000 revisions and was in effect in 2003.  The court believes it was the routine and practice of judges to instruct the grand jury in the manner recommended by the Benchbook.

The Benchbook charge, in relevant part, states that the grand jury should be told that, "[y]our task is to determine whether the government's evidence is sufficient to conclude that there is probable cause to believe that the accused is guilty of the offense charged--that is, whether the evidence presented to you is sufficiently strong to cause a reasonable person to believe that the accused is probably guilty of the offense charged."  Benchbook at 208 (emphasis in original).  It continues, "[w]hile you would perform a disservice if you did not indict where the evidence justifies an indictment, you would violate your oath if you merely 'rubber-stamped' indictments brought before you by the government representatives."  Id. at 210.

This charge, in essence, directs a grand jury to indict if the evidence establishes probable cause for each element of an offense.  It does not inform the grand jury that it has the right to disagree with the Executive branch's decision to prosecute if probable cause exists.  This is consistent with

7

"the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions," Branzburg, 408 U.S. at 686-87, motivated by bias, prejudice, or partisan purpose.

After Ring, "the intent and aggravating factors requirements of the Federal Death Penalty Act must now be treated procedurally as elements of an offense" for which the death penalty is authorized. Sampson, 245 F. Supp. 2d at 333. A grand jury could ignore the evidence and refuse to find probable cause for facts that make a defendant eligible for the death penalty. In this sense, it has the power to refuse to issue a well-founded indictment.

The petit jury has a similar power not to convict, even if the evidence proves each essential element of an offense beyond a reasonable doubt. However, in Sparf v. United States, 156 U.S. 51, 102-03 (1895), a capital case, the Supreme Court found that while a petit jury had the power to disregard a judge's statement of the law and find a defendant not guilty, even if he had been proven guilty beyond a reasonable doubt, the jury did not have the right to do so. The Court noted that permitting disregard for the law as stated by the judge would undermine the equal protection of the law and cause "our government [to] cease

8

to be a government of laws, and become a government of men."

See id. at 102-03.

Sparf resolved a question that had raged for a century concerning whether jury nullification was lawful. For example, in a Fugitive Slave Law case in Massachusetts in 1851:

> a prosecution against a black attorney for his alleged part in a rescue attempt, Richard Dana and John Hale argued that the jury should be instructed that it could independently decide both the law and fact. [Then-judge Benjamin] Curtis not only refused to give any such discretion to the jury, he explicitly charged [the jurors] that their moral responsibility was to make every conscientious effort to apply the law as charged by the judge to the facts as found by themselves. He stressed that "power" is not "right;" and that the mere fact that there was no easy way to pierce a general verdict of acquittal, in no sense gave the jury a "right" to render [] a verdict contrary to the law charged by the judge.

Robert M. Cover, Justice Accused 191 (1975) (footnote omitted) (quoting United States v. Morris, 26 F. Cas. 1323, 1335-36 (C.C.D. Mass. 1851) (No. 15,815)).

This is, of course, the charge district judges routinely and rightly have given to juries in cases since Sparf. Jurors are instructed that they must follow the law as the judge describes it regardless of whether they agree with it.

The court finds that, despite the dicta in Vasquez and Campbell,[3] the Supreme Court now would find that the grand jury

---

[3] After the court's oral ruling on this Motion, Sampson filed a Notice of Supplemental Authority (Docket No. 1841) regarding a recent case where the First Circuit stated that "federal

has the power, but not the right, not to indict if the government presents a capital charge and the evidence established probable cause for every essential element of it. As this court stated when sentencing Sampson to be executed in 2003, "[t]he people, through their representatives in Washington, D.C., have decided that the death penalty is justified in some cases." United States v. Sampson, 300 F. Supp. 2d 275, 278 (D. Mass. 2004). Telling the grand jury that certain factual findings would make a defendant eligible for the death penalty would invite the grand jury to question the wisdom of that law and nullify it if a sufficient number of grand jurors found it to be unwise. "The prospect of a grand jury here and there deciding for itself that a law lacked 'wisdom' is an invitation to lawlessness and something less than the equal protection of the laws." United States v. Navarro-Vargas, 408 F.3d 1184, 1203 (9th Cir. 2005).

In addition, in effect vesting the grand jury with the right to nullify would be especially intolerable in capital cases. In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme

_____

appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by the Court's outright holdings, particularly when . . . a dictum is of recent vintage and not enfeebled by any subsequent statement." Cuevas v. United States, 778 F.3d 267, 272-73 (1st Cir. 2015) (emphasis added) (internal quotation marks omitted) (quoting McCoy v. MIT, 950 F.2d 13, 19 (1st Cir. 1991)). I respectfully find that, for present purposes, the dicta in Campbell and Vasquez does not constitute "considered dicta."

