UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
          v.                  )       Cr. No. 01-10384-MLW
                              )
GARY LEE SAMPSON              )

MEMORANDUM AND ORDER

WOLF, D.J.                                    October 28, 2015
                                   Amended December 2, 2015

TABLE OF CONTENTS

I.    INTRODUCTION .............................................. 2
II.   HISTORY ................................................... 3
III.  GENERAL PRINCIPLES ........................................ 6
A.    Law of the Case Doctrine .................................. 6
B.    The Role of the District Court in Eighth Amendment
      Litigation ................................................ 9
C.    Evidentiary Hearings ..................................... 11
IV.   RIPENESS ................................................. 12
A.    Legal Standard ........................................... 13
B.    Unguided Discretion ...................................... 16
C.    Proportionality Review ................................... 16
D.    Manner of Execution ...................................... 17
V.    EVOLVING STANDARDS OF DECENCY ............................ 18
A.    Facial Challenge to the Death Penalty .................... 18
B.    Execution of the Mentally Ill ............................ 32
C.    Geography-Based Challenge ................................ 36
VI.   ARBITRARINESS ............................................ 38
A.    Legal Standard ........................................... 39
B.    Racial Disparity ......................................... 41
C.    Rate of Error ............................................ 46
D.    General Arbitrariness .................................... 56
VII.  JUROR CONFUSION AND IMPAIRMENT IN CAPITAL PROCEEDINGS .... 59
A.    Legal Standard ........................................... 59
B.    Analysis ................................................. 61
VIII. THE GOVERNMENT'S PURSUIT OF THE DEATH PENALTY IN
      MASSACHUSETTS AND IN THIS CASE SPECIFICALLY ............. 66

1

A.  Government's Decisionmaking Process ..................... 67
B.  Government's Decision to Seek the Death Penalty in
    Massachusetts .......................................... 70
IX.  APPRENDI CHALLENGES ..................................... 74
A.  Legal Standard ......................................... 75
B.  Standard of Proof ...................................... 76
C.  Grand Jury Presentment ................................. 78
X.   DELAY MOTION ............................................ 80
XI.  CATCH-ALL CONSTITUTIONAL MOTION ......................... 84
XII. MOTIONS TO PRESERVE THE RIGHT TO FILE FUTURE MOTIONS ..... 84
XIII. ORDER .................................................. 85

## I.  INTRODUCTION

For the reasons explained in the December 2, 2015 Memorandum
and Order Regarding Amendment of October 28, 2015 Decision (Docket
No. 2113), this Amended Memorandum and Order replaces the original.
The amended language replaces the discussion of jury verdicts in
the analysis of Evolving Standards of Decency in §V, and adds
footnote 28 concerning Delay in §X.

* * * *

In August 2014, defendant Gary Sampson filed twenty-six
motions raising constitutional challenges to his capital
sentencing retrial under the Federal Death Penalty Act (the
"FDPA").[1]  After receiving written responses from the government,

---

[1] This Memorandum and Order addresses twenty-five of the motions
to dismiss.  The court denied Sampson's Motion to Strike the Death
Notice for Failure to Inform the Grand Jury of the Consequences of
its Special Findings (Docket No. 1436) orally at the February 18,
2015 hearing.  That oral decision was converted into a September
11, 2015 Memorandum and Order.  See United States v. Sampson, No.

2

and allowing the defendant the opportunity to submit reply briefs,
the court held hearings on these motions on December 3, 4, 5, 17,
and 18, 2014.  For the reasons explained below, each of Sampson's
constitutional motions is being denied.[2]

II.  HISTORY

On July 24, 2001, Phillip McCloskey, a 69-year old retiree,
picked up Sampson, who was hitchhiking.  Sampson murdered Mr.
McCloskey with a knife and attempted to steal his automobile.

On July 27, 2001, Sampson was hitchhiking again.  He was
picked up by Jonathan Rizzo, a college student.  Sampson murdered
Mr. Rizzo by tying him to a tree and stabbing him to death.  Sampson
then stole Mr. Rizzo's automobile.

On July 30, 2001, Sampson encountered Robert Whitney in New
Hampshire.  Sampson tied Mr. Whitney to a chair and strangled him
to death.  Sampson then stole Whitney's automobile.

Sampson was arrested in Vermont.  On August 1, 2001, he was
returned to Massachusetts.  Later that month, he was charged by
the Commonwealth of Massachusetts for the murders of Mr. McCloskey
and Mr. Rizzo.  On October 24, 2001, Sampson was also indicted in
federal court for carjacking resulting in the deaths of Mr.

---

01-cr-10384-MLW, 2015 WL 5315186 (D. Mass. Sept. 11, 2015) (Docket
No. 2082).

[2] The court reached its decisions on these motions before the
government filed its Motion for Recusal Under 28 U.S.C. §455(a)
(Docket No. 2024) on July 16, 2015.

McCloskey and Mr. Rizzo, in violation of 18 U.S.C. §2119. The Massachusetts charges against Sampson were dismissed in deference to that federal prosecution. On November 19, 2002, after receiving approval from the Attorney General, the government filed a Notice of Intent to seek the death penalty in this case.

In 2003, Sampson filed pretrial motions challenging the constitutionality of various provisions of the FDPA. In United States v. Sampson, 245 F. Supp. 2d 327 (D. Mass. 2003) and United States v. Sampson, 275 F. Supp. 2d 49 (D. Mass. 2003) ("Sampson I"), the court rejected those challenges.

On September 9, 2003, Sampson pled guilty to both charges. The court subsequently impaneled a jury to determine the penalty. See 18 U.S.C. §3593(b)(2)(A). On December 23, 2003, the jury returned its verdicts requiring that the death penalty be imposed on both counts. See 18 U.S.C. §3593(e). The court denied Sampson's motion for a new sentencing trial. See United States v. Sampson, 332 F. Supp. 2d 325 (D. Mass. 2004) ("Sampson II"). On January 29, 2004, the court sentenced Sampson to be executed. See United States v. Sampson, 300 F. Supp. 2d 275, 276 (D. Mass. 2004); 18 U.S.C. §3594.

Sampson appealed his death sentences. On August 26, 2004, the court issued a Memorandum and Order memorializing and explaining some of the oral decisions it made during the pretrial proceedings and the trial. See United States v. Sampson, 335 F.

4

Supp. 2d 166 (D. Mass. 2004) ("Sampson III"). In 2007, the First Circuit affirmed the sentences. See United States v. Sampson, 486 F.3d 13 (1st Cir. 2007) ("Sampson IV"). The United States Supreme Court denied Sampson's petition for a writ of certiorari. See Sampson v. United States, 553 U.S. 1035 (2008).

In 2009, Sampson sought relief from his death sentences pursuant to 28 U.S.C. §2255. In 2010, the court allowed Sampson to file an amended §2255 petition. After several hearings and substantial briefing, the court concluded that it was compelled to vacate Sampson's death sentence because of misconduct by a juror. See United States v. Sampson, 820 F. Supp. 2d 151 (D. Mass. 2011). Over Sampson's objection, the court subsequently exercised its discretion to authorize an immediate appeal of that decision to the First Circuit. See United States v. Sampson, 58 F. Supp. 3d 136 (D. Mass. 2012). On July 23, 2013, the First Circuit agreed that Sampson's "death sentence must be vacated and a new penalty-phase hearing undertaken." United States v. Sampson, 724 F.3d 150, 170 (1st Cir. 2013). Therefore, it dismissed the government's appeal. Id.

On November 15, 2013, mandate issued and the case was returned to this court. The court provided the parties opportunities to address scheduling issues in written submissions and at hearings. On June 6, 2014, the court established a deadline of August 1, 2014, for Sampson to file dispositive motions challenging the

constitutionality of the FDPA or the lawfulness of this
prosecution. The court extended that deadline to August 4 or 7,
2014, for certain motions.

In August 2014, Sampson filed twenty-six motions raising
constitutional issues. After receiving written responses from the
government and permitting the defendant to submit reply briefs,
the court held hearings on these motions in December 2014.[3]

III. GENERAL PRINCIPLES

A.   Law of the Case Doctrine

Sampson makes several constitutional challenges that he
presented in 2003. This court and the First Circuit denied each
of those challenges. The government argues that the re-litigation
of these challenges is barred by the law of the case doctrine. As
the court has previously explained in this case, because of the
equitable nature of habeas corpus relief, the First Circuit has
emphasized "'the broad leeway traditionally afforded district
courts in the exercise of their §2255 authority.'" United States
v. Sampson, 82 F. Supp. 3d 502, 512 (D. Mass. 2014) (quoting United
States v. Torres-Otero, 232 F.3d 24, 30 (1st Cir. 2000)). The

---

[3] With regard to almost every motion, Sampson made substantial
changes in his arguments between his opening supporting memorandum
and his reply memorandum. In some instances, the arguments in
Sampson's reply contradicted those in his initial submission. In
addition, Sampson raised many subsidiary arguments that this
Memorandum and Order does not discuss. The court has, however,
considered all of Sampson's evidence and arguments in reaching its
conclusions.

court concludes that it is inappropriate to exercise its equitable authority to apply a stringent rule of law of the case to limit the issues that Sampson is now allowed to raise.

The law of the case doctrine provides that:

> [A] legal decision made at one stage of a civil or criminal case, unchallenged in a subsequent appeal despite the existence of ample opportunity to do so, becomes the law of the case for future stages of the same litigation, and the aggrieved party is deemed to have forfeited any right to challenge that particular decision at a subsequent date.

United States v. Bell, 988 F.2d 247, 250 (1st Cir. 1993). Generally, to reopen an issue, a party must do "one of three things: show that controlling legal authority has changed dramatically; proffer significant new evidence, not earlier obtainable in the exercise of due diligence; or convince the court that a blatant error in the prior decision will, if uncorrected, result in a serious injustice." Id. at 251.

The law of the case doctrine may not apply to an FDPA sentencing retrial ordered by the district court in a §2255 proceeding. The Eighth Circuit has held that when a defendant receives a de novo resentencing under §2255, the law of the case doctrine "does not apply to the resentencing." United States v. Parker, 762 F.3d 801, 806 (8th Cir. 2014). Therefore, in the Eighth Circuit at least, if the district court grants a "plenary resentencing, . . . the district court '[is] not bound by the law of the case doctrine . . . .'" Id. (quoting Pepper v. United

7

States, 562 U.S. 476, 508 (2011)). The Second Circuit has held
that the law of the case doctrine does apply, however, if the
resentencing is only to correct a minor sentencing error. See
United States v. Quintieri, 306 F.3d 1217, 1226-27 (2d Cir. 2002).

In any event, in the procedural posture of this case,
flexibility in applying the law of the case doctrine is justified.
After the court vacated Sampson's death sentence, the parties and
the court agreed that a number of other claims Sampson had raised
in his amended §2255 petition were moot. See United States v.
Sampson, No. 01-cr-10384-MLW, 2013 WL 6224287, at *1 (D. Mass.
Nov. 29, 2013); Joint Report, Feb. 1, 2012, ¶3 (Docket No. 1233).
These included certain claims that Sampson's original defense
counsel were ineffective in 2003. If the court again sentences
Sampson to death, and that sentence is affirmed, Sampson will be
entitled to a second §2255 proceeding. In such a proceeding,
Sampson is likely to allege that his current counsel were
ineffective.[4] If the court were to reject any of the claims Sampson
raised in 2014 because predecessor counsel in 2003 failed to
present the claim or failed to investigate the facts that would
support the claim, the court could be confronted with a more
complex claim of ineffective assistance of counsel in the future.

---

[4] The court views future claims of ineffective assistance of
counsel as foreseeable because no matter how effective counsel in
a capital case actually are, defendants sentenced to death often
claim that their attorneys were ineffective.

8

Accordingly, the court is considering Sampson's motions on the merits despite the government's assertion that some of them are foreclosed by the law of the case doctrine.

## B. The Role of the District Court in Eighth Amendment Litigation

The court must decide Sampson's claims in view of Supreme Court precedent. As this court wrote in 2003, "[i]f the Supreme Court has directly decided an issue, the lower courts must reach the same result unless and until the Court reinterprets the binding precedent." Sampson I, 275 F. Supp. 2d at 72 (internal quotation marks and alterations omitted) (quoting Agostini v. Felton, 521 U.S. 203, 238 (1997)). The Supreme Court recently reiterated its prior holdings that capital punishment is not inherently unconstitutional. See Glossip v. Gross, 135 S.Ct. 2726, 2732-33, 2739 (2015).

However, the Court has repeatedly held that courts must look to "'evolving standards of decency that mark the progress of a maturing society'" in deciding whether the Eighth Amendment permits a particular punishment for a particular crime. Hall v. Florida, 134 S.Ct. 1986, 1992 (2014) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)); Roper v. Simmons, 543 U.S. 551, 560-61 (2005). The question of whether standards of decency have materially changed since the Supreme Court decided an issue is a factual question. See, e.g., Kansas v. Marsh, 548 U.S. 163, 207-

9

11 (2006) (Souter, J., dissenting). Factfinding is, in the first instance at least, typically done based on evidence presented in the district courts, where the adversary process operates to test that evidence and material disputes are decided by a trial judge or jury. See Sykes v. United States, 131 S.Ct. 2267, 2286 (2011) (Scalia, J., dissenting); see also Allison Orr Larsen, The Trouble with Amicus Facts, 100 Va. L. Rev. 1757 (2014); Adam Liptak, Seeking Facts, Justices Settle for What Briefs Tell Them, N.Y. Times, Sept. 2, 2014, at A10.

Therefore, if there has been a material change in facts relevant to the evolving standards analysis--a question initially for the trial courts--an issue is not foreclosed by Supreme Court precedent because the Supreme Court has not decided the matter in dispute. Rather, the district court is deciding a distinguishable case and controversy. As this court wrote in 2003, when the Supreme Court held that the death penalty was not per se unconstitutional in Gregg v. Georgia, 428 U.S. 153 (1976), "the Court also implicitly acknowledged that future developments might challenge the basis of its decision." Sampson I, 275 F. Supp. 2d at 72 (citing Gregg, 428 U.S. at 187 (plurality op. of Stewart, Powell, and Stevens, JJ.)).

Accordingly, in evaluating Sampson's 2014 challenges to the death penalty, the court has examined the alleged facts on which Sampson relies and decided whether they are significantly

10

different than the facts in the cases in which the Supreme Court
or the First Circuit decided the analogous issue. If there is no
significant difference in the facts, this court must follow the
higher court's holdings.    If there might be a significant
difference in the proven facts, this court has both the authority
and the obligation to decide whether new facts have been proven
and, if so, whether they are material in the sense that they
require a different conclusion.

