```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA      )
                              )
            v.                )    Cr. No. 01-10384-MLW
                              )
GARY LEE SAMPSON              )
```

MEMORANDUM AND ORDER CONCERNING REASSIGNMENT

WOLF, D.J.                                          January 6, 2016

I.  SUMMARY

This capital case was randomly assigned to me in 2001. After extensive pretrial litigation, in 2003 defendant Gary Sampson pled guilty to two charges of carjacking resulting in murder. At a trial that year to determine Sampson's sentence, the jury decided that the death penalty was justified. After denying Sampson's post-trial motions, in 2004 I sentenced him to death. In 2007, the First Circuit affirmed that sentence.

In 2008, as required by law, I appointed new counsel to represent Sampson in post-conviction proceedings. In 2011, it was proven that perjury by a juror who should not have been allowed to serve had deprived Sampson of a fair trial in 2003. Therefore, I ordered a new trial to determine Sampson's sentence and, over Sampson's objection, authorized an appeal by the government of that order. In 2013, the First Circuit agreed that the juror's

misconduct required a retrial and returned this case to the District Court for another trial to determine Sampson's sentence.

Since then, I have given the highest priority to preparing this case for what reportedly would have been the fastest retrial of a federal capital case in history if it had commenced, as scheduled, in September 2015. I had arranged to dedicate from August 2015 through January 2016 to preparing for and completing that retrial. The government's unmeritorious July 2015 motion for my recusal pursuant to 18 U.S.C. §455(a), and its unmeritorious request that I reverse the denial of that motion, made a retrial in 2015 impossible.

In 2013, I retired from active service and became a Senior Judge. As a Senior Judge, I have been entitled to reduce my caseload and have some of my cases reassigned. As I explained when I took Senior Status, I intended to do so in order to devote more time to international endeavors in service of human rights and the rule of law. Nevertheless, I retained responsibility for this case, which has restricted my ability to engage in those activities.

Except for motions relating to the retrial, I have now decided every matter presented, including Sampson's many motions to declare the Federal Death Penalty Act unconstitutional or otherwise end this as a capital case. The Department of Justice has recently denied Sampson's request that it withdraw its notice

2

of intent to seek the death penalty, which if granted would have resulted in Sampson being sentenced to life in prison without possibility of parole and concluded this case. Therefore, this case is again ready to be prepared for retrial and potential post-trial proceedings.

If I retain this case, I will be implicitly undertaking to devote many more years to preparing for the retrial, conducting it, deciding post-trial motions if Sampson is again sentenced to death and, if any such sentence is affirmed, conducting potentially protracted post-conviction proceedings. In view of the many opportunities, and to some extent obligations, I have to do the meaningful international work I intended to perform when I became a Senior Judge, I am no longer able to make that commitment.

This case is now in a posture that will permit the most efficient transition possible to an active judge, who can conduct the retrial and, in the process, become well-prepared to conduct the many years of post-trial proceedings that may be required. I have concluded that it is in the interest of justice to make that transition at this time. The Chief Judge of the District Court has agreed. Accordingly, for the reasons more fully explained in this Memorandum, this case is, pursuant to Rule 40.1(I) of the Local Rules of the United States District Court for the District of Massachusetts, being returned to the Clerk to be randomly reassigned to an active judge, as cases were reassigned to me for

3

almost three decades pursuant to the established policies, practices, and procedures of the District Court.[1]

II. DISCUSSION

   A.  <u>Becoming a Senior Judge</u>

I was appointed a United States District Judge in 1985. On January 1, 2013, the day after my seven-year term as Chief Judge of the District Court ended, I retired from regular active service as a District Judge and continued to serve as a Senior Judge. As I wrote to the President of the United States in 2012, "[w]hile I look[ed] forward to continuing to render substantial service as a Senior Judge, I [was] confident that my court and my community [would] be enriched by also having the undoubtedly younger judge who [would] be appointed to fill the vacancy created as a result of my becoming a Senior Judge." Press Release, United States District Court, District of Massachusetts (Oct. 16, 2012). As reported in the media in 2012, my decision to retire and become a Senior Judge was also influenced by my desire to devote more time to working internationally to combat corruption, promote human rights, and encourage the development of independent, impartial

---

[1] The internal rules of the District Court do not permit cases returned to the Clerk for reassignment to be drawn by a Senior Judge.

judiciaries in countries struggling to establish democratic governments.[2]

A Senior Judge may reduce his or her caseload, and select the types of cases he or she will retain or take. As is customary, upon becoming a Senior Judge in January 2013, I reduced my caseload and some of my pending cases were reassigned to active judges of the District Court. However, I retained responsibility for this case.

