UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                    )
UNITED STATES OF AMERICA        )
                                                    )
v.                                                 )          Criminal Action No. 01-10384-LTS
                                                    )
GARY LEE SAMPSON                    )
_____)

ORDER ON JURY MOTIONS; MOTION CONCERNING THE INTERROGATION ON
AUGUST 1, 2001; MOTION TO PRECLUDE DEATH AS A POSSIBLE
PUNISHMENT; AND MOTION TO CHANGE VENUE

May 13, 2016

SOROKIN, J.

       The defendant Gary Lee Sampson pled guilty to two counts of carjacking resulting in

death and was sentenced to death in 2004.  In 2011, the Court (Wolf, J.) vacated the death

sentence in light of juror misconduct, and the First Circuit affirmed, ruling that Sampson is

entitled to a resentencing hearing pursuant to 28 U.S.C. § 2255.  Sampson v. United States, 724

F.3d 150, 170 (1st Cir. 2013).  The case was reassigned to this session of the Court on January 6,

2016.  At that point, a number of motions were pending, see Doc. No. 2137, and the parties have

filed additional motions since.  This Order resolves the following motions filed by Sampson: (1)

Motion for Disclosure of Jury Records (Doc. No. 2031-1); (2) Motion to Dismiss the Indictment

and/or Jury Venire and Stay Proceedings Pending Reconstituting the Jury Wheel to Conform

with Statutory and Constitutional Requirements (Doc. No. 2030-1); (3) Motion in Limine

Concerning Sampson's Interrogation on August 1, 2001 (Doc. No. 1899-1); (4) Motion to

Preclude Death as a Possible Punishment in Light of the Fact that Sampson Is Terminally Ill

(Doc. No. 2175); and (5) Renewed Motion for Change of Venue (Doc. No. 2184).

I.      Discussion

        A.      Motion for Disclosure of Jury Records (Motion for Disclosure)

        Sampson seeks a variety of this judicial district's jury records pertaining to "the selection

process of the grand and petit juries during calendar years 2011, 2012, 2013, and 2014."  Doc.

No. 2031-1 at 1.  He also seeks jury records pertaining to his resentencing trial when they

become available.  Id.  Sampson contends that he needs this information to challenge this

district's jury wheel as unconstitutional and in violation of federal law.  The government does

not oppose this motion.  Doc. No. 2040 at 4 n.2.

        In light of Test v. United States, 420 U.S. 28, 30 (1975), the Motion for Disclosure (Doc.

No. 2031-1) is ALLOWED IN PART.  The Clerk of the Court is ordered to provide the

following information to Sampson:

  a.  JS-12 forms and AO-12 forms completed for the calendar years 2011, 2012, 2013, and

      2014 Master and Supplemental Jury Wheels during the life of the wheels.

  b.  Other statistical analyses of the calendar years 2012, 2013, and 2014 Master and

      Supplemental Jury Wheels.[1]

  c.  Blank juror summons/qualification form that will be used to summon the petit jurors for

      this case.

  d.  Calendar years 2011, 2012, 2013, and 2014 Master Jury Wheel data (in electronic and

      accessible form, including a layout with descriptions of all data fields and codes).  The

      data should not include any personally identifiable information, such as name and street

      address, but should include participant number, zip code, county, municipality, and date

      of birth, to the extent available.

---

[1] This information does not exist for 2011.

e.  Calendar years 2011, 2012, 2013, and 2014 Supplemental Jury Wheel data (in electronic

and accessible form, including a layout with descriptions of all data fields and codes).

