UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) ) | Criminal Action No. 01-10384-LTS |
| GARY LEE SAMPSON | ) ) ) | |

ORDER ON ADMISSIBILITY OF USP-TERRE HAUTE EVIDENCE

September 16, 2016

SOROKIN, J.

Gary Lee Sampson pled guilty to two counts of carjacking resulting in death and was sentenced to death in 2004. The First Circuit affirmed the judgment. United States v. Sampson, 486 F.3d 13 (1st Cir. 2007). In 2011, the Court (Wolf, J.) vacated the death sentence in light of juror misconduct, and the First Circuit affirmed, ruling that Sampson is entitled to a new penalty phase trial pursuant to 28 U.S.C. § 2255. Sampson v. United States, 724 F.3d 150, 170 (1st Cir. 2013). The case was reassigned to this session of the Court on January 6, 2016. Trial began with jury selection on September 14, 2016.

In support of its non-statutory aggravating factor of "Future Dangerousness of the Defendant While Incarcerated," the government has proffered evidence of Sampson's conduct from his decade in the custody of the Bureau of Prisons (BOP) at United States Penitentiary, Terre Haute, Indiana (Terre Haute) following his first penalty phase trial. See generally Doc. No. 2201 (sealed). In June 2016, the Court determined that some of the evidence was not admissible either because it was not probative of future dangerousness or because it was insufficiently reliable for admission in a capital proceeding. Doc. No. 2305 at 8-10 (sealed). Then, last month, the Court heard testimony from a dozen Terre Haute witnesses, who were

1

subject to cross-examination, over a three-day sealed evidentiary hearing convened to determine the admissibility of the remaining evidence. In the wake of that hearing, Sampson filed a memorandum, which the Court treats as a motion, urging the Court to exclude the remaining Terre Haute evidence because it is "non-representative of [Sampson's] time at Terre Haute, unreliable, insufficiently probative of future dangerousness, and unduly prejudicial." Doc. No. 2423 at 20 (sealed). The government disagrees, arguing that its Terre Haute evidence is "relevant, probative, reliable," and otherwise admissible. Doc. No. 2444 at 1 (sealed).[1] For the reasons that follow, Sampson's motion (Doc. No. 2423) is generally DENIED, except as described below.

I.  Background

The government's future dangerousness aggravating factor in its Second Amended Notice of Intent to Seek the Death Penalty alleges that Sampson "is likely to commit criminal acts of violence in the future that would be a continuing and serious threat to the lives and safety of prison officials and inmates," as demonstrated by, among other things, his "prison misconduct" at Terre Haute. Doc. No. 2197 at 4, 6. At the upcoming penalty phase trial, the jury will be asked to choose between sentencing Sampson to death or to life imprisonment without the possibility of release. Therefore, the government's future dangerousness aggravator does not assert that Sampson poses a future danger to the community, and "any future dangerousness inquiry must be limited to considering Sampson's potential dangerousness in prison." United States v. Sampson, 275 F. Supp. 2d 49, 108 (D. Mass. 2003).

---

[1] Consistent with prior practice in this case, the Court will address unsealing these documents at the conclusion of trial.

In the motion before the Court, Sampson seeks to exclude evidence related to six incidents that allegedly occurred in the special confinement unit (SCU) where Sampson was housed at Terre Haute. All six of the incidents occurred entirely within locked confines of the SCU while Sampson was within his locked cell, in other locked portions of the SCU, or in restraints with guards while in another part of the SCU.

With this background in mind, the Court generally summarizes each of the six incidents before considering Sampson's specific challenges. Nothing that follows is to be construed as the Court making findings regarding what occurred, or did not occur, at Terre Haute.

