UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                            )
UNITED STATES OF AMERICA                    )
                                            )
v.                                          )        Criminal Action No. 01-10384-LTS
                                            )
GARY LEE SAMPSON                            )
_____)

MEMORANDUM AND ORDER ON
DEFENSE POST-TRIAL MOTION (DOC. NO. 2929)

August 15, 2017

SOROKIN, J.

On January 9, 2017, more than two months after hearing opening statements in this case,

twelve men and women unanimously decided that Gary Sampson should die for one of the two

capital offenses that have been the subject of more than fifteen years of legal proceedings,

including two lengthy penalty-phase trials.  Doc. No. 2834 at 27.[1]  As required by the Federal

Death Penalty Act ("FDPA"), 18 U.S.C. § 3594, the Court imposed the recommended death

sentence on February 3, 2017, and judgment entered thereafter.  Doc. Nos. 2904, 2917.  Before

the Court now is Sampson's post-trial motion seeking an order vacating his death sentence,

citing eighteen errors or categories of error he alleges infected his second penalty-phase trial.

Doc. Nos. 2929, 2930.

In run-of-the-mine cases, district courts often resolve motions for new trials –

appropriately – in one-sentence orders of denial.  This is no run-of-the-mine case.  Gary

_____
[1] Citations to "Doc. No." are to items appearing on the electronic docket in this matter, and the
document numbers are those assigned by CM/ECF.  Pincites within these citations are to the
page numbers appearing in the top right corner of each page within the header appended by
CM/ECF.

Sampson brutally and incomprehensibly murdered Philip McCloskey, Jonathan Rizzo, and Robert Whitney. He faces the ultimate, irreversible punishment for two of those killings. All of the proceedings in this case since Sampson's September 2003 guilty plea have concerned only whether Sampson will be executed for his federal crimes or will serve a term of life imprisonment without the possibility of release. Now, after a second trial, a fair and impartial jury of twelve of Sampson's peers has spoken, returning a sentence of death on one charge, which the Court has imposed. Sampson, through his counsel – each of whom serves by appointment of the Court, discharging a role essential to our system of justice – has raised a series of post-trial challenges to his death sentence. In this opinion, the Court has attempted to address fully, and to consider carefully and fairly, every argument Sampson has raised. No less is required in a case where the government seeks to impose the gravest of punishments on one of its citizens.

For the reasons that follow, Sampson's motion is DENIED.

# TABLE OF CONTENTS

I.      BACKGROUND ....................................................................................................... 5

II.     GENERAL LEGAL STANDARDS .......................................................................... 8

    A.      Rule 29 ........................................................................................................... 8

    B.      Rule 33 ........................................................................................................... 8

III.    DISCUSSION ............................................................................................................ 9

    A.      Sufficiency .................................................................................................... 9

        1.      Heinous, Cruel, and Depraved ........................................................ 10
        2.      Other Serious Acts of Violence ...................................................... 12
        3.      Series of Criminal Episodes ........................................................... 12
        4.      Murder to Obstruct Justice .............................................................. 14
        5.      Victim Impact .................................................................................. 15
        6.      Substantial Planning and Premeditation ........................................ 16

    B.      Competency ................................................................................................. 17

    C.      Withdrawal of Counsel ............................................................................... 18

        1.      Conflict of Interest .......................................................................... 19
        2.      Irreconcilable Breakdown ............................................................... 24

    D.      Voir Dire Rulings ....................................................................................... 30

    E.      Prosecutorial Misconduct .......................................................................... 35

        1.      Testimony Elicited ........................................................................... 36
        2.      Questions Asked .............................................................................. 38
        3.      Opening and Closing ....................................................................... 39
        4.      Cumulative Challenge ...................................................................... 44

    F.      August 1, 2001 Interrogation ..................................................................... 45

    G.      Confessions .................................................................................................. 46

    H.      Defensive Wounds ...................................................................................... 47

    I.      Prison Misconduct ...................................................................................... 48

    J.      Victim Impact Testimony ........................................................................... 50

K.     Evidentiary Rulings at Trial.................................................................52

L.     Jury Instructions................................................................................59

M.    Mitigating Factors.............................................................................60

N.     Weight of Evidence...........................................................................64

O.     Juror 5 Inquiry..................................................................................65

P.     Denial of Pretrial Motions ................................................................66

        1.    Constitutional Challenges ........................................................66
        2.    Motions in Limine....................................................................72
        3.    Other Pretrial Motions .............................................................74

Q.     Cumulative Error ..............................................................................77

R.     As-Applied Constitutional Challenge ...............................................77

S.     Scope of Rebuttal..............................................................................79

IV.    REMAINING DISPUTES REGARDING UNSEALING OF PAPERS..........................81

V.     CONCLUSION.....................................................................................84

I.        <u>BACKGROUND</u>

The facts in this case – those related to the crimes Sampson confessed to committing, those related to the aggravating factors alleged by the government in support of its pursuit of a death sentence, and those related to Sampson's background and the mitigating factors alleged by the defense in support of its pursuit of a life sentence – were developed through the testimony of more than a hundred witnesses in a trial that spanned more than eight weeks.  Only a brief overview of the events that led to Sampson's second penalty-phase trial is required here.  Where a more detailed account of certain facts is necessary to discuss any individual claim Sampson advances, it will be provided under the appropriate heading in the Discussion section below. § III, <u>infra</u>.

Sampson is a native of Abington, Massachusetts.  The defense offered evidence suggesting his childhood was marked by struggles with dyslexia; a tense relationship with his father; early involvement with drugs, alcohol, and criminal activity; and one or more head injuries.  While still a teenager, Sampson married for the first of five times and fathered the first of his three children.  He spent significant portions of his young adulthood in state correctional facilities in and around New Hampshire.  In the late 1990s, he moved to North Carolina, where he worked, developed relationships with a number of people, resorted to abuse of drugs and alcohol, and robbed several banks.  He fled to Massachusetts in July 2001, after his fifth bank robbery.

On July 23, 2001, after returning to the area where he grew up, Sampson called the Federal Bureau of Investigation ("FBI") in an attempt to turn himself in for the series of bank robberies he had committed before leaving North Carolina.  His call was disconnected, no FBI agent came to arrest him at the time and place he had designated, and he made no further effort

to surrender at that time.  Instead, on July 24, 2001, he carjacked and killed Philip McCloskey, a sixty-nine-year-old father and grandfather who was retired after working as a Boston Gas plumber for more than forty years.  After Mr. McCloskey showed kindness to Sampson – a stranger who appeared to be in need – by offering him a ride, Sampson stabbed Mr. McCloskey to death in a wooded area in Marshfield, then unsuccessfully attempted to steal his car.

Afterward, Sampson wandered the South Shore for several days and encountered a number of people who testified about their interactions with him.  On July 27, 2001, he carjacked and killed Jonathan Rizzo, a nineteen-year-old college student who was home for the summer working at a restaurant and spending time with his parents and two younger brothers.  In exchange for his willingness to help a stranger, Mr. Rizzo was made to endure a drive at knifepoint from Plymouth to Abington, during which he pleaded for his life.  Once in Abington, Sampson forced Mr. Rizzo to carry his luggage to a campsite in the woods, then tied the young man to a tree, gagged him with his own socks, stabbed him to death, and took his car.  Sampson fled to New Hampshire and broke into an empty vacation home near Lake Winnipesaukee.  On July 30, 2017, Robert Whitney, a family friend of the home's owner, discovered Sampson there. After a struggle, Sampson tied Mr. Whitney to a chair and strangled him to death.

Sampson collected his belongings and fled to Vermont in Mr. Whitney's car.  On July 31, 2017, after abandoning Mr. Whitney's car, Sampson posed as a stranded businessman and was picked up by William Gregory, yet another kind-hearted driver willing to assist a stranger. Sampson promptly threatened Mr. Gregory with a knife, but Mr. Gregory was able to escape from the moving car and report the incident to police.  Meanwhile, Sampson broke into another vacation home, called 911, and surrendered himself to Vermont State Troopers.  He made a series of detailed, tape-recorded confessions that night and the following day to detectives from

Vermont and Massachusetts.  Ultimately, state murder charges against Sampson for the stabbings of Mr. McCloskey and Mr. Rizzo were withdrawn in favor of the federal carjacking charges that initiated these proceedings.[2]

In 2003, Sampson pleaded guilty to both counts of carjacking resulting in death and, after a penalty-phase trial that lasted several weeks, he was sentenced to death for both offenses. United States v. Sampson, 335 F. Supp. 2d 166, 173, 175 (D. Mass. 2004) ("Sampson II").  His conviction and sentence were upheld on direct appeal.  United States v. Sampson, 486 F.3d 13, 18 (1st Cir. 2007) ("Sampson III").  This Court (Wolf, J.) subsequently vacated his death sentences and ordered a new penalty-phase trial after concluding that Sampson had established a violation of his constitutional rights arising from the misconduct of a juror in his first trial – a conclusion which was affirmed on appeal by a unanimous panel of the First Circuit.  United States v. Sampson, 724 F.3d 150, 169-70 (1st Cir. 2013) ("Sampson IV"); United States v. Sampson, 820 F. Supp. 2d 151, 159-60 (D. Mass. 2011).  During a second round of pretrial proceedings before Judge Wolf that spanned several years, a new team of lawyers was formed to represent Sampson at his second trial.  On January 6, 2016, pursuant to Local Rule 40.1(I), Judge Wolf returned the case to the Clerk, and it was randomly reassigned.  Doc. Nos. 2128, 2129.

Represented by his new defense team, and with the matter transferred to the undersigned, Sampson faced his second penalty-phase trial in the fall of 2016.  That trial is the subject of the present motion.  Although Sampson's second jury was unable to reach a unanimous sentencing decision with respect to the carjacking and killing of Mr. McCloskey (resulting in imposition of a sentence of life without the possibility of release for that crime), it concluded that a death

---

[2] Sampson was charged separately in New Hampshire state court with murdering Mr. Whitney. He pled guilty and received a life sentence there in 2004.

sentence was justified for the carjacking and killing of Mr. Rizzo. Doc. No. 2834 at 27. The Court imposed sentence on February 3, 2017. Doc. No. 2904; <u>see</u> Doc. No. 2917 (entering amended judgment on February 6, 2017). Sampson's post-trial motion was filed and briefed pursuant to a schedule adopted by the Court and agreed to by the parties, and it is now ripe for resolution.

## II. GENERAL LEGAL STANDARDS

### A. Rule 29

This Court, like Judge Wolf before it, has applied Federal Rule of Criminal Procedure 29 in the context of Sampson's penalty-phase trial. <u>Sampson II</u>, 335 F. Supp. 2d at 198-201. Here, Rule 29 governs the evaluation of "the sufficiency of the evidence with respect to the alleged aggravating factors." <u>Id.</u> at 201. In considering challenges to the sufficiency of evidence under Rule 29, "the court must look at the evidence in the light most favorable to the government," "must draw reasonable inferences in favor of the government," and "must resolve all credibility questions and evidentiary conflicts in favor of the government." <u>Id.</u>

These standards govern the assessment of whether the evidence offered at trial was "sufficient to permit a rational jury to find each essential fact to have been proven beyond a reasonable doubt." <u>Id.</u> In making this inquiry, the court must consider all evidence presented to the jury, "regardless of whether it was properly admitted." <u>United States v. Gonzalez-Sanchez</u>, 824 F.2d 572, 588 (1st Cir. 1987); <u>accord</u> <u>United States v. DiMasi</u>, 810 F. Supp. 2d 347, 351 (D. Mass. 2011).

### B. Rule 33

The Federal Rules of Criminal Procedure also provide that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33.

Motions brought pursuant to Rule 33 "are directed to the broad discretion of the trial judge," but the authority to order a new trial is "sparingly" invoked "only where there would be a miscarriage of justice . . . and where the evidence preponderates heavily against the verdict." United States v. Wilkerson, 251 F.3d 273, 278 (1st Cir. 2001) (quotation marks omitted).

In resolving a Rule 33 motion, a court "may, and indeed must, consider its own evaluation of the credibility of the evidence and it may, in certain, limited circumstances, grant a new trial if it disagrees with the jury's judgment." United States v. Sampson, 332 F. Supp. 2d 325, 330 (D. Mass. 2004) ("Sampson I"). Even in this context, though, the "trial judge is not a thirteenth juror"; he may not "set aside a verdict merely because he would have reached a different result." United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986); accord Sampson I, 332 F. Supp. 2d at 331.

Unlike Rule 29, Rule 33 permits the court to "consider whether its evidentiary rulings at trial were correct." DiMasi, 810 F. Supp. 2d at 362; cf. Gonzalez-Sanchez, 825 F.2d at 588 n.57 (noting that an error in admitting evidence is "necessarily prejudicial" if "the evidence is insufficient [to sustain a conviction] without the improperly admitted evidence"). Thus, Rule 33 provides the appropriate lens through which to consider a majority of Sampson's claims.[3]

III.    DISCUSSION

        A.  Sufficiency

In his first claim, Sampson challenges the sufficiency of the evidence supporting various aggravating factors that the jury found were proven beyond a reasonable doubt. He also

_____

[3] The government now argues that review of Sampson's motion should be guided by the standards governing motions for reconsideration. Doc. No. 2964-1 at 2. However, during the first penalty-phase trial, the government agreed that Rule 33 "applies generally in this case," and Judge Wolf applied that standard to Sampson's motion for a new trial in 2004. Sampson I, 332 F. Supp. 2d at 327. This Court will do the same.

reiterates constitutional and legal challenges he asserted in pretrial motions concerning certain factors. For the most part, this claim repeats the oral motion for a judgment of acquittal Sampson made at the close of the government's evidence, which the Court orally denied at that time. See Tr. Rule 29 Hr'g (Nov. 18, 2016), Doc. No. 2721 at 9-19.

### 1. *Heinous, Cruel, and Depraved*

Sampson attacks both the legal and factual sufficiency of the statutory aggravator alleging he committed each offense "in an especially heinous, cruel, and depraved manner." Doc. No. 2834 at 2, 3. Neither attack has merit.

First, Sampson argues that the heinousness factor as it was described on the verdict form was inconsistent with prior decisions in this case and "did not sufficiently instruct" regarding the definitions of the terms involved. Doc. No. 2930 at 6. The Court can discern no meaningful difference between the manner in which the factor was presented to the jury during these proceedings – on the verdict form, and as explained in the Court's instructions to the jury – and the manner in which Judge Wolf described the same factor in the context of the original trial.[4] For the reasons Judge Wolf, the First Circuit, and this Court previously have rejected Sampson's legal challenges to the heinousness aggravator, the present challenge fails. See Sampson III, 486 F.3d at 36-39 (concluding factor as written, and as defined in Judge Wolf's instructions, was not unconstitutionally vague); Sampson II, 335 F. Supp. 2d at 202-06 (same); Doc. No. 2189 at 23-25 (same).

---

[4] The verdict forms for Sampson's two trials articulated the factor in virtually indistinguishable terms. Compare Doc. No. 2834 at 2, 3 (January 2017), with Doc. Nos. 654 and 654-2 at 4 (December 2003). The relevant portions of the jury instructions also were nearly identical. Compare Doc. No. 2820 at 21-23 (January 2017), with Doc. No. 1870 at 21-25 (December 2003). The First Circuit found no error in Judge Wolf's instructions at the first trial. Sampson III, 486 F.3d at 36-39.

Second, Sampson challenges the evidence supporting the heinousness aggravator, arguing it was insufficient to prove he intended "to do anything other than kill the victims." Doc. No. 2930 at 6. "Applying the Rule 29 sufficiency standard, and looking at the evidence in the light most favorable to the government," as Judge Wolf did in response to the same claim during the original trial, the Court finds the evidence was sufficient to establish that the carjacking and killing of Mr. Rizzo "was especially heinous, cruel, or depraved in that it involved serious physical abuse." Sampson II, 335 F. Supp. 2d at 207. In particular, there was evidence permitting jurors to conclude that Sampson intended to kill Mr. Rizzo from the time they met; that he tied Mr. Rizzo to a tree and gagged him, essentially rendering him defenseless, before inflicting any wounds with his knife; that he knew, based on his experience killing Mr. McCloskey, that he could have approached Mr. Rizzo from behind and killed him quickly by slitting his throat; and that, instead, he attacked Mr. Rizzo from the front and inflicted more than a dozen wounds to the chest and neck, many of which would have been independently fatal. See Tr. Jury Trial Day 32 (Nov. 8, 2016), Doc. No. 2762 at 188-94 (describing nature and effect of wounds and Mr. Rizzo's position when he received them); Tr. Jury Trial Day 33 (Nov. 9, 2016), Doc. No. 2763 at 76, 89 (describing position of body, noting thirteen fatal wounds, and opining all wounds were inflicted before Mr. Rizzo's death); see also Sampson II, 335 F. Supp. 2d at 208 (describing relevant evidence from Sampson's confessions offered at the first trial and again during these proceedings).

"This evidence was sufficient to permit, though not require, the jury to find that the defendant . . . specifically intended to inflict abuse beyond what he thought necessary to kill [Mr.] Rizzo." Sampson II, 335 F. Supp. 2d at 208. Thus, Sampson's attack on the heinousness factor is meritless.

## 2. *Other Serious Acts of Violence*

Sampson's next challenge is to the first three nonstatutory aggravating factors presented to the jury – the murder of Mr. Whitney, the carjacking of Mr. Gregory, and four bank robberies in North Carolina. See Doc. No. 2834 at 5 (listing the challenged factors in Questions 3(a)-(c)).[5] Failure to consolidate these "into a single aggravating factor of 'other serious acts of violence,'" Sampson claims, "violate[d] the Eighth Amendment" by "[i]nflating the number of aggravating factors." Doc. No. 2930 at 6.

Although presented under the heading "Insufficiency of the Evidence," Doc. No. 2930 at 5, this amounts to a legal challenge to the nonstatutory aggravators that the Court rejected before Sampson's retrial. Doc. No. 2189 at 28-31. The challenge fares no better now than it did then. The legal analysis supporting the previous rulings remains unchanged. Any concern that failure to consolidate the seven nonstatutory aggravating factors into five invited jurors to assign extra weight to those factors due to the number alleged, id. at 29, is substantially undermined by the fact that the total number of aggravating factors was dwarfed by the 115 mitigating factors presented on the verdict form. Doc. No. 2834 at 5-25.

In these circumstances, Sampson has not demonstrated that presentation of the separate "other acts of violence" aggravating factors amounted to error at all, let alone resulted in a miscarriage of justice requiring a new trial.