10

Court found that the unguided discretion of capital juries resulted in the arbitrary imposition of death sentences, which constituted cruel and unusual punishment in violation of the Eighth Amendment.  Four years later, in Gregg v. Georgia, 428 U.S. 153 (1976), the Supreme Court held that the Georgia death penalty statute was constitutional because it guided jurors' discretion in deciding whether to impose the death penalty.  The FDPA is a federal statute with elaborate standards and procedures that petit jurors must follow in deciding whether to impose a death sentence.  See United States v. Sampson, 486 F.3d 13, 24 (1st Cir. 2007).  For example, among other things, the FDPA requires jurors to certify that their decision was not influenced by race.  18 U.S.C. §3593(f).  If the grand jury had the right to refuse to find facts that would make a person eligible for the death penalty, despite the existence of probable cause, and therefore a right to be informed that their factual findings would determine if a defendant would be eligible to be executed, their discretion would be unguided. There would be a grave risk that the grand jury's decision would be influenced by impermissible considerations such as race. Furthermore, because deliberations of a grand jury are secret, the exercise of that discretion would be unreviewable, and a system carefully calibrated to eliminate arbitrary results would be undermined.

11

In England and the American Colonies, the grand jury may have been regarded as having the right, as well as the power, to refuse to return a factually well-founded indictment. See, e.g., James R. Acker, The Grand Jury and Capital Punishment: Rethinking the Role of an Ancient Institution Under the Modern Jurisprudence of Death, 21 Pac. L.J. 31, 45-46, 92-93 (1989). However, before the American Revolution and the adoption of the Constitution, at least, colonists were not represented in making the laws or in selecting those charged with enforcing them. Therefore, there was a rationale for such a right. As the eminent constitutional historian Mark DeWolfe Howe wrote regarding nullification by petit juries, "it is arguable that such a right loses its importance when a statute is the enactment of a truly democratic legislature." Mark DeWolf Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582, 616 (1939). This is equally true of a grand jury's power to nullify.

Finally, every district court that has decided this issue has held that it is not error for the government not to tell a grand jury that certain factual findings will make a defendant eligible for the death penalty. In most of those cases, the courts reason that the grand jury's proper role is limited to determining if there is probable cause for the proposed findings. See, e.g., United States v. Sanders, No. 10-cr-00351,

2014 WL 3122418, at *6 (W.D. La. July 3, 2014); United States v. Savage, No. 07-cr-550, 2013 WL 1934531, at *7 (E.D. Pa. May 10, 2013); United States v. Williams, No. 4:08-cr-00070, 2013 WL 1335599, at *15 (M.D. Pa. Mar. 29, 2013); United States v. McCluskey, No. 10-cr-2734, ECF No. 590, at 15-17 (D.N.M. Sept. 24, 2012) (denying the defendant's request for discovery of the legal instructions given to the grand jury); United States v. Jacques, No. 2:08-cr-117, 2011 WL 1675417, at *10 (D. Vt. May 4, 2011), aff'd in part and vacated in part on other grounds, 684 F.3d 324 (2d Cir. 2012); United States v. Aquart, No. 3:06-cr-160, 2010 WL 4363414, at *1 (D. Conn. Oct. 26, 2010); United States v. Cruz-Ramirez, No. 08-cr-0730, 2010 WL 1459446, at *4 (N.D. Cal. Apr. 9, 2010) (citing United States v. Diaz, No. 05-cr-00167, 2007 WL 656831, at *5-6 (N.D. Cal. Feb. 28, 2007)); United States v. Troya, No. 06-cr-80171, 2008 WL 4327004, at *7-8 (S.D. Fla. Sept. 22, 2008) (magistrate op.), adopted, 2008 WL 5109257 (S.D. Fla. Nov. 21, 2008); United States v. Green, No. 5:06-cr-19, 2008 WL 4000902, at *5-6 (W.D. Ky. Aug. 26, 2008); United States v. Duncan, No. 07-cr-23, 2008 WL 544845, at *3 (D. Idaho Feb. 26, 2008); United States v. O'Reilly, No. 05-cr-80025, 2007 WL 4591862 (E.D. Mich. Dec. 28, 2007); United States v. Talik, No. 5:06-cr-51, 2007 WL 4570704, at *23-24 (N.D.W. Va. Dec. 26, 2007); United States v. Williams, No. 06-cr-00079, 2007 WL 2916123, at *3-4 (D. Haw. Oct. 2, 2007); United States v.

Lecco, No. 2:05-cr-00107, 2007 WL 1074775, at *2-3 (S.D.W. Va. Apr. 5, 2007); United States v. Natson, 444 F. Supp. 2d 1296, 1304-05 (N.D. Ga. 2006); United States v. Rodriguez, No. 2:04-cr-55, 2006 WL 487117, at *6-7 (D.N.D. Feb. 28, 2006); United States v. Haynes, 269 F. Supp. 2d 970, 980-81 (W.D. Tenn. 2003); United States v. Matthews, 246 F. Supp. 2d 137, 147 (N.D.N.Y. 2002). Those cases include two in this district. See United States v. Tsarnaev, No. 13-cr-10200, ECF No. 425, at 9 (D. Mass. June 18, 2014) (denying the defendant's discovery request for the grand jury transcript); United States v. Green, 372 F Supp. 2d 168, 184 n.27 (D. Mass. 2005).[4]

IV.  ORDER

In view of the foregoing, the court finds that the Motion is not meritorious. Accordingly, it is hereby ORDERED that Sampson's Motion to Strike the Death Notice for Failure to Inform the Grand Jury of the Consequences of its Special Findings (Docket No. 1436) is DENIED.

UNITED STATES DISTRICT JUDGE

---

[4] The court also notes that, to its knowledge, the government is correct when it argues that no court has held that the grand jury must be told that a factual finding will make the defendant subject to a mandatory minimum sentence or a higher mandatory minimum sentence.