## C.    Evidentiary Hearings

Sampson has requested evidentiary hearings in connection with
some of his motions. He has submitted affidavits and other offers
of proof to explain the evidence he would introduce at those
hearings. The government's responses generally do not contest the
factual allegations underlying Sampson's claims.    Rather, the
government argues that his claims fail as a matter of law.

An evidentiary hearing is justified only if the defendant
identifies a disputed fact that, if proven, would be likely to
entitle the defendant to relief.    See, e.g., United States v.
Mitchell-Hunter, 663 F.3d 45, 53 (1st Cir. 2011) ("The test for
whether an evidentiary hearing is required is whether the defendant
made 'a sufficient threshold showing that material facts were in
doubt or dispute.'") (quoting United States v. Panitz, 907 F.2d
1267, 1273 (1st Cir. 1990)). A defendant seeking an evidentiary
hearing must "allege facts with sufficient definiteness, clarity,

and specificity to enable the trial court to conclude that contested issues of fact exist." United States v. Howell, 231 F.2d 615, 620 (9th Cir. 2000).

"The district court has considerable discretion in determining the need for, and the utility of, evidentiary hearings." United States v. De Jesus-Viera, 655 F.3d 52, 58 n.4 (1st Cir. 2011) (quoting United States v. Allen, 573 F.3d 42, 50-51 (1st Cir. 2009)) (internal quotation marks omitted); see also United States v. Salemme, 978 F. Supp. 343, 349-50 (D. Mass. 1997). The court finds that Sampson has not sufficiently identified any disputed facts that, if proven, would entitle him to relief on any of his motions. Therefore, the court is not granting any of the requests for an evidentiary hearing.

IV. RIPENESS

In four motions, Sampson challenges how the court would select the place and manner of his execution if he is again sentenced to death, how Sampson would appeal any death sentence, and how that death sentence would be implemented. See Motion to Bar the Death Penalty Because, in Prosecutions Brought in States Without That Penalty, 18 U.S.C. §3596(a) Gives Courts Unguided Discretion in Choosing the State Law Governing the Manner of the Execution, and Because the Federal Government Has Not Implemented Adequate Procedures for Complying with the Court's Selection ("Unguided Discretion Motion") (Docket No. 1428); Motion to Declare the

12

Federal Death Penalty Act Unconstitutional for Failure to Require

Comparative Proportionality Review ("Proportionality Review

Motion") (Docket No. 1426); Motion to Declare the Federal Death

Penalty Act Unconstitutional and to Bar the Death Penalty in This

Case Due to the Lack of Public Executions ("Public Executions

Motion") (Docket No. 1438); Motion to Bar Lethal Injection Because

It Violates the Eighth Amendment Ban on Cruel and Unusual

Punishment ("Lethal Injection Motion") (Docket No. 1443). For the

following reasons, these motions are not yet ripe. They are,

therefore, being denied without prejudice.

A.    Legal Standard

In 2003, this court described the standard for determining

whether a pretrial challenge to the FDPA is ripe, writing:

> The Supreme Court has "noted that ripeness doctrine is
> drawn from both Article III limitations on judicial
> power and from prudential reasons for refusing to
> exercise jurisdiction." [Reno v. Catholic Soc. Svcs.,
> 509 U.S. 43, 58 n.18 (1993).] Thus, while the Article
> III requirement of a case and controversy is satisfied,
> prudential considerations may indicate that certain
> claims should not be decided by this court either before
> trial or at all.
>
> As the First Circuit [] wrote:
>
>> Ripeness is dependent on the circumstances of
>> a particular case.   See Ernst & Young v.
>> Depositors Econ. Prot. Corp., 45 F.3d 530, 535
>> (1st Cir. 1995) ("The various integers that
>> enter into the ripeness equation play out
>> quite differently from case to case . . . .").
>> Two factors are used to evaluate ripeness:
>> "the fitness of the issues for judicial
>> decision and the hardship to the parties of
>> withholding court consideration."   [Abbott

13

> Labs. v. Gardner, 387 U.S. 136, 149 (1967).]
> Ordinarily, both factors must be present.
> Ernst & Young, 45 F.3d at 535.
>
> Doe v. Bush, 323 F.3d 133, 138 (1st Cir. 2003); see also
> [Stern v. U.S. Dist. Court for Dist. Of Mass., 214 F.3d
> 4, 10 (1st Cir. 2000)].

Sampson I, 275 F. Supp. 2d at 70.

There are two important differences in evaluating ripeness now as compared to 2003.   First, Sampson has pled guilty. Accordingly, Sampson will not experience any of the "practical and legally-cognizable disadvantages" associated with postponing resolution of a challenge to the death penalty until after a guilt-phase trial.   See United States v. Quinones, 313 F.3d 49, 59 (2d Cir. 2002) (holding constitutional challenge to FDPA ripe because, among other reasons, defendant may prefer to avoid guilt-phase trial before death-qualified jury).

Second, at the time this court considered Sampson's pretrial challenges to the death penalty in 2003, it was unclear whether this "court ha[d] the authority to grant Sampson any relief if a jury decides that he should be executed."  Sampson I, 275 F. Supp. 2d at 71.   In 2003, the court decided two post-trial motions concerning this issue, denying a motion for a new trial and motion to declare the FDPA unconstitutional because of a claimed "white victim" effect.  See Sampson II, 332 F. Supp. 2d at 326-40.  The First Circuit affirmed those decisions and did not suggest that

14

this court lacked authority to make them because the jury had rendered its verdict. See Sampson IV, 486 F.3d at 23-27, 50-51.

At the December 5, 2014 hearing, the government clarified its current position on this issue. The government correctly stated that, "[i]f the jury again sentences Sampson to death, this court must impose that sentence . . . and what we mean by that is [the court does not] have discretion as some systems may still have or definitely used to have to overrule the jury's verdict." Dec. 4, 2014 Tr. at 36 (Docket No. 1726). However, the government also acknowledged that the court would have authority to decide certain motions after a jury verdict of death, depending on the relief requested. See id. at 37. The availability of post-verdict relief is an important consideration in deciding whether to rule on a motion before trial. A trial could produce a more fully developed record or cause the motion to become moot. However, if the court were to lose its authority to decide a motion after a trial, there would be a strong reason to decide that motion before trial.

In addition, as in 2003, the expense and burden of a capital sentencing trial for the parties and the victims' families is great.

Therefore, the court is liberally construing which motions are ripe for resolution now. However, there are four motions that the court cannot decide on the current record or that are otherwise not ripe for decision.

15

## B.   Unguided Discretion

In his Unguided Discretion Motion, Sampson argues that the FDPA does not provide courts with sufficient guidance in determining where and how defendants should be executed.  The FDPA provides that if a death sentence is imposed in a state that does not have the death penalty itself, "the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in the latter State in the manner prescribed by such law."  18 U.S.C. §3596(a).

This motion is not now ripe.  If at retrial the jury again finds that Sampson's execution is justified and Sampson renews his motion, the court will consider it on the merits.

## C.   Proportionality Review

In 2003, Sampson argued that the FDPA was unconstitutional because it does not provide for mandatory appellate proportionality review.  This court found that this claim was not ripe for resolution by this court, as the First Circuit would conduct any such review.  See Sampson I, 275 F. Supp. 2d at 96-97.  Sampson renews this argument in his Proportionality Review Motion.  Sampson asserts that this Motion is now ripe because the First Circuit did not conduct proportionality review during his 2007 appeal.  However, Sampson did not ask the First Circuit to conduct such a review.  See Sampson IV, 486 F.3d 13.  Therefore,

16

this claim remains unripe. If Sampson is again sentenced to death, believes that he is entitled to proportionality review of a death sentence, and believes that such a review would benefit him, he may in his appeal seek such review.

D.    Manner of Execution

Finally, Sampson's Public Executions Motion and his Lethal Injection Motion challenge the manner in which he anticipates he and other federal prisoners will be executed. In these motions, Sampson argues that even if the death penalty is constitutional, non-public execution by lethal injection is unconstitutional.

If Sampson is again sentenced to death, it is likely that he will not be executed for several years. Assuming he would be executed by lethal injection, the manner of lethal injection to be employed is not now known.[5] The number of people who could witness his execution, and how they would be selected, are also not now known.    Sampson's challenges to the implementation of a death sentence that has not been imposed are, therefore, not ripe.

---

[5] The United States Bureau of Prisons (the "BOP") does not now have a lethal injection protocol in effect. See Defs.' Status Rpt. in Roane v. Holder, No. 05-cv-2337 (D.D.C. July 1, 2015) (Docket No. 352).   According to the Department of Justice, the BOP has been reviewing its protocols for four years, but has not made any "final determinations . . . as to specific changes to the protocol." Id. The court understands that no federal prisoner has been executed during the pendency of this review.

17

In view of the foregoing, the court finds that these four motions are not ripe and is denying them without prejudice.

## V. EVOLVING STANDARDS OF DECENCY

In three motions, Sampson argues that the death penalty, either facially or in certain circumstances, is unconstitutional because it is inconsistent with evolving standards of decency. See Mot. to Preclude the Death Penalty as a Violation of the Eighth Amendment as Evidenced by Evolving Standards of Decency ("Evolving Standards Motion") (Docket No. 1456); Motion to Recognize Mandatory Exemption in the Federal Death Penalty Act Due to the Unconstitutionality of Executing Those Who Lack the Extreme Culpability Required to Be Eligible for the Death Penalty Because They Had a Severe Mental Disorder at the Time of the Offense ("Mental Illness Motion") (Docket No. 1486); Motion to Strike the Death Notice Because the Cruel and Unusual Punishment Clause Prohibits a Severe Penalty That Is Rarely or Never Imposed in the State and Region Where the Offense Was Committed (Docket No. 1440) ("Jurisdiction Specific Motion").   For the following reasons, these motions are not meritorious.   They are, therefore, being denied.

### A.   Facial Challenge to the Death Penalty

In his Evolving Standards Motion, Sampson argues that the death penalty violates evolving standards of decency and asks the

18

court to preclude it as a sentencing option in this case.[6]   The
First Circuit has concluded that a claim that the death penalty is
per se unconstitutional is foreclosed by Supreme Court precedent
and no lower court may deviate from that precedent.   See Sampson
IV, 486 F.3d at 28-29.   The Supreme Court recently stated that "it
is settled that capital punishment is constitutional."   Glossip,
135 S.Ct. at 2732.   However, as explained earlier, if there is
proof that the facts on which the Supreme Court decided an issue
have materially changed, then the issue is not the same and prior
decisions would not dictate the outcome.   Cf. Hall, 134 S.Ct. at
1992; Roper, 543 U.S. at 560-61.

The Supreme Court has established a two-step process to
evaluate a claim that a form of punishment violates contemporary
standards of decency:

> The beginning point is a review of objective indicia of
> consensus, as expressed in particular by the enactments
> of legislatures that have addressed the question.   These
> data give us essential instruction.   We then must
> determine, in the exercise of our own independent
> judgment, whether the death penalty is a
> disproportionate punishment . . . .

---

[6] In his motion and supporting memorandum, Sampson seems to attack
the death penalty generally.   In a reply brief filed almost three
months after his initial motion, Sampson narrows his argument,
claiming that he seeks to prove only that "imposition of the death
penalty for murder during a felony" violates the Eighth Amendment.
See Reply to Gov't's Opp. to Evolving Standards Mot., at 4 (Docket
No. 1637).   This would carve out from his original argument capital
punishment for crimes of treason, espionage, terrorism and certain
other capital offenses he lists in a footnote.   The evolution of
Sampson's argument is not material to the merit of the motion.

Roper, 543 U.S. at 564; see also Hall, 134 S.Ct. at 1993.  This court understands that lower courts too are required to both consider objective indicia and exercise independent judgment.  The judgment of trial courts, and the reasons for them, are a vital part of a colloquy with higher courts, citizens, and the legislators who represent them in enacting statutes providing for punishment.  See Sampson I, 275 F. Supp. 2d at 66.

The defendant encourages the court to examine a number of objective indicia recognized by the Supreme Court: (1) legislative enactments; (2) the direction of any legislative change; (3) actual use of the death penalty; (4) jury verdicts; (5) polling data; (6) actions of other countries; and (7) where relevant, views of professional organizations.[7]  See Sampson I, 275 F. Supp. 2d at 62-66 (citing cases).

As the Supreme Court wrote in Roper, legislative action is of particular importance in assessing whether there is a national consensus.  See 543 U.S. at 564; see also Atkins v. Virginia, 536 U.S. 304, 312 (2002).  Although a range of factors must be considered, the number of states that have statutes authorizing

---

[7] The defendant's memorandum also cites to the views of certain law enforcement officials and political leaders, family members of some murder victims, and former capital jurors.  The evidence presented by the defendant concerning their views appears to be selectively chosen.  Moreover, these are not groups whose views the Supreme Court has identified as objective indicia of contemporary values.  Accordingly, the court is not considering this evidence when determining contemporary standards of decency.

capital punishment is important to assessing the objective indicia
of contemporary values. Since Gregg in 1976, the Supreme Court
has   found   that   imposition   of   the   death   penalty   violated
contemporary standards of decency only when a majority of states
had    statutes    that    prohibited    capital    punishment    in    the
circumstances at issue. See Coker v. Georgia, 433 U.S. 584 (1977)
(prohibiting death penalty for rape of an adult; not a potential
punishment in 49 states); Enmund v. Florida, 458 U.S. 782 (1982)
(prohibiting death penalty for defendants guilty under the felony
murder rule, but lacking the mental state required to prove common
law murder; not a potential punishment in at least 33 states);
Thompson v. Oklahoma, 487 U.S. 815 (1988) (prohibiting death
penalty for defendants who were under age 16 at the time of the
offense; not a potential punishment in 31 states); Atkins, 536
U.S. 304 (prohibiting death penalty for the mentally retarded; not
a  potential  punishment  in  30  states);  Roper,  543  U.S.  551
(prohibiting death penalty for people who were juveniles at the
time of the offense; not a potential punishment in 30 states);
Kennedy v. Louisiana, 554 U.S. 407 (2008) (prohibiting death
penalty for child rape; not a potential punishment in 44 states);
Hall, 134 S.Ct. 1986 (prohibiting bright-line cut-off of an IQ
score over 70 to distinguish between those defendants who were
mentally retarded and those who were not without allowing for

consideration of other evidence; automatic eligibility for execution not the practice of 41 states).