B. The History of this Case

As indicated earlier, this case was randomly assigned to me in 2001. In 2003, I conducted a three-month trial to determine Sampson's sentence. The jury decided that death was the most appropriate sentence for the two murders in connection with carjackings Sampson had committed. After deciding post-trial

---

[2] See, e.g., M. Stout, "Chief Judge Wolf to step down and become senior judge on fed court," Boston Herald (Oct. 16, 2012) ("Wolf in recent years has traveled extensively, speaking at a conference in St. Petersburg, Russia, and on combatting corruption in engagements in Romania, Slovakia, and the Czech Republic. He's also helped train judges in Turkey."); M. Valencia, "Wolf to step down as chief US judge, But will continue in senior status," The Boston Globe (Oct. 17, 2012) (Wolf "plans to broaden his work to teach law and give seminars in other countries on the judicial system and combatting public corruption, as he has in recent years in Slovakia, Turkey, and Romania."); Editorial Opinion, "Aging gracefully: Judge Wolf takes senior status," The Boston Globe (Oct. 19, 2012) ("Wolf has spoken about the benefits of having more judges with youthful idealism and different cultural experiences. He has also touted the advantages for older judges in taking senior status – time to travel, teach, and consult; Wolf himself plans to meet with judges in the Czech Republic and Slovakia about the role of an independent judiciary . . .").

5

motions, in 2004 I sentenced Sampson to be executed. In 2007, the First Circuit affirmed that sentence. Also in 2007, the Supreme Court declined Sampson's request to review this case.

In 2008, as required by law, I appointed new counsel to represent Sampson in post-conviction proceedings. See 28 U.S.C. §2255; 18 U.S.C. §3599. In 2009, Sampson filed a petition for a new trial on multiple grounds not previously asserted. He amended that petition in 2010.

In 2011, I was persuaded that perjury by a juror who should have been excluded from the jury had deprived Sampson of his constitutional right to a fair trial to determine his sentence. I, therefore, vacated his death sentence and ordered a retrial. As requested by the government, and over Sampson's objection, I subsequently exercised my discretion to authorize an immediate appeal of that decision. In 2013, the First Circuit rejected the government's arguments and agreed with my decisions that the juror's misconduct had deprived Sampson of a fair trial and that a retrial is necessary.

In November 2013, this case was remanded for further proceedings in the District Court. As a Senior Judge, I could have requested that the case be reassigned. Instead, I promptly began giving the highest priority to preparing it for retrial as

soon as reasonably possible.³ I also continued to be attentive to the many other cases assigned to me.⁴ However, because of the demands of this case, I did not, as usual, teach the law school course I had developed on the Role of the Federal Judge in American Democracy in the Fall of 2014, the Fall of 2015, and in January 2016.⁵

   C.  <u>My International Endeavors</u>

Although I stopped teaching, I continued my international activities to the extent possible. Among other things, while on vacation in July 2014, I published two articles advocating the

---

³ In response to a Motion filed on November 27, 2013, I issued my first order after remand on the day after Thanksgiving, November 29, 2013. <u>See</u> Docket No. 1255. It has been common for me to work on this case on weekends and during holiday seasons. For example, I issued 10 Memoranda and Orders in this case between December 23 and December 27, 2014. <u>See</u> Docket Nos. 1747, 1748, 1750 (Under Seal), 1751, 1752 (Under Seal), 1753 (Under Seal), 1754, 1755, 1756, 1757 (Under Seal).

⁴ <u>See, e.g.</u>, M. Valencia, "'Senior status' lets federal judges keep working - for free," <u>The Boston Globe</u> (Dec. 12, 2014) ("Two days before Thanksgiving, the shadows of the late afternoon had started to creep into the halls of the John Joseph Moakley Courthouse in South Boston and U.S. Senior Judge Mark L. Wolf still had three cases to hear. In his late 60s, Wolf is technically retired - old enough to be on the golf course, or in the Bahamas. But, like three other federal judges in Massachusetts, he is on what is known as senior status, which allows the veteran jurists to retire with a full pension but continue working with a reduced caseload.").

⁵ Teaching and mentoring have long been important to me. As I said in 2010, "the exceptional students . . ., who achieve so much when given a little help and a fair chance, have been for me the indispensable antidote to melancholy and doubt about the wisdom and worth of my dedication to pursuing justice inside and outside the courtroom." <u>Presentation of Portrait, Honorable Mark L. Wolf</u>, 698 F. Supp. 3d XLV, LXXI-LXXII (D. Mass. 2010).