The data should not include any personally identifiable information, such as name and

street address, but should include participant number, zip code, county, municipality, and

date of birth, to the extent available.

f.  Results of the national change-of-address comparison for calendar years 2011, 2012,

2013, and 2014.

g.  All draws from the calendar years 2011, 2012, 2013, and 2014 Master and Supplemental

Jury Wheel.  The data should include participant number, pool summoned for, date of

summoning, type of jury service (grand or petit), and disposition for each summons sent

during the life of the wheel.  The disposition should indicate whether the summons was

returned undeliverable, not responded to, disqualified, reason for disqualification,

qualified, excused, reason for excusal, selected for jury service, and/or served as a juror.

h.  Source Data:

i.  The municipal resident lists used to construct the calendar years 2011, 2012,

2013, and 2014 Master and Supplemental Jury Wheels (in electronic and

accessible form, including a layout with descriptions of all data fields and codes).

Personally identifiable information, such as name and street address, should be

redacted, but information such as zip code, county, and demographic information

should be retained.

ii.  Any statistical or other analyses of the municipal resident lists.

i.  Data regarding replacement summons for summons returned as undeliverable for the jury

pool used for this trial, when it becomes available.

The Motion for Disclosure (Doc. No. 2031-1) is DENIED IN PART, however, in that the Court declines to grant Sampson access to qualification forms, completed juror summons/qualification forms, and documentation for excusals and deferrals for each summons, "unless he can make some showing of reasonable necessity for and relevance to his preparation of a motion challenging this District's jury selection procedures." See Order for Disclosure of Jury Records, United States v. Tsarnaev, No. 1:13-cr-10200-GAO-1, Doc. No. 393 at 2 (D. Mass. June 26, 2014). Sampson's "right to inspect jury records is not without bounds," and the necessary redaction of personally identifiable juror information "from tens of thousands of forms [would] pose an extraordinary administrative burden on the Clerk's Office." Id.

> B.    Motion to Dismiss the Indictment and/or Jury Venire and Stay Proceedings Pending Reconstituting the Jury Wheel to Conform with Statutory and Constitutional Requirements (Motion to Dismiss)

Sampson also moves to dismiss his Indictment or the jury venire in this case, and to stay proceedings pending reconstitution of the District of Massachusetts's jury wheel to conform to federal statutory and constitutional law and to the district's Plan for Random Selection of Jurors (Plan). See U.S. District Ct. for the District of Mass. Plan for Random Selection of Jurors (Nov. 1, 2015) [hereinafter Plan]; Doc. No. 2030-1 at 1. The government opposes this motion. Doc. No. 2040. The Motion to Dismiss raises a number of issues, many of which are identical to those raised, and resolved adversely to the defendant, in United States v. Tsarnaev, 53 F. Supp. 3d 443 (D. Mass. 2014). In fact, Sampson relies on the same jury pool analysis that the defense submitted in Tsarnaev, specifically, the Declaration of Jeffrey O'Neal Martin (Martin Declaration). Doc. No. 2030-2 at 2 n.2. As discussed below, the Court finds the Tsarnaev decision persuasive in all respects relevant to the Motion to Dismiss.

i.    The Plan

"The Plan relies on the Massachusetts Office of Jury Commissioner to furnish randomly generated lists of current residents for use in constituting jury pools." Tsarnaev, 53 F. Supp. 3d at 444.[2]  "In brief, the Clerk randomly selects the names of at least 35,000 residents in the Eastern Division [of the District of Massachusetts] for inclusion in the 'master jury wheel,' taking care that the counties within the division are proportionally represented." Id. at 444-45. "The Clerk randomly selects and assigns numbers to names from the master jury wheel to identify what residents will receive summons and qualification forms." Id. at 445.  "Certain classes of individuals are exempt from jury service, including active members of the armed forces, police officers, firefighters, and certain public officers." Id.  Additionally, the Plan states that the "Clerk, upon individual request, shall excuse . . . any person over the age of 70 years old who makes a showing of physical infirmity, travel difficulties, undue hardship, or extreme inconvenience[.]" Plan § 9(c)(i).  "After returned questionnaires are reviewed, the names of jurors who appear to be qualified for service are placed in sequence based on their assigned number in a 'qualified jury wheel' from which jurors are drawn in numerical order as needed." Tsarnaev, 53 F. Supp. 3d at 445.