A. December 3, 2008

Two prison guards were distributing ice on Sampson's tier of the SCU on December 3, 2008. Doc. No. 2417 at 130-31.[2] Sampson was locked in his cell. Id. at 139. By the time the two guards arrived at Sampson's cell to deliver ice, another guard had spilled ice inside his cell through the food slot in the cell door. Id. at 131. BOP policy permitted Sampson and other SCU inmates to possess within their SCU cells a broomstick with a short handle. Id. at 138. Sampson became agitated with the two guards delivering the ice, and swung his broomstick at them through the food slot, telling them, "If I ever get out of this cell, I'll fucking kill you. You better not let me out of this cell, I'll fucking kill you." Id. at 131-32. Sampson did not make contact with either guard with the broomstick. Id. at 132. BOP did not thereafter prohibit Sampson from possessing a broomstick. Id. at 138.

B. May 11, 2011

To deliver commissary in the SCU, an officer would go to an inmate's cell and hand commissary items to the inmate through the food slot in the inmate's cell door. Doc. No. 2412 at

---

[2] Document number 2417 refers to the transcript of the hearing held on August 16, 2016.

93.³   Three prison officers were delivering commissary to the cells on Sampson's hallway in the SCU on May 11, 2011. Id. at 94, 97. Sampson was locked in his cell when one of the officers approached to explain to Sampson why one of his special commissary orders, placed at an earlier date, had been cancelled. Id. at 94-95, 115. Sampson became angry and yelled at the officer. Id. at 95-96. The officer told Sampson to calm down so that he could deliver Sampson his regular commissary (separate from the special commissary order). Id. at 96. When Sampson refused, the officer took a few steps away from Sampson's cell to enlist a second officer to deliver Sampson's regular commissary. Id. at 98. The first officer then walked back toward Sampson's cell and, as he did, he saw Sampson grab a broomstick. Id. Sampson then stuck a short, sharp, broken wooden broomstick through his food slot. Id. at 103-04, 113. He attempted (unsuccessfully) to stab the officer, id. at 98, and then threw the broomstick out of his food slot down the hall where various officers stood. Id. at 128. The broomstick did not hit anyone. Id. at 137. Another guard then closed and locked Sampson's food slot. Id. at 111. At that point, Sampson told a guard outside his cell to "[g]et the fuck away from my door or I'll end up killing all of you." Id. at 144.

    C.   January 20, 2012

In accordance with BOP policy in effect at the time, Sampson was outside his SCU cell within the locked hallway using a microwave oven on January 20, 2012. Id. at 146-47. The hallway was enclosed by a locked steel door. Doc. No. 2417 at 20. The microwave was located near the end of the hallway, close to the steel door that enclosed the hallway. Id. Sampson was alone in the hall; a prison guard was on the other side of the steel door. Id. While out of his cell, Sampson became angry about not being delivered ice; he began kicking the steel door, and yelled

---

[3] Document number 2412 refers to the transcript of the hearing held on August 15, 2016.

for ice. Doc. No. 2412 at 147. He then told the guard, "[o]pen this door . . . and I'll come out on the range and beat your[]– []make you my bitch."[4] Id. at 148. He added, "[l]et me out there where there's no cameras [sic]." Id. The guard told Sampson to return to his cell, which Sampson did without further incident. Id. at 148.

### D. February 22, 2013

As two prison guards were escorting Sampson in handcuffs and a belly chain back to his cell on February 22, 2013, they passed the cell of another inmate who said to Sampson from his cell, "[a]re you done being a rat yet?" Doc. No. 2417 at 30, 39. As the guards continued to escort Sampson past the other inmate's cell, Sampson turned and replied to the other inmate, "I have nothing but time to kill you, nigga." Id. at 30-31. Sampson then made a move toward the other inmate's cell, at which point one of the guards put Sampson up against a wall, and Sampson calmed down. Id. at 31. The guards returned Sampson to his cell without any further altercation. Id.