## 3. *Series of Criminal Episodes*

Sampson asserts three challenges to the nonstatutory aggravating factor alleging that he "intentionally killed [the two victims] over the course of a series of criminal episodes." Doc. No. 2834 at 5. First, he suggests "it is really one factor that encompasses both murders," and that

---

[5] The jury found that the government had proven only the first two of these three factors.

alleging it "more than once" (i.e., once as to each offense) inflated the number of aggravators in violation of the Eighth Amendment. Doc. No. 2930 at 6. This argument fails now, as it did before Judge Wolf during Sampson's first trial, and as it did before this Court in Sampson's retrial.[6] See Doc. No. 2189 at 34-35 (quoting and adopting Judge Wolf's reasoning for allowing the aggravator to be presented once as to each charged offense).

Second, Sampson argues the factor "was contrary to the evidence," which, he urges, demonstrated "one continuous course of conduct" rather than a series of criminal episodes. Doc. No. 2930 at 6. Considering the evidence in the light most favorable to the government, the Court finds sufficient evidence to establish that Sampson killed Mr. McCloskey and Mr. Rizzo intentionally, and that the killings were separate, unrelated crimes coming one after another in succession. See Doc. No. 2820 at 28 (explaining legal definition and elements of this aggravating factor). In particular, Sampson's confessions contain various statements supporting a finding that he killed each victim on purpose, and not as a result of a mistake or accident. See Sampson II, 335 F. Supp. 2d at 208 (summarizing such statements in concluding evidence of heinousness aggravator was sufficient). Indeed, there was virtually no evidence offered at trial to suggest the killings were anything other than intentional. Moreover, the fact that the killings occurred three days apart – with a significant amount of time in between for Sampson to regroup, consider his next course of action, and travel around the South Shore area, encountering various

---

[6] Two additional facts bear noting with respect to this factor. First, although the verdict form sought two responses for each nonstatutory aggravator – one for each capital offense – each factor appeared on the form only once. Doc. No. 2834 at 5-6. Second, any concern about assigning improper weight to this factor because it was alleged twice rather than once is thoroughly undermined by the fact that 115 mitigating factors were presented (each of which sought separate responses for each offense). Id. at 7-25.

other people as he did so – supports the jury's finding that the crimes were separate and unrelated, rather than part of one continuous criminal episode.

Third, Sampson reiterates the position he advanced before his retrial, claiming that this factor violated his Fifth Amendment rights because it deviated from the aggravating factor found by the grand jury and alleged in the indictment. Compare Doc. No. 1326 at 4, 7 (alleging in amended notice of intent to seek the death penalty that Sampson killed the victims "over the course of a series of criminal episodes"), with Doc. No. 74 at 4, 6 (alleging in superseding indictment that Sampson killed "more than one person in a single criminal episode"). The Court remains unpersuaded for reasons explained fully in response to the previous iteration of this claim. Doc. No. 2189 at 32-34; see United States v. Sampson, No. 01-cr-10384, 2015 WL 7962394, at *30 (D. Mass. Dec. 2, 2015) ("Sampson V") (concluding the Constitution does not require non-statutory aggravators to be presented to a grand jury); see also Doc. No. 2283 at 7-8 (finding subsequent decisions by the Supreme Court did not justify reconsideration of Sampson's previous grand-jury-related motions).

### 4. *Murder to Obstruct Justice*

Next, Sampson challenges the sufficiency of evidence in support of the nonstatutory aggravating factor alleging that he killed Mr. Rizzo "for the sole or primary purpose of preventing him from reporting to the authorities the theft . . . of his car."[7] Doc. No. 2834 at 6. He claims "there was no evidence from which a reasonable jury could find that [his] sole or dominant motive for the murders was to eliminate a witness." Doc. No. 2930 at 7. But there was such evidence. Sampson sequestered Mr. Rizzo in the woods, tied him to a tree, and gagged him before stabbing him. As in the first trial, "[a] rational jury could have concluded that the

---

[7] The jury found this factor proven only as to the killing of Mr. Rizzo. Doc. No. 2834 at 6.

defendant did not need to kill [Mr.] Rizzo to effect the carjacking, but instead chose to kill him because, as Sampson stated during one of his confessions, he needed [Mr.] Rizzo's car for a long time." Sampson II, 335 F. Supp. 2d at 217; see also Gov't Trial Ex. 1B at 24 (showing statement in transcript of one of Sampson's confessions, "I don't like to leave witnesses, witnesses can tell on me"). As to this aggravator, then, Sampson's sufficiency claim cannot succeed.

### 5. *Victim Impact*

Although Sampson includes under his "insufficiency" heading a challenge to the nonstatutory aggravating factors regarding victim impact, it is difficult to discern the nature of the challenge he intends to press there. See Doc. No. 2930 at 7. A separate section of his motion is devoted to challenging the extent and nature of the victim impact evidence admitted at trial, id. at 62-64, and that challenge will be discussed below, § III(J), infra. Despite the heading under which this puzzling paragraph appears, Sampson does not assert – nor could he reasonably assert – that there was insufficient evidence to support the jury's findings that the killings of Mr. McCloskey and Mr. Rizzo "caused injury, harm, and loss to" their families "because of [their] personal characteristics as . . . individual human being[s]." Doc. No. 2834 at 6; see Doc. No. 2721 at 16 (conceding during Rule 29 argument that this aggravator was "factually supported").

Rather, Sampson's cursory challenge purports to repeat a claim he says was "argued in court" and included in his objections to the Court's draft jury instructions – a claim that the victim impact aggravator "as a whole should be stricken as unconstitutionally vague." Doc. No. 2930 at 7. Such a claim, however, has never been presented to this Court. See Doc. No. 2721 at 16 (preserving without identifying "constitutional arguments we've advanced," then making vagueness challenge to future dangerousness aggravator); Doc. No. 2805 at 3-11 (asserting vagueness challenge to heinousness aggravator, but raising no objection to any language in

victim impact factor); Doc. Nos. 1904-1, 1905 (moving to strike various aggravators, but asserting no such challenge to victim impact factor); Doc. Nos. 1901-1, 1901-2 (seeking various rulings limiting victim impact evidence, but not asserting a constitutional challenge to the factor in general).

Because Sampson has not raised a vagueness challenge to this factor before, because he does not articulate such a challenge now in a manner sufficient to permit the Court to meaningfully consider it, and because the FDPA explicitly contemplates a nonstatutory aggravating factor of the sort presented here, 18 U.S.C. § 3593(a), this claim fails.

### 6. *Substantial Planning and Premeditation*

Sampson's final sufficiency challenge is aimed at the statutory aggravating factor alleging that his killing of Mr. Rizzo was the result of "substantial planning and premeditation." Doc. No. 2834 at 4. He claims the factor is unconstitutionally vague – a claim which fails now for the same reasons it has failed at least twice before. See Doc. No. 2189 at 20-22 (noting vagueness challenges to this factor have been "uniformly rejected" by courts); United States v. Sampson, 275 F. Supp. 2d 49, 104 (D. Mass. 2003) (same); see also Sampson II, 335 F. Supp. 2d at 209-10 (finding the factor "narrows the class of murderers in a way that is constitutionally relevant").

Sampson further suggests that, "while there may have been evidence adduced at trial that the killing of Jonathan Rizzo was in some way planned or premeditated, the evidence was insufficient to show that [the planning and premeditation] was 'substantial,' as required." Doc. No. 2930 at 7. In Sampson's view, the only "slim evidence of planning and premeditation" came from his confessions, "which also included numerous demonstrable falsehoods and factual errors." Id. at 8. Because this factor was charged only as to the killing of Mr. Rizzo, and

because the jury returned a death verdict only as to that offense, Sampson suggests this "error . . . was particularly harmful." Id. at 7.

The evidence relevant to this factor, particularly when considered in the light most favorable to the government, was more than "sufficient to prove, beyond a reasonable doubt, that Sampson engaged in substantial planning and premeditation to cause" Mr. Rizzo's death. Sampson II, 335 F. Supp. 2d at 212. The relevant evidence was essentially the same at this trial as it was in 2003. It was recounted in detail by Judge Wolf when he rejected Sampson's Rule 29 motion after the first trial, and this Court adopts and incorporates that recitation here. See id. (describing evidence including Sampson's selection of a remote location known to him for the scene of the killing, the time that passed on the drive to that location during which Sampson could have chosen a different course of action, and the steps Sampson took to prevent resistance by Mr. Rizzo).

To the extent Rule 33 permits a broader review of Sampson's sufficiency claims, the Court finds no miscarriage of justice flowing from the jury's determinations as to any of the challenged aggravators, and is satisfied that "the evidence [did not] preponderate[] heavily against the verdict." Wilkerson, 251 F.3d at 278. Accordingly, none of Sampson's sufficiency challenges warrant relief.

B. Competency

In his second post-trial claim, Sampson urges that the Court erred in determining he was competent to stand trial, and in finding no competency hearing was necessary in light of the relevant expert reports. Doc. No. 2930 at 8. The Court's discussion of these issues – expressed after a thorough review of all relevant expert tests and reports, upon careful consideration of the applicable legal standards, and in reliance on the Court's own observations throughout these

proceedings – is fully set forth in a previous unsealed order. Doc. No. 2895. Nothing that has occurred since that order was issued, and nothing Sampson has asserted in the present motion,[8] alters the Court's previous analysis or persuades the Court that a miscarriage of justice arose from its ruling on Sampson's competency motion. Accordingly, Sampson's request for a new trial on this basis is denied.

## C. Withdrawal of Counsel

Sampson's third claim asserts error in the Court's denial of a motion to withdraw filed by his team of defense counsel near the conclusion of jury selection, and renewed twice during the trial. Doc. No. 2930 at 9-14. Sampson alleges his Sixth Amendment right to counsel was violated due to an actual conflict of interest that arose between him and the members of his defense team, and due to an irreconcilable breakdown in his relationship with his attorneys. Id. Neither of these related but distinct claims merits granting Sampson a new penalty-phase trial.[9]

---

[8] Neither the existence of conflicting expert reports nor the fact that Dr. Woods's testimony was credited in a pretrial motion hearing renders a competency hearing mandatory. See, e.g., United States v. Dunn, 594 F.2d 1367 (10th Cir. 1979) (concluding no hearing was required despite conflicting reports where court determined hearing would not be helpful). The fact that Dr. Pinals acknowledged certain impairments in Sampson did not mandate a hearing nor undermine her conclusion that he was able to assist counsel. And, the two cases cited in Sampson's motion are materially distinguishable. See United States v. Duncan, 643 F.3d 1242 (9th Cir. 2011) (concluding a hearing was required to determine whether defendant was competent to waive his right to counsel and proceed pro se where three defense experts found the defendant incompetent, a court examiner found him "unusual," a Bureau of Prisons examiner found him competent only after an examination in which the defendant refused to participate, and the defendant wrote semi-irrational letters to the court); United States v. Soldevila-Lopez, 17 F.3d 480 (1st Cir. 1994) (finding an abuse of discretion in denying a continuance requested to permit time for the defendant to secure his own evaluation to respond to an unexpected expert opinion that he was malingering). Sampson did not represent himself, the only issue presented by his competency motion was whether he could rationally assist his counsel, and he did not attempt to secure any further evidence in response to Dr. Pinals's report. See Doc. No. 2894 at 2-5 (responding with legal argument to the report but not seeking time or resources to obtain further expert testing or opinions).

[9] The Court expended substantial time and effort reviewing the trial record as it relates to these claims and researching the law relevant to them. This is due to the passion with which the

1. *Conflict of Interest*

Sampson asserts that a conflict of interest arose when he "made credible threats of violence against" members of his defense team late in the jury selection process, causing his attorneys' representation of (and duty of loyalty to) him to be "materially limited by [the attorneys'] own legitimate interest in personal security."  Doc. No. 2930 at 11.  Citing a standard crafted by the Supreme Court in Cuyler v. Sullivan, 446 U.S. 335 (1980), Sampson argues that this alleged conflict created a "lapse in representation."  Doc. No. 2930 at 12.  As proof of that "lapse," Sampson cites defense counsel's discussion of his behavior in ex parte proceedings without his presence or knowledge, and their accession to security measures during the trial, including leg shackles and exclusion of Sampson from the courtroom at certain times.  Id.  This, Sampson says, is sufficient under Sullivan to establish a violation of his Sixth Amendment rights.  Id.

The circumstances relevant to Sampson's withdrawal motion were described in detail in his original pleading, Doc. No. 2629 at 1-10,[10] and are reflected in events or discussions that are part of the record in this case, e.g., Tr. Jury Trial Day 24 (Oct. 27, 2016), Doc. No. 2662 at 3-120, 184-93 (disclosing threats and discussing appropriate response, including security measures to be taken); Tr. Jury Trial Day 25 (Oct. 28, 2016), Doc. No. 2663 at 3-22, 28-32, 192-204 (discussing continued safety concerns of counsel based on further conversations with Sampson); Tr. Jury Trial Day 26 (Oct. 31, 2016), Doc. No. 2756 at 6-13, 67-68 (discussing status of

_____

defense presented the claims, the seriousness of the legitimate legal issues involved, the dearth of published decisions from any court dealing with circumstances like those presented here, and the government's decision to summarily dismiss Sampson's withdrawal claim without citing a single legal authority to rebut the arguments advanced therein, Doc. No. 2964-1 at 5-6.

[10] Although this filing was submitted under seal, it will be unsealed in accordance with the discussion in section IV of this Memorandum.

relationship between Sampson and counsel and pending motions related to competency and withdrawal); Tr. Jury Trial Day 27 (Nov. 1, 2016), Doc. No. 2757 at 3-18 (discussing Sampson's return to the courtroom and accompanying safety measures); Tr. Jury Trial Day 31 (Nov. 7, 2016), Doc. No. 2761 at 6-20 (discussing status of relationship between Sampson and counsel and renewing competency and withdrawal motions); Tr. Ex Parte Hr'g (Nov. 30, 2016, 8:35 a.m.), Doc. No. 2882 (discussing status of relationship between Sampson and counsel, requesting stay of proceedings pending competency evaluation, and renewing motion to withdraw); Tr. Ex Parte Hr'g (Nov. 30, 2016, 1:08 p.m.), Doc. No. 2883 (discussing schedule of defense witnesses and Sampson's desire to be absent when certain evidence was offered). Only the following summary of those events is necessary to resolve the conflict-of-interest question, in light of what the Court deems the controlling law.

Sampson's relationship with his defense team, and particularly with lead counsel Michael Burt, was tumultuous but, in his lawyers' view, manageable in the months leading up to his retrial and during the first few weeks of jury selection. Between October 19 and 26, 2017, a dispute arose between Sampson and the defense team as to whether evidence suggesting Sampson had been sexually assaulted should be introduced in the defense mitigation case. The defense team intended to offer such evidence against Sampson's strongly expressed wishes. That dispute culminated in Sampson threatening certain members of his defense team, including Mr. Burt, during a heated telephone call with one of his attorneys on October 26, 2017.

After consulting with at least one expert in legal ethics, the defense team brought Sampson's threats to the Court's attention in an emergency ex parte hearing on October 27,

2017, unbeknownst to Sampson.[11]  The Court credited the defense team's account of the threats, concluded they reasonably feared for their own safety and the safety of others in the courtroom, and accepted their proposal that Sampson be barred from entering the courtroom that day. Arrangements were made for Sampson to view and hear court proceedings from his holding cell beside the courtroom, and to communicate with his counsel.  The Court found that the same security concerns justified keeping Sampson outside the courtroom, with the same arrangements in place, for three more days of proceedings.  On November 2, 2017, when opening statements and evidence began, Sampson was permitted to resume his place in the courtroom, sitting with his counsel.  The Court required that he wear leg irons to address continuing security concerns, with table skirts placed on all counsel tables to shield the leg irons from the jury's view without drawing attention to the defense table.  These conditions remained in effect for the duration of the trial.[12]

In support of his conflict-of-interest argument, Sampson relies on Sullivan and cases applying it, most of which involved alleged conflicts arising from multiple representations (i.e.,

---

[11] The defense team did not seek to withdraw from the case at that time.  See Doc. No. 2662 at 10 (reflecting Mr. Burt's belief the day after Sampson's threats that the situation did not "impede[ the defense team's] ability to represent him"); cf. United States v. Gorski, 36 F. Supp. 3d 256, 265 (D. Mass. 2014) ("In evaluating the potential for conflict, the court may rely on counsel's representations that no such conflict exists." (quotation marks omitted)).  Instead, they made an oral request for a competency evaluation.  They first asserted a conflict of interest and sought to withdraw on October 31, 2017, see generally Doc. No. 2629, but retreated from that request on the same day, Doc. No. 2756 at 67-68.  Defense counsel twice renewed the withdrawal motion during trial, but in each instance they primarily focused on competency concerns and a breakdown of the attorney-client relationship, rather than on personal safety concerns.  Doc. No. 2761 at 6-20; Doc. No. 2882 at 3-11, 14-18.

[12] During the defense mitigation case, Sampson elected to be absent from court when evidence to which he objected was offered.  In each such instance, defense counsel acceded to his request to be absent, the Court conducted a colloquy and found that he was waiving his presence knowingly and voluntarily, and arrangements were made for him to have real-time access to audio and video of proceedings in the courtroom as well as access to his counsel.

one defense attorney representing two clients with conflicting interests).  Doc. No. 2930 at 10-12.  Those cases, which dispose of the requirement that defendants demonstrate prejudice arising from an alleged conflict on the part of counsel, confront facts which differ materially from those presented here.  The most critical distinction between Sampson and the defendants in the cases he cites relates to the manner in which the alleged conflict arose.  Sullivan and its progeny tend to involve conflicts created by the lawyer, at no fault of his client (e.g., due to counsel's decision to represent multiple clients, pursue his financial interests, or engage in a romantic relationship with the prosecutor).  The conflict Sampson identifies here is one of his own making.  Accordingly, the Court finds the Sullivan line of cases inapplicable to these facts.[13]

A more appropriate framework for considering Sampson's claim is set out in Nix v. Whiteside, 475 U.S. 157 (1986).  There, a dispute arose between Whiteside and his counsel when Whiteside proposed giving perjured testimony, and his lawyer threatened to withdraw and disclose the perjury to the court.  Id. at 160-62.  Whiteside urged the Supreme Court to assess his conflict-of-interest claim under the Sullivan rubric.  Id. at 176.  The Court demurred, applying instead the traditional standard for counsel-ineffectiveness claims announced in Strickland v. Washington, 466 U.S. 668 (1984), and finding that the defendant had failed to show either deficient performance or prejudice as required by Strickland.  Whiteside, 475 U.S. at 164-76.

---

[13] Sampson cites only one case remotely comparable to his own.  There, a defense attorney's apparent concern for his own safety caused him to sit a few seats away from his client for a brief portion of jury selection.  State v. Parrott, 811 A.2d 705, 710 (Conn. 2003).  The lawyer said his ability to effectively represent his client would not be impaired, and his safety concerns (and the resulting seating arrangements) ended before the trial began.  Id. at 711.  On direct appeal, the Supreme Court of Connecticut assessed the defendant's conflict claim under the Sullivan standard, but found no violation of the right to counsel because the defendant had not identified deficient performance by his lawyer.  Id. at 712-14.  The Connecticut court's invocation of Sullivan does not persuade this Court that Sullivan should guide its analysis of Sampson's claim.