In contrast, the Supreme Court has rejected challenges to the death penalty when there was not a substantial majority of states that prohibited such a sentence in the relevant circumstances. See Penry v. Lynaugh, 492 U.S. 302 (1989) (permitting death penalty for the mentally retarded; not a potential penalty in only 16 states); see also Stanford v. Kentucky, 492 U.S. 361 (1989) (permitting death penalty for people who were juveniles at the time of the offense where only half, or a slight majority, of states prohibited such a practice; not a potential penalty for 17-year-olds in 25 states and not a potential penalty for 16-year-olds in 28 states).

In 2003, in evaluating Sampson's claim that the FDPA was unconstitutional because of the risk of executing the innocent, this court found no material change in contemporary standards of decency since Gregg was decided in 1976. There have been some changes in legislative judgments since 2003. Seven states have abolished the death penalty in one way or another. Connecticut, Illinois, Maryland, Nebraska, New Jersey, and New Mexico have enacted legislation abolishing the death penalty either prospectively or entirely. Connecticut's abolition was prospective, but the Connecticut Supreme Court subsequently declared the death penalty unconstitutional for inmates remaining

on the state's death row. See State v. Santiago, 318 Conn. 1, 56
(2015). In 2004, New York's highest court declared the state's
death penalty statute unconstitutional. See People v. LaValle, 3
N.Y.3d 88, 131 (2004). The New York legislature has not enacted
a new death penalty statute. See Hall, 134 S.Ct. at 1997.

Therefore, for purposes of determining a national consensus,
the court understands that seven states have abolished the death
penalty since 2003. The direction of change since 2003 has been
uniformly toward abolition. Twenty jurisdictions, including
Washington, D.C. do not now have valid statutes authorizing the
death penalty. However, thirty-one states and the federal
government continue to authorize capital punishment.

Sampson argues that this court should look beyond legislative
enactments and group together those states that do not provide for
the death penalty by statute and those states in which the death
penalty has not been imposed recently. The defendant's submissions
in support of the Evolving Standards Motion indicate that in a
number of states with statutes authorizing the death penalty, few,
if any, executions have occurred in many years.[8] Sampson asserts
that when the death penalty falls into disuse, legislatures do not
have an incentive to repeal the statutes authorizing it.

---

[8] In particular, the defendant cites to Kansas, Montana, New
Hampshire, Oregon, and Wyoming. Recer Decl. ¶¶6-10 (Docket No.
1558).

23

Therefore, the defendant argues, lack of legislative change in states that have not executed anyone in many years does not indicate that those states still support capital punishment. However, the defendant's submissions also indicate that in almost all of those states, legislation to repeal the death penalty has been introduced, but not enacted.[9]   Recer Decl. ¶5 (Docket No. 1558).   These states are not equivalent to those that have abolished the death penalty.

In support of his argument that the court should look beyond legislative enactments, Sampson cites to two Supreme Court cases in the area of juvenile sentencing, Graham v. Florida, 560 U.S. 48 (2010), and Miller v. Alabama, 132 S.Ct. 2455 (2012).   In both Graham and Miller, the Supreme Court found a sentencing practice unconstitutional despite the fact that a majority of jurisdictions allowed the practice.

In Graham, the Supreme Court considered the constitutionality of imposing life without parole sentences on juvenile offenders for offenses other than murder. At the time, thirty-seven states, the District of Columbia and the federal government allowed for such sentences by statute. "Relying on this metric, [Florida] and its amici argue[d] that there is no national consensus against the

---

[9] This was the case in all of the states listed in footnote 8, supra, with the exception of Oregon. Id. ¶5.

sentencing practice at issue." Graham, 560 U.S. at 62.  The Court

rejected this argument, writing:

> This argument is incomplete and unavailing.  "There are
> measures of consensus other than legislation."  Kennedy,
> [554 U.S. at 433].  Actual sentencing practices are an
> important part of the Court's inquiry into consensus.
> See Enmund, [458 U.S. 782]; Thompson, [487 U.S. 815]
> (plurality opinion); Atkins, [536 U.S. 304]; Roper, [543
> U.S. 551]; Kennedy, [554 U.S. at 433-34].  Here, an
> examination of actual sentencing practices in
> jurisdictions where the sentence in question is
> permitted by statute discloses a consensus against its
> use.  Although these statutory schemes contain no
> explicit prohibition on sentences of life without parole
> for juvenile nonhomicide offenders, those sentences are
> most infrequent.  According to a recent study,
> nationwide there are only 109 juvenile offenders serving
> sentences of life without parole for nonhomicide
> offenses.  See P. Annino, D. Rasmussen, & C. Rice,
> Juvenile Life without Parole for Non-Homicide Offenses:
> Florida Compared to Nation 2 (Sept. 14, 2009)[.]

Id. at 62-63.

The Supreme Court "supplement[ed]" the Annino study,

apparently by conducting its own research outside the record.  Id.

at 63.  Based on the supplemented statistics, the Court concluded

that despite legislation in thirty-seven states authorizing these

sentences, only eleven states actually had one or more inmates

serving a life without parole sentence for a nonhomicide offense

committed while a juvenile.  Id. at 63-64.

Using the supplemented statistics, the Supreme Court tallied

a total of 123 juvenile offenders under sentences of life without

parole for crimes other than homicide.  Id. at 64.  This number is

significantly smaller than the number of inmates currently under

a sentence of death in the United States. According to the defendant's statistics, as of December 31, 2012, there were 3,033 people in the United States who had been sentenced to death. See U.S. Department of Justice, Bureau of Justice Statistics, Capital Punishment, 2012 -- Statistical Tables, at 20 t.17 (Docket No. 1558-20). These individuals had been sentenced to death by the courts of thirty-five states and of the United States. Id. It appears that, of the thirty-one states which now have the death penalty authorized by law, at least one death sentence has been imposed in all but seven in the past decade. See Smith Decl. ¶4 (Docket No. 1720).

Similarly, in Miller, the Supreme Court held that states may not impose mandatory life without parole sentences on juveniles convicted of murder. Miller, 132 S.Ct. at 2460. The Court reached this decision despite the fact that 28 states and the federal government provided for such mandatory sentences. Id. at 2471. The Court explained that "the case[] here [is] different from the typical one in which we have tallied legislative enactments." Id. In Miller, the decision "d[id] not categorically bar a penalty for a class of offenders or type of crime." Id. Rather, "it mandate[d] only that a sentencer follow a certain process . . . before imposing a particular penalty." Id. The Court also noted that the "decision flow[ed] straightforwardly from our precedents . . .

26

that youth matters for purposes of meting out the law's most serious punishments." Id.

Sampson's Evolving Standards Motion does not seek only "that a sentencer follow a certain process." Id. Rather, it seeks to "categorically bar a penalty." Id. Therefore, it is different than Miller and is more analogous to the previously discussed cases in which the Supreme Court did, or did not, prohibit the death penalty by relying in meaningful measure on the number of jurisdictions that still authorized it. As thirty-one states continue to authorize the death penalty, the court does not find that this factor indicates the death penalty has become a rare phenomenon in the way that life without parole for juveniles convicted of crimes other than homicide was found to be in Graham. Nor has it become unusual in the way that death sentences for adult rape had become unusual in 1977, death sentences for felony murder had become unusual in 1982, death sentences for those under 16 had become unusual in 1988, death sentences for mentally retarded individuals had become unusual in 2002, death sentences for juveniles had become unusual in 2005, death sentences for child rapists had become unusual in 2008, and an irrebutable presumption that someone with an IQ score over 70 was not mentally retarded had become unusual in 2014.

The defendant points to three additional indicia of contemporary values in support of his motion: jury verdicts,

national polls, and international developments. The government
has not disputed the facts on which defendant relies. Accordingly,
an evidentiary hearing is not necessary because there are no facts
in dispute. Even assuming that the facts as alleged by the
defendant are true, the court does not find that contemporary
standards of decency have changed sufficiently to render capital
punishment unconstitutional.

Sampson argues that juries have recently imposed death
sentences less often than in the past. Sampson asserts that
federal jurors were more likely to impose life sentences rather
than death sentences during the period from 2000 to 2010 than
in the period between 1995 and 2000. See Mem. in Support
of Evolving Standards Motion at 11 (Docket No. 1457) (quoting
Death Penalty Focus, The Federal Death Penalty: An Overview,
available at http://deathpenalty.org/article.php?id=46). Sampson
also contends that the number of death sentences imposed each year
has declined since the 1990s. Sampson first provided evidence of
jury verdicts through 2012 to support this assertion in the
September 16, 2014 Recer Declaration. See Docket No. 1558 ¶13.[10]

---

[10] Sampson acknowledges that "less than perfect citation work by
the defense," Docket No. 2109-1 at 5, in the Recer Declaration
generated the confusion concerning the statistics relating to jury
verdicts in the original October 28, 2015 Memorandum and Order
(Docket No. 2097), which has caused this Amended Memorandum and
Order (Docket No. 2114) to be issued. The process of clarifying
and updating these statistics illustrates why facts should be

After the October 28, 2015 Memorandum and Order was issued, Sampson submitted additional statistics concerning jury verdicts through 2013. Motion for Clarification and/or Reconsideration & Ex. C (Docket No. 2109); see also Memorandum and Order Regarding Amendment of October 28, 2015 Decision (Docket No. 2113). This evidence shows that the number of new death sentences imposed in 2012 or 2013 is approximately one quarter the number of new death sentences imposed in 1994. See U.S. Department of Justice, Bureau of Justice Statistics, Capital Punishment, 2012 -- Statistical Tables, at 19 t.16 (Docket No. 1558-20) (315 new death sentences in 1994; 79 new death sentences in 2012); U.S. Department of Justice, Bureau of Justice Statistics, National Prisoner Statistics (NPS-8) (Docket No. 2109-3) (330 new death sentences in 1994; 79 new death sentences in 2012); U.S. Department of Justice, Bureau of Justice Statistics, Capital Punishment, 2013, at 19 t.16 (Docket No. 2109-5) (311 new death sentences in 1994; 82 new death sentences in 2012; 83 new death sentences in 2013).

The court has considered the evidence of jury verdicts Sampson has offered in support of his Evolving Standards Motion.[11] While

---

found, at least initially, in trial courts rather than taken from briefs by the appellate courts.

[11] In another motion, Sampson "moves to bar the death penalty on the grounds that the 'objective indicia' of community standards used by the government to justify the death penalty is false and misleading--particularly in Massachusetts." See Mot. to Bar the Death Penalty Based Upon the Gov't.'s Distortion of the Objective Indicia of Contemporary Values Establishing that Capital

not as influential as legislative action and the direction of it, the court continues to understand that jury verdicts provide valuable, objective evidence of contemporary community values. They indicate that the number of death sentences being imposed by jurors has been declining.

For the reasons explained in Sampson I, 275 F. Supp. 2d at 66, "[w]hile less meaningful than legislation or jury verdicts, [polling data and the experience of other nations which share our traditions] are also relevant to determining whether a sufficient consensus has emerged to render a previously permissible

---

Punishment Violates the Evolving Standards of Decency ("Jury Distortion Motion") (Docket No. 1477). In essence, Sampson argues that jury verdicts in favor of death are not an accurate indicator of contemporary values because the jurors have been subject to the "death qualification" process, see Wainwright v. Witt, 469 U.S. 412, 433-34 (1985), which eliminates from the jury pool people who are categorically opposed to the death penalty and would never vote to impose it. See Mem. in Supp. of Jury Distortion Motion, at 2 (Docket No. 1478).

Sampson asserts that this "distortion" seriously undermines jury verdicts as an objective indicator of contemporary standards. In his memorandum, Sampson claimed that this was an independent justification for finding the death penalty unconstitutional. However, at oral argument, Sampson in effect withdrew the Jury Distortion Motion, conceding that this was "not itself an independent basis to invalidate the Federal Death Penalty Act." Dec. 3, 2014 Tr. at 55-56 (Docket No. 1711). The death qualification process does mean that the full cross-section of the community is not represented on capital juries. While this may affect the weight to be given to jury verdicts recommending death as indicia of community standards, as Sampson acknowledges, it is not alone a basis for finding that a presumptively constitutional statute violates the Eighth Amendment. See Sampson IV, 486 F.3d at 20 ("Statutes duly enacted by Congress are presumed to be constitutional."). Accordingly, the Jury Distortion Motion is being denied.

punishment now cruel and unusual." See also Atkins, 536 U.S. at 316 n.21.    The defendant's submissions include evidence of declining support for the death penalty in national polls.    In 2003, a Gallup poll found that 53% of Americans preferred the death penalty to life in prison without parole for convicted murderers. See Sampson I, 275 F. Supp. 2d at 84.  Continuing a trend noted in Sampson I, a 2014 ABC News poll indicated that 42% of Americans preferred the death penalty to life in prison without parole for convicted murderers, a decline of 11 percentage points since 2003. See Recer Decl., ¶17 (Docket No. 1558); Damla Ergun, New Low in Preference for Death Penalty, ABC News (June 5, 2014) (Docket No. 1558-30).

    Finally, as this court wrote in 2003, England and other countries which share our heritage have abolished the death penalty.   See Sampson I, 275 F. Supp. 2d at 83.   Since 2003, according to the defendant's evidence, seventeen countries have abolished the death penalty for all crimes, and two countries have abolished the death penalty for ordinary crimes.  Recer Decl. ¶18; Death Penalty Information Center, Abolitionist and Retentionist Countries,    available    at    http://www.deathpenaltyinfo.org/ abolitionist-and-retentionistcountries?scid=30&did=140    (Docket No. 1558-32).   However, not all of these countries share our democratic traditions.  Sampson's evidence indicates that a total of ninety-eight countries have abolished the death penalty for all

crimes, seven have abolished it for ordinary crimes, thirty-five have abolished it in practice, and fifty-eight retain the death penalty.  Id.  When viewed in the context of the world as a whole, the death penalty has become unusual.  See Sampson I, 275 F. Supp. 2d at 83-84.   However, the key question is whether the death penalty is sufficiently unusual in the United States to violate the Eighth Amendment.

The objective indicia of evolving contemporary standards of decency show that support for the death penalty is eroding in the United States.  However, a majority of the states and the federal government still have statutes authorizing the imposition of the death penalty, and juries in the past decade have imposed death sentences in most jurisdictions that authorize it.   In these circumstances, exercising independent judgment, the court again finds that the record does not include sufficient objective evidence to prove that the FDPA provides for cruel and unusual punishment in violation of the Eighth Amendment.   Therefore, the Evolving Standards Motion is being denied.