7

creation of an International Anti-Corruption Court. See M. Wolf, "Ending global corruption," The Washington Post (July 23, 2014); M. Wolf, "The Case for an International Anti-Corruption Court," Brookings Institution, Governance Studies Program (July 23, 2014). The proposal for an International Anti-Corruption Court has since received substantial support from organizations and individuals throughout the world, including many courageous young people. See, e.g., C. Biron, "Proposal for International Anti-Corruption Court Seeing 'Significant' Momentum," Inter Press Service (Nov. 21, 2014); J. Githongo, "Corruption has opened the door to al-Shabaab in Kenya," The Guardian (Mar. 19, 2015); Y.A. Ojo, "SERAP wants Jonathan, Buhari to endorse international court against corruption," The Guardian (Mar. 16, 2015); A. Oppenheimer, "It's time for International Anti-corruption Court," The Miami Herald and el Nuevo Herald (in Spanish) (July 23, 2014); see also International Anti-Corruption Court, http://www.iaccnow.org/.[6] I have since July 2014 spoken about the proposed Court in Switzerland, the Czech Republic, Slovenia, Canada, the United

---

[6] The proposed International Anti-Corruption Court has been endorsed by, among others, the United Nations High Commissioner for Human Rights, a Co-Chair of the Tom Lantos Human Rights Commission of the United States House of Representatives, Transparency International, Human Rights Watch, Global Witness, Global Parliamentarians Against Corruption, and leading international prosecutors, including Justice Richard Goldstone of South Africa, Luis Moreno Ocampo of Argentina, and Jose Ugaz of Peru.

States House of Representatives, the United States Department of State, the World Bank, and several universities. However, primarily because of the demands of this case, I have recently been unable to accept invitations to participate in international programs in Malaysia, Indonesia, and Turkey.

   D.   The Unmeritorious Motion for My Recusal

By June 19, 2015, I had decided many pretrial matters in this case. In addition, I had established an intensive schedule for submissions, hearings, and decisions on the matters that remained to be resolved before the retrial I had scheduled to begin in September 2015. I had organized my professional and personal life to be able to devote from August 2015 through January 2016 to preparing for that retrial and conducting it.

On June 19, 2015, I learned that Sampson had requested funding to retain Dr. James Gilligan as a possible expert witness at retrial. As I immediately explained to the parties, while on vacation in July 2014, I helped organize and moderated a program on which Dr. Gilligan spoke, and hosted him at a supper before that program at the home I rented.

At hearings the following week, Sampson and the government agreed that I was not biased or prejudiced as a result of my association with Dr. Gilligan and, therefore, my recusal was not required under 28 U.S.C. §455(b). However, I granted the government's unusual request for an opportunity to investigate the

facts I had disclosed before it decided whether to move for my recusal -- on the theory that a reasonable person could question my impartiality -- pursuant to 28 U.S.C. §455(a).

The government's investigation confirmed the facts that I had disclosed. The government then could have concluded that there was not a proper basis for my recusal under §455(a) and, in any event, have waived any such ground for my recusal pursuant to 28 U.S.C. §455(e). It had done both in 2010 with regard to my association with Assistant United States Attorney Zachary Hafer, one of the prosecutors in this case.[7] If the government had agreed with Sampson that a reasonable person could not question my impartiality based on my association with Dr. Gilligan or, in any event, waived any arguable §455(a) ground for my recusal relating to Dr. Gilligan, the schedule for resolving the remaining pretrial matters could have been maintained and the retrial could have begun

---

[7] In 2010, Mr. Hafer became one of the prosecutors in this case. I disclosed my association with Mr. Hafer, including attending his wedding, meeting with him in my home to provide professional advice, recommending him to be hired as an Assistant United States Attorney, and praising Mr. Hafer when I swore him in as a federal prosecutor. The government promptly reported that it did not believe that my recusal for actual bias or prejudice was required under 28 U.S.C. §455(b); it did not believe that a reasonable person could question my impartiality and, therefore, it did not believe that my recusal was justified under §455(a); and, in any event, it waived any objection to my continuing to preside under §455(e). Sampson agreed with the government's views and also waived any objection under §455(e). See United States v. Sampson, No. CR 01-10384-MLW, 2015 WL 5257123 at *14 (D. Mass. Sept. 8, 2015); United States v. Sampson, 12 F. Supp. 3d 203, 205 (D. Mass. 2014).

10

in September 2015 before a judge the government, as well as Sampson, acknowledged was actually impartial.