---

[2] In Tsarnaev, Judge O'Toole interpreted a prior version of the Plan that went into effect on March 3, 2009.  Tsarnaev, 53 F. Supp. 3d at 444.  That version of the Plan stated that the "Clerk, upon individual request, shall excuse . . . any person over the age of 70 years old." U.S. District Ct. for the District of Mass. Plan for Random Selection of Jurors § 9(c)(i) (Mar. 3, 2009). However, the current Plan, effective November 1, 2015 and applicable to this case, modified § 9(c)(i) to require an individualized determination prior to the exclusion from jury service of those over the age of 70.  In all other respects, the 2009 and 2015 versions of the Plan are identical.  As such, the Court relies on Judge O'Toole's summary of the Plan, except for his treatment of § 9(c)(i).  The Court notes, however, that its resolution of this motion does not turn on the change to § 9(c)(i).

In addition, pursuant to the Plan's supplemental draw procedure, "the Clerk must create a supplemental jury wheel using the same procedures as for the master jury wheel." Id.

> For each summons returned by the United States Postal Service to the Court as "undeliverable," the Clerk shall draw at random from the Supplemental Jury Wheel the name of a resident who lives in the same zip code area to which the undeliverable summons had been sent and prepare and cause to be mailed to such resident a new one-step juror summons/qualification form.

Plan § 8(a). This provision was added "to further the policy of the Court that all citizens have the opportunity to be considered for service and to ensure, to the greatest extent possible, that juries are drawn randomly from source lists in the relevant division that represent a fair cross section of the community of each division." Tsarnaev, 53 F. Supp. 3d at 445.

    ii.    Fair Cross Section Requirement

Sampson contends that African-Americans and persons over the age of seventy are underrepresented in the qualified jury wheel, and that such underrepresentation violates the fair cross section requirement of the Jury Selection and Service Act (Act), 28 U.S.C. § 1861 et seq., and the Constitution. "The Sixth Amendment requires that the jury venire be drawn from a fair cross section of the community." Tsarnaev, 53 F. Supp. 3d at 447 (citing Taylor v. Louisiana, 419 U.S. 522, 530 (1975)); accord Berghuis v. Smith, 559 U.S. 314, 319 (2010). "The Act 'impose[s] essentially the same obligation.'" Tsarnaev, 53 F. Supp. 3d at 447 (quoting In re United States, 426 F.3d 1, 8 (1st Cir. 2005)). "This requirement of a fair cross-section, however, does not guarantee that juries be 'of any particular composition[.]'" United States v. Royal, 174 F.3d 1, 6 (1st Cir. 1999) (quoting Taylor, 419 U.S. at 538). Nor must "venires . . . [be] a substantially true mirror of the community[.]" Id. (quoting Barber v. Ponte, 772 F.2d 982, 997 (1st Cir. 1985) (en banc)). "In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive'

group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process."  Duren v. Missouri, 439 U.S. 357, 364 (1979).  "This test applies to [a defendant's] fair cross-section claims under both the Sixth Amendment and the Act."  Royal, 174 F.3d at 6.

First, as Sampson essentially concedes, his argument that African Americans are underrepresented in the qualified jury wheel, and that this underrepresentation constitutes a fair cross section violation, is identical to an argument considered, and rejected, by Judge O'Toole in Tsarnaev in light of First Circuit law.  Tsarnaev, 53 F. Supp. 3d at 447-48 (concluding that the defendant "failed to demonstrate that the representation of African-Americans on the jury wheel was not 'fair and reasonable'" (citing Royal, 174 F.3d at 7-11)).  The Court finds Judge O'Toole's reasoning persuasive and, therefore, concludes that Sampson has failed to establish a *prima facie* fair cross section violation with regard to the representation of African Americans in the qualified jury wheel.[3]