### E. July 9, 2013

A few days prior to July 9, 2013, a guard was delivering ice to Sampson when Sampson asked the guard about an assault elsewhere in the prison. Id. at 54-55. The guard replied that he did not wish to speak about that, and Sampson responded by saying through his food slot that he would kill the guard if given the opportunity. Id. at 54. After Sampson's recreation period on July 9, 2013, a few guards, including the one whom Sampson had threatened, were escorting Sampson from the recreation area (a fully enclosed, locked outdoor space) back to his cell. Id. at 57, 65, 100. Sampson was restrained by handcuffs and a belly chain, at least. Id. at 66, 110. During the escort, Sampson became agitated at the guard he had threatened. Id. at 57. He

---

[4] The Court has removed only the name of the guard, but no substantive portion of the statement.

attempted to head butt and kick the guard, but did not make contact. Id. at 57, 72-74. The guards then took Sampson to the ground and, once on the ground, Sampson kicked the arm and head of the guard whom he had threatened. Id. at 58, 73-74, 83. The guard had a minor injury on his arm and was cut on his ear. Id. at 74, 85. Once the guards had restrained Sampson on the ground, Sampson said to the guard whom he had tried to head butt, "I've got hepatitis C. Take that home to your boyfriend, you fucking faggot." Id. at 101. Shortly thereafter, Sampson said that the issue with this guard was "not over," that the guard "will get his," and that Sampson would stab the guard through his food slot in the future. Id. at 105-106, 120.

    F. February 13, 2014

Sampson was housed in a single cell but was allowed out for certain purposes, such as medical appointments.[5] Doc. No. 2412 at 21, 28. On February 13, 2014, he was escorted by two prison guards to a medical appointment, restrained by handcuffs and a belly chain. Doc. No. 2418 at 58-59, 67.[6] He was placed in a chair in a medical room in the SCU, still restrained, with a guard directly next to him and another guard outside the door to the room. Id. at 59, 67. A physician assistant, sitting five feet further into the examination room, began talking to Sampson about his arthritic knees. Id. at 53, 60, 69. Sampson requested a wheelchair, and the physician

---

[5] This information is drawn from the testimony of one witness at the evidentiary hearing who provided general information concerning the operation of the SCU and management of SCU inmates. Doc. No. 2412 at 20-44. Sampson challenges some of this testimony as being more prejudicial than probative. See 18 U.S.C. § 3593(c). The Court does not now decide this issue. However, the Court notes that during its case-in-chief, the government must establish how each piece of evidence it proposes to introduce is relevant to an issue on which the government carries the burden of proof. As an example, the Court discerns the relevance of testimony concerning Sampson's recreational opportunities, because it shows the frequency with which prison guards move him around the SCU outside his secured cell. Doc. No. 2412 at 23. However, the Court is as yet unable to discern the relevance of other testimony discussing, for example, the fact that BOP places a television in each SCU cell. Id. at 21. The relevance of such testimony would have to be established prior to its admission.

[6] Document number 2418 refers to the transcript of the hearing held on August 17, 2016.

assistant informed him that a wheelchair was not the proper treatment. Id. at 60. Instead, she said, the correct treatment plan involved exercise, physical therapy, or medication. Id. at 60-62. At that point, Sampson became upset, got out of his chair, and yelled "I'm going to tear this place apart. You have to get me out of here." Id. at 63. As he turned to the door to exit the room with the guards, he added, "I'm going to stab someone next time, if I don't get what I want," and asked a guard to remove him from the room. Id. at 62-63, 70. The guards immediately escorted Sampson back to his cell without further incident. Id. at 70-71. The following week, Sampson returned for another appointment with the physician assistant and apologized to her. Id. at 66.

II. Discussion

The government seeks to admit evidence of these incidents in support of the non-statutory aggravating factor of future dangerousness. See generally Doc. No. 2201. "Before admitting evidence of a non-statutory aggravating factor, the judge must find that it is sufficiently relevant, that the evidence supporting it is sufficiently reliable, and that the probative value of the evidence is not 'outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.'" Sampson, 275 F. Supp. 2d at 101 (quoting 18 U.S.C. § 3593(c)). The Supreme Court has said that capital proceedings must be undertaken with an eye toward heightened reliability. See Woodson v. North Carolina, 428 U.S. 280, 305 (1976).