The <u>Whiteside</u> Court explained its choice of <u>Strickland</u> over <u>Sullivan</u> as the standard governing Whiteside's conflict claim this way:

> Here, there was indeed a "conflict," but of a quite different kind; it was one imposed on the attorney by the client's proposal to commit [a] crime . . . .  This is not remotely the kind of conflict of interests dealt with in <u>Cuyler v. Sullivan</u>. . . . If a "conflict" between a client's proposal and counsel's ethical obligation gives rise to a presumption that counsel's assistance was prejudicially ineffective, every guilty criminal's conviction would be suspect if the defendant had sought to obtain an acquittal by illegal means.  Can anyone doubt what practices and problems would be spawned by such a rule and what volumes of litigation it would generate?

<u>Whiteside</u>, 475 U.S. at 176.

The same logic counsels against applying the <u>Sullivan</u> standard here.  Sampson, like Whiteside, threatened to commit a crime related to his case during a discussion of his case with his lawyers.[14]  It was Sampson, like Whiteside, who "imposed" on his counsel a "conflict" between their duties of confidentiality and loyalty to him on the one hand, and their ethical obligations to the Court on the other.  Indeed, the relevant ethical rules may "not merely *authorize*" Sampson's counsel, like Whiteside's, to disclose the threatened criminal acts; they possibly "*require* such disclosure."  <u>Id.</u> at 168 (emphases in original); <u>see</u> Mass. R. Prof. C. 1.6(b) (permitting disclosure of confidential communications "to prevent reasonably certain . . . substantial bodily harm" and "to prevent the commission of a criminal . . . act"); Mass. R. Prof. C. 3.3(b) (requiring "remedial measures, including, if necessary, disclosure to the tribunal," where counsel "knows that a person intends to engage . . . in criminal . . . conduct related to the proceeding").  In these circumstances, the Court will apply <u>Strickland</u> to Sampson's Sixth Amendment claim.

---

[14] In fact, Sampson credibly threatened to commit multiple crimes – violent assaults of at least one of his lawyers, his mitigation specialist, and a major defense expert witness – and he threatened to do so in the courtroom, where the safety of people besides those who were the focus of the threats might have been jeopardized as well.

The right to counsel does not include a right to a lawyer who will stand silent in the face of credible threats of violent criminal conduct by his client, risking the lawyer's own safety and the safety of others, and exposing the lawyer to disciplinary proceedings and sanctions for disregarding his professional and ethical obligations. Whiteside, 475 U.S. at 173. The defense team's disclosure of Sampson's threats, and their request for and/or acquiescence to the security measures imposed thereafter, were "a professionally responsible and acceptable response" to Sampson's conduct. Id. at 170. Accordingly, Sampson has not demonstrated deficient performance by his lawyers, and his conflict-of-interest claim fails. See id. at 175 ("Since there has been no breach of any recognized professional duty, it follows that there can be no deprivation of the right to assistance of counsel under the Strickland standard.").

### 2. *Irreconcilable Breakdown*

Sampson's defense team cited an irreconcilable breakdown in their relationship with Sampson as a second ground supporting their motion to withdraw. They claimed their disagreement with Sampson over whether to offer evidence that he was a victim of sexual assault "created a situation where basic communication between Mr. Sampson and his legal team became impossible." Doc. No. 2930 at 12. This issue – Sampson's willingness and/or ability to communicate with and assist his counsel – dominated the series of ex parte proceedings in which defense counsel's parallel motions for a competency evaluation and to withdraw were explored. E.g., Doc. No. 2761 at 6-20; Doc. No. 2882 at 3-26; see also Doc. No. 2663 at 3-22 (exploring conflict with counsel before motion to withdraw was filed). The Court found then, and remains of the view now, that the balance of interests relevant to assessing a request for withdrawal or substitution of counsel tipped in favor of denying the defense team's request.

An indigent defendant's Sixth Amendment right to counsel does not include "a right to have a particular lawyer represent him, nor to demand a different appointed lawyer except for good cause." United States v. Allen, 789 F.2d 90, 92 (1st Cir. 1986) (citation omitted); accord United States v. Myers, 294 F.3d 203, 206 (1st Cir. 2002). "Once a court appoints an attorney" to represent an indigent defendant, "a subsequent decision to replace that attorney" must be made in light of "the totality of the circumstances" presented at the time of the request to withdraw or substitute counsel, "including the need for economy and efficiency in the judicial process." Myers, 294 F.3d at 206.

To resolve a request to replace appointed counsel, a trial court must engage in an inquiry aimed at assessing the extent of the asserted dispute or breakdown in the attorney-client relationship, see id. at 206-07 (explaining that a defendant is not entitled to new counsel with "every bump in the road," that loss of trust in counsel is not sufficient to warrant appointment of new counsel, and that the trial court must assess objectively whether the conflict prevented an adequate defense), and the practical impact replacement of counsel would have on the proceedings, see United States v. Teemer, 394 F.3d 59, 67 (1st Cir. 2005) (instructing that "as trial approaches, the balance of considerations shifts ever more toward maintaining existing counsel and the trial schedule"). Accord United States v. Diaz-Rodriguez, 745 F.3d 586, 590-92 (1st Cir. 2014).

The balance here strongly favored keeping the existing defense team in place. Although the Court emphatically rejects the government's characterization of defense counsel's request to withdraw as "a thinly disguised strategic attempt to create a mistrial," Doc. No. 2964-1 at 6, the timing of the request weighed heavily against allowing it. The defense first asserted that the relationship between Sampson and counsel had deteriorated to the point where constitutional

concerns were presented on October 31, 2016 – after seven weeks of jury selection, months of pretrial motion practice, and years of preparation for Sampson's second penalty-phase trial. The petit jury was to be empaneled, sworn, and preliminarily instructed the next day; opening statements and witness testimony were scheduled to begin the day after that. Replacing Sampson's entire defense team at that juncture would have meant losing the seventy-two prospective jurors who had been qualified for service after more than six-hundred individuals had completed lengthy written questionnaires and more than two-hundred prospective jurors had been questioned individually by the Court and counsel. This voir dire process consumed twenty-two days of proceedings that were attended by members of the victims' families, the press, and the public. No team of lawyers could have stepped into the case on Sampson's behalf without requiring a substantial continuance in the proceedings in order to familiarize themselves with more than fifteen years' worth of events, court proceedings, and legal rulings and prepare themselves for the complex undertaking of representing a defendant in a capital penalty-phase trial. Cf. Doc. No. 2882 at 7 (reflecting that even an attorney who was a member of the defense team but had not taken an active role in developing trial strategy did not feel able to replace lead trial counsel without requiring additional time to prepare). Only a conflict "so great that it resulted in a total lack of communication preventing an adequate defense," Allen, 789 F.2d at 92, would outweigh "the public's interest in the prompt, fair and ethical administration of justice," Diaz-Rodriguez, 745 F.3d at 590, under these circumstances.

The Court spent substantial time throughout the trial exploring with Sampson and his counsel the nature and extent of the difficulties they experienced in their relationship after Sampson learned of the defense team's intent to present evidence that he had been sexually assaulted in prison. In addition, the Court had ample opportunity to witness interactions between

Sampson and his counsel during the proceedings in this case. Although Sampson's submission in support of his post-trial motion describes even "the most perfunctory communication" between lawyer and client as "impossible," claims Sampson was "unable to communicate rationally" about the disputed evidence, and suggests the conflict resulted in Sampson "actively s[eeking] to sabotage his own case," Doc. No. 2930 at 13, neither the record developed in the various ex parte hearings on these issues nor the Court's observations during trial support conclusions quite so extreme.

First, while the record suggests Sampson's relationship with counsel was quite difficult at times, it does not support a finding that communication was "impossible" for the duration of the trial.[15] E.g., Doc. No. 2757 at 12-13 (reflecting defense counsel had explained to Sampson its approach to the peremptory strikes process); Doc. No. 2762 at 33-34, 204 (reflecting defense counsel had conferred with Sampson outside the courtroom before witness testimony, and had communicated with him thereafter about the need for further ex parte proceedings); Tr. Ex Parte Conf. (Dec. 7, 2016), Doc. No. 2890 at 3-6 (reflecting defense counsel had met with Sampson to discuss competency evaluation process and that Sampson was "fine with the lawyers" he had); cf. Morris v. Slappy, 461 U.S. 1, 14 (1983) (rejecting "claim that the Sixth Amendment guarantees a 'meaningful relationship' between an accused and his counsel").

---

[15] In support of his conflict claims, Sampson relies on a series of Ninth Circuit cases involving materially different circumstances. See Daniels v. Woodford, 428 F.3d 1181 (9th Cir. 2005) (finding constructive denial of counsel where conflict was not created by defendant or counsel, was not the result of contumacious conduct by the defendant, was exacerbated by defendant's paranoid delusions, was not adequately explored by the trial court, and was first brought to the court's attention long before trial); United States v. Nguyen, 262 F.3d 998 (9th Cir. 2001) (finding constructive denial of counsel where trial court summarily denied requests for substitution of counsel without conducting meaningful inquiry beyond noting that counsel was competent); United States v. Moore, 159 F.3d 1154 (9th Cir. 1998) (finding constructive denial of counsel where trial court summarily denied requests for substitution of counsel without conducting meaningful inquiry into nature or scope of conflict).

Second, the Court credits the defense team's representations (some of which are supported by Sampson's own statements to the Court) that Sampson reacted to the dispute over sexual assault evidence by threatening to engage in conduct that might have undermined his mitigation case. See, e.g., Doc. No. 2629 at 7-8 (recounting threats by Sampson to tell his brother not to cooperate with the defense team and to insist that the defense call witnesses who would testify that Sampson had not been sexually abused); Doc. No. 2663 at 21 (reflecting Sampson's comment to government counsel that he would "testify for you, on your side"). However, the record is devoid of any indication that Sampson ever acted on these threats.

Third, Sampson's subjective belief that his defense team was "against him," and his resulting loss of trust in them, was not objectively borne out by the record. His belief arose because the defense team had located witnesses who would testify to sexual abuse Sampson suffered in state prisons in the decades before his capital crimes – evidence counsel viewed as credible and potentially powerful mitigation. E.g., Doc. No. 2662 at 23, 48. Sampson denied such abuse, accused the defense witnesses of lying and the defense team of coaching them to commit perjury, and worried he would suffer harm (or, at least, humiliation) upon his return to prison if such evidence were offered and publicized. E.g., Doc. No. 2662 at 32; Doc. No. 2882 at 23. If, as Sampson believed, the evidence had been patently not credible, or if the defense team had wholly disregarded his concerns and sought to offer the evidence without carefully assessing its credibility and worth, Sampson's view of his lawyers as adversaries might have been valid. However, the record reflects that counsel critically reviewed the relevant evidence, understood and carefully considered Sampson's objections to its use, and concluded – in good faith and based on extensive capital trial experience – that offering the evidence was in Sampson's best interests given his stated desire to avoid the death penalty. Having presided over

the trial and witnessed the presentation of the relevant testimony, the Court is satisfied that the defense team's decision to offer the evidence was reasonable – a view which is further supported by the fact that at least one juror credited the evidence and found the associated mitigating factor proven. Doc. No. 2834 at 14. In these circumstances, Sampson's belief that the defense team were his enemies was unreasonable; indeed, the team's representation of Sampson was "more than adequate."[16] See Allen, 789 F.2d at 93 (rejecting Sixth Amendment claim arising from denial of request to substitute counsel where defendant's belief that counsel "had prejudged him" and "was not prepared for trial" was unreasonable).

Finally, it is abundantly clear that Sampson can be a difficult, volatile individual. That observation – which is putting it mildly – would surprise no one who knows even the most basic facts of this case. In the context of a second months-long trial at which searing evidence was offered daily about the horrifying murders Sampson committed, the inspiring lives he cut short, and the impact of his actions on those who loved his victims; which required examination of the unhappiest aspects of his life, including detailed expert testimony about his mental health and other impairments from which he suffers; and which culminated in a group of twelve strangers deciding for the second time whether he should live or die, there is no reason to think another set

---

[16] Although the defense argues the breakdown in communication was persistent at a time "when Mr. Sampson's cooperation was crucial," Doc. No. 2930 at 13, nothing in the record demonstrates whether or in what manner the communication difficulties impaired counsel's ability to zealously defend Sampson. Aside from consenting to his shackling (which resulted from a disclosure required by the rules of professional conduct, arose from Sampson's own behavior, and would have been imposed by the Court under the circumstances disclosed regardless whether counsel had consented or objected) and seeking or acquiescing in his absence from certain proceedings (which included portions of jury selection involving no one ultimately seated as a juror, and portions of the trial for which the Court found Sampson knowingly and voluntarily waived his presence), the defense has identified no specific actions either taken or forsaken due to the tumultuous nature of their communications with Sampson.

of lawyers would have experienced an attorney-client relationship any less fraught than the one that unfolded here.

Considering the totality of these circumstances, and balancing Sampson's constitutional right to counsel of his choice against the strong public interest in fair and efficient administration of justice, Sampson has not demonstrated that his defense team's motion to withdraw should have been granted, or that its denial worked a miscarriage of justice warranting a new trial.[17]

D. Voir Dire Rulings

In his fourth claim, Sampson challenges twenty-six of the Court's rulings during individual voir dire qualifying or striking prospective jurors for cause.[18]  He offers no new facts or law to support these challenges.

Three jurors Sampson alleges were improperly qualified served as deliberating jurors, and one was selected as an alternate.  As to at least the three deliberating jurors, any error in

---

[17] The government's response to Sampson's third claim – in addition to providing no useful answer to the legal questions raised – improperly cited information from two reports evaluating Sampson's competency to stand trial.  See Doc. No. 2964-1 at 6 & n.3 (quoting reports prepared in 2014 and 2017).  These reports were disclosed subject to court orders unambiguously limiting their use to competency proceedings – orders which remain in effect.  See Tr. Jury Trial Day 40 (Nov. 22, 2016), Doc. No. 2869 at 6-8 (announcing the Court's intention to provide the 2014 report subject to an order limiting its use "to the competency proceedings," and reflecting government counsel's explicit agreement that "there would be no use for it outside of the competency context"); Doc. No. 2726 at 2 (stating that the 2014 report would be disclosed subject to an order limiting its use to competency questions and proceedings, and citing Doc. No. 2708, which announced the same limitation as to other competency-related disclosures); see also Fed. R. Crim. P. 12.2(c)(4) (limiting use of information contained in court-ordered competency examinations).  The citations to those orders in this context are hereby STRICKEN from the government's brief, and the government is admonished that it must seek leave of court before making any future use of competency materials which remain sealed after this Order, see § IV, infra.

[18] The government incorrectly describes Sampson's claim as challenging seventeen rulings qualifying jurors for service and seven rulings striking jurors for cause.  Doc. No. 2964-1 at 7; see Doc. No. 2930 at 14-24 (challenging rulings qualifying sixteen jurors for service and striking ten jurors for cause).

qualifying them would warrant vacating Sampson's sentence.  See Sampson IV, 724 F.3d at 169

(citing United States v. Martinez-Salazar, 528 U.S. 304, 316 (2000), and explaining that "where

a biased juror sits on a jury that sentenced a defendant to death and the issue was properly

preserved, the sentence would have to be overturned").  Ten others who Sampson alleges were

improperly qualified were removed via peremptory strikes (nine by the defense, and one by the

government),[19] one ultimately was excused due to a work-related hardship, and one was not

reached during the final selection process.  As such, any error in qualifying these jurors would

not merit a new trial.[20]  Cf. Martinez-Salazar, 528 U.S. at 317 (finding no reversible error where

a defendant "chooses to use a peremptory challenge to remove a juror who should have been

excused for cause").

Having reviewed the record as it relates to each challenged juror, including the transcripts

of the relevant voir dire examinations, all written submissions by the parties, and this Court's

prior oral and written rulings, the Court overrules Sampson's objections for the same reasons

expressed in the original rulings.  In light of the legal standards summarized above, the Court

will discuss only on those cleared jurors who were selected to serve as members of the petit jury,

and on those jurors who were removed for cause over Sampson's objection.[21]  Each challenged

ruling warrants only brief comment.

---

[19] Each side had twenty peremptory strikes to use in selecting the deliberating jurors, and three
more to use in selecting the alternates.  See Doc. No. 2651 (listing the parties' strikes).

[20] As to the juror removed due to a hardship and the juror whose number was higher than the last
juror selected as an alternate, any alleged error would be moot.

[21] The locations in the record of the challenged rulings as to the jurors not discussed above are:
for Juror 59 (defense peremptory strike), see Tr. Jury Trial Day 6 (Sept. 26, 2016), Doc. No.
2541 at 120-21, and Doc. No. 2662 at 97-98, 135; for Juror 70 (defense peremptory strike), see
Doc. No. 2541 at 180-81; for Juror 119 (defense peremptory strike), see Tr. Jury Trial Day 11
(Oct. 4, 2016), Doc. No. 2570 at 111-12; for Juror 161 (defense peremptory strike), see Tr. Jury
Trial Day 10 (Sept. 30, 2016), Doc. No. 2547 at 47-48; for Juror 214 (defense peremptory
strike), see Doc. No. 2556 at 8-9; for Juror 246 (defense peremptory strike), see Doc. No. 2571 at

Juror 124 was cleared on September 28, 2016, based on a finding that she was able to learn and apply legal concepts – which initially were unfamiliar to her – in a fair and impartial manner. Tr. Jury Trial Day 8 (Sept. 28, 2016), Doc. No. 2543 at 130-31. She served as a member of the jury.

Juror 224 was cleared on October 5, 2016, without objection by either party. Tr. Jury Trial Day 12 (Oct. 5, 2016), Doc. No. 2571 at 84. The next morning, the defense challenged her because she worked with a relative of Mr. McCloskey. Tr. Jury Trial Day 13 (Oct. 6, 2016), Doc. No. 2572 at 21-22. The Court overruled the challenge, finding her answers the previous day had reflected that she would not be biased or impaired in her ability to fairly decide this case. Id. at 22. Juror 224 served as a member of the jury.

Juror 280 was cleared on October 6, 2016, after thirty-five minutes of questioning by the Court and the parties, based on findings that she had not predetermined the appropriate sentence, that she would remain open to mitigating evidence (including evidence not rising to the level of mental incompetence), that she was conscientious and open to hearing and following instructions from the Court, and that no further questioning was warranted as to future dangerousness or any other topic. Doc. No. 2572 at 203-05. She served as a member of the jury.