        B.   Execution of the Mentally Ill

In his Mental Illness Motion, Sampson asserts that those suffering from severe mental disorders are comparable to juveniles and the mentally retarded.  The Supreme Court has held that such individuals lack the culpability necessary to make the death

32

penalty constitutionally permissible.  See Atkins, 536 U.S. 304;

Roper, 543 U.S. 551.

Sampson does not define what constitutes the "severe" mental illness that would make a death sentence cruel and unusual punishment.  Federal law now precludes imposition of the death penalty, or any other criminal penalty, on a person with a mental illness that rendered him "unable to appreciate the nature and quality or the wrongfulness of his acts."  See United States v. Cartagena-Carrasquillo, 70 F.3d 706, 710 (1st Cir. 1995) (quoting 18 U.S.C. §17(a)).  Federal law also provides that "[a] sentence of death shall not be carried out upon a person who, as a result of mental disability, lacks the mental capacity to understand the death penalty and why it was imposed on that person."  18 U.S.C. §3596(c).

However "severe" mental illness is defined, the defendant has not identified objective indicia sufficient to prove that current standards of decency are incompatible with imposing a death sentence on a person suffering from a severe mental illness.  In Atkins and Roper, the Supreme Court relied heavily on the number of jurisdictions, including the federal government, that had legislation precluding the imposition of a death sentence on the mentally retarded and juveniles.  See Atkins, 506 U.S. at 313-16; Roper, 543 U.S. at 564-67.  Sampson does not provide evidence of

a similar legislative rejection of imposing death sentences on the
mentally ill.

The legislative treatment of mental illness as compared to
mental retardation and youth under federal statutes authorizing
the death penalty is instructive.  In enacting the FDPA in 1994,
and providing for the federal death penalty for certain drug crimes
in 1988, Congress and the President addressed the questions posed
by the commission of capital crimes by juveniles, the mentally
retarded, and the mentally ill.  The legislative judgment of
Congress and the President was that "no person may be sentenced to
death who was less than 18 years of age at the time of the offense,"
18 U.S.C. §3591(a)(2), and that "[a] sentence of death shall not
be carried out upon a person who is mentally retarded," 18 U.S.C.
§3596(c).  See also 21 U.S.C. §848(l) (2002).  In contrast, the
FDPA treats impaired capacity as a result of mental illness as a
mitigating factor, rather than a categorical bar to execution.
See 18 U.S.C. §3592(a)(1); see also 21 U.S.C. §848(m)(1) (2002).

The only objective indications that evolving standards of
decency are incompatible with the execution of the severely
mentally ill that Sampson identifies are the recommendations of
the American Bar Association, the American Psychiatric
Association, the American Psychological Association, and the
National Alliance of the Mentally Ill.  These organizations each
recommend that legislatures adopt the categorical exclusion that

34

Sampson argues this court should find is required by the Eighth
Amendment. See Recer Decl. ¶¶11-13 & Ex. 13 (Docket No. 1544).
In Hall, 134 S.Ct. 1986, the Supreme Court relied in part on views
expressed by professional associations in holding that Florida's
use of an IQ test as conclusive evidence of intellectual disability
violated the Eighth Amendment. However, the four dissenting
justices warned that "what counts are our society's standards--
which is to say, the standards of the American people
--not the standards of professional associations, which at best
represent the views of a small professional elite." Id. at 2005
(Alito, J., dissenting).

Recognizing that this court may consider the views of the
professional organizations that Sampson cites, the court finds
that they are not as important indicia of contemporary values as
the actions of legislatures. See Roper, 543 U.S. at 564; Hall,
134 S.Ct. at 1993-96. The legislatures in thirty-one states, as
well as Congress, have not been persuaded to enact statutes
prohibiting the execution of defendants with severe mental
illnesses. The court finds that there is no national consensus
against executing individuals who are criminally responsible and
competent, even if they suffer from severe mental illness.
Accordingly, the Mental Illness Motion is being denied.

35

C.    Geography-Based Challenge

In his Jurisdiction Specific Motion, Sampson argues that the Eighth Amendment framework Sampson advocated in the Evolving Standards Motion and the court described earlier is not applicable in this case.  Instead, Sampson argues that "[r]ecent scholarship has persuasively shown that, for Eighth Amendment purposes, usage is properly measured on a jurisdiction-by-jurisdiction basis." Mem. in Support of Jurisdiction Specific Motion, at 14 (Docket No. 1441).  Sampson urges the court to evaluate whether the death penalty has become so rare as to be "unusual" when measured by activity solely within the state and district in which a crime was committed, id. at 15-17, or the region of the United States in which the crime was committed, id. at 17-19.

Neither argument is persuasive.  As Sampson himself wrote in support of his Evolving Standards Motion, the Supreme Court "has consistently looked for 'objective evidence of contemporary values' in the form of legislative enactments and jury verdicts from across the country."  Mem. in Supp. of Evolving Standards Motion at 4-5 (Docket No. 1478).  In arguing that this court should depart from that long-standing practice, Sampson relies solely on law review articles and a selective reading of two Supreme Court decisions.

Sampson cites Graham, 560 U.S. 48, for the proposition that "it is important to 'compare the defendant's sentence with the

36

sentences received by other offenders in the same jurisdiction.'"
Mem. in Support of Jurisdiction Specific Motion, at 15 (quoting
Graham, 560 U.S. at 60) (emphasis in Sampson's memorandum).
However, the full sentence that Sampson quotes states:

> In the rare case in which this threshold comparison [of
> the gravity of the offense to the severity of the
> sentence] leads to an inference of gross
> disproportionality the court should then compare the
> defendant's sentence with the sentences received by
> other offenders in the same jurisdiction and with the
> sentences imposed for the same crime in other
> jurisdictions.

Graham, 560 U.S. at 60 (internal punctuation omitted) (emphasis
added). Therefore, Graham does not support Sampson's contention
that an Eighth Amendment analysis should focus solely on
punishments within a particular jurisdiction.

Similarly, Sampson argues that in Enmund, 458 U.S. 782, the
Court compared the defendant's conduct, which had resulted in a
death sentence, to others convicted of felony murder and sentenced
to death in Florida. While this is accurate, it is also
incomplete. In Enmund, the Court looked at the defendant's
sentence and compared it not only to what other Florida juries had
decided in analogous cases, but also to what other juries in the
United States had decided in comparable cases. See 458 U.S. at
794-95 ("The evidence is overwhelming that American juries have
repudiated imposition of the death penalty for crimes such as
petitioner's.").

The Supreme Court has never indicated that the phrase "cruel and unusual punishment" in the Eighth Amendment means different things in different states or in different parts of the country. Rather, adopting the approach Sampson advocates might violate the Fifth Amendment right of all persons in the United States to receive equal protection of the laws. Accordingly, the court is denying the Jurisdiction Specific Motion.

VI.   ARBITRARINESS

In three motions, Sampson argues that capital sentencing is imposed in an arbitrary and capricious manner in violation of the Fifth and Eighth Amendments. See Mot. to Preclude the Death Penalty Due to Pervasive Racial Disparities in Its Imposition (Docket No. 1432) ("Racial Disparity Motion"); Motion to Preclude Death as a Possible Punishment in Light of Overwhelming Evidence that the System for Imposing Death Sentences is Infected by an Unacceptable Rate of Error ("Rate of Error Motion") (Docket No. 1448); Mot. to Dismiss the "Special Findings" From the Second Superseding Indictment, and to Strike the Notice of Intent to Seek the Death Penalty Because of the Arbitrary, Capricious, and Random Application of the Federal Death Penalty ("General Arbitrariness Motion") (Docket No. 1454).   For the following reasons, these motions are not meritorious.   They are, therefore, being denied.

A.   Legal Standard

The court has used a common framework to analyze these three motions.  The Due Process Clause of the Fifth Amendment prohibits the imposition of punishment on the basis of "arbitrary distinction[s]."  Chapman v. United States, 500 U.S. 453, 465 (1991).  In the capital punishment context, "arbitrariness" has a procedural component and a substantive component.

Procedurally, "[b]ecause of the uniqueness of the death penalty, Furman[v. Georgia, 408 U.S. 238 (1972)] held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner."  Gregg, 428 U.S. at 188.  As Justice Douglas explained, "[t]he high service rendered by the 'cruel and unusual' punishment clause of the Eighth Amendment is to require legislatures to write penal laws that are evenhanded, nonselective, and nonarbitrary, and to require judges to see to it that general laws are not applied sparsely, selectively, and spottily to unpopular groups."  Furman, 408 U.S. at 256 (Douglas, J., concurring).  However, the Eighth Amendment also requires that capital sentencing be performed by a judge or jury with discretion to decide whether death is the appropriate punishment.  See Roberts v. Louisiana, 428 U.S. 325, 333 (1976).

Consequently, "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life

should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." Gregg, 428 U.S. at 189. This requires that the sentencer be given all relevant information concerning the defendant and his offense. Id. at 189-91. However, "the provision of relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of a punishment." Id. at 192. The jury must be given guidance in its decisionmaking, which can be accomplished by enumerating aggravating and mitigating sentencing factors that are "particularly relevant to the sentencing decision." Id. at 192-93; see also McCleskey v. Kemp, 481 U.S. 279, 305-06 (1987) ("First . . . the state must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. . . . Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty.").

When a system of capital punishment includes these safeguards, the fact that there may still be opportunity for discretionary action--for example, in charging decisions or in the jury's decision to require a lesser sentence--is not constitutionally problematic. See Gregg, 428 U.S. at 199; McCleskey, 481 U.S. at 310-312. However, a defendant's sentence

may still be "arbitrary and capricious" if it is sought or imposed based on impermissible considerations of immutable characteristics, such as race. McCleskey, 481 U.S. at 309-10.

To limit the possibility of capital sentencing being influenced by such impermissible considerations, the Constitution also imposes substantive limits on what must and must not be considered in imposing a death sentence. Substantively, the Constitution requires that the decision whether to impose the death penalty be based on "the circumstances of the particular offense and the character and propensities of the offender." Roberts, 428 U.S. at 333. If the system contains the requisite substantive and procedural safeguards, "[t]he Constitution does not require that a State eliminate any demonstrable disparity that correlates with a potentially irrelevant factor in order to operate a criminal justice system that includes capital punishment." McCleskey, 481 U.S. at 319.

B.   Racial Disparity

In his Racial Disparity Motion, Sampson claims that the court should preclude the death penalty due to pervasive racial disparities. Utilizing the framework articulated earlier, the court is denying Sampson's Racial Disparity Motion because the statistical evidence that he relies on is not stronger than that found to be insufficient by this court and the First Circuit in this case previously, and by the Supreme Court in McCleskey.

41

Consequently, he has not proven an impermissible level of bias in the capital punishment system.

The statistical evidence presented by Sampson regarding the federal system is weaker than that regarding the Georgia system the Court found constitutional in McCleskey.[12] In McCleskey, the Court was presented with a reportedly thorough statistical analysis of the Georgia capital punishment system, which showed that defendants with white victims were 4.3 times more likely to be sentenced to death than defendants with black victims. See McCleskey, 481 U.S. at 354-55. The Court held that the study "does not demonstrate a constitutionally significant risk of racial bias

---

[12] Regarding the federal system, Sampson presents evidence that federal capital defendants with white female victims are three times more likely to be sentenced to death than other federal capital defendants. Most of Sampson's evidence concerns studies of capital punishment in individual states. The studies that he cites show that: in Georgia, a defendant "suspected of" killing a white person is 4.56 times more likely to be sentenced to death than a defendant suspected of killing a black person; in Delaware, black defendants who kill white people are 7 times more likely to receive the death penalty than black defendants who kill black people; in Louisiana, the odds of receiving a death sentence if the victim is white are 2 times higher than if the victim is black; in Maryland, blacks who kill whites receive the death penalty nearly 2.5 times as often as whites who kill whites; in North Carolina, killing a white person rather than a black person makes it 3 times more likely that a defendant will receive the death penalty; and in South Carolina, prosecutors are nearly 5 times more likely to seek death if the victim is white. See Mem. in Support of Racial Disparity Motion at 16-19 (Docket No. 1433); see also Recer Decl. ¶¶2-3 (Docket No. 1543). Delaware is the only jurisdiction for which the evidence presented by Sampson appears to show a greater racial disparity than the one considered by the Supreme Court in McCleskey.

affecting the Georgia capital sentencing process." Id. at 313. In the instant case, Sampson presents little evidence concerning the federal system, which is the system that he is challenging. The evidence that he presents shows a smaller effect based on race than that identified by the study rejected in McCleskey. Furthermore, none of Sampson's studies is as comprehensive as the study found to be insufficient by the Court in McCleskey, which controlled for 230 non-racial variables. Id. at 325. Consequently, his statistical evidence does not prove a constitutionally significant risk of racial bias affecting the federal capital sentencing process.

Sampson raises two additional arguments in an attempt to overcome the insufficiency of his evidence. First, he argues that the fact that racial disparities in capital sentencing still exist almost thirty years after McCleskey shows that racism is an "essential" component of capital punishment that cannot be eradicated through procedural safeguards. However, this argument mischaracterizes the Supreme Court's holding in McCleskey.

In McCleskey, the Court assumed the validity of the Baldus study on which the defendant relied, yet found the evidence insufficient to prove a constitutional violation. As the Court explained with regard to McCleskey's equal protection claim:

> [A]bsent far stronger proof, it is unnecessary to seek [a] rebuttal [from the government of the alleged discrimination], because a legitimate and unchallenged

explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty.

481 U.S. at 296-97 (emphasis added). The Court further explained with respect to McCleskey's Eighth Amendment claim:

In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process.

Id. at 313 (emphasis added).

The Court rejected McCleskey's claims because the demonstrated risk of bias was not significant enough, not because there had only been one study showing such risk. The Court did not suggest that continuing statistical discrepancies in capital sentencing at the same rate in the future would cause it to revise its conclusion.

Second, Sampson contends that modern psychological studies of juror behavior, which were not available when the Court decided McCleskey, show that jurors subconsciously devalue the lives of victims who are not white. Because there is now a social science mechanism to explain the means by which race invades capital sentencing, he asks the court to disregard McCleskey's admonition that courts should "decline to assume that what is unexplained is

44

invidious." McCleskey, 481 U.S. at 313. The court, however, is required to follow this instruction.

The Supreme Court evidently recognized the risk of unconscious juror bias in capital sentencing when it decided McCleskey. See McCleskey, 481 U.S. at 332-34 (Brennan, J., dissenting) (discussing the "the psychological dynamics of unconscious racial motivation"); see also Turner v. Murray, 476 U.S. 28, 35 (1986) ("Because of the range of discretion entrusted to a jury in a capital sentencing hearing, there is a unique opportunity for racial prejudice to operate but remain undetected. . . . More subtle, less consciously held racial attitudes could also influence a juror's decision in this case."). Furthermore, the studies cited by the defendant provide only an explanation for the existence of racial bias. They do not render the correlations identified in the statistical evidence any stronger or transform what the Supreme Court has found to be a constitutionally permissible level of risk into a constitutionally impermissible level.