Instead, on July 16, 2015, the government moved for my recusal, under §455(a), arguing that a reasonable person could question my impartiality. The government subsequently requested that I defer ruling on substantive motions until the issue of my possible recusal was resolved. Sampson opposed the motion for my recusal. The issue was not fully briefed until mid-August 2015.

On September 8, 2015, for the reasons explained in detail in a 114-page Memorandum and Order, I decided that a reasonable person could not question my impartiality and, therefore, my recusal pursuant to §455(a) was not justified. See United States v. Sampson, No. CR 01-10384-MLW, 2015 WL 5257123 (D. Mass. Sept. 8, 2015) (Docket No. 2073).[8] As I wrote in that decision:

> The parties and I have devoted much of the past two years to preparing for what Sampson represents would have been the fastest retrial of a federal capital case in history. I had established an intensive schedule for submissions, hearings, and decisions in August and September 2015 to prepare for a September 16, 2015 retrial. More than two months have now been devoted to the government's

---

[8] Recusal under §455(a) is not discretionary. If a reasonable person could question the judge's impartiality, disqualification is required. However, the First Circuit has admonished judges not to allow litigants to abuse §455(a) for strategic reasons or to misuse §455(a) themselves to avoid sitting on difficult or controversial cases. See Sampson, 2015 WL 5257123 at *7-11, 41-44 (citing cases). Therefore, it was important that I carefully analyze the arguments for my recusal and explain fully the reasons for my conclusion that the government's motion was not meritorious.

>   investigation, the parties' briefing, and my deciding the government's motion for my recusal, rather than to resolving the many other pretrial issues that were on the agenda. Therefore, it will not be possible to begin the retrial as scheduled before a judge the parties each acknowledge is impartial.
>
>   While I have been obligated to decide the government's motion, I may not be the ultimate arbiter of its merit. I am providing the government until October 13, 2015, to state whether it intends to seek review of my decision by the First Circuit. It will not be possible to establish a new schedule for the retrial until the motion for my recusal is finally resolved.

Id., at *7; see also id. at *45.

On October 13, 2015, the government did not, as ordered, report whether it would ask the First Circuit to review and reverse my decision. Instead, the government then requested that I reconsider the finding that my recusal was unjustified. Sampson again opposed the government's motion. The motion for reconsideration was fully briefed on November 6, 2015. On November 13, 2015, I denied the motion for reconsideration for the reasons explained in a 37-page Memorandum and Order.

I also then ordered the government to report whether it would appeal my decisions. On December 1, 2015, the government reported that it would not.

E.  <u>The Aftermath of the Unmeritorious Motion to Recuse</u>

While the issue of my possible recusal was being litigated, in a series of sealed submissions,[9] I was informed that Sampson had asked the Department of Justice to withdraw its notice of intent to seek the death penalty and end this as a capital case. If that request had been granted, I would have sentenced Sampson to life in prison without possibility of parole and this case would have been concluded. On December 14, 2015, I was informed that Sampson's request had been denied.

Therefore, this case will continue. Accordingly, I ordered the parties to confer and, by January 6, 2016, report concerning the matters that must be briefed, heard, and decided before the retrial to determine Sampson's sentence can begin.

As explained earlier, I was prepared to devote from August 2015 through January 2016 to addressing additional pretrial matters and conducting the retrial. I planned to then devote much more time to international endeavors. In anticipation of this, I began working with the Smithsonian Institution's Woodrow Wilson International Center for Scholars to develop an international anti-corruption program for the Center. This program will begin with an event in early 2016 that I am helping to organize. If the project progresses as planned, it will require that I spend time

---

[9] The impounded submissions concerning Sampson's request have since been unsealed.

13

in Washington, D.C. periodically. I have also been asked to continue to play a leading role in a program that I helped launch in 2013 for the CEELI Institute in the Czech Republic. Doing so will require that I return to Prague in March 2016, and from time to time thereafter. In addition, I have been invited to return in May 2016 to Russia, where, in 2013, I first proposed the creation of an International Anti-Corruption Court. I understand that I will soon be invited to speak in Ukraine as well. I will be unable to do this meaningful work properly if I continue to preside in this case.

I have decided all of the many matters on which hearings were held before the government's unmeritorious motion for my recusal derailed the schedule for concluding the retrial to determine Sampson's sentence in or before January 2016. Among other things, in the Fall of 2015, I issued lengthy memoranda and orders concerning Sampson's 26 substantive motions, including denying his motions that asserted that the Federal Death Penalty Act is unconstitutional for various reasons or which otherwise sought to end this as a capital case. Only motions relating to the retrial remain pending.