Second, Sampson's contention that persons over the age of seventy are underrepresented in the qualified jury wheel, resulting in a fair cross section violation, also is identical to an argument Judge O'Toole rejected.  Id. at 450 (concluding that "persons aged 70 and above should not be regarded as a distinctive group in considering whether there was a violation of the fair cross section principle, and the defendant has consequently failed to establish a *prima facie*

---

[3] Sampson argues also that the purported underrepresentation of African Americans is exacerbated by the selection of a "death qualified" jury in a capital case such as his.  However, given that he presents no evidence specific to this district to support his claim, the Court concludes that there is insufficient evidence to support Sampson's position and declines to reach its legal merits.

showing of a violation of that principle under the <u>Duren</u> criteria"). Judge O'Toole's reasoning is applicable here. Thus, Sampson has not established a *prima facie* fair cross section violation based on the purported underrepresentation in the qualified jury wheel of those over the age of seventy.[4]

### iii.   Undeliverable Summonses

Sampson next argues that the Eastern Division of the District of Massachusetts has failed to comply with Section 8 of the Plan, which requires that, "[f]or each summons returned . . . as 'undeliverable,' the Clerk shall draw at random from the Supplemental Jury Wheel the name of a resident who lives in the same zip code area to which the undeliverable summons had been sent" and mail to that resident a new summons and qualification form. <u>Plan</u> § 8(a). Relying on the Martin Declaration submitted by the defense in <u>Tsarnaev</u>, Sampson asserts that in "the 71 pools from 2010 through 2013 for which data was supplied, 4,964 summonses (7.28%) were 'undeliverable' and replacement summonses were sent only 64.18% of the time." Doc. No. 2030-2 at 16. In Sampson's view, the alleged failure of the Clerk to mail replacement summonses violates the Plan and, therefore, violates the Act.

"In criminal cases, . . . the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the . . . petit jury."[5]  28 U.S.C. § 1867(a).

---

[4] To the extent that the jury records ordered to be produced to the defense by this Order substantively support the defense's filing of a renewed motion addressing alleged fair cross section violations, the Court will entertain such a motion.

[5] Section 1867(a) requires that such a motion be filed "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier[.]"  The government asserts that Sampson's Motion to Dismiss is untimely under § 1867(a).  Given that the Court resolves the Motion to Dismiss adversely to Sampson, the Court need not address the government's timeliness argument.

> A substantial failure [to comply with the Act] is one that contravenes one of . . . two basic principles . . . : (1) random selection of jurors, and (2) determination of juror disqualification, excuses, exemptions, and exclusions on the basis of objective criteria.  Technical violations, or even a number of them, that do not frustrate the[se] . . . requirements and do not result in discrimination and arbitrariness do not constitute a substantial failure to comply.

Royal, 174 F.3d at 11 (quoting United States v. Savides, 787 F.2d 751, 754 (1st Cir. 1986)).  Sampson's theory is substantially similar to one rejected in Tsarnaev, and it is based on the same Martin Declaration that Judge O'Toole found insufficient to support the defendant's assertion that the "purported failure of the Clerk to send replacement summonses for summonses returned as undeliverable" violated the Plan and the Act.  See Tsarnaev, 53 F. Supp. 3d at 445-46.  As Judge O'Toole noted with regard to the Martin Declaration, "no information is presented about what zip codes were implicated, so it cannot be determined what zip codes might have been underrepresented, or to what degree, in the pool as a result of the failure to send replacement summonses."  Id. at 446.  Although Judge O'Toole's observation applied to the Martin Declaration's analysis of undeliverable summonses and replacement summonses issued to convene the grand jury that indicted the defendant in that case, his reasoning applies equally here.  This is so because the Martin Declaration also does not provide the zip codes implicated in the alleged failure to deliver some replacement summonses between 2011 and 2013.  See Doc. No. 2030-3 at ¶¶ 12, 14.  In all, therefore, the Court is not persuaded that the Clerk's alleged failure to send replacement summonses violated the Plan or the Act.[6]  See