In addition, at Sampson's first trial, Judge Wolf made a number of rulings regarding the admissibility of certain types of evidence to establish Sampson's future dangerousness. He ruled that Sampson's past violence in prison is relevant to future dangerousness, as is "[p]ast prison misconduct of a potentially violent nature," such as the possession of a sharpened instrument. United States v. Sampson, 335 F. Supp. 2d 166, 225 (D. Mass. 2004); see Kelly v. South

7

Carolina, 534 U.S. 246, 253 (2002) ("[E]vidence of violent behavior in prison can raise a strong implication of 'generalized . . . future dangerousness.'" (quoting Simmons v. South Carolina, 512 U.S. 154, 171 (1994))).  These rulings stand.

Judge Wolf also ruled broadly that "[t]hreats to harm prison guards and other officials are . . . relevant to future dangerousness." Sampson, 335 F. Supp. 2d at 226.  Accordingly, he permitted the government at Sampson's first trial to "introduce[] evidence of several threats Sampson made to correctional officers and others after he was charged in this case." Id.  In 2015, Judge Wolf reiterated that Sampson's threats, at least when accompanied by physical violence or attempted violence, are probative of future dangerousness.  Doc. No. 2015 at 43.  That ruling stands.  Sampson argues Judge Wolf reopened the issue of whether threats, unaccompanied by violence or attempted violence, are probative of future dangerousness.  Doc. No. 2423 at 6; see Doc. No. 2015 at 41, 43.  Assuming without deciding that Sampson is correct, the Court now considers this issue de novo.

Whether a defendant's verbal threat to harm a prison guard or inmate, unaccompanied by a contemporaneous violent act or attempted violent act, is probative of future dangerousness is an unsettled area of the law.  Compare United States v. Pleau, Cr. No. 10-184-1 S, 2013 WL 1673109, at *7 (D.R.I. Apr. 17, 2013) ("[M]ere 'threatening words' directed at correctional officers are not probative of future dangerousness."), and United States v. Concepcion Sablan, 555 F. Supp. 2d 1205, 1234 (D. Colo. 2007) (excluding under 18 U.S.C. § 3593(c) evidence that the defendant, while locked in his cell, threatened a prison guard because it involved "only threatening words which, when viewed in context, show mere bravado on the part of Defendant"), with United States v. Basham, 561 F.3d 302, 331 (4th Cir. 2009) (finding no abuse of discretion in the trial court's admission of evidence that the defendant threatened prison staff

8

unaccompanied by violence or attempted violence), and United States v. Grande, 353 F. Supp. 2d 623, 640 (E.D. Va. 2005) (ruling that "threats to fellow inmates or correctional staff" are relevant to future dangerousness), and United States v. Chong, 98 F. Supp. 2d 1110, 1117, 1122 (D. Haw. 1999) (rejecting the defendant's contention that the Court should exclude "mere threats," and permitting the government to introduce evidence that the defendant threatened to kill prison guards).

The Court takes from these cases that the probative value of a threat, unaccompanied by physical violence or attempted violence, tends to depend on the particular circumstances of the threat, see Concepcion Sablan, 555 F. Supp. 2d at 1234 (excluding the defendant's threat from his locked cell as "illusory" under the circumstances); Grande, 353 F. Supp. 2d at 639 (admitting evidence of the defendant's alleged threat to kill a purported law enforcement cooperator), and also on the defendant's misconduct as a whole.[7]  See Basham, 561 F.3d at 331-32 (noting that the government introduced evidence of an incident in which the defendant verbally threatened prison staff without attempting violence as well as evidence of incidents in which the defendant was physically aggressive toward prison staff, and viewing this evidence together as admissible regarding the defendant's future dangerousness).  Here, Sampson is alleged to have threatened to kill or seriously injure prison guards and inmates on multiple occasions.  Sampson's attempts at violence at Terre Haute described at the sealed hearing (and summarized in this Order) – including two incidents in which he attempted to strike or stab a prison guard with a broomstick, as well as another in which he attempted to head butt a guard – add gravity to his threats.  In the

---

[7] To be sure, some Courts, including this one at Sampson's first trial, simply have ruled categorically that threats of violence are probative, or not probative, of future dangerousness. Pleau, 2013 WL 1673109, at *7; Sampson, 335 F. Supp. 2d at 226; Chong, 98 F. Supp. 2d at 1117.

circumstances of this case, therefore, the Court is persuaded that evidence of Sampson's threats to prison guards or inmates unaccompanied by contemporaneous violence or attempted violence are probative of future dangerousness.