Juror 439 was cleared on October 24, 2016, based on a finding that his ability to remain fair and impartial would not be impaired by information he knew or had inferred regarding the

49-50; for Juror 299 (defense peremptory strike), see Tr. Jury Trial Day 15 (Oct. 11, 2016), Doc. No. 2574 at 105-07; for Juror 332 (defense peremptory strike), see Tr. Jury Trial Day 16 (Oct. 13, 2016), Doc. No. 2575 at 168; for Juror 351 (defense peremptory strike), see Doc. No. 2580; for Juror 367 (government peremptory strike), see Tr. Jury Trial Day 18 (Oct. 17, 2016), Doc. No. 2656 at 180; for Juror 374 (subsequent hardship showing), see Doc. Nos. 2606, 2650, 2757 at 30-33; and for Juror 500 (highest selected alternate was Juror 445), see Doc. No. 2662 at 171.

outcome of Sampson's first trial.  Tr. Jury Trial Day 21 (Oct. 24, 2016), Doc. No. 2659 at 181.

He served as an alternate juror.

Juror 3 was stricken for cause on September 21, 2016, based on a finding that he would

not be able to set aside his strong personal belief that life imprisonment is a worse punishment

than death.  Tr. Jury Trial Day 3 (Sept. 21, 2016), Doc. No. 2528 at 273.

Juror 19 was stricken for cause on September 21, 2016, based on a finding that her

written and oral answers reflected substantial limitations in her ability to understand English, and

that such limitations would impair her ability to serve as a juror in this case (a view which she

credibly explained in her written questionnaire and again during individual voir dire).  Doc. No.

2528 at 249-50.

Juror 35 was stricken for cause on September 23, 2016, based on a finding that his

pending graduate school applications, with the related interview process he expected to follow,

would interfere with his ability to serve as a juror given the trial schedule in this case.  Tr. Jury

Trial Day 4 (Sept. 23, 2016), Doc. No. 2529 at 199-203.

Juror 42 appeared for voir dire on September 26, 2016 and was stricken for cause the

next day based on two separate findings: first, that he was actively seeking employment after

being out of work for a period of time, and serving on the jury in a case of this length would

present a hardship as it would interfere with his efforts to find work; and second, that he had not

convinced the Court (or himself) that he realistically could consider voting to impose a death

sentence.  Tr. Jury Trial Day 7 (Sept. 27, 2016), Doc. No. 2542 at 6-8.

Jurors 82 and 93 appeared for voir dire on September 27, 2016, and were the subject of

subsequent motions to strike by the government due to concerns about the completeness of their

responses on the written questionnaire and during individual voir dire.  They appeared for further

voir dire on October 26, 2016, and were stricken for cause based on concerns about their veracity and the general reliability of their responses to both written and in-court questioning. Doc. No. 2618 at 1-2.

Juror 6 appeared for voir dire on September 21, 2016, and also was the subject of a subsequent motion to strike by the government. He appeared for further voir dire and was stricken for cause on October 27, 2016 for two reasons: first, he had failed to disclose relevant information on his questionnaire and during his first individual voir dire; and second, his professional obligations in January 2017, when the trial was expected to (and did) continue, created a hardship for him. Doc. No. 2662 at 130-31.

Juror 116 was stricken for cause on September 29, 2016, for three reasons: first, based on his failure to disclose social media accounts on the questionnaire and during voir dire; second, based on a finding that he had not credibly explained how he could set aside his personal opposition to the death penalty and consider imposing it; and third, based on a finding that he could not understand and follow legal instructions on concepts involved in the case. Tr. Jury Trial Day 9 (Sept. 29, 2016), Doc. No. 2545 at 37, 39-42.

Juror 243 was stricken for cause on October 6, 2016, based on a finding that she was not able to realistically consider imposing a death sentence in this (or any) case. Doc. No. 2572 at 56-57. In light of that determination, further questioning regarding her belief that life imprisonment was a worse sentence than death was unnecessary. Id. at 56.

Juror 308 appeared for voir dire on October 11, 2016, and subsequently was stricken for cause based on a finding that she had not fully and reliably answered certain questions on the written questionnaire, and had failed to credibly explain or reconcile those issues during her voir dire. See Doc. No. 2577.

Accordingly, Sampson's challenges to these voir dire rulings are meritless.

E.  Prosecutorial Misconduct

In his fifth claim, Sampson reiterates complaints he articulated during the trial regarding conduct by the two prosecutors who tried this case.  He alleges various comments made by the prosecutors during witness examinations, the opening statement, and the closing argument – individually and cumulatively – amounted to misconduct and resulted in a miscarriage of justice. Doc. No. 2930 at 24-46.  The Court denied Sampson's mistrial motions arising from the challenged conduct during the trial, either rejecting the misconduct claims or concluding that curative instructions would ameliorate any harm caused by improper comments.[22]  The same reasoning justifies denying Sampson's prosecutorial misconduct claim now.

The parties agree that a three-pronged inquiry guides analysis of claims such as this one. That inquiry asks: "(1) whether the prosecutor's conduct was isolated and/or deliberate; (2) whether the trial court offered a strong and explicit curative instruction; and (3) whether, in light of the strength of the evidence against the defendant, it is likely that any resulting prejudice affected the verdict."  United States v. Zarauskas, 814 F.3d 509, 516 (1st Cir. 2016).  These factors are aimed at determining "whether the prosecution's misconduct so poisoned the well that the trial's outcome was likely affected."  United States v. Joyner, 191 F.3d 47, 54 (1st Cir. 1999) (quotation marks omitted); accord Zarauskas, 814 F.3d at 516.  Analysis of these factors is required only where misconduct has occurred.  Cf. United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007) (determining whether challenged statements, which "constituted misconduct," "resulted in prejudice to the defendant").  These standards guide the Court's consideration of

_____

[22] The relevant rulings will be cited in the discussion of each alleged instance of misconduct that follows.

each discrete instance of misconduct alleged by Sampson, as well as the cumulative effect of those instances.

## 1. *Testimony Elicited*

Sampson identifies two instances in which the government elicited from its witnesses testimony about facts previously excluded by the Court. First, in its redirect examination of a New Hampshire prison guard on November 7, 2016, the government asked whether the guard was "aware that Mr. Sampson threw feces at correction officers" while in a state prison in Maine. Doc. No. 2761 at 118. Such testimony had not been offered during the first trial, and it was identified during pretrial proceedings in 2016 as information that would be precluded again in this trial. See Doc. No. 2495 at 50-51 (listing previously withdrawn or excluded facts that would not be admitted and upon which government expert witnesses could not rely). The government's question about the incident was improper for two reasons: 1) it disregarded the Court's consistent practice in this case – a practice which the government endorsed and embraced – that information not admitted in the government's case-in-chief in 2003 would not be admitted in 2016, absent an affirmative request and an explicit ruling permitting such use as to a particular item; and 2) it was asked despite the lack of a good-faith basis to believe that the witness had personal knowledge of the referenced incident, see id. at 145-46 (conceding that the only basis for the witness's knowledge of the incident was his review of a previously unseen prison report that the government showed him when preparing him to testify). However, because the question was isolated, the witness denied knowledge of the incident, and the Court reminded the jury that questions are not evidence and explicitly instructed that no evidence about Sampson throwing feces had been or would be presented, Doc. No. 2762 at 35, the question did not amount to

prejudicial misconduct.[23]  See United States v. Munyenyezi, 781 F.3d 532, 540-42 (1st Cir. 2015) (finding no prejudicial misconduct and affirming denial of mistrial where jury was instructed several times that questions were not evidence and was explicitly told that facts suggested in an improper question by the prosecutor were not to be considered).

A week later, the government elicited testimony from a former Plymouth County corrections officer that went beyond his 2003 testimony and referenced a claim by Sampson that he had escaped from a New Hampshire county jail.  Tr. Jury Trial Day 36 (Nov. 15, 2016), Doc. No. 2862 at 185-86.  Best trial practices do not include sending a witness to the stand holding documents from which he will read his testimony, as the government did with this corrections officer.  And, when parameters have been set marking the appropriate scope of a witness's testimony, an effective advocate will exercise careful control to ensure those parameters are observed.  Even if the government's failure to adhere to these principles in this instance were deemed misconduct, though, the Court would not find it prejudicial.  It was not deliberate, it was isolated, and the Court gave a curative instruction specifically addressing the challenged testimony, Tr. Jury Trial Day 37 (Nov. 16, 2016), Doc. No. 2864 at 148-49.[24]

---

[23] The government preliminarily suggests that the reference to this incident could not have been prejudicial because Sampson himself "elicited the fact that [his] lengthy strangulation of" Mr. Whitney "caused his victim to defecate."  Doc. No. 2964-1 at 11.  This suggestion is not only irrelevant, but also misleading.  The government "elicited" this description of the strangulation at both trials via a portion of one of Sampson's recorded confessions.

[24] The Court also finds it exceedingly unlikely that any juror recalled – let alone improperly considered – this isolated and inaccurate reference to an escape, given the other properly admitted evidence related to Sampson's attempt to escape from a New Hampshire prison, his statements in his confessions about his history of escapes, and his various other instances of misconduct in both state and federal prisons.  It also bears noting that this witness's testimony was offered to show Sampson's future dangerousness – an aggravating factor which the jury did not find proven.

## 2. *Questions Asked*

Next, Sampson identifies three instances in which he asserts the government asked improper questions or made improper comments during its cross examinations of two defense witnesses. First, the government invoked a defense witness's own phrasing, asking the witness whether Sampson had "done some pretty heinous shit, too." Tr. Jury Trial Day 42 (Nov. 29, 2016), Doc. No. 2880 at 158. This was not misconduct. It was fair for counsel to echo the vulgar language used by the witness in seeking to rebut the witness's testimony about Sampson's character and reputation in prison.[25] See id. at 130 (reflecting the witness's opinion that he had "done some pretty heinous shit," and that Sampson was "nothing like me").

Second, the government twice prefaced questions of another defense witness with accusations that the witness "left out some details." Tr. Jury Trial Day 43 (Nov. 30, 2016), Doc. No. 2881 at 36, 38. Even if inappropriate, these two passing comments – both of which were met with immediate and forceful objections by defense counsel, followed by admonishments from the Court in front of the jury, see id. (stating it is "not for counsel" to say whether something was left out, and reminding counsel to "[j]ust ask the questions") – did not amount to misconduct.

Third, during its cross-examination of the same witness, in response to questions asked by the witness, government counsel informed the witness (and the jury) that Sampson had attacked other inmates while in prison in New Hampshire. Id. at 56-57. It was improper for counsel to answer the witness's questions, particularly where his answers cited facts about which

---

[25] To the extent any juror somehow could have understood this question as seeking an opinion regarding an aggravating factor, rather than as an effort to rebut the witness's character testimony (despite the preceding question which explicitly directed the jury's attention to the latter purpose), the defense objection to the question was sustained and no answer was given.

the witness had just denied personal knowledge, and at least some of which were not otherwise in evidence.  See United States v. Azubike, 504 F.3d 30, 38 (1st Cir. 2007) (explaining prosecutor's statement of fact unsupported by evidence is misconduct).  However, the relevant exchange came just moments after the Court had reminded the jury that information contained in questions by the lawyers was not evidence unless and until it was adopted by the witness.  Doc. No. 2881 at 55-56.  Moreover, the Court intervened immediately to clarify that counsel was "not a witness" and to rephrase the question into an appropriate form.  Id. at 57.  In these circumstances, the misconduct was not prejudicial.

### 3. *Opening and Closing*

The next category of comments Sampson asserts amounted to prosecutorial misconduct were made in the government's opening statement and closing argument.  Sampson identifies seven types of comments falling into this category.

The first and second types relate to Mr. Whitney's murder.  According to Sampson, both times the government addressed the jury, it improperly discussed victim impact information about Mr. Whitney and his death – a type of evidence admissible here only as to the two victims of the federal crimes for which the jury was sentencing Sampson.  Specifically, Sampson cites passages in which the government grouped the three victims together and talked in some detail about Mr. Whitney's background, characteristics, family, and friends.  See Doc. No. 2930 at 34-36 (quoting relevant excerpts of the opening and closing).  Furthermore, Sampson says, the government's closing argument improperly urged the jury to sentence Sampson for all three killings, rather than just the two underlying the charges in this case.  See id. at 38 (citing a moment near the end of the government's closing when counsel asked the jury what the proper sentence is "for extinguishing the lives of three kind and caring souls").

The government's comments about Mr. Whitney in both opening and closing went beyond what was said in the 2003 trial, in some instances invited the jury to equate him with the other two victims, and referenced the impact of his death in a way that was not legally appropriate in this case.[26]  However, considering the entirety of the government's statements to the jury, in the context of the trial as a whole, the challenged comments were not prejudicial misconduct.  Elsewhere in both the opening and closing, the government specified that jurors were not tasked with imposing a sentence for Mr. Whitney's murder, and that the only victim impact evidence jurors could consider related to Mr. McCloskey and Mr. Rizzo.  E.g., Tr. Jury Trial Day 28 (Nov. 2, 2016), Doc. No. 2758 at 60 (stating death penalty only available for the two federal crimes); Tr. Jury Trial Day 60 (Jan. 4, 2017), Doc. No. 2951 at 82, 108 (urging consideration of impact of crimes on McCloskey and Rizzo families only).  Moreover, the Court repeatedly reminded jurors of the legal distinction between Mr. Whitney and the other victims, starting with the first statements made to prospective jurors when the selection process began, Doc. No. 2498 at 3; Doc. No. 2523 at 1-2; in cautionary instructions given after the government's opening, Doc. No. 2758 at 71-73, and closing, Doc. No. 2951 at 118-19; and again in its final charge, Doc. No. 2820 at 25-26, 30-31.[27]  In the totality of these circumstances, the challenged commentary on Sampson's murder of Mr. Whitney does not warrant a new trial.

---

[26] To be clear, Mr. Whitney's murder was no less a crime than the stabbings of Mr. McCloskey and Mr. Rizzo, and his death had just as significant an impact on those who loved him. However, Sampson was charged, convicted, and sentenced for killing Mr. Whitney in separate proceedings in a different court.  In this penalty-phase trial, the purpose of which was determining the appropriate sentence for Sampson's federal crimes resulting in the deaths of Mr. McCloskey and Mr. Rizzo, a legal and evidentiary distinction between Mr. Whitney and the other victims had to be drawn by the Court, explained to the jury, and respected by the parties.

[27] In addition, the verdict form sought victim impact findings only as to Mr. McCloskey and Mr. Rizzo, Doc. No. 2834 at 6, and the Court presumes the jury abided by its clear instructions to consider only those aggravating factors specifically enumerated on the verdict form and found proven by all twelve jurors, Doc. No. 2820 at 33, 46; see Sampson III, 486 F.3d at 47 ("Jurors

The third type of statements Sampson asserts were prosecutorial misconduct involved references by the government to the fact that Sampson chose not to exercise the "power of mercy" or "power of life" when he killed each of his victims. Doc. No. 2930 at 38-41. These comments were not misconduct. They complied with the parameters the Court set for this sort of statement. See Doc. No. 2951 at 28-29 (explaining scope of permissible argument). In suggesting Sampson had shown no mercy, the government stopped short of urging the jury to act as Sampson had acted. Cf. Lesko v. Lehman, 925 F.2d 1527, 1540, 1545 (3d Cir. 1991) (finding prejudicial misconduct where prosecutor appealed to jurors' vengeance by urging them to show "no more" sympathy than the defendants showed the victims, and to even "the score" by imposing a death sentence, in comments "calculated to incite an unreasonable and retaliatory sentencing decision"). Further, the government was entitled to comment on the appropriateness of showing Sampson mercy, as that was included among the mitigating factors submitted to the jury for consideration. Doc. No. 2834 at 25.

Fourth, according to Sampson, the government's opening statement mentioned "unnoticed aggravation" – crimes Sampson committed in his youth, which were not among the offenses noticed as nonstatutory aggravating factors. Doc. No. 2930 at 41-42. The relevant comments described information contained in portions of Sampson's recorded confessions that were presented as evidence at trial. These comments on admissible evidence were not misconduct. The government did not characterize the prior crimes as aggravating factors, the verdict form did not contain information about the crimes among the aggravating factors the jury was permitted to consider, Doc. No. 2834 at 5-6, and the Court provided a number of instructions

_____

are presumed to follow instructions."). Similarly, the verdict form sought a sentencing verdict only as to the carjackings resulting in the deaths of Mr. McCloskey and Mr. Rizzo, not as to the murder of Mr. Whitney. Doc. No. 2834 at 27.

throughout the trial reminding jurors of the limits placed on what evidence was relevant when considering future dangerousness, and requiring them not to consider any facts in aggravation beyond those specifically enumerated as aggravating factors on the verdict form, e.g., Doc. No. 2758 at 73; Doc. No. 2820 at 33.

Sampson's fifth complaint cites language from the government's closing argument which, he says, impermissibly urged jurors to disregard mitigating factors. Doc. No. 2930 at 42-43. He faults the government for "trivializing mitigation" as a general matter by arguing that the large number of alleged factors indicated that the factors lacked "quality." Id. at 43. This aspect of the government's closing – which essentially asked jurors to view many of the factors alleged as "trivial" and unworthy of "much weight at all," Doc. No. 2951 at 92-93 – was within the bounds of proper argument.

However, Sampson also asserts – and the Court agrees – that the government veered from the bounds of proper argument, and from the law as this Court explained it, when addressing a particular mitigating factor during the rebuttal argument. Doc. No. 2930 at 43. The factor, which required jurors to determine whether "Mr. Sampson's post-arrest statements led to the recovery of Jonathan Rizzo's body," Doc. No. 2834 at 21, was included on the verdict form for the jury's consideration (as it had been during the 2003 trial), thereby reflecting the Court's assessment that, if proven, it was mitigating as a matter of law. Doc. No. 2820 at 44-45. The government characterized the factor as "perverse," and beseeched the jury not to allow Sampson to "profit" from it. Doc. No. 2951 at 256. Such comments are tantamount to a request that jurors disregard the law as the Court found and applied it in this case, and are improper.[28]

---

[28] The government was free, of course, to argue that the evidence did not establish Sampson's confession had aided law enforcement in locating Mr. Rizzo's body (i.e., that the factor was not proven at all), and/or that the jury should place little weight on this particular factor in

The Court concludes, however, that these few sentences in the government's rebuttal argument did not work a miscarriage of justice here. At least one juror found the relevant mitigating factor proven. Doc. No. 2834 at 21. The Court presumes that jurors followed its clear instructions requiring them to treat proven mitigators as mitigating during the weighing process (as opposed to disregarding them or, worse, treating them as aggravating). Doc. No. 2820 at 44-45. There is no basis for finding prejudice arising from the government's improper but brief commentary on this one mitigator.[29]

Sixth, Sampson claims that one sentence from the government's closing argument "impermissibl[y] demoniz[ed]" him. Doc. No. 2930 at 44. The relevant comment – "Those are statements of pure depravity, pure cruelty, pure evil," Doc. No. 2951 at 58 – related to the manner in which Sampson had described killing Mr. McCloskey during a tape-recorded confession. It was made, appropriately, when the government was addressing the evidence it suggested proved the heinousness aggravator (a factor which asked jurors to consider Sampson's intent when he stabbed Mr. McCloskey). Id. at 56-59. It was not a gratuitous or pejorative pronouncement that the defendant was evil, as other courts have deemed improper. Cf. Doc. No. 2930 at 44 (citing cases in which defendants were called "demonic," "fiends," and "monsters").