In analyzing Sampson's racial discrimination claim in 2004, the parties and this court agreed that "it would be valuable to have an updated Baldus-type comprehensive study of the operation of the Federal Death Penalty system." Sampson II, 332 F. Supp. 2d at 338. The court has not been presented with any such updated study. As it wrote in 2004, "[i]f the facts concerning the so-

45

called white victim effect were materially different in this case [than in McCleskey], this court would have the discretion to reach the result the defendant advocates." Id. at 337. The court also noted that "the Supreme Court might reconsider and reverse" McCleskey, which was a 5-to-4 decision. Id. at 339. However, as the Supreme Court has not reversed or revised McCleskey, and "the evidence does not prove a white victim effect that is more pronounced than the Supreme Court found to be constitutionally acceptable in McCleskey, the lower courts may not properly declare the [FDPA] unconstitutional for this reason." Id. at 339.

Sampson's failure to provide stronger statistical evidence of racial disparities in capital punishment than that deemed insufficient by the Court in McCleskey is fatal to his facial challenge in this court to the FDPA based on racial disparities. The court is, therefore, denying Sampson's Racial Disparity Motion.

C. Rate of Error

In his Rate of Error Motion, Sampson argues that juries make fact-finding errors, both at the guilt and sentencing phase of capital trials, which prevent them from reliably selecting the worst offenders for capital punishment. He maintains that these mistakes result in a rate of error in imposing the death penalty that is unacceptable in view of the heightened procedural reliability required by capital punishment. He contends that the

46

rate of error renders the death penalty unconstitutionally arbitrary in violation of the Fifth and Eighth Amendments.[13]  This claim is not meritorious because Sampson has not shown that a significant risk of error affects sentencing in FDPA cases.

The Eighth Amendment imposes a "heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.'"  Caldwell v. Mississippi, 472 U.S. 320, 340 (1985) (quoting Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality op. of Stewart, Powell, and Stevens, JJ.)).  As this court explained in 2004, "[t]he degree of reliability to make [decisions in ordinary criminal cases] in a manner that satisfies the requirements of due process may be considerably less than the certainty that should be required to establish a fact that may determine whether a person will live or die."  Sampson III, 335 F. Supp. 2d at 222.

However, the Supreme Court has made "clear that it is possible to construct capital-sentencing systems capable of meeting" the heightened need for reliability in capital cases.  Gregg, 428 U.S. at 195.  It has also stated that the issues inherent in reliance

---

[13] At oral argument, Sampson's counsel contended for the first time that this claim was based on the rate of error specific to Sampson's trial--that the type of evidence that the parties would present in his case presented a high possibility of jury error. That claim is not ripe for resolution now.

on juries do not render capital sentencing conducted by juries unconstitutional, writing:

> Since the members of the jury will have had little, if
> any, previous experience in sentencing, they are
> unlikely to be skilled in dealing with the information
> they are given. . . . To the extent that this problem
> is inherent in jury sentencing, it may not be totally
> correctible.

See id. at 192. Recognizing that the "criminal justice system does not operate perfectly," the Court has explained that its "precedents do not prohibit the States from authorizing the death penalty, even in our imperfect system." Marsh, 548 U.S. at 181. This reasoning is equally applicable to the federal government.

The FDPA has substantial procedural safeguards intended to ensure that juries properly exercise guided discretion in deciding whether death is the appropriate punishment. See Sampson III, 335 F. Supp. 2d at 175. The Supreme Court has upheld the constitutionality of similar state capital sentencing statutes, even those with features less favorable to defendants than those found in the FDPA. See, e.g., Marsh, 548 U.S. at 175-80. The First Circuit has held that the FDPA satisfies the Constitution's procedural requirements. See Sampson IV, 486 F.3d at 24.

Sampson's evidence of the rate of error affecting capital sentencing falls into several categories. He provides the same type of evidence that he presented to this court and the First Circuit in 2003 concerning execution of the innocent. This

48

included his contention that 146 people have been exonerated from death row, and studies finding that 1 in 25 capital defendants are wrongfully convicted. See Docket No. 1540 at 3-6.

He also provides studies that identify factfinding errors that affect the guilt phase of criminal trials. He cites studies that find that certain types of evidence--eyewitness testimony, non-DNA forensic evidence, biased-witness testimony, and false confessions--are often found in cases where defendants are later exonerated. See Recer Decl. at 6-16 (Docket No. 1540). Most of the studies do not involve capital murder trials or the federal system. None of the studies involve capital sentencing. However, Sampson urges the court to conclude that these are the same types of evidence that will be presented in capital sentencing proceedings and, therefore, capital sentencing is infected with an impermissible rate of error.

The only evidence specific to capital sentencing that Sampson has presented consists of studies showing that jurors have difficulty in predicting future dangerousness, that jurors may assess evidence of mental illness as aggravating instead of mitigating, and that mitigating evidence exists in many cases in which defendants are sentenced to death. See id. at 19. These studies are based largely on anecdotal evidence and provide no estimate of the magnitude of prejudicial error resulting from these alleged problems.

49

Finally, Sampson cites evidence that 17 of 73 FDPA defendants who were sentenced to death have had their sentences reversed. See id. at 21 (citing Death Penalty Information Center, Federal Death Row Prisoners, available at http://www.deathpenaltyinfo.org/federal-death-row-prisoners (Docket No. 1540-44)). He also relies on a study, which was cited by this court in 2003, that found a 68% prejudicial-error rate in the American capital punishment system--in other words, that retrials were required in 68% of cases. See Sampson II, 275 F. Supp. 2d at 57 (citing J.S. Liebman et al., A Broken System: Error Rates in Capital Cases, 1973-1995 (2000) (Docket No. 1540-43)).

For several reasons, Sampson's evidence does not prove jury error "create[s] a substantial risk that [the death penalty] w[ill] be inflicted in an arbitrary and capricious manner." Gregg, 428 U.S. at 188.[14] First, the Supreme Court has held that a capital punishment scheme is constitutional as long as it "rationally narrow[s] the class of death eligible defendants" and "permit[s] a jury to render a reasoned, individualized sentencing determination." See Marsh, 548 U.S. at 173-74. The Court has

---

[14] This is different from the standard for post-trial challenges to specific jury instructions in capital cases, where a defendant is entitled to relief if he can show that there was a "reasonable likelihood that the jury has applied the challenged instruction in a way that" prevents the jury from discharging its duties as required by the Constitution. Boyde v. California, 494 U.S. 370, 380 (1990). Even if the Boyde standard applied here, Sampson's claim would fail.

recognized that the capital punishment system may result in errors, but has held that it is nevertheless constitutional. See id. at 181.

Second, much of the evidence on which Sampson relies was presented in 2003, and found by this court to be insufficient to invalidate the FDPA because of the risk of executing the innocent. See Sampson I, 275 F. Supp. 2d at 77-81. The First Circuit also found that this evidence, by itself, was insufficient to establish that the death penalty is imposed arbitrarily. See Sampson IV, 486 F.3d at 27-28. As the evidence on which Sampson relies concerning the execution of the innocent is not materially different, the First Circuit's decision must be followed. Sampson has not shown that there has been a significant change in the arguable rate of error in FDPA cases, the material facts have not changed, and the First Circuit's decision, particularly, is binding precedent.

Third, the FDPA has the substantial procedural protections that provide the heightened reliability that the Supreme Court has stated is required of capital proceedings. See Sumner v. Shuman, 483 U.S. 66, 71-72 (1987). The guilt and sentencing phases are bifurcated; the government bears the burden of proving beyond a reasonable doubt that a statutory aggravating factor exists and that the defendant had a culpable state of mind in order to make him eligible for the death penalty. See Sampson III, 335 F. Supp.

2d at 175 (citing 18 U.S.C. §§3591-92). If the jury finds the defendant eligible, it must then determine if death is the appropriate sanction. Id. This requires the jury to find any aggravating factors beyond a reasonable doubt and balance those factors against any mitigating factors, which only must be proven by a preponderance of the information. Id. at 176. Mitigating information includes anything that could influence a juror to find a death sentence is not justified. Id. To find a sentence of death justified, the jurors must unanimously conclude that the aggravating factors sufficiently outweigh the mitigating factors. Id. However, the jury would retain the discretion not to impose a death sentence. Id. (citing 18 U.S.C. §3593(e)). The district court must exclude any evidence if its probative value is outweighed by the danger of unfair prejudice. Id.

The FDPA also provides for appellate review of the full record. See 18 U.S.C. §3595. The Court of Appeals reviews all substantive and procedural issues raised on appeal, and must "consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports the special finding of the existence of an aggravating factor." 18 U.S.C. §3595(c)(1). If the Court of Appeals identifies any error in the sentencing, it must vacate the death sentence unless "the Government establishes beyond a reasonable doubt that the error was harmless." See id.

52

Sampson has not provided any evidence that there is a tendency for juries to commit error with regard to any of the statutory aggravating factors. With the exception of "future dangerousness," he has not shown any errors specific to federal capital litigation that indicate that ordinary criminal procedural protections are insufficient. As this court has previously explained, the issue of future dangerousness is problematic, but the problems can be mitigated through careful court control of the evidence presented. See Sampson III, 335 F. Supp. 2d at 218-23.

Furthermore, as this court recognized in 2004, its discretion to exclude evidence under 18 U.S.C. §3593(c) may be employed to prevent the jury from considering evidence that cannot reliably be evaluated. The evidence that Sampson presents concerning the rate of reversal of federal death sentences is comparable to the rate this court considered in 2003. See Sampson I, 275 F. Supp. 2d at 77-82; Recer Decl., at 21 (Docket No. 1540).

The protections afforded by the FDPA are greater than those in capital sentencing procedures that the Supreme Court has upheld. The evidence of factual error that Sampson provides is of the type that the Supreme Court has implicitly recognized is inherent and acceptable in our judicial system. For these reasons, Sampson has not proven that jury error "create[s] a substantial risk that the [death penalty] will be inflicted in an arbitrary and capricious

53

manner." Godfrey v. Georgia, 446 U.S. 420, 427 (1980). Accordingly, the court is now denying the Rate of Error Motion.

The court remains concerned, however, about the potential rate of error in federal capital cases generally and the risk of the execution of the innocent particularly. Although the court did not find in 2003 that the objective indicia of contemporary standards justified invalidating the FDPA, it did agree with other courts that "the FDPA, like state death penalty statutes, will inevitably result in the execution of innocent people." Sampson I, 275 F. Supp. 2d at 81. Several Justices of the Supreme Court have since expressed similar concerns. See, e.g., Glossip, 135 S.Ct. at 2756-59 (Breyer, J., dissenting) (noting that the number of exonerations in capital cases has increased from 60 in 2002 to 115 in 2015); Marsh, 548 U.S. at 207-08 (Souter, J., dissenting) ("Today, a new body of facts must be accounted for in deciding what, in practical terms, the Eighth Amendment guarantees should tolerate, for the period starting in 1989 has seen repeated exonerations of convicts under death sentences, in numbers never imagined before the development of DNA tests.").

In June 2015, Justice Breyer, joined by Justice Ginsburg, dissented from a decision finding Oklahoma's method of execution constitutional. Referencing much of the evidence that Sampson presented to this court concerning the Rate of Error Motion, Justice Breyer called for "full briefing" on the question of

54

"whether the death penalty violates the Constitution," in part
because some current information concerning alleged arbitrariness
was not available when the issue was decided previously.  See
Glossip, 135 S.Ct. at 2755; see also id. at 2759-64.  This court,
respectfully, suggests that factfinding in a district court, in an
appropriate case, should precede any such "briefing."  More
specifically, this court agrees that:

> Supreme Court briefs are an inappropriate place to
> develop the key facts in a case.  We normally give
> parties more robust protection, leaving important
> factual questions to district courts and juries aided by
> expert witnesses and the procedural protections of
> discovery. . . .
>
> An adversarial process in the trial courts can identify
> flaws in the methodology of the studies that the parties
> put forward . . . .

Sykes, 131 S.Ct. at 2286 (Scalia, J., dissenting).

Sampson's motion to dismiss based on the allegedly arbitrary
imposition of the death penalty was orally argued on December 3
and 4, 2014.  As the court noted at the hearing, Sampson's written
arguments and evidence were scattered throughout numerous filings,
comprising hundreds, if not thousands, of pages.  See, e.g., Dec.
3, 2014 Tr. at 76 (Docket No. 1711) ("the pieces [of evidence] are
in four filings more than 200 [docket numbers] apart" and it is
difficult to "put[] together jigsaw puzzles").  Sampson has not
identified disputed material facts with the specificity required
to justify an evidentiary hearing on the motion alleging general

55

arbitrariness.  See Mitchell-Hunter, 663 F.3d at 53.  Nor, on the current record, has the court found that his evidence, if accepted as true, justifies finding capital punishment generally, or the FDPA particularly, unconstitutional.  However, Sampson's motion for an evidentiary hearing on this issue, and therefore this motion, are being denied without prejudice to possible reconsideration if a future, focused presentation persuades the court that a hearing is justified.

     D.   General Arbitrariness

     In his General Arbitrariness Motion, Sampson argues that the FDPA is unconstitutional, at least with respect to carjacking resulting in death, because it is so rarely imposed, and because it is impossible to discern any difference between carjackings in which the death penalty is sought and those in which it is not. This claim is not meritorious because Sampson has not established that variations in sentencing under the FDPA are not attributable to individual offense and offender characteristics rather than some irrational, arbitrary factor.

     The death penalty must be imposed "with reasonable consistency," but "a consistency produced by ignoring individual differences is a false consistency." Sampson IV, 486 F.3d at 24 (quoting Eddings v. Oklahoma, 455 U.S. 104, 112 (1982)). Sampson's argument ignores the Supreme Court's holding that "[t]he Constitution is not offended by inconsistency in results based on

the objective circumstances of the crime. Numerous legitimate factors may influence . . . a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt." Id. at 24-25 (quoting McCleskey, 481 U.S. at 307 n.28). Constitutionally, a capital sentencing jury must be allowed to consider "as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett v. Ohio, 438 U.S. 586, 604-05 (1978) (emphasis in original).