This case is again poised to proceed to retrial. Additional issues may have emerged since June 2015. It could take several months or more to conduct pretrial proceedings. In 2003, three months were required to select a jury and to conduct the trial to

determine Sampson's sentence. I have been educated by the parties to understand that the retrial may take longer. If the jury again decides that Sampson should be sentenced to death, post-trial motions will have to be decided.

In addition, any death sentence will be appealed. As indicated earlier, the appeal of the sentence imposed on Sampson in 2004 was decided by the First Circuit in 2007. The Supreme Court denied Sampson's request to review that decision later that year. If Sampson is again sentenced to death and his death sentence is affirmed on appeal, it will again be necessary to appoint new lawyers to represent him in bringing new challenges. Experience in this and other capital cases demonstrates that post-conviction proceedings often continue for many years.

Prior to the government's request for my recusal, the lawyers and I worked hard in an attempt to conclude the retrial to determine Sampson's sentence in 2015 or soon after. That proved to be impossible. I am now not able to make the commitment necessary to prepare for and preside at the retrial, and to conduct the future proceedings that will be required if Sampson is again sentenced to death. Having decided all of the substantive matters presented to me, I have concluded that it is now in the interest of justice that this case be reassigned to an active judge, rather than have it remain the responsibility of this, or any other, retired Senior Judge, in part because it is desirable that any

determine Sampson's sentence. I have been educated by the parties to understand that the retrial may take longer. If the jury again decides that Sampson should be sentenced to death, post-trial motions will have to be decided.

In addition, any death sentence will be appealed. As indicated earlier, the appeal of the sentence imposed on Sampson in 2004 was decided by the First Circuit in 2007. The Supreme Court denied Sampson's request to review that decision later that year. If Sampson is again sentenced to death and his death sentence is affirmed on appeal, it will again be necessary to appoint new lawyers to represent him in bringing new challenges. Experience in this and other capital cases demonstrates that post-conviction proceedings often continue for many years.

Prior to the government's request for my recusal, the lawyers and I worked hard in an attempt to conclude the retrial to determine Sampson's sentence in 2015 or soon after. That proved to be impossible. I am now not able to make the commitment necessary to prepare for and preside at the retrial, and to conduct the future proceedings that will be required if Sampson is again sentenced to death. Having decided all of the substantive matters presented to me, I have concluded that it is now in the interest of justice that this case be reassigned to an active judge, rather than have it remain the responsibility of this, or any other, retired Senior Judge, in part because it is desirable that any

post-conviction challenges be decided by the judge who conducted the trial. Therefore, with the consent of the Chief Judge, this case is being returned to the Clerk of the District Court to be randomly reassigned, pursuant to Local Rule 40.1(I).

F. The Traditions of this District Court

This request for reassignment is consistent with the traditions of this collegial District Court. For example, in 1989 Judge A. David Mazzone was assigned a RICO case against the alleged "Boss," "Consigliere," several "Capos," and other alleged members of the Patriarca Family of La Cosa Nostra. See United States v. Patriarca, et al., Cr. No. 89-00289 (the "Patriarca" case). In 1991, Judge Mazzone returned the case for reassignment and it was drawn by me.

The Patriarca case presented many challenging issues, which required many years to resolve fully and finally.[10] My work on

---

[10] The challenging matters in Patriarca included, but were not limited to, the following:

In 1991 I decided that the new statute that authorized the "roving" wiretap, which was used to obtain a warrant to record a Mafia induction ceremony, was constitutional. In 1992, after conducting extensive pretrial proceedings to prepare for a projected six-month trial, I accepted interlocking binding plea agreements concerning five of the defendants, including Vincent Ferrara. In 1993, I conducted a two-month trial that resulted in the conviction of Pasquale Barone. In 1995, Raymond J. Patriarca, the "Boss" of the Family, who had pled guilty, was sentenced. In 1996, former fugitive Angelo Mercurio pled guilty and was sentenced.

In 1998 and 2000 respectively, Barone and Ferrara moved to have their convictions and sentences vacated pursuant to 28 U.S.C. §2255. Because of prosecutorial misconduct revealed as a result

16

that case -- though long and hard -- proved to be especially meaningful professionally. I hope and trust that my successor in this case will ultimately feel the same.

III. ORDER

In view of the foregoing, it is hereby ORDERED that, pursuant to Local Rule 40.1(I), this case is RETURNED to the Clerk to be randomly reassigned.

                                                /s/ Mark L. Wolf
                                  UNITED STATES DISTRICT JUDGE

---

of another case assigned to me involving James "Whitey" Bulger and others, I ordered Barone's release in 2003 from the 10-year sentence he was serving and ordered Ferrara's release in 2005 from the 22-year sentence he was serving.

17