---

[6] In any event, the undeliverable and replacement summonses statistics "that matter are those pertaining to the pool[s] from which" Sampson's grand jury was drawn or from which his petit jury will be drawn, and "[n]either compliance nor non-compliance with the Plan in the establishment of pools for other juries would affect the issue addressed here."  See Tsarnaev, 53 F. Supp. 3d at 446.  At this time, Sampson has not put forth any statistics about undeliverable and replacement summonses regarding the jury wheel from which his grand jury was chosen or

Tsarnaev, 53 F. Supp. 3d at 446 (noting that the defendant "failed to show that the omission to send replacement summonses compromised either the principle of random selection of jurors or the principle that juror qualification is to be assessed on objective criteria").

    iv.  Sampson's Additional Arguments

    Sampson raises a host of other objections, which the Court rejects in turn.  First, he contends that the Plan and the Act violate the Constitution by disqualifying from jury service those who have not lived in this judicial district for at least one year.  See Plan § 9(a)(iii); 28 U.S.C. § 1865(b)(1).  Numerous circuit courts of appeals have upheld one-year residency requirements for jury service.  See, e.g., United States v. Perry, 480 F.2d 147, 148 (5th Cir. 1973); United States v. Gast, 457 F.2d 141, 142-43 (7th Cir. 1972).  In light of the Act and the weight of authority, the Court rejects Sampson's challenge to the residency requirement.

    Likewise, the Court rejects Sampson's arguments that the Plan and the Act are unconstitutional for excluding from jury service those who face a pending criminal charge that is punishable by imprisonment for more than one year, and those who have been convicted of a felony and have not had their civil rights restored.  See United States v. Foxworth, 599 F.2d 1, 4 (1st Cir. 1979) (upholding as constitutional 28 U.S.C. § 1865(b)(5), which "disqualifies from jury service persons convicted of or charged with a crime punishable by imprisonment for more than one year whose civil rights have not been restored," because it is a "rationally based" mechanism for "assur[ing] the 'probity' of the jury" (quoting H.R. Rep. No. 1076, 90th Cong., 2d Sess., Reprinted in (1968) U.S. Code Cong. & Admin. News, pp. 1792, 1796)).

---

the jury wheel from which his petit jury will be chosen.  Pursuant to this Order, Sampson will have access to such data with regard to his petit jury when it becomes available.

Finally, Sampson claims that the Plan's and the Act's disqualification from jury service of people who do not speak English and are physically infirm is "so broad" as to violate the Constitution and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.  The Court construes Sampson's argument to be that the exclusion from jury service of those who cannot speak English by reason of physical infirmity is unconstitutional.  Sampson does not state explicitly how the Plan or the Act contravenes the ADA, and his argument is otherwise unavailing.  The Plan and the Act disqualify a physically infirm person only if such physical infirmity renders him or her incapable of performing "satisfactory jury service."  28 U.S.C. § 1865(b)(4); Plan § 9(a)(vi).  The Court is hard-pressed to conclude that the exclusion of a person who cannot serve satisfactorily as a juror runs afoul of the ADA or the Constitution.  See United States v. Johnson, No. CR 01-3046-MWB, 2013 WL 1149763, at *1 (N.D. Iowa Mar. 19, 2013) (rejecting "the novel argument that the exclusion of non-English speakers, coupled with the exclusion of persons suffering from a physical infirmity that renders them incapable of satisfactory performance of jury service," violates the Constitution and the ADA because the defendant could not be heard to "argue that the Constitution or the ADA requires inclusion of prospective jurors who cannot 'render satisfactory jury service'" (quoting 28 U.S.C. § 1865(b)(4)) (citations omitted)).

In all, therefore, the Motion to Dismiss (Doc. No. 2030-1) is DENIED.