Against this legal backdrop, and having heard the testimony of the Terre Haute witnesses, the Court concludes that the evidence of each of Sampson's six incidents of misconduct at Terre Haute is sufficiently reliable, and that the probative value of this evidence outweighs any risk of unfair prejudice, confusing the issues, or misleading the jury, such that it is admissible at the new penalty phase trial. Thus, Sampson's challenges to the admissibility of each of the six individual incidents are overruled.

Sampson makes one more overarching argument. He contends that the evidence, taken as a whole, presents an unreliable picture of his behavior at Terre Haute, considering that, as the defense points out, these events occurred during a short portion of the ten years Sampson was in custody at Terre Haute, during which time Terre Haute staff "never uncovered any dangerous contraband or weapons attributable to Sampson" despite conducting periodic random searches. Doc. No. 2423 at 1-2. This is particularly true, he contends, because the Terre Haute witnesses offered testimony that at times conflicted with their prior statements or the statements of other witnesses. Having closely observed the Terre Haute witnesses' testimony on direct and cross-examination, the Court concludes that evidence of the six Terre Haute incidents – whether viewed separately or as a whole – is sufficiently reliable to permit its admission. It is for the jury to find and weigh the factual evidence. See United States v. Wilson, 967 F. Supp. 2d 673, 680 (E.D.N.Y. 2013) (noting that a death penalty jury is "the sole arbiter of the facts"). The defense may explore these matters on cross-examination.

Some additional points about the Terre Haute evidence bear mentioning. First, Sampson's approach to the Terre Haute evidence essentially invites the Court to parse each of the six incidents into admissible and inadmissible segments. He argues, for example, that certain threats allegedly levied by Sampson during an incident are insufficiently reliable because they were not memorialized in writing at the time. <u>See, e.g.</u>, Doc. No. 2423 at 11. To the extent Sampson argues that the testimony of each Terre Haute witness should be limited to the four corners of his or her report of a given incident, the Court disagrees. Put simply, the Court declines to parse the admissibility of testimony regarding each incident so finely. The general contours of each of the six incidents were memorialized in contemporaneous reports, and nothing in the testimony of the Terre Haute witnesses at the evidentiary hearing so grossly exceeded these reports as to be impermissibly unreliable or raise other issues for the Court's consideration.[8] To the extent the testimony of the Terre Haute witnesses regarding these incidents conflicts with other testimony or evidence, or includes information not reported contemporaneously, the defense is entitled, of course, to elicit such discrepancies on cross-examination. The jury will determine the veracity of the testimony both as to statements or actions recorded in contemporaneous documents and those statements or actions not so recorded.

Second, as stated previously, the Court will not permit the introduction of Terre Haute evidence unless a witness can testify to his or her personal knowledge of the information. <u>See</u> Doc. No. 2015 at 35. The government has proffered as to each of the six incidents at least one witness with personal knowledge. Of course, witnesses lacking in personal knowledge may not

---

[8] This is in stark contrast, for example, to the government seeking to introduce evidence of an incident that allegedly occurred years ago, that was not reported then, despite a BOP requirement that such an incident be reported at the time it took place, and that only now comes to light in preparation for trial.

offer hearsay testimony to prove what happened because "federal district courts have required the government to prove aggravating factors without relying on hearsay evidence." Pleau, 2013 WL 1673109, at *7 (citing Sampson, 335 F. Supp. 2d at 224).