---

determining the appropriate sentence. Although the government likely intended to make the latter argument, the Court is concerned about the specific words it used (i.e., "perverse," "profit," and "credit") and the manner in which it used them. Even if similar language was used in the 2003 trial, the Court explicitly flagged this issue for counsel before closing arguments, stated its view that the government had crossed the line into improper argument on this point during the previous trial, and explained the legal limitations it perceived regarding this aspect of the government's argument. Doc. No. 2951 at 25-27.

[29] It also bears noting that the defense did not raise an objection to this aspect of the closing argument at trial. In addition, the fact that jurors did not find Sampson had demonstrated acceptance of responsibility for his crimes by confessing, revealing the location of evidence, and pleading guilty is not evidence that these comments constituted prejudicial prosecutorial misconduct. See Doc. No. 2834 at 22-23.

Finally, Sampson challenges another passage from the government's closing as having argued facts that were not in evidence. Doc. No. 2930 at 44-45. In the government's discussion of the victim impact evidence offered by Mr. Rizzo's family, counsel argued: "Again, for what? For what? Because Gary Sampson wanted a car? The Rizzos now, instead of gathering around a Christmas tree, have to gather around Jonathan's grave?" Doc. No. 2951 at 89. This was improper, says Sampson, because there was no evidence offered to prove that the Rizzos no longer gather around a Christmas tree or that they visit Mr. Rizzo's grave on Christmas, and because it constituted an emotional ploy that was particularly potent in an argument given ten days after Christmas. Doc. No. 2930 at 45. This objection was overruled when made at trial and, for the same reasons, fails to warrant relief now. <u>See</u> Doc. No. 2951 at 114-15; <u>see also</u> Tr. Jury Trial Day 38 (Nov. 17, 2016), Doc. No. 2865 at 133 (reflecting testimony by Mr. Rizzo's mother that he was buried). The government's comment was fair argument from the evidence; it was not misconduct.

### 4. *Cumulative Challenge*

Sampson concludes his prosecutorial misconduct claim by arguing that the cumulative effect of the series of comments he identified worked a miscarriage of justice and violated his right to a fair trial. Doc. No. 2930 at 45-46. Of the twelve specific objections Sampson included in this claim, seven of them pertained to statements the Court has found were not misconduct at all. Considered in the context of the entire months-long trial, the five statements that were improper were relatively isolated, do not suggest a deliberate effort by the government to inject inadmissible information into the proceedings, and were neither individually nor cumulatively prejudicial, especially in light of the Court's explicit instructions and the jury's careful verdict

(as reflected by the time jurors spent deliberating and the number of special questions they were required to – and did – answer in reaching their sentencing decision).

In sum, the Court does not find prosecutorial misconduct in this case that "so poisoned the well" that it resulted in a miscarriage of justice or undermines confidence in the jury's verdict.[30]  Joyner, 191 F.3d at 54.

### F.  August 1, 2001 Interrogation

In his sixth claim, Sampson asserts the Court erred in permitting the government to admit at trial the last in a series of four confessions Sampson made to various police detectives after his arrest.  Doc. No. 2930 at 46-50.  He claims the statement was made during an interrogation that violated his Sixth Amendment right to counsel.  Id.; see also Doc. Nos. 1899, 2032 (containing the original defense filings related to this issue, with attached exhibits).

This Court rejected Sampson's pretrial challenge to admission of the relevant confession after concluding that United States v. Coker, 433 F.3d 39 (1st Cir. 2005), doomed Sampson's Sixth Amendment claim.  See Doc. No. 2258 at 11-13 (finding the federal offenses at issue are distinct from the state offenses charged at the time of the interrogation, that the offenses issued from separate sovereigns, and that Sampson had not submitted evidence sufficient to warrant an evidentiary hearing to explore whether an exception to the dual sovereignty doctrine applied).

---

[30] In reaching this conclusion, the Court has not reasoned that the government's evidence in this case was so strong that any improper statement or statements by the government were unlikely to have impacted the verdict.  The Court seriously doubts whether that ever could be said in a case such as this one, where a vigorous defense and substantial mitigating evidence were presented, where the FDPA permits jurors to consider a broad range of relevant information and asks them to make an intensely personal decision in weighing the various factors to determine the appropriate sentence, and where the jury returns a verdict reflecting findings that both parties had succeeded in proving certain factors in their favor and failed to prove others.  As such, the Court's assessment of this claim turns on the first two prongs of the Zarauskas analysis, without reliance on the third.

Although Sampson identifies legitimate concerns about the implications of applying <u>Coker</u> and the dual sovereignty doctrine in the circumstances presented here, the First Circuit explicitly has considered such concerns and rejected the cases from other jurisdictions which Sampson identifies as having adopted the "correct" view. 433 F.3d at 44-47; Doc. No. 2973 at 26-27. This Court is not empowered to proclaim <u>Coker</u> and its careful analysis of these questions "erroneous" as Sampson urges. Doc. No. 2973 at 26.

Accordingly, Sampson's challenge to his August 1, 2001 interrogation did not justify suppression of his final confession, nor does it justify awarding a new trial.

### G. <u>Confessions</u>

Sampson claims the Court's denial of objections he raised to the admissibility of specific portions of his confessions was prejudicial error. Doc. No. 2930 at 51-52. In a written pretrial motion and oral requests during trial, Sampson identified excerpts from his confessions that he asserted were more prejudicial than probative and/or amounted to unnoticed aggravating evidence. <u>Id.</u>; Doc. No. 1898-2; Doc. No. 2758 at 8-15; Tr. Jury Trial Day 34 (Nov. 10, 2016), Doc. No. 2764 at 223-32; Tr. Jury Trial Day 35 (Nov. 14, 2016), Doc. No. 2861 at 33-38.

In overruling Sampson's objections and permitting the government to include the challenged statements in its presentation of the confessions to the jury, the Court noted that the statements all had been admitted during Sampson's first trial, found that Sampson had adequate notice of the government's intent to use the statements again, determined that the statements were within the scope of relevant and admissible evidence on future dangerousness, and concluded that the statements satisfied the balancing test set forth in 18 U.S.C. § 3593(c). Doc. No. 2688; Doc. No. 2861 at 39; Doc. No. 2758 at 13-15. Nothing that has transpired since

the initial rulings on these statements changes the Court's analysis of their admissibility or suggests that the government's use of them undermines confidence in the jury's verdict.

### H. Defensive Wounds

Next, Sampson asserts that the three medical examiners who testified for the government impermissibly speculated that certain wounds were defensive in nature or were the result of a struggle.[31] Doc. No. 2930 at 52. According to Sampson, such testimony is prohibited by Rule 702 and fails the § 3593(c) balancing test. Id.; Doc. No. 2861 at 37-38; Doc. No. 2762 at 6-8; Tr. Jury Trial Day 29 (Nov. 3, 2016), Doc. No. 2759 at 20-23; Doc. No. 2649.

The Court overruled Sampson's objections to these aspects of each medical examiner's testimony. All three doctors were qualified as experts in this case, explained the basis for the opinions they rendered – including their prior experience examining similar types of wounds – and were cross-examined pointedly about these issues. Doc. No. 2760 at 82-83, 88-90; Doc. No. 2762 at 180-83; Tr. Jury Trial Day 33 (Nov. 9, 2016), Doc. No. 2763 at 85-89; Doc. No. 2861 at 58-59, 61-64. Sampson has cited no decisions in which any court has precluded a properly qualified medical examiner from offering an expert opinion as to the defensive nature of a wound. See State v. Gamester, 821 A.2d 1076, 1078 (N.H. 2003) (finding no error where precisely the same sort of testimony as that offered here was elicited by state prosecutors and defense counsel in a murder trial); cf. United States v. Sampson, 486 F.3d 13, 49 (1st Cir. 2007)

---

[31] Dr. William Zane testified that wounds to Mr. McCloskey's left hand were "consistent with defensive-type wounds." Tr. Jury Trial Day 30 (Nov. 4, 2016), Doc. No. 2760 at 83. Dr. Richard Evans testified that abrasions on Mr. Rizzo's forearm and wounds on his knee were "consistent with being defensive" in nature. Doc. No. 2762 at 181-83. And Dr. Thomas Andrew testified that the absence of certain types of injury to Mr. Whitney suggested he had struggled against the ligature around his neck. Doc. No. 2861 at 58-59.

(acknowledging, without questioning the propriety of, evidence in the original trial "that McCloskey suffered several defensive wounds").

Under these circumstances, the challenged testimony was plainly relevant, was more probative than prejudicial, and, thus, was admissible pursuant to § 3593(c). Permitting the medical examiners to offer this testimony was not error, nor did it inject an "unacceptable level of risk that an unreliable death sentence has been handed down." Doc. No. 2973 at 17.

I. Prison Misconduct

In his ninth claim, Sampson asserts that the Court erroneously permitted the government to present three categories of "prejudicial prison misconduct." Doc. No. 2930 at 53-62. The first category includes what Sampson characterizes as "evidence of illusory threats and threats unaccompanied by assaultive action, as well as evidence of [Sampson's] vulgar, racist, sexist, and homophobic language." Doc. No. 2930 at 53. This evidence relates to incidents of misconduct occurring while Sampson was on death row at the United States Penitentiary in Terre Haute, Indiana ("USP-Terre Haute") after his 2003 trial. The government offered this evidence in support of the nonstatutory aggravator alleging Sampson presented a future danger to prison guards and other inmates. The scope of admissible evidence from this time period was the subject of substantial pretrial motion practice, briefing, and evidentiary hearings. E.g., Doc. Nos. 2237, 2407, 2408, 2410, 2423. The Court's previous rulings on this subject explain the Court's analysis of the admissibility of this evidence. Doc. Nos. 2305, 2507; see also Sampson II, 335 F. Supp. 2d at 224-26 (explaining Judge Wolf's rulings on admissibility of prison misconduct evidence, including threats of violence by Sampson); Doc. No. 2015 at 43 (reflecting Judge Wolf's view of the scope of admissible evidence of misconduct at USP-Terre Haute). Nothing that has occurred since those decisions has altered the Court's analysis.

The second category of prison misconduct evidence Sampson challenges are statements he made in connection with disciplinary proceedings or investigations of three incidents that occurred in state prisons. Doc. No. 2930 at 58-59. As Sampson concedes, these statements were admitted during the 2003 trial. Id. at 59. Although Judge Wolf later noted concerns about the admissibility of such statements in the context of USP-Terre Haute evidence proffered for use in the new penalty-phase trial, see id. at 56-57 (quoting transcripts), this Court – exercising its discretion under § 2255 and the § 3593(c) balancing test – determined that those concerns did not justify precluding the evidence Sampson challenges here. See Doc. No. 2677 (ruling on the issue in an electronic order); see Tr. Sealed Hr'g (Nov. 9, 2016), Doc. No. 2765 at 9-25 (discussing the issue and the parties' arguments). The same considerations cause the Court to reject Sampson's present challenge to this evidence.

The third category contains only one incident – the 1994 discovery of a shank in Sampson's Connecticut jail cell. Sampson objects to the government's failure to call a witness with personal knowledge of the incident. Doc. No. 2930 at 60-62. Evidence about this incident was admitted in 2003, and the Court permitted the challenged testimony in this trial after balancing the same considerations that guided its decision to admit evidence of Sampson's statements in disciplinary proceedings. Doc. No. 2677.

For the reasons underlying the Court's previous rulings on these issues, the admission of the challenged evidence related to Sampson's misconduct in prison does not justify a new trial.[32]

---

[32] Despite admission of the prison misconduct evidence Sampson challenges, the government failed for a second time to prove that Sampson presents a future danger in prison – the only aggravator to which this evidence was relevant. The Court assumes jurors followed instructions requiring them not to weigh in aggravation any factors they did not unanimously find proven. Doc. No. 2820 at 33. To the extent Sampson views the prison misconduct evidence as having been prejudicial because it "encouraged the jury to dislike" him, Doc. No. 2930 at 59, that is not a legal basis for finding the evidence was erroneously admitted. There was plenty of plainly

J.   <u>Victim Impact Testimony</u>

Next, Sampson asserts that the Court's "fail[ure] to appropriately limit victim impact testimony" resulted in the admission of "highly emotional and prejudicial . . . testimony" which, Sampson says, invited jurors to return a verdict based on passion rather than reason.  Doc. No. 2930 at 62-64.  The general constitutional limitations on victim impact testimony applicable in death penalty proceedings – as well as specific limitations tailored to the evidence here – have been set forth in detail in previous decisions in this case.  <u>See</u> Doc. No. 2864 at 226-35 (discussing and ruling on a challenge to specific aspects of the government's revised proffer, Doc. No. 2946, including testimony about a Boston College High School blanket and the Christmas following the victims' deaths); Doc. No. 2430 (ruling on a defense pretrial motion); <u>Sampson II</u>, 335 F. Supp. 2d at 186-89 (outlining the general legal standards applicable to such evidence and explaining how those standards applied in the context of the 2003 trial); <u>see also</u> Tr. Sealed Hr'g (Nov. 17, 2016), Doc. No. 2866 at 30-31 (denying motion for mistrial based on victim impact testimony, citing testimony by Mr. Rizzo's brother who was not called in 2003 and song lyrics quoted by Mr. Rizzo's mother).  Sampson's post-verdict challenge to this evidence fails for the same reasons his earlier attacks on it foundered.  As such, the Court incorporates its previous decisions on this subject and need not repeat them.  A few observations as to the manner in which the evidence factored into the retrial, however, are worth emphasizing.

First, the victim impact testimony in this case consumed less than one of the eleven trial days spent on the government's case in chief, and spanned only about seventy-five pages of a

---

relevant and properly admissible evidence in the government's case – for example, Sampson's own descriptions of his three gruesome murders – that no doubt had the same effect.

voluminous trial transcript.[33]  Second, the number of victim impact witnesses permitted to testify

in this case – even with the addition of Mr. Rizzo's youngest brother – was not excessive

compared to other cases, and was in line with the number Judge Wolf contemplated permitting in

2003.  See Sampson II, 335 F. Supp. 2d at 188-89 (finding "three to four family members per

victim in this case was not too many *per se*," and citing United States v. Barnette, 211 F.3d 803,

818 (4th Cir. 2000), a case with two victims in which a total of seven family members testified).

Third, the testimony of the victims' family members was followed by an expansive mitigation

presentation by the defense that lasted for the next nineteen trial days.  In fact, the jury did not

begin its deliberations until approximately seven weeks after the victim impact testimony was

presented, due to the length of the defense presentation, the rebuttal and surrebuttal evidence,

and breaks for holidays that occurred during the trial.  Finally, the verdict form required jurors to

proceed methodically through the carefully structured decision-making process mandated by the

FDPA, which included individually considering and responding to dozens of mitigating factors

(and, with respect to each one, considering the factor twice – once for each offense).

The testimony of the victims' family members was undeniably powerful, visibly moving

many people in the courtroom.  However, any risk that it rendered jurors unable to comply with

the Court's instructions, or prevented them from reaching a verdict based on reason rather than

passion, was ameliorated by the circumstances listed above.[34]  See Payne v. Tennessee, 501 U.S.

808, 832 (1991) (O'Connor, J., concurring) ("I do not doubt that the jurors were moved by this

---

[33] Sampson's claim that the evidence "went far beyond the 'brief glimpse' into the victim's life"
that the law permits is undermined by the fact that Mr. Rizzo's mother summarized her oldest
son's nineteen years of life and the impact his death has had on her in testimony that occupies
not even seven pages of the trial transcript.  Doc. No. 2865 at 128-34.
[34] To the extent Sampson's claim relies on statements by a member of the jury to the press
following the verdict, Federal Rule of Evidence 606(b) prevents the Court from considering, let
alone relying on, such information.

testimony – who would not have been?  But surely this brief statement did not inflame their passions more than did the facts of the crime . . . .  I cannot conclude that the additional information provided by [the victim impact] testimony deprived petitioner of due process.").  Accordingly, Sampson's tenth claim does not merit relief.

K.  Evidentiary Rulings at Trial

Sampson next challenges nine evidentiary rulings the Court made during his trial.  The Court discerns no error in any of the challenged rulings, nor any prejudice flowing from them.

First, a Bureau of Prisons witness familiar with the Special Confinement Unit ("SCU") at USP-Terre Haute, where federal death row inmates are housed, characterized inmates in the SCU as having "the prevalence [sic] to be extremely violent," as men who "don't deal with things the same way that you and I" do, and as going "instantly" to "being violent."  Doc. No. 2764 at 166-67.  Sampson characterizes this as improper opinion testimony by a witness who was not qualified as an expert.  Doc. No. 2930 at 65.  The Court views the relevant exchange as a factual description of the SCU and the population housed there – a description which, when it began to tread into territory the Court had instructed counsel to avoid (i.e., information about inmates other than Sampson), was interrupted promptly by a defense objection, and redirected immediately by the government guiding the witness back to relevant information via leading questions.  Doc. No. 2764 at 166-67.  The Court sustained the defense objection and made clear that the government was not to argue that the witness had provided evidence of Sampson's (or any other inmate's) propensity for violence, largely due to the Court's general ruling that information about the characteristics of inmates other than Sampson was irrelevant and

inadmissible in this case.  Tr. Jury Trial Day 39 (Nov. 21, 2016), Doc. No. 2867 at 7-9.  The

government complied.[35]

    <u>Second</u>, a USP-Terre Haute corrections officer tasked with delivering inmate commissary

orders testified that Sampson had attempted to assault him by thrusting a broken broomstick

through the open food slot on Sampson's cell door.  The witness expressed his belief he "would

have been stabbed" if he hadn't reacted and moved away from the door in time.  Doc. No. 2864

at 105.  Even if this comment, standing alone, constituted improper opinion testimony or (more

likely) speculation, the government offered a complete video of the relevant incident, and the

witness was exhaustively cross-examined on the subject, permitting jurors to assess for

themselves his credibility, the reasonableness of his interpretation of the event, and the severity

of Sampson's conduct.  Sampson has not demonstrated that this testimony resulted in a

miscarriage of justice, particularly where the jury did not deem him a future danger.  Doc. No.

2834 at 6.