While Sampson has shown that some people who committed heinous carjackings did not receive the death penalty, he has provided no reason to find that the discretion-guiding safeguards required by the Supreme Court in Gregg are not functioning properly. Without any evidence concerning the other offenders' characteristics and more details about the offenses they committed, "Sampson invites the court to invalidate the FDPA because it does not produce a 'false consistency' in the imposition of the death penalty. This is not permissible or appropriate." Sampson I, 275 F. Supp. 2d at 88 (citations omitted).[15]

---

[15] For the reasons discussed here and with regard to the Racial Disparities Motion, Sampson's Motion to Compel Compliance with His Third Discovery Request Relating to Constitutional Issues (Docket No. 1418) is being denied to the extent that he seeks race-based discovery. See Aug. 19, 2014 Order Memorializing Decisions at the August 12 and 14, 2014 Hr'gs, ¶4(c) (Docket No. 1505). Sampson has not supported his motion by "the requisite showing to establish entitlement to discovery." United States v. Armstrong, 517 U.S.

Furthermore, Sampson's focus on the rarity of capital
sentences under the FDPA is misplaced. "Arbitrariness" focuses on
the lack of guided discretion in imposition of the death penalty,
not the frequency with which it is imposed. As the First Circuit
explained in deciding Sampson's direct appeal:

> In the thirty-four years since Furman was decided, the
> Court has made clear that its decision was not based on
> the frequency with which the death penalty was sought or
> imposed. Rather, the primary emphasis of the Court's
> death penalty jurisprudence has been the requirement
> that the discretion exercised by juries be guided so as
> to limit the potential for arbitrariness.

Sampson IV, 486 F.3d at 23. Consequently, Sampson has not proved
that the FDPA imposes capital punishment arbitrarily because it
results in death sentences infrequently.[16]

---

456, 468 (1996). More specifically, Sampson has not shown that
"similarly situated individuals who do not share [his] protected
characteristic[, white victims,] were not prosecuted." United
States v. Lewis, 517 F.3d 20, 25-26 (1st Cir. 2008). Nor has he
provided any evidence that the government chose to prosecute "'at
least in part because of, not merely in spite of,'" the fact that
he killed white victims. Id. (quoting Wayte v. United States, 470
U.S. 598, 610 (1985)).

[16] Sampson also argues that the rarity with which capital punishment
is imposed eliminates any potential deterrent effect that it might
have. As the Supreme Court has explained, "Gregg instructs that
capital punishment is excessive when it . . . does not fulfill the
two distinct social purposes served by the death penalty:
retribution and deterrence of capital crimes." Kennedy, 554 U.S.
at 441. However, Sampson has presented no empirical evidence to
support his contention that the death penalty does not deter
because it is infrequently imposed.

58

VII. JUROR CONFUSION AND IMPAIRMENT IN CAPITAL PROCEEDINGS

In two motions, Sampson argues that the FDPA is unconstitutional because jurors cannot perform their required tasks.[17] See Motion to Declare the Federal Death Penalty Act Unconstitutional Because It Is Incomprehensible to Jurors and Results in the Arbitrary Application of the Death Penalty (Docket No. 1458) ("Incomprehensibility Motion") and his Motion to Strike Death Notice Due to the Systematic Impairment of Capital Jurors (Docket No. 1460) ("Systematic Impairment Motion"). For the following reasons, these motions are not meritorious. They are, therefore, being denied.

A. Legal Standard

As discussed earlier, see supra §VI.A, a capital sentencing jury's discretion must be guided by clear standards and instructions that allow jurors to consider properly the evidence before them and understand their sentencing responsibility. See Gregg, 428 U.S. at 192-95.

From the general principle of guided discretion, the Supreme Court has derived specific rules governing capital juries. For example, capital jurors must consider and give effect to the defendant's mitigating evidence. See, e.g., Morgan v. Illinois,

---

[17] To the extent that Sampson argues that the jurors who will hear his case are impaired and that the procedures the court will employ are incomprehensible, this motion is not ripe.

504 U.S. 719, 729 (1992). They must be given discretion whether
to impose the death penalty. See Woodson, 428 U.S. at 302-05.
Furthermore, it is constitutionally impermissible to "mislead the
jury as to its role in the sentencing process in a way that allows
the jury to feel less responsible than it should for the sentencing
decision." Romano v. Oklahoma, 512 U.S. 1, 9 (1994) (citation and
internal quotation marks omitted); see also Caldwell, 472 U.S. at
336 (stating that a capital jury should understand that it is
responsible for deciding the sentence). In addition, if future
dangerousness is at issue and life without parole is the only
alternative to death, jurors must be informed of that fact. See
Shafer v. South Carolina, 532 U.S. 36, 51 (2001). A sentencing
scheme in which there is a "substantial risk" that jurors do not
understand or follow these requirements may be unconstitutional.
See Gregg, 428 U.S. at 188; see also United States v. Llera Plaza,
179 F. Supp. 2d 444, 449 (E.D. Pa. 2004) ("Although the defendants
do not cite legal authority which expressly states the proposition
that capital sentencing schemes are only constitutional if they
are 'comprehensible' to the sentencer, the principle involved
seems axiomatic.").

Courts have long presumed that juries, including capital
juries, follow their instructions. See Weeks v. Angelone, 528
U.S. 225, 234 (2000); Richardson v. Marsh, 481 U.S. 200, 211
(1987). However, "in some circumstances 'the risk that the jury

will not, or cannot, follow instructions is so great, and the
consequences of failure so vital to the defendant, that the
practical and human limitations of the jury system cannot be
ignored.'" Simmons v. South Carolina, 512 U.S. 154, 171 (1994)
(plurality op.) (quoting Bruton v. United States, 391 U.S. 123,
135 (1968)).

B.    Analysis

In his Incomprehensibility Motion and his Systematic
Impairment Motion, Sampson argues that jurors do not understand
their duties under the FDPA.[18]   Sampson seeks to demonstrate a
substantial risk that capital jurors cannot or will not follow
instructions by citing evidence gathered by various social
scientists, including through the Capital Jury Project (the
"CJP").  See Recer Decl. ¶3 (Docket No. 1548); Bowers, Capital
Jury Project (Docket No. 1548-5).   In these studies, CJP
researchers interviewed people who had served as jurors in capital
cases in various state courts.    Jurors were interviewed
individually.   Interviews took place, on average, about two and
one quarter years after their jury service.

The studies allegedly found several flaws in capital
sentencing juries.  These alleged flaws fall into four general

---

[18] Although they are distinct motions, the Incomprehensibility
Motion is based largely on the evidence presented in support of
the Systematic Impairment Motion.

categories.  First, a large percentage of capital jurors do not understand the jury instructions.  See Recer Decl. ¶12.  Second, capital jurors decide what punishment to impose before hearing all of the evidence or otherwise fail to consider mitigating evidence. See id. ¶¶3-4.  Third, they fail to understand certain important facts.  For example, some jurors fail to understand that they have discretion not to impose death, that life without parole is an alternative to death, and that they are ultimately responsible for deciding punishment.  See id. ¶10.  Fourth, Sampson points to various types of juror bias, some of which results from the death-qualification process.[19]  For example, some studies show that death-qualified juries favor the prosecution, see Recer Decl. ¶5, and that views on the death penalty correlate with the race of jurors, see id. ¶9.

The question presented by Sampson's motion is whether there is a "substantial risk" that FDPA jurors do not follow the constitutional and statutory rules governing capital sentencing. Gregg, 428 U.S. at 188.  Given the presumption that capital juries follow their instructions, Weeks, 528 U.S. at 234, and the trust

---

[19] "Death qualification" refers to the standard practice in capital cases of ensuring that jurors will follow the court's instructions and not automatically refuse to impose the death penalty because of personal beliefs, regardless of the law and the facts of a particular case.  See Morgan, 504 U.S. at 728; Lockhart v. McCree, 476 U.S. 162, 167 (1986); Wainwright, 469 U.S. at 439 (Brennan, J., dissenting).

that the United States has historically placed in trial by jury, see Duncan v. Louisiana, 391 U.S. 145, 148-57 (1968), Sampson bears a heavy burden in this challenge. After considering the CJP studies and other evidence submitted by Sampson, the court finds that it does not show a substantial risk that federal capital jurors do not meet the constitutional requirements of capital sentencing that have been stated by the Supreme Court. Nor does Sampson's evidence identify any disputed fact that, if proven, would entitle him to relief. At most, Sampson's evidence shows only that some capital jurors, well after the trial, might fail to remember certain legal principles, hold certain beliefs that may or may not have impacted their deliberations, and have certain recollections of the process that may or may not be accurate.

First, Sampson's studies "concentrate on state penalty schemes, rather than the FDPA or instructions given in federal capital trials and are therefore unconvincing." United States v. Mikos, No. 02-cr-137, 2003 WL 22110948, at *17 (N.D. Ill. Sept. 11, 2003). The fact that the CJP did not study federal cases does not necessarily render them unpersuasive. However, Sampson has not shown that the CJP results can be generalized to apply to the FDPA. Specifically, he has not proffered evidence that the state capital statutes, jury instructions, and voir dire procedures studied by the CJP are sufficiently similar to those of the federal courts.

63

Second, even if the CJP results can be generalized to federal cases, there are flaws in the CJP studies that render their results unpersuasive.  The CJP juror interviews generally took place years after the trial about which the jurors were being interviewed about.  See William J. Bowers et al., Jurors' Failure to Understand or Comport with Constitutional Standards in Capital Sentencing: Strength of the Evidence, 46 No. 6 Crim. L. Bull. Art. 2, 14 (2010) (Docket No. 1548-33) (median length of 2.22 years).  Given the complexity of capital sentencing, the court is not persuaded that this evidence shows that a juror's memory, long after hearing the instructions and deliberating, accurately reflects what occurred during deliberations.

Furthermore, the jurors being interviewed by the CJP did not have three important aids to which deliberating jurors have access.  First, CJP jurors did not have access to written jury instructions.  See Apr. 18, 2013 Tr. at 98, United States v. Watland, No. 11-cr-0038 (D. Colo.) (Docket No. 1735-1) (testimony of Dr. Wanda Foglia).  This court and others provide written instructions to the jurors in a capital case, which enables jurors to consult the instructions if any confusion or questions arise.  Second, during their CJP interviews, the jurors were unable to speak with other jurors who had heard the same instructions.  See Boyde v. California, 494 U.S. 370, 380-81 (1990) (explaining the importance of jury deliberation to understanding jury instructions).

Finally, CJP interviewees were not allowed to ask the trial judge questions about the jury instructions during their interviews, a practice that presumably corrects juror confusion about instructions. See Weeks, 528 U.S. at 234 ("A jury is presumed to follow its instructions. Similarly, a jury is presumed to understand a judge's answer to its question." (citation omitted)).

The foregoing analysis of the CJP study is not exhaustive. Rather, the issues addressed illustrate the reasons that Sampson's evidence does not suffice to create a material dispute as to whether, and the undisputed facts do not show that, there is a substantial risk that federal capital jurors, after searching voir dire and careful instructions, will be unable to discharge their duties in the manner required by the Constitution.[20] Therefore, the Systematic Impairment and Incomprehensibility Motions are being denied.[21]

---

[20] Sampson provides evidence that studies of mock jurors replicate the findings of the CJP. See, e.g., Foglia Aff., ¶10 (Docket No. 1719-1). However, the Supreme Court has stated that it has "serious doubts" that studies of the general population, as opposed to those who have served on a jury, can "predict[] the behavior of actual jurors." Lockhart, 476 U.S. at 171. This court finds that studies of mock jurors are insufficiently comparable to actual jury trials to render meaningful results. See also Free v. Peters, 12 F.3d 700, 705-06 (7th Cir. 1993).

[21] The court is not persuaded by Sampson's contention that the death penalty is unconstitutional because the outcomes are influenced by the race of the jurors. The Constitution does not require "a certain mix of individual viewpoints on the jury." Lockhart, 476 U.S. at 178. Therefore, the death penalty is not arbitrary because different juries may have different mixes of

VIII.    THE  GOVERNMENT'S  PURSUIT  OF  THE  DEATH  PENALTY  IN
         MASSACHUSETTS AND IN THIS CASE SPECIFICALLY

         Sampson    raises    several    challenges    to    the    government's
decision  to  pursue  the  death  penalty  in  Massachusetts,  a  state
that  does  not  have  capital  punishment,  as  well  as  the  particular
decisionmaking  process  in  this  case.    See  Motion  to  Strike  the
Death  Notice  Because  United  States  Attorney  Michael  Sullivan's
Participation   in   the   Process   Leading   to   the   Death   Penalty
Authorization  Deprived  Sampson  of  the  Right  to  a  Prosecutor  Free
to  Exercise  His  Discretion  Fairly  and  Injected  an  Arbitrary  Factor
into  the  Death  Penalty  Authorization  Process  (Docket  No.  1473)
("Sullivan  Motion");  Motion  to  Strike  the  Death  Notice  on  the
Ground  that  the  Attorney  General  Authorized  Seeking  the  Death
Penalty  in  Part  to  Reintroduce  Capital  Punishment  to  a  State  That
Had  Abolished  It  ("Ashcroft  Motion")  (Docket  No.  1479);  Motion  to
Strike  the  Death  Notice  Because  of  the  Unconstitutionality  of
Forcing  the  Death  Penalty  on  the  Citizens  of  a  State  That  Has
Rejected  It  ("Reintroduction  Motion")  (Docket  No.  1430);  Motion  to
Preclude  Penalty  of  Death  Due  to  the  Unconstitutionality  of
Selecting  a  "Death-Qualified"  Jury  in  a  State  Most  of  Whose
Citizens  Oppose  the  Death  Penalty  (Docket  No.  1462)  ("Death

---

viewpoints.    Assuming  that  juror  viewpoints  may  correlate  with
race does not alter this conclusion.

Qualification Motion"). For the following reasons, these motions are not meritorious. They are, therefore, being denied.

A. Government's Decisionmaking Process

Sampson first argues in his Sullivan Motion that Mr. Sullivan's comments and actions as District Attorney for Plymouth County, prior to becoming United States Attorney, violated Sampson's right to an impartial prosecutor. Before becoming United States Attorney for the District of Massachusetts, Mr. Sullivan expressed his belief that the United States should pursue carjacking charges against Sampson and seek the death penalty. When he became United States Attorney, Mr. Sullivan secured Sampson's federal indictment and successfully recommended that the Department of Justice authorize him to seek the death penalty.