C.      Motion in Limine Concerning Sampson's Interrogation on August 1, 2001

Sampson moves to suppress his August 1, 2001 interrogation on the ground that the detectives from the Plymouth County District Attorney's Office conducted this interrogation in violation of Sampson's rights under the Sixth Amendment to the United States Constitution.

Doc. No. 1899-1.  The motion is DENIED; Sampson has not submitted sufficient evidence to warrant an evidentiary hearing.

First, the Court (Wolf, J.) previously denied the motion.  Doc. No. 1992 at ¶ 12.  Second, assuming without deciding that under federal law the Sixth Amendment right to counsel attaches for purposes of a Massachusetts criminal prosecution upon the filing of a criminal complaint in a district court of the Commonwealth,[7] the motion nonetheless fails.  The First Circuit has held "the dual sovereignty doctrine applies for the purposes of defining what constitutes the same offense in the Sixth Amendment right to counsel context."  United States v. Coker, 433 F.3d 39, 44 (1st Cir. 2005).  The offenses Sampson faced as a result of two criminal complaints in Massachusetts state court as of August 1, 2001 – murder – and the offenses later charged in federal court – carjacking resulting in death – issued from separate sovereigns and, therefore, are separate offenses for purposes of the Sixth Amendment.  Id. at 43-44.  In any event, these federal and state offenses are separate for the additional reason that each requires proof of at least one different element.  Id. at 43.  Thus, even assuming that a Sixth Amendment violation occurred at the time of the August 1 interrogation, Kansas v. Ventris, 556 U.S. 586, 592 (2009), the remedy for that violation arises in the state prosecution (which did not proceed in deference to the federal prosecution) and not in this prosecution.  In addition, the exception to the dual sovereignty doctrine applicable when one sovereign so dominates the prosecution forces of another[8] is

---

[7] But see United States v. Boskic, 545 F.3d 69, 83 (1st Cir. 2008) (noting that, "at least under federal law, the complaint is not a 'formal charge' in the relevant sense for triggering the Sixth Amendment right to counsel"); Commonwealth v. Beland, 764 N.E.2d 324, 335 (Mass. 2002) ("This court has held, '[t]here is no authority for the proposition that the right to counsel under the Sixth and Fourteenth Amendments to the Constitution of the United States or under art. 12 of the Massachusetts Declaration of Rights arises prior to arraignment, even though a criminal complaint and an arrest warrant have issued.'" (quoting Commonwealth v. Ortiz, 661 N.E.2d 925, 927 n.1 (Mass. 1996))).
[8] See Coker, 433 F.3d at 45.

inapplicable here because there is no evidence that the federal government dominated or controlled the Commonwealth's prosecution of Sampson.[9]

> D.     Motion to Preclude Death as a Possible Punishment in Light of the Fact that <u>Sampson Is Terminally Ill</u>

Sampson moves also to preclude death as a possible punishment due to his health concerns.  Doc. No. 2175.  The government opposes the motion.  Doc. No. 2199.  Because the motion is premature in at least two senses, it is DENIED.

First, at Sampson's resentencing trial the jury will be instructed to consider any proven mitigating factors in determining whether a death sentence is justified.  <u>See</u> 18 U.S.C. § 3593(e). Sampson's current health is, the government concedes, relevant and admissible information for the jury to consider in mitigation.  Doc. No. 2199 at 4 ("[T]he defendant is entitled to individualized sentencing and will be afforded the opportunity to present mitigating factors to the jury, including factors relating to his age and purported health conditions."); <u>see</u> <u>Abdul-Kabir v. Quarterman</u>, 550 U.S. 233, 263-64 (2007) (noting that a jury in a capital case "must be allowed to consider a defendant's moral culpability and decide whether death is an appropriate punishment for that individual in light of his personal history and characteristics[,]" among other things).  Accordingly, the jury can decide whether, and to what extent, Sampson's health concerns weigh against the imposition of a death sentence.