Third, the ranking of Sampson's behavior compared to other inmates is not relevant to the future dangerousness aggravating factor. In other words, that Sampson is more or less dangerous than other inmates, or that a witness's experience with Sampson was unique (or rare, or common) is not probative of whether Sampson poses a future danger in prison. In this case, the legal objective of the new penalty phase trial is to reach an individualized sentence for Sampson, Doc. No. 2432 at 4; see Zant v. Stephens, 462 U.S. 862, 879 (1983), and whether certain inmates are more or less dangerous than Sampson is irrelevant to that inquiry. The government either will prove beyond a reasonable doubt that Sampson "is likely to commit criminal acts of violence in the future that would be a continuing and serious threat to the lives and safety of prison officials and inmates" (thus discharging its burden on this issue), or it will not. The focus remains on the danger posed by Sampson in prison without regard to whether other inmates are, or are not, dangerous. In the same vein, a Terre Haute witness's subjective opinion as to Sampson's dangerousness, or subjective fear of or comfort with Sampson, also is improper. See Chong, 98 F. Supp. 2d at 1121 (limiting the government's fact witnesses "to testifying as to their personal observations of Defendant and his actions," and prohibiting them from offering opinion testimony).[9]

---

[9] However, if a dispute arises as to whether Sampson intended an alleged statement to be a threat, such a dispute may open the door not only to testimony regarding the recipient's subjective fear upon receiving the alleged threat, but also to testimony regarding whether the recipient has observed similar behavior in other inmates.

Finally, Sampson has not persuaded the Court to exclude *in toto* under § 3593(c) the profane language he allegedly used during the six incidents. Crude language alone is not probative of future dangerousness, but much of it provides context to, and is intertwined with, the evidence of each incident. See Concepcion Sablan, 555 F. Supp. 2d at 1231 n.18 (allowing admission of evidence of property damage because it was "interconnected with" evidence admissible on the issue of future dangerousness). Given the nature and substance of the incidents to which Sampson's foul language relates, his profanity in connection with these incidents is not so unfairly prejudicial as to be excludable under 18 U.S.C. § 3593(c).[10] Of course, mere expressions of feelings or belief (even crudely expressed) unconnected to a threat, violence, or attempted violence, are not relevant or probative of future dangerousness in prison.

III. Conclusion

Sampson's motion regarding the Terre Haute evidence (Doc. No. 2423) is DENIED, except as described herein. This Order is not sealed. However, the sealing order remains in place with respect to the transcript of the evidentiary hearing concerning the Terre Haute evidence. The admissible evidence to which the hearing transcript refers is summarized in this Order. However, the transcript also contains inadmissible evidence – although no other incidents

---

[10] Sampson also argues broadly that the incidents involving his speech are inadmissible because the First Amendment prohibits the introduction into evidence of his protected activities where they are irrelevant to the issues being decided. He relies on Dawson v. Delaware, 503 U.S. 159, 165 (1992). In that case, however, the Supreme Court expressly contemplated that evidence protected by the First Amendment "might serve a legitimate purpose in showing that a defendant represents a future danger to society." Id. at 166. Here, as a general matter, Sampson's speech during the six incidents, whether in the form of threats or otherwise, is relevant not only as direct evidence of his future dangerousness (in the case of threats), but also as context for each of the incidents which are relevant to future dangerousness. Contrary to Dawson, therefore, Sampson's challenged statements do more than simply show his "abstract beliefs." Id. at 167. Accordingly, Dawson does not bar the admission of Sampson's speech in the circumstances of this case.

13

of Sampson's misconduct[11] – such as evidence that implicates Sampson's Sixth Amendment right to counsel, and other evidence admissible for purposes of this motion but inadmissible at trial. For this reason, the transcript of the hearing, and the parties' motion papers, will remain sealed until the conclusion of the new penalty phase trial.

                              SO ORDERED.

                              /s/ Leo T. Sorokin
                              Leo T. Sorokin
                              United States District Judge

---

[11] One BOP employee who testified as a witness to one of the incidents described herein also related what arguably amounts to another "incident." In 2013, Sampson asked the employee to reserve him time in the SCU law library. Doc. No. 2417 at 145. The employee went home sick that day and forgot to do so. Id. at 146. When she returned to work, Sampson, while locked in his cell, yelled at her about forgetting. Id. The employee told Sampson that she would ensure he received library access that day, and Sampson immediately calmed down, saying "Okay. Fine. No problem." Id. This incident, which involved no violence, attempted violence, or threat of violence on the part of Sampson, cannot be said to be probative of his future dangerousness.