    Through the same witness, the government offered as an exhibit a screenshot captured

from the video of the incident.  Doc. No. 2864 at 108-09.  The blurry photograph showed a

zoomed-in view of Sampson's hand protruding through the slot in his cell door, holding the

broken broomstick.  Although the defense did not object to admission of the video, it objected to

the extracted photograph, citing the Bureau of Prisons' failure to preserve the broomstick itself.

---

[35] The passing comment by this witness about SCU inmates had been preceded by two witnesses
who testified about Sampson having possessed shanks in state prisons in the 1990s, and was
followed by testimony by more than a dozen witnesses describing specific instances in which
Sampson engaged in threatening or violent conduct while in various prisons.  Despite this
extensive testimony – and despite the comments challenged here – jurors did not unanimously
find that the government had proven Sampson posed a future danger to others while in prison.
Even if admission of the challenged comments were error, Sampson has not established that they
were prejudicial to him.

Id.; Doc. No. 2930 at 66. Where the photograph was taken from a concededly admissible video, the defense had ample opportunity to cross-examine several witnesses to the incident about the appearance of the broomstick as well as their failure to preserve it, and the jury did not find the government had proven future dangerousness in any event, admission of this exhibit was neither erroneous nor unduly prejudicial to Sampson.[36]

Third, the defense sought to offer into evidence investigative reports prepared by law enforcement agencies related to conditions at a school and a prison in which Sampson once was housed. At least one defense expert had reviewed the reports and relied on information they provided about conditions to which Sampson was exposed during his time living in each environment. The reports were long – one spanned thirty-seven pages, and the other more than forty – and neither directly pertained to Sampson. As such, the Court allowed Sampson to elicit testimony about the substance of the reports, but precluded him from admitting the reports as exhibits. This ruling appropriately balanced Sampson's right to present relevant mitigating evidence against the Court's duty to avoid confusing or misleading the jury with lengthy documents having only attenuated connections to Sampson. Tr. Jury Trial Day 54 (Dec. 15, 2016), Doc. No. 2911 at 20-26; see 18 U.S.C. § 3593(c) (permitting exclusion of evidence when its "probative value is outweighed by the danger of . . . confusing the issues, or misleading the jury").

---

[36] In asserting prejudice, Sampson argues that "[t]here is no way of knowing if, for example, only one juror found the future danger aggravator not proven." Doc. No. 2930 at 66. It is unclear to the Court why this should matter. The jurors were instructed in no uncertain terms that they were not to consider and weigh in aggravation any factors not specifically alleged by the government and found proven by all twelve jurors. Doc. No. 2820 at 33, 46. The Court presumes jurors followed all of its instructions, including these. Sampson III, 486 F.3d at 47.

Fourth, the Court precluded a defense witness who knew Sampson from a New Hampshire jail from offering his opinion that Sampson had been a victim of sexual assault while in prison. Sampson argues this would have constituted permissible lay opinion, in light of observations the witness made of Sampson during their time sharing a prison cell. See Tr. Jury Trial Day 41 (Nov. 28, 2016), Doc. No. 2981 at 7-8 (arguing the witness had heard Sampson cry out during the night, and had seen him walk "in a guarded manner protecting the rear along the wall"). The Court found then, and adheres to the view, that whether a person's behavior indicates he was a victim of sexual abuse is not "something in the scope of ordinary experience and understanding" and, thus, is not generally within the scope of permissible lay opinion testimony. Id. at 8, 33-34. Sampson has not established that the witness's "individual experience and knowledge . . . establish his . . . competence" to offer the relevant testimony. United States v. Paiva, 892 F.2d 148, 157 (1st Cir. 1989). Moreover, the Court explicitly permitted the defense to elicit the facts underlying the proffered opinion testimony, to argue what conclusions jurors should draw from those facts, and to ask appropriately qualified expert witnesses to opine on the meaning of those facts. Id. at 33. Sampson has cited no authority establishing that this ruling was error.[37]

Fifth, the government's cross-examination of three defense witnesses included questioning related to the offenses for which those witnesses had been convicted and incarcerated. In his post-trial motion, Sampson argues for the first time that permitting such "aggressive cross-examinations on the details of the witness[es'] prior convictions" was error under First Circuit law and the Rules of Evidence, and that it "poisoned these crucial witnesses

---

[37] In opposing this challenge, the government gratuitously references the crime for which the witness at issue was serving time when he met Sampson. Doc. No. 2964-1 at 39. That information is irrelevant to the evidentiary question at issue.

in the eyes of the jury."[38]  Doc. No. 2930 at 70.  Even if questioning about the factual

underpinnings of a witness's prior convictions normally is not appropriate, see Doc. No. 2930 at

69-70 (citing Rule 609 and cases construing it), the portions of the government's cross-

examinations Sampson identifies here were aimed, at least in part, at the credibility of the three

relevant witnesses.  Specifically, the government's examinations suggested that two of the

witnesses had inaccurately recited or selectively omitted details when describing their offenses

on direct examination, and that the third had lied about his offense when interrogated by police at

the time of his arrest.  See Doc. No. 2880 at 94-96; Doc. No. 2881 at 35-39; Tr. Jury Trial Day

49 (Dec. 8, 2016), Doc. No. 2891 at 63-68.  Moreover, the challenged portions of the

examinations were limited to between two and five transcript pages, within testimony that

spanned between thirty and fifty transcript pages per witness.  Such questioning was permissible

in these circumstances.

Sixth, Sampson called as a witness the former supervisor at Myles Standish State Forest,

who had signed an incident report after Sampson encountered park rangers there between his

murders of Mr. McCloskey and Mr. Rizzo, and had described Sampson as having "a psych

disorder."  Tr. Jury Trial Day 44 (Dec. 1, 2016), Doc. No. 2884 at 179, 192.  In explaining the

basis for that characterization, the witness referenced his experience as "caregiver to a person

with mental illnesses."  Id. at 193.  The government objected to further elaboration, and the

Court sustained the objection.  Id.  Sampson's counsel did not protest the ruling.  Id.  He

---

[38] Sampson concedes that he did not object to these lines of questions during trial as to two of the
three witnesses he identifies.  Doc. No. 2930 at 70.  He explains this failure by citing the Court's
"earlier ruling" as to the cross-examination of the first witness.  Id.  The "earlier ruling"
referenced, however, was the overruling of a cursory relevance objection.  Doc. No. 2880 at 96.
At no time before, during, or after that witness's testimony did Sampson press the Rule 609
argument he pursues now.

complains now, though, that the ruling effectively precluded him from rebutting the assertion by a park ranger who testified earlier in the trial that this defense witness lacked specialized training in "diagnosing or observing mental health disorders." Doc. No. 2761 at 216. Sampson's complaint, however, is undermined by the fact that the defense witness did testify, without objection, about the factual basis for the characterization he included in his report, and about his "prior background . . . including state police training" in this area. Doc. No. 2884 at 192-93. In these circumstances, the Court's ruling struck a balance under § 3593(c) by permitting rebuttal of the government's evidence and providing context to allow jurors to weigh the witnesses' testimony on this point, while preventing testimony on extraneous matters likely to confuse and mislead the jury.

Seventh, Sampson offered extensive testimony by "an expert on prison conditions [and] the psychological effects of adverse conditions of confinement." Tr. Jury Trial Day 45 (Dec. 2, 2016), Doc. No. 2886 at 50. That expert opined, in part, that Sampson's experiences in state prison before his capital offenses had transformed him from "prey" to "predator." Id. at 129, 155-56. The Court permitted the government to question the expert about a state prison record which included a claim by Sampson that he was thrown out of school in seventh grade after pulling a switchblade on a teacher. Id. at 162-65. This was fair cross-examination of an expert using a report which the expert had reviewed in preparing his opinion in this case (and upon which other experts in his field reasonably would rely in rendering such an opinion). Furthermore, it involved a statement attributed to Sampson, and the defense had ample opportunity to demonstrate – through this witness, id. at 173-74, and others – that the statement was not supported by Sampson's official school records.

Eighth, during its cross-examination of a neuropsychologist who testified for the defense, the government sought to play an audio recording of a telephone call Sampson made from prison at a time when mental health experts were examining him in preparation for the 2003 trial. On the call, Sampson boasted that he was "dancing around" the experts who were evaluating him. Tr. Jury Trial Day 50 (Dec. 9, 2016), Doc. No. 2892 at 141. Sampson asserts that the Court erred in allowing the government to use the recording for a variety of reasons. Doc. No. 2930 at 72-74. The Court carefully considered Sampson's objections in colloquies with counsel during trial, and permitted the government to use the tape only after a proper foundation had been laid. Doc. No. 2892 at 114-23, 131-42. Once the witness – who had administered tests to Sampson and drawn conclusions therefrom, and also had reviewed previous testing of Sampson by other experts – conceded he "would take . . . into account" when evaluating an individual evidence that the examinee "was intending to beat" a neuropsychological test, id. at 139, there was a foundation for the government to ask whether Sampson's boasting on the phone call "affect[ed his] opinion on the validity of the" various tests he analyzed in his report on Sampson, id. at 141-42. This line of cross examination was appropriate under the circumstances.

Ninth, with the government's consent, Sampson read into the record declarations by six individuals who had been interviewed by defense investigators but had died before the 2016 trial. Tr. Jury Trial Day 53 (Dec. 14, 2016), Doc. No. 2910 at 100-28, 131-43. Sampson now claims that, as to three declarations, the Court erroneously permitted the government to respond by reading into the record a list of prior criminal convictions of the declarants. This argument fails. To start, it is based on a view that strict adherence to Federal Rule of Evidence 609 would have precluded the government's use of a number of the relevant prior convictions. Strict adherence to the Federal Rules of Evidence as to these declarations, however, would have precluded their

use by the defense entirely.  Fed. R. Evid. 802, 803, 804(b).  Furthermore, Sampson's assertion

that the Court ruled as it did without sufficiently explaining its reasoning is demonstrably false.

Doc. No. 2930 at 74.  Indeed, the record reflects that the Court explicitly set out its initial

thinking on the issue, promptly acknowledged a mistake in its understanding of Rule 609(b), and

then articulated its basis for permitting specified categories of prior convictions to be read by the

government, citing the correct legal standards.  <u>See</u> Doc. No. 2910 at 5-11 (permitting use of

felony convictions within ten years of December 14, 2003; all crimes of dishonesty without

regard to timing; crimes for which witnesses who knew Sampson in prison were incarcerated

when they encountered him; and a crime which one witness had committed with Sampson).  In

ruling on this issue, the Court considered the relevant Rules of Evidence, the probative value and

prejudicial effect of the criminal histories involved, and the equitable considerations that guide

the exercise of discretion under § 2255.  The same considerations lead the Court to reject the last

of Sampson's evidentiary challenges.

      L.  <u>Jury Instructions</u>

Sampson's twelfth claim "reiterates" objections he asserted to the Court's final jury

charge.  Doc. No. 2930 at 75-76.  He includes a list of objections he wishes to "highlight[]" here,

citing to the pages in his submission responding to the Court's draft instructions (Doc. No.

2805), the pages in the final charge where the relevant issues appear (Doc. No. 2820), and the

location in the trial transcript containing the Court's discussion and ruling on each issue (Tr. Jury

Trial Day 59 (Jan. 3, 2017), Doc. No. 2956).  The Court overrules each of Sampson's objections

now for the same reasons it rejected them during the trial.  <u>See generally</u> Doc. No. 2956 at 12-30.

The Court's instructions described the law correctly as to each challenged issue, and in many

instances did so in language similar or identical to the language Judge Wolf used during the 2003

trial.  See Sampson III, 486 F.3d at 36-39 (finding no error in challenged portions of the 2003 charge).[39]

Sampson has not demonstrated that any aspect of the final jury instructions was contrary to the law, let alone resulted in a miscarriage of justice requiring a third trial in this case.

M.  Mitigating Factors

Sampson next challenges the Court's rulings reducing the number of mitigators from the 308 factors he originally proposed, Doc. No. 1868-1, to the 115 factors ultimately included on the verdict form, Doc. No. 2834 at 7-25.  In particular, Sampson identifies five categories of factors which he asserts the Court improperly struck, Doc. No. 2930 at 77-88, and faults the Court for not requiring jurors to denote on the verdict form how many of them found each alleged factor proven, id. at 88-89.

The Court previously explained its reasoning for finding that the first three categories of proposed mitigators – factors describing the two sentencing options available, factors related to the unavailability of capital punishment under Massachusetts law, and factors asserting contributory negligence by third parties – do not fall within the broad definition of mitigating factors the Court applied in this case.  Doc. No. 2259 at 8-11.  The Court adheres to that reasoning; elimination of these factors from the list presented to the jury was not error.

---

[39] The instruction to which Sampson objects most forcefully here permitted jurors to find "serious physical abuse" based on wounds inflicted both before and after the victim's death. Doc. No. 2820 at 22.  The Court overruled this objection for two primary reasons.  First, Judge Wolf gave the instruction in 2003, and the First Circuit generally approved the portion of Judge Wolf's instructions regarding the heinousness aggravator.  Second, the cases Sampson cites as precluding consideration of wounds inflicted after death involved post-mortem abuse distinct from the act of killing the victim (e.g., dismemberment of the body after the defendant knew the victim had died).  Here, there was no evidence from which jurors could have concluded that Sampson intentionally engaged in that type of post-mortem abuse of either victim.

Sampson's arguments as to these three categories of proposed mitigators are further undermined by several additional facts. First, the Court unambiguously instructed jurors that, under the law, the only two sentencing options available were death and life imprisonment without the possibility of release, that there is no federal parole, and that Sampson truly would spend the rest of his life in prison if the jury imposed a life sentence. E.g., Doc. No. 2820 at 1-2; cf. Doc. No. 2930 at 77 (listing these facts among those the Court struck). Second, the defense was permitted to offer detailed expert testimony about the conditions in which Sampson would be confined if given a life sentence, and to argue how that information should be considered by jurors. Third, the verdict slip did contain two factors related to this category but specifically tied to Sampson, both of which at least one juror found had been proven. Doc. No. 2834 at 23, 25 (including factors related to the Bureau of Prisons' ability to safely confine Sampson, and the severity of a life sentence for Sampson). And fourth, that jurors in other federal capital trials have elected to write in additional mitigating factors like those Sampson faults the Court for omitting here underscores the fact that Sampson's jurors could have done the same, had they found such facts were both proven and mitigating. See Doc. No. 2930 at 82, 84-85 (citing cases, including some in which jurors wrote in factors such as the state's lack of capital punishment and the contributory actions or inactions of parties besides the defendant); Doc. No. 2834 at 26 (providing space for jurors to add "anything else that matters to any [juror] individually that would reasonably suggest life in prison without the possibility of release is a more appropriate punishment for Mr. Sampson than a sentence of death").

The other two categories of proposed mitigators Sampson accuses the Court of improperly striking include a dozen separate statements about specific head injuries Sampson allegedly suffered, and a series of descriptions of state institutions in which Sampson was

imprisoned before these offenses. Doc. No. 2930 at 86-88. As Sampson implicitly recognizes, Doc. No. 2930 at 87, the Court did not "strike" these factors; it invoked its gate-keeping role and discretion by consolidating sets of related factors in an effort to avoid overwhelming jurors with an unreasonably lengthy verdict form. See Doc. No. 2834 at 7 (including one factor pertaining to Sampson's history of head injuries in lieu of twelve proposed factors separately enumerating such injuries); id. at 12-13 (including consolidated factors related to conditions at Bridgewater, New Hampshire State Prison, and other state prisons).

Two overarching points are worth emphasizing with respect to the Court's orders reducing the number of mitigating factors. First, although the Court struck and consolidated a number of proposed factors, it did not unconstitutionally "exclude consideration of relevant mitigating factors." Doc. No. 2973 at 39. It permitted a broad mitigation presentation by Sampson, including evidence of each alleged head injury, the specific forms of violence that characterized various state institutions in which he was housed throughout his lifetime, the FBI's failure to follow up on Sampson's attempt to turn himself in before the murders, and the conditions that were available to secure and punish him if given a life sentence.[40] The defense was free to argue – and jurors were free to consider – the extent to which evidence on these subjects mitigated against a death sentence in this case. And, as noted above, jurors were free to write in additional mitigating factors on these or other topics, if they believed such factors had been proven and were mitigating here. Second, the Court's adoption of a broad definition of mitigating evidence, Doc. No. 2259 at 7, did not strip the Court of its traditional discretion to

_____

[40] Although the defense elected not to pursue it in this trial, the Court ruled that information about a lawsuit the McCloskey family filed against the FBI arising from its failure to apprehend Sampson before he killed Mr. McCloskey was fair response to the government's victim impact presentation. Doc. No. 2430 at 2-3.

place reasonable limits on the scope and presentation of information to the jury and to protect against irrelevant, duplicative, or otherwise confusing or misleading information, see Sampson II, 335 F. Supp. 2d at 229 (describing court's "gate-keeping role" in "ensuring that the defendant did not present any mitigating factors to the jury that were irrelevant to the decision between life and death, duplicative, or unsupported by reliable evidence").

Sampson's final attack on the manner in which the mitigating factors were presented faults the Court for failing to include a space on the verdict form requiring jurors to note the number of them that found each listed factor proven. Doc. No. 2930 at 88-89; see Doc. No. 2834 at 7 (asking jurors to check "yes" for any factor that "one or more" of them found Sampson had "proven . . . by a preponderance of the evidence"). Although this information was solicited on the 2003 verdict form (and, it appears, often is solicited in federal capital trials), see Doc. No. 2930 at 88, Sampson has cited no authority for the proposition that the FDPA, the Constitution, or any other source of binding federal law mandates that courts require jurors to provide this information, nor has he established that the Court's failure to do so resulted in the arbitrary imposition of a death sentence here.[41] The Court's reasons for not requiring jurors to provide this additional piece of information as to each of the 115 mitigating factors (and, in fact, to provide it twice for each factor) appears in the record and remains unchanged. See Doc. No. 2951 at 35-38 (rejecting argument that such information is necessary to permit a future double jeopardy claim, citing First Circuit decision rejecting similar claim as to nonstatutory

---

[41] The fact that jurors are permitted to consider and weigh anything they personally deemed mitigating, even if they elect not to specify it on the verdict form, Doc. No. 2834 at 26, underscores the lack of any legal basis for Sampson's argument. It would make little sense for the law not to require that defendants be told every factor jurors considered, while mandating that they be informed of the number of jurors who found each listed factor.

aggravators, and noting parties' agreement that any juror could consider a mitigating factor found by any other juror renders the requested information meaningless).

For these reasons, none of Sampson's complaints regarding the presentation of mitigating factors to the jury warrants relief.