Prosecutors are not held to the same standard of disinterest as judges. See, e.g., Young v. U.S. ex rel. Vuitton et Fils S.A., 481 U.S. 787, 807 (1987) ("The requirement of a disinterested prosecutor is consistent with our recognition that prosecutors may not necessarily be held to as stringent a standard of disinterest as judges. . . . We have thus declined to find a conflict of interest in situations where the potential for conflict on the part of a judge might have been intolerable."); Marshall v. Jerrico, Inc., 446 U.S. 238, 250 (1980). As the First Circuit has stated, "[p]rosecutors need not be empty vessels, completely devoid of any non-case-related contact with, or information about,

criminal defendants." United States v. Lilly, 983 F.2d 300, 310 (1st Cir. 1992).

However, "traditions of prosecutorial discretion do not immunize from judicial scrutiny cases in which the enforcement decisions of an administrator were motivated by improper factors or were otherwise contrary to law." Marshall, 446 U.S. at 249. Sampson has not offered evidence indicating that Mr. Sullivan was motivated by more than support for the death penalty generally and a desire to seek it, at least in part, to serve the interests of the victims' families. Therefore, he has not shown that Mr. Sullivan's involvement in the events leading up to the Department of Justice's decision to seek the death penalty against Sampson was motivated by an improper purpose. See Wright, 732 F.2d at 1056 (A prosecutor "is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with regard to the crime with which he is charged."); see also Young, 481 U.S. at 807-08 (finding an improper purpose where the private lawyer appointed to prosecute a criminal contempt simultaneously represented a party who stood to benefit from enforcement of the court order that resulted in the contempt); Lilly, 983 F.2d at 310 (stating that an improper purpose had not been found by other circuits even "when a prosecutor is simultaneously representing

private clients who are suing the defendants on related matters,"
or "when a prosecutor is simultaneously the target of a civil
action filed by an associate of the criminal defendant").
Accordingly, the Sullivan Motion is unmeritorious and is being
denied.

Ultimately, the decision to seek the death penalty was made
by then-Attorney General John Ashcroft as required by Department
of Justice guidelines.[22]   Sampson challenges this decision in his
Ashcroft Motion.   Sampson argues that Attorney General Ashcroft
decided to seek the death penalty against Sampson as part of a
plan to reintroduce the death penalty to states, like
Massachusetts, that had abolished it.   He contends that this
decision violated his right to equal protection under the Fifth
Amendment and right to a non-arbitrary sentencing proceeding under
the Eighth Amendment.

---

[22] In a separate motion, Sampson argues that, before seeking the
death penalty against Sampson in this retrial, the Department of
Justice must follow the authorization procedures included in the
United States Attorneys' Manual and consider whether to seek the
death penalty de novo.   See Mot. to Prevent the Prosecution from
Seeking the Death Penalty in this Case Due to the Lack of Uniform
Standards in its Authorization Process as Applied to Mr. Sampson
(Docket No. 1469).   However, the United States Attorneys' Manual
does not create rights that a defendant can enforce.   See United
States Attorneys' Manual, 1.100; see also United States v. Lopez-
Matias, 522 F.3d 150, 155-56 & n.11 (1st Cir. 2008).   Therefore,
a violation of the United States Attorneys' Manual "does not create
a basis for dismissing the [death] Notice."   Lopez-Matias, 522
F.3d at 156.   Accordingly, this motion is being denied.

This is essentially a selective prosecution claim. In essence, Sampson contends that he was selected for prosecution based on a constitutionally impermissible arbitrary factor, geography. However, as in 2003, Sampson has failed to identify a similarly situated individual who committed his or her crimes in a state that allows for capital punishment for whom the Department of Justice chose not to seek the death penalty. See Sampson II, 332 F. Supp. 2d at 335; see supra note 15. He has, therefore, failed to establish an essential element of a selective prosecution claim. See Sampson II, 332 F. Supp. 2d at 335; see also United States v. Armstrong, 517 U.S. 456, 458-59 (1996); United States v. Lewis, 517 F.3d 20, 25-26 (1st Cir. 2008). Accordingly, the Ashcroft Motion is being denied.

## B. Government's Decision to Seek the Death Penalty in Massachusetts

In two other motions, Sampson argues that Attorney General Ashcroft's alleged goal of reintroducing capital punishment in states that had abolished it would, if successful, violate the Constitution. In his Reintroduction Motion, Sampson asserts that federalism interests bar the application of the federal death penalty in a state that has abolished it as a punishment.

Sampson's argument is based on a mistaken view of the Supremacy Clause, and the power of Congress to define federal crimes and provide for potential sentences. Congress may establish

federal crimes. See Ex parte United States, 242 U.S. 27, 42 (1916); United States v. Severino, 316 F.3d 939, 954 (9th Cir. 2003). When Congress passes a law defining a federal crime, that law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. This principle applies to statutes that authorize the death penalty for crimes committed within the United States, regardless of the state in which the crime is committed, whether that conduct is criminal in that state, or what the maximum penalty for that conduct is in that state. See, e.g., United States v. McCluskey, No. 10-cr-2734, slip op. at 21-24 (D.N.M. Sept. 24, 2012) (Docket No. 1589-1); United States v. Jacques, No. 2:08-cr-117, 2011 WL 3881033 (D. Vt. Sept. 2, 2011); United States v. Tuck Chong, 123 F. Supp. 2d 563, 567-68 (D. Haw. 1999).

The Attorney General may have been motivated to seek the death penalty in this case, and others, in a state whose laws do not provide for capital punishment in part by a desire to respond to arguments that utilizing the FDPA only in certain states that do authorize the death penalty violates the right of people in those states to the equal protection of the law. This would not be an impermissible motive.

In any event, the Reintroduction Motion is unmeritorious. It is, therefore, being denied.

In his Death Qualification Motion, Sampson argues that that
the federal government should be barred from seeking the death
penalty in Massachusetts. More specifically, Sampson asserts that
a majority of Massachusetts citizens do not support the death
penalty, and the punishment is not available under state law, so
a death-qualified jury would not be representative of the
Massachusetts community in violation of the Eighth Amendment.
Sampson again relies on CJP and other studies to contend that
death-qualified jurors generally favor conviction and the death
penalty.

Under Supreme Court precedent, "death qualification," see
supra note 19, is constitutional. "[A] juror who in no case would
vote for capital punishment, regardless of his or her instructions,
is not an impartial juror and must be removed for cause." Morgan,
504 U.S. at 728; see also Lockhart v. McCree, 476 U.S. 162, 177
(1986); Wainwright v. Witt, 469 U.S. 412, 424 (1985). The Supreme
Court has held that death qualification is acceptable even if it
"produces juries somewhat more 'conviction-prone' than 'non-death-
qualified' juries." Lockhart, 476 U.S. at 173.[23] Jurors who oppose
the death penalty but who could follow the law may not be removed

---

[23] Sampson does not persuasively explain why the studies he cites
in his motions would lead to a different result from those studies
the Court considered in Lockhart.

for cause. See, e.g., id. at 176; Witherspoon v. Illinois, 391 U.S. 510, 520-21 (1968).

Furthermore, death qualification does not violate a defendant's Sixth Amendment right "to a jury selected from a representative cross section of the community" because the "fair-cross-section" requirement does not apply to the petit jury. Lockhart, 476 U.S. at 173-74. The Supreme Court stated that "even if [it] were willing to extend the fair-cross-section requirement to petit juries," it would still hold that death qualification does not violate that requirement because the point of the requirement is to prevent the exclusion of a "distinctive group in the community" from the jury pool generally. Id. at 174 (internal quotation marks omitted). Jurors who would never impose the death penalty do not constitute a "distinctive group" for fair-cross-section analysis because the basis of their exclusion is their inability to follow the law, which is not a protected characteristic such as race or gender. Id. at 176-77.[24]

_____

[24] Sampson seeks to escape the Supreme Court's holdings in Witherspoon and Lockhart by framing his argument as one made under the Eighth Amendment. However, the Sixth Amendment is the proper framework to analyze Sampson's claim that death qualified juries are not impartial and do not represent the community. The Sixth Amendment is designed to prevent these harms, while the Eighth Amendment prevents the more general, and different, harm of "cruel and unusual punishments." Cf. Sampson I, 275 F. Supp. 2d at 63 (explaining that substantive due process does not apply when a specific constitutional provision governs).

73

The fact that the jury at retrial must be "death qualified" does not render the FDPA unconstitutional. Therefore, Sampson's Death Qualification Motion is unmeritorious, and is being denied.[25]

IX.  APPRENDI CHALLENGES

In two motions, Sampson argues that the FDPA is unconstitutional because it does not require that all facts that increase the potential punishment be alleged in the indictment, found by the grand jury, and then proved to the jury beyond a reasonable doubt. See Motion to Prohibit the Government from Seeking Death Through the Application of an Unconstitutional Statute, Which Fails to Require the Government to Prove Beyond a Reasonable Doubt that Death is the Appropriate Punishment ("Standard of Proof Motion") (Docket No. 1452); Motion to Dismiss the Indictment for Failure to Include Non-Statutory Aggravating Factors (Docket No. 1450) ("Grand Jury Presentment Motion").  For the following reasons, these motions are not meritorious.  They are, therefore, being denied.

---

[25] At oral argument, Sampson changed his position, arguing that "the death-qualification process itself means that you can't select a capitally-qualified jury.  So this is the motion that would say we could get rid of the death-qualification process." Dec. 17, 2014 Tr. at 96 (Docket No. 1758).  This is essentially the same argument raised in the Incomprehensibility and Systematic Impairment Motions.  For the reasons explained in Part VII.B, supra, the evidence cited by Sampson fails to create a substantial risk that death-qualified juries under the FDPA will not meet their constitutional obligations.

## A.    Legal Standard

Any fact that alters the "legally prescribed punishment" must be found by a jury. Alleyne v. United States, 133 S.Ct. 2151, 2162 (2013). A fact alters the legally prescribed punishment when it increases the minimum, see id. at 2161-63, or maximum, see Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), sentence prescribed by law.  The question "is one not of form, but of effect--does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict," Apprendi, 530 U.S. at 494 (emphasis added), or prevent the sentencer from imposing a lower punishment than is authorized by the jury's guilty verdict, see Alleyne, 133 S.Ct. at 2161.  In addition, in federal prosecutions, facts falling into either category must be found by a grand jury by a preponderance of the evidence and charged in an indictment.    See United States v. Cotton, 535 U.S. 625, 627 (2002); see also Sampson IV, 486 F.3d at 21 (holding that that "the mental culpability and aggravating factors required by the FDPA" must be found by the grand jury).

However, facts that merely affect the sentencer's choice within the range of statutorily authorized sentences need not be found by a jury beyond a reasonable doubt.  See Alleyne, 133 S.Ct. at 2163 ("Our ruling today does not mean that any fact that influences judicial discretion must be found by a jury.  We have

75

long recognized that broad sentencing discretion, informed by
judicial factfinding, does not violate the Sixth Amendment.").

B.   Standard of Proof

In his Standard of Proof Motion, Sampson argues that the FDPA
violates the Fifth, Sixth, and Eighth Amendments because it fails
to require the government to prove beyond a reasonable doubt that
death is the appropriate punishment.

To understand Sampson's argument, it is necessary to
understand the process prescribed by the FDPA. In essence, the
FDPA requires the government to prove aggravating factors to the
jury beyond a reasonable doubt and requires the defendant to prove
mitigating factors by a preponderance of the information. See 18
U.S.C. §3593(c). Jurors must unanimously find any aggravating
factor for it to be proven and relied upon. See 18 U.S.C. §3593(d).
However, any individual juror can consider a mitigating factor
that he or she finds has been proven. See id. Jurors must then
"consider whether all the aggravating factor or factors found to
exist sufficiently outweigh all the mitigating factor or factors
found to exist to justify a sentence of death . . . ." Id.
§3593(e). "Based upon this consideration, the jury by unanimous
vote . . . shall recommend whether the defendant should be
sentenced to death . . . ." Id.

Sampson appears to argue that this process is
constitutionally deficient for two reasons. First, he asserts

76

that the Constitution requires jurors to find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors. The First Circuit rejected this argument in Sampson's appeal from his initial conviction. It explained that the FDPA's "requisite weighing [of aggravators and mitigators] constitutes a process, not a fact to be found. The outcome of the weighing process is not an objective truth that is susceptible to (further) proof by either party." Sampson IV, 486 F.3d at 32 (citations omitted). Sampson's contention that Alleyne and other cases require a different result is unmeritorious. Alleyne held only that facts which increase the minimum sentence are subject to Apprendi. See Alleyne, 133 S.Ct. at 2155; United States v. Razo, 782 F.3d 31, 39-40 (1st Cir. 2015) (stating that, in Alleyne, "the [Supreme] Court held that a jury finding was required to trigger a mandatory minimum [sentence]").

Sampson also asserts that each juror must find proven beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death. This would require jurors to find beyond a reasonable doubt that death is the appropriate sentence. The First Circuit declined to decide this issue. See Sampson IV, 486 F.3d at 33 n.9.

Sampson's argument is not meritorious. Finding that death is the appropriate sentence does not alter the range of penalties. Instead, such a finding is the selection of the appropriate penalty

from the statutorily prescribed range.  Even if Sampson were correct in contending that the reasonable doubt standard must be applied to the final sentencing determination, the FDPA does not prohibit the court from requiring the jury to use that standard, as this court did in 2003.  See id. at 29, 33 n.9.  Therefore, the statute is not facially unconstitutional.  See United States v. Natson, 444 F. Supp. 2d 1296, 1301-02 (M.D. Ga. 2006) (holding that the FDPA is not unconstitutional on its face for not applying the reasonable doubt standard to the weighing process).

The court is also not persuaded by Sampson's arguments that Due Process and the Eighth Amendment require that the beyond a reasonable doubt standard be applied to the weighing process or ultimate sentencing determination.  As discussed previously, the FDPA sufficiently guides capital jurors' discretion and is constitutional under the Eighth Amendment.  Therefore, Sampson's Standard of Proof Motion is unmeritorious and is being denied.

C.    Grand Jury Presentment

In his Grand Jury Presentment Motion, Sampson argues that the grand jury must find probable cause for the existence of the non-statutory aggravating factors that the government will present at trial.  Because the indictment in this case does not include any non-statutory aggravators, he asks the court to dismiss the indictment or strike those factors from the death notice.

78

In the context of the FDPA, Apprendi and its progeny do not require that non-statutory aggravators be alleged in the indictment or found to be sufficiently supported by the grand jury. As this court explained in 2003, under the FDPA, non-statutory aggravators do not "increase the penalty for a crime beyond the prescribed statutory maximum" and "need not be alleged in the indictment." Sampson I, 275 F. Supp. 2d at 100 (citations and internal quotation marks omitted) (quoting United States v. Davis, No. 01-cr-282, 2003 WL 1873088, at *2 (E.D. La. 2003)).