Second, the issue presented by Sampson's motion – whether executing a person in Sampson's medical condition is unconstitutional – is not ripe for resolution in this case. Sampson is not now subject to a death sentence.  <u>See</u> <u>Sampson v. United States</u>, 724 F.3d 150,

---

[9] Michael Sullivan, then the District Attorney for Plymouth County, may have been on the cusp of nomination to the position of United States Attorney for the District of Massachusetts, but he did not then control the United States Attorney's Office because his nomination was subject to the advice and consent of the United States Senate.  <u>See</u> 28 U.S.C. § 541(a).

170 (1st Cir. 2013) (affirming vacatur of Sampson's death sentence).  Instead, at present he faces

a new penalty phase trial.  At this stage, therefore, "Sampson's challenges to the implementation

of a death sentence that has not been imposed are . . . not ripe."  United States v. Sampson, Cr.

No. 01-10384-MLW, 2015 WL 7962394, at *7 (D. Mass. Dec. 2, 2015); see City of Fall River,

Mass. v. Fed. Energy Regulatory Comm'n, 507 F.3d 1, 6 (1st Cir. 2007) ("[A] 'claim is not ripe

for adjudication if it rests upon contingent future events that may not occur as anticipated, or

indeed may not occur at all.'" (quoting Texas v. United States, 523 U.S. 296, 300 (1998))

(quotations omitted)).[10]

> E.     Renewed Motion for Change of Venue

On June 26, 2015, this Court (Wolf, J.) denied Sampson's motion to change the venue of

his death penalty resentencing trial.  Doc. No. 1992 at ¶ 2.  Judge Wolf made his decision

"without prejudice" to Sampson renewing the motion during jury selection.  Id.  Although jury

selection for Sampson's resentencing trial does not begin until September 14, 2016, Sampson has

filed a Renewed Motion for Change of Venue in light of the First Circuit's decision in United

States v. Casellas-Toro, 807 F.3d 380 (1st Cir. 2015), which was rendered after Judge Wolf's

ruling, and in light of additional publicity about Sampson's case.  Doc. No. 2184.  The

government opposes the motion.  Doc. No. 2209.  Upon review, the Court concludes that neither

Casellas-Toro nor the additional cited publicity – whether measured against the standard for

reconsideration or under a de novo evaluation of the matter – warrant an outcome different than

that reached by Judge Wolf.  Accordingly, the Renewed Motion for Change of Venue (Doc. No.

---

[10] The parties vigorously dispute the reliability of the methodology employed by Sampson's
expert.  The Court need not resolve this dispute because the motion does not present a ripe
matter, even assuming without deciding the reliability of Sampson's expert's report.

2184) is DENIED WITHOUT PREJUDICE to Sampson moving for reconsideration of this ruling during the process of jury selection.

II.      Conclusion

        To summarize, the Motion for Disclosure (Doc. No. 2031-1) is ALLOWED IN PART and DENIED IN PART.  Counsel for Sampson shall arrange directly with the Clerk of the Court, or his designee, for the transfer of information consistent with this Order.  Upon disseminating such information to Sampson, the Clerk also shall transfer such information to the government and to the Court.

        Furthermore, the Motion to Dismiss (Doc. No. 2030-1) is DENIED; the Motion in Limine Concerning Sampson's Interrogation on August 1, 2001 (Doc. No. 1899-1) is DENIED; the Motion to Preclude Death as a Possible Punishment in Light of the Fact that Sampson Is Terminally Ill (Doc. No. 2175) is DENIED; and, the Renewed Motion for Change of Venue (Doc. No. 2184) is DENIED WITHOUT PREJUDICE.

        The defense has seven days to show cause why the motion papers pertaining to the defense's Motion in Limine Concerning Sampson's Interrogation on August 1, 2001 (Doc. No. 1899-1), and the defense's Renewed Motion for Change of Venue (Doc. No. 2184), should not be unsealed.


                                SO ORDERED.

                                  /s/ Leo T. Sorokin
                                Leo T. Sorokin
                                United States District Judge