### N. Weight of Evidence

In his fourteenth challenge, Sampson argues the jury's verdict was against the weight of the evidence because one or more jurors found that certain mental-impairment-related mitigators were proven, but others were not. Doc. No. 2930 at 89-90. Sampson suggests that because he presented "numerous defense mental status experts" who addressed these topics, while the government presented "only one" such expert, the jury was obligated to accept the defense evidence on these topics (which Sampson characterizes as "overwhelming"). Id. This view blatantly disregards the bedrock principle that jurors are free to accept or reject all or part of the testimony of any witness – including experts, even if such testimony is unrebutted, and regardless how many witnesses testify as to a particular subject. See Doc. No. 2820 at 10-12 (explaining jurors' role in determining witness credibility).

Although one or more jurors believed Sampson suffered from some degree of brain injury and mental illness, the jury rejected the defense mitigation case insofar as it sought to attribute Sampson's offenses to those impairments, or to contend that those impairments meant the government had not proven a sentence of death was justified for Sampson's killing of Mr. Rizzo. This was a rational set of conclusions to draw from the evidence. In other words, the weight of the evidence in this case reasonably permitted jurors to find that the choices Sampson made in late July 2001 were neither meaningfully explained nor substantially mitigated by his

brain injury or other mental impairments.  See Sampson III, 486 F.3d at 50 (rejecting similar

weight-of-evidence argument involving mental illness mitigator after first trial).

O.  Juror 5 Inquiry

Next, Sampson asserts that the Court failed to conduct an adequate inquiry into

comments made by a juror to the courtroom deputy during the defense mitigation case.  Doc. No.

2930 at 90-93.  In brief, a defense expert who already had spent nearly three full trial days on the

witness stand, upon realizing that she might be required to return the following week for further

redirect examination by Sampson's counsel, inappropriately blurted out a comment in front of

the jury about a conflict between the trial schedule and a personal commitment.  See Tr. Jury

Trial Day 55 (Dec. 16, 2016), Doc. No. 2912 at 200.  After leaving the courtroom, one juror

expressed frustration to the deputy clerk about the witness's comment, which she considered

disrespectful of the time jurors and others involved in the trial were investing in the case.  Id. at

209-11.  At Sampson's request, the Court questioned the juror outside the presence of the rest of

the jury on the next trial day.  Tr. Jury Trial Day 56 (Dec. 19, 2016), Doc. No. 2913 at 34-40.

The juror assured the Court that she had been speaking only for herself, that she had not

consulted with other jurors about the issue, and that her momentary frustration would not impair

her ability to consider the case fairly and impartially.  Id.

The Court was satisfied then – and remains satisfied – that no further inquiry on this issue

was necessary.  Id. at 41; see Sampson III, 486 F.3d at 42 (finding no abuse of discretion where

trial court's "swift" response to mid-trial juror issue involved "face-to-face assessment of the

juror's sincerity and of the possibility that other jurors had been contaminated," from which the

trial court "concluded that the interaction was harmless").  Sampson's suggestion that the juror's

answers implied she and other jurors inappropriately had discussed the defense expert's

comment in some location other than the jury room, id. at 40; Doc. No. 2930 at 91-92, is

unreasonable (and borderline frivolous) in light of the totality of the juror's statements and her

demeanor when questioned by the Court.  The post-trial comments referenced in Sampson's brief

have no bearing on the sufficiency of the Court's mid-trial inquiry of this juror, and

consideration of such comments is not permitted in any event.  Fed. R. Evid. 606(b); Sampson

III, 286 F.3d at 51; see Doc. No. 2930 at 93 (quoting media reports).

P.  Denial of Pretrial Motions

Sampson's sixteenth claim renews arguments and objections he raised in a litany of

pretrial motions and motions in limine, all of which the Court previously rejected in whole or in

part.  He identifies fifty-five such motions, divided into three categories, and reasserts two other

motions that remain pending.  Doc. No. 2930 at 93-99.  As to many of the motions, the Court's

previous written decisions resolving the challenges Sampson presented provide legal analysis of

the relevant issues which remains unchanged.  Since Sampson, in most instances, has provided

no new support for the motions, the discussions set out in the previous decisions justifies denial

of Sampson's renewed challenges.

1.  *Constitutional Challenges*

Sampson broadly argues that the Court should reconsider rulings denying twenty-six

pretrial motions raising "objections to the unconstitutional application of the [FDPA] as to him"

in light of the record developed during evidentiary hearings held in United States v. Fell, another

federal capital trial now pending in the District of Vermont (in which Mr. Burt also appears as

lead counsel).  Doc. No. 2930 at 93.  According to Sampson, the evidence developed in the Fell

hearings "thoroughly rebut[s]" any presumption that the FDPA contains safeguards which

effectively protect against constitutional violations.  Id. at 93-94; see United States v. Fell, No.

01-cr-12-01, 2016 WL 7238930, *24-28 (D. Vt. Dec. 13, 2016) (rejecting disproportionality challenge to FDPA, then finding evidence that the death penalty is arbitrarily imposed, but concluding a federal trial court lacks the authority to rule the FDPA unconstitutional on that basis).  There are several flaws in Sampson's invocation of the Fell record in this manner.

First, well over half of the constitutional motions Sampson renews here raise issues upon which the Fell decision and its related hearings appear to have no bearing.  E.g., Doc. No. 1450 (raising a challenge under Apprendi and its progeny to the failure of the indictment to specifically allege nonstatutory aggravating factors); Doc. No. 1486 (arguing it is cruel and unusual to execute defendants with severe mental disorders).  Second, a comparison of the evidence recounted by Judge Crawford in his December 2016 Fell decision with the evidence discussed by Judge Wolf in his decision a year earlier resolving the bulk of Sampson's constitutional motions reveals that, at least as a general matter, both Courts considered the same or very similar sorts of information.  Compare, e.g., Fell, 2016 WL 7238930, at *7-*8 (summarizing research and studies by the Capital Jury Project), with Sampson V, 2015 WL 2962394, at *23-24 (same).

Third, like Judge Wolf, the Fell court acknowledged its authority to take "a fresh look at the manner in which existing [legal] principles" apply to a "new factual record," but found that nothing in the facts developed during the hearings it conducted permitted it to find a constitutional violation in the face of settled Supreme Court precedent governing such claims. 2016 WL 7238930, at *2; accord Sampson V, 2015 WL 2962394, at *4.  Finally, Sampson has not specified which of his previous motions he believes are impacted by the evidence and findings from Fell, nor has he identified any specific evidence that was presented to the Fell court but was not before this Court when the relevant constitutional rulings were rendered.  The

obligation is Sampson's to sift through his dozens of filings related to these issues and their voluminous exhibits, as well as the thousands of pages of transcripts and exhibits submitted in Fell, and to identify for this Court the extent to which there are new facts or legal conclusions that support his constitutional claims. Sampson's summary renewal of a laundry list of previously denied motions – each of which received careful and thoughtful analysis by Judge Wolf in December 2015 – is not sufficient to burden this Court with a duty to conduct that task on Sampson's behalf, particularly where Sampson is ably represented by a team of experienced lawyers. Cf. United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (noting "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

With that preamble, the Court rejects Sampson's renewed constitutional claims for the reasons stated in its previous decisions resolving those claims.[42] Further comment is warranted

---

[42] The motions are listed in section XVI(A) of Sampson's post-trial motion with docket citations to supporting memoranda and exhibits. Doc. No. 2930 at 94-96. The renewed motions which are subject to the same analysis that led to their denial previously and, thus, are not discussed above, are: the Comparative Proportionality motion (Doc. No. 1426, denied without prejudice as not ripe in Sampson V, 2015 WL 2962394, at *7); the Reintroduction motion (Doc. No. 1430, denied in Sampson V, 2015 WL 2962394, at *26-27); the Delay motion (Doc. No. 1434, denied in Sampson V, 2015 WL 2962394, at *30-31); the Grand Jury Special Findings motion (Doc. No. 1436, denied in Doc. No. 2082); the Public Executions motion (Doc. No. 1438, denied without prejudice as not ripe in Sampson V, 2015 WL 2962394, at *7); the Lethal Injection motion (Doc. No. 1443, denied without prejudice as not ripe in Sampson V, 2015 WL 2962394, at *7); the Grand Jury Presentment motion (Doc. No. 1450, denied in Sampson V, 2015 WL 2962394, at *29-30, and Doc. No. 2283 at 2-8); the Standard of Proof motion (Doc. No. 1452, denied in Sampson V, 2015 WL 2962394, at *28-29, and Doc. No. 2283 at 2-8); the Systematic Impairment motion (Doc. No. 1460, denied in Sampson V, 2015 WL 2962394, at *22-24); the Death Qualification motion (Doc. No. 1462, denied in Sampson V, 2015 WL 2962394, at *27-28); motions to preserve the right to make future filings (Doc. Nos. 1464, 1471, and 1475, denied in Sampson V, 2015 WL 2962394, at *32, and now moot); the Catchall Constitutional motion (Doc. No. 1466, denied in Sampson V, 2015 WL 2962394, at *32); the Authorization Standards motion (Doc. No. 1469, denied in Sampson V, 2015 WL 2962394, at *26 n.22); the Sullivan motion (Doc. No. 1473, denied in Sampson V, 2015 WL 2962394, at *25); the Distortion motion

now only regarding those motions as to which the Court has discerned a change in the underlying facts or law that merits consideration. There are eight such motions.

The Unguided Discretion motion, Doc. No. 1428, renewed just before the Court imposed sentence in February 2017, Doc. No. 2899, is meritless in part, and is not ripe in part.[43] In the motion, Sampson advances two separate challenges to a provision of the FDPA requiring federal trial courts located in states which do "not provide for implementation of a sentence of death" to "designate another State, the law of which does provide for the implementation of a sentence of death," where the sentence will be implemented. 18 U.S.C. § 3596(a). He first argues that the FDPA is unconstitutional because it "contains no legal standard whatsoever to guide a court in choosing among the many states that authorize the death penalty." Doc. No. 2900 at 4. This "unbridled discretion," says Sampson, denies him due process. Id. at 8.

Sampson's due process challenge fails. He cites no decision in which any federal court has adopted the view he espouses. The cases he does cite involve the selection and imposition of various sanctions in criminal and civil contexts, rather than the implementation of lawfully selected punitive measures. See id. at 9-13 (discussing cases concerning issues such as when acquitted defendants may be required to pay court costs and when punitive damages may be awarded). Sampson cites no legal authority, nor any factual basis, that would support a finding that the Court's selection of Indiana as the location of his future execution places any burden on him (separate and apart from the burden of his lawfully imposed death sentence) and, thus,

---

(Doc. No. 1477, denied in Sampson V, 2015 WL 2962394, at *11 n.11); and the Ashcroft motion (Doc. No. 1479, denied in Sampson V, 2015 WL 2962394, at *26).

[43] This motion was not ripe when presented to Judge Wolf before the second penalty-phase trial, but consideration of its merits is appropriate now because "at retrial the jury again f[ound] that Sampson's execution is justified and Sampson [has] renew[ed] his motion." Sampson V, 2015 WL 2962394, at *7.

violates due process. See id. at 2-4, 14 (citing botched executions in Oklahoma and Arizona, litigation about injection protocol in Ohio, and the illegality of electrocution in Nebraska).[44]

Sampson's second challenge to the provision that required this Court to choose a state for the future implementation of Sampson's death sentence relates directly to the "carrying out of a death sentence." Doc. No. 2900 at 15. Specifically, Sampson asserts that there are no established "procedures to ensure compliance with the state law chosen by the sentencing court," creating "an impermissibly high risk of a botched execution." Id. Such a claim is not ripe now for reasons expressed by Judge Wolf as to other challenges Sampson has levied against the manner in which his sentence will be implemented at least "several years" in the future.[45] Sampson V, 2015 WL 2962394, at *7.

The Racial Disparity motion, Doc. No. 1432, is meritless. Sampson V, 2015 WL 2962394, at *15-17. The statistical evidence summarized by the Fell court does not cure the fatal flaw in Sampson's argument. Neither the statistics presented to Judge Wolf in 2015, Sampson V, 2015 WL 2962394, at *16 n.12, nor those identified in Fell, 2016 WL 7238930, at *13, depict racial disparities that exceed in scope those which the Supreme Court found insufficient to

---

[44] Indiana is the location of the federal death row, and is the state in which all three previous federal executions conducted since the enactment of the FDPA have taken place. Under Indiana law, the only available method of execution is lethal injection, Ind. Code § 35-38-6-1(a) (2017), a method which the Supreme Court recently upheld against an Eighth Amendment challenge, Glossip v. Gross, 135 S. Ct. 2726, 2731 (2016); see also Baze v. Rees, 553 U.S. 35, 48 (2008) (noting the Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death" under the Eighth Amendment).

[45] For the same reasons, Sampson's separate motion to bar the death penalty because the FDPA "violates the Tenth Amendment by commandeering state officials and state facilities to be conscripted into conducting federal executions," Doc. No. 2901, is not ripe. It is not now known whether such "commandeering" of officials or facilities will take place when Sampson's death sentence eventually is implemented.

establish a constitutionally significant risk of racial bias in McCleskey v. Kemp, 481 U.S. 279, 354-55 (1987).

The Jurisdiction Specific motion, Doc. No. 1440, is meritless. Sampson V, 2015 WL 2962394, at *13-14. It bears noting that Sampson's geography-based attack on the constitutionality of imposing the death penalty in this jurisdiction is in some sense undermined by the imposition of a death sentence in United States v. Tsarnaev, No. 13-cr-10200, in this very District in the time since Sampson filed his constitutional motions. Cf. Gregg v. Georgia, 428 U.S. 153, 181 (1976) (looking to sentencing decisions of juries as "a significant and reliable objective index of contemporary values" relevant to assessing challenges to the constitutionality of capital punishment).

The Rate of Error motion, Doc. No. 1448, is meritless. Sampson V, 2015 WL 2962394, at *15, *18-21. This motion was renewed, Doc. No. 2172, and denied, Doc. No. 2509, for the same reasons cited by Judge Wolf previously. The Fell decision does not strengthen Sampson's Rate of Error challenge. See 2016 WL 7238930, at *3, *11 (concluding "errors leading to exoneration have not been a feature of FDPA litigation," and noting the Second Circuit's rejection of claims that "the risk of erroneous conviction in a capital case" renders the death penalty unconstitutional).

The General Arbitrariness motion, Doc. No. 1454, is meritless. Sampson V, 2015 WL 2962394, at *15, *21-22. Judge Crawford found that the record in Fell established the "arbitrary imposition of the death penalty through the FDPA," and concluded that this finding calls into question the Supreme Court's holding in Gregg v. Georgia, 428 U.S. 153, 195 (1976), that concerns about arbitrary and capricious imposition of the death penalty "can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information

and guidance." 2016 WL 7238930, at *27-28; but see Gregg, 428 U.S. at 199-200 (specifying that arbitrary decisions to afford mercy and choose not to impose a death sentence would not offend the Constitution). Even if the Court were to adopt those conclusions, it is bound by the Gregg holding "unless and until the [Supreme] Court reinterpets the binding precedent." Sampson V, 2015 WL 7962394, at *4.

The Evolving Standards motion, Doc. No. 1456, is meritless. Sampson V, 2015 WL 2962394, at *8-12. This determination is only bolstered by Fell. 2016 WL 7238930, at *2 (finding no "proof of a national consensus to abolish the death penalty").

The Incomprehensibility motion, Doc. No. 1458, is meritless. Sampson V, 2015 WL 2962394, at *22-24. Judge Wolf considered – and identified significant flaws in – the same sort of evidence material to this motion that the Fell court discussed and credited. Sampson V, 2015 WL 2962394, at *24. This Court adopts Judge Wolf's view of the relevant evidence.

The Mental Illness motion, Doc. No. 1486, is meritless. Sampson V, 2015 WL 2962394, at *12-13. Similarly, Sampson has not established that there is a "national consensus against executing individuals who are criminally responsible and competent, even if they suffer from" traumatic brain injury. Sampson V, 2015 WL 7962394, at *13. Accordingly, his motion for a categorical exemption from the death penalty due to such injury, Doc. No. 2795, also is meritless.

Finally, the Court's rejection of Sampson's renewed motions also amounts to a rejection of his Motion to Reconsider Constitutional Motions, Doc. No. 2794.

### 2. *Motions in Limine*

Sampson offers no new information or legal theories to support the remaining motions in limine and pretrial motions he renews, and the Court perceives no reason to amend its previous

rulings as to these motions.  Accordingly, the Court rejects Sampson's request for a new trial on the basis of its denial of following motions in limine:

The motion to preclude substitute medical examiner testimony, Doc. No. 1893, for the reasons stated in the original ruling, Doc. No. 2431.

The motion to admit testimony of Kevin McNally, Doc. No. 1896-1, for the reasons explained by Judge Wolf as his basis for excluding comparative proportionality evidence, Tr. Hr'g (June 17, 2015), Doc. No. 2014 at 97-101; Doc. No. 1992 at 2.

The motion regarding Sampson's July 31, 2001 interrogations, Doc. No. 1898-1, for the reasons stated in the original ruling, Doc. No. 2434.

The motion regarding Sampson's August 1, 2001 interrogation, Doc. No. 1899-1, for the reasons stated in the original ruling, Doc. No. 2258 at 11-13.

The motion to prohibit cross-examination of Mark Bezy in certain areas, Doc. No. 1900-1, for the reasons stated in the original ruling, Doc. No. 2308.

The motion regarding victim impact evidence, Doc. No. 1901-1, for the reasons stated in the original ruling, Doc. No. 2430.

The motion to dismiss or strike certain aggravating factors and to exclude certain evidence, Doc. Nos. 1904-1, 1910-1, for the reasons stated in the original ruling, Doc. No. 2189, and in the First Circuit's decision affirming that ruling, Sampson v. United States, 832 F.3d 37 (1st Cir. 2016).

The motion to prevent use of certain protected activities, Doc. No. 1906-1, for the reasons stated in the original ruling, Doc. No. 2304.

The objections to the government's omnibus motion in limine, Doc. Nos. 1889, 1918, for the reasons stated in the previous rulings on the issues raised in the omnibus motion, see Doc.

No. 1992 at 2-3 (ruling on certain portions of the motions and citing hearings held by Judge Wolf on June 17 and 19, 2015); Doc. No. 2259 (regarding scope of mitigating evidence); Doc. No. 2283 (regarding standard of proof and allocution).

The motions and briefs regarding USP-Terre Haute evidence, Doc. Nos. 1908-1, 2423, for the reasons stated in the previous rulings as to such evidence, Doc. Nos. 2305, 2507.

The motion to exclude certain testimony by Dr. Geoffrey Aguirre, Doc. No. 2331, for the reasons stated in the original ruling, Doc. No. 2459 at 18-22.

The motion to prohibit the parties from tendering witnesses as experts, Doc. No. 2334, for the reasons stated in the original ruling, Doc. No. 2459 at 65-66.

The motion to exclude testimony by Laurie Herrebrugh, Doc. No. 2484, for the reasons stated in the original ruling, Doc. No. 2512.