The federal statute under which Sampson pled guilty provides that a person who is convicted of carjacking resulting in death may "be fined . . . or imprisoned for any number of years up to life, or both, or sentenced to death." 18 U.S.C. §2119(3). Under the FDPA, for a death sentence to be an option, the jury must find that at least one statutory aggravating factor has been proven beyond a reasonable doubt. See 18 U.S.C. §3593(e). Such a finding raises the legally authorized maximum sentence to death. Findings regarding non-statutory aggravating factors are relevant to the jury's choice of the appropriate sentence within the statutory range, but they do not affect the range. Therefore, such facts need not be proved to a jury beyond a reasonable doubt. See

Alleyne, 133 S.Ct. at 2163.  Thus, they need not be charged in an indictment. Cf. Cotton, 535 U.S. at 627.[26]

For the foregoing reasons, the Non-Statutory Aggravating Factors Motion is unmeritorious and is being denied.

X.   DELAY MOTION

In his Motion to Bar the Imposition of the Federal Death Penalty Due to Unconstitutional Delay (Docket No. 1434; the "Delay Motion"), Sampson challenges the FDPA based on the length of time it takes to execute people sentenced to death under that statute. Sampson argues that this delay renders the FDPA unconstitutional both on its face and as applied to him "because as a result the death penalty fails to serve any legitimate penological purpose, is imposed so rarely as to be entirely arbitrary, and entails years of waiting in the shadow of execution that are themselves cruel and unusual punishment."  Mem. in Support of Delay Motion, at 1 (Docket No. 1435).  To the extent Sampson is challenging the FDPA because of the length of time between his crimes and his possible

---

[26] Seven circuits have held that non-statutory aggravating factors are not subject to the requirements of Apprendi.  See United States v. Lawrence, 735 F.3d 385, 420 (6th Cir. 2013); United States v. Lighty, 616 F.3d 321, 367-68 (4th Cir. 2010); United States v. Fell, 531 F.3d 197, 236-38 (2d Cir. 2008); United States v. Mitchell, 502 F.3d 931, 979 (9th Cir. 2007); United States v. Brown, 441 F.3d 1330, 1367-68 (11th Cir. 2006); United States v. Purkey, 428 F.3d 738, 749-50 (8th Cir. 2005); United States v. Bourgeois, 423 F.3d 501, 507-08 (5th Cir. 2005); but see United States v. Green, 372 F. Supp. 2d 168, 175-78 (D. Mass. 2005).  As stated earlier, Alleyne does not alter this analysis.

execution at an unknown future date, this motion is not ripe, and is being denied without prejudice. To the extent that Sampson is challenging the FDPA because of the length of time it takes to execute federal prisoners generally, the motion is ripe for resolution.

It is not, however, meritorious. Assuming, without deciding, that Sampson is correct that significant, unwarranted delay leading up to execution would violate the Constitution, the evidence Sampson presents fails to establish that the delay associated with the federal system is long as compared to other jurisdictions that provide for capital punishment or unwarranted in the sense that the delays are avoidable.

Federal courts have usually rejected similar arguments. See Thompson v. Secretary for Dept. of Corr., 517 F.3d 1279, 1284 (11th Cir. 2008); White v. Johnson, 79 F.3d 432, 439 (5th Cir. 1996); Stafford v. Ward, 59 F.3d 1025, 1028 (10th Cir. 1995); McKenzie v. Day, 57 F.3d 1493, 1494 (9th Cir. 1995). It appears that only one federal court has found capital punishment in a particular jurisdiction unconstitutional due to systemic delays in executions. In 2014, in Jones v. Chappell, 31 F. Supp. 3d 1050, 1053 (C.D. Cal. 2014), the district court held that California's "dysfunctional[ly] administ[ered]" death penalty system was unconstitutional.

81

Assuming that the court in Jones is correct that lengthy, unwarranted delay in implementing death sentences violates the Constitution, this court does not find that the federal system is comparable to the California system found to be constitutionally deficient in Jones.  In Jones, the court found that the average length of time from imposition of a death sentence to an execution in California was over twenty-five years, significantly longer than in other states.  Id. at 1054.  The average time in the federal system is under ten years, the second fastest in the nation behind Delaware.  See Recer Decl. Ex. 4 (Docket No. 1536).  In Jones, the court also identified a series of problems with California's system that Sampson does not allege exist in the federal system.  These are: (a) a delay of three to five years, on average, in appointing counsel for direct appeals, Jones, 31 F. Supp. 3d at 1056; (b) a delay of two to three years, on average, between the completion of the briefing process on direct appeal and a decision from the California Supreme Court, id. at 1057; (c) a delay of eight to ten years, on average, in appointing counsel for state court habeas proceedings, which results in over half of California's death row inmates not having habeas counsel appointed, id. at 1058; (d) a delay of 47.8 months, on average, in deciding fully briefed habeas petitions by the California Supreme

82

Court, id. at 1059; and (e) a delay of 10.4 years, on average, in deciding federal habeas litigation, id.[27]

As Sampson repeatedly argued in his successful effort to persuade this court to continue the retrial of this matter, it takes time to prepare for and conduct a capital sentencing proceeding that is fair.  Searching appellate review of a death sentence is also time consuming.  Even assuming that this delay could form the basis of a constitutional violation, and further assuming that systemic delays in a capital punishment regime could render that regime unconstitutional as to every defendant prosecuted under it regardless of the amount of time that passed before that defendant's execution, Sampson has not proven that the federal system is generally so slow that a finding that the FDPA is unconstitutional is warranted.[28]

---

[27] In his dissent in Glossip, 135 S.Ct. at 2764-72, Justice Breyer, relying on statistics from studies concerning delay in state cases, suggests that the death penalty may be cruel, in violation of the Eighth Amendment, in part because of excessive delays in executions.  In their respective concurrences, Justices Scalia and Thomas disagree.  See id. at 2748-49 (Scalia, J., concurring); id. at 2750 n.1 (Thomas, J., concurring).  Whatever the possible merit of Justice Breyer's view of the implications of delay in the state systems, the evidence presented by Sampson is not sufficient to prove unconstitutionally excessive delay in executions under the FDPA.

[28] The court notes that after the issuance of the original October 28, 2015 Memorandum and Order, the Ninth Circuit reversed the district court's decision in Jones.  See Jones v. Davis, --- F.3d ---, 2015 WL 6994287 (9th Cir. Nov. 12, 2015) (holding that "systemic delay" was a novel theory of constitutional law, not

## XI. CATCH-ALL CONSTITUTIONAL MOTION

The court is denying Sampson's Motion to Strike the Death Notice Because of the Combination of Constitutional Defects Demonstrated in His Other Motions (Docket No. 1466). Some of Sampson's motions, such as those alleging arbitrariness, raise parallel issues, and the arguments made in one motion complement arguments made in other motions. In deciding these motions, the court has considered them together. Other motions are based on mutually inconsistent arguments. In deciding these motions, the court has considered them separately. However, as explained earlier, Sampson has not proved a constitutional violation in any of his other motions. Accordingly, this catch-all motion is being denied as well.

## XII. MOTIONS TO PRESERVE THE RIGHT TO FILE FUTURE MOTIONS

In three motions, Sampson seeks to preserve his right to file motions in the future. See Mot. to Preserve the Right to File a Mot. to Preclude the Death Penalty Because Evidence Has Gone Missing, Important Witnesses Have Died, and Because Exculpatory Evidence No Longer Is Available (Docket No. 1464); Mot. to Preserve the Right to File a Challenge[] to the Exercise of Prosecutorial Discretion (Docket No. 1471); Mot. to Preserve the Right to File a Mot. to Dismiss Indictment as Unconstitutional Exercise of Fed.

---

cognizable on habeas review, and declining to address the merits of the district court's decision).

Powers as Applied Specifically to Mr. Sampson (Docket No. 1475). In these motions, Sampson claims that he has not completed his investigation of the facts that he hopes will eventually be developed to the point where he can prove a constitutional violation.  He asks the court, therefore, to allow him an open-ended extension of time to file more motions.

These three motions are being denied.  Sampson's prediction that he will someday have evidence sufficient to prove a violation of his constitutional rights is speculative.  If, in the future, Sampson believes that he has discovered new evidence that proves that his constitutional rights have been violated, he may request leave to file one or more motions seeking relief in accordance with paragraph 5 of the December 26, 2014 Amended Order Concerning Scheduling (Docket No. 1756).   The court will then determine whether good cause exists to permit the filing of any motions after the August 2014 deadline for constitutional motions previously established.

XIII.     ORDER

For the foregoing reasons, it is hereby ORDERED that:

1.     Sampson's Motion to Declare the Federal Death Penalty Act  Unconstitutional  for  Failure  to  Require  Comparative Proportionality  Review  (Docket  No.  1426)  is  DENIED  without prejudice to Sampson's right to request that the First Circuit

conduct comparative proportionality review if he is again sentenced to death.

2. Sampson's Motion to Bar the Death Penalty Because, in Prosecutions Brought in States Without That Penalty, 18 U.S.C. §3596(a) Gives Courts Unguided Discretion in Choosing the State Law Governing the Manner of the Execution, and Because the Federal Government Has Not Implemented Adequate Procedures for Complying with the Court's Selection (Docket No. 1428) is DENIED without prejudice because it is not ripe.

3. Sampson's Motion to Strike the Death Notice Because of the Unconstitutionality of Forcing the Death Penalty on the Citizens of a State that Has Rejected It (Docket No. 1430) is DENIED.

4. Sampson's Motion to Preclude the Death Penalty Due to Pervasive Racial Disparities in Its Imposition (Docket No. 1432) is DENIED.

5. Sampson's Motion to Compel Compliance with His Third Discovery Request Relating to Constitutional Issues (Docket No. 1418) is DENIED to the extent that he seeks race-based discovery.

6. Sampson's Motion to Bar the Imposition of the Federal Death Penalty Due to Unconstitutional Delay (Docket No. 1434) is DENIED without prejudice with regard to any as-applied challenge based on Sampson's personal experience if he is again sentenced to death.

7.    Sampson's Motion to Declare the Federal Death Penalty Act Unconstitutional and to Bar the Death Penalty in This Case Due to the Lack of Public Executions (Docket No. 1438) is DENIED without prejudice because it is not ripe.

8.    Sampson's Motion to Strike the Death Notice Because the Cruel and Unusual Punishment Clause Prohibits a Severe Penalty That Is Rarely or Never Imposed in the State and Region Where the Offense Was Committed (Docket No. 1440) is DENIED.

9.    Sampson's Motion to Bar Lethal Injection Because it Violates the Eighth Amendment Ban on Cruel and Unusual Punishment (Docket No. 1443) is DENIED without prejudice because it is not ripe.

10.   Sampson's Motion to Preclude Death as a Possible Punishment in Light of Overwhelming Evidence that the System for Imposing Death Sentences Is Infected by an Unacceptable Rate of Error (Docket No. 1448) is DENIED without prejudice.

11.   Sampson's Motion to Dismiss the Indictment for Failure to Include Non-Statutory Aggravating Factors (Docket No. 1450) is DENIED.

12.   Sampson's Motion to Prohibit the Government from Seeking Death Through the Application of an Unconstitutional Statute, Which Fails to Require the Government to Prove Beyond a Reasonable Doubt that Death Is the Appropriate Punishment (Docket No. 1452) is DENIED.

13. Sampson's Motion to Dismiss the "Special Findings" From the Second Superseding Indictment, and to Strike the Notice of Intent to Seek the Death Penalty Because of the Arbitrary, Capricious, and Random Application of the Federal Death Penalty (Docket No. 1454) is DENIED.

14. Sampson's Motion to Preclude the Death Penalty as a Violation of the Eighth Amendment as Evidenced by Evolving Standards of Decency (Docket No. 1456) is DENIED.

15. Sampson's Motion to Declare the Federal Death Penalty Act Unconstitutional Because It Is Incomprehensible to Jurors and Results in the Arbitrary Application of the Death Penalty (Docket No. 1458) is DENIED.

16. Sampson's Motion to Strike Death Notice Due to the Systematic Impairment of Capital Jurors (Docket No. 1460) is DENIED.

17. Sampson's Motion to Preclude Penalty of Death Due to the Unconstitutionality of Selecting a "Death-Qualified" Jury in a State Most of Whose Citizens Oppose the Death Penalty (Docket No. 1462) is DENIED.

18. Sampson's Motion to Preserve the Right to File a Motion to Preclude the Death Penalty Because Evidence Has Gone Missing, Important Witnesses Have Died, and Because Exculpatory Evidence Is No Longer Available (Docket No. 1464) is DENIED.

19.   Sampson's Motion to Strike the Death Notice Because of Constitutional Defects Demonstrated in His Other Motions (Docket No. 1466) is DENIED.

20.   Sampson's Motion to Prevent the Prosecution from Seeking the Death Penalty in This Case Due to the Lack of Uniform Standards in its Authorization Process as Applied to Mr. Sampson (Docket No. 1469) is DENIED.

21.   Sampson's Motion to Preserve the Right to File [] Challenges to the Exercise of Prosecutorial Discretion (Docket No. 1471) is DENIED.

22.   Sampson's Motion to Strike the Death Notice Because United States Attorney Michael Sullivan's Participation in the Process Leading to the Death Penalty Authorization Deprived Sampson of the Right to a Prosecutor Free to Exercise His Discretion Fairly and Injected an Arbitrary Factor into the Death Penalty Authorization Process (Docket No. 1473) is DENIED.

23.   Sampson's Motion to Preserve the Right to File a Motion to Dismiss Indictment as Unconstitutional Exercise of Federal Powers as Applied Specifically to Mr. Sampson (Docket No. 1475) is DENIED.

24.   Sampson's Motion to Bar the Death Penalty Based Upon the Government's Distortion of the Objective Indicia of Contemporary Values Establishing that Capital Punishment Violates the Evolving Standards of Decency (Docket No. 1477) is DENIED.

25. Sampson's Motion to Strike the Death  Notice on the Ground that the Attorney General Authorized Seeking the Death Penalty in Part to Reintroduce Capital Punishment to a State that Had Abolished it (Docket No. 1479) is DENIED.

26. Sampson's Motion to Recognize Mandatory Exemption in the Federal Death Penalty Act Due to the Unconstitutionality of Executing Those Who Lack the Extreme Culpability Required to Be Eligible for the Death Penalty Because They Had a Severe Mental Disorder at the Time of the Offense (Docket No. 1486) is DENIED.

UNITED STATES DISTRICT JUDGE

90