The motion to preclude use of audio or video recordings during opening and closing arguments, Doc. No. 2597, because such recordings were used without objection during the 2003 trial, because such recordings are commonly used in other cases in this jurisdiction, and because the Court perceived no risk of misleading or confusing the jury, see Doc. No. 2613 (summarily denying the motion).

### 3.   *Other Pretrial Motions*

Similarly, the Court rejects Sampson's request for a new trial on the basis of its denial of the following pretrial motions:

The motion to disqualify certain members of the government's trial team, Doc. No. 1356, for the reasons stated in the original ruling, Doc. No. 1664 at 45-49.

The motion to compel compliance with a particular discovery request, Doc. No. 1418, for the reasons stated in the original ruling, Sampson V, 2015 WL 7962394, at *21 n.15.

The motion to prevent disclosure to government experts of certain testimony, Doc. No. 1835, for the reasons previously cited by Judge Wolf, Tr. Hr'g (Apr. 15, 2015), Doc. No. 1873 at 75-82.

The motion to trifurcate or bifurcate the proceedings, Doc. No. 1880, for the reasons stated in the original ruling, Doc. No. 2188.

The motion for a change of venue, Doc. No. 1903-1, and the renewals of that motion, Doc. Nos. 2184, 2610, for the reasons stated in previous rulings on this issue, Doc. No. 2258 at 14-15; Doc. No. 2014 at 42-47.

The motion to dismiss and stay proceedings pending reconstitution of the jury wheel, Doc. No. 2030-1, and the renewal of that motion, Doc. No. 2638, for the reasons stated in the original ruling, Doc. No. 2258 at 4-11.[46]

The motion for disclosure of jury records, Doc. No. 2031-1, for the reasons stated in the original ruling, Doc. No. 2258 at 2-4.

The motion to prohibit the government from striking prospective jurors based on their death penalty views, Doc. No. 2044-1, which was denied at the conclusion of jury selection insofar as it was inconsistent with the law governing the selection of impartial jurors in a capital case, Doc. No. 2757 at 28; see Doc. No. 2556 at 1-4 (describing the relevant law as applied in this case).

---

[46] Sampson's renewal of the motion argued that the Court's Jury Office improperly treated Massachusetts criminal charges that were "continued without a finding" ("CWOF") under state law as convictions for purposes of the Jury Selection and Service Act ("JSSA"), 28 U.S.C. § 1861 et seq. Doc. No. 2639. The Court denied the renewed motion, Doc. No. 2644, having concluded that, even assuming that in certain instances disqualifying a juror on the basis of a CWOF would be improper, there was no basis for a finding in this case that there was a "substantial failure" to comply with the JSSA. United States v. Royal, 174 F.3d 1, 11 (1st Cir. 1999).

The motion to preclude the death penalty based on terminal illness, Doc. No. 2175, for the reasons stated in the original decision, Doc. No. 2258 at 13-14.

The motion for sentence correction, Doc. No. 2217, for the reasons stated in the original decision, Doc. No. 2282.

The motion for reconsideration of rulings based on Hurst v. Florida, 136 S. Ct. 616 (2016), Doc. No. 2171, for the reasons stated in the original decision, Doc. No. 2283 at 2-9.

The motion to preclude the death penalty because exculpatory and mitigating information is no longer available, Doc. No. 2494, which was denied, Doc. No. 2533, because Sampson cited no legal authority directly supporting the extraordinary remedy the motion sought, and because he did not establish prejudice sufficient to warrant such a remedy here.[47]

The motion to continue the trial and for eight additional peremptory challenges, Doc. No. 2465, which was denied, Doc. No. 2510, because Sampson failed to demonstrate that the events underlying the motion so tainted the jury pool that his right to a fair trial before an impartial jury was impaired.[48]

The motion to dismiss the jury panel due to misconduct and taint, Doc. No. 2640, which was denied, Doc. No. 2642, because Sampson's concerns about juror taint and veracity as a general matter were not borne out by the Court's observations and colloquies with jurors throughout the selection process.

---

[47] The Court notes that, with the government's agreement, declarations provided by six individuals to defense investigators were read to the jury and admitted as evidence in the defense case, where those witnesses had died before the new penalty-phase trial. This undermines Sampson's claim that the passage of time rendered him wholly unable to present and argue such information in his second trial.

[48] The Court further notes that the jury selection process in this case did not reveal a venire saturated with prospective jurors who were tainted by the events cited in Sampson's motion.

Q.  Cumulative Error

In the penultimate claim of his post-trial motion, Sampson asserts that the sixteen challenges levied before it amount to "a column of errors" which had "a logarithmic effect" in his case, "producing a total impact greater than the arithmetic sum of its constituent parts." Doc. No. 2930 at 99 (quoting Sampson III, 486 F.3d at 51).  Because the Court has found no error in Sampson's second trial, there are no "constituent parts" capable of generating a prejudicial cumulative error here.[49]

R.  As-Applied Constitutional Challenge

Sampson's final claim is a novel one.  Though he acknowledges the Court's rejection of his various constitutional challenges and its resulting conclusion that the FDPA can be applied constitutionally "in many cases," he urges the Court to consider the specific circumstances of this case – as they unfolded throughout the trial – and to conclude that the FDPA is unconstitutional as applied here, to Sampson.  Doc. No. 2931 at 2-4.  He bases this claim on two primary assertions:  first, that "the facts and circumstances of" Sampson's "case [are] such that the risk that constitutionally protected mitigation [was not] properly comprehended and accounted for by the" jury, id. at 4, 6-15; and second, that "the procedural safeguards presumed

---

[49] To the extent Sampson asserted a blanket challenge to every ruling rendered adverse to him throughout these proceedings, see Doc. No. 2930 at 5 (purporting to "renew[] in their entirety [Sampson's] motions, objections, and other requests from his sentencing, previously raised by him and denied by the Court"), such a challenge is rejected.  None of the specific rulings identified by Sampson throughout his motion were error justifying a new trial, nor has the Court's review of the record in this or any other context suggested to it that justice was miscarried at any point during the proceedings culminating in the re-imposition of Sampson's death sentence for the carjacking and killing of Mr. Rizzo.  See Zannino, 895 F.2d at 17 (citing rule that claims raised without developed argument and support are waived).

to guard against arbitrariness and unreliability [under the FDPA] have failed in this case," id. at 15-21.[50]

This claim fails primarily for two reasons. First, it essentially amounts to a synthesis of a number of his other claims, previously rejected by the Court, into one overarching appeal for relief. Specifically, the motion cites circumstances including Sampson's relationship with his defense team and the issues underlying the competency motion, the possibility that jurors gave mitigating factors no effect or aggravating effect, the Court's rulings related to the admissibility of antisocial personality disorder diagnoses, and the government's reference to certain mitigators as things Sampson should not "get credit for." Id. at 4-15. The Court has considered facts and law related to each of these issues in rejecting other challenges discussed earlier in this Memorandum, including a separate cumulative error challenge. The combination of the claims here cannot establish a cumulative constitutional error where none of the individual underlying claims established error in the first instance.

Second, the record as it stands now does not support a finding that any safeguard necessary to a constitutional scheme of capital punishment broke down in this case, such that Sampson's sentence is unconstitutional. There is no evidence before the Court suggesting that the jurors who deliberated in this case could not comprehend the information presented to them, were confused by the process they were required to apply when deliberating, were exposed to and considered inadmissible or unduly prejudicial information, improperly treated mitigating information as aggravating, or otherwise disregarded the Court's instructions. The Fell hearings

---

[50] Sampson cites no case in which any other court has considered, let alone endorsed, an argument such as this one. The novelty of the argument, however, does not render it unclear or incoherent, as the government's ad hominem response to it suggests. Doc. No. 2964-1 at 56. Given the seriousness of this case, the Court evaluated this claim without the benefit of meaningful input from the government.

do not change this assessment for reasons already discussed. § III(P)(1), supra. Sampson's challenges to the government's decision to pursue a death sentence in this case were the subject of motions previously litigated and denied, and no new information is before the Court now that bears on those decisions.

In these circumstances, the Court finds no errors in the FDPA process as it has been applied in Sampson's case. Without such errors, there is nothing to compound, and nothing to deem harmless. Doc. No. 2931 at 21 (citing Chapman v. California, 386 U.S. 18, 24 (1967)). Therefore, Sampson's eighteenth claim cannot justify a new trial.

### S.  Scope of Rebuttal

Sampson's reply brief contains what the Court construes as a nineteenth claim in support of his post-trial motion. He asserts that the Supreme Court's March 2017 decision in Moore v. Texas, 137 S. Ct. 1039 (2017), "demonstrates that it was error to rule that the government would be allowed to rebut the defense brain impairment claim through cross-examination or expert evidence to the effect that Mr. Sampson has antisocial personality disorder." Doc. No. 2973 at 6. In so arguing, Sampson continues to press a "rigid limitation" on the scope of relevant rebuttal evidence which the Court previously has rejected as "elevat[ing] semantics over substance." Doc. No. 2459 at 44-45. Sampson invokes language from Moore to urge that, notwithstanding the broad scope of relevant information admissible during the penalty phase of a capital trial conducted pursuant to the FDPA, the government may not offer evidence that a personality disorder better explains a defendant's reprehensible actions than a (co-existing) traumatic brain impairment. Doc. No. 2973 at 6-9. This argument unmoors Moore (and decisions preceding it, upon which Sampson relied in previous iterations of this claim) from its proper foundation.

Moore concerns a defendant's claim that he may not constitutionally be executed due to intellectual disability. The fact that a defendant advancing such a challenge to his impending execution may also suffer from a personality disorder or other mental illness is immaterial to a determination of whether that defendant suffers from an intellectual disability of such severity that the Eighth Amendment precludes his execution.[51] Moore, 137 S. Ct. at 1048, 1051. In this penalty-phase trial, the questions presented to the jury regarding Sampson's mental impairments were not so discrete. By alleging as a mitigating factor that Sampson suffered from a traumatic brain impairment after one or more head injuries, the defense opened the door to the jury's consideration of a series of related questions as it deliberated about the appropriate sentence in this case, including: Did Sampson suffer from traumatic brain impairment? How severe was it? To what extent did it impact or explain his conduct in late July 2001? Did Sampson suffer from any other mental illness, such as a personality disorder? To what extent might another disorder better explain his criminal conduct? How much mitigating effect should be assigned to the fact that Sampson suffered from a brain injury, either instead of or in addition to other disorders?

In this context, the government was entitled to respond to Sampson's evidence of brain injury and related impairments with information that he might (also) suffer from antisocial personality disorder – and to argue that, as a result, evidence of Sampson's mental impairments as a general matter was entitled to less mitigating effect than the defense suggested. Cf. Sampson III, 486 F.3d at 50 (noting mental health evidence in first trial was "freighted with contradictions," and concluding jury could have found defense presentation regarding bipolar

_____

[51] Neither the Court nor the government in this case took the position that a person suffering from antisocial personality disorder could not also suffer from brain injury or an intellectual impairment. Such a view, as the Supreme Court noted in Moore, is roundly rejected by mental health professionals. 137 S. Ct. at 1051.

disorder and other mental health history was rebutted by evidence regarding antisocial

personality disorder and observations by witnesses who described Sampson as "calm, polite, and

capable of normal discourse with others" in the midst of "his week-long killing spree"). For

these reasons, Moore provides no avenue to relief for Sampson here.

IV.    REMAINING DISPUTES REGARDING UNSEALING OF PAPERS

Throughout the pretrial proceedings and during the trial in this case, filings and

proceedings on a number of topics were conducted under seal, primarily to avoid tainting the

pool of prospective jurors with (and, later, to minimize the risk of exposing selected jurors to)

information that would not be offered or was not admissible as evidence during the trial. This

concern was particularly acute given the high profile nature of the case and the fact that it was

being retried as a result of a juror problem which infected the 2003 trial. In March 2017, the

Court sought the parties' input regarding the extent to which sealed items on the docket should

be unsealed in the wake of the jury's verdict and the Court's imposition of sentence. Doc. No.

2934. By agreement of all counsel, about 250 docket entries were unsealed at that time. Doc.

No. 2943. The Court held under advisement the parties' dispute as to whether two categories of

documents should remain under seal. Id. at 3. Those categories include a defense motion and

supporting memorandum containing the defense team's October 31, 2016 request to withdraw as

counsel, and defense filings and expert reports regarding Sampson's competency to stand trial.

Doc. No. 2940 at 5-6.

The government urges the Court to unseal both groups of documents, citing the public's

right of access to information related to important issues litigated by the parties and decided by

the Court. Id. at 6-8. Sampson argues that the identified documents contain information that is

protected by his Fifth Amendment right against self-incrimination, the attorney-client privilege,

the work-product doctrine, and his expectation that his medical and mental health history will remain private.  Id. at 8-10.  He claims these protections persist even though the trial has concluded, and suggests the public's right of access to information pertinent to the Court's competency decision is satisfied by other competency-related items which were unsealed by agreement of the parties.  Id.

After carefully considering the parties' arguments and weighing the interests Sampson cites against the presumption that the public has a right to access judicial records impacting the Court's "disposition of substantive rights," United States v. Kravetz, 706 F.3d 47, 56-59 (1st Cir. 2013), the Court concludes that all but three of the disputed items will be unsealed.  In reaching this determination, the Court relies on the same analysis that Judge Gergel thoughtfully explained in his decision unsealing similar categories of information following the capital trial of Dylann Roof in the District of South Carolina.  See Doc. No. 2971-1 at 6-8 (finding that protections for mental condition information provided in Rule 12.2 do not permit sealing of materials filed in connection with a competency evaluation conducted at the defendant's request, and that all cited privileges against disclosure had been waived or had dissipated in the wake of the imposition of sentence).[52]

---

[52] To the extent Sampson bases his privilege claims on the Court's prior orders noting the possible application of the cited privileges to certain competency materials, e.g., Doc. No. 2708, those orders set guidelines for the proper use of such materials while the trial was imminent or in progress.  They did not constitute the Court's final and considered determination as to whether such privileges applied to the relevant documents.  Moreover, the privileges Sampson invokes do not apply now in the same way they might have applied before the jury rendered its sentencing verdict and that sentence was imposed by the Court, and before extensive information about Sampson's physical and mental health were offered by the defense during the public trial.  See Minnesota v. Murphy, 465 U.S. 420, 426 (1984) (explaining that convicted and imprisoned defendants do not lose the Fifth Amendment's protections as to compelled, incriminating statements sought to be admitted "in a subsequent trial *for a crime other than that for which he has been convicted*" (emphasis added)); see also Doc. No. 2971-1 at 8-9 n.1 (finding "the possibility that appeals of or collateral attacks on" a conviction "might result in a new trial" – a

Accordingly, the Clerk is hereby directed to UNSEAL the following docket items **two weeks after the date of this Memorandum and Order**:

- Ex Parte Defense Counsel Motion to Withdraw Because of Conflict of Interest and an Irreconcilable Breakdown in the Attorney-Client Relationship, Doc. No. 2628;

- Ex Parte Memorandum in Support of Defense Counsel Motion to Withdraw Because of Conflict of Interest and an Irreconcilable Breakdown in the Attorney-Client Relationship, Doc. No. 2629;

- Defense Memorandum in Support of Oral Motion for Competency Evaluation and Hearing, Doc. No. 2627;

- Competency Report by Dr. George Woods, Doc. No. 2698; and

- Forensic Psychiatric Evaluation by Dr. Debra A. Pinals, M.D., Doc. No. 2879.

Two disputed items do not appear on the docket.[53] Both were created by defense counsel and provided to Dr. Pinals, the court-appointed competency examiner, in connection with her examination of Sampson. The parties gathered and provided to Dr. Pinals a host of records in connection with her evaluation; most of those records were not docketed or reviewed closely by the Court. Although the Court did receive and review the two items listed among those the

---

possibility which "exists until Defendant's death" – insufficient to overcome "the public's First Amendment right of access to capital criminal proceedings" and justify sealing "every judicial document that would be potentially inadmissible as evidence at a hypothetical future trial"). The Court does not construe the defense's disclosure of the relevant materials to the government pursuant to the Court's previous orders as having operated to waive the cited privileges. Rather, it concludes that the disputed items either were not protected from disclosure by the cited privileges in the first instance, or are no longer protected from disclosure by interests sufficient to outweigh the public's right of access.

[53] These items are a November 10, 2016 Memorandum of Trial Counsel Regarding Interactions with Mr. Sampson in October and November 2016, and a November 25, 2016 Declaration of Danalynn Recer Regarding Competency. Doc. No. 2940 at 6 (items 2(b) and (c)).

parties now dispute, it did not take any judicial action relying on them (except insofar as Dr. Pinals cited and relied upon them in reaching her conclusions, upon which the Court did rely in resolving Sampson's competency motion). Accordingly, the items are not "judicial records," Kravetz, 706 F.3d at 54, and the Court will not now require their docketing or their unsealing. The only information derived from these items to which the public has a right of access is anything discussed by Dr. Pinals in her report, which will be unsealed.

One other disputed item shall remain sealed. That item – a competency report prepared by Dr. Bryon Herbel in September 2014 – was prepared pursuant to a court-ordered competency assessment to which both parties objected at the time. As such, the report falls within the scope of Rule 12.2 and the protections against disclosure it provides. See Fed. R. Crim. P. 12.2(c) (governing disclosure of court-ordered competency assessments, and of evaluations prepared in connection with defense notices of intent to pursue an insanity defense or to offer expert mental condition evidence during the guilt or penalty phase of a capital trial). No judicial action was taken at the time the report was submitted. See United States v. Sampson, 82 F. Supp. 3d 502, 521 (D. Mass. 2014) (concluding no further proceedings with respect to Sampson's competency were required at that time, since the report's conclusion was consistent with the view of all counsel that Sampson was competent to stand trial). To the extent the experts assessing Sampson's competency during the 2016 trial referenced or relied on Dr. Herbel's report in rendering their opinions, the unsealing of the reports by Dr. Woods and Dr. Pinals is sufficient to satisfy the public's right of access to any relevant portions of Dr. Herbel's report.

V.    CONCLUSION

For the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that Sampson's post-trial motion (Doc. No. 2929) is DENIED; his motion to reconsider previous

constitutional motions (Doc. No. 2794) is DENIED; his motion to bar the death penalty due to traumatic brain injury (Doc. No. 2795) is DENIED; his motion to bar the death penalty due to unguided discretion as to the location of his execution (Doc. No. 2899) is DENIED without prejudice insofar as it asserts a challenge that is not yet ripe, and otherwise is DENIED; and his motion to bar the death penalty on Tenth Amendment grounds (Doc. No. 2901) is DENIED without prejudice.

The Clerk is hereby ORDERED to unseal the docket entries identified in section IV, supra, two weeks from the date of this Memorandum and